IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(NORTHERN DIVISION)

| | |
|---|---|
| B. DIANE TAMARIZ-WALLACE<br>3069 Solomons Island Road<br>Edgewater, Maryland 21037 | *<br><br>* |
| and | * |
| DIANE TAMARIZ & ASSOCIATES, P.A.<br>3069 Solomons Island Road<br>Edgewater, Maryland 21037 | *<br><br>* |
| and | * |
| MORAN INSURANCE SERVICES, INC.<br>696 Ritchie Highway<br>Severna Park, Maryland 21146 | *<br><br>* |
| Plaintiffs | * |
| v. | * |
| NATIONWIDE MUTUAL INSURANCE<br>  COMPANY | * |
| and | |
| NATIONWIDE BANK | * |
| and | * |
| CORRIGAN INSURANCE, INC.<br>8951 Edmonston Road<br>Greenbelt, Maryland 20770<br>SERVE ON: William P. Corrigan, Jr.<br>1305 St. Paul Way<br>Crownsville, Maryland 21032 | *<br><br>*<br><br>* |
| and | * |
| WILLIAM P. CORRIGAN, JR.<br>1305 St. Paul Way<br>Crownsville, Maryland 21032 | *<br><br>* |

1

|  |  |  |
|---|---|---|
| and | * | |
| C.W. "KIP" HAYES, III | * | |
| 129B Mitchell Chance Road | | |
| Edgewater, Maryland 21037 | * | |
| and | * | |
| CHARLENE E. HARDEE | * | |
| 129B Mitchell Chance Road | | |
| Edgewater, Maryland 21037 | * | |
| and | * | |
| SAMUEL BRADSHAW, IV | * | |
| 7125 Columbia Gateway Drive, Suite 350 | | |
| Columbia, Maryland 21045 | * | |
| and | * | |
| JOHN PAUL PURSSORD | * | |
| 7125 Columbia Gateway Drive, Suite 350 | | |
| Columbia, Maryland 21045 | * | |
| Defendants | * | Civil No. WDQ-09-667 |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## AMENDED COMPLAINT

COMES NOW, the Plaintiffs, B. Diane Tamariz-Wallace, Diane Tamariz & Associates, P.A., and Moran Insurance Services, Inc., by and through their attorneys, HILLMAN, BROWN & DARROW, P.A. and Michael P. Darrow, pursuant to FRCP 15(a) (2009) and for their Amended Complaint states as follows:

    1.    Defendant, Nationwide Mutual Insurance Company (Nationwide), is a corporation, created under the laws of Ohio, that carries on a regular business in Anne Arundel County, Maryland.

    2.    Defendant, Nationwide Bank is a federally chartered bank which carries on regular business in Anne Arundel County, Maryland, and was formerly known as Nationwide Federal Credit Union.

    3.    Defendant, Corrigan Insurance, Inc. is a Maryland corporation carrying on regular business in Anne Arundel County, Maryland.

4. Defendant, William P. Corrigan, is a resident of this State and regularly carries on business in Anne Arundel County, Maryland.

5. Defendant, C.W. "Kip" Hayes, III, is a resident of this State and regularly carries on business in Anne Arundel County, Maryland.

6. Defendant, Charlene E. Hardee, is a resident of this State and regularly carries on business in Anne Arundel County, Maryland.

7. Defendant, Samuel Bradshaw, IV, is a resident of this State and regularly carries on business in Anne Arundel County, Maryland.

8. Defendant, John Paul Purssord, is a resident of this State and regularly carries on business in Anne Arundel County, Maryland.

9. Plaintiff, B. Diane Tamariz-Wallace (Tamariz-Wallace), is a resident and is employed in Anne Arundel County, Maryland.

10. Plaintiff, Diane Tamariz & Associates, P.A. ("DTA"), is a Maryland corporation with its principal place of business in Anne Arundel County, Maryland.

11. Plaintiff, Moran Insurance Services, Inc. (MIS), is a Maryland corporation with its principal place of business in Anne Arundel County, Maryland.

12. Tamariz-Wallace is the sole owner and shareholder of DTA and MIS.

13. Tamariz-Wallace has been an insurance agent for Nationwide for approximately 19 years, until her recent termination by Nationwide.

