IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| NATIONWIDE MUTUAL INSURANCE CO., | : | |
| | : | |
| Plaintiff, | : | Case No. 1:09-cv-1867 |
| | : | |
| v. | : | |
| | : | |
| B. DIANE TAMARIZ-WALLACE, et al., | : | |
| | : | |
| and | : | |
| | : | |
| MORAN INSURANCE SERVICES, INC. | : | |
| 696 Ritchie Highway | : | |
| Severna Park, Maryland 21146, | : | |
| (Anne Arundel County) | : | |
| | : | |
| and | : | |
| | : | |
| GEORGE T. MORAN, INC. | : | |
| 696 Ritchie Highway | : | |
| Severna Park, Maryland 21146, | : | |
| (Anne Arundel County) | : | |
| | : | |
| and | : | |
| | : | |
| C. DAVID WALLACE | : | |
| 696 Ritchie Highway | : | |
| Severna Park, Maryland 21146 | : | |
| (Anne Arundel County) | : | |
| | : | |
| Defendants. | : | |

## PLAINTIFF NATIONWIDE MUTUAL INSURANCE COMPANY'S SECOND AMENDED COMPLAINT

Now comes Nationwide Mutual Insurance Company, by and through counsel, and for its

Second Amended Complaint against B. Diane Tamariz-Wallace, Diane Tamariz & Associates, P.A.,

George T. Moran, Inc., Moran Insurance Services, Inc., and C. David Wallace (collectively

"Defendants") hereby states as follows:

## I.    PERSONAL JURISDICTION AND VENUE

1.    This Court has personal jurisdiction over Defendants because Defendants reside and/or are organized to do business in Maryland, have transacted business in Maryland, have caused tortious injury in Maryland, and entered into the agreements that are the subject of this action in Maryland.

2.    Venue is proper in this district because the case was transferred from the United States District Court for the Southern District of Ohio as requested by Defendants, and venue is otherwise proper in this district pursuant to 28 U.S.C. § 1391(a).

## II.    THE PARTIES

3.    Nationwide Mutual Insurance Company ("Nationwide") is a corporation duly created and organized under the laws of the State of Ohio.

4.    Defendant B. Diane Tamariz-Wallace ("Tamariz") is a resident of the State of Maryland, and is or has been the sole or majority shareholder of Defendants Diane Tamariz & Associates, P.A., George T. Moran, Inc., and Moran Insurance Services, Inc.

5.    Defendant Diane Tamariz & Associates, P.A. ("Tamariz & Associates") is a corporation duly created and organized under the laws of the State of Maryland.

6.    Defendant George T. Moran, Inc. ("George T. Moran, Inc.") is a corporation duly created and organized under the laws of the State of Maryland.

7.    Defendant Moran Insurance Services, Inc. ("Moran Insurance Services") is a corporation duly created and organized under the laws of the State of Maryland.

8.    Defendant C. David Wallace ("Wallace") is a resident of the State of Maryland, at all relevant times herein has been the husband of Tamariz, and is or has been a shareholder of George T. Moran, Inc.

9.      Non-Party Nationwide Bank is formerly known as Nationwide Federal Credit Union, a federally chartered credit union, and is now a federally chartered bank with its principal place of business in Columbus, Ohio ("Nationwide Bank").

III.    FACTS COMMON TO ALL CLAIMS

A.      Tamariz's Long History as a Nationwide Agent

10.     Tamariz was an agent on behalf of Nationwide from approximately September 1989.

11.     During most of those almost 20 years, Tamariz was an independent contractor agent who owned and operated her own insurance agency, Tamariz & Associates.

12.     Tamariz is the sole shareholder of Tamariz & Associates.

13.     As the sole shareholder of Tamariz & Associates, Tamariz has sole control over all the operations of Tamariz & Associates, including decisions on leasing, employee staffing, agency marketing, acquiring agencies and books of business, and the like.

B.      Tamariz Looks To Expand Her Agency

14.     By 2004, Tamariz, with almost two decades in the insurance business, was an experienced and successful insurance agent who knew her business and knew the market in which she operated.

15.     In 2004, Tamariz began to look to expand her agency.

16.     Oftentimes, entrepreneurial exclusive agents like Tamariz desire to expand their business by acquiring other insurance agencies.

17.     Unfortunately for these exclusive agents like Tamariz, traditional commercial banks often refuse to loan money to agents for the purpose of acquiring other agencies since there are typically no hard assets or receivables that could be used as collateral to secure such a loan, since

the insurance policies sold and premiums collected through an agency are not the property of the agency, but of the insurance company.

18.    In order to assist these agents in acquiring other agencies, Nationwide offers resources to them to assist in such expansion opportunities.

19.    Among the resources offered is access to credit that may not be available from a traditional commercial bank.

20.    Nationwide sponsors a loan program through its affiliate Nationwide Bank.

21.    This program is generally known as the Independent Agency Acquisition loan program ("IAA").

22.    IAA loans are generally made available to exclusive agents who want to purchase other agencies.

23.    The Bank underwrites such loans using its ordinary underwriting guidelines and offers such loans based in part upon a payment guarantee from Nationwide.

C.    <u>George T. Moran, Inc.</u>

24.    In the fall of 2004, Tamariz identified an insurance agency that she potentially wanted to acquire for herself in the form of an agency operated by George T. Moran.

25.    On October 8, 2004, Tamariz signed a letter of intent to George T. Moran indicating that she desired to purchase 100% of the shares of his agency, George T. Moran, Inc.

26.    In the course of her investigation of this acquisition, Tamariz retained her own outside due diligence firm, WFG Capital Advisors.