14. In 2004, Tamariz-Wallace formed DTA.

15. Shortly thereafter, Tamariz-Wallace and DTA entered into their first Corporate Agency Agreement with Nationwide. Attached hereto and incorporated herein as Exhibit A is a copy of the Corporate Agency Agreement.

16. Under the Corporate Agency Agreement, Tamariz-Wallace and DTA were exclusive agents for Nationwide, selling property, casualty, life, health and variable products.

17. Tamariz-Wallace was consistently an award-winning producer for Nationwide and one of their top twelve leading Nationwide agents in the Country in 2005 and 2006.

18. In the Fall of 2003 Nationwide began aggressively recruiting Tamariz-Wallace to participate in their "Independent Agency Acquisition" program (IAA).

19. Through the IAA program Nationwide targeted its highest producing agents to expand Nationwide's businesses by buying up independent (non-exclusive and non-Nationwide)

agencies. Through the IAA Nationwide could expand their own revenue and customer base by having otherwise exclusive agents buy independent agencies and then convert/transfer accounts of the purchased agency over to Nationwide. Rather than renegotiating or amending the exclusive agency agreements Nationwide would simply overlook the obvious breach of the exclusivity clause because it served their best interests, although putting the agent into a continual and ongoing breach of their exclusivity clause in their Corporate Agency Agreement. This way, Nationwide would always have the option to enforce the exclusivity clause at their will and whim.

20. Agents were induced to participate in IAA with promises of a vastly increased revenue stream in the form of increased ordinary Nationwide commission revenue stream and handsome annual contingency commission bonuses as the purchased accounts were transitioned into new Nationwide policies. However, any rights of ownership to the policies and premium/income generated by the policies, once transferred, belonged solely to Nationwide, not the agent. The agents however had to keep servicing the accounts and to win the customer's business back at each renewal to earn another commission for that customer.

21. Due to the nature of the exclusive agents' agreement, the fact that the commission revenue of an insurance agency is not considered a hard asset and the fact that the agent would not "own" the book of business, commercial lending institutions were unwilling to loan the purchase money necessary for the targeted agents, including B. Diane Tamariz-Wallace, to participate in the IAA program and buy the targeted independent agency.

22. Cognizant of the fact that the targeted Nationwide agents would not be able to secure typical commercial lending programs to purchase the independent agencies, Nationwide employed a scheme through Nationwide Bank, formerly known as Nationwide Federal Credit Union, whereby agent participants in the IAA program could pledge their Nationwide retirement plan as collateral on a loan. This included the agent's accrued Deferred Compensation Incentive Credits (DCIC), and Agency Security Compensation (ASC), both of which obligated Nationwide to pay out benefits to agents in the future like in a pension system.

23. When the IAA participating agents' loans went into default as a result of Nationwide's refusal to write new or renew existing policies and write the volume of business represented prior to the independent agency's purchase, the elite agents targeted to participate in the IAA program were unable to make Nationwide's projected minimums in their revenue flow.

The agents would default on their loans and forfeit their substantial Agency Security Compensation package, including their substantial and, from Nationwide's standpoint, expensive, DCICs and ASC.

24. In the case at bar, Nationwide solicited the IAA to Tamariz-Wallace and represented that they wanted to expand their commercial product sales and market share in Maryland. George T. Moran, Inc. (GTM), a local and well established independent agency specializing in medium to large premium commercial accounts, was identified as a uniquely desirable acquisition candidate, as Nationwide expressed its desire to Tamariz-Wallace to expand its existing market deeper into commercial insurance lines.

25. Nationwide induced Tamariz-Wallace to participate in the IAA program by promising and projecting a steady revenue stream and large annual contingency bonus payouts which in retrospect were unrealistic and unattainable.

26. Tamariz-Wallace attempted to obtain purchase money loans to acquire GTM from non-Nationwide affiliated banks and was flatly and repeatedly denied, as expected by Nationwide.

27. After her loan applications were denied by other lending institutions, Tamariz-Wallace informed Nationwide that she was withdrawing from the deal, the IAA and not acquire GTM. Nationwide in reaction, immediately proposed that Tamariz-Wallace finance the transaction through the Nationwide Federal Credit Union, using her agency security compensation (ASC) plan and DCIC as collateral. Nationwide, desperate to push this acquisition, also agreed to guarantee the loan from Nationwide Federal Credit Union, since the Credit Union could not make these types of loans without further security.