27.    Tamariz also retained her own legal counsel who negotiated and drafted terms of the purchase agreement.

4

28.     Tamariz also took part in drafting a business plan and pro forma financial statements for her new agency.

29.     Tamariz's business plan indicated that her existing agency had been growing at an 18% annual rate, had an aggressive marketing program in place, and was "well positioned to seize this sales opportunity and penetrate these markets in all product lines."

D.      Tamariz Utilizes The IAA Program To Purchase George T. Moran, Inc.

30.     On March 11, 2005, Tamariz signed a Stock Purchase Agreement whereby she agreed to personally acquire all of the outstanding shares of stock of George T. Moran, Inc.

31.     The closing for Tamariz's acquisition of George T. Moran, Inc. occurred in May 2005.

32.     Under the terms of the acquisition, Tamariz paid $3 million for George T. Moran, Inc. -- $2.25 million of which was to be paid at closing and the remainder paid by two promissory notes in the respective amounts of $500,000 and $250,000.

33.     The $500,000 note was to be payable in two equal installments, with the first $250,000 installment due in July 2006 and the second $250,000 installment due in July 2007.

34.     The remaining balance of the purchase price in the form of the $250,000 note was to be payable in July 2008.

35.     In order to obtain the funds she needed to meet her down payment obligation under the Stock Purchase Agreement, Tamariz chose to participate in the IAA program by Nationwide.

36.     Pursuant to her participation in the IAA program, Tamariz acquired an IAA loan from Nationwide Bank.

37.     Of the $2.25 million Tamariz paid at the closing of George T. Moran, Inc., $2.107 million came in the form of a loan from Nationwide Bank and the remaining $143,000 came in the

form of a pre-conversion bonus that Nationwide had provided Tamariz for the specific purpose of purchasing George T. Moran, Inc.

38.     The loan that Tamariz and Tamariz & Associates took out from Nationwide Bank was journalized in a certain Credit Agreement and Promissory Note signed by Tamariz both in her individual capacity and an officer of Tamariz & Associates (the "Promissory Note"). A true and accurate copy of the Promissory Note is attached hereto as Exhibit A.

39.     To provide collateral to secure collection of monies loaned under the Promissory Note, on or about April 26, 2005, Tamariz and Tamariz & Associates also executed a Security Agreement, whereby they granted a security interest to Nationwide Bank in "all commissions, extended earnings, deferred compensation incentive credits, bonuses (including post-conversion bonuses and contingency bonuses), and any other compensation now due or becoming due in the future under the Agent's Agreement or any future Agent's Agreement executed by and between Nationwide and the Agent (collectively, 'Collateral')" (the "Security Agreement"). A true and accurate copy of the Security Agreement is attached hereto as Exhibit B.

40.     The terms of the Promissory Note required Tamariz and Tamariz & Associates, as borrowers, to repay the loan over 288 semi-monthly installments (144 months) at a variable interest rate of prime plus one percent.

41.     Nationwide guaranteed to Nationwide Bank the repayment obligations of Tamariz and Tamariz & Associates under the loan.

E.     Tamariz Defaults on the Promissory Note

42.     In or about 2007, Tamariz and Tamariz & Associates stopped paying on their loan.

43.     As a result, Tamariz and Tamariz & Associates went into default under the terms of the Promissory Note.

44.     Under the Promissory Note's acceleration clause, upon default, all amounts outstanding under the loan became immediately due and owing in full and began to accrue interest at a rate of prime plus five percent.

45.     On or about June 23, 2008, Nationwide Bank assigned all of its right, title, and interest in the Promissory Note and the Security Agreement to Nationwide.

46.     Pursuant to that assignment, Nationwide is now the owner and holder of Promissory Note and Security Agreement, with full rights to enforce the terms thereon.

47.     In or about January 2008, Tamariz transferred her entire ownership interest in George T. Moran, Inc. to her husband, Wallace, and retained her entire ownership interest in Moran Insurance Services, Inc.

48.     As 100% owners of George T. Moran, Inc. and Moran Insurance Services, Inc., Tamariz and Wallace have continued to enjoy revenue and the other benefits of ownership of George T. Moran, Inc. while failing to pay the loan that provided substantially all of the funds for Tamariz to purchase that insurance agency.

49.     In fact, Tamariz and Wallace have doubled their household income as a result of the acquisition of George T. Moran, Inc.

50.     For instance, in 2007 alone, Tamariz and Wallace pulled over $400,000 out of George T. Moran, Inc. for themselves in the form of salary and dividends.

51.     This is $400,000 in income that Tamariz and Wallace would not have received and enjoyed but for the funding for the acquisition of George T. Moran, Inc. provided by Nationwide Bank through Nationwide's IAA program.

52.     In other words, Tamariz and Wallace used the money of Nationwide Bank (and now Nationwide) to acquire George T. Moran, Inc., have made significant amounts of money from this

acquisition of George T. Moran, Inc., but have steadfastly refused to pay back the very loan that enabled them to enjoy this significant increase in income.

F. **Tamariz Stops Selling Nationwide Policies and Begins Diverting Nationwide Customers To Other Insurance Companies.**

1. Corporate Agency Agreement

53. On June 21, 2004, Tamariz & Associates entered into a Corporate Agency Agreement with Nationwide. A true and accurate copy of the Corporate Agency Agreement is attached hereto as Exhibit C.

54. Under the terms of the Corporate Agency Agreement, Tamariz & Associates, including its "Principal, directors, officers, and employees" were required to "represent Nationwide exclusively in the sale and service of insurance."