28. Nationwide represented that Tamariz-Wallace and DTA would be able to payback the loan in less then 12 years and that, if benchmarks in the standard acquisition agreement pro forma drafted by Nationwide were met, certain debt obligations would be forgiven and wiped clean. Based on Nationwide's representations regarding the transferability of non-Nationwide accounts from GTM and substantial annual contingency payouts, Tamariz-Wallace was led to believe that she would be able to meet her loan payments from the contingency monies alone, and would profit immediately by earning commissions on the business she sold just as she always had.

29. In reliance on Nationwide's representations: that, among other things, they would provide the loan to support the acquisition; that Tamariz-Wallace would receive substantial contingency payouts more than doubling what would be available without the acquisition from which she could make her loan payments, as well as increased ordinary commissions from the volume of purchased accounts being transitioned to Nationwide; that Nationwide would continue to underwrite the same types and classes of policies and products that comprised GTM's commercial customer book; and that Nationwide would offer equal or better coverage at equal or better premiums, Tamariz-Wallace went forward with the deal and signed the loan documents to borrow from Nationwide Federal Credit Union.

30. During the due diligence period of the acquisition negotiations, Nationwide represented that approximately $5.327 million in premium from active non-Nationwide accounts at GTM were eligible for conversion/transfer to Nationwide and thus would account for direct income to Tamariz-Wallace upon conversion/transfer of those accounts. Nationwide represented that they would continue to be a competitive market for the types and kinds of business written by GTM, that they would be committed to staying in and competing with other insurers in the medium to large business commercial market, that they would provide equal or better coverage and service on existing GTM accounts, that they would underwrite on an account basis the GTM accounts with multiple policies, and that they would be competitive in terms of their information technology, processing and agent and customer support systems and personnel.

31. In reliance on Nationwide's representations, DTA executed a Credit Agreement and Promissory Note on April 26, 2005, which is attached hereto and incorporated herein as Exhibit B.

32. Contemporaneously with the execution of the note, DTA executed a Security Agreement granting Nationwide a security interest in "all commissions, extended earnings, deferred compensation incentive credits, bonuses…and any other compensation now due or becoming due under the Agent's Agreement…" Attached hereto and incorporated herein as Exhibit C is a copy of the Security Agreement.

33. With the money from the IAA loan Tamariz-Wallace and her own funds purchased GTM at a cost of $3 million.

34. Tamariz-Wallace created MIS in August of 2005 to be a conduit for the Nationwide business written from GTM, while still using the good will and name recognition of

6

"Moran Insurance." A Corporate Associate Agency Agreement was executed by DTA and MIS on or about August 26, 2005, which is attached hereto and incorporated herein as Exhibit D.

35. GTM has no involvement in the matters at issue in this litigation and is a separate and independent corporate entity from the Plaintiffs. The independent brokerage and corporate status of GTM has never changed.

36. Almost immediately after the acquisition of GTM was complete, Tamariz-Wallace realized that Nationwide had been in the process of re-writing its commercial underwriting and eligibility guidelines. Nationwide implemented new commercial guidelines for commercial underwriting soon after the GTM settlement in 2005. These new guidelines, were not taken into account by the pro forma analysis which the Defendant used to induce Tamariz-Wallace into borrowing the acquisition funds to acquire GTM. The new guidelines resulted in higher premiums on policies that Nationwide would even consider writing and vastly reduced Nationwide's new commercial account acceptance, dramatically reducing Nationwide's competitive position in the marketplace, and its ability to maintain a steady renewal rate, specifically for medium to large business policies, which made up the majority of GTM's book of business.

37. Tamariz-Wallace and MIS presented over $21 million in accounts for conversion to Nationwide in 2005, 2006 and 2007 mostly from GTM's existing book of business.

38. Nationwide actually qualified as eligible for underwriting only approximately $2.9 million, as opposed to Nationwide's representations to induce Tamariz-Wallace to participate in the IAA program that GTM possessed at least $5 million in qualified accounts.

39. Additionally, Nationwide provided such poor customer service, poor account management support and servicing options on the policies that were actually converted/transferred to Nationwide that Plaintiffs lost additional business and policy sales and renewals due to dissatisfied customers.

40. Tamariz-Wallace has to date paid a total at least 1 million dollars toward the $2.3 million due under the loan from Nationwide Bank. However, as a result of Nationwide's actions and refusal to transfer and write policies as they had promised, Tamariz-Wallace, DTA and MIS were unable to meet their payment obligations on the IAA loan and went into default under the terms of the Promissory Note.