55. As a result of their exclusive appointment as Nationwide agents, Tamariz & Associates and its owners, directors, officers, and employees agreed that they would not "solicit or write policies of insurance in companies" other than on behalf of Nationwide and Nationwide's related companies without the consent of Nationwide.

2. Corporate Associate Agent Agreement

56. On August 26, 2005, Nationwide, Tamariz & Associates, and Moran Insurance Services entered into a Corporate Associate Agent Agreement ("Associate Agent Agreement"). A true and accurate copy of the Corporate Associate Agent Agreement is attached hereto as Exhibit D.

57. The purpose of the Associate Agent Agreement was to allow Moran Insurance Services to act as an associate agent of Tamariz & Associates for the purpose of writing Nationwide business.

58.     The Associate Agent Agreement expressly stated that Moran Insurance Services was subject to all of the terms of the Corporate Agency Agreement, including the obligation to exclusively represent Nationwide in the sales and servicing of insurance.

> 3.     **Defendants sell business away from Nationwide and then stop offering or selling Nationwide policies altogether.**

59.     Upon information and belief, Defendants systemically undertook to sell business away from Nationwide and ceased selling or offering for sale any Nationwide products.

60.     For instance, one Nationwide customer received an unsolicited letter from Tracy Mazurowski, an associate agent for George T. Moran, Inc., providing a cost comparison for insurance between Nationwide and another insurer and urging the Nationwide customer to switch to the competing company.

61.     In another instance, on September 26, 2008, a potential customer visited Tamariz & Associates and was not provided a quotation for Nationwide insurance, but was thereafter provided quotations by Matt Lehman of George T. Moran, Inc. for insurance from two competing insurance companies.

62.     In another instance, on October 1, 2008, a potential customer visited Tamariz & Associates requesting an automobile insurance quotation from Nationwide, but was instead directed to contact George T. Moran, Inc. to obtain quotations for insurance.

63.     That potential customer proceeded to George T. Moran, Inc.'s office and met with Tracy Mazurowski, who provided the customer a quotation from a competing insurance company.

64.     In another instance, on October 2, 2008, a potential customer visited Tamariz & Associates and requested a commercial insurance quotation for his HVAC company.

65.     Upon being asked by the potential customer whether Tamariz sold Nationwide commercial policies, the receptionist at Tamariz & Associates instructed the potential customer to

travel to George T. Moran, Inc.'s office because all of the company's underwriters were in that office.

66.     The receptionist gave the potential customer the name, address, and directions to George T. Moran, Inc.

67.     The potential customer traveled to George T. Moran, Inc.'s office and met with Mr. Lehman, who provided the potential customer a commercial automobile insurance quotation from a competing company and failed to offer an insurance quotation for Nationwide or otherwise mention Nationwide by name.

68.     In another instance, upon a Nationwide customer's decision to transfer his business out from to another Nationwide agent, Mr. Lehman, on behalf of George T. Moran, Inc., sent to this Nationwide customer an unsolicited quotation for insurance from a competing company and urged the Nationwide customer to switch his insurance coverage to that competing insurance company.

69.     At the same time that it was referring all new business to George T. Moran, Inc., Tamariz, Tamariz & Associates, and Moran Insurance Services ceased all efforts to sell Nationwide's products and instead began an intentional, systematic scheme to move all of the Nationwide policyholders they serviced to George T. Moran, Inc.

70.     For instance, Tamariz & Associates and Moran Insurance Services collectively initiated only one quotation for Nationwide insurance during the entire month of August 2008, only three quotations for Nationwide insurance during the entire month of July 2008, and no quotations for Nationwide insurance during the entire month of June 2008.

71.     Moreover, throughout much of 2008, Defendants were also actively involved in moving existing Nationwide policyholders that were being serviced by Tamariz & Associates or

Moran Insurance Services to other insurance companies with which George T. Moran had agency appointments.

G.   **Nationwide Terminates Its Agency Relationship With Defendants.**

72.   The foregoing conduct of Tamariz, Tamariz & Associates, and Moran Insurance Services constituted serious and ongoing breaches of contractual and fiduciary duties they owing to Nationwide, as well as a significant ongoing risk to Nationwide's relationship with its policyholders.

73.   As a result, on November 3, 2008, Nationwide gave notice to Tamariz, Tamariz & Associates, and Moran Insurance Services of the immediate cancellation of their agencies appointments with Nationwide.

H.   **After Cancellation, Defendants Engage in Theft of Nationwide's Confidential and Proprietary Trade Secrets and Use Them To Compete Against Nationwide.**

74.   Tamariz, Tamariz & Associates, and Moran Insurance Services had previously downloaded and provided to Wallace the list of approximately 1,340 Nationwide customers whose policies they had or were servicing.

75.   This list was stored on the computer of Wallace or one of his companies under the file name "DTA" or a similar name, and was proprietary information belonging to Nationwide.

76.   After Nationwide canceled Tamariz's agency appointments in early November 2008, Defendants used this Nationwide proprietary customer list as a distribution list for the purposing of contacting Nationwide's policyholders.

77.   On November 3, 2008, Defendants prepared a letter over Tamariz's signature telling Nationwide customers that Tamariz was no longer a Nationwide agent, that she had grown disenchanted with Nationwide, and that she is "now positioned to bring you several highly rated,

extremely competitive insurance companies such as Hartford, Travelers, and Liberty Mutual who all want to bid on your insurance needs."

78.     This letter concluded by stating "I know more about you and your needs than anyone in the Nationwide organization.  I will continue to take care of you and save you money in the process."