41. On or about November 3, 2008, Tamariz-Wallace's agency contract with Nationwide was terminated. Plaintiffs were informed that they were no longer authorized to sell Nationwide products.

42. Nationwide did not cancel or terminate DTA or MIS as its agents, and in breach of the agency contracts (attached as exhibits A and D), Nationwide has failed and refused to provide DTA or MIS with their commissions, or their electronic data stored on Nationwide's computer systems since terminating Tamariz-Wallace.

43. Estimated commissions from November 3, 2008 to March 15, 2009 amount to approximately $143,000.00 for DTA and $80,000.00 for MIS.

44. Upon termination, Nationwide cut off Plaintiffs access to Nationwide's computer system, which contained Plaintiffs' personal information and business records, in addition to data and policy information belonging to Nationwide. Plaintiffs have not been permitted any access to the information stored in the frozen computer system. Plaintiffs have on several occasions demanded access to the stored information and data, but have not been given any response what so ever by Nationwide its counsel.

45. In addition to their unauthorized and wrongful exercise of dominion over Plaintiffs personal information and business records contained on the frozen computer system, Nationwide has seized and denied Plaintiffs access to thousands of pages of documents containing business records and personal information.

46. Despite this, Plaintiffs customers continue to receive automated phone calls and mailings purporting to be from Tamariz-Wallace or DTA. These communications represent that Tamariz-Wallace and DTA continue to service Nationwide accounts. For example, customers have received what appear to be account statements with Tamariz-Wallace's name over another Nationwide agent's address and contact information.

47. Plaintiffs have recently learned that customers have also been receiving defamatory correspondence claiming that Nationwide has received what appear to be forged cancellation notices from Plaintiffs' customers. These correspondence insinuate that the Plaintiffs were forging customers' signatures on cancellation notices submitted to Nationwide.

48. Plaintiffs have also discovered that Nationwide Agents and employees, including but not limited to, Corrigan Insurance, Inc., William P. Corrigan, Jr., C.W. "Kip" Hayes, III, Charlene E. Hardee, Samuel Bradshaw, IV, and John Paul Purssord, have made or permitted the

publication of defamatory comments about Tamariz-Wallace and DTA to customers which are more fully described below.

49.     These defamatory comments include, but are not limited to: representing that Tamariz-Wallace and DTA have been ripping customers off for years, that she and DTA have misappropriated customer payments, that she and DTA have refused to give customers discounts to which they were entitled so she could keep the money for herself, has had an employee quit because of "shady operations", etc.

50.     Nationwide and the other named defendants are using and misappropriating, Plaintiffs' strong reputation and customer relationships which had been established over many years, by using correspondence using the Plaintiffs' names to lure customers to the offices of Corrigan Insurance, Inc and Kip Hayes, the customers expecting to meet with the Plaintiffs, and then attempting to frighten Plaintiffs' customers in person by making said defamatory and slanderous statements which are designed to and have the effect of reducing and injuring the Plaintiffs' reputations for honesty, loyalty to their customers and trustworthiness.

51.     Prior to default on the Promissory Note, Tamariz-Wallace had been in constant communication with Nationwide executive leadership, including Kirt Walker, President of Eastern Operations, and Mark Berven, Regional Vice President, regarding Nationwide's debilitating new underwriting guidelines and their refusal to honor their prior representations and new business opportunities and meet the minimum renewal guidelines upon which Tamariz-Wallace had based her decision to purchase GTM and execute the IAA loan.

52.     In response, Nationwide proposed that the parties participate in mediation and a mediated agreement was reached on June 11, 2008. Attached hereto and incorporated herein as Exhibit E is a copy of the June 17, 2008 letter from Plaintiffs' counsel to Nationwide setting forth the terms of the Mediated Agreement.

53.     Pursuant to the Mediated Agreement, Nationwide agreed reduce the remaining principal on the loan to $1.3 million, refinance the balance to a 20 year repayment period at prime plus one percentage point interest, to "retire" the first 12 payments under the refinanced loan, and to allow Tamariz-Wallace to act as a non-exclusive agent for a period of 2 years in regard to commercial policies, in addition to certain other provisions regarding tax liability.