79.     Defendants mailed this letter on or about November 6, 2008 to some or all of the 1,300 Nationwide customers whose Nationwide policies had previously been serviced by Tamariz & Associates.

80.     Defendant sent this same letter to this same list of Nationwide policyholders on or about November 12, 2008.

81.     On or about Sunday, November 9, 2008, Defendants collectively participated in a strategy session for the purpose of determining how best to frame for the policyholders that Tamariz & Associates' had serviced why her agency with Nationwide had been terminated, and how to best market to these customers to move their business from Nationwide to another carrier represented by George T. Moran, Inc.

82.     During this strategy session, Defendants decided they would further use the Tamariz & Associates' list of Nationwide policyholders—which Tamariz & Associates transmitted to Wallace and he stored on a computer prior to its cancellation from Nationwide—in an effort to move the business to other carriers.

83.     Defendants decided to draft a series of four additional letters to be mailed to Nationwide customers, soliciting them to move their insurance business to other carriers.

84.     Each of these letters were from "Diane Tamariz" at "Moran Insurance," and each letter sought to convince Nationwide customers to move to another insurance company.

12

85.     The letters also contained the logos of various other insurers, such as CNA, Farmers, Safeco, Ohio Casualty, Travelers, The Hartford, Kemper, Progressive, Encompass, and State Auto, with whom it is believed Tamariz has agency appointments through George T. Moran, Inc.

86.     The final letter stated "Join the hundreds of *former* Nationwide customers that are now enjoying significant savings!" (Emphasis in original.)

87.     These letters were sent to Nationwide policyholders at periodic intervals over a six-week period from November to mid-December 2008.

88.     Defendants also continued their scheme by using Nationwide confidential and proprietary policyholder files, which Tamariz & Associates originally had access to as a result of being a Nationwide agent, to more directly solicit Nationwide's customers.

89.     These Nationwide policyholder files were Nationwide property, and constituted confidential and proprietary information of Nationwide, and Tamariz, Tamariz & Associates, and Moran Insurance Services were required to safeguard, hold confidential, and return these files immediately upon termination of the agency relationship.

90.     Instead of safeguarding and promptly returning Nationwide's confidential policyholder files to Nationwide upon cancellation of the agency relationship, Tamariz, Tamariz & Associates, and Moran Insurance Services, along with the other Defendants and other individuals acting at the specific direction of Tamariz and Wallace, began wholesale copying of all these files.

91.     Tamariz had originally intended to copy these documents on a copier provided to her by her co-tenant, Re/Max Realty, but she was not able to get the copier "lock code" to work properly.

92.     Thus, Tamariz and Wallace decided that these files would be copied at the offices of a company owned by Wallace because it had a large copier that permitted the paper files to be copied on an expedited basis.

93.     Over a two week period in mid-November 2008, Nationwide's files and policyholder information that were in Tamariz and her agencies' possession were systematically transported from Tamariz's offices to the Wallace's offices for photocopying.

94.     Tamariz employed a number of her and Wallace's agents and associates to copy Nationwide's policyholder files on her behalf, including Marc Dorman, Trish Tamariz, Nannette Williams, and Phyllis Smith.

95.     In all, Defendants copied approximately 46 large boxes of Nationwide's confidential policyholder files at Wallace's office.

96.     Tamariz then returned the original policyholder files to Nationwide, but retained the duplicate copy of the files without disclosing this fact to Nationwide.

97.     Defendants used the information in these copied Nationwide policyholder files to make telephone calls to Nationwide policyholders to recommend new coverage for them with other insurance companies.

98.     During these phone conversations, Defendants told Nationwide policyholders that Tamariz was no longer with Nationwide, and used various confidential information about the policyholder or his policies with Nationwide to solicit these policyholders to move their business to other insurance companies with which Tamariz had appointments through George T. Moran, Inc.

99.     In each instance, Defendants accessed and utilized Nationwide's confidential policyholder information, such as the policyholder's renewal date information, coverage levels, and premium information, to make specific proposals to Nationwide's insureds.

14

100.    By having access to a customer's specific personal policy information, Defendants were able to generate quotations from competing insurers that directly compared premiums based on specific types of insurance and levels of coverage.

101.    By having access to a customer's policy expiration/renewal dates, Defendants could target Nationwide insureds whose policies were coming up for renewal to time their solicitation to the specific period during which the insureds were most likely to be considering their insurance needs.

102.    Tamariz, Wallace, and the other Defendants scheme involved contacting Tamariz & Associates' best and most lucrative former customers in an effort to move that business from Nationwide to new insurance companies that Tamariz had begun representing through George T. Moran, Inc.

103.    Defendants theorized that they could focus their effort initially on the top 20% of customers because those 20% of policyholders constituted at least 80% of the policy premium value of the book of business.

104.    Along these lines, Defendants prioritized the list of policyholders to solicit first by the policyholder's total written premium of all policies, and then second by expiration dates of the policies.

105.    By mid-December 2008, Defendants had converted 50% of Tamariz's former Nationwide's policyholders to other insurers through George T. Moran, Inc.

106.    In mid-December 2008, Defendants held another strategy meeting.

107.    This meeting was attended by, among others, Tamariz, Wallace, Marc Dorman, and Caroline Sullivan, a business consultant retained by Tamariz and Wallace to assist in a marketing and public relations campaign to move Nationwide customers to George T. Moran, Inc.

108.    During this meeting, Wallace disclosed that he and Tamariz been successful in moving approximately 50% of Nationwide's policyholders to other insurance companies through George T. Moran, Inc.

109.    Wallace disclosed that it was the goal of Tamariz and Wallace to ultimately move 75% of these policyholders to other insurers through George T. Moran, Inc.