54.     In material breach of the Mediated Agreement, Nationwide filed suit against Tamariz-Wallace, DTA, and GTM in Ohio on or about November 3, 2008, claiming, among

other things that Nationwide Bank had assigned the Promissory Note and the Security Agreement to Nationwide, who in turn accelerated the loan.

55.   That case was subsequently removed to United States District Court, where Nationwide is claiming substantial damages attorney's fees, as well as $2,182,162.45 due on the loan plus default interest on the outstanding balance of the loan, and an injunction.

56.   Aside from the amount claimed in Nationwide's suit, which does not appear to properly take into account Plaintiffs' prior monthly payments on the loan, Plaintiffs have not received any accounting or statement regarding her outstanding balance on the loan or the status of her DCIC or ASC, despite Plaintiffs' repeated demands and requests.

## COUNT I –BREACH OF CONTRACT
## (NATIONWIDE)

57.   Plaintiffs incorporate the allegations contained in paragraphs 1 through 56 of the above-captioned Complaint as if fully restated herein.

58.   For the reasons stated above, Defendant Nationwide Mutual Insurance Company failed to properly service and transfer Plaintiff's customers' accounts and refused to write insurance policies on competitive terms and further breached the Corporate Agency Agreement and Corporate Associate Agency Agreement.

59.   As a result of Defendant's breach Plaintiffs' have been exposed to millions of dollars in liability and attorneys fees, and have been damaged by loosing business and commissions.

WHEREFORE, Plaintiffs pray that this Honorable Court:

a.   Grant them judgment as to Count I of their Complaint.

b.   Award Plaintiffs compensatory damages in the amount of $3,500,00.00 and attorney's fees and costs of suit.

c.   For such other and further relief as the nature of this cause may require.

## COUNT II –BREACH OF CONTRACT
## (NATIONWIDE)

60.   Plaintiffs incorporate the allegations contained in paragraphs 1 through 59 of the above-captioned Complaint as if fully restated herein.

61.   For the reasons stated above Defendant Nationwide Mutual Insurance Company breached DTA and MIS' Corporate Agency Agreement and Corporate Associate Agency

10

Agreement by failing to provide payment of DTA and MIS' commissions after terminating Tamariz-Wallace in November of 2008. MIS and DTA to date have not had their agency agreements terminated, but have not been paid their commissions for policies they sold under their contracts with Nationwide.

62.  As a result of Defendant's breach, Plaintiffs have suffered the loss of commissions owed to them in the total amount of approximately $223,000.00.

WHEREFORE, Plaintiffs pray that this Honorable Court:

a.  Grant it judgment as to Count II of their Amended Complaint.

b.  Award Plaintiffs compensatory damages in the amount of $250,000.00 and attorney's fees and costs of suit.

c.  For such other and further relief as the nature of this cause may require.

## COUNT II (IN THE ALTERNATIVE) –DECIET/FRAUD
## (NATIONWIDE & NATIONWIDE BANK)

63.  Plaintiffs incorporate the allegations contained in paragraphs 1 through 62 of the above-captioned Complaint as if fully restated herein.

64.  As stated above, Defendants made knowing or reckless false representations and concealments, including but not limited to, that Tamariz-Wallace would receive substantial contingency payouts more than doubling what would be available without the acquisition, that there would be increased ordinary commissions from the volume of purchased accounts being transitioned to Nationwide, that Nationwide would continue to underwrite the same classes of cases that comprised GTM's commercial customer book and that Nationwide would offer equal or better coverage at equal or better premiums with the intent of inducing Plaintiffs to participate in the Independent Agency Acquisition Program, executing the Credit Agreement and Promissory Note, the Security Agreement and the Corporate Associate Agent Agreement, and having Plaintiff, Tamariz-Wallace, forfeit her Nationwide retirement (DCIC and ASC) benefits.

65.  In justifiable reliance on Defendants' false representations Tamariz-Wallace purchased GTM, accepted a loan from Defendant, and Plaintiffs entered into the Corporate Associate Agent Agreements and other agency contracts.

66.  As a result of Defendants' false representations and concealments, Plaintiffs were forced to default on their note and are unable to perform under the terms of their agreements.

11

67. Plaintiffs' now face potential liability greatly in excess of the $2,182,162.45 due on the loan and have been sued by Defendants for damages as well as payment of the accelerated note.