110.    During this meeting, Marc Dorman, an agent of the Defendants, also disclosed Tamariz, Tamariz & Associates, and Moran Insurance Services had been moving Nationwide policyholders to other insurance companies for several months prior to Nationwide's cancellation of their agency appointments on November 3, 2008.

111.    Defendants' scheme has resulted in a significant raiding of Nationwide's policyholders, made possible by virtue of Defendants' unlawful copying, retention, and use of Nationwide's confidential and proprietary trade secrets.

COUNT I
<u>Breach of Promissory Note/Amounts Due and Owing</u>
(Tamariz and Tamariz & Associates)

112.    Nationwide realleges and incorporates herein each and every allegation set forth above.

113.    As a result of the default of Tamariz and Tamariz & Associates under the Promissory Note, there is now currently due and owing to Nationwide principal and interest in the amount of $2,182,162.45, plus default interest accruing at a rate equal to the prime rate plus five percent per annum.

114.    Nationwide is entitled to judgment against Tamariz and Tamariz & Associates, jointly and severally, in the amount of $2,182,162.45, plus default interest accruing at a rate equal to the prime rate plus five percent per annum.

## COUNT II
### Equitable Indemnification
### (Tamariz and Tamariz & Associates)

115. Nationwide realleges and incorporates herein each and every allegation set forth above.

116. As consideration for the assignment of the Promissory Note and Security Agreement, Nationwide paid to Nationwide Bank an amount equal to all principal and interest that was then due and owing by Tamariz and Tamariz & Associates.

117. Such payment was made pursuant to a guarantee Nationwide had made to Nationwide Bank.

118. As a result of the foregoing, and in the alternative, Nationwide is entitled to equitable indemnification from Tamariz and Tamariz & Associates in an amount equal to all payments made to Nationwide Bank relating to Defendants' loans.

119. As a result of its right to equitable indemnification, Nationwide is entitled to judgment against Tamariz and Tamariz & Associates jointly and severally in the amount of $2,182,162.45.

## COUNT III
### Breach of Corporate Agency Agreement
### (Tamariz & Associates)

120. Nationwide realleges and incorporates herein each and every allegation set forth above.

121. Tamariz & Associates, by virtue of its execution of the Corporate Agency Agreement, agreed to perform certain duties, including, without limitation, agreeing to represent Nationwide exclusively in the sale and service of insurance; agreeing not to solicit or write insurance policies

with insurers other than Nationwide; and, agreeing to direct their efforts in the field of insurance toward advancing the business and interests of Nationwide to the best its ability.

122.    Tamariz & Associates breached its contractual duties as set forth above, including, without limitation, by switching, siphoning off, and facilitating the transfer of Nationwide policyholders to other insurers; refusing and failing to quote, sell, or offer for sale virtually any new Nationwide insurance policies during 2008; failing to use its best efforts to advance the business interests of Nationwide by acting in the aforesaid manner; interfering with Nationwide's right to retain and continue to provide insurance services to its policyholders and to continue to solicit such policyholders for additional business; inducing and/or encouraging Nationwide policyholders and potential Nationwide policyholders to obtain insurance from Nationwide's competitors; furnishing and sharing the names and contact information for Nationwide's policyholders to Tamariz's other agencies; utilizing Nationwide's confidential property, expirations, renewals, and trade secrets to directly or indirectly solicit, switch, or service the insurance business of policyholders of Nationwide contrary to the terms and conditions of the Corporate Agency Agreement; and violating the non-competition restriction of the Corporate Agency Agreement.

123.    Tamariz & Associates' breaches of the Corporate Agency Agreement have caused damage to Nationwide, which will continue into the future, consisting of, but not limited to, loss of renewal business from existing policyholders, loss of new business from existing policyholders, and loss of new business from new policyholders.

124.    Nationwide has been damaged by the foregoing breaches of Tamariz & Associates in an amount in excess of $75,000.

## COUNT IV
### Breach of Corporate Associate Agent Agreement
(Tamariz & Associates and Moran Insurance Services)

125.    Nationwide realleges and incorporates herein each and every allegation set forth above.

126.    Tamariz & Associates and Moran Insurance Services, by virtue of their execution of the Corporate Associate Agent Agreement, agreed to perform certain duties, including, without limitation, agreeing to represent Nationwide exclusively in the sale and service of insurance; agreeing not to solicit or write insurance policies with insurers other than Nationwide; and, agreeing to direct their efforts in the field of insurance toward advancing the business and interests of Nationwide to the best its ability.

127.    Tamariz & Associates and Moran Insurance Services breached their contractual duties as set forth above, including, without limitation, by switching, siphoning off, and facilitating the transfer of Nationwide policyholders to other insurers; refusing and failing to quote, sell, or offer for sale virtually any new Nationwide insurance policies during 2008; failing to use its best efforts to advance the business interests of Nationwide by acting in the aforesaid manner; interfering with Nationwide's right to retain and continue to provide insurance services to its policyholders and to continue to solicit such policyholders for additional business; inducing and/or encouraging Nationwide policyholders and potential Nationwide policyholders to obtain insurance from Nationwide's competitors; furnishing and sharing the names and contact information for Nationwide's policyholders to Tamariz's other agencies; utilizing Nationwide's confidential property, expirations, renewals, and trade secrets to directly or indirectly solicit, switch, or service the insurance business of policyholders of Nationwide contrary to the terms and conditions of the

Corporate Associate Agent Agreement; and violating the non-competition provision of the Corporate Agency Agreement and Corporate Associate Agent Agreement.