WHEREFORE, Plaintiffs pray that this Honorable Court:

a. Grant it judgment as to Count II of their Complaint.

b. Award Plaintiffs compensatory damages in the amount of $3,500,000 and attorney's fees and costs of suit.

c. Award Plaintiffs punitive damages in an amount to be determined by the Court.

d. For such other and further relief as the nature of this cause may require.

## COUNT III –INVASION OF PRIVACY
## (NATIONWIDE)

68. Plaintiffs incorporate the allegations contained in paragraphs 1 through 67 of the above-captioned Complaint as if fully restated herein.

69. Plaintiff, Tamariz-Wallace, has spent her career building an outstanding reputation in insurance sales and customer service for herself and her agencies including a strong reputation for trustworthiness and honesty. As a result, the name and likeness of Plaintiffs has a high commercial value in the Baltimore/Washington/Virginia Metropolitan area insurance market.

70. Defendant, Nationwide, has appropriated the names and likeness of Plaintiffs, Tamariz-Wallace and DTA, through mailings and communications with third parties that wrongfully represent Plaintiffs are still Nationwide agents or affiliated with Nationwide.

71. Defendant, Nationwide, has done so solely for their own use and benefit.

72. As a result, Plaintiffs have lost business, customers and revenue.

WHEREFORE, Plaintiffs pray that this Honorable Court:

a. Grant them judgment as to Count III of their Complaint.

b. Award Plaintiffs compensatory damages in the amount of $1,500,000 and attorney's fees and costs of suit.

c. Award Plaintiffs punitive damages in an amount to be determined by the Court.

d. For such other and further relief as the nature of this cause may require.

## COUNT IV –DEFAMATION
## (NATIONWIDE)

73. Plaintiffs incorporate the allegations contained in paragraphs 1 through 72 of the above-captioned Complaint as if fully restated herein.

74. Defendant and its agents, has knowingly made and is continuing to make the aforementioned false and defamatory statements, including but not limited to, correspondence with Plaintiffs customers regarding allegedly forged customers signatures on Nationwide policy cancellations.

75. In the alternative, Defendant and its agents negligently made the aforementioned false and defamatory statements about the Plaintiffs.

76. Defendant and its agents have published these false and defamatory communications to the Plaintiffs customers and other third parties who reasonably understood these communications to be defamatory with the intent to injure the Plaintiffs.

77. Defendant acted with knowledge of the falsity of these communications and with the intent to harm the Plaintiffs' reputations.

78. As a result of these false and defamatory communications the character and reputation of Plaintiffs were and continue to be harmed, their standing and reputation among their customer base and in the community for trustworthiness, honesty, integrity and loyalty were and are impaired, and Plaintiff, Tamariz-Wallace has suffered mental anguish and personal humiliation.

79. As a direct and proximate result of these false and defamatory statements published by the Defendant and its agents, Plaintiffs have lost business and customers and their reputations as reputable and dependable insurance agents have been irrevocably harmed.

WHEREFORE, Plaintiffs pray that this Honorable Court:

a. Grant it judgment as to Count IV of their Complaint.

b. Award Plaintiffs compensatory damages in the amount of $1,500,000 and attorney's fees and costs of suit.

c. Award Plaintiffs punitive damages in an amount to be determined by the Court.

d. For such other and further relief as the nature of this cause may require.

## COUNT V –DEFAMATION
## (CORRIGAN INSURANCE, INC., WILLIAM P. CORRIGAN, JR., C.W. "KIP" HAYES, III, CHARLENE E. HARDEE, SAMUEL BRADSHAW, IV, AND JOHN PAUL PURSSORD, NATIONWIDE)

80. Plaintiffs incorporate the allegations contained in paragraphs 1 through 79 of the above-captioned Complaint as if fully restated herein.

81. Defendants, Nationwide Mutual Insurance Company, Corrigan Insurance, Inc., William P. Corrigan, Jr., C.W. "Kip" Hayes, III, Charlene E. Hardee, Samuel Bradshaw, IV, and John Paul Purssord, and possibly other Nationwide Agents or employees, have knowingly and intentionally made and are continuing to make the aforementioned false and defamatory statements or are permitting publication of the same with full knowledge thereof, including but not limited to, correspondence with Plaintiffs customers regarding allegedly forged customers signatures on Nationwide policy cancellations, that Plaintiffs have been ripping customers off for years, that Plaintiffs have misappropriated customer payments, that Plaintiffs have refused to give customers discounts to which they were entitled so Tamariz-Wallace could keep the money for herself, has had an employee quit because of "shady operations", that Plaintiffs were being criminally prosecuted, and that they or their personnel would be in jail, etc.