128.   Tamariz & Associates and Moran Insurance Services' breaches of the Corporate Associate Agent Agreement have caused damage to Nationwide, which will continue into the future, consisting of, but not limited to, loss of renewal business from existing policyholders, loss of new business from existing policyholders, and loss of new business from new policyholders.

129.   Nationwide has been damaged by the foregoing breaches of Tamariz & Associates and Moran Insurance Services in an amount in excess of $75,000.

COUNT V
<u>Breach of Guaranty</u>
(Tamariz)

130.   Contemporaneously with Tamariz & Associates entering into the Corporate Agency Agreement, Tamariz personally entered into a Guaranty, whereby she personally guaranteed the performance of Tamariz & Associates under the Corporate Agency Agreement.

131.   Such guarantee was subsequently incorporated into the Corporate Associate Agent Agreement.

132.   Tamariz has waived any right to demand, protest, and notice under the Guaranty.

133.   Tamariz & Associates and Moran Insurance Services have breached the Corporate Agency Agreement and the Corporate Associate Agent Agreement as forth in the preceding paragraphs.

134.   Tamariz is therefore liable for all damages resulting from Tamariz & Associates' breaches of the Corporate Agency Agreement

135.   Nationwide has been damaged by the foregoing in an amount in excess of $75,000.

## COUNT VI
### Breach of Fiduciary Duty
(Tamariz, Tamariz & Associates, Moran Insurance Services)

136.    Nationwide realleges and incorporates herein each and every allegation set forth above.

137.    Defendants, as insurance agents for Nationwide, occupied a position of trust and confidence in their contractual, agency, and/or fiduciary relationship with Nationwide.

138.    Defendants, as agents and fiduciaries of Nationwide, had the duty to deal with Nationwide with the utmost care, trustworthiness, fairness, honesty, loyalty, diligence, and fidelity, and to avoid putting themselves in a position in which their personal interests conflicted with their duties and obligations to Nationwide.

139.    Defendants have breached their fiduciary duties to Nationwide as alleged herein.

140.    As a direct and proximate cause of Defendants' fiduciary breaches, Nationwide has suffered damages in an amount in excess of $75,000.

141.    The actions and conduct of Defendants as set forth herein were undertaken fraudulently, in bad faith and with ill will and actual malice, entitling Nationwide to punitive damages in an amount to be determined at trial.

## COUNT VII
### Fraud
(Tamariz, Tamariz & Associates, Moran Insurance Services)

142.    Nationwide realleges and incorporates herein each and every allegation set forth above.

143.    By virtue of their fiduciary and contractual relationship with Nationwide, Tamariz, Tamariz & Associates, and Moran Insurance Services owed a duty of disclosure and candor to Nationwide.

21

144.    Tamariz, Tamariz & Associates, and Moran Insurance Services intentionally concealed and failed to disclose to Nationwide, among other things their diversion and attempted diversion of hundreds of Nationwide customers to other insurers.

145.    In none of the foregoing instances did Tamariz, Tamariz & Associates, and Moran Insurance Services disclose to Nationwide that they had and were continuing to sell away and siphon off business from Nationwide or intended to not sell, offer to sell, or quote any further Nationwide business.

146.    Such information was material to Nationwide in that Nationwide would not have continued to engage them as agents on its behalf and would not have guaranteed a $2.1 million loan on Tamariz's behalf had it known of these actions and true intentions.

147.    As a direct and proximate result of the conduct of Tamariz, Tamariz & Associates, and Moran Insurance Services, Nationwide has suffered damages in an amount in excess of $75,000.

148.    The actions and conduct of Tamariz, Tamariz & Associates, and Moran Insurance Servces, as set forth herein, were undertaken fraudulently, in bad faith and with ill will and actual malice, entitling Nationwide to punitive damages in an amount to be determined at trial.

### COUNT VIII
### Tortious Interference With Contract
### (All Defendants)

149.    Nationwide realleges and incorporates herein each and every allegation set forth above.

150.    Nationwide had contracts of insurance with certain of its customers, of which Defendants had knowledge, and therefore Defendants owed duties to Nationwide not to interfere with these insurance contracts.

151.   In numerous instances, Nationwide's customers either canceled or did not renew their insurance with Nationwide as a result of the intentional, improper instigation and inducement of Defendants to solicit, recommend, and divert said customers to other competing insurance carriers.

152.   Defendants intentionally interfered with these existing insurance contracts between Nationwide and its customers without justification and contrary to their contractual and fiduciary duties and obligations to Nationwide.

153.   The tortious actions of Defendants in interfering with the existing insurance contracts proximately caused damage to Nationwide, which will continue into the future, consisting of, but not limited to, loss of renewal business from existing policyholders, loss of new business from existing policyholders, and loss of new business from new policyholders.

154.   As a direct and proximate result of Defendants' conduct, Nationwide has suffered damages in an amount in excess of $75,000.

155.   The actions and conduct of Defendants as set forth were undertaken fraudulently, in bad faith and with ill will and actual malice, entitling Nationwide to punitive damages in an amount to be determined at trial.

## COUNT IX
### Tortious Interference With Prospective Business Relationship
### (All Defendants)

156.   Nationwide realleges and incorporates herein each and every allegation set forth above.

157.   Nationwide had certain potential contracts of insurance with potential customers, of which Defendants had knowledge or should have had knowledge and owed duties to Nationwide not to interfere with these potential insurance contracts.

23

158.    Nationwide's did not have the opportunity to enter into contracts with these potential customers as a result of the intentional, improper influence of Defendants, who either encouraged the potential policyholders to purchase insurance from another insurance company or failed to offer Nationwide insurance to the potential insured altogether.