82. In the alternative, Defendants negligently made the aforementioned false and defamatory statements about the Plaintiffs, by failing to properly investigate or verify the veracity of any of the allegations and statements listed herein. The Defendants made the statements with the knowledge that such statements would injure and damaged the reputation of the Plaintiffs.

83. Defendants have published these false and defamatory communications to the Plaintiffs customers and other third parties who reasonably understood these communications to be defamatory.

84. Defendants acted with knowledge of the falsity of these communications and with the intent to harm the Plaintiffs reputation.

85. As a result of these false and defamatory communications the character and reputation of Plaintiffs were and continue to be harmed, their standing and reputation among their customer base and in the community were impaired, and Plaintiff, Tamariz-Wallace has suffered mental anguish and personal humiliation.

86. As a direct and proximate result of these false and defamatory statements published by the Defendants, Plaintiffs have lost business, revenue and customers and their reputations as reputable insurance agents have been irrevocably harmed.

WHEREFORE, Plaintiffs pray that this Honorable Court:

a. Grant it judgment as to Count V of their Amended Complaint.

b. Award Plaintiffs compensatory damages in the amount of $1,500,000 and attorney's fees and costs of suit.

c. Award Plaintiffs punitive damages in an amount to be determined by the Court.

d. For such other and further relief as the nature of this cause may require.

## COUNT VI –CONVERSION
## (NATIONWIDE)

87. Plaintiffs incorporate the allegations contained in paragraphs 1 through 86 of the above-captioned Complaint as if fully restated herein.

88. Upon terminating Tamariz-Wallace, Defendant and its agents froze Plaintiffs computer system prohibiting Plaintiff from accessing the personal and business records contained on the system.

89. Defendant and its agents have also seized and refused to return boxes of Plaintiffs documents which also contain both personal information and business records.

90. Plaintiffs are rightful owners and are entitled to immediate possession of the information stored on the computer system and the seized documents.

91. Defendant and its agents have and continue to exercise wrongful and unauthorized control over these items and information by denying Plaintiffs access and exercising dominion in a manner inconsistent with the Plaintiffs rights.

92. Defendant and its agents are wrongfully barring Plaintiff access to these items and information with the intent of depriving Plaintiffs of their benefit.

WHEREFORE, Plaintiffs pray that this Honorable Court:

a. Grant it judgment as to Count VI of their Amended Complaint.

b. Award Plaintiffs compensatory damages in the amount of $1,500,000 and attorney's fees and costs of suit.

c. Award Plaintiffs punitive damages in an amount to be determined by the Court.

d. For such other and further relief as the nature of this cause may require.

/s/
_____
Michael P. Darrow, Esquire
Bar No.02891

/s/
_____
Brian D. Lyman, Esquire
MD. Fed Bar No. 27360

HILLMAN, BROWN & DARROW, P.A.
221 Duke of Gloucester Street
Annapolis, Maryland 21401
Telephone Nos. #410-263-3131
Counsel for Plaintiffs

**VERIFICATION**

I hereby swear and affirm under the penalties of perjury that the matters and facts contained herein are true and correct to the best of my personal knowledge, information and belief.

_____
B. Diane Tamariz-Wallace

I hereby swear and affirm under the penalties of perjury that the matters and facts contained herein are true and correct to the best of my personal knowledge, information and belief.

Diane Tamariz & Associates, P.A.

By:_____
B. Diane Tamariz-Wallace its President

I hereby swear and affirm under the penalties of perjury that the matters and facts contained herein are true and correct to the best of my personal knowledge, information and belief.

Moran Insurance Services, Inc.

By:_____
B. Diane Tamariz-Wallace its President

## JURY DEMAND

Plaintiffs pursuant to Rule 38 hereby demand a jury trial on all issues allowed to be tried by a jury.

/s/
Michael P. Darrow, Esquire
Bar No.02891

/s/
Brian D. Lyman, Esquire
MD. Fed Bar No. 27360

HILLMAN, BROWN & DARROW, P.A.
221 Duke of Gloucester Street
Annapolis, Maryland  21401
Telephone Nos. #410-263-3131
Counsel for Plaintiffs