159.    Defendants tortiously and/or intentionally interfered with these prospective insurance contracts without justification and contrary to their contractual and fiduciary duties and obligations to Nationwide.

160.    The tortious actions of Defendants in interfering with these prospective business relationships proximately caused damage to Nationwide, which will continue into the future, consisting of, but not limited to, loss of renewal business from existing policyholders, loss of new business from existing policyholders, and loss of new business from new policyholders.

161.    As a direct and proximate result of Defendants' conduct, Nationwide has suffered damages in an amount in excess of $75,000.

162.    The actions and conduct of Defendants as set forth were undertaken fraudulently, in bad faith and with ill will and actual malice, entitling Nationwide to punitive damages in an amount to be determined at trial.

COUNT X
Civil Conspiracy
(All Defendants)

163.    Nationwide realleges and incorporates herein each and every allegation set forth above.

164.    Defendants together formed a confederation or combination by agreement or understanding.

165.    Defendants engaged in unlawful and/or tortious conduct in furtherance of the conspiracy and/or used of unlawful or tortious means to accomplish an act not in itself illegal.

166.    By way of example only, such conduct included switching, siphoning off, and facilitating the transfer of Nationwide policyholders to other insurers; interfering with Nationwide's right to retain and continue to provide insurance services to its policyholders and to continue to solicit such policyholders for additional business; inducing and/or encouraging Nationwide policyholders and potential Nationwide policyholders to obtain insurance from Nationwide's competitors; furnishing and sharing the names and contact information for Nationwide's policyholders to Tamariz's other agencies; utilizing Nationwide's confidential and proprietary policyholder information, data, and records (such as expiration dates, policy limits, and customer data) to directly or indirectly solicit, switch, or service the insurance business of policyholders of Nationwide, and undertaking a scheme to use Nationwide's confidential policyholder data to injury Nationwide.

167.    As a direct and proximate result of Defendants' conspiratorial conduct, Nationwide suffered actual legal damages, in an amount in excess of $75,000

### Count XI
### Violation of the Ohio Trade Secrets Act
### (All Defendants)

168.    Nationwide realleges and incorporates herein each and every allegation set forth above.

169.    Nationwide's confidential and proprietary policyholder records, files, data, and other information constitutes a "trade secret" as that term is defined by Ohio Revised Code § 1333.61(D) because (1) it derives independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic

value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

170.    Defendants' actions, as described above, including but not limited to retaining, wholesale copying, and use of Nationwide's trade secrets, constituted "misappropriation" of such trade secrets, as defined in Ohio Revised Code § 1333.61(B).

171.    By way of example only, the foregoing misappropriation included, but was not limited to: (1) the retention, copying, and use by Tamariz, Tamariz & Associates, and Moran Insurance Services of the trade secrets where they knew or should have known they had no rights in such information; (2) the acquisition by George T. Moran, Inc. and Wallace of the trade secrets by improper means where they knew or should have known that such trade secrets were acquired and retained by improper means; and (3) Defendants' disclosure or use of Nationwide trade secrets without express or implied consent where they knew Tamariz, Tamariz & Associates, and Moran Insurance Services had acquired the trade secrets under circumstances giving rise to a duty to maintain its secrecy.

172.    As a result of the foregoing, Nationwide is entitled to actual damages in the form of (1) its actual losses caused by Defendants' misappropriation of Nationwide's trade secrets, and (2) the unjust enrichment to Defendants resulting from their misappropriation, as set forth in Ohio Revised Code § 1333.63(A).

173.    Defendants' actions and conduct in misappropriating Nationwide's trade secrets were wilful and malicious, entitling Nationwide to an exemplary damages in the amount of three times the amount of actual compensatory damages recovered, as set forth in Ohio Revised Code § 1333.63(B).

174.    Defendants' actions and conducting in misappropriating Nationwide's trade secrets were wilful and malicious, entitling Nationwide to an award of attorneys' fees, as set forth in Ohio Revised Code § 1333.64(C).

COUNT XII
Violation of the Maryland Trade Secrets Act
(All Defendants)

175.    Nationwide realleges and incorporates herein each and every allegation set forth above.

176.    Nationwide's confidential and proprietary policyholder records, files, data, and other information constitutes a "trade secret" as that term is defined by § 11-1201(e) of the Maryland Uniform Trade Secrets Act ("MUTSA") because (1) it derives independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

177.    Defendants' actions, as described above, including but not limited to retaining, wholesale copying, and use of Nationwide's trade secrets, constituted "misappropriation" of such trade secrets, as defined in § 11-1201(c) of the MUTSA.

178.    By way of example only, the foregoing misappropriation included, but was not limited to: (1) the retention, copying, and use by Tamariz, Tamariz & Associates, and Moran Insurance Services of the trade secrets where they knew or should have known they had no rights in such information; (2) the acquisition by George T. Moran, Inc. and Wallace of the trade secrets by improper means where they knew or should have known that such trade secrets were acquired and retained by improper means; and (3) Defendants' disclosure or use of Nationwide trade secrets without express or implied consent where they knew Tamariz, Tamariz & Associates, and Moran

27

Insurance Services had acquired the trade secrets under circumstances giving rise to a duty to maintain its secrecy.

179.   As a result of the foregoing, Nationwide is entitled to actual damages in the form of (1) its actual losses caused by Defendants' misappropriation of Nationwide's trade secrets, and (2) the unjust enrichment to Defendants resulting from their misappropriation, as set forth in § 11-1203(b) of the MUTSA.

180.   Defendants' actions and conduct in misappropriating Nationwide's trade secrets were wilful and malicious, entitling Nationwide to an exemplary damages in the amount of two times the amount of actual compensatory damages recovered, as set forth in § 11-1203(d) of the MUTSA.

181.   Defendants' actions and conduct in misappropriating Nationwide's trade secrets were wilful and malicious, entitling Nationwide to an award of attorneys' fees, as set forth in § 11-1204(3) of the MUTSA.

### COUNT XIII
### Violation of the Ohio Fraudulent Transfer Act
### (Tamariz, George T. Moran, Inc., and David Wallace

182.   Nationwide realleges and incorporates herein each and every allegation set forth above.

183.   From approximately May 2005 until January 2008, Tamariz owned 100% of the outstanding stock of George T. Moran, Inc.

184.   In or about January 2008, Tamariz transferred her entire ownership interest in George T. Moran, Inc. to her husband, Wallace.

185.     Upon information and belief, this transfer by Tamariz of her stock to Wallace was without consideration or without reasonably equivalent value.

186.     During this transfer, Tamariz was engaged in a business or transaction with Nationwide, namely the Promissory Note, for which Tamariz's remaining assets were unreasonably small in relation to the business or transaction.

187.     Because Nationwide is the holder of the Promissory Note on which Tamariz is the obligor (along with Tamariz & Associates), a creditor-debtor relationship exists between Nationwide and Tamariz.

188.     Additionally, upon information and belief, George T. Moran, Inc. about the same time entered into an $840,000 promissory note payable to Egan Insurance, on which it has since defaulted and on which judgment has since been confessed against it in the amount of $584,441.17.

189.     Tamariz's transfer of her entire ownership interest in George T. Moran, Inc. rendered Tamariz insolvent and thus constituted a fraudulent transfer as it concerned Nationwide where Tamariz, through the transfer, was thereby rendered unable to satisfy her obligations and left her with unreasonably small capital.

190.     As a proximate result of the foregoing, Nationwide has been damaged and is entitled to (1) a constructive trust in its favor over George T. Moran, Inc., and/or (2) have the conveyance of George T. Moran to Wallace set aside to the extent necessary to satisfy its claim, and/or (3) levy against or garnish the property of Wallace, including the stock of George T. Moran, as if the conveyance of George T. Moran, Inc. were not made.

COUNT XIV
Violation of the Maryland Fraudulent Conveyance Act
(Tamariz, George T. Moran, Inc., and David Wallace)

191.   Nationwide realleges and incorporates herein each and every allegation set forth above.

192.   From approximately May 2005 until January 2008, Tamariz owned 100% of the outstanding stock of George T. Moran, Inc.

193.   In or about January 2008, Tamariz transferred her entire ownership interest in George T. Moran, Inc. to her husband, Wallace.

194.   Upon information and belief, this transfer by Tamariz of her stock to Wallace was without consideration or without fair consideration.

195.   Because Nationwide is the holder of the Promissory Note on which Tamariz is the obligor (along with Tamariz & Associates), a creditor-debtor relationship exists between Nationwide and Tamariz.

196.   Additionally, upon information and belief, George T. Moran, Inc. at about the same time entered into an $840,000 promissory note payable to Egan Insurance, on which it has since defaulted and on which judgment has since been confessed against it in the amount of $584,441.17.

197.   Tamariz's transfer of her entire ownership interest in George T. Moran, Inc. rendered Tamariz insolvent and thus constituted a fraudulent transfer as it concerned Nationwide where Tamariz, through the transfer, was thereby rendered unable to satisfy her obligations and left her with unreasonably small capital.

198.   As a proximate result of the foregoing, Nationwide has been damaged and is entitled to (1) a constructive trust in its favor over George T. Moran, Inc., and/or (2) have the conveyance of

George T. Moran to Wallace set aside to the extent necessary to satisfy its claim, and/or (3) levy against or garnish the property of Wallace, including the stock of George T. Moran, as if the conveyance of George T. Moran, Inc. were not made.

WHEREFORE, Nationwide requests judgment be granted in its favor and that the Court award it compensatory, punitive, exemplary, and other damages in an amount that will be proven at trial, together with prejudgment and post-judgment interest, attorneys' fees and costs, and such other relief as the Court deems just and proper.

Respectfully submitted,

*/s/ Patricia McHugh Lambert*
Quintin F. Lindsmith (Ohio 0018327)
James P. Schuck (Ohio 0072356)
Sommer L. Sheely (Ohio 0076071)
*Admitted Pro Hac Vice*
BRICKER & ECKLER LLP
100 South Third Street
Columbus, Ohio  43215
(614) 227-2300
(614) 227-2390 (facsimile)
qlindsmith@bricker.com
jschuck@bricker.com

Patricia McHugh Lambert (02539)
Steven B. Schwartzman(04686)
HODES, PESSIN & KATZ, P.A.
901 Dulaney Valley Road, Suite 400
Towson, Maryland  21204
(410) 339-6759
(410) 832-5628 (facsimile)
plambert@hpklegal.com

*Counsel for Plaintiff*
*Nationwide Mutual Insurance Company*

## JURY DEMAND

Nationwide hereby demands a trial by jury on all issues so triable.

/s/ Patricia McHugh Lambert
Patricia McHugh Lambert

## CERTIFICATE OF SERVICE

The foregoing document was filed and served this 2nd day of October, 2009, upon counsel of record via the Court's electronic filing and notification system.  Copies of this document and all attachments and exhibits may be accessed through the Court's electronic filing system.

*/s/ Patricia McHugh Lambert*
Patricia McHugh Lambert

87829-1