**A401106**
**BRENDA DIANE TAMARIZ-WALLACE      MARCH 4, 2010**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| NATIONWIDE MUTUAL | )Case No. |
| INSURANCE CO., | )1:09-cv-667 |
|    Plaintiff | ) |
|    vs. | ) |
| B. DIANE TAMARIZ-WALLACE, | ) |
| et al., | ) |
|    Defendants | ) |

DEPOSITION OF BRENDA DIANE TAMARIZ-WALLACE
Towson, Maryland

March 4, 2010

ATKINSON-BAKER, INC.

COURT REPORTERS

TELEPHONE:   1-800-288-3376

www.depo.com

REPORTED BY:   BONNIE RUSSO

FILE NO. A401106

**BRENDA DIANE TAMARIZ-WALLACE      MARCH 4, 2010**

1  APPEARANCES:
2
3  FOR THE PLAINTIFF:
4    QUINTIN F. LINDSMITH, ESQUIRE
5    BRICKER & ECKLER, LLP
6    100 S. Third Street
7    Columbus, OH 43215
8    614-227-2300
9      and
10   ROBIN D. KORTE, ESQUIRE
11   Hodes, Pessin & Katz, P.A.
12   901 Dulaney Valley Road
13   Suite 400
14   Towson, Maryland 21204
15   410-938-8800
16  FOR THE DEFENDANTS:
17   BRIAN D. LYMAN, ESQ.
18   HILLMAN BROWN & DARROW, P.A.
19   221 Duke of Gloucester Street
20   Annapolis, Maryland 21401
21   410-263-3131

Page 2

1  EXAMINATION OF
2  BRENDA DIANE TAMARIZ-WALLACE        PAGE
3  BY MR. LINDSMITH                 7
4
5      E X H I B I T S
6  No.   Description            Page
7  1   Agent Employee Agreement      24
8  2   Agent's Agreement         26
9  3   Corporate Agency Agreement    55
10  4   Business Loan Application    77
11  5   Letter dated 7-16-04      82
12  6   Letter dated 9-9-04       84
13  7   Notes on Conversation with    90
14   Larry Cook 9-7-04
15  8   Acquisition Meeting with     92
16   Ed Cooper 9-8-04
17  9   E-Mail dated 9-9-04    99
18  10   Business Plan dated 9-9-04    161
19  11   Outline of Global Picture    163
20  12   Memo dated 9-22-04       164
21  13   Letter dated 10-8-04      166

Page 3

1  14   Fax Communication to Bill Jones   172
2   10-28-04
3  15   Valuation Analysis        176
4  16   Independent Agency Acquisition    194
5   Business Plan
6  17   E-Mail dated 12-7-04       209
7   Attachments
8  18   E-Mail dated 12-7-04       212
9  19   Talking Points-Meeting      214
10   with Dave Wallace
11   12-29-04
12  20   12-30-04 Talking Points with     215
13   George
14  21   The Counter to George Moran     216
15  22   Personal Financial Statement    219
16   for Dave and Diane Wallace 2004
17  23   Income Tax Return for Dave & Diane 221
18   Wallace 2003
19  24   Financial Statements of Diane    225
20   Tamariz & Associates, P.A. 12-31-04
21  25   1-5-05 Notes           227

Page 4

1  26   1-6-05 Notes           228
2  27   1-7-05 Note to Greg Pearce    235
3  28   2-11-05 Notes          237
4  29   Note to Dave and Diane      238
5  30   E-Mail dated 4-6-05       242
6  31   Agreement for Sale of Stock    244
7  32   Credit Agreement and Promissory   251
8   Note
9  33   Settlement Sheet         255
10  34   Conversion Payment Request Form   256
11  35   Reminder List for Diane-Meeting   259
12   with Coop
13  36   Points to cover in meeting    274
14   with Ed Cooper regarding acquistion
15  37   Outline for meeting with     275
16   Ed Cooper
17   8-8-05
18  38   E-Mail dated 8-9-05       282
19  39   E-Mail dated 11-5-09      286
20  40   Corporate Associate Agent Agreement 288
21  41   7-13-05 Agenda          290

Page 5

1  42    Memo to Dick Kelly dated 11-18-05  291
2  43    Conversion Payment Request Form    300
3  (Exhibits included with transcript.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21

Page 6

1  PROCEEDINGS
2  BRENDA DIANE TAMARIZ-WALLACE,
3  was called as a witness and, after having been
4  first duly sworn by the Notary Public, was
5  examined and testified as follows:
6    EXAMINATION BY COUNSEL FOR PLAINTIFF
7    BY MR. LINDSMITH:
8    Q.   Good morning, Ms. Tamariz-Wallace.
9  Could you please state, for the record, your
10 full name and current address?
11   A.   Yeah.  It's Brenda Diane
12 Tamariz-Wallace.  And my address is 1649
13 Homewood Road, Annapolis, Maryland 21409.
14   Q.   And how long have you resided at
15 that address?
16   A.   Since '06.  About September of '06.
17   Q.   And for whom are you currently
18 employed?
19   A.   I'm not.
20   Q.   Are you self-employed?
21   A.   I'm not working.  Currently I'm

Page 7

1  still with George T. Moran, Inc., but I'm
2  currently not working every day.
3    Q.   Okay.  Can you tell me what is your
4  current role with George T. Moran, Inc.?
5    A.   I'm vice president, one of the
6  officers recently.
7    Q.   I'm sorry.  You became an officer
8  recently?
9    A.   Recently.
10   Q.   To the extent you are working with
11 the company, what is your day-to-day role or if
12 it's a part-time kind of role, could you
13 describe what that is, please?
14   A.   I would describe it as a management
15 level.
16   Q.   And what are your duties, generally?
17   A.   They have been a variety of
18 training, instructional, problem solving.
19 Customary oriented.
20   Q.   Is it kind of part-time that you do
21 this?

Page 8

1    A.   Yes.
2    Q.   Can you approximate about how much
3  time per week you devote to George T. Moran,
4  Inc.?
5    A.   Lately, it's been on and on-call
6  basis, so maybe two days, maybe three days.
7    Q.   The other company that you did have
8  that was the corporate agent of Nationwide, is
9  that still an active company?
10   A.   It has not been dissolved.
11   Q.   Does it have any operations?
12   A.   No.
13   Q.   Was there a time when you were
14 working full-time with George T. Moran, Inc.?
15   A.   Yes.
16   Q.   And up to what point -- when did you
17 stop being full-time participating with that
18 company?
19   A.   I would say probably around October.
20 I'm estimating.  October of '09.
21   Q.   And what was the occasion or why did

Page 9

3 (Pages 6 to 9)

A401106
**BRENDA DIANE TAMARIZ-WALLACE        MARCH 4, 2010**

1  you go from being a full-time participant to a
2  part-time participant, as you've described it?
3      A.   Medical.
4      Q.   **Personal medical?**
5      A.   Yes.
6      Q.   **I need to ask these questions and**
7  **I'm going to be asking not because I want to**
8  **intrude personally into your medical history or**
9  **anything like that, and I don't want to know**
10  **your medical history and I'm not going to ask**
11  **you that. I only want to ask you, sitting here**
12  **today for today's deposition, are you under any**
13  **kind of medication that you think might**
14  **interfere with your ability to recall events**
15  **or --**
16      A.   No.
17      Q.   **-- to be able to testify here?**
18      A.   No.
19      Q.   **Okay. All right.**
20           **Ever so briefly I want to ask some**
21  **biographical information from you beginning**

1  **with your formal education after high school.**
2      A.   George Mason University and Trinity
3  College in Washington, D.C..
4      Q.   **And did you receive a degree from**
5  **Trinity College?**
6      A.   No, just short of it.
7      Q.   **And when were you last enrolled at**
8  **Trinity College?**
9      A.   '80s. In the '80s.
10      Q.   **Remember the year?**
11      A.   I don't remember the year exactly.
12      Q.   **George Mason University, did you**
13  **receive a degree from that?**
14      A.   No, that was all undergraduate.
15      Q.   **Okay. Do you have any college**
16  **degree?**
17      A.   I didn't complete it, no.
18      Q.   **Okay. I didn't know if you went to**
19  **a different school or not.**
20           **When you -- I guess I would now like**
21  **to know your career path, so to speak, either**

1  **while you were in college or after you**
2  **completed enrollment in college. And by career**
3  **path I mean your career history, not odd jobs**
4  **here and there.**
5      A.   Nursing, beginning in the '70s.
6  Practice management during that time.
7      Q.   **Can I stop you there? On nursing,**
8  **were you a registered nurse?**
9      A.   No.
10      Q.   **What was the nature of the nursing**
11  **work that you did?**
12      A.   Family practice, primary care. I
13  managed a patient care delivery, the insurance,
14  the overall marketing and management of the
15  practice.
16      Q.   **So it was more the business side of**
17  **the practice?**
18      A.   Uh-huh.
19      Q.   **Was this a -- you need to say yes or**
20  **no for the record.**
21      A.   Yes. I'm sorry.

1      Q.   **Was this like a family physician's**
2  **practice?**
3      A.   Yes, and general surgery.
4      Q.   **Okay. Was it one doctor at a**
5  **physician's group?**
6      A.   One doctor, uh-huh.
7      Q.   **Okay. And when did you stop that**
8  **line of work?**
9      A.   '89.
10      Q.   **And what happened in '89?**
11      A.   I became an issuing agent. I
12  transitioned.
13      Q.   **And we'll be going through what you**
14  **might imagine would be a fair amount of**
15  **documents in this case. And I did notice that**
16  **it looked like you started with Nationwide in**
17  **the FCA program?**
18      A.   No, I did not.
19      Q.   **You did not?**
20      A.   Uh-uh.
21      Q.   **How did you -- tell me about your**

**Page 14**

1  first role with Nationwide, how you came to
2  Nationwide.
3      A.   I was in the program at the
4  community college, got my licensing on my own
5  and was -- I guess I was sought out from that
6  classroom by Nationwide, interviewed was and
7  hired in their NADP program, which is new agent
8  development program.
9      Q.   You said community college, which
10  community college?
11      A.   Anne Arundel.
12      Q.   Can you spell that?
13      A.   A-N-N-E, second word A-R-U-N-D-E-L.
14      Q.   Okay.  And when you said licensing,
15  you mean insurance licensing?
16      A.   Property and casualty, life and
17  health.
18      Q.   Did you secure your licensing in
19  those areas in '89?
20      A.   I did.
21      Q.   What was this program?  Was it a

**Page 15**

1  one-year program, two-year program?
2      A.   It was based on -- the concept was
3  to build an agency from scratch.
4      Q.   I'm sorry.  The community college.
5  The nature of the community college?
6      A.   It was professional licensing
7  program specific based on semesters, one or two
8  semesters to pass the exams.
9      Q.   How many courses was it?
10      A.   I don't remember.
11      Q.   So let's now go to the NADP program.
12  Over the time, Nationwide has had different
13  programs with agents and I -- if you don't mind
14  describing what was the nature of that program
15  in 1989?
16      A.   Just to summarize it quickly, was to
17  build new agencies and agents.
18      Q.   Were you an employee?
19      A.   I was an employee up until the time
20  I had produced enough premium to -- for an
21  agency, I guess, to economically survive.  And

**Page 16**

1  at that point --
2      Q.   At that point, did you graduate to
3  become an independent contractor agent?
4      A.   Yes.  That was the goal of the
5  program.
6      Q.   Right.
7           It sounds very similar to what's now
8  called the FCA program.  Which is why I use
9  that term.
10           Well, tell me a little bit about
11  that in terms of -- I take it, before you came
12  to Nationwide you didn't have any experience
13  selling insurance or any in the insurance
14  field?
15      A.   No.
16      Q.   Aside from whatever health insurance
17  stuff you did with the doctor's office?
18      A.   Uh-huh.
19      Q.   And tell me how you started out.
20  Did they find a location for you?
21      A.   No.  Everything was self-generated.

**Page 17**

1  So I built the agency -- that was my
2  assignment -- from scratch.
3      Q.   And among the assignments, was it
4  for you to find a location yourself?
5      A.   That was one of the things that I
6  would do as an independent agent, so I planned
7  with the -- within the program to become an
8  independent agency.
9      Q.   I guess what I'm getting at is in
10  those first years under that program, were you
11  located in a particular location?
12      A.   I was in the regional office in
13  Annapolis in the early, early days.
14      Q.   And then did there come a time where
15  you found a location that would be the
16  beginning of what came to be your agency?
17      A.   Right.
18      Q.   Did that -- was that location found
19  before you became an IC agent?
20      A.   Yes.
21      Q.   And so during -- while you were

A401106
BRENDA DIANE TAMARIZ-WALLACE       MARCH 4, 2010

1  still in the program, did you work out of an
2  agency away from the regional office?
3      A.   I found a location and opened a
4  location.  I think it was probably a year
5  before I received my IC contract.
6      Q.   Now, is this something that you
7  found all by yourself?  Did you get help from
8  Nationwide?  Did they give you some assistance
9  as to what would be a good location, what's a
10 bad location, that kind of thing?
11     A.   Yeah.  They set the parameters of
12 what their plans were, what their goals were
13 and suggested.
14     Q.   Did they bring location suggestions
15 to you?
16     A.   Not really, no.
17     Q.   Now, as to that location, do you
18 remember the address of that?
19     A.   3161 Solomon's Island Road.
20     Q.   And that was ultimately -- that's
21 the address of the agency that you had also

Page 18

1  when you became an IC contractor?
2      A.   Yes.
3      Q.   While you were still under the
4  program and working at that location, who paid
5  for the rent?
6      A.   I did.
7      Q.   Even when you were still in the NAPD
8  program?
9      A.   Yes.
10     Q.   Who paid the office expenses?
11     A.   I did.
12     Q.   What was the nature of the
13 compensation that you were receiving at that
14 time?
15     A.   Commissions.
16     Q.   Just commissions?
17     A.   Yes.
18     Q.   So is it the case that two years
19 into the program you had grown sufficient sales
20 revenue to be able to afford a location that
21 you would pay for and office expenses you would

Page 19

1  pay for?
2      A.   It was a struggle, but I knew I had
3  to manage it and grow it so I did what I had to
4  do.
5      Q.   Were you still on a salary at that
6  time?
7      A.   No, it was a draw against
8  commissions, to the best of my recollection.
9      Q.   Did Nationwide provide you -- again,
10 still in that program before you became an IC
11 agent, did Nationwide provide you any kind of
12 subsidy or growth subsidies or anything like
13 that, marketing subsidies?
14     A.   Not to my recollection.
15     Q.   Okay.
16     A.   It might have been some small
17 bonuses or small programs that they offered,
18 but I can't give you specifics.
19     Q.   Before you graduated become an
20 independent contractor agent, did you have
21 any -- and I know we're going back some time.

Page 20

1      A.   That's okay.
2      Q.   But did you have any frustrations
3  with Nationwide?
4      A.   No.  No.  It was the best
5  opportunity I had ever had and I was able to
6  identify natural talents and I did very well
7  for building the agency and meeting the
8  requirements of me.
9      Q.   During that three-year period, I
10 take it that by the time you became an
11 independent contractor agent you were aware of
12 the possibilities of premium rates going up or
13 going down and the impact that rate increases
14 or decreases would have upon your ability to
15 sell insurance?
16     A.   I learned eventually what it would
17 take to weather an agency life cycle.
18     Q.   What do you mean by a "life cycle"?
19     A.   The ups and downs and the rates and
20 the customers needs.
21     Q.   Did you understand at that time that

Page 21

6 (Pages 18 to 21)

A401106
BRENDA DIANE TAMARIZ-WALLACE      MARCH 4, 2010

1  if Nationwide had decided to raise premium
2  rates in your area that that could make it more
3  of a challenge to sell insurance, for example,
4  on your close to bind ratios?  Quote, excuse
5  me.
6      A.   I wouldn't -- yes and no.  I mean,
7  it depended on the product.  It depended on the
8  product.
9      Q.   But you were aware that that was a
10 possibility that if Nationwide raised rates to
11 the point that they might be less competitive,
12 generally speaking, that could make it a little
13 bit harder to sell insurance?
14     A.   It could, yeah.
15     Q.   And, likewise, were you aware at
16 that time that if Nationwide tightened up its
17 underwriting standards and became more
18 demanding as to what insurance it would write
19 for policyholders, that could make it harder to
20 sell insurance?
21     A.   Generally.

Page 22

1      Q.   And did you understand also at that
2  time that, in fact, Nationwide had an absolute
3  right to raise premiums or to tighten
4  underwriting standards in their sole discretion
5  without needing your approval to do that?
6      A.   Yeah, they could have.  They could
7  make their decisions to do that.
8      Q.   And you understood at that time that
9  when they make those decisions they make those
10 decisions as to what's happening in the market,
11 they don't make those decisions specific as to
12 you?
13     A.   Yeah.  No, I understood that and I
14 also understood that they made those decisions
15 relative to the market.  I mean, we were
16 dependent on them to be relative to the market.
17     Q.   But you understood, also, that like
18 any company they could make mistakes and
19 perhaps make those decisions that turned out
20 not to be relevant to the market, but that that
21 was still their right to make that mistake,

Page 23

1  right?
2      A.   Sure.  Sure.
3          (Deposition Exhibit No. 1 was marked
4  for identification.)
5      BY MR. LINDSMITH:
6      Q.   Ms. Tamariz-Wallace, I have handed
7  you what's been marked as Deposition Exhibit
8  No. 1.  Do you recognize this document?
9      A.   Yes.
10     Q.   And, for the record, what is this,
11 please?
12     A.   This was my original NADP agreement.
13     Q.   And it indicates on the last page a
14 date of September 18, 1989.  And is that your
15 signature on the last page?
16     A.   Yes.
17     Q.   And this would be the first contract
18 you had whereby you became an employee of
19 Nationwide?
20     A.   Yes.
21     Q.   I want to bring your attention to

Page 24

1  Page 3 of this agreement, Paragraph 14.  There
2  is actually two paragraphs within that number.
3  I just want to talk about the first of the two.
4  I want to read part of this.  I may end up just
5  reading all of it, so forgive me.  It says,
6  "The insurance business being subject to
7  changing laws, regulations and conditions, it
8  is understood and agreed that each company will
9  prescribe rules, regulations, prices and terms
10 under which it will insure risk and each
11 company retains the right to change, alter or
12 amend such rules, regulations, prices and
13 terms, including the right to establish quotas
14 and to limit, restrict or discontinue entirely
15 the acceptance or writing of any policies,
16 coverages, lines or kinds of insurance at any
17 time it deems it advisable to do so and without
18 notice to or consent of the agent.  And any
19 such change, alteration, amendment or
20 limitation shall become effective on the date
21 specified by the company."

Page 25

7 (Pages 22 to 25)

A401106
**BRENDA DIANE TAMARIZ-WALLACE      MARCH 4, 2010**

1    Do you see where I have been
2  reading?
3    A.  Yes.
4    Q.  Now, did you understand at the time
5  you signed this contract, essentially, what we
6  were talking about a little bit before that it
7  was solely within the discretion of Nationwide
8  that if it wanted to raise premiums or tighten
9  underwriting standards or even stop writing
10  insurance in Maryland, they could do so without
11  prior notice or consent from you?
12    A.  Uh-huh.
13    MR. LYMAN:  Objection.  You can
14  answer.
15    BY MR. LINDSMITH:
16    Q.  You need to say yes or no for the
17  record.
18    A.  Yes, I know what it says.
19    Q.  All right.
20    (Deposition Exhibit No. 2 was marked
21  for identification.)

Page 26

1    BY MR. LINDSMITH:
2    Q.  Ms. Tamariz-Wallace, you have been
3  handed what has been marked deposition Exhibit
4  2.  Do you recognize this document?
5    A.  Yes.
6    Q.  And what is this document?
7    A.  This is the document that
8  transitioned me from an NADP agent to an
9  independent agent.
10    Q.  And if you go to the last two pages
11  of this, the second to last page, is that your
12  signature?
13    A.  Yes.
14    Q.  And the date of March 1, 1992?
15    A.  Uh-huh.  Yes.
16    Q.  And, also, if you go to the prior
17  page, Page 7, we have, again, a Paragraph 14.
18  And you're welcome to compare them.  I'll
19  represent to you that that paragraph, that
20  first paragraph in 14 is identical to the
21  paragraph I just read.

Page 27

1    Did you understand, again, when you
2  became an independent contractor agent it was
3  reaffirmed by your signing this that Nationwide
4  could change premiums, change underwriting with
5  standards, choose not to accept business in its
6  sole discretion without prior notice to you or
7  your consent?
8    A.  Yes.
9    MR. LYMAN:  Objection.  You can
10  answer.
11    THE WITNESS:  Sorry.
12    BY MR. LINDSMITH:
13    Q.  I want to ask you, when you became
14  an independent contractor agent, among the
15  benefits -- well, let me -- let me just ask you
16  without looking -- you're welcome to look at
17  the document, but it doesn't need to be
18  referenced in the document.
19    To you, in your mind, what were the
20  benefits of becoming an independent contractor
21  agent?  Why did you want to become one?

Page 28

1    A.  One of the benefits that I
2  identified was the partnership with Nationwide.
3  They were a large company that had a great
4  history, so that was one of the biggest
5  benefits to me.  And, obviously, to excel in an
6  area that I loved.  That I discovered that I
7  was very talented in and I loved doing.  So...
8    Q.  Were there some economic benefits to
9  becoming an independent contractor agent that
10  you did not have under the program?
11    A.  Yeah, there was a promise of an
12  economic benefit in the future, sure, if I
13  performed and was successful.
14    Q.  Among those benefits would have
15  included things like extended earnings?
16    A.  Uh-huh.
17    Q.  You need to say yes or no.
18    A.  Yes.
19    MR. LYMAN:  You should say yes.
20    THE WITNESS:  I'm sorry.  Yes.
21    MR. LYMAN:  Uh-uhs and uh-huhs are

Page 29

8 (Pages 26 to 29)

A401106
**BRENDA DIANE TAMARIZ-WALLACE      MARCH 4, 2010**

1  pretty close on the record.  Yeses or noes.
2       MR. LINDSMITH:  I have never heard a
3  witness not do it.
4       BY MR. LINDSMITH:
5     **Q.   And, in fact, the last page of this**
6  **agreement has -- it's actually an addendum**
7  **because within the agreement there is**
8  **discussion of extended earnings.**
9     A.   Uh-huh.
10    **Q.   So you understood when you signed**
11 **this that there was the potential of securing**
12 **what was -- I called it extended earnings.**
13 **This is called deferred compensation incentive**
14 **credits?**
15    A.   Uh-huh.  Yes.
16    **Q.   So now we're up to 1992, and I would**
17 **like to ask -- to me, I see that the next -- at**
18 **least significant contract change that I see,**
19 **at least, to me, is in 2004 you converted to a**
20 **corporate agency agreement --**
21    A.   Uh-huh.
                                    Page 30

1     **Q.   -- and we'll get to that document in**
2  **a minute, but that's kind of the bookends of**
3  **time that I want to talk about, from 1992 to**
4  **2004.**
5       **Are you able to give me just kind of**
6  **a history of your agency and maybe tell me such**
7  **things as when you started as an IC agent about**
8  **how much premium you've had with your agency**
9  **and the growth of the agency?**
10      MR. LYMAN:  Objection.  You can
11 answer.
12      THE WITNESS:  I couldn't give you
13 specific numbers without looking at more
14 documents about the history of the agency.  I
15 can tell you general terms.
16      BY MR. LINDSMITH:
17    **Q.   Sure.**
18    A.   That I grew a very profitable agency
19 in that time period.  I managed it well
20 according to the training that Nationwide
21 provided to me.
                                    Page 31

1     **Q.   When you first opened your own**
2  **agency location in 1991 --**
3     A.   I think it was '91.
4     **Q.   -- did you have any employees?**
5     A.   Yes.
6     **Q.   How many employees did you have?**
7     A.   I believe it was one and then it
8  grew to two.
9     **Q.   The first employee you had, what was**
10 **the position of that employee?**
11    A.   An associate.
12    **Q.   Associate agent?**
13    A.   That was an associate -- it was a
14 CSR under an associate agreement.
15    **Q.   Okay.  And your second employee?**
16 **I'm not going to go through every employee.**
17 **Was that a producer?**
18    A.   No.  I think that was just
19 reception, office support.
20    **Q.   By the time your agency converted to**
21 **a corporate agency in 2004, how many employees**
                                    Page 32

1  **did the agency have by that time,**
2  **approximately?**
3     A.   It would only be a guess.  I
4  couldn't tell you exactly.  I'm thinking it may
5  have been around six.
6     **Q.   By 2004, did you have more than one**
7  **location?**
8     A.   I don't think so.  I think that came
9  after 2004.
10    **Q.   Now, am I correct -- and we'll get**
11 **into this in a little bit, but also 2004 is**
12 **when you started having discussions with Mr.**
13 **Moran about the purchase of his agency?**
14    A.   Well, let me back that up.
15 Discussion about purchasing an agency was in
16 2003.  And that was brought to me by
17 Nationwide.
18    **Q.   Was that the Moran agency?**
19    A.   No.
20    **Q.   Okay.**
21    A.   That was the introduction of the
                                    Page 33

A401106
BRENDA DIANE TAMARIZ-WALLACE        MARCH 4, 2010

1  concept of acquiring agencies.
2      Q.   And we will get into that.
3      A.   Okay.
4      Q.   I guess what I'm getting at is --
5  and maybe that's a better point of time of
6  reference.  Before Nationwide was having
7  discussions about the concept of acquiring
8  agencies, had you ever done that before?
9      A.   No.
10     Q.   I take it, then, that up to that
11 time you had no experience about the true cost
12 of acquiring an agency, how long it would take
13 before that acquisition would become
14 profitable, what the expenses would be in the
15 acquisition of an agency, things like that?
16     A.   That wasn't in the framework of my
17 job and my agency principal at that time.
18     Q.   Let me ask you this.  It's a
19 slightly different question.  I've asked you
20 about acquiring agencies which I have meant to
21 mean existing separate agencies that are
                                      Page 34

1      actively operating.
2          Did you -- I think from your answer,
3  as you've indicated, that you also did not have
4  any other store front.  In other words, where
5  you just opened up a different location of your
6  agency and just put some producers in there to
7  try to grow more business.  You also did not do
8  that?
9      A.   Let me just back up a second.
10     Q.   Sure.
11     A.   I believe that I had opened a small
12 office, not a store front, but a small office
13 in the Deal/Churchton area.  That was an
14 experiment in growing into that market area.
15 But I don't remember the exact year.  It was a
16 very small experiment.
17     Q.   You used the term "experiment"
18 suggests that it's not there now?
19     A.   No.
20     Q.   How long was that office opened, if
21 you can remember, approximately?
                                      Page 35

1      A.   I think it was probably a year.
2      Q.   Okay.  Do you remember about when
3  that was in this time frame?
4      A.   I'm going to say maybe 2002, maybe.
5      Q.   And how did you have that location
6  staffed?
7      A.   I had a part-time customer service
8  producer type in that office.
9      Q.   Why did you discontinue that office?
10     A.   The market couldn't support that
11 operation.
12     Q.   I guess I'll use the frame 2003.
13 That might be the better time frame.  By 2003,
14 you had been with the company since 1989?
15     A.   Uh-huh.
16     Q.   And I guess a question I have is:
17 Did you have any, not little frustrations, but,
18 you know, major frustrations with the company
19 from time to time?
20         MR. LYMAN:  Objection.  You can
21 answer.
                                      Page 36

1          THE WITNESS:  I wouldn't say that it
2  was anything that was abnormal.  That every
3  agent has in the course of, you know, that many
4  years.
5          BY MR. LINDSMITH:
6      Q.   Did you experience any frustrations
7  with -- so that along the lines of it seemed
8  like year to year Nationwide would switch gears
9  as to what they want to push?  They would want
10 to push a product one year and then not push it
11 the next year.  They would want their agents to
12 do certain programs and not the next year.
13 Anything like that?
14     A.   Well, that was a problem off and on,
15 but I didn't necessarily let that get in my
16 way.
17     Q.   Can you give me an example of
18 something like that?  Does something in
19 particular come to mind?
20     A.   Not really.  Just the rate issues
21 were always problems.
                                      Page 37

10 (Pages 34 to 37)

A401106
**BRENDA DIANE TAMARIZ-WALLACE       MARCH 4, 2010**

1     Q.   How so?
2     A.   Up and down.  It wasn't consistent.
3   It was consistency issue in market approach.
4     Q.   I have heard -- there are -- I have
5   other cases involving agents and that I have
6   heard that from different agents, frustration
7   of along the lines it is hard to plan a
8   business and plan growth when you don't know
9   what the rates are going to be doing.  Is
10   that -- was that a frustration of yours?
11     A.   I mean, not in those years.  I
12   wasn't selling on rates.  I learned very early
13   that selling on rates wasn't necessarily the
14   way to build a business.
15     Q.   If not rates, then what was?
16     A.   Coverage.
17     Q.   What do you mean by that?
18     A.   Well, simply what coverages were in
19   the contract.  What that premium was buying,
20   the customer, and what the customer's needs
21   were.

Page 38

1   description of the agency acquisition program?
2     A.   Well, it wasn't his verbal
3   description.  It was an actual written package
4   that Nationwide had put together as the IAA
5   packet.  And the way it was explained to me was
6   that it was a mutually beneficial program for
7   the agents in the company to grow premium
8   share.
9     Q.   Was it presented to you as something
10   that was an opportunity or as something that
11   you had to do or the company is going to cancel
12   the relationship?
13     A.   It was presented as an opportunity,
14   but there was, I would say, significant
15   encouragement for agents to get involved.
16     Q.   Did you feel -- I want to get a
17   sense of what you mean by significant
18   encouragement.  Are you -- did you feel that --
19     A.   I'm sorry.
20     Q.   I'm trying to understand what you
21   mean by that.

Page 40

1     Q.   Okay.  I guess I now want to move to
2   2003 and you had referenced discussion with the
3   company about expansion?
4     A.   Uh-huh.
5     Q.   And could you tell me what it is you
6   are referring to?  What it is you recall about
7   that?
8     A.   In 2003, Nationwide approached me.
9   I guess I was almost a veteran by then and I
10   had built the agency profitably and they had
11   approached me about their new concept of
12   gaining market share, and it was called their
13   independent agency acquisition program.
14     Q.   And who in particular from
15   Nationwide approached you about this?
16     A.   The agency manager.
17     Q.   And who was that?
18     A.   Dick Kelly.
19     Q.   Dick Kelly?
20     A.   Uh-huh.  Dick Kelly.
21     Q.   What do you remember about his

Page 39

1     A.   When it was presented to me it was
2   presented in such a way that I felt that it was
3   a special reward opportunity.
4     Q.   You mean it was kind of presented to
5   you in a way that they're not presenting this
6   to everybody?
7     A.   No.  They presented it to everybody
8   in a general, you know, agency meeting, but
9   particularly singling out and approaching
10   specific agents felt as though to me it was a
11   reward of some kind.
12     Q.   I'm just trying to understand this,
13   so --
14     A.   For having done a good job in
15   growing and building a profitable agency to the
16   company.
17     Q.   So they were making this available
18   to all agents, but there were certain agents
19   that they were presenting it more to or more
20   specifically to as a reward?
21     A.   Well, significantly encouraging them

Page 41

A401106
**BRENDA DIANE TAMARIZ-WALLACE     MARCH 4, 2010**

1 to step out into this new vision of a program.

2   Q.   Were there any kind of actual

3 presentations or anything that come to mind or

4 anything -- I'm looking for any particular

5 meeting or any particular presentation that

6 comes to mind that you look back now on and

7 say, you know, that was important.

8   A.   That was when I met with Dick Kelly

9 and he brought the packet to me and my husband

10 was invited to attend the meeting.

11   Q.   Why was he invited?

12   A.   Just because, I believe, at the time

13 that because he was a marketer, had a special

14 skillset and we were a unique blend of talents.

15   Q.   Where was this meeting, do you

16 remember?

17   A.   It was the Annapolis Yacht Club.

18   Q.   And was it just Mr. Kelly and you

19 and your husband?

20   A.   Uh-huh.  Yes.  Yes.

21   Q.   Now, I'm really going to press your

Page 42

1 memory.  Do you have any idea what time of year

2 this was or season of the year?

3   A.   Uh-huh.  I believe it was in the

4 fall, early fall of '03.

5   Q.   So now focusing on this particular

6 program, what was the -- what stands out in

7 your mind at the next material thing that

8 happened in this proposed program?

9   A.   Let me ask you a question.

10   Q.   Sure.  Sure.

11   A.   Is it about the presentation or

12 about the actual implementation of the program?

13   Q.   Maybe I should -- I'm sorry.  Maybe

14 it should be more of when you had this meeting

15 and they gave you this packet I guess I wanted

16 to know when did you get to a point where you

17 thought this may be something you want to do?

18   A.   When we evaluated the materials in

19 the packet and looked at the potential economic

20 reward and did the math, because one of the --

21 I mean, just the way it was presented there was

Page 43

1 the opportunity of contingency bonus.  It's all

2 in the packet.

3   Q.   That within the program there were

4 additional economic features that could be made

5 available to you that didn't have available at

6 the time?

7   A.   With the -- I would say yes.

8   Q.   And we'll get into some of those

9 things like the contingency bonus that you're

10 talking about.

11   So I take it, there came a time

12 where you and Mr. Wallace decided this was

13 something you wanted to pursue?

14   A.   Uh-huh.  Yes.

15   Q.   Was it, like, the day after or maybe

16 you thought about it for a month and decided

17 you wanted to do it?

18   A.   We discussed it, reviewed it,

19 discussed it and then we were approached again

20 for a decision.

21   Q.   And do you remember when that was,

Page 44

1 at least, relative to when this last meeting

2 was?

3   A.   I would say that every time I met

4 with the agency manager I was asked if I had

5 made a decision to participate.

6   Q.   Maybe an unfair question.  About how

7 often did you meet with the agency manager at

8 that time?

9   A.   The agency manager dropped into the

10 office frequently and would check in by phone

11 or we had monthly meetings scheduled.  He was

12 in touch a lot.

13   Q.   So I take it that there was a second

14 time when he was talking with you and you said

15 you're interested in pursuing it?

16   A.   It was more than a second time.  It

17 was, you know, I think we're interested.  We'll

18 see what we can do.

19   Q.   In the package that he gave you in

20 that meeting at the yacht club, did it have --

21 because, honestly, I really haven't seen that

Page 45

1  packet.  I didn't see it among the documents
2  produced, if it was.  Do you know if you still
3  have those documents?
4      A.    Yeah, it was Bates stamped.
5      Q.    Was it.
6      A.    Yes.
7      Q.    Okay.  Then we have it.  But I don't
8  have it here today.
9           Did it have examples of a
10  hypothetical agency you might acquire and what
11  that might look like?
12     A.    Yes.
13     Q.    Did it have examples of actually
14  numbers, you know, like if you acquire a 2
15  million dollar agency this could happen?
16     A.    It was presented as a scenario, a
17  case scenario.
18     Q.    Okay.  Well, I'm not going to try to
19  identify the date on which you made the
20  decision, I guess.  At some pointed you and
21  your husband decided to pursue this.  What was

1  the first thing you did toward actively looking
2  for another agency to acquire?
3      A.    We looked at the letters, sample of
4  letters, and adapted them to his direct mail
5  business and sent out letters to agencies, just
6  the same way we would for acquiring insurance
7  policies.
8      Q.    These were suggested form letters
9  that were in the packet?
10     A.    Uh-huh.  Yes.  To my recollection,
11  they were in the packet.
12     Q.    And how did you come up with a list
13  of agencies to send those letters to, do you
14  remember?
15     A.    I believe that the information came
16  from the licensed agencies in the -- from the
17  insurance department or for some other similar
18  reference point for licensed agencies in the
19  state.
20     Q.    Did you put that list together from
21  the Department of Insurance or did Nationwide

1  put that list together, do you remember?
2      A.    I don't remember exactly.  It may
3  have been that it was a combination of efforts.
4      Q.    Tell me what happened next in the
5  process toward your acquisition of an agency.
6      A.    It was defined an agency that would
7  be interested in discussing an exit strategy,
8  exit plan, and so there were a lot of phone
9  calls following up the letters, just a lot of,
10  you know, laying the ground work to have these
11  conversations.
12     Q.    Now, I know ultimately that there
13  became a serious conversation with George
14  Moran, and we'll get to that in a minute.  Were
15  there -- I'm curious about the responses.  I
16  mean, were there -- was there more than just --
17  I mean, did people call you back or write you
18  back and say, hey, I want to sell this agency?
19  What kind of response did you get?
20     A.    It wasn't -- they weren't knocking
21  the doors down.  I mean, that was a very

1  sensitive delicate subject to present to a
2  principal, so the response was, you know,
3  lukewarm.  But then we followed up with phone
4  calls and the conversations became more
5  personable then.
6      Q.    And in following up with phone
7  calls, was there more than just the Moran
8  agency who ultimately expressed some interest
9  in selling?
10     A.    Yeah.  Yes.
11     Q.    Are you able to count about how many
12  there were?
13     A.    I couldn't give you a specific
14  number, but I know that there were
15  interested -- other interested principals and
16  we, you know, checked them off the list for one
17  reason or another.  Either the location may not
18  have -- there were a variety of reasons that we
19  didn't pursue it.
20     Q.    You have anticipated my next
21  question, which was what kind of things would

1  get somebody off the list of someone you wanted
2  to pursue, location being one?  Would another
3  one be the size of their book?
4      A.   Size of the book, market, attitude,
5  type of customers.  Just a variety.
6      Q.   Were these all independent agencies?
7      A.   Yes.
8      Q.   I'm sorry.  Independent agency
9  acquisition program.
10      So these other ones go by the
11  wayside and ultimately the focus is just on
12  George Moran's agency?
13      A.   Right.  That's right.
14      Q.   Now, I -- it looked -- from the
15  documents it looks like that it got the letter
16  of intent stage in the spring of '04?
17      A.   Yes.  That sounds right.
18      Q.   Can you tell me about the first what
19  I'll call serious discussions that you would
20  have had with Mr. Moran?
21      A.   The first serious discussions were

Page 50

1  between Dave and George and I didn't come into
2  the conversation until it had gone a little way
3  in relationship building with George.
4      Q.   Was Dave kind of the lead in that
5  relationship building, at least in the
6  beginning?
7      A.   Yeah.  I would say they got along
8  very well.  They seemed to have a nice mutual
9  respect for each other.
10      Q.   I want to step off this chronology
11  for a minute and ask about the role of Mr.
12  Wallace in your agency up to that time and also
13  his business and his career a little bit.
14      First of all, when did you get
15  married?
16      A.   2002.
17      Q.   And just tell me a little bit of his
18  career.
19      A.   He was a direct marketing.  I guess
20  I would say expert.  He was involved in the
21  direct mail business, but he had specialized

Page 51

1  his business into a niche so that he was
2  mailing for specific customers.
3      Q.   And did he have his own business?
4      A.   He did.
5      Q.   And is that CRMG?
6      A.   That's the current name of the
7  business, yes.
8      Q.   I forget -- that stands for?
9      A.   Client Retention Management Group.
10      Q.   That's the current name of his
11  business?
12      A.   Uh-huh.  Yes.
13      Q.   Do you remember if it had that name
14  at the time you got married?
15      A.   No, it didn't.
16      Q.   Do you remember the prior name?
17      A.   Specialty Direct.
18      Q.   Do you remember when the name
19  changed?
20      A.   I don't remember the specific date.
21      Q.   Now, prior to Mr. Wallace being

Page 52

1  invited to this conversation in the fall of '03
2  at the yacht club with Mr. Kelly, had he had
3  any active involvement in your insurance
4  agency?
5      A.   He assisted me with marketing
6  programs.
7      Q.   Did your -- was there any kind of
8  formal, I guess, business relationship between
9  the two companies such that your agency paid
10  his company for marketing or anything like
11  that, or was this just more in giving you an
12  assist?
13      A.   I would say yes and no.  It depended
14  on the projects, I believe.
15      Q.   So sometimes you would pay his
16  company and sometimes not?
17      A.   Uh-huh.  Yes.
18      Q.   Would the difference be if it was,
19  for example, a significant mailing with
20  actual -- well, with expenses like paper
21  expenses and printing expenses and then there

Page 53

14 (Pages 50 to 53)

A401106
BRENDA DIANE TAMARIZ-WALLACE      MARCH 4, 2010

1    would be a payment to his company?
2        A.   I believe so.
3        Q.   Other than Mr. Wallace assisting on
4    marketing efforts before the conversation at
5    the yacht club in the fall of 2003, did he have
6    any other active role in your agency in any
7    respect in terms of -- I mean, did he have an
8    officer position, did he have any formal
9    position at the agency?
10       A.   No.
11       Q.   Did he have any role in looking at
12   the company's books and looking at controlling
13   expenses or anything like that?
14       A.   No.
15       Q.   Did he have any input, really, other
16   than marketing in the operations of your
17   agency?
18       A.   Not in an official capacity, but
19   certainly in obvious problem-solving capacity.
20       Q.   Can you give me an example?
21       A.   Changing the light bulb.  I mean,

Page 54

1    any -- it was just a typical kind of
2    interaction between a husband and wife
3    business.
4        Q.   I understand.
5            Prior to the Moran acquisition, do
6    you know if he had any experience in acquiring
7    a business.
8        A.   To the best of my knowledge, I would
9    say he had some experience.
10       Q.   Do you know what that was?
11       A.   I think I would characterize it as
12   general business knowledge of having run a
13   business for 25 years.
14       Q.   Do you have any particular
15   understanding of any particular business he
16   actually bought?
17       A.   That was before my time, so I don't
18   really know.
19           (Deposition Exhibit No. 3 was marked
20   for identification.)
21           BY MR. LINDSMITH:

Page 55

1        Q.   Ms. Tamariz-Wallace, I have handed
2    you what's been marked Deposition Exhibit No.
3    3.  And do you recognize this document?
4        A.   Yes.
5        Q.   And what is this, please?
6        A.   This is the corporate agency
7    agreement.
8        Q.   And on the last page is that your
9    signature next to the date, June 21, 2004?
10       A.   Yes.
11       Q.   And before I ask you much about this
12   document, I only have a few questions about
13   this document, why at that time did you switch
14   from the agency being an agency whereby you
15   personally were the agent to the corporate
16   agency agreement?
17       A.   It was on advice of my counsel.
18       Q.   Mr. Hennessy at the time?
19       A.   No.
20       Q.   Who is that?
21       A.   Mike Darrow.

Page 56

1        Q.   Mike Darrow?
2        A.   Uh-huh.
3        Q.   And is there any reason you're able
4    to tell me as to why you wanted it other than
5    advice of counsel, because I don't know -- I
6    don't want to know what your counsel told you.
7    So if the only reason is what your counsel told
8    you, then I don't want you to answer the
9    question.
10          So is it just on what your counsel
11   told you?
12       A.   I would be a little more to the
13   point that I was growing, the business was
14   growing.  But beyond that I relied on counsel.
15       Q.   Okay.  That's really what I was
16   trying to get at.  You know, lawyers will give
17   legal advice, but the business folks make
18   business decisions.  And I'm trying to get at
19   what was the -- was there a business reason as
20   to why you thought this would be valuable?  And
21   I think you may have just answered that.

Page 57

15 (Pages 54 to 57)

1  Anything beyond what you just answered?
2     A.   No.
3     Q.   By going to a corporate agency, did
4  that offer any additional benefits that you
5  didn't already have as an individual IC agent?
6     A.   In that corporate structure I was
7  able to offer more benefits to my employees and
8  attracted -- you know, retain them.
9     Q.   Now, if I understand it right, this
10 is also done in a time frame where you're
11 having active discussions with Mr. Moran about
12 the acquisition of his business?
13    A.   Uh-huh.  Yes.
14    Q.   Was any of this related to that and
15 was that in mind that you also did this?
16    A.   No.
17    Q.   The name of the corporate agency is
18 Diane Tamariz & Associates, P.A..  And when did
19 you actually form that entity?  Was it around
20 this time?
21    A.   I believe it was -- I would say it's

Page 58

1  probably within 90 days of this.
2     Q.   Okay.  On the second to last page of
3  this document there is a page with the heading
4  "Guarantee," and is that your signature next to
5  the date of June 21, '04?
6     A.   Yes.
7     Q.   And I'll read part of this.  "For
8  value received and to induce the above
9  insurance companies to enter into the foregoing
10 agency agreement with Diane Tamariz Associates,
11 P.A., the undersigned individually hereby
12 guarantees the performance by agency of all the
13 terms and conditions contained in said agency
14 agreement to be performed, kept, observed by
15 said agency, including but not limited to the
16 unconditional payment of all amounts and debts
17 due from agency and hereby waives, demands,
18 protest and notice of nonpayment of any and all
19 said indebtedness, liabilities and
20 obligations."  I'm going to stop there.
21    Do you see where I'm reading?

Page 59

1     A.   I see that.
2     Q.   And so you understand here today
3  that you have guaranteed not only any
4  liabilities of Diane Tamariz Associates, P.A.,
5  but also the contract obligations of that
6  company?
7     MR. LYMAN:  Objection.  The
8  guarantee speaks for itself.
9     You can answer to the extent that
10 you know or think you know what the guarantee
11 means.
12    BY MR. LINDSMITH:
13    Q.   I'm just asking for your
14 understanding.
15    A.   I believe I did.
16    Q.   Okay.  Now, if we could go to
17 Paragraph 13 in this agreement -- there is no
18 page number on this.
19    A.   Okay.
20    Q.   We come to, again, what had been
21 Paragraph 14 in the two prior contracts that we

Page 60

1  looked at that were signed in '89 and '92.
2  This one has the heading "Pricing Products
3  Rules and Regulations."
4     Do you see that?
5     A.   Yes.
6     Q.   And I'll represent to you again that
7  the first paragraph -- and you're welcome to
8  read the entire thing -- but it is, again, the
9  same paragraph we saw before in those contracts
10 concerning Nationwide's right to change premium
11 rates, to change underwriting standards or even
12 not to write any insurance, and being able to
13 do so without giving your prior notice and
14 without seeking your consent before doing that.
15 You understood that you were reaffirming that
16 again when you signed this in 2004, did you
17 not?
18    MR. LYMAN:  I'm going to note the
19 same objection as before as to the document
20 speaks for itself.
21    And you can answer as to your

Page 61

16 (Pages 58 to 61)

1  understanding.
2       THE WITNESS:  I know that's what it
3  says.
4       BY MR. LINDSMITH:
5       Q.   And you understood that when you
6  signed this document?
7       A.   Once again, to the extent that
8  that's what it says.
9       Q.   Okay.  But you indicated you
10  understood in '89, you understood in '92 --
11      A.   Right.
12      Q.   -- and you understood in 2004 that
13  Nationwide could do such things without getting
14  your consent first?
15      A.   Yes.
16      Q.   Now, I also want to talk, though,
17  about a different part of this contract.  There
18  is a Paragraph 12, or we can call it a Section
19  12, which is a few pages earlier because it's a
20  long Section 12 and it's under the heading
21  "Agency Security Compensation."  And I'm not

Page 62

1  going to go through this whole thing, but if I
2  understand it right, there are two types of
3  agency security compensation that were
4  available.  The deferred compensation incentive
5  credits and also extended earnings.
6       Did you understand those two general
7  categories that were available to you?
8       A.   Yes.
9       Q.   And I wanted to go -- I think it's
10  four pages back to Subparagraph F, as in Frank.
11      A.   Four pages forward?
12      Q.   Further back into the document.
13      A.   Okay.
14      Q.   And there's a heading next to the F
15  that says:  "Cessation of agency security
16  compensation."
17      Do you see that heading?
18      A.   Yes.
19      Q.   And I will read part of this.  It
20  begins by saying, "All liability of Nationwide
21  for agency security compensation provided for

Page 63

1  in Paragraph 12 and its subparagraphs shall
2  cease and terminate in the event any one or
3  more of the following shall occur."  And I want
4  to come down to Subparagraph 3.  And it says:
5  "After cancellation of this agreement, the
6  agency's principal or its employees solicit or
7  attempt to solicit existing policyholders at
8  any time or directly or indirectly induces,
9  attempts to induce or assists anyone else in
10  inducing or attempting to induce policyholders
11  to lapse, cancel or replace any insurance
12  contract enforced with Nationwide" -- and I'll
13  stop there.  You're welcome to read the rest.
14      Is it the case that since the
15  cancellation of your contract with Nationwide
16  that you have chosen to compete with Nationwide
17  and that you have solicited customers,
18  policyholders of Nationwide?
19      A.   I have.
20      Q.   I just want to make sure we're
21  clear.  I take it, then, you understood that

Page 64

1  when you did that you were giving up your right
2  to extended earnings?
3       MR. LYMAN:  Objection.
4       You can answer.
5       THE WITNESS:  I'm just thinking how
6  to phrase this.  I know that that's what it
7  says.  But I don't know that that's what I did.
8       BY MR. LINDSMITH:
9       Q.   Well, after the cancellation did you
10  choose to compete against Nationwide?
11      A.   Yes.
12      Q.   Well, do you still believe that
13  you're entitled to extended earnings even
14  though you're competing against Nationwide?
15      A.   Yes.
16      Q.   Why?
17      A.   I believe it goes back to the
18  termination.
19      Q.   And what do you mean by that?
20      A.   The subject of the termination.
21      Q.   Can you explain?

Page 65

1    A.   The grounds of the termination.
2    **Q.   You believe the termination was**
3    **wrongful?**
4    A.   I believe that it was inappropriate.
5    **Q.   Why?**
6    A.   Based on my interactions with the
7    company and representations to me by the
8    company.
9    **Q.   Can you explain more, please?**
10   A.   I was specifically told by company
11   officers that they had no problem with
12   customers leaving for premium, for reason of
13   uncompetitive premium going to Moran.
14   **Q.   Any particular officer you're**
15   **talking about?**
16   A.   Kurt Walker.
17   **Q.   I think we will get into this when**
18   **we get to those events.**
19   A.   Okay.
20   **Q.   But I appreciate what you have said**
21   **today because I asked you about it.  Did you**
Page 66

1    appeal your cancellation?
2    A.   I did.
3    **Q.   And that went before a board of four**
4    **people?**
5    A.   Yes.
6    **Q.   And that board is comprised of other**
7    **agents?**
8    A.   Two other agents.
9    **Q.   Two other agents.**
10       And what was the ruling of that
11   **board?**
12   A.   They did not uphold the
13   reinstatement.
14   **Q.   They did not uphold it?**
15   A.   Uh-huh.
16   **Q.   That included the two agents?**
17   A.   I don't know.
18       May I ask a question?  When do we
19   have breaks?
20   **Q.   I apologize.  You take a break any**
21   **time you want to.  And let me tell you also**
Page 67

1    while we're on the record, I didn't really give
2    you kind of the common instructions lawyers do
3    at the beginning of depositions.  We're going
4    to go through a lot of documents.
5    A.   Uh-huh.
6    **Q.   If you think we have a document here**
7    that you want to look at that will help you
8    answer a question, you tell me.  I'll do what I
9    can to get the document in front of you.
10       If you want to take a break for any
11   reason, talking with counsel, or whatever, the
12   only thing I ask is that if there's a question
13   pending you answer the question, unless you
14   think there's a privilege issue, and then
15   you're welcome to talk to Counsel.  But yes,
16   let's take a break.
17       (A short recess was taken.)
18       BY MR. LINDSMITH:
19   **Q.   Ms. Tamariz-Wallace, there's a lot**
20   of documents I have seen with notes and like
21   kind of progress reports and what I might call
Page 68

1    diaries, for want of a better term, of the
2    progress of the discussions with Mr. Moran.
3    A.   Uh-huh.
4    **Q.   I may get into some of those, but --**
5    and I may not, but just try and move this along
6    I would like to get your recollection of really
7    what happened.
8        I think we had left off your husband
9    was having initial discussions with Mr.
10   Moran --
11   A.   Right.
12   **Q.   -- and then when -- it sounded like**
13   you were saying when at least he and Mr. Moran
14   were getting comfortable with each other you
15   were -- you came into those discussions; is
16   that fair?
17   A.   Yeah.  When he was a CRS seller,
18   then I came in.
19   **Q.   And if we could pick up and if you**
20   could tell me kind of the progress of those
21   discussions and how they began and how they
Page 69

A401106
BRENDA DIANE TAMARIZ-WALLACE     MARCH 4, 2010

1  evolved.
2      A.   It was a long, long, long
3  negotiation period.  And he was just a very
4  tough negotiator.  He was very clear what he
5  wanted.  He was very clear how he wanted it and
6  he didn't budge off of that.
7      Q.   It looked like from the documents
8  there is an evolution over time over what the
9  purchase price would be and what the payments
10  would be.  It looks like maybe it began at like
11  a purchase price of 2 million, but he was
12  asking for more.
13      A.   Uh-huh.
14      Q.   It also looked like the cash down,
15  at least when you began, you wanted less cash
16  down.  I think it was like a million down and
17  payments over time, but then ultimately it
18  became, I think --
19      A.   More down.
20      Q.   -- more down and then less over
21  time.

Page 70

1      Mr. Deveaux, about how many other people worked
2  in the Moran agency?
3      A.   I'm going to say at least six.
4      Q.   Six others?
5      A.   Yes.  At least six.
6      Q.   And of those, how many were
7  producers besides Mr. Moran, his wife and Mr.
8  Deveaux, do you know?
9          Or maybe it's easier to say how many
10  producers did they have altogether?
11      A.   They were the key producers.
12      Q.   Before you signed, I guess, what
13  I'll call serious documents like the letter of
14  intent and then ultimately the contract, what
15  was the attraction to you of purchasing the
16  Moran agency and specifically George T. Moran,
17  Inc.?
18      A.   First of all, it was a very cleanly
19  run operation.  It was a very -- just very well
20  managed and very efficient.  Their focus was on
21  commercial.  I had been told repeatedly that

Page 72

1          I just don't remember this if I read
2  it.  How long had he had this agency?
3      A.   Thirty years.
4      Q.   And it was -- was it an agency that
5  he grew from scratch?
6      A.   Yes.
7      Q.   And at the time I saw that he had --
8  was his wife one of the producers, Donna?
9      A.   Yes.
10      Q.   And then there was another
11  significant producer, I want to say Dan Buster,
12  but it may be the wrong name.
13      A.   Russ Deveaux.
14      Q.   I was way off.  Where did I get
15  that?
16          MR. LYMAN:  She knows the name.
17  That's okay.
18          THE WITNESS:  I got you.  That's
19  okay.
20          BY MR. LINDSMITH:
21      Q.   Besides Mr. Moran and his wife and

Page 71

1  Nationwide wanted to get into the commercial
2  arena in a big way with the regional revenue
3  projections or goal of regional revenue to be
4  30 percent of commercial.
5      Q.   In your region?
6      A.   No.  In that region.
7          When I -- I kept the management of
8  the region informed as to how this was going.
9  The negotiations and they were keenly, keenly
10  interested that this was a major vehicle with
11  which to meet those corporate goals.  So I was
12  encouraged regularly to make this deal happen.
13      Q.   Up to that time you had some
14  commercial that you wrote with Nationwide?
15      A.   I had a pretty good commercial book.
16  I had good experience with commercial.
17      Q.   I didn't ask you, in the spring of
18  '04 or thereabouts, about what was the size of
19  your agency in terms of premium?
20      A.   Off the top of my head I would say 3
21  to 3.5 million.  I -- just very rough.

Page 73

19 (Pages 70 to 73)

1    Q.   I remember seeing -- we may see
2  these, but I remember seeing some calculations
3  that indicated commission revenue at that time
4  was about 350,000, which would be consistent
5  with a range of three to three-and-a-half
6  million in premium.  Does that sound familiar
7  to you?
8    A.   Yes.  I would say.  That's ordinary
9  revenue.  Not including contingency.
10   Q.   Right.
11       Of your agency's book, can you give
12 me a rough approximation about how much of that
13 was commercial, 10 percent, 20 percent?
14   A.   I'm going to take a real stab at
15 this.  This is just -- I believe it was close
16 to 30 percent.  Between 20 and 30 percent
17 commercial.
18   Q.   In your agency?
19   A.   Uh-huh.
20   Q.   Does it -- is there typically
21 someone who is devoted to producing commercial

Page 74

1  because it requires kind of a separate
2  skillset?
3    A.   That would be me.
4    Q.   Okay.  Were you the one who --
5    A.   I was it, yeah.
6    Q.   Okay.
7    A.   Can I just clarify that?
8    Q.   Sure.
9    A.   That was producing Nationwide
10 commercial business?
11   Q.   Yes.
12   A.   Just so that we're clear.  That
13 that's my frame of reference was completely
14 Nationwide commercial.
15   Q.   Moran, on the other hand, it had a
16 large commercial book, but it was with several
17 different companies and was it also a different
18 customer base than your customer base?  I mean,
19 different type of customers?
20   A.   Not really.  Not really.
21   Q.   Okay.

Page 75

1    A.   I was in the contractors market
2  myself.
3    Q.   Did you -- were some of your
4  Nationwide customers roofers?
5    A.   No.  Roofing was not necessarily a
6  line of business that was acceptable.  But
7  contractors, home builders, tradesmen, you
8  know, commercial contracting operations as
9  opposed to residential.  I had -- that was my
10 arena in the agency, my agency.
11   Q.   Yes.
12       You said roofers was not acceptable.
13 That's not a line that Nationwide favored to
14 write?
15   A.   Not the general liability for the
16 Workers' Comp.  The auto, perhaps.
17   Q.   Did Moran have among its commercial
18 portfolio some -- not minor, but some sizable
19 roofer clients?
20   A.   I believe there was one.
21   Q.   Was it a significant customer,

Page 76

1  though?
2    A.   I believe that the roofing was a
3  part of what they did, and yeah -- and it was a
4  significant premium.
5        (Deposition Exhibit No. 4 was marked
6  for identification.)
7        MR. LINDSMITH:  I want to say on the
8  record that my paralegal, Carol, will
9  appreciate that when she reads this deposition
10 and transcribes it and does a summary of it.
11 And everybody should say hello to Carol now.
12       MR. LYMAN:  Hello, Carol.
13       MS. KORTE:  Hi, Carol.
14       BY MR. LINDSMITH:
15   Q.   I have handed you what's been marked
16 Number 4.
17       Ms. Tamariz-Wallace, I think I said
18 I handed you -- the court reporter handed it to
19 you.  Sorry about that.  I always say that.
20       Do you recognize what this is?
21   A.   Yes.

Page 77

A401106
**BRENDA DIANE TAMARIZ-WALLACE     MARCH 4, 2010**

1    Q.   Is this part of an application in
2  which you sought a cap loan and also a
3  wholesale choice loan?
4    A.   I believe so.
5    Q.   Now, this is dated, it looks like,
6  in the -- well, it's got a couple of different
7  dates.  On the bottom of the first page it
8  says -- it's handwritten, "New entity effective
9  July 1, '04."  Is that your handwriting?
10   A.   It is.
11   Q.   Do you know what that's referring
12 to?
13   A.   I believe that was the date that the
14 appointments were completed.
15   Q.   When you say, "the appointments,"
16 what are you saying?
17   A.   The license and the appointments of
18 Nationwide as a corporate -- as representing
19 Nationwide with the insurance department.  I
20 believe that --
21   Q.   You mean the corporate, your

Page 78

1    A.   For -- yes.
2    Q.   Not relating to Moran, but to
3  something else?
4    A.   Yes.
5    Q.   And what was the purpose of the cap
6  loan?
7    A.   The Crofton satellite.
8    Q.   Okay.  You were opening up a
9  different satellite office for Diane
10 Tamariz-Wallace?
11   A.   Right.
12   Q.   For your existing agency?
13   A.   Right.
14   Q.   And what currently is the status of
15 that cap loan?
16   A.   It was paid.
17   Q.   Paid off?
18   A.   I met all the production
19 requirements for that operation.
20   Q.   So you got a loan way before that?
21   A.   Yes.

Page 80

1  corporation, Diane Tamariz?
2    A.   The corporation, right.
3    Q.   Okay.
4    A.   It was the agreement -- the order
5  was I signed the agreement with the company and
6  then the company had to appoint the entity to
7  do business.
8    Q.   Okay.  On the next page there is --
9  is that your signature at the bottom?
10   A.   Yes.
11   Q.   And it's dated June 21, '04?
12   A.   Yes.
13   Q.   There's a schedule for type of
14 credit requested above that page or on the top
15 of that page.  And it says cap loan $150,000
16 and the purpose described is agency expansion,
17 purchase equipment, purchase building, hire
18 staff.
19       Did you take out a -- if it's there,
20 I didn't see it.  Did you take out a cap loan
21 at this time?

Page 79

1    Q.   That's why I haven't seen anything
2  on it.
3    A.   Yes.
4    Q.   The wholesale choice loan, $20,000,
5  did you actually take out that loan?
6    A.   I honestly don't know.  I think we
7  did.  But without further research I can't
8  really say for sure.  But I will say that that
9  office in Crofton was intended to be the
10 financial office.
11   Q.   Where you would sell financial
12 products?
13   A.   Primarily -- we would sell lines
14 there but primarily emphasize the financials.
15   Q.   Just so I can get a sense of the
16 locations of the corporate agency locations,
17 there's the first location that you had on
18 Solomon Islands?
19   A.   Old Solomons Island Road, yes.
20   Q.   And then Crofton was a location that
21 you had?

Page 81

21 (Pages 78 to 81)

1    A.  Right.
2    Q.  By 2004, 2005, what other locations
3    did you have?
4    A.  We would have had an office in the
5    downstairs of the Moran building.
6    Q.  That would have been post
7    acquisition of Moran?
8    A.  Uh-huh.  Yes.
9    Q.  Any other locations besides those
10   three?
11   A.  No.
12   (Deposition Exhibit No. 5 was marked
13   for identification.)
14   BY MR. LINDSMITH:
15   Q.  Ms. Tamariz-Wallace, you have been
16   handed what's been marked Exhibit 5, which
17   appears to be an unsigned copy of a letter sent
18   from Mr. Wallace to Mr. Moran dated July 16,
19   2004.  The Bates number at the bottom which is
20   on the first page, CRMG 338, would indicate
21   from that prefix that it came from production

Page 82

1    from his company, CRMG.
2    Does this letter look familiar to
3    you?  And you're welcome to take a minute to
4    look at it.
5    A.  This may or may not have been sent
6    to George.  I can't be sure if it was a draft
7    or if it was the actual letter that would have
8    gone to him.
9    Q.  I was -- I don't see that you're
10   copied on even this draft.
11   Do you know if Mr. Wallace may have
12   sent letters -- that you may have seen, but
13   you're just not copied on, do you know?
14   A.  I doubt that.  I doubt that.
15   Q.  Let me just ask you.  I take it, it
16   was the practice if he was going to send
17   letters such as this discussing the possible
18   acquisition, your possible acquisition of Mr.
19   Moran's agency, that he would have shared this
20   with you in some respect or discussed it with
21   you?  That would have been the practice?

Page 83

1    A.  Sure.
2    Can I add something here?
3    Q.  Yes.
4    A.  On this draft I'm just reading --
5    no.  That's okay.  Sorry.
6    (Deposition Exhibit No. 6 was marked
7    for identification.)
8    BY MR. LINDSMITH:
9    Q.  You have been handed what's been
10   marked Deposition Exhibit No. 6, which appears
11   to be a letter from a Daniel B. Price, a
12   financial analyst with WFG Capital Advisors.
13   Now, there's no letterhead that indicates that.
14   It's just the first paragraph that indicates
15   that.
16   Do you recognize this letter?
17   A.  Yes.
18   Q.  And is this a letter that you
19   received from Mr. Price of September 9, 2004?
20   A.  I believe it is.
21   Q.  Do you know why it's an unsigned

Page 84

1    copy -- I'm not sure who BRDR is.  It was
2    produced from that party, perhaps by a
3    third-party subpoena.  I just don't remember.
4    A.  I think this is just simply a copy,
5    an electronic copy of an original that may have
6    been sent to me.
7    Q.  Okay.  Well, regardless of the
8    document, first of all, this is September of
9    '04.  What is WFG Capital Advisors?  How did
10   they come into this discussion?
11   A.  They are an entity that would
12   evaluate the business operation of Moran and I
13   came to contact them by Nationwide's
14   recommendation.
15   Q.  Who recommended them?
16   A.  Tim Riggins.
17   Q.  Who is Tim Riggins at this time?
18   A.  He was in charge of the acquisition
19   program and they apparently had been their
20   advisors of choice.
21   Q.  And did you then retain WFG Capital

Page 85

BRENDA DIANE TAMARIZ-WALLACE      MARCH 4, 2010

1  Advisors for your agency?
2     A.  Yes.
3     Q.  I note on the third page there's a
4  price structure with a fee of where the
5  purchase price is in excess of $1 million.  The
6  fee is 3 percent of the purchase price.  The
7  ultimate purchase price was, I think, $3
8  million and then some consulting arrangement.
9        So did it turn out that they were
10 paid, ultimately, somewhere in the range of 90
11 to $100,000?  Does that sound right?
12    A.  No.
13    Q.  Oh, 9 to $10,000, excuse me.  I did
14 that wrong.
15    A.  It may have been that.  I don't know
16 exactly, but...
17    Q.  You know, I think my digit was right
18 that at 3 percent of 3 million that would be
19 somewhere in the range of a high five figures.
20       Do you remember paying them anything
21 like that?

Page 86

1     A.  Uh-uh.
2     Q.  Do you remember what you did pay
3  them, I guess, is my question?
4     A.  No.  I think the way I'm reading
5  this letter, the contingent consulting fee
6  would be after the fact.  I wouldn't have paid
7  them that kind of money.
8     Q.  Do you remember how much you did pay
9  them?
10    A.  I know we definitely paid them the
11 retainer and then I don't know.  I'm thinking
12 it was around 10,000 plus.  I can't remember
13 exactly.  But I didn't pay them $100,000,
14 that's for sure.
15    Q.  Okay.  The reason I ask is because
16 in that area of contingent consulting fee it
17 says:  "Upon completion of a successful
18 acquisition they would be entitled to a
19 contingent consulting fee," and that's where
20 that schedule is.  That's why I asked the
21 question.

Page 87

1        And they list a whole bunch of
2  services that they could provide.  Did they
3  actually provide all those services or maybe
4  make it easier, what services did they provide,
5  if you can tell me?
6     A.  They came and evaluated the business
7  operations of Moran, just mainly an
8  underwriting of the business.  But I believe
9  they had a special fee arrangement with
10 Nationwide.  I -- that's all that comes to
11 mind, but I don't remember anything else about
12 that.
13    Q.  Do you believe part of their fee was
14 paid by Nationwide?
15    A.  No, I don't.
16    Q.  Just they had a rate structure that
17 they agree they wouldn't charge agents a
18 certain amount above?
19    A.  I believe they were already involved
20 with Nationwide in Pennsylvania and I think
21 that's where the fee structure was coming from,

Page 88

1  so I don't know exactly.  But I know it was a
2  limited purpose for which they were retained.
3     Q.  Did they provide any services beyond
4  evaluating the business opportunity?
5     A.  No.
6     Q.  Did they work on any pro formas or
7  anything like that?
8     A.  No.
9     Q.  Did they develop any specific
10 recommendations as to whether you should buy
11 the agency?
12    A.  They prepared a final assessment of
13 the business operations of the agency and they
14 would have said it was a good business, a bad
15 business, or whatever, but that was the extent
16 of their services.
17    Q.  Okay.  And I do have in my stack
18 evaluation analysis prepared as of the end of
19 June 2004 and we will get into that.
20       But beyond that evaluation analysis,
21 is that -- after the evaluation analysis, that

Page 89

23 (Pages 86 to 89)

A401106
**BRENDA DIANE TAMARIZ-WALLACE      MARCH 4, 2010**

1  was the end of their engagement?
2      A.  Yes.
3          (Deposition Exhibit No. 7 was marked
4  for identification.)
5          BY MR. LINDSMITH:
6      **Q.  You have been handed what's been**
7  **marked Exhibit 7.  This also is a document --**
8  **well, tell me what this is.  It looks like**
9  **notes.  Do you recognize what this is?**
10     A.  I believe this is probably following
11  a conversation that Dave had with Larry Cook.
12     **Q.  And who is Larry Cook?**
13     A.  At that time he was the acquisition
14  guru for Nationwide.
15     **Q.  Do you remember seeing these notes**
16  **or do these look at all familiar to you?**
17     A.  I may have seen them.  I may have
18  seen these.
19     **Q.  In the beginning Mr. Wallace in the**
20  **second paragraph says that "Diane has about**
21  **600,000 in D.C. IC and her extended earnings**

Page 90

1  are about 350 K."
2          **Do you remember if there was some**
3  **kind of thought that your current D.C. IC at**
4  **that time and extended earnings at that time**
5  **would somehow -- could be tapped in to use**
6  **toward the acquisition of the agency?**
7      A.  There was conversation on -- I don't
8  know if that was at this time or not, but there
9  was conversation about utilizing that, I guess,
10  to -- by the bank as collateral.
11     **Q.  Oh, okay.  At the bottom the last**
12  **comment made on this page says:  "On the**
13  **downside things can happen with an acquisition.**
14  **One, the seller dies; two, markets can turn."**
15         **Do you see that?**
16     A.  Uh-huh.
17     **Q.  I mean, when you were having these**
18  **discussions with the acquisition of the Moran**
19  **agency, did you understand that after you buy**
20  **this agency unpredictable things could happen**
21  **that could affect the success of the**

Page 91

1  acquisition?
2      A.  I would say that, once again, it's
3  the nature of the business.  I mean, it's
4  subject to all the kinds of things that
5  happened to any business in the general economy
6  or the specific.  So, I mean, yeah, I was aware
7  that there was always a plan for the best, but
8  you realize that running any business is --
9  takes a good bit of skill.
10         (Deposition Exhibit No. 8 was marked
11  for identification.)
12         BY MR. LINDSMITH:
13     **Q.  You've been handed what's been**
14  **marked Deposition Exhibit 8, which, again,**
15  **appear to be notes.  It has the heading at the**
16  **top "Acquisition Meeting With Ed Cooper**
17  **9-8-04."**
18         **Do you recognize what these are?**
19     A.  I believe these are Dave's notes
20  from our meeting with Ed Cooper.
21     **Q.  Do you remember -- you and Mr.**

Page 92

1  **Wallace having a meeting with Mr. Cooper about**
2  **this time?**
3      A.  Yes.  There were several.
4      **Q.  And Mr. Cooper at that time what was**
5  **his position at Nationwide?**
6      A.  He was the RVP.
7      **Q.  Meaning regional vice president?**
8      A.  Yes.
9      **Q.  Was this a meeting Mr. Cooper**
10  **wanted, that you wanted, or you both wanted or**
11  **what?**
12     A.  He wanted regular reports on our
13  progress.
14     **Q.  Did it appear to you that he had**
15  **high interest in this particular acquisition?**
16     A.  Yes.
17     **Q.  Now, you're welcome to take time to**
18  **look at this, tell me if you want to do that.**
19  **I'm not going to ask you about the whole**
20  **document.**
21         **In Paragraph 3 it says:  "Nationwide**

Page 93

24 (Pages 90 to 93)

A401106
BRENDA DIANE TAMARIZ-WALLACE       MARCH 4, 2010

1   has stated aggressive growth goals in numerous
2   corporate messages.  This type of acquisition
3   exactly correlates with those goals, yet here
4   at the regional level there seems to be a
5   hindrance bordering on double speak to the
6   stated corporate goals.  This particular
7   acquisition is exactly the type of fast
8   hard-nosed good business growth that corporate
9   has said that they want.  Management should
10  endeavor to support our activities."
11        Do you see where I'm reading?
12    A.  Uh-huh.  Yes, I do.
13    Q.  Is this a -- are these notes of what
14  would have been said to Mr. Cooper or by Mr.
15  Cooper?
16        Look at that last line, "Management
17  should endeavor to support our activities."  I
18  mean, do you know?  Can you tell?
19    A.  I don't know.
20    Q.  Was there?
21    A.  I don't know exactly what that's

Page 94

1   Q.  You were looking for a stronger
2   level of financing from Nationwide than they
3   were at that time willing to provide?  Was that
4   the issue?
5   A.  No, we -- no, we couldn't -- we
6   could not finance this deal on our own.
7   Q.  And you were looking at Nationwide
8   to help you finance it?
9   A.  Well, we were bringing the reports
10  back.  I don't know if it was in this meeting
11  or the next, but we were told to go get the
12  money on our own.
13  Q.  You were told that by Nationwide?
14  A.  Yes.  And so I -- I don't know if
15  this was one of those meetings about that
16  issue, but that's definitely the direction that
17  we received.
18  Q.  Okay.  In Paragraph 5 it says:  "On
19  a regional basis when we stated our objectives
20  of growing through acquisitions some nine
21  months ago the verbal support was there and the

Page 96

1   indicating other than these were just, you
2   know, David's impressions or notes.  I really
3   don't know.
4     Q.  I mean, it kind of goes on here and
5   in the next paragraph, Paragraph 4, in the
6   third line down after the comma it's written:
7   "So why, then, if" -- "would there be any
8   hindrance to culminate a acquisition that so
9   closely follows the stated goals?  This
10  acquisition is not only a prudent use of
11  corporate assets, but should be applauded and
12  supported rather than hindered in any way."
13  Let me just stop there.
14        I mean, was there some kind of issue
15  at this point in early September where you were
16  feeling Nationwide was hindering your
17  acquisition of the Moran agency?
18    A.  If anything, I believe this would
19  point to the financial obstacles.  I don't
20  know.  I'm just -- I would say that was a big
21  issue.

Page 95

1   impression was given and reinforced that this
2   support extended to the very top.  To find at
3   this late date that this is, indeed, not the
4   case undermines the trust and responsibilities
5   that as agents we share as business partners
6   and as good corporate citizens and as
7   Nationwide agents that embrace and follow
8   stated corporation corporate goals."  I'm going
9   to stop there.
10        I mean, that's -- I read that to
11  mean that when it's we and our it's referencing
12  you and Mr. Wallace.  Does that look right to
13  you?
14    A.  I think so.
15    Q.  So in that first line where it says:
16  "We stated our objectives of growing through
17  acquisition some nine months ago" --
18    A.  That was a corporate statement that
19  was made in a regional meeting by Ed Cooper.
20    Q.  Okay.
21    A.  When I said, if you recall, 30

Page 97

25 (Pages 94 to 97)

BRENDA DIANE TAMARIZ-WALLACE      MARCH 4, 2010

1  percent of the region's premiums was to be
2  concentrated in commercial.  And so the way
3  that this strikes me from the conversations we
4  had been through, we were -- this acquisition
5  was representing an opportunity to meet those
6  goals.
7      Q.   Okay.  It is kind of a struggle
8  because I see the first person being used and
9  it looks like in that first line the "we" is
10 more of Nationwide, but later on the "we" is
11 the agent.  So I was trying to figure out who
12 had the acquisition goals by nine months ago.
13 Your recollection is that was Nationwide's
14 goals?
15     A.   Yes.
16     Q.   Okay.
17     A.   Yes.
18          I think this also goes to the fact
19 that corporate was evaluating how much money I
20 had in deferred comp as to whether or not they
21 would support the deal.

Page 98

1      Q.   They are trying to determine whether
2  you could use deferred comp as collateral?
3      A.   We'll have to investigate this more,
4  I think.  But there is a tie between the
5  deferred comp as collateral and funding for the
6  deal.
7      Q.   Okay.  But that's the extent you can
8  recall right now?
9      A.   Right.
10         (Deposition Exhibit No. 9 was marked
11 for identification.)
12      BY MR. LINDSMITH:
13     Q.   You have been handed what's been
14 marked Deposition Exhibit No. 9.  This appears
15 to be an e-mail from Mr. Wallace to a Craig
16 Siebert.  And this is September 9, '04, the day
17 after the date of the notice of this meeting
18 with Ed Cooper.  And it shows you copied on it.
19          Who is Craig Siebert?
20     A.   He is our C.P.A..
21     Q.   Is he -- he's an outside accountant?

Page 99

1      A.   Yes.
2      Q.   Do you remember the name of his
3  accounting firm?
4      A.   Toll, Griffith, and that's all I can
5  remember.
6      Q.   What was Mr. Siebert's role in the
7  transaction that ultimately became the
8  acquisition of the Moran agency?
9      A.   Well, he continued as our C.P.A. and
10 he was evaluating, as we went along, financial
11 impacts for, you, know just as a C.P.A. would.
12     Q.   But, I take it -- how long had he
13 been your C.P.A. after this time?
14     A.   I would say since 2002, mine.
15     Q.   Right.
16          And was this a C.P.A. that you
17 picked, not Nationwide?
18     A.   He had just been our regular C.P.A..
19     Q.   Okay.
20     A.   And I didn't know that Nationwide
21 was -- I wasn't told Nationwide was picking

Page 100

1  C.P.A.s at the time.
2      Q.   Now, a little of the ways down Mr.
3  Wallace says:  "Two hurdles we have them
4  working on," and then he has an Item A
5  conversion time?
6      A.   Uh-huh.
7      Q.   And he writes:  "To expand the
8  conversion time from 15 months to 24 months to
9  qualify for the second conversion bonus."
10          Do you know what he's referring to
11 there?
12     A.   I believe in the conversation with
13 Ed Cooper that we talked about the fact that 15
14 months in the acquisition program was just not
15 enough to get the job done properly.
16     Q.   And let's talk about what that is
17 we're talking about in terms of getting the job
18 done.  You are -- your company is a captive
19 agent and you are a captive agent of Nationwide
20 at that time, correct?
21          By "captive" I mean exclusive.  You

Page 101

A401106
**BRENDA DIANE TAMARIZ-WALLACE       MARCH 4, 2010**

1  can only write Nationwide except where they
2  permit you to write otherwise?
3      A.   Well, let me clarify it from how I
4  believe --
5      Q.   Sure.
6      A.   -- how this actually was working.
7  In order to get this job done Nationwide
8  necessarily and knowingly wanted me to work in
9  that broker position to bring that business
10  from other carriers to Nationwide out of the
11  Moran agency.  So they -- in this acquisition
12  process they suspended that exclusivity.
13      Q.   Right.
14          And we'll get to that in a minute.
15  I'm just saying before they consented they
16  suspended that exclusivity up to that time you
17  were an exclusive agent, you could only sell
18  for Nationwide or you could broker through
19  what's called Triple I; is that right?
20      A.   Yes.
21      Q.   And so this conversion period we're

Page 102

1  talking about from 15 to 24 months, was the
2  concept at the time that that would be your
3  window that would be open that would allow you
4  to be nonexclusive with the Moran agency so
5  that over time some of that insurance would be
6  converted over to Nationwide?
7      A.   Right.  However, on the regional
8  level they acknowledged that that may have --
9  may require time past the 24 months.
10      Q.   Okay.  But at this point, was the
11  conversation with Mr. Cooper that Nationwide's
12  position was 15 months, but you were looking at
13  it and saying no we need 24 months to convert?
14      A.   Yes.
15      Q.   Let's go through income pro forma,
16  which is the Item B of the hurdles.  I want to
17  understand what's written here and you tell me
18  if these are better questions given to Mr.
19  Wallace.  I'm going to try to walk through this
20  with you.  The first time there he says:
21  "Right know there is a 3 percent signing bonus

Page 103

1  on probably 5 to 7 million and then another 4
2  percent on that which converted."
3          What is that referring to, a signing
4  bonus?
5      A.   That would have been the
6  preacquisition bonus.  According to the plan
7  documents at the time, this was the way the IAA
8  program had been set up.
9      Q.   That they would prepay you a bonus
10  that would be used toward the acquisition?
11      A.   Not necessarily.  I mean, it's just
12  a preacquisition bonus on the estimated
13  compensation.
14      Q.   So here the estimated bonus in this
15  paragraph is, you know, they're making some
16  assumptions of $5 million at 7 percent which
17  gets to 350,000.  Do you see that?
18      A.   Yes.
19      Q.   Did that come near what the actual
20  bonus was paid?  Is that right around that
21  number?  Not exactly, but close?

Page 104

1      A.   It could have been.  It could have
2  been.
3      Q.   Okay.  The next couple of paragraphs
4  talks about a contingency bonus and in
5  Paragraph Number 2 in the middle line it says:
6  "Diane is on track to qualify for this from DTA
7  and could be 6 percent of 3.5 million."  Then
8  it goes on.  It says:  "Basically barring some
9  circumstances."
10      A.   Uh-huh.
11      Q.   And it could be a $210,000 bonus
12  even if the acquisition does not happen.
13  That's just describing the contingency bonus
14  that you might be getting just from your agency
15  operations for that year.  Am I reading that
16  right?
17      A.   Yes.
18      Q.   And then in the next numbered
19  paragraph it says:  "However, this" -- excuse
20  me -- "with the acquisition happening next year
21  the formula holds, this 6 percent could be on

Page 105

27 (Pages 102 to 105)

BRENDA DIANE TAMARIZ-WALLACE     MARCH 4, 2010

Page 106

1  12 to 14 million.  That's a hefty 720 to
2  840,000 in bonus.  It certainly does not take
3  too many years of this to bring a real smile on
4  our faces."  Let me stop there.
5        I guess I'm a little confused by
6  that because the concept here is you're going
7  to acquire the Moran agency, which has little,
8  if any, Nationwide business at the time of the
9  acquisition, or did it have some?
10    A.  Well, if it didn't -- I mean, that
11  would defeat the whole purpose of the deal if
12  it didn't have eligible Nationwide business.
13    Q.  No, no.  I mean before you bought
14  the Moran agency, Nationwide was not a -- I
15  mean, obviously, it wasn't a carrier --
16    A.  No.
17    Q.  -- that he could write for?
18    A.  Maybe I don't understand what you're
19  asking.
20    Q.  Yeah.
21        Well, even though -- if I understand

Page 107

1  it right, the size of premium written by Moran
2  at around that time was about 11 million or
3  close to 11 to 12 million.  Does that sound
4  right?  And so if you were to acquire that, was
5  it anticipated that, I think, 90 percent of
6  that book would come over to Nationwide over
7  time?
8    A.  I think that was one and I'm not
9  sure.  I believe that was one of the numbers
10  they used, but there was also a requirement for
11  DTA to continue growing.
12    Q.  Right.  Right.
13    A.  And there was also the opportunity
14  to write new business above and beyond.
15    Q.  So this paragraph was kind of
16  addressing the scenario of, I guess, maybe an
17  optimistic scenario of a lot of the
18  transitioning within a year so that DTA could
19  be as high as 12 to 14 million on which a
20  contingency bonus could be calculated.  Is that
21  how that means?  Is that fair?

Page 108

1    A.  I would say most likely because we
2  certainly had -- I certainly had the intent to
3  grow that Nationwide business to a sizable
4  agency.  It may not have been in two years, but
5  it would have definitely been the spring board
6  for real synergistic growth.  So to answer your
7  question I definitely had an eye on being a
8  very healthy sized Nationwide agency.
9    Q.  Right.
10        And, just for the record, we'll get
11  into the purchase agreement.  But you came to
12  purchase George T. Moran, Inc. in, I think it
13  was 200 shares and you were the sole
14  shareholder when you first acquired it?
15    A.  Yes.
16    Q.  So if we go to paragraph numbered 4
17  it says:  "So the baseline is DTA equals
18  350,000 gross commission on 3.5 million and
19  Moran, 1.4 million gross commission on 12
20  million, and George not pulling executive fees
21  we will have 1.7 million gross commission on

Page 109

1  15.5 of the WP.
2        Do you see where I'm reading?
3    A.  I see that.
4    Q.  So I'm reading this to mean kind of
5  transition aside if we just look this whole
6  thing together between Moran and DTA, the total
7  premium base will be 15.5 million which would
8  be commission generation of about 1.7 million.
9  Is that a fair reading?
10    A.  I think what this is referring to is
11  that there was some of the Moran business that
12  was necessarily going to have to stay in
13  specialty carriers.
14    Q.  Right.
15    A.  But I'm not for sure that those
16  numbers are -- that the gross commission pieces
17  are correct.  I think it's pie in the sky
18  planning to look at these numbers.  The real --
19  and I don't know -- also, I don't know if this
20  is taken from the pro forma, the actual pro
21  forma.  So I'm not sure where these numbers

A401106
**BRENDA DIANE TAMARIZ-WALLACE      MARCH 4, 2010**

1  were coming from other than just conversation
2  and --
3      Q.    What was the commission structure,
4  generally, that you found with the Moran agency
5  before you bought it?  And by that it, I mean
6  were they typically 10 percent commissions or
7  what was the typical range of commissions on
8  insurance that they wrote?
9      A.    In the beginning of all of this I
10  didn't get into it because I was -- I didn't
11  dwell on that piece of it because I was so busy
12  transitioning business.  But we were looking at
13  the net, the way the business was being run and
14  the net profit going into it.  So I didn't -- I
15  didn't care what the other carriers were paying
16  at the time.  I -- as I said, I was focused on
17  maximizing the potential with Nationwide.
18      Q.    Did you eventually come to
19  understand what the carriers were paying in
20  terms of commission rates?
21      A.    When I was forced to, yeah.  I mean,

Page 110

1  I had to understand that.
2      Q.    Are you able to tell me generally
3  what those rates were in a general sense or how
4  they compared to rates you were getting from
5  Nationwide?
6      A.    They were higher generally.
7      Q.    If you were to blend them and give
8  me your best estimate, would they be in the
9  range of 11 or 12 percent?
10      A.    I would have to take a look at some
11  other documents to be absolutely sure, but I
12  would say that that might be close.
13      Q.    Okay.  Here's what I'm getting at,
14  and this question is kind of triggered by that
15  Paragraph 4.  Is it the case that if you're the
16  owner of Diane Tamariz & Associates and you
17  come to be the sole owner of George T. Moran,
18  Inc., as the owner of both companies you're
19  going get the commission revenue from your
20  Nationwide agency, you're going to get the
21  commission revenue from George T. Moran, Inc.,

Page 111

1  so that your total commission base -- your
2  total commission base regardless of how much
3  comes over to Nationwide, and I'm talking about
4  your base commissions, not bonus or
5  contingencies, your total base commission will
6  be, as a package, the same, won't it?
7      A.    Not necessarily.
8      Q.    Why not?
9      A.    Retention impacts that.
10      Q.    How so?  What are you talking about?
11      A.    Retention of the base of the
12  customers and the renewals.  That's what's
13  generating the revenue.  So if the retention
14  drops, the revenue is going to drop.
15      Q.    Well -- but is there something
16  about -- what does it have to do with
17  conversion, I guess, is my question?
18      A.    It had a lot to do with it.
19      Q.    If you're unable to convert say a
20  commercial customer over to become a Nationwide
21  customer, so they stayed with the Moran agency?

Page 112

1      A.    Well, my experience, what I went
2  through, was that a destabilization of the
3  Moran agency by just introducing the whole
4  conversion concept and changing from choice of
5  carriers to one and only one carrier, that was
6  a real problem with some of the customers.
7  They didn't want to change.  I had to overcome
8  that entire hurdle with the customers and some
9  of them didn't like that at all.  Didn't even
10  like being broached with this idea and we lost
11  them as customers entirely.  So that affected
12  the revenue streams.
13      Q.    Some customers just because they
14  didn't like the effort of --
15      A.    They -- they -- let me think of how
16  to explain this.  In introducing the concept of
17  hi, we're here to introduce this great new
18  carrier with Nationwide, the very first
19  reaction was that they were used to already
20  shopping their business every year.  So when
21  they asked me questions about would -- will I

Page 113

29 (Pages 110 to 113)

1 be shopping my business next year or would it
2 come up in discussion, it invariably did, my
3 answer was no.
4     **Q.   Because you only had a window in**
5 **which you could?**
6     A.   Once they were converted to
7 Nationwide that was it.  I mean, the practice
8 was not to shop them.  We couldn't do that.
9 So --
10    **Q.   Well, then were there some customers**
11 **that said, no, I want to be able to shop around**
12 **so you just kept them with Moran?**
13    A.   If they refused to transition we
14 would just have to leave them alone until the
15 next time we could try again or they just left
16 because they didn't like Nationwide or they had
17 a bad experience or they didn't want to -- if
18 George Moran was changing their way of doing
19 business, I have been doing business with him
20 for 30 years, I don't want to change.  If I'm
21 going to have to change I'm going somewhere

Page 114

1 else.  So it was a very delicate balance with
2 these customers to even approach the transition
3 discussion.  And to keep them, you know, going
4 along and get their permission to quote their
5 business.  It was just like acquiring a brand
6 new piece of business.  It was really
7 difficult.
8     **Q.   I take it that that kind of**
9 **threshold, those threshold discussions of going**
10 **to a customer who for years had been enjoying a**
11 **choice of insurance companies, that initial**
12 **resistance that you encountered sometimes had**
13 **occurred before you even got to talking about**
14 **price or anything like that?**
15    A.   I had to overcome the market
16 competition outside the customer, just out in,
17 you know, with a competitor.  Because they were
18 trying to use this to their advantage.
19    **Q.   They heard about it?**
20    A.   Oh, absolutely.  So I had to
21 overcome all of the difficulties in the

Page 115

1 marketplace of things being said, that
2 Nationwide couldn't do this.  Nationwide won't
3 be able to give you this coverage and -- you
4 know, before I even really was able to dig in.
5 The point I'm trying to make is this revenue
6 stream that you're talking about is totally
7 dependent on the retention ability and the
8 conversation he's having here, this pie in the
9 sky idea is because that was nowhere near the
10 kind of reality we were going to encounter.
11    **Q.   So that's very helpful.  So the**
12 **reality that -- of my term, the buzz saw**
13 **reality that hit here included the fact that**
14 **word got out that George is selling or George**
15 **is moving competitors?**
16    A.   Taking customers.
17    **Q.   Smelled blood in the water or**
18 **opportunity?**
19    A.   Sharks, yes.
20    **Q.   And went after those customers and**
21 **in doing so would say things like you won't**

Page 116

1 **like Nationwide, you won't like this?**
2    A.   Not only --
3     **Q.   At least that's what you were**
4 **hearing back from them?**
5    A.   Not only that, but other Nationwide
6 agents were preying on the opportunity to
7 take -- to transfer business out of my agency
8 over to their Nationwide agency.  And it was
9 happening.  I'm like, oh, my goodness.  Wait a
10 minute.  And so, you know, I saw within the
11 first 90 days the impact of the exclusive world
12 and the brokerage world colliding.  And I --
13 quite truthfully, I had not in any way been
14 prepared for that happening in this acquisition
15 program.  I mean, I had a reasonable
16 expectation that there were going to be some
17 hard core, if it's not George it's nobody, you
18 know.  But the reality that I faced was
19 amazing.  It was just -- it really took me by
20 surprise.  I was not prepared for that level of
21 difficulty.

Page 117

**Page 118**

1      And it was the larger higher premium
2  accounts that were the most disturbed.  So my
3  job was particularly -- I mean, it was a
4  challenge that, I think, we rose to admirably.
5      **Q.   The reason I'm leafing through some**
6  **documents I notice some discussion about the**
7  **difficulty of the first 90 days.  I recall that**
8  **being something that I read in some of these**
9  **discussions.**
10     A.   It wasn't limited to the first 90
11 days, but those were the initial.
12     **Q.   Yeah, I didn't mean to limit it at**
13 **that, but your first three months is when**
14 **you're actually engaged in doing this after you**
15 **acquire the agency.**
16     **Now, the -- we'll get -- I kind of**
17 **want to just, you know, finish this discussion**
18 **without getting bogged down by the documents.**
19 **But I do need to kind of frame when you**
20 **actually acquired the agency.**
21     **I'll show this to you later on.**

**Page 119**

1  **It's the agreement for sale of stock and I see**
2  **a date of March 11, 2005.  Does that sound**
3  **about right when you signed the stock purchase**
4  **agreement?  It was to close in 60 days after**
5  **that.**
6     A.   I think that's right.
7     **Q.   Could close in maybe May of '05,**
8  **does that sound right?**
9     A.   April 29th, '05.
10    **Q.   Okay.  And I'm not going to hold you**
11 **down to 90 days, but basically in the first**
12 **three months or so after the closing and you**
13 **became the owner of the company, that's when**
14 **you hit this reality you're talking about?**
15    A.   Uh-huh.  Among others, yes.
16    **Q.   Well, what were some of the other**
17 **realities?  That's what I want to talk about,**
18 **those first 90 days.  It looks to me from the**
19 **document there were some --**
20    A.   Technology.
21    **Q.   Technology interface issues?**

**Page 120**

1     A.   Didn't match up.  We blew out the
2  first -- I will tell you, the first week we
3  blew out the entire computer system in the
4  office trying to --
5     **Q.   Yours or Moran?**
6     A.   Moran.  Trying to, you know, get AOA
7  up and running, the database system.
8     **Q.   Is it cultural issues?  By that I**
9  **mean, cultural fit issues?**
10    A.   Actually, I would say beyond
11 cultural.  You know, the difference between
12 working as a broker and working as an exclusive
13 I would define that as cultural.  Beyond that,
14 it was just -- it was differences in commercial
15 orientation.  The company was different than
16 any other company.
17    Nationwide is proprietary or had for
18 the longest time been proprietary over their
19 commercial products.  So everything was
20 different.  The application process, they were
21 different applications than the agency had

**Page 121**

1  normally used to record applications.  The
2  Nationwide applications could have been as many
3  as 20 pages long to submit one risk when the
4  agency had routinely used maybe three pages for
5  the same risk.  So some of those kinds of
6  day-to-day.
7     **Q.   So the people who -- people on the**
8  **Moran side who had been used to filling out an**
9  **application for a commercial policy of maybe**
10 **three pages now had to get adjusted to an**
11 **Nationwide application which was as much as 20**
12 **pages for some lines?**
13    A.   And it was represented to me that at
14 the rollover that this would be a very easy
15 seamless processes, but we ended up having to
16 submit everything to new business guidelines,
17 which included credit.  We lost business
18 because we were applying new business
19 guidelines instead of what I had expected.
20    And to make myself clear, I was told
21 the transition process would be smooth,

**BRENDA DIANE TAMARIZ-WALLACE      MARCH 4, 2010**

1 seamless, support from the Gainesville service
2 people, support from the underwriters, when, in
3 effect, what I got was a new guideline saying
4 everything must be written as new business.
5 **Q.   So that -- so from your perspective**
6 **and from the perspective of the people who had**
7 **come from the Moran side of the business, they**
8 **had been dealing with maybe commercial**
9 **customers they had for 20 years and now they're**
10 **to be treated as new customers by Nationwide**
11 **which means now they go through a credit check,**
12 **basically?**
13 A.   Right.  Yeah.  So I had employees
14 leaving.  Seasoned and Moran employees, CRSs
15 that new the customers that I was depending on
16 for retention of those customers.  They're see
17 you.  I'm out of here.
18 **Q.   Because they just didn't like going**
19 **through that additional effort?**
20 A.   They were -- they just thought it
21 was the most ridiculous thing.  They were

Page 122

1 transition.
2 **Q.   So when it was written, it would**
3 **still go back to the week of bind, but it would**
4 **just take too long?**
5 A.   But it takes six months.  And
6 business owners that had been used to having
7 their policies like this and knew exactly where
8 they stood, they weren't happy.
9 **Q.   I take it that was different for**
10 **you, too.  I mean, it didn't take that long**
11 **when you wrote commercial on the DTA side?**
12 A.   Sometimes.  I mean, it was much
13 different because we had such volume we were
14 trying to manage.  I would say -- there was one
15 other point I wanted to make about that in that
16 process.  I had been promised an account
17 underwriting approach, so account meaning you
18 have a business audit, you have a general
19 liability, you have Workers' Comp.  If the
20 account was approved, all of the policies were
21 approved.

Page 124

1 revolting because it was a different culture.
2 It was nothing that they had ever learned
3 through -- so I became teacher, the trainer.  I
4 would -- you know, shepherding them, try to get
5 them settled down so we could get the job done.
6 We had computer issues.  We had
7 coverage issues.  We had billing and accounting
8 issues.  We had mail issues.  We couldn't get
9 the policies issued for -- for -- you know, the
10 other carriers policies -- new policies would
11 come in issued within a week of binding.
12 Nationwide policies that had been their
13 experience and their standard of operation.  So
14 the Nationwide was taking six months sometimes
15 to get a policy and the customers had not been
16 used to that and the staff had not been used to
17 it.
18 **Q.   Did those customers still have -- it**
19 **took as long as six months.  Were they still**
20 **written by their old carrier during that time?**
21 A.   No.  These were policies we tried to

Page 123

1 What I learned, however, was that
2 when I got into writing one line that's all I
3 could write until the next renewal date.  Which
4 was particularly common occurrence for, let's
5 say general liability renewed first, Workers'
6 Comp renewed six months later.  I couldn't take
7 the Workers' Comp or the business auto midterm
8 that the underwriters wouldn't.  So if the
9 Workers' Comp came first with a general
10 liability renewing six months later,
11 underwriters would decline the Workers' Comp
12 because I didn't have the general liability
13 first.  Well, it was impossible form me to do
14 the general liability first because it wasn't
15 due yet.
16 So rather than sticking to the
17 account underwriting practices that I had been
18 promised -- because, obviously, that's the only
19 thing that was going to work within 24 months.
20 Because by the time I got around to trying to
21 pick up the general liability, the Workers'

Page 125

32 (Pages 122 to 125)

1  Comp had already been declined.  I write the
2  general liability, I had to wait another year
3  to pick up the Workers' Comp or, you know, run
4  the risk of harming the customer by an interim
5  cancellation on Workers' Comp, which messes up
6  their mod and everything else.
7      It was that alone caused me to lose
8  business.  Because if they had a bad experience
9  in the first policy, then I tried to add -- and
10  they don't get it for an extended period of
11  time and I try to pick up the other accounts in
12  the process when the renewal came up and the
13  billing was wrong, they would say, no, I don't
14  want to have anything else to do with
15  Nationwide.  I want out of it.  Put me back
16  where I came from.  Don't move my other
17  business.
18      So it was a functional reality of
19  arguing to get Nationwide to stick to the
20  account underwriting methodology.  But they
21  refused to.  So I don't know if that helps

Page 126

1  explain.
2      Q.   Yeah.  We'll come back to that
3  during our break.  Brian has a conference call.
4          (A short recess was taken.)
5          BY MR. LINDSMITH:
6      Q.   Ms. Tamariz-Wallace, we had left off
7  before we took our break talking about -- we
8  have been talking about a 90-day period, I know
9  it's not just the 90-day period, but those
10  first months after you acquired the Moran
11  agency and you had -- we had left off with you
12  describing some of the issues of now the actual
13  transition.  I don't mean just the transition
14  of insurance books, but also really the
15  blending of operations or trying to figure out
16  how operations are going to work.
17      In -- I'm trying to understand --
18  I'm trying to get some kind of quantitative
19  understanding as to the impact those kinds of
20  things were having on your customer base and in
21  terms of a -- I mean, if you get 11 million did

Page 127

1  you lose $500,000 of premium on the Moran side,
2  something like that?
3      A.   I could probably answer that better
4  if I had access to the records, if I could
5  really look at the data, but I could -- and I
6  could answer that.
7      Q.   Can you tell me today how much
8  premium today is enforced that is written
9  through George T. Moran?
10      A.   I don't have those numbers in my
11  head because I haven't been actively in there.
12      Q.   Okay.  I saw a tax return that was
13  for the year end 2007 that based upon the
14  revenue would indicate that the premium had
15  grown to as much as 19 million.  Does that
16  sound right to you?  Am I in the ballpark?
17      A.   I would actually have to see what
18  that tax return was -- which entity it was
19  referring to if it was combined.  That doesn't
20  sound like the full -- that doesn't sound like
21  a number that's familiar to me.

Page 128

1      Q.   Okay.  Well, I guess what I'm trying
2  to figure out is before you went to a part-time
3  role with the Moran agency, what was the peak,
4  the most premium you had written through that
5  agency?
6      A.   I honestly thought -- and I can't --
7  once again, I can find the documents to answer
8  the question specifically, I thought it to be
9  less than that.  I thought it to be -- the
10  number that I recall was 16, but I can't --
11      Q.   And I'm not going to hold you to it.
12  I understand that's just your best recollection
13  today without the benefit of the documents.
14      How is it that Moran was able to go
15  from a 11 or $12 million agency when you bought
16  it in 2005 to become a something more that
17  could be as much as $16 million?
18      A.   Let me answer it this way:  When I
19  discovered and recognized that the acquisition
20  itself was failing, the transition had failed,
21  I had to find other ways to make up for the

Page 129

A401106
**BRENDA DIANE TAMARIZ-WALLACE       MARCH 4, 2010**

1  damage that had already been caused to Moran
2  from the failure of the acquisition effort.  So
3  that was why the numbers increased.  When the
4  appetite for Nationwide changed we had to find
5  a way to survive with getting into those --
6  getting into growing, organic growth.  Not
7  something --
8      Q.   Are you able to identify the
9  approximate time where you determined in your
10  own mind the acquisition was failing?
11     A.   I think I documented it throughout
12  with management that it came to -- and I would
13  say that probably in 2007 it became pretty
14  apparent to me that there were agendas at work
15  that hadn't been disclosed to me that caused
16  the agency -- the acquisition program to just
17  fall apart.
18     Q.   So when you came to that
19  realization, what exactly did you then do to
20  try -- to use your words -- make up for the
21  damage?  I mean, basically, did you buy some
                                    Page 130

1      Q.   Was there a different business name
2  for it?
3      A.   No.
4      Q.   Okay.  What was the -- at the time
5  you bought the Insurance Place -- and let me
6  ask you first:  What was the nature of the
7  acquisition?  Was it a stock purchase?
8      A.   No.  Asset.
9      Q.   Asset purchase.
10         And generally what were the assets
11  that were bought?
12     A.   It was a book of nonstandard
13  business.
14     Q.   Nonstandard auto?
15     A.   Yes.
16     Q.   And what was the size of that book
17  at the time of purchase?
18     A.   I'm thinking it was about 2.5
19  million.
20     Q.   What did you pay for that?
21     A.   I'm thinking it was around 200.
                                    Page 132

1  other agencies?
2      A.   Yes.  We leveraged.  We looked at
3  another agency that would fit the appetite
4  where Nationwide was at that time.
5      Q.   What other agency was that, the name
6  of the agency?
7      A.   Insurance Place in Laurel.
8      Q.   Did you buy that?
9      A.   George T. Moran bought it.
10     Q.   Why did George T. Moran buy it?
11     A.   Because Nationwide had changed their
12  appetite.
13     Q.   Was it bought in 2007?
14     A.   That was the end of 2006.
15     Q.   The end of 2006?
16     A.   Yes.  So it was timed in with
17  that -- with the recognition that I had to do
18  something, try to do something.
19     Q.   I think you said the name of it was
20  the Insurance Place?
21     A.   Right.
                                    Page 131

1      Q.   200,000?
2      A.   Thousand, I believe.
3      Q.   Who was the seller or owner of the
4  insurance place?
5      A.   Luanne Rexrode.
6      Q.   How do you spell that?
7      A.   Rexrode, R-E-X-R-O-D-E.
8      Q.   Now, nonstandard auto, was this
9  book already in place among a number -- was
10  this an independent agency?
11     A.   Yes.
12     Q.   Was it an independent agency that
13  that's the only thing she wrote?
14     A.   Yes, pretty much.
15     Q.   Is nonstandard auto a little bit
16  more of a -- I guess that I call a volatile
17  book?
18     A.   Very much so.
19     Q.   Why is that?
20     A.   It's usually a reflection of hard
21  economic times or hard, you know, driver
                                    Page 133

A401106
BRENDA DIANE TAMARIZ-WALLACE      MARCH 4, 2010

1 circumstances.  So it's a little more difficult
2 to service and maintain.
3      Q.   Renewal rates were lower?
4      A.   Depended because the purpose of that
5 was to make up for the failures to use that
6 premium to put with Nationwide because that was
7 the appetite they now had.
8      Q.   For nonstandard auto?
9      A.   Yes.
10      Q.   You're saying this was Nationwide's
11 appetite?
12      A.   Yes.
13      Q.   Then why did George T. Moran buy it?
14      A.   Because Nationwide refused it.
15      Q.   I guess I'm not understanding.
16 You're saying --
17      A.   I went to Nationwide and they told
18 me no, you hit your funding wall.  We're not
19 going to participate in this acquisition.
20      Q.   Where did you get the funding to be
21 able to pay $200,000?

Page 134

1      A.   I leveraged it out of cash flow
2 revenue from that agency.
3      Q.   So it was to be paid over time?
4      A.   Yes.
5      Q.   Has it been paid off?
6      A.   Yes.
7      Q.   About when did it become paid off?
8      A.   I don't remember, but I know that
9 it's paid.
10      Q.   And how has that book done since you
11 bought it in the end of 2006?  Is it still
12 around 2.5 million?
13      A.   I don't know specifically, but I
14 know that that business -- the majority of that
15 business went to Nationwide.
16      Q.   Why do you say that?
17      A.   Nonstandard auto, that's where we
18 placed it.  That was the whole intent of the
19 acquisition.
20      Q.   Okay.  So you acquired it and then
21 eventually placed most of it with Nationwide?

Page 135

1      A.   Uh-huh.  Yes.
2      Q.   And did you place it through your
3 agency?
4      A.   It went through Bob Moran Insurance
5 Services, Inc., which is a -- yes.
6      Q.   All right.  Yeah, we're kind of
7 jumping the gun.  I'm jumping the gun here in
8 terms of chronology.
9           And Moran Insurance Services was set
10 up to be the associate agent?
11      A.   Yes.
12      Q.   And was that still an active
13 associate agent at the time that Nationwide
14 cancelled the agency of Diane Tamariz
15 Associates?
16      A.   Yes.
17      Q.   What is the status of George Moran
18 Services today?
19      A.   Can you repeat that?
20      MR. LYMAN:  The name is Moran
21 Insurance Services, Inc..

Page 136

1      MR. LINDSMITH:  I'm sorry.  Moran
2 Insurance, yeah.
3      MR. LYMAN:  So we're clear for the
4 record.
5      BY MR. LINDSMITH:
6      Q.   Yeah.  Moran Insurance Services,
7 Inc., what is the status of that company today?
8      A.   It is dormant and it ended when the
9 contract terminated.
10      Q.   What happened to those nonstandard
11 Nationwide policies when the cancellation
12 occurred?  And I know that they're Nationwide
13 policies --
14      A.   Uh-huh.
15      Q.   -- but what happened to that book?
16 Did those customers migrate back to George T.
17 Moran?
18      A.   Some did.  Some didn't.
19      Q.   Can you give me a sense of how many
20 came back to George T. Moran?
21      A.   I really didn't track those, I'm

Page 137

35 (Pages 134 to 137)

A401106
BRENDA DIANE TAMARIZ-WALLACE       MARCH 4, 2010

1  sure.
2      Q.   Okay.  So you bought the assets from
3  the Insurance Place at the end of 2006.  Was
4  there another acquisition that you undertook
5  after that?
6      A.   I didn't.
7      Q.   Did George T. Moran make an
8  acquisition?
9      A.   Yes.
10     Q.   And what was that acquisition?
11     A.   That was another agency that was
12  personal loans and very little commercial.
13     Q.   What was the name of that agency?
14     A.   Eagan, Mike Eagan.
15     Q.   Besides the Insurance Place and Mike
16  Eagan, is there another agency that was
17  acquired or a book that was acquired by Moran,
18  Inc. or Moran Services or Diane Tamariz
19  Associates?
20     A.   I don't believe so.  I don't think
21  so.  It doesn't --

Page 138

1      Q.   I saw a name that's not what we've
2  been talking about, but it may have been
3  something that was just under consideration
4  that wasn't bought.
5          When -- was the Eagan transaction an
6  asset-only transaction?
7      A.   Yes.
8      Q.   And you said it was mostly personal
9  lines.  What was the size of the book?
10     A.   That was -- I think that was just
11  under 4 million.
12     Q.   And did that happen in 2008?
13     A.   Yes.
14     Q.   I'm sorry.  I don't have documents
15  here.  About when in 2008, do you remember?
16     A.   January.
17     Q.   And George T. Moran bought it?
18     A.   Yes.
19     Q.   I have just -- George T. Moran,
20  Inc.?
21     A.   Right.

Page 139

1          MR. LYMAN:  I know George T. Moran,
2  actually, individually.
3          MR. LINDSMITH:  Right.
4          MR. LYMAN:  Each time that I assume
5  we're referring to George T. Moran we're
6  probably talking about George T. Moran
7  insurance company.
8          MR. LINDSMITH:  I do mean the
9  company.  If I'm talking about him I'll
10  probably say Mr. Moran, but it's good to have
11  that clarification.
12         BY MR. LINDSMITH:
13     Q.   And what was the purchase price?
14     A.   I can't remember exactly.  I would
15  say in the vicinity of 800,000.
16     Q.   That's the range that I remembered
17  seeing.
18         Now, by this time you had
19  transferred your shares in George T. Moran,
20  Inc. over to your husband?
21     A.   Yes.

Page 140

1      Q.   Just while we're on that topic,
2  was -- did he pay you for those shares?
3      A.   No.
4      Q.   Why did you transfer those shares?
5      A.   I was told that I couldn't own the
6  shares, stock in the independent agency and be
7  compliant with my contract.
8      Q.   Is that because that window we had
9  talked about?
10     A.   No.
11     Q.   We talked about earlier a conversion
12  window of 24 months or there was a document 15
13  to 24 months.  At some point that window
14  closed, do you remember when it closed?
15     A.   I don't.
16     Q.   Was this decision to transfer the
17  stock any way related to the closing of that
18  conversion window?
19     A.   No.
20     Q.   So was it pretty much your -- is it
21  both your decision or is it pretty much your

Page 141

36 (Pages 138 to 141)

1  husband's decision to buy the Eagan books?
2      A.   I would say that it was a joint
3  decision.
4      Q.   And if I understand from the
5  documents, the acquisition was -- the funding
6  for the acquisition was supposed to occur the
7  same way that the Insurance Place acquisition
8  had occurred?
9      A.   Yes.
10     Q.   Be funded by the assets themselves?
11     A.   Yes.
12     Q.   Why did George T. Moran, Inc. buy
13  that book as opposed to Diane Tamariz &
14  Associates?
15     A.   Let me see.  The easiest
16  explanation, simplest explanation is that it
17  matched with George T. Moran carrier-wise and
18  it was an attempt to restabilize George T.
19  Moran after the blows it took from
20  transitioning business or attempting to -- the
21  failure of the acquisition.

Page 142

1      Q.   So this was supposed to help George
2  T. Moran, Inc.?
3      A.   And be a resource for first right of
4  refusal business to come to Nationwide.
5      Q.   Of that $4 million, how much were
6  you able to transition over the Nationwide?
7      A.   I don't know exactly the amount.
8      Q.   Any significant amount, relatively
9  small amount?
10     A.   It was probably small.
11     Q.   In fact, isn't it the case that the
12  reason you bought it was to help repair damage
13  to George T. Moran, Inc. sending that business
14  over to Nationwide doesn't repair that damage,
15  does it?  It takes away business from George T.
16  Moran, Inc.?
17     A.   It would have allowed us to fulfill
18  as much as possible what we could have done to
19  make up for the acquisition plans that we
20  couldn't do with the commercial business.
21     Q.   Well, what you couldn't do with a

Page 143

1  commercial business was transition over the
2  Nationwide like you hoped, right?
3      A.   Yes.
4      Q.   But you buy a book of personal lines
5  that largely does not get transitioned over to
6  Nationwide and I'm trying to understand, isn't
7  it the case that by that time in 2008, early
8  2008, to buy a $4 million book, for Moran to
9  buy the $4 million book and then transition it
10  over to Nationwide, doesn't help the fiscal
11  health of Moran, does it?
12     A.   That -- not necessarily.  I mean,
13  from what I understood it would help both
14  causes.
15     Q.   Can you explain how moving
16  customers, personal lines customers out of the
17  business of George T. Moran, Inc. which means
18  you're also removing commission income from
19  George T. Moran, Inc. when you do that, is
20  actually helpful to George T. Moran, Inc.?
21     A.   We were still attempting to in good

Page 144

1  faith reach those goals with Nationwide and
2  capitalize on the contingency possibilities.
3  The other reason that it was becoming -- that
4  it was important is because in this -- prior to
5  this the commercial change and appetite and
6  direction is so significant that we had to
7  attempt to do something to re -- to survive, to
8  restructure and rebuild the -- restabilize
9  Moran.
10     Q.   Well, if the original goal was to
11  move890 percent of Moran's book over to your
12  agency, why was that important to rebuild
13  Moran?
14     A.   Well, it was that consistent source
15  of referrals to the DTA operations.  They
16  weren't a personal lines entity.
17     Q.   When did you start moving producers
18  from Diane Tamariz Associates over to George T.
19  Moran, Inc.?
20     A.   It wasn't that I moved the
21  producers.

Page 145

37 (Pages 142 to 145)

BRENDA DIANE TAMARIZ-WALLACE      MARCH 4, 2010

| | |
|---|---|
| 1   **Q.  Regardless of who, were they moved?** | 1   **Q.  Is that the reason why in June of** |
| 2   A.  The producers didn't want to write | 2   **'08 no new policies were written?** |
| 3   Nationwide business anymore.  They were | 3   A.  I was ill from April until late |
| 4   quitting. | 4   September. |
| 5   **Q.  So instead of quitting you allowed** | 5   **Q.  Do you mind if I ask you the nature** |
| 6   **them the opportunity to go over to George T.** | 6   **of your illness?** |
| 7   **Moran?** | 7   A.  Infectious mono and some secondary |
| 8   A.  I had to.  I already invested a lot | 8   virus. |
| 9   of money, time and talent in developing them. | 9   **Q.  During that period of time, were you** |
| 10   **Q.  And when did that start to happen?** | 10   **unable to come into the office?** |
| 11   A.  It didn't happen -- let me clear | 11   A.  The better part of that time I was |
| 12   this up.  There were -- it was an individual | 12   on bed rest.  And I was infectious, so I was |
| 13   case by case situation.  So it wasn't a lock | 13   told I had to stay away from people during the |
| 14   stock transfer of producers. | 14   acute phases. |
| 15   **Q.  Yeah.  I understand this wasn't** | 15   **Q.  Was -- I'm using June as a frame of** |
| 16   **suddenly everybody went over there, but that --** | 16   **reference for a couple of reasons.  One of** |
| 17   **if I understand it right, there was a gradual** | 17   **which is no new policies were written in June.** |
| 18   **migration of producers from Diane Tamariz &** | 18   **Was that a more acute time?** |
| 19   **Associates over to George T. Moran, Inc., and I** | 19   A.  Yes. |
| 20   **just wanted to know when did that migration** | 20   **Q.  But it was also a time where, I** |
| 21   **start.** | 21   **believe, you and I met?** |
|             Page 146 |             Page 148 |
| 1   A.  I believe that it was in -- the last | 1   A.  The mediation. |
| 2   one that I recall was in '08. | 2   **Q.  The mediation.** |
| 3   **Q.  Early, mid, late?** | 3       **And that was a -- we're not going to** |
| 4   A.  May 31st. | 4   **talk about what happened at the mediation.  But** |
| 5   **Q.  So I take it that being the last one** | 5   **there was an event where a number of folks,** |
| 6   **you recall migrations had occurred before that?** | 6   **including folks from Moran and you and** |
| 7   A.  It was only one other person. | 7   **Nationwide and their respective counsel met** |
| 8   **Q.  And how many people went, how many** | 8   **during that time you were also in that state of** |
| 9   **producers went?** | 9   **condition?** |
| 10   A.  To the best of my recollection, DTA | 10   A.  Yes, I was unable to travel. |
| 11   lost two producers. | 11   **Q.  Well, during this period of time** |
| 12   **Q.  That went over to George T. Moran,** | 12   **from April to September, who was handling** |
| 13   **Inc.?** | 13   **renewals in your office?** |
| 14   A.  To the best of my recollection. | 14   A.  Caroline Conti, the service staff in |
| 15   **Q.  So by the summer of '08, how many** | 15   Edgewater, and there was one other person |
| 16   **producers did DTA have?** | 16   assisting her. |
| 17   A.  DTA was in the process of rebuilding | 17   **Q.  So is it the case that during this** |
| 18   exclusive Nationwide producers, so I was the | 18   **time -- let me ask you:  At its peak, how many** |
| 19   producer in '08 for DTA. | 19   **producers did DTA have?** |
| 20   **Q.  Were you the only producer?** | 20       **Let me put it differently.  What was** |
| 21   A.  I was. | 21   **the most producers it ever had, the most it** |
|             Page 147 |             Page 149 |

A401106
BRENDA DIANE TAMARIZ-WALLACE      MARCH 4, 2010

1  ever had at one point?
2      A.   It may have had six to seven.
3      Q.   And when would that have been?  I
4  think you said in '04 they had six.  You had
5  six.  I may have misrecalled that.
6      A.   I had to staff up and step up with
7  the staffing that I had in order to handle the
8  acquisition process.  So some people left, some
9  people came on.
10     Q.   So that that staffing up, is that
11 what you're recalling as for that staffing up
12 here you may have had six or seven producers?
13     A.   Yeah.  And it might have been even a
14 couple more.  I'm just trying to think.  I
15 would estimate that.
16     Q.   So that staffing up would have
17 occurred in the second half of '05,
18 thereabouts, after you bought Moran?
19     A.   Yes.
20     Q.   You indicated that the producers on
21 the DTA side, I think you use terms like,

Page 150

1  that this process of producers leaving DTA from
2  its peak at the end of '05 was something that
3  was happening over that two-plus-year period?
4      A.   No.  No.
5      Q.   Was it more of an abrupt where a
6  number of folks left rather rapidly?
7      A.   Yes.
8      Q.   Okay.  So what time frame are we
9  talking about where this cluster of folks left?
10     A.   I would say it was in '07 when I
11 pretty much reached my breaking point with
12 them, the acquisition program.
13     Q.   You said you reached your breaking
14 point?
15     A.   When it became apparent to me that
16 there was nothing I could do immediately to fix
17 it.
18     Q.   And did you share that conclusion
19 with your producers?
20     A.   No.  They shared it with me.  I
21 mean, there -- I was getting information from

Page 152

1  became unhappy with Nationwide or working with
2  Nationwide.  Did they just leave over time?  Is
3  that what happened, so that you went from six
4  or seven or maybe even more producers at the
5  end of '05 to just you by the spring of '08?
6      A.   I terminated one for noncompliance.
7  The other one didn't want to deal with
8  Nationwide anymore.  Frustrated, left the
9  Nationwide agenda.  Just refused to do it
10 anymore.
11     Q.   Well, if the goal here is to
12 transition business from Moran over to DTA, I
13 guess my question is, for those who were
14 leaving why didn't you recruit new producers?
15     A.   I started to.  Then Dave's mother
16 was in Hospice.  She died -- she was in the
17 dying process in April.
18     Q.   Of '08?
19     A.   Of '08.  And when she died that's
20 when I got sick.
21     Q.   But I guess it sounded like, though,

Page 151

1  them constantly account by account and the
2  frustration level of realizing that there
3  was -- it was pretty -- that the whole program
4  had been misrepresented.
5      Q.   It sounds like you had staffed the
6  DTA side up to be more than what you would have
7  needed if DTA had just grown in the ordinary
8  course.  I mean, you were up to
9  three-and-a-half million dollars and you
10 continued to grow after the grand acquisition,
11 didn't you, conversions aside, you grew new
12 business?
13     A.   Yes, but that might -- yes, some.
14 But it was actually -- and I don't know exactly
15 how much the growth was for DTA.
16     Q.   Is it the case, though, that the
17 staff that you had built up was more than you
18 otherwise would have needed for the DTA side of
19 the business but for the hoped for conversions?
20     A.   No.  No.
21     Q.   So that staff -- you needed about

Page 153

1  that level of staff for three-and-a-half to $4
2  million book?
3     A.   It was a very specialized business
4  that we were working in, commercial.  I would
5  say yes.
6     Q.   What I'm trying to understand is the
7  staff that you had on the DTA side, even when
8  convergence don't occur there's still rather
9  large book and what sounds look a large set of
10 customers to maintain and hopefully grow the
11 business.  And was there something different
12 happening that was causing them frustrations
13 than just doing their job with the book that
14 they had?
15    A.   Yeah, the Allied platform.  That
16 whole transition that I hadn't been told about
17 that was impacting, truly impacting the staff
18 and the agency.  It had never been shared with
19 me that this was going to be happening.
20    Q.   And when did Allied start to -- do
21 you perceive Allied was starting to have an

Page 154

1  impact on your business?
2     A.   In August of '05.
3     Q.   What happened in August of '05?
4     A.   They started training immediately
5  for this new platform, you know, the company.
6  But I had never been told about this as a
7  underwriting and an appetite change.
8     Q.   When you say, "they started
9  training," they started training who?
10    A.   Staff members.
11    Q.   Your staff members?
12    A.   Uh-huh.  Yes.
13    Q.   The Allied platform being akin to an
14 independent type platform?
15    A.   Well, I didn't find that out until I
16 was in the middle of it.  I was told in the
17 beginning when they presented it to me that it
18 was a computer transition.  The front end
19 system.  I later found out that the intention
20 was that it was an entire reunderwriting
21 project and a brand new way of doing commercial

Page 155

1  business that had never been disclosed to me
2  before.
3     Q.   Ultimately, did you understand that
4  Allied presented a different distribution
5  channel to an independent platform?
6     A.   I, frankly, didn't understand
7  anything about Allied at the time.  I had no
8  idea what this -- what was coming about.  I
9  wasn't told in August that it was a front end
10 computer platform.
11    Q.   Well, I guess my question is what is
12 it about the Allied training and the Allied
13 platform that was so disruptive in your agency
14 such that people started to leave?
15    A.   The Allied platform was a complete
16 departure from the way that Nationwide had been
17 conducting commercial business, and in the
18 midst of transitioning business already this
19 was just a total new previously unknown factor
20 that was impacting the acquisition project
21 entirely.

Page 156

1     Q.   Well, could you give me -- can you
2  explain that a little bit more so I can kind of
3  touch and feel and see what you're talking
4  about?  Can you give me some examples of what
5  you're talking about?
6     A.   Specifically, Nationwide had been in
7  the contractors market, the middle to large
8  commercial arena.  And Allied, the introduction
9  of the Allied program was a total departure for
10 us from that focus.
11    Q.   What was the focus of Allied?
12    A.   Small business policies.
13    Q.   Small business commercial policies?
14    A.   Yes.
15    Q.   Were you excluded -- was this to the
16 exclusion of Nationwide?  I mean, could it be
17 both?  In other words, with Nationwide it would
18 still be the larger customers, but through
19 Allied it's a smaller business?
20    A.   No.  The way I experienced it was
21 that it was a total reunderwriting of the

Page 157

A401106
**BRENDA DIANE TAMARIZ-WALLACE      MARCH 4, 2010**

1    Nationwide existing book of business coupled
2    with the introduction of a new appetite and
3    platform.
4       **Q.   What's the new appetite we're**
5    **talking about?  How did you -- can you describe**
6    **what that new appetite was that you observed?**
7       A.   It was small business that could be
8    handled just in the front end of the computer.
9    We weren't dealing with an underwriter.
10      **Q.   Tell me specifically how that had an**
11   **impact with your existing commercial business.**
12      A.   Because I -- it had been represented
13   to me that there would have been accounts taken
14   from the Moran business that would fit into the
15   Nationwide appetite and as this Allied platform
16   was coming in, the appetites were completely
17   changing and the Allied platform was now the
18   primary business focus.
19      **Q.   So the large -- the mid to large**
20   **contractors that you had on the Moran side**
21   **weren't fitting into the Allied platform that**

Page 158

1    kind of business of larger customers?
2       A.   That's what I understood.  But it
3    was a much bigger decision than just an
4    underwriting change.
5       **Q.   Okay.  That it was a decision not to**
6    **even write that kind of business?**
7       A.   Yes, and get out of some markets.
8    But, once again, it was a corporate decision,
9    much more than just an underwriting appetite
10   change.
11      **Q.   And -- but you understood and you**
12   **had understood for years that Nationwide could**
13   **choose to stop writing in certain areas if they**
14   **wanted to and they didn't need your -- they did**
15   **not need to tell you in advance or get your**
16   **consent to do that, right?**
17      A.   This was different than that.
18      **Q.   How so?**
19      A.   This information was concealed from
20   me when I went into the deal with Moran.  That
21   was different than changing an appetite.

Page 160

1    was devoted to small business contractors?
2       A.   Yes.  Sorry.
3       **Q.   What about the existing commercial**
4    **business that you had on the DTA side before**
5    **you even bought Moran?  What happened to that**
6    **business?**
7       A.   With this new platform?
8       **Q.   Yeah.**
9       A.   There were large accounts being
10   nonrenewed.
11      **Q.   New accounts you had for a long**
12   **time?**
13      A.   That I had for years and the
14   accounts that I had just transitioned were
15   being nonrenewed.
16      **Q.   Was this because of a change in**
17   **underwriting?**
18      A.   I think it was more than just
19   underwriting.  This was a company change.  This
20   was a --
21      **Q.   It was a decision not write that**

Page 159

1    That's just not telling me what they were going
2    to do.
3       **Q.   But didn't you sign a contract three**
4    **times that says they don't have to tell you,**
5    **they don't have to give you a notice of a**
6    **change that they're going to be making?  Do you**
7    **remember the language says --**
8       A.   I remember that, yes.
9       **Q.   They don't have to give you notice?**
10      A.   That's sufficiently different,
11   significantly different, excuse me, wrong word.
12   Significantly different from failure to
13   disclose to me what they were going to be doing
14   in that market entirely.  This was beyond an
15   underwriting appetite.  This was beyond any of
16   that.  It was a failure to tell me the truth of
17   what I would be facing.
18      **Q.   So you think they should have given**
19   **you notice of what they were going to be doing?**
20      A.   I absolutely do.
21          (Deposition Exhibit No. 10 was

Page 161

41 (Pages 158 to 161)

**BRENDA DIANE TAMARIZ-WALLACE      MARCH 4, 2010**

1  marked for identification.)

2     BY MR. LINDSMITH:

3    Q.   Ms. Tamariz-Wallace, I have handed

4  you what's been marked as -- or you have been

5  handed what's been marked Exhibit 10, which is

6  a document -- it's kind of a thick document.

7  It has on the front a heading "Business Plan

8  For Nationwide Insurance Agency Financial Sales

9  Operations, Full-Time Financial Agent Model

10  Wholesale Choice Program."  And it's dated

11  September 9, 2004.

12     Do you know what this is?  Does this

13  look familiar to you?

14    A.   Yes.

15    Q.   What is this?

16    A.   This was a plan to develop financial

17  arm of the agency.

18    Q.   Of which agency?

19    A.   Of Diane Tamariz & Associates.

20    Q.   When you say, "the financial arm,"

21  what do you mean "the financial arm"?

Page 162

---

1  Financial products?

2    A.   Financial products.

3    Q.   Up to this time in September of '04,

4  had Diane Tamariz & Associates done much in

5  terms of the sale of products, like annuities

6  or anything like that?

7    A.   Yes.

8    Q.   Was it a significant part of your

9  business?

10    A.   Not at that point, the way we wanted

11  it to become.

12    Q.   Was that -- part of this was to try

13  to grow that part of your business?

14    A.   Yes.

15    Q.   Is this separate and unrelated to

16  what was going on at the time in terms of the

17  acquisition of George T. Moran, Inc.?

18    A.   Yes.

19    (Deposition Exhibit No. 11 was

20  marked for identification.)

21     BY MR. LINDSMITH:

Page 163

---

1    Q.   You have been handed what's been

2  marked Deposition Exhibit No. 11, which is a

3  one-page document.  It has at the bottom a date

4  next to the word "Moran."  And it's 9-15-04.

5  It was produced by -- from the records of your

6  husband's company, CRMG, as indicated at the

7  bottom right-hand side by that prefix.

8     Do you recognize this document?  It

9  has Dave and Diane at the bottom.

10    A.   I believe I do.

11    Q.   And are these notes of something,

12  notes that your husband might have prepared?

13    A.   Yes.

14    Q.   It looks to me like this is just

15  kind of a thoughts on what the transaction

16  could look like in terms of possible purchase

17  price, how much money down.  This is just a

18  document that kind of shows the progress of

19  thoughts at that time?

20    A.   I would agree.

21    (Deposition Exhibit No. 12 was

Page 164

---

1  marked for identification.)

2     BY MR. LINDSMITH:

3    Q.   You have been handed what's been

4  marked Deposition Exhibit No. 12, which appears

5  to be a memorandum from you to George Moran and

6  it's dated seven days later from the document

7  we just saw, September 22, 2004.  And the

8  reference is acquisition letter of

9  understanding.  And it would appear to show

10  proposed signature blocks for yourself and for

11  Mr. Moran.

12     Is this a draft of something that

13  was sent or can you tell if this memorandum was

14  actually sent to Mr. Moran?

15    A.   I don't know.  I don't know for

16  sure.  I can't answer that with certainty.

17    Q.   I do have a couple of questions

18  about this.  Here, there is some numbered

19  paragraphs.  We get to Paragraph 4, it says:

20  "Settlement dates, December 1, '04 is

21  preferable."  And then it says: "Sales price,

Page 165

1  **$3 million guaranteed by Nationwide with**
2  **payment terms of 1,500,000 at settlement and**
3  **500,000 payable in first quarter '06, '07, and**
4  **'08."**
5       **Do you see where I'm reading?**
6  A.   Yes.
7       **Q.   I take it that was the thought of**
8  **the proposal.  At the time that was the form of**
9  **the proposal, half the money down and payments**
10 **over time.  Does that sound familiar to you?**
11 A.   Yes.
12      **Q.   Do you know why it says sales price,**
13 **$3 million guaranteed by Nationwide?**
14 A.   No, I don't.  And I'm not certain
15 that this went to George Moran.
16      **Q.   It was maybe a draft?**
17 A.   Because there were still
18 conversations going on with Nationwide.
19      **Q.   Okay.**
20      **(Deposition Exhibit No. 13 was**
21 **marked for identification.)**

Page 166

1  **document?  What is this document?**
2       MR. LYMAN:  I'll note an objection.
3  The document speaks for itself.  But she can
4  answer if she can.
5       BY MR. LINDSMITH:
6       **Q.   You're welcome to spend some time to**
7  **look at it.**
8  A.   I believe this was just as it says.
9  Our expression of interest to proceed in
10 negotiating our position.
11      **Q.   Was this written with the assistance**
12 **of Counsel, do you know?**
13 A.   No.  This was -- no, I don't know.
14      **Q.   Was this written with the assistance**
15 **of anyone at Nationwide?**
16 A.   This was written -- and the best of
17 my recollection, this was written in conference
18 with them.
19      **Q.   With Nationwide?**
20 A.   Yes.
21      **Q.   Who?**

Page 168

1       BY MR. LINDSMITH:
2       **Q.   You have been handed what's been**
3  **marked Deposition Exhibit No. 13, which appears**
4  **to be a letter on the letterhead of Diane**
5  **Tamariz & Associates dated October 8, 2004,**
6  **which would have been, I guess, about two weeks**
7  **after this, at least the date of this document**
8  **that we just saw that may have been just a**
9  **draft.**
10      **And on the last page, is that your**
11 **signature on the last page?**
12 A.   Yes, it is.
13      **Q.   And under the heading "Accepted on**
14 **October 9, 2004, Moran Insurance," do you**
15 **understand that to be Mr. Moran's signature?**
16 A.   Yes.
17      **Q.   This is styled as a preliminary**
18 **written expression of interest.  That's the**
19 **term used in the first paragraph and the second**
20 **paragraph.**
21      **What is the purpose of this**

Page 167

1  A.   Well, Tim Riggins.
2       **Q.   Did he help write this letter?**
3  A.   He didn't write this letter, but he
4  was in conference about writing this letter.
5       **Q.   Did he ever participate in the**
6  **actual meetings with Mr. Moran to negotiate the**
7  **terms?**
8  A.   He did on a couple of times during
9  the acquisition process.
10      **Q.   And so if I talked to Mr. Moran**
11 **later on and Mr. Moran will recall Mr. Riggins**
12 **being there?  That's an unfair question.**
13      **You believe that he actually -- what**
14 **exactly was Mr. Riggins' role in those**
15 **meetings?  What did he actually do?**
16 A.   What comes to mind immediately is
17 his role in due diligence with Mr. Moran.
18      **Q.   Well -- okay.  I wanted to focus on**
19 **the actual terms, though.  Because these have**
20 **terms of the purchase price and, you know, how**
21 **the payments are going to be made and the**

Page 169

43 (Pages 166 to 169)

1 salary to Mr. Moran.
2     My question is: Who was the
3 decision-maker on the Tamariz side of the table
4 as to how much you would pay, how much would be
5 paid over time and how much salary you'd pay to
6 Mr. Moran? Who actually made those decisions?
7     A.   We were making them as we were
8 interacting in the acquisition process with
9 George.
10     Q.   We being you and your husband?
11     A.   Yes.
12     Q.   If I'm reading this right, at the
13 bottom of the first page the purchase price and
14 the structure of the transaction it says:
15 "It's a $3 million amount plus a contingent
16 amount not to exceed a half million dollars and
17 it's to be paid with one-and-a-half million
18 paid in cash upon closing and then
19 one-and-a-half million paid over three years."
20 Let me stop there.
21     I'm kind of curious about that

Page 170

1 because Mr. Moran signed this, but ultimately
2 that's not how it was structured. There was a
3 lot more cash upfront than this. What happened
4 that Mr. Moran -- I know it's not an agreement
5 or a contract, but it is -- he did sign this.
6     What happened that he ultimately
7 required more cash upfront?
8     A.   That was -- he was very clear about
9 that he wasn't going to settlement without some
10 of those terms being met which caused an
11 increase in cash and that's just the course of
12 the negotiations with him.
13     Q.   Okay. So now on the second page in
14 paragraph letter D it says: "The salary paid
15 to George Moran for a minimum of three years
16 and maximum of five years agreeable," and it
17 shows a base salary of 138,000 plus a 5 percent
18 annual increase will be considered based on
19 performance.
20     Now, my rough math, if it's at three
21 years that works out to be -- and with no

Page 171

1 increase -- if there's no increase, that's
2 $414,000 altogether. Was the idea of this that
3 it would be $3 million plus that would be part
4 of the purchase price but paid by way of salary
5 over time?
6     A.   Yes.
7     Q.   At the time you were in these
8 negotiations, did you genuinely want Mr. Moran
9 to stay on to be active in the Moran agency for
10 a period of time?
11     A.   Yes.
12     Q.   Why?
13     A.   Transition of relationships.
14     Q.   Were you concerned about loss of
15 customers if he were to abruptly quit?
16     A.   Yes.
17     Q.   And would the same be true of his
18 wife, Donna?
19     A.   Yes.
20     (Deposition Exhibit No. 14 was
21 marked for identification.)

Page 172

1 BY MR. LINDSMITH:
2     Q.   You have been handed what's been
3 marked Deposition Exhibit No. 14, which appears
4 to be a two-page memorandum from Mr. Wallace to
5 a Bill Jones, and it shows yourself and Craig
6 Siebert as copied on this. Let me ask you,
7 first of all, who is Bill Jones?
8     A.   He was the attorney that we had
9 started working with.
10     Q.   Is this your attorney?
11     A.   He is an attorney, yes, at the time,
12 yes.
13     Q.   I just want to make sure who he's
14 counsel for. He's counsel for you?
15     A.   Yes.
16     Q.   Okay. So would this be an
17 inadvertent production of counsel
18 communications?
19     MR. LYMAN: It may very well be, and
20 I have not been involved with vetting the
21 documents.

Page 173

1           MR. LINDSMITH:  Yeah.
2           MR. LYMAN:  And, to be honest with
3    you, I have not heard Bill Jones' name until
4    right now in the process.  So this goes back
5    to --
6           MR. LINDSMITH:  Well, I'll tell you
7    what --
8           MR. LYMAN:  Let me read it and let
9    me -- I mean --
10          MR. LINDSMITH:  Yeah.
11          MR. LYMAN:  I mean, I don't really
12   have any objection to this remaining produced
13   to you.
14          MR. LINDSMITH:  Okay.
15          MR. LYMAN:  THE -- I may have some
16   objections to your line of questioning by Mr.
17   Jones being an attorney.
18          MR. LINDSMITH:  Let me say.  I won't
19   view this as a waiver of any communications
20   with Mr. Jones, and I'm not going to ask about
21   any discussions with Mr. Jones.  I do -- I only

Page 174

1    have a couple questions on this.
2           BY MR. LINDSMITH:
3       Q.   Toward the bottom -- and, now, this
4    is dated October 28 of '04.
5       A.   Uh-huh.
6       Q.   It says -- there's a paragraph near
7    the bottom, the thumbnail is that "Nationwide
8    is willing to provide a jumbo loan for 3
9    million with one-and-a-half million at
10   settlement."
11          Now, that's said at a time when
12   that's the idea.  It will be $3 million, half
13   paid down.  Did you actually have some kind of
14   commitment from Nationwide that they would
15   provide a jumbo loan inasmuch as three loans?
16      A.   That would have been the whole chain
17   of conversation with Ed Cooper --
18      Q.   Okay.
19      A.   -- to make this deal work.
20      Q.   Had it -- but had there actually
21   been -- beyond a discussion with Mr. Cooper,

Page 175

1    had it progressed beyond to actually applying
2    with Nationwide Federal Credit Union or
3    Nationwide -- what became Nationwide Bank to
4    see if they would make that loan?
5       A.   I can't remember exactly the
6    submission dates.
7       Q.   Okay.
8           (Deposition Exhibit No. 15 was
9    marked for identification.)
10          BY MR. LINDSMITH:
11      Q.   Ms. Tamariz-Wallace, you have been
12   handed what's been marked as Exhibit 15, and if
13   you could identify the record -- for the record
14   what this is, please.
15      A.   This is the written opinion findings
16   of the WFG Capital Advisers.
17      Q.   This was their valuation analysis?
18      A.   Yes.
19      Q.   And I see on the first page it's a
20   valuation as of June 30, 2004.  Way in the back
21   on Page 33 we come to a page that has at the

Page 176

1    heading "Valuation Summary," and there's a box
2    that shows his conclusion of value and he has a
3    low range and a mid range and a high range.
4    The low being 2.376 million, the mid range
5    being 2.493 million and the high range being
6    2.617 million.  And, in fact, that's what he
7    says in the next box, that it's in the range of
8    the low that I just said and the high that I
9    just said.
10          Now, when you got this range, did
11   you get this around -- well, actually, I should
12   ask you that.  Do you know when you got this?
13          I'm sorry.  The second page of the
14   exhibit there's a cover letter that says
15   December 15 of '04.  Okay?  So I'm just going
16   to assume that -- does that sound right about
17   when you might have gotten it in December of
18   '04?
19      A.   Yes.
20      Q.   And, in fact, in that cover letter
21   he has the same range.  I didn't need to go to

Page 177

Page 33.
1   When you got this up to that time
2   you're talking about paying $3 million plus an
3   additional payment of salary to Mr. Moran over
4   a period of time.  And, ultimately, you did
5   acquire the business for $3 million and for a
6   time you did pay him some salary over time; is
7   that right?
8   A.   Yes.
9   Q.   Why did you stay with that figure of
10  $3 million even though the company that had
11  given you this appraisal said that it may only
12  be worth under 2.4 million or maybe as much as
13  a little over 2.6 million?
14  A.   First off, this is just a tool.
15  This doesn't set the price for a deal to close.
16  This is just an indication of their opinion.
17  Q.   Well, I mean, it's an indication
18  that the $3 million purchase price is too much
19  for the value of the business.
20  A.   Well --

Page 178

1   Q.   Why did you think it was worth more
2   than what this appraiser was telling you?
3   A.   Once again, this was a tool to give
4   us an indication of the value, but ultimately,
5   what the seller will sell for is what we have
6   to deal with.
7   Q.   Even if it's more than what an
8   appraiser is saying it's worth?
9   A.   And that's not -- I mean, that's not
10  unusual in agency acquisitions.
11  Q.   Now, did you understand that if you
12  were acquiring this agency, the Moran agency
13  and the goal is to basically transfer 90
14  percent of the premium written over to your
15  Nationwide agency that as that transition
16  occurred, if it had been successful, the
17  actually value of Moran, Inc. would have gone
18  down?
19  A.   Perhaps.
20  Q.   I mean, if -- on $12 million if 90
21  percent gets transferred to Nationwide, you

Page 179

1   understood that that would have dropped Moran
2   down to maybe a million dollars or a million
3   and a half dollars?
4   A.   Business -- let me just answer it.
5   Not necessarily.
6   Q.   Why do you say "not necessarily"?
7   A.   Because business that was not
8   accepted by Nationwide was known to me to be
9   ineligible business that I couldn't place
10  there.  I had the right to place through the
11  carriers at Moran.
12  Q.   Well, is it the case that
13  ultimately, though, you could have only have
14  placed business through Triple I?
15  A.   That's not true.  That's not what I
16  was told.  That's not way the program worked.
17  Q.   All right.  Well -- but even with
18  that, all I'm trying to get at is even if
19  you're able to place ineligible business with
20  Moran, the plan was that basically 90 percent
21  of the premium that Moran was enjoying would be

Page 180

1   moved over to your agency, right?
2   A.   That was the plan.
3   Q.   And if that plan had been
4   successful -- and I understand some -- there
5   may have been still some growth on what was
6   left, but taking that growth out for a minute
7   from some referrals back, that would have left
8   Moran to be around one or one-and-a-half
9   million dollars.  It would no longer be a $12
10  million premium business.  It would be a one
11  million or one-and-a-half million dollar
12  premium business?  In fact, that was the goal,
13  wasn't it?
14  A.   No.  No.
15  Q.   What was your goal, then, as to how
16  big Moran would be after you hopefully would
17  have --
18  A.   It was very clear with Nationwide,
19  and they stated repeatedly that the Workers'
20  Comp business and the specialty business would
21  stay in Moran.

Page 181

46 (Pages 178 to 181)

**Page 182**

1    Q.   That's that 10 percent, isn't it?

2    A.   No.  It was bigger than that.

3    Q.   Okay.  Well, then why was it thought

4 that 90 percent would go over to Nationwide if

5 chunks would stay with Moran and it's more than

6 10 percent?

7    A.   Those are Nationwide's assumptions.

8 Those were the numbers that Nationwide used.

9    Q.   What was your assumption?

10    A.   I was hoping that it was true.  I

11 was hoping that that business would transition

12 at that rate.

13    Q.   And that's all I'm talking about.

14 You were hoping it was true?

15    A.   Yes.

16    Q.   So what you were hoping for was 90

17 percent of Moran's premium to go over to your

18 agency, right?  That's what you were hoping

19 for?

20    A.   I was believing that that would be

21 possible.

**Page 183**

1    Q.   Okay.  And if what you were hoping

2 for came to pass you knew that the size of the

3 Moran business would shrink dramatically?

4    A.   I still can't agree that that would

5 shrink dramatically.  I still can't agree with

6 that.

7    Q.   Well, you knew it wouldn't be a $12

8 million book anymore?

9    A.   Yeah.  But it wasn't intended to be

10 a $1 million book either.

11    Q.   What -- in your mind, what did you

12 think it would be by the time it all was

13 settled out?  If everything had gone as you had

14 hoped, what did you -- in your mind, did you

15 envision would be --

16    A.   It just wasn't in my mind.  This was

17 the discussion that I had had with management

18 that that book of business or the carriers that

19 Nationwide -- that Moran represented would be

20 outlets, would continue to be outlets because

21 for other business like the Workers' Comp.

**Page 184**

1 And, in fact, there was no exit strategy.

2    Q.   And that's kind of my question.  If

3 everything had gone as hoped, you still were

4 hoping that there would have been some business

5 left with Moran, Inc., right?  That, in fact,

6 Moran, Inc. would be positioned to get

7 referrals for ineligible business from your

8 Nationwide business, right?

9    A.   That was an essential part of paying

10 the loan, was that specialty business

11 would stay viable with Moran.

12    Q.   Well, the essential part was also in

13 the commissions you would -- the new

14 commissions you would generate from the

15 transition of business over to your agency,

16 right?

17    A.   I would say beyond that it was the

18 contingencies that had been promised.

19    Q.   If those transitions -- if the

20 conversions had occurred as you had hoped?

21    A.   No, it wasn't dependent on the

**Page 185**

1 conversions occurring as I had hoped.  It was

2 a -- it was promised to me as part of the plan.

3    Q.   Prior to your acquiring the shares

4 of George T. Moran, Inc., did you yourself

5 engage in some of the due diligence?

6    A.   I did.

7    Q.   Did you meet with the producers at

8 George Moran?

9    A.   No.

10    Q.   Why not?

11    A.   George didn't want that.  Didn't

12 want that to happen.

13    Q.   Why not?

14    A.   The confidentiality of the sale was

15 critical to him.

16    You're asking me preacquisition?

17    Q.   Yes.

18    A.   Yes.

19    Q.   Well -- but the three top producers

20 were George and his wife and Mr. Deveaux,

21 right?

1    A.   Right.
2    Q.   But they were like 90 percent of
3  production, weren't they?
4    A.   Yes.
5    Q.   So George knew about it, right?
6    A.   Yes.
7    Q.   And Donna knew about it?
8    A.   Yes.
9    Q.   Do you know if Mr. Deveaux knew
10  about it?
11   A.   I don't believe so.
12   Q.   Okay.
13   A.   He was insistent on confidentiality.
14   Q.   All right.  Now, you said you had
15  someone come in to do due diligence of the
16  Moran agency.  I think that was WRG.  Correct
17  me if I'm wrong, did they do some of the -- I
18  thought you hired them to do some of the due
19  diligence?
20   A.   No.  They have nothing to do with
21  Nationwide's program of the IAA, Whatsoever.

Page 186

1  that he was including anyone.
2    Q.   Even his wife?
3    A.   Right.
4    Q.   Well, the occasion you had to meet
5  her, how were you introduced to her?  What was
6  that occasion?  We're still talking
7  preacquisition.
8    A.   I believe it was a social event,
9  like a networking event.  I can't remember
10  specifically.
11   Q.   Before you signed the stock purchase
12  agreement, did you tell Mr. Moran, George Moran
13  that you very much hoped that 90 percent of the
14  premium that had been written by his agency
15  would be transferred over to Diane Tamariz &
16  Associates?
17   A.   I was very specific with George the
18  purpose of the acquisition.  I cannot tell you
19  I said 90 percent would transition, but I can
20  tell you that I was very specific that that was
21  the entire purpose of the acquisition.

Page 188

1    Q.   I'm talking now about the due
2  diligence done by you or your lawyer or Mr.
3  Wallace or the accountant.  That part of the
4  due diligence, did any of those folks that I
5  have just named go actually onsite to the Moran
6  agency to -- maybe not to advertise of a
7  possible acquisition, but to go just meet some
8  folks?
9    A.   No.  He wouldn't permit that.
10   Q.   Well, did you meet Donna before the
11  acquisition?
12   A.   I did meet her.
13   Q.   And --
14   A.   Casually.
15   Q.   Did you have the impression she
16  understood that George was negotiating the sale
17  of his company?
18   A.   George made it very clear to us that
19  this was his decision.
20   Q.   I understand that.
21   A.   And I didn't have the impression

Page 187

1    Q.   When you told him that, did he have
2  any concerns as to the impact that would have
3  upon his people, the people that he had worked
4  with for many years?
5    A.   He did.  Yes, he did.
6    Q.   What was his concern as expressed to
7  you?
8    A.   I would summarize it by saying that
9  it was going to be different with them.
10   Q.   So I take it by virtue of the
11  confidentiality insisted on by Mr. Moran, you
12  were not really able to assess the adaptability
13  of the other producers of Moran in terms of
14  their ability to adapt going from an
15  independent platform to moving business over to
16  a captive platform?
17        MR. LYMAN:  Objection.
18        You can answer.
19        THE WITNESS:  Frankly, that didn't
20  bother me.
21        BY MR. LINDSMITH:

Page 189

48 (Pages 186 to 189)

| | |
|---|---|
| 1   **Q.   Why not?** | 1   **Q.   Okay.  Well, did they go physically** |
| 2   A.   Because that was the goal of him | 2   **into the Moran agency?** |
| 3   getting the money he had wanted. | 3   A.   They physically received samples of |
| 4   **Q.   The ultimate goal is if you're -- if** | 4   business from George. |
| 5   **most of that business transfers over to your** | 5   **Q.   But they didn't physically go into** |
| 6   **agency, maybe those producers come, too, or** | 6   **the Moran agency?** |
| 7   **maybe they don't?** | 7   A.   They -- I believe that one of them |
| 8   A.   Right. | 8   met with George individually after hours. |
| 9   **Q.   Okay.** | 9   **Q.   Okay.  Do you know what was done --** |
| 10   A.   Once the business -- well, yes. | 10   **I mean, did you even ask, you or your husband** |
| 11   **Q.   In the course of your due diligence** | 11   **or anybody on your side, separate from** |
| 12   **before you signed the purchase agreement, did** | 12   **Nationwide, to ask to meet George after hours** |
| 13   **you have any meaningful ability to look at** | 13   **on a weekend or something when nobody else was** |
| 14   **their computer systems or their -- the manner** | 14   **there to go look at their computer systems and** |
| 15   **in which they were used to filling out** | 15   **look and see how they were set up?** |
| 16   **applications to see how they would fit in with** | 16   A.   Yes. |
| 17   **the way things were done on the Nationwide side** | 17   **Q.   Before you signed the contract?** |
| 18   **of the business?** | 18   A.   Before we signed the contract. |
| 19   A.   Nationwide did that. | 19   Meaning before we went to settlement? |
| 20   **Q.   You mean went into the Moran agency?** | 20   **Q.   That's fine.  Either way.  Before** |
| 21   A.   Yes. | 21   **you signed the contract?** |
| Page 190 | Page 192 |

| | |
|---|---|
| 1   **Q.   Before you signed the contract?** | 1   A.   I don't understand. |
| 2   A.   I'm trying to think.  Yes. | 2   **Q.   Well, I'm trying to understand the** |
| 3   **Q.   I guess I'm trying to understand --** | 3   **due diligence.  This is all part of due** |
| 4   A.   I'm trying to get the dates.  Let me | 4   **diligence that I'm talking about.  So I'm** |
| 5   rethink the dates.  I'm going to say yes.  I'll | 5   **trying to understand what due diligence you did** |
| 6   have to clarify it with documents, but | 6   **to understand, for example, their computer** |
| 7   Nationwide sent a team in to evaluate the | 7   **system.** |
| 8   business of that agency. | 8   A.   I saw the computer system and I |
| 9   **Q.   I guess here is what I am struggling** | 9   spoke with Kevin Dorrigan in home office about |
| 10   **with.  If Mr. Moran was so guarded and wanting** | 10   compatibility.  So, yes, I mean, I did that. |
| 11   **to keep so confidential the potential sale of** | 11   **Q.   All right.** |
| 12   **the agency, why would he let in people from a** | 12   A.   And I was told, you know, as part of |
| 13   **company to look at their operations when nobody** | 13   the -- just this whole process. |
| 14   **there even writes for that company?** | 14   **Q.   Getting back to the question I had.** |
| 15       MR. LYMAN:  Objection.  Calls for | 15   **It's your recollection that you clearly told** |
| 16   speculation. | 16   **Mr. Moran that the entire purpose of this** |
| 17       BY MR. LINDSMITH: | 17   **acquisition would be to transfer as much** |
| 18   **Q.   What's your understanding as to why** | 18   **business as possible from the Moran side to the** |
| 19   **he would?** | 19   **Diane Tamariz side?  That's clear in your head?** |
| 20   A.   The due diligence team worked out of | 20   A.   Yes.  Yes. |
| 21   my office in Edgewater. | 21   **Q.   Did there come a time after the** |
| Page 191 | Page 193 |

1  transaction where Mr. Moran indicated he had
2  never understood that was going to be the case?
3  That he was surprised that, in fact, efforts
4  were being made to transition work over to --
5  business over to Nationwide?
6      A.   No, I don't believe so.  I mean --
7          (Deposition Exhibit No. 16 was
8  marked for identification.)
9          BY MR. LINDSMITH:
10     Q.   You have been handed what's been
11  marked Deposition Exhibit No. 16, which has a
12  cover sheet that says:  "Independent agency
13  acquisition business plan for the Diane Tamariz
14  agency."
15         Do you recognize this document?
16     A.   Yes.
17     Q.   And I see what it says, but what's
18  your understanding as to what this document is?
19     A.   This was standard Nationwide
20  business plan that was required as a part of
21  the independent agency acquisition program.

Page 194

1      Q.   Page 10.
2      A.   Okay.
3      Q.   And if you go back two pages or
4  three pages to Page 13 there's a customer
5  retention and multi-lining plan and the column
6  for whose responsible puts in the name for nine
7  action items, Mr. Wallace as being responsible
8  for all those items.
9          Do you see that?
10     A.   Yes.
11     Q.   So I take it that, you know, among
12  other things, that the deciding of who is
13  responsible to do what tasks would have been
14  done in consultation with you?
15     A.   More or less.
16     Q.   Okay.  I mean, you would be the one
17  who would best know who would be best suited
18  for certain of these action items; is that
19  fair?
20     A.   Yes.
21     Q.   Now, is there something in this

Page 196

1      Q.   Now, did you have a role in
2  preparing this business plan?
3      A.   I sat with the business consultant.
4  She asked me questions and I answered her
5  questions.
6      Q.   That would be Sandy Wisefeld?
7      A.   Yes.
8      Q.   Did you look at a draft of it before
9  it became a final plan, or were you given the
10  opportunity to look at the draft?
11     A.   I may have been.
12     Q.   I mean, I'm seeing schedules on here
13  that -- you know, there's like what looks to be
14  like an action plan.  For example, there's a
15  rollover action plan and there are columns on
16  it identifying what the action item is, a
17  completion date, who is responsible for it, you
18  know.  And in the column of responsibility I
19  see your name, the name of someone named Lee,
20  someone named Farrah, someone named --
21     A.   Where is this?

Page 195

1  business plan that today as you look at you
2  believe is misleading or turned out not to be
3  the case or is a problem.  I guess I'm just
4  concerned -- or I'm interested if you have any
5  particular complaints about this business plan,
6  sitting here today.
7      A.   Well, I will tell you on Page 13 is
8  incorrect.
9      Q.   What about --
10     A.   Wallace didn't do those things.
11  Those were done by CSRs in-house.
12     Q.   Okay.  Well, you're saying
13  ultimately those were done by CSRs, right?
14     A.   Yes.
15     Q.   I'm not asking you who actually did
16  it afterwards.  I guess my question is:  Is
17  there something wrong about this business plan
18  that was somehow -- did mislead you or cause
19  you any problems?  Were you -- that's really
20  what I'm getting at.  Not whether it was
21  strictly followed.

Page 197

A401106
**BRENDA DIANE TAMARIZ-WALLACE      MARCH 4, 2010**

1    A.   Okay.

2       Q.   You know, that it may -- you know,

3    Mr. Gorman may not have done -- someone else

4    may have done what was assigned to Mr. Gorman

5    or something like that.

6       Is there anything written here that

7    you believe was somehow misleading or

8    problematic?

9    A.   Yes, there are several things.

10      Q.   Like what?

11   A.   This underwriting.

12      Q.   Where are you, what page?

13   A.   Number 1. I'm on Page 10.

14      Q.   Page 10?

15   A.   And nowhere in this entire document

16   does it take into account that whole -- the

17   whole platform changed to Allied. Nowhere is

18   it referenced anywhere in here that that was

19   going to be an issue that was going to have to

20   be dealt with.

21      Q.   You mentioned underwriting here,

Page 198

1    what's --

2    A.   Well, I'm using that to launch my

3    explanation to you that none of this represents

4    the challenges that I had with the

5    implementation and the introduction of the

6    Allied platform change and the commercial --

7    the directional change corporately.

8       Q.   I understand that. But if we put

9    that aside for a minute, is there something

10   separate about Page 10 that has some particular

11   misinformation? I mean, I'm looking at Item 1,

12   for example. It says: "The action item is

13   establish performance standards with the

14   service center to exceed customer, agency needs

15   and expectation including underwriting

16   timelines."

17   A.   Uh-huh.

18      Q.   So that's a goal to establish

19   performance standards. There is no -- nothing

20   written that I see about what those standards

21   are.

Page 199

1    A.   Uh-huh.

2       Q.   Is there something beyond the Allied

3    that you've mentioned that is a problem on this

4    page?

5    A.   It just didn't happen according to

6    these specifics.

7       Q.   Okay. Now, did you -- when you did

8    look at this did you read the disclaimer on the

9    first page?

10   A.   I may or may have not. I mean, when

11   I saw this it was in a PDF form.

12      Q.   Well --

13   A.   And I don't think this was on there

14   then, but regardless.

15      Q.   Do you have some reason to believe

16   this was added on afterwards?

17   A.   I'm just saying to you that I was

18   working in a PDF format in Excel worksheet with

19   the business consultant. I didn't see this

20   this way. That's all.

21      Q.   The disclaimer says: "The services

Page 200

1    and information provided herein are for your

2    consideration only. It is not required that

3    you use the services or information provided.

4    Implementation of any of the programs or

5    services is entirely optional and solely your

6    responsibility."

7       Did you understand that?

8    A.   I couldn't be responsible for the

9    things that the company was specifically

10   responsible to do.

11      Q.   Okay.

12   A.   So I don't have a comment about that

13   except that stands on its own.

14      Q.   It also says: "Nationwide cannot

15   and does not guarantee that any of the programs

16   or services will result in achieving your

17   desired objectives or that they are in

18   compliance with your specific state law."

19      Do you see that? You understood

20   that just because this is a plan there is no

21   guarantee?

Page 201

51 (Pages 198 to 201)

**BRENDA DIANE TAMARIZ-WALLACE     MARCH 4, 2010**

1    A.   I wasn't looking for a guarantee.
2    Q.   Okay.
3    A.   I didn't need a guarantee to be
4  successful if I had all the information that I
5  needed at the time I made these decisions.
6    Q.   The last sentence of the disclaimer
7  says: "Nationwide continues to recommend that
8  you consult with your personal attorney and
9  business advisers when preparing to implement
10  new programs or processes." And, in fact, you
11  were doing that. You had your own personal
12  attorney and you had your own accountant and
13  you even had an appraiser?
14    A.   That's true. However, as long as I
15  had all of the information necessary to make
16  the important decisions from Nationwide. --
17  but this doesn't really apply to that.
18  Personal attorney and the business advisers
19  could not know what Nationwide was not telling
20  me.
21    Q.   On page -- we'll finish this up in a

Page 202

1  little bit and then we will take a break.
2  Excuse me. I've gone a little longer than I
3  thought I would.
4        On Page 13, Item 7, in the third
5  bullet point, and this is -- the subject on
6  this page is customer retention and
7  multi-lining planning.
8    A.   I'm sorry -- okay.
9    Q.   And there's a sentence at the top
10  that says: "The Tamariz agency will focus on
11  retention and multi-lining of the IA
12  policyholders throughout the Nationwide
13  conversion process." And then in Box 7 in the
14  third bullet it says: "Refer commercial lines
15  to commercial staff located in IA satellite."
16    A.   Uh-huh.
17    Q.   Let me stop there. What's the IA
18  satellite, at that time?
19    A.   This does not conform to -- I'm not
20  understanding exactly what they mean by this
21  because there was just the one office for

Page 203

1  George T. Moran, Inc..
2    Q.   Right.
3        Well, this says IA -- okay. Never
4  mind. I hear what you're saying.
5        Well, you did set up an office in
6  the basement, though?
7    A.   That was Diane Tamariz & Associates
8  and Moran Insurance Services, Inc..
9    Q.   Okay. On Page 15 there's some
10  narrative at the top of that page that says
11  that "Tamariz's agency immediate six-month
12  objective is to concentrate upon the
13  assimilation of the IA storefront staff and
14  premium to the agency and to Nationwide. Once
15  the conversion plan is well under way, the
16  third quarter '05 objective will be to continue
17  expansion via additional independent agency
18  acquisition.
19        George Moran, a well connected and
20  well respected independent agent in the
21  community will function as the primary resource

Page 204

1  for this new opportunity search." Let me stop
2  there.
3        Is that really what was in mind at
4  the time in late '04?
5    A.   Yes.
6    Q.   That one of the benefits of George
7  is he would help look for other independent
8  agencies for you to acquire?
9    A.   Yes. And that was Nationwide's goal
10  for us.
11    Q.   And then it goes on to say:
12  "Tamariz's profile of future acquisitions will
13  target personal line books located in
14  geographically favored growth areas where the
15  competitive position and penetration present
16  the best opportunity to enroll to Nationwide."
17        Do you see that?
18    A.   Yes.
19    Q.   The Eagan book that we talked about
20  earlier, you indicated that that was a personal
21  lines book of almost $4 million, but very

Page 205

52 (Pages 202 to 205)

1  little transition to your agency, right?

2      A.   Yes.

3      Q.   Did that present a competitive

4  position and present the best opportunity to

5  roll to Nationwide?

6      A.   I believe it could have.

7      Q.   Well, why didn't it?

8      A.   I wasn't able to maximize it.

9      Q.   Because of what was happening in

10  terms of your health condition or what?

11      A.   I was out of work.  They were

12  stabilizing the transition and then from June

13  on I wasn't sure what was going to happen.

14      Q.   You know, when you bought Moran,

15  Inc., you were the purchaser of Moran, Inc..

16  And with the Eagan books since that was

17  financed not with any -- was any of it cash

18  upfront?

19      A.   No.

20      Q.   So you brought the $4 million Eagan

21  book with no cash upfront, but it was to be

1  paid off from revenue from the assets bought

2  themselves.  There is no reason why Tamariz &

3  Associates couldn't have bought it, right,

4  since there was no cash upfront?

5      A.   Yes.

6      Q.   What's the reason?

7      A.   Because, as I had been told in the

8  past, I hit my funding wall and that was under

9  Laurel.  But I wasn't given the opportunity to

10  maximize the opportunity with the Eagans.

11      Q.   Well, I want to make sure I

12  understand what you say about that.  The

13  funding wall is Nationwide wouldn't give you

14  new loans?

15      A.   Right.

16      Q.   But you didn't need a loan to buy

17  this book because it was bought out of -- there

18  was no cash down and you would pay it back from

19  the --

20      A.   We finalized it that way.  We

21  finalized the deal that way.

1      Q.   Well, that's my question.  Since you

2  didn't need a loan, ultimately, to buy the

3  Eagan book, why did -- why didn't Diane Tamariz

4  Associates buy it?

5      A.   Because I didn't trust what had

6  happened the last time to me.  If I was going

7  to buy it through DTA from Nationwide, I hadn't

8  even made it through the first disaster.  So

9  why should I open it up again?  I couldn't get

10  the first diaster resolved.

11      Q.   The Laurel book you were talking

12  about, that's actually the name that I was

13  thinking of earlier.  You had bought the

14  Insurance Place book we talked about, the Eagan

15  book.  There was an opportunity that you

16  thought you had with the Laurel agency, the

17  Laurel book?

18      A.   I don't understand.  Say it --

19      Q.   What was the Laurel book you were

20  referring to?

21      A.   That is the Insurance Place.

1      Q.   Oh, okay.

2          MR. LYMAN:  Just so you know, Laurel

3  is a place.  It's a location in Maryland.

4          MR. LINDSMITH:  I thought it was a

5  person's name.

6          MR. LYMAN:  It's a name, but it's a

7  name of a town called Laurel.  Part of it is in

8  Anne Arundel County, part of it is in Prince

9  George's County.

10          MR. LINDSMITH:  Thank you, Ralph.

11  We would have been -- I would have been

12  struggling with that all day and you would have

13  been looking at me like what is wrong with him.

14          MR. LYMAN:  There is no hardy book

15  either.  Laurel book, hardy book.

16          MR. LINDSMITH:  Why don't we take a

17  break.

18          (A short recess was taken.)

19          (Deposition Exhibit No. 17 was

20  marked for identification.)

21          BY MR. LINDSMITH:

1    Q.   You have been handed what's been
2  marked Exhibit 17.  On the first page it
3  appears to be -- looks like two e-mails.  The
4  bottom being the first e-mail of November 17,
5  2004.  It looks to be sent from Mr. Wallace to
6  Tim Riggins.  And it shows you as a copy along
7  with some other folks that I think are mostly
8  Nationwide folks.  And the subject is "Moran
9  DTA Pro Formas."  And Mr. Wallace says:  "Tim,
10 good seeing you today at Diane's office and we
11 appreciate your help.  Attached are the pro
12 formas per our discussion.  The color codes
13 work great.  And please note the bulleted items
14 in the right box to increase the size of the
15 spread.  Just hit view and zoon.  Dave."
16     Do you see where I've been reading?
17     A.   Uh-huh.  Yes.
18     Q.   And this e-mail was produced -- the
19 Bates numbers would indicate it was produced
20 by -- I think from your office.  And what
21 follows the e-mail, then, is the e-mail is

1  Bates page DTA 226 and then we have what looks
2  like a pro forma with Bates Page 227 ending on
3  Bates Page 255.
4      So focusing on that now, do you
5  recognize what is the documents styled as a pro
6  forma revenue that is the rest of this exhibit?
7      A.   Give me a second here.
8      Q.   Sure.
9      A.   I believe -- I want to say two
10 things about it.
11     Q.   Sure.
12     A.   I believe that this was expense
13 information that Tim Riggins had asked for from
14 Moran and from DTA.  This first page says:
15 "Pro forma revenue."  I'm not sure where this
16 came from.
17     Q.   And some of this looks like it's in
18 different formats.  And, I guess, my general
19 question is:  Do you know who prepared this or
20 was it a combination of folks who prepared
21 certain parts of this?

1      A.   This was not the actual pro forma.
2      Q.   Okay.
3      A.   This was not used in the deal.
4      Q.   Okay.
5      A.   And so I don't know where it came
6  from.
7      Q.   All right.  Why don't we move on,
8  then.
9          (Deposition Exhibit No. 18 was
10 marked for identification.)
11     BY MR. LINDSMITH:
12     Q.   You have been handed what's been
13 marked Deposition Exhibit 18, which appears to
14 be an e-mail from Mr. Wallace to Craig Siebert
15 dated December 7, 2004.  Now, again, Mr.
16 Siebert is your C.P.A.?
17     A.   That's correct.
18     Q.   And he talks about Nationwide still
19 working on the number.  He says:  "Nationwide
20 state."  I don't know if that's a typo.
21     A.   No.

1      Q.   Yeah.  What is that?
2      A.   State officers.
3      Q.   Oh, okay.  A bank or what?
4          And it says in the second paragraph,
5  "George is okay with closing the first week of
6  January."  In the third -- or, excuse me,
7  fourth paragraph he writes:  "Our concern is
8  that Nationwide may only want to finance
9  business coming to them.  We are pushing that
10 they need to finance the whole works in order
11 to get the gem."
12     A.   Uh-huh.
13     Q.   Do you know what he's talking about
14 there?
15     A.   I do.
16     Q.   At this point in time?
17         What is that?
18     A.   We were told to go find our own
19 money, our own financing in the market.
20     Q.   But Nationwide had committed to a
21 certain amount of the financing, but not enough

A401106
BRENDA DIANE TAMARIZ-WALLACE     MARCH 4, 2010

1  to buy the agency?
2      A.   Right.
3      Q.   Okay.
4      A.   And, frankly, I don't even think
5  they had committed to it.  Because as of this
6  date, as I'm reading this, it doesn't -- I
7  don't think that the full commitment had been
8  made.  But we had been told we had to go find
9  our own money.
10     Q.   Let me ask about that.  Did you
11  actually go out in the commercial market and go
12  visit banks and try to get loans from banks?
13     A.   Yes.
14     Q.   What was the nature of your success?
15     A.   Nothing.  No success.
16     Q.   You couldn't get any loans?
17     A.   No.
18         (Deposition Exhibit No. 19 was
19  marked for identification.)
20         BY MR. LINDSMITH:
21     Q.   You have been handed what's been

Page 214

1      Q.   You have been handed what's been
2  marked as Deposition Exhibit No. 20.  It,
3  again, looks like the kind of notes we have
4  seen before.  At the top it says: "Talking
5  points with George."  It's dated 12-30-04.
6         Do you recognize what this is?
7      A.   I believe, again, this is -- this
8  represents all the different gyrations of
9  George's deal request.
10     Q.   Are these -- I mean, this -- the
11  title suggests to me that these are talking
12  points that Mr. Wallace has prepared for some
13  kind of upcoming visit with Mr. Moran?
14     A.   Yes.  Yes.  I would say yes.  Or it
15  may actually be conversations that they have
16  had.
17     Q.   Okay.
18         (Deposition Exhibit No. 21 was
19  marked for identification.)
20         BY MR. LINDSMITH:
21     Q.   You have been handed Exhibit 21,

Page 216

1  marked 19, which, again, appears to be typed
2  notes.  It has at the top -- well, I don't know
3  if it's notes or not, but it's a document
4  that's -- it looks like the same kind of thing
5  we've seen before that look like notes.  At the
6  top it says:  "Talking points meeting with Dave
7  Wallace.  Meeting December 29, 2004."
8         I guess I was a little confused by
9  this as to whose writing this if this concerns
10  a meeting with Dave Wallace.
11         Do you know what this is?
12     A.   I believe this is George's position
13  at this point in time.
14     Q.   Okay.  So this is -- are these
15  Dave's notes out of a reflection of the
16  conversation he's having with George at this
17  time?
18     A.   I believe it is.
19         (Deposition Exhibit No. 20 was
20  marked for identification.)
21         BY MR. LINDSMITH:

Page 215

1  which, again, looks to be notes in the form we
2  have seen earlier.  This one -- it does have a
3  date at the bottom of 12-31-04, which would be
4  the day after the notes we just saw and it says
5  at the top, "To counter" -- excuse me -- "The
6  counter to George Moran, no promissory notes
7  from DTL security funding," and it goes on.
8         Does this kind of help you refresh
9  your recollection as to what's kind of
10  happening in this time frame?  Are these more
11  back and forth discussions?
12     A.   Yes.  Yes, they are.
13     Q.   In the -- toward -- two-thirds of
14  the way down where it says, "other required
15  points," Item Number 1 says: "The three key
16  employees, George Moran, Donna Moran and Russ
17  Deveaux must remain productively involved at
18  Moran for a minimum of three years or a $50,000
19  deduction/key employee is made in that year and
20  all future years against the payout."
21         Do you see that?

Page 217

55 (Pages 214 to 217)

1    A.   Yes.
2    Q.   Why was it important that those
3  three key employees remain productively
4  involved for a minimum of three years?
5    A.   They were responsible for the
6  transition of relationships to the success --
7  for the success of the acquisition, a rollover.
8    Q.   But I take it from your earlier
9  testimony that, as far as you knew, neither
10 Donna nor Russ even knew that that would be
11 their role?
12   A.   Let's see.  This is 12-31.  That's
13 true.  That's true.
14   Q.   I mean, was that kind of a risk you
15 understood that part of your plan is they have
16 to stay involved for three years, but you
17 haven't even had a chance to personally talk to
18 them about that; is that right?
19   A.   Let me say it this way.  Let me
20 answer you this way.  It would be George's job
21 to make sure that the transitions occurred as I

Page 218

1  was directing.  That's what he was getting paid
2  for.  So the penalty is that if these folks
3  left or didn't cooperate it was going to cost
4  him money.  Now, we had specifically designed
5  it that way to have some measure of control
6  over the success of the transition of business.
7    Q.   Because that would not be a good
8  thing if one of those two left?
9    A.   Absolutely.
10   Q.   Because they have a customer
11 relationships, they might take those
12 relationships with them?
13   A.   I wasn't -- no.  Now, that isn't
14 what I was concerned about.
15   Q.   Okay.  In the course of this, did
16 you provide financial statements to Mr. Moran?
17 Did he ask for financial statements?
18   A.   I believe so.
19       (Deposition Exhibit No. 22 was
20 marked for identification.)
21       BY MR. LINDSMITH:

Page 219

1    Q.   I just have a quick question on
2  this.  Exhibit 22 that you have been handed,
3  are these your personal financial statements
4  for you and Mr. Wallace for 2004?
5        And before you answer that, I didn't
6  mean to mislead you here.  I just now noticed
7  that on these statements there's a letterhead
8  for Commerce First, which would indicate to me
9  that this is, perhaps, a financial statement
10 filled out for a bank.
11   A.   Yes.
12   Q.   Is that more of what this looks like
13 to you?
14   A.   Yes.  I believe this was done in
15 compliance with going out and getting our own
16 financing.
17   Q.   Okay.  Just a question I have about
18 this is for the list of your assets you show
19 stocks and bonds, $2 million, and it's written
20 in parenthesis -- I think that reads 100
21 ownership of Diane Tamariz & Associates.  Am I

Page 220

1  reading that right?
2    A.   I believe that's actually life
3  insurance.  It's on the wrong line.
4    Q.   Oh, okay.  That was my next
5  question.
6    A.   I'm sorry.  Can you read this again?
7    Q.   Yeah.  Where it says, "stocks and
8  bonds," it shows $2 million and in parenthesis
9  I read that to mean 100 percent ownership of
10 Diane Tamariz & Associates?
11   A.   It's life insurance.
12   Q.   Okay.  You had a $2 million policy
13 on your life for the benefit of the company?
14   A.   Yes.
15       (Deposition Exhibit No. 23 was
16 marked for identification.)
17       BY MR. LINDSMITH:
18   Q.   You have been handed Exhibit 23.  Is
19 this a copy of the personal tax return for you
20 and Mr. Wallace for the year 2003?  Is that
21 what this is?

Page 221

**BRENDA DIANE TAMARIZ-WALLACE      MARCH 4, 2010**

1    A.   Oh, yes.  I'm sorry.  I believe it
2  to be.  Yes.  I'm sorry.
3    Q.   I just want to ask you a couple of
4  questions about this.  On the beginning and
5  front page, that is, the first page of your tax
6  return, it shows on Line 12 business income of
7  89,786 which tracks the number that's shown on
8  the profit-loss schedule for your business of
9  Brenda Diane Tamariz-Wallace.  That's the
10  number that shows up as the -- in Line 31 as
11  the profit.  So that -- so where we see that on
12  the first page of the return, that's your
13  income?
14    A.   Uh-huh.
15    Q.   Can you say yes or no for the
16  record?
17    A.   Yes, I believe that to be.
18    Q.   For the -- and for Mr. Wallace I see
19  that he has filled out a -- I believe that's a
20  partnership return.  Well, I'm sorry.  I
21  misspoke.

Page 222

1       It looks like a partnership return,
2  Charles D. Wallace and Brenda Diane
3  Tamariz-Wallace for the company's Specialty
4  Direct Marketing, Inc..  I'm sorry.  I have
5  confused this.  That's just the name of the
6  return, which is both your names.
7       But in Part 2 of that same schedule
8  income or loss from partnerships and S
9  corporations there is listed an S corporation,
10  not a partnership, of Specialty Direct
11  Marketing, Inc..  This is on Page 9 of the
12  faxed copy.  The top right-hand side, it's Page
13  9 if you look at that faxed notation.  And
14  there's a Part 2, and if you drop down to Line
15  28-A you see Specialty Direct Marketing, Inc.?
16    A.   Yes.
17    Q.   And that's your husband's business?
18    A.   Yes.
19    Q.   And it shows -- for that S
20  corporation he shows only a loss of $51,687.
21       Do you see that?

Page 223

1    A.   I do.
2    Q.   So if we go back to the first page
3  of the return, in terms of income -- and I'm
4  ignoring capital gains -- there is your income
5  of 89,786.  There's also wage income of 54,166
6  on Line 7.
7    A.   Uh-huh.
8    Q.   We don't have the benefit of the
9  W-2.  Whose wage income is that, do you know?
10    A.   I didn't prepare these, so I don't
11  know.  I can't tell you.
12    Q.   I mean, would you have had any W-2
13  income yourself that year?
14    A.   No.
15    Q.   Okay.  So is it fair to conclude
16  that would be your husband's W-2 income?
17    A.   Probably, yeah.
18    Q.   And is it your understanding in this
19  year his only income would have derived from
20  his business, the specialty marketing business?
21    A.   Yes, I believe so.  But, once again,

Page 224

1  I didn't prepare this and I don't have
2  knowledge of the documents that would support
3  the preparation of this.
4    Q.   Did you know in 2003 that you were
5  both enjoying a loss declaration of over
6  $51,000 from a business where the loss largely
7  was the salary paid to Mr. Wallace?
8    A.   I don't know anything about that.
9  I'm sorry.  I can't answer any of that.
10       (Deposition Exhibit No. 24 was
11  marked for identification.)
12       BY MR. LINDSMITH:
13    Q.   Can you identify for the record
14  what's been handed to you as Exhibit 24?
15    A.   It reads:  "Financial statements of
16  Diane Tamariz & Associates, P.A.."
17    Q.   And this would be for the period
18  ending December 2004?
19    A.   If it's for Diane Tamariz &
20  Associates, P.A., it would only represent six
21  months, five months.

Page 225

57 (Pages 222 to 225)

1    Q.   You're on a June to June fiscal
2 year?
3    A.   No.  No.  I'm thinking of the time
4 frame from which DTA became incorporated and
5 operated through the end of the year.
6    Q.   Okay.  Thank you.
7         If we go to the second to the last
8 page of this exit it shows that the total
9 income for DTA as of year end is almost half a
10 million dollars.
11        Do you see that income line just
12 prior to the word "expenses"?
13   A.   I'm sorry.  Can you point that out?
14   Q.   Yes.
15   A.   All right.  Got it.  Sorry.  I'm
16 with you now.
17   Q.   The precise number is $474,896?
18   A.   Yes.
19   Q.   Is that consistent with your
20 recollection that you would have generated that
21 much income in only six or seven months?

Page 226

1    A.   The contingency bonus.
2    Q.   Part of that?
3    A.   Yes.
4    Q.   Oh, I see.  That's reflected in the
5 lines above that.  Your Nationwide contingency
6 bonus is 162,000?
7    A.   Right.
8    Q.   Okay.  Thank you for pointing that
9 out.
10        Even so -- strike that.
11        (Deposition Exhibit No. 25 was
12 marked for identification.)
13   BY MR. LINDSMITH:
14   Q.   Ms. Tamariz-Wallace, you have been
15 handed what's been marked Exhibit 25.  These
16 look like more notes.  Do you recognize -- and
17 they're dated January 5 of '05?
18   A.   Yes.
19   Q.   What is this about?
20   A.   This is, once again, the deal
21 negotiations with George.  And this has to do

Page 227

1 with, obviously, closing the deal and -- yeah,
2 I would say that's pretty much it.  And also
3 related to us going out and finding the funding
4 on our own or attempting to.
5    Q.   And there's reference to SunTrust
6 and Severn Saving and Bay Country and Commerce
7 First SBR.  These all different folks that you
8 were thinking of or maybe --
9    A.   Financial institutions, yes.
10        (Deposition Exhibit No. 26 was
11 marked for identification.)
12        BY MR. LINDSMITH:
13   Q.   You have been handed Exhibit 26.
14 These appear to be notes dated the next day,
15 January 6, 2005.  It says at the top:  "Game
16 Plan For Moran, Overview For Greg Pearce,
17 SunTrust."  Is this kind of notes of approach
18 to be taken with SunTrust?
19   A.   Yeah.  Yes.  This was to make sure
20 we stayed on track about funding the deal.
21   Q.   In terms of the deal on Item 3 it

Page 228

1 says:  "We have a $12 million independent
2 agency acquisition deal; A, a letter of intent
3 is signed; B, the deal is for 3 million and we
4 have secured funding from Nationwide for 2
5 million (payable over 12 years at 1 percent
6 over prime) which covers the 5 million of
7 premium which will convert to Nationwide."  Let
8 me stop there.
9         By that time, have you actually
10 secured funding from Nationwide?  Do you have
11 some kind of commitment whether it's --
12   A.   Through Ed Cooper, I believe we did.
13   Q.   Okay.  So you have a 3 million price
14 tag, but you only have 2 million from
15 Nationwide.  So you're hunting for the other
16 million?
17   A.   Yes.
18   Q.   And it says that "The 2 million from
19 Nationwide is to cover the 5 million of premium
20 that will convert to Nationwide."  Let me stop
21 there.

Page 229

**BRENDA DIANE TAMARIZ-WALLACE      MARCH 4, 2010**

1    At the time, was it thought that of
2 the $12 million that Moran had at the time that
3 was being bought, 5 of that 12 million would go
4 over to Nationwide?
5    A.   I believe this number is coming from
6 the pro forma that Tim Riggins had prepared.
7    Q.   By that time there had been a pro
8 forma done and the amount was about -- they
9 projected about 5.1 million?
10    A.   5.6, but they would take 5.1.
11    Q.   5.1 would be acceptable as the goal?
12    A.   Yes.  Yes.
13    Q.   Okay.  Here's my question:  So by
14 this time the -- if there had been an early
15 expectation of 90 percent coming over to
16 Nationwide, that had dropped quite a bit now to
17 under -- well under 50 percent.  It looks like
18 5 million out of 12 million to my rough math is
19 about 40 percent.  So Nationwide is looking to
20 benefit from -- and your agency to benefit of
21 40 percent of that Moran business coming over

Page 230

1 the premium that was in Moran would stay in
2 Moran to fund the debt service payments over
3 the 12 years of the loan.
4    Q.   Okay.  And in Item 5 it says:  "The
5 combined business of Diane agency and the
6 acquisition will be about 16 million and
7 whoever comes forward to help us will be the
8 bank we do business with."
9    Do you see that?
10    A.   Right.
11    Q.   At this time in an ideal world and
12 without anticipating the loss of producers and
13 some of the problems that you came to have,
14 regardless of the actual conversions, you were
15 still going to have a total book of 16 million
16 between the two agencies; is that fair?
17    A.   Can you just say that one more time
18 for me?
19    Q.   Yeah.  It was kind of a long
20 question.
21    I understand what you've said

Page 232

1 and yet even though only 40 percent is coming
2 over, Nationwide is -- at that time, the idea
3 is it would fund 66 percent of it.  And I guess
4 my question was why -- what's your
5 understanding as to why Nationwide was willing
6 to do that to fund 66 percent of the purchase
7 price and only get 40 percent of the business?
8    MR. LYMAN:  Objection.  Speculation.
9    You can answer.
10    THE WITNESS:  Let me just answer it
11 this way.  They wanted this deal to happen.
12    BY MR. LINDSMITH:
13    Q.   So by this time in January of '05
14 now with Nationwide indicating they would be
15 happy if 5 million came over, what were you
16 thinking at the time as to, you know, if that
17 was successful and 5 million came over, what
18 were your thoughts as to what would happen with
19 the 7 million that would still be with Moran?
20    A.   At that point in time, there -- and
21 I -- I assumed I understood and I was told that

Page 231

1 earlier about what actually happened and the
2 loss of customers and how the buzz saw the
3 first 90 days, that the reality was very
4 different from what had been hoped for.  But
5 I'm just focusing on this time when we're still
6 in the what's hoped for phase that you
7 understood at this time that, you know, if only
8 4 million came over you would still have $8
9 million with Moran and that could still fund
10 the loan to Nationwide, paying the loan to
11 Nationwide.  So you would still have a total
12 book of 16 million as a hoped-for scenario; is
13 that fair?
14    A.   I think to be -- to honestly answer
15 this question I need to see some more of the
16 documents of that pro forma.  It was very
17 complicated.  I just -- I don't know that I can
18 give you an honest answer on that without
19 seeing more.
20    Q.   I mean, I -- because I don't know if
21 this is actually told to the bank, but this is

Page 233

59 (Pages 230 to 233)

1  written as if it's going to be told to the bank
2  that in a very simple big picture way this is
3  basically a $16 million package altogether and
4  in the grand scheme of things -- I mean, you
5  know that you're going to have 12 million on
6  the Moran side, you're going to have 4 million
7  on the DTA side, generally speaking, and that
8  adds up to 16 million.
9      I mean, you were not anticipating a
10 big loss of business from either the Moran side
11 or the Tamariz side; is that fair?
12     A.  I would say that was fair.
13     Q.  Okay.
14     A.  At that point in time that would be
15 correct.
16     Q.  Okay.  So even if you didn't convert
17 as many as you were hoping for, the hope would
18 be what wasn't converted would still be at
19 least with Moran and would provide commission
20 payments to pay back.  There would be a basis
21 for paying back some of the Nationwide debts as

Page 234

1  a hope, you know?
2      A.  Right.
3      Q.  Is that fair?
4      A.  I would agree at this point in time
5  that may have been what we were thinking.
6      Q.  And that's all I'm asking.
7          (Deposition Exhibit No. 27 was
8  marked for identification.)
9          BY MR. LINDSMITH:
10     Q.  You have been handed Exhibit 27.
11 This is -- looks like another set of notes of
12 the type we have seen before.  This is dated
13 two days later on January 7 of '05.
14     A.  Uh-huh.
15     Q.  Are these notes reflecting -- are
16 these notes prepared by Mr. Wallace -- I'm
17 sorry.
18         Are these notes or is this a memo to
19 Greg Pearce at SunTrust bank?
20     A.  It appears to be an actual memo.
21     Q.  Okay.  At this point in time in Item

Page 235

1  E-2 a thought or a proposal is that the 5
2  million that will get converted to Nationwide
3  that will be left over 7 million with Moran,
4  and it's written here in Paragraph 2, "The
5  other 7 Moran premium is what we are looking
6  for a security on the promissory note payable,"
7  and then it goes over to time.
8      Do you see that?
9      A.  Number 2?
10     Q.  Yes.
11     A.  Yes.
12     Q.  Well, here's a question I have.  Can
13 you actually -- I mean, can you actually use
14 premium to be security?  Because that premium
15 doesn't actually belong to the Moran agency or
16 the agency itself.  That premium is the
17 property of the insurance company, isn't it?
18         MR. LYMAN:  Objection.
19         Calls for an opinion, but you can
20 give it if you want to or if you know what he's
21 asking and if you feel like you can answer.

Page 236

1          THE WITNESS:  I think what's trying
2  to be said here is that that $7 million of
3  premium, the revenue stream that comes from
4  that.  It may not be worded properly.
5          BY MR. LINDSMITH:
6      Q.  Okay.  And that's me being the
7  lawyer.  When I see security that typically
8  means collateral.
9          Your reading of this is more that
10 that would be a basis of income that would
11 support repayments to the bank.  Is that how
12 you read it?
13         MR. LYMAN:  Objection.
14         You can answer.
15         THE WITNESS:  I don't know what he
16 was trying to say here when he was writing
17 this.
18         BY MR. LINDSMITH:
19     Q.  Okay.  That's fine.
20         (Deposition Exhibit No. 28 was
21 marked for identification.)

Page 237

1        BY MR. LINDSMITH:
2        Q.   You have been handed what's been
3    marked Exhibit 28.  Now, this was produced by
4    CRMG.  It's CRMG, Bates No. 340.  It's dated
5    2-11-05.
6        Do you recognize what this is?
7    A.   Vaguely.
8        Q.   In the beginning it says at the top,
9    "George, our concern is what assurances do we
10   have that you will be around for a minimum of
11   three years?"
12       Was that kind of a growing concern
13   in the time frame in February as you're
14   continuing to try to bring this deal to
15   conclusion?
16   A.   I really can't comment on what
17   generated that question.  It doesn't ring a
18   bell to me for what would have generated that
19   question.
20       (Deposition Exhibit No. 29 was
21   marked for identification.)

Page 238

1        BY MR. LINDSMITH:
2        Q.   You have been handed Exhibit No. 29,
3    which appears to be a correspondence from Mr.
4    Moran to yourself and your husband.  There's no
5    date on it, but it references -- well, at the
6    beginning he says:  "For the past week I have
7    been pondering your e-mail of February 22,
8    2005," which suggests it's some time after
9    that.
10       Do you remember receiving this
11   correspondence?  Does this look familiar to
12   you?
13   A.   I believe that I recollect this.  I
14   recognize it.
15       Q.   In the first bullet point under
16   Paragraph Number 1 in the second sentence he
17   says:  "Since DTA expects to pay for a large
18   portion of the buyout through Nationwide
19   contingency agreement, it would be unlikely
20   that Moran Insurance would continue to receive
21   contingency income from its carriers at

Page 239

1    historic levels."  Let me stop there a minute.
2        Is that what was being contemplated
3    at the time that after the acquisition occurs
4    the Diane Tamariz contingency commissions will
5    increase and you'll be able to use that money
6    to pay for part of this acquisition?
7    A.   To answer your question, I think it
8    says two things.  I think number one, he
9    recognizes and he's seriously recognizing that
10   the purpose of the acquisition is to transition
11   the business to Nationwide.  And number two,
12   based on the pro forma that Nationwide prepared
13   that carries the contingency line out
14   significantly, this ties into that, to that
15   whole issue.
16       Q.   I mean, basically, it's anticipated
17   if everything goes as planned that the Diane
18   Tamariz contingencies will go up, but the Moran
19   contingencies will go down as they have to if
20   business is being transitioned; is that fair?
21   A.   True.

Page 240

1        Q.   But then he says:  "Moran's PNC
2    commission revenue, excluding profit sharing
3    for FYE," -- I read that to mean fiscal year
4    ending June 30, 2004 -- "was 1,300,000.  This
5    would be the commission number to be
6    maintained.
7        Do you know what he means by that?
8    A.   I believe that looking at DTA and
9    Moran and the rollover together, in order for
10   Moran to remain stable, that would be the
11   threshold that would have to be continued.
12       Q.   Well, if -- and the math is not
13   adding up.  If 40 percent of the commission
14   income is to go over to Tamariz-Wallace, the
15   base commissions for Moran would go down far
16   below that.
17   A.   I think he's looking at all of the
18   revenue stream in the first place.
19       Q.   Okay.  I don't mean to -- this is
20   his letter.  I don't mean to box you in.  I'm
21   just trying to understand, at least, how you're

Page 241

A401106
**BRENDA DIANE TAMARIZ-WALLACE      MARCH 4, 2010**

1 reading this. And if you're not sure, that's
2 fine, too.
3     A.   That would be my first statement, is
4 that he was looking at it in terms of a
5 collective revenue.
6     Q.   Okay. This is actually a document I
7 was going to show Mr. Wallace, but I'm just
8 curious if you know what this is all about.
9         (Deposition Exhibit No. 30 was
10 marked for identification.)
11     BY MR. LINDSMITH:
12     Q.   You have been handed what's been
13 marked Exhibit 30, which is a couple of
14 e-mails. And I have it in -- it's kind of a --
15 I'm trying to follow a chronology of events
16 here. This is dated April 6 of '05.
17     A.   Okay.
18     Q.   And the first one is an e-mail from
19 Jim Green to a P. Smith with a copy to Dave
20 Wallace and it's at specialtydirect.com. That
21 would be Mr. Wallace's company?

Page 242

1     A.   This is part of the business plan
2 that you showed me where the agency acquisition
3 efforts would be handled by Dave as part of the
4 acquisition.
5     Q.   Oh, part of the task?
6     A.   Right. To find more agencies.
7     Q.   Okay. Thank you. That cleared that
8 up.
9         (Deposition Exhibit No. 31 was
10 marked for identification.)
11     BY MR. LINDSMITH:
12     Q.   Here we are now to Exhibit 31, which
13 is -- it appears to me to be the agreement for
14 sale of stock. If you could, for the record,
15 identify what this is.
16     A.   This, in fact, appears to be the
17 document signed by George Moran with the intent
18 to sell the stock of George T. Moran, Inc..
19     Q.   So as we look at the final deal
20 here, and this is signed by you and its also
21 signed by Mr. Moran?

Page 244

1     A.   Yes.
2     Q.   And is Mr. Green at this time an
3 employee of Specialty Direct?
4     A.   He would have been at that time,
5 yes.
6     Q.   And again, just so the record is
7 clear, Specialty Direct is now CRMG?
8     A.   Yes.
9     Q.   And who is P. Smith -- oh, Phyllis?
10     A.   Yes.
11     Q.   Okay. The second e-mail at the top
12 from Mr. Wallace it looks to be from Mr.
13 Wallace to Jim Green, but he starts out by
14 saying: "Phyllis, remind Judy no mention of
15 Nationwide or Diane and no mention of CRMG or
16 SDM on the agency acquisition management group
17 calls. Also, remember when she is doing this
18 calling, if she leaves a call back, we need to
19 know how to handle that since the phone will
20 answer CRMG Specialty Direct."
21         What's this all about? Do you know?

Page 243

1     A.   Uh-huh.
2     Q.   I believe the signature page is on
3 Page 24. Is that your signature?
4     A.   Yes.
5     Q.   Okay. On the first page if you look
6 at how the deal finally resulted, it is a
7 purchase price of $3 million and 2.25 million
8 is to be paid upfront and then a promissory
9 note of -- in the amount of $500,000. Explain
10 to me these stages. So you have 2.5 paid
11 upfront. In the second paragraph it says:
12 "The $500,000 promissory note will be secured
13 by purchasers right to receive deferred
14 payments from Nationwide Federal Credit Union."
15         I really didn't understand what that
16 was.
17     A.   The first two back end
18 installments --
19     Q.   Yes?
20     A.   -- that's what it is.
21     Q.   But the --

Page 245

BRENDA DIANE TAMARIZ-WALLACE     MARCH 4, 2010

1      A.   I'm assuming you had a question
2   about that.
3      Q.   Yeah.
4      A.   I'm answering.
5      Q.   The actual loan agreement, the
6   promissory note, which I'll show you next, the
7   amount that you actually borrowed from
8   Nationwide Federal Credit Union was $2.3
9   million.  So that's enough to cover the 2.25
10  million and $50,000 going in escrow.  And I'm
11  just -- and -- but there was no other -- at
12  least I didn't see it, no other separate loan
13  from the credit union.  And I was just trying
14  to understand, ultimately, was there some kind
15  of advance of a contingency bonus paid to you
16  that you were able to use that was part of that
17  second installment?
18     A.   No.  No.  The way that I recall it
19  is that Nationwide would give us access to the
20  500,000, the first and second year
21  installments, if we needed them.  And then the

Page 246

1   final note we were on our own.
2      Q.   You come up with that yourself?
3      A.   Uh-huh.
4      Q.   So did Nationwide actually advance
5   that second or provide the funding for that --
6   the second installment of $500,000?
7      A.   Yes, they did.
8      Q.   Okay.  On the second page it
9   provides that -- and I'm looking at Paragraph
10  I.  Noncompetition and confidentiality
11  agreement and employment agreement.  It says:
12  "A key employee of the company is George T.
13  Moran.  This agreement is expressly contingent
14  upon" -- "on," -- excuse me -- "George T. Moran
15  executing and delivering a closing an
16  employment agreement requiring him to continue
17  in the company's employ for at least three
18  years in the form of attached as" -- "in the
19  form attached as Exhibit 1."  Let me stop
20  there.
21          Did Mr. Moran sign such an

Page 247

1   agreement?
2      A.   Yes.
3      Q.   Why -- before there was in the
4   negotiations you also wanted him to lock in, so
5   to speak, Mrs. Moran also Mr. Deveaux.  Is
6   there a reason why a condition of the purchase
7   is just Mr. Moran and does not include a
8   similar contract for Mrs. Moran and Mr.
9   Deveaux?
10     A.   I would answer it this way:  George
11  T. Moran was the key name relationship
12  connection.  We didn't want to sign an
13  employment agreement with anyone else.  They
14  were dependent already.  And George represented
15  that there wouldn't be any issues with them
16  continuing.
17     Q.   Toward the back of this document we
18  come across a page -- I'm trying to figure out
19  the faxed page number, but it's not by itself
20  numbered.  But it's -- I'm looking for this
21  page, acquisition loan program.

Page 248

1          Do you see that?
2      A.   Okay.
3      Q.   There is a page in this exhibit that
4   has the heading "Acquisition Loan Program
5   Notice of Proposed Acquisition," and it appears
6   to have a signature at the bottom for Kelly A.
7   Hamilton.
8          Do you see that?
9      A.   I do.
10     Q.   And I apologize.  It's just what is
11  copied here, but it is very small font.  It
12  shows near the bottom a purchase price of $3
13  million.  The loan amount requested is $2.3
14  million.  And then it says:  "With
15  disbursements of 1.8 million," and then 250 and
16  250."
17          Do you know why that's attached to
18  this purchase agreement?
19     A.   I have no idea.
20     Q.   Okay.
21     A.   I'm sorry.  Is this document dated?

Page 249

A401106
BRENDA DIANE TAMARIZ-WALLACE      MARCH 4, 2010

1    Q.   I wish I could help you.  I don't
2  see a date on this.
3    A.   Honestly, I don't recognize this.
4    Q.   Following that is a number of pages
5  that appear to be spreadsheets and charts of
6  numbers that look to -- looks to be a pro forma
7  with -- among other things, conversion
8  revenues, projections, projections of premium
9  conversions to Nationwide.
10       Would this have been -- can you tell
11  if this would have been the final pro forma
12  that would have been attached to the purchase
13  agreement?
14    A.   All I can say is that it's dated
15  3-11-2005, I would assume.
16    Q.   Well, the reason I'm asking if it
17  was attached to the purchase agreement, that
18  would indicate to me that at least Mr. Moran
19  would have been able to look at this if he
20  wanted to, so he would have understood -- there
21  would have been written evidence that he

Page 250

1  certainly should have understood the conversion
2  issue.
3    A.   I can't say for sure.
4       (Deposition Exhibit No. 32 was
5  marked for identification.)
6       BY MR. LINDSMITH:
7    Q.   Ms. Tamariz-Wallace, you have been
8  handed what's been marked Deposition Exhibit
9  No. 32.  Do you recognize this to be the credit
10  agreement and promissory note that you signed
11  when you took out a loan with what was then
12  Nationwide Federal Credit Union in the amount
13  of $2.3 million?
14    A.   Yes.
15    Q.   And is that your signature on the
16  fourth page of this document?
17    A.   Yes.
18    Q.   Did you have the benefit of Counsel
19  to help you review this document before you
20  signed it?
21    A.   No.

Page 251

1    Q.   Was there a reason why you didn't
2  have Counsel look at it?
3    A.   Yeah.  This was a rush job.  I was
4  asked to sign this like that, you know, very
5  quickly in the regional office because Tim
6  Riggins was working to get the funds ready for
7  settlement in two or three days.  Two days.
8    Q.   So he needed to sign this in order
9  to have the funds available for the closing?
10    A.   Yes.  And I didn't have any time to
11  do anything with this except sign it.
12    Q.   And is the same true of the security
13  agreement that follows in this exhibit?
14    A.   Yes, that's correct.  It was all one
15  package.
16    Q.   As well as the certified copy of
17  corporate resolutions which follows that?
18    A.   I believe so.  I believe it was all
19  the same time.
20    Q.   I mean, did -- did you since show it
21  to Counsel, at least get Counsel's input about

Page 252

1  these documents?  I mean, is there any -- do
2  you have any issue with these documents in
3  terms of their contents that there's something
4  wrong with these documents?
5       MR. LYMAN:  Objection.
6       You can answer.
7       THE WITNESS:  After the fact I had
8  questions regarding the function of the IAA
9  program and the whole guarantee.  The operation
10  of the guarantee.
11       BY MR. LINDSMITH:
12    Q.   When you say, "the guarantee" --
13    A.   The guarantee of Nationwide.  In
14  other words, Nationwide guaranteeing to the
15  credit union that this would be assignable to
16  them.  But I didn't get any documents to
17  support how that assignment would happen or I
18  wasn't told how that worked with the program.
19  Although I did ask.
20    Q.   I mean, you do know that from time
21  to time banks will assign debt to other

Page 253

64 (Pages 250 to 253)

A401106
BRENDA DIANE TAMARIZ-WALLACE     MARCH 4, 2010

1    entities or assign notes over?  For example,
2    when you take out a mortgage for the bank, you
3    find out that you're paying another bank for
4    your mortgage, you understand that happens from
5    time to time?
6        A.   And usually I would expect to know
7    that in advance.  I would expect to see that
8    disclosure, but I didn't have any disclosure
9    about how that guarantee would work with
10   Nationwide.  That's all I'm sharing.
11       Q.   Okay.  Did you read this note before
12   you signed it?
13       A.   I read through it speed reading, but
14   I was being hurried along by Mr. Riggins to
15   make sure that he met the deadline with the
16   bank to get this back to them.
17       Q.   When you say, "speed reading," I
18   mean, did you tell him wait a minute, I want to
19   spend 10, 15 minutes to look at this and
20   understand it?
21       A.   Yes.

Page 254

1        Q.   Okay.  And did you feel you
2    understood this document sufficiently for your
3    own purposes to sign it?
4        A.   With the exception of the guarantee
5    part, yes.
6        Q.   Okay.
7        (Deposition Exhibit No. 33 was
8    marked for identification.)
9        BY MR. LINDSMITH:
10       Q.   You have been handed what's been
11   marked Deposition Exhibit 33, which says the
12   word "settlement sheet" at the top.  Is this
13   simply a one-page closing statement concerning
14   the closing of the purchase?
15       A.   Uh-huh.
16       Q.   Say yes or no for the record.
17       A.   Oh, yes.  I'm sorry.
18       Q.   It has a date of April 29, 2005.  I
19   think you mentioned that's your recollection of
20   the closing date?
21       A.   Yes.

Page 255

1        Q.   And that's your signature on this?
2        A.   Yes.
3        Q.   Now, here it has -- for the buyer it
4    says:  "Purchase price under the obligations
5    A-1, $3 million," and then for B, buyer's
6    credit there is a negative promissory note half
7    a million dollars and then promissory note
8    $250,000.
9        Do you remember if you actually
10   signed two separate promissory notes to Mr.
11   Moran, one for half a million and one for 250?
12       A.   I believe we did.  I believe I did,
13   but I can't be absolutely certain.
14       Can I take just one second?
15       Q.   Yeah.  Sure.
16       (Deposition Exhibit No. 34 was
17   marked for identification.)
18       BY MR. LINDSMITH:
19       Q.   Ms. Tamariz-Wallace, you have been
20   handed what's been marked Exhibit 34.  This is
21   dated -- well, it has a signature on the second

Page 256

1    page.  It looks like your signature of December
2    2, 2004, and looks like an ABP signature of --
3    that's what confuses me.  An ABP signature of
4    March 31 of '05.
5        What is this document?  It has at
6    the heading "Conversion Payment Request Form."
7    It begins by saying:  "I understand that I have
8    purchased George T. Moran, Inc.," meaning -- it
9    says, "have," past tense which would be
10   consistent with the day of the purchase
11   agreement.
12       A.   And your question?
13       Q.   Yeah.  What is this document?
14   What's the function of this?
15       I mean, I'm not going to read it,
16   but I'm not sure I understand what this is.
17       A.   This has to do with the upfront
18   payment.  However, I had issues with this
19   document all along the way because the way it
20   was worded did not properly represent what
21   actually happened.

Page 257

65 (Pages 254 to 257)

1    Q.   What was the upfront payment that
2    you're talking about?
3    A.   That was the preacquisition bonus
4    under their program.
5    Q.   And was that a bonus calculated on
6    anticipation of what would be the contingency
7    bonus post acquisition?
8    A.   No.  No.  This was the mechanism by
9    which we were able to get to settlement using
10   this preacquisition bonus under the program.
11   Q.   You mean settlement with Mr. Moran?
12   A.   Yes.  Based on the anticipated
13   conversion of 5.16 million.
14   Q.   Okay.  And do you remember the
15   amount of what that was?
16   A.   No, not exactly.  I know it was six
17   figures, but I don't remember the exact amount.
18   Q.   I'm going to throw out a number and
19   see if that sounds about right to you.  Around
20   350 or 360, does that sound about right?
21   A.   Yeah, that may be close, correct.

Page 258

1    Q.   And just so the record is clear, I
2    mean 350,000 or 360,000.
3         Okay.  So for the actual closing you
4    had the loan from Nationwide and then you had
5    this -- what do you call that, that 350, 360?
6    A.   Preacquisition.
7    Q.   Payment?
8    A.   Uh-huh.
9    Q.   Okay.  Was part of that paid to Mr.
10   Moran at the closing?
11   A.   I can't recall exactly.
12   Q.   Okay.
13        (Deposition Exhibit No. 35 was
14   marked for identification.)
15        BY MR. LINDSMITH:
16   Q.   You have been handed Exhibit 35.
17   The bottom left-hand side appears to have a
18   date of August 4, 2005.  So this would be -- if
19   closing was April -- the end of April, this
20   would be a little over three months after the
21   closing.  And at the top it says:  "Reminder

Page 259

1    list for Diane, meeting with co-op."
2    A.   Coop.
3    Q.   Oh, Coop.  Oh, Ed Cooper?
4    A.   Uh-huh.  Yes.
5    Q.   I was wondering what's the co-op.
6         Are these, again, notes prepared
7    either for that meeting or -- I mean, are these
8    kind of like talking points prepared in
9    anticipation of the meeting?  Is that how you
10   read this?
11   A.   Yes.
12   Q.   In Item 2 it says:  "Real world now
13   after 90 days.  Negatives and opportunities."
14   And then there's a list of negatives.
15   A.   Uh-huh.
16   Q.   And, in fact, it's written here,
17   "Negatives, 90-day reality check."
18   A.   Uh-huh.
19   Q.   "Item 1, commercial in Gainesville,
20   not ready.  Had to slow down conversions and it
21   may get worse since Lightfoot removed and will

Page 260

1    possibly resign."
2         What's this referring to?
3    A.   The underwriter.  He was the only
4    underwriter that Gainesville had that had
5    experience with an independent carriers and
6    independent world.
7    Q.   Did he have some experience with
8    commercial in particular?
9    A.   Absolutely.
10   Q.   Okay.  So what happened, he was no
11   longer -- do you know what happened to him?
12   A.   I think they forced him into
13   retirement.
14   Q.   That caused a slow down in the
15   conversion because the underwriting process
16   slowed down?
17   A.   Partly.
18   Q.   Was there something else that slowed
19   down?
20        Well, let's just go through this and
21   we'll get things together.

Page 261

1      "Item 2, the miss on the 300,000
2  case is annoying," what's that about?
3      A.   There was a $300,000 contracting
4  case that came up for renewal during that first
5  90 days.  That was --
6      Q.   On the Moran side or the Tamariz
7  side?
8      A.   Moran.
9      Q.   Okay.  Sorry.  Go ahead.
10     A.   And we lost it because they couldn't
11 quote it properly and they couldn't deliver the
12 quote to us.
13     Q.   And you said this is up for renewal.
14 Was this a contracting customer who had been
15 with Moran a long time?
16     A.   Yes.
17     Q.   What exactly was it that they
18 couldn't quote?  What was the problem?
19     A.   They just missed it.  They just
20 missed the renewal date.  We had given them the
21 documents to quote it because it was a

Page 262

1  we got the signatures, we bound coverage.  We
2  collected on one premium and then when the
3  policy issued it came back at another premium
4  entirely.
5      Q.   Higher?
6      A.   Much higher.
7      Q.   And this happened more than once?
8      A.   On every case.
9      Q.   Was this commercial?
10     A.   Yes.
11     Q.   When you say, "higher every case,"
12 can you give me an order of magnitude of how
13 much higher?
14     A.   Significantly percentage-wise.
15 Enough to make the customers extremely angry.
16     Q.   Like 5, 10, 15 percent?
17     A.   They could have been as high as
18 that.
19     Q.   And from your note here, I take it,
20 it made staff on the Moran side unhappy also?
21     A.   Yes.  Because we were now in the

Page 264

1  complicated case.  They totally missed it.
2      Q.   Was there a deadline by which the
3  time the customer was expecting a quote back
4  and they couldn't turn it around fast enough?
5      A.   Yes.  Right.
6      Q.   Okay.  "Number 3, service center.
7  Billing has been changed for every piece of
8  business submitted and we have had to resell
9  customers.  Made staff very mad."
10         What's that about?
11     A.   Every case that we were submitting
12 was coming back a different quote than we had
13 provided to the customer.
14     Q.   Explain that.
15         Was there some kind of preliminary
16 quote given to the customer but when it came
17 back it was --
18     A.   We quoted it on our system.
19     Q.   From what the system was telling you
20 on the computer?
21     A.   Yes.  We completed the applications,

Page 263

1  mode of a defensive posture to try to calm
2  these people down on top of putting them with a
3  brand new carrier.
4      Q.   Okay.  Then four, "Technology
5  disaster.  Lost one key employee."
6         Is that what you were talking about
7  before some time earlier?
8      A.   I believe so, yes.
9      Q.   That the computer system of Moran
10 did not fit as well as it was hoped with your
11 agency or Nationwide?
12     A.   Yes.
13     Q.   "Five, training.  Other than Chris
14 and Rita coming from home office, nonexistent."
15 What's that about?
16     A.   Just the nature of my processes of
17 the system, the quoting system.
18     Q.   And you're talking about training of
19 the Moran people?
20     A.   Yes.
21     Q.   I take it you undertook some of that

Page 265

67 (Pages 262 to 265)

1  training?
2      A.   Yes.
3      Q.   "Six, the licensing issue is a real
4  barrier to this environment."  What does that
5  mean?
6      A.   I'm not sure what he was referring
7  to there.
8      Q.   "Seven, technology with the other
9  carriers are light years ahead of Nationwide,
10  especially Travelers.  Much quicker getting to
11  market."
12       Do you know what he's referring to
13  there?
14      A.   The speed to deliver to the
15  customer.
16      Q.   In terms of quotes?
17      A.   Policies.
18      Q.   Policies issued?
19      A.   Yes.
20      Q.   And then that's it for the list of
21  negatives.  Positives:  "One, the Moran staff
                                        Page 266

1  is far superior than ever expected; two, the
2  processes inside Moran are a model for
3  commercial; three, there is even a great
4  opportunity that I originally realized."
5       Is that consistent with what you saw
6  in terms of the positives?
7      A.   This was Item Number 3.  I would say
8  this was the first 90 days before I realized
9  the coming storm.
10      Q.   Okay.  You're talking about the
11  challenges with Mr. Moran and folks?
12      A.   No.  No.
13      Q.   Okay.
14      A.   I'm referring to the Allied invasion
15  that I never knew was coming.
16      Q.   Okay.  "Number 3, what I want."  Who
17  is saying this, "what I want"?
18      A.   It would be me.
19      Q.   Okay.  Would this have been prepared
20  by Mr. Wallace, though?
21      A.   I don't know particularly that it
                                        Page 267

1  was.
2      Q.   Okay.  So Item 3, what I want:  A,
3  exceptions for licensing, allow us to be
4  Nationwide licensed and licensed with other
5  carriers."  Now, maybe that ties back to Item 6
6  of the negatives before.
7      A.   Yes.
8      Q.   What exactly were you talking about
9  here?
10      A.   Without being dual licensed we were
11  unable to service and maintain the Moran
12  clients and accommodate transition to
13  Nationwide.
14      Q.   So for those who would stay with
15  more you couldn't service them?
16      A.   Right.
17      Q.   Well, could the Moran people who
18  were already there service them?
19      A.   They could, but I had to have
20  Nationwide's approval on that.
21      Q.   For this period of time you did, did
                                        Page 268

1  you not?
2      A.   Not at this point.
3      Q.   You ultimately came to have their
4  approval, though?
5      A.   But I had to fight for it.
6      Q.   Yeah.
7       The form of that approval resulted
8  in Moran Insurance Services as the associate
9  agent?
10      A.   No.
11      Q.   Okay.  What was the form of the
12  approval?  Was there a written document?
13      A.   Yes.
14      Q.   Can't remember the name of it?
15      A.   It was an e-mail from Jim Holtkamp.
16      Q.   H-O-L-T-K-A-M-P.
17       Okay.  Back to 3-B.  "Eliminate the
18  tier limit of not being able to write business
19  into the other carriers."  What's that about?
20      A.   I believe this was tied along with
21  losing business, beginning to see a trend of
                                        Page 269

A401106
BRENDA DIANE TAMARIZ-WALLACE      MARCH 4, 2010

1  difficulty in price.
2      Q.   Well, here's my question:  Was
3  there -- what was the two-year limit reference
4  to?
5      A.   This goes back to the 24 months
6  referred to in the other documents.
7      Q.   Right.
8          But at the end of the two-year
9  period you would not be able to write business
10 with other carriers?
11     A.   No.
12     Q.   Okay.
13     A.   I was not ever told that directly.
14 There was no exit strategy completely given to
15 me.
16     Q.   Well, then what -- that's what I'm
17 trying to understand here.  What is the
18 two-year limit?
19     A.   That goes back to the other
20 documents that were referenced in the original
21 two-year time frame to roll the business.

Page 270

1  to convert and at the end of that period, then
2  you can't service what's not converted.  I read
3  this to mean eliminate that two-year deadline.
4      A.   Ask the question.
5      Q.   What am I -- I guess I'm trying to
6  understand what am I missing here?
7      A.   There was no exit plan discussed.
8      Q.   As to what happens at the end of the
9  two-year period?
10     A.   Exactly.
11     Q.   Okay.  So what is it that you
12 wanted, for that two-year period to be
13 extended?
14     A.   What I wanted was the ability to
15 place the customers that were leaving with the
16 other carriers to keep them from leaving.
17     Q.   Okay.  "3-D, we have the applied
18 system now.  Allow us to write through Allied
19 now and give credit to all and give us proper
20 commissions and contingencies."
21         Why is it you want to write through

Page 272

1      Q.   Right.
2          You had two years to roll the
3  business and -- but I understood that the idea
4  was -- I mean, if you're going to roll the
5  business you've got to be able to service it
6  while it's there until it's rolled, and that
7  basically you were given permission to service
8  it while you were in the process of rolling it,
9  but basically at the end of two years what you
10 haven't rolled you can't service anymore?
11     A.   That was never told to me at the
12 outset of that.  That was not the plan at the
13 outset.
14     Q.   Okay.  But by this time, is that
15 what you understand the plan is by August of
16 '05?
17     A.   No.  No.  It still was not
18 discussed.
19     Q.   But I thought -- I'm really not
20 understanding the two-year limit.  I mean, I
21 understood that to be that you have two years

Page 271

1  Allied now in August of '05?
2      A.   We were being told.  That's when it
3  was introduced to us that it was going to be an
4  ease of doing business.  And telling us that on
5  the front end we have this computer platform to
6  use.  And this was when it was first introduced
7  to us.  I'm sorry.  Applied.  I'm sorry.
8      Q.   Well, there's both applied system
9  and Allied.  Is applied a typo?
10     A.   Applied, no.  No.
11         MR. LYMAN:  You're not that lucky.
12 Sorry.
13         THE WITNESS:  Applied is the
14 database management system.
15         BY MR. LINDSMITH:
16     Q.   Okay.  Through which you would write
17 Allied?
18     A.   Through which we would manage the
19 customer base.  Allied, that they were bringing
20 it on as a -- in the capacity as this new
21 direction which for the first time we had ever

Page 273

**BRENDA DIANE TAMARIZ-WALLACE     MARCH 4, 2010**

1  been told about.

2   **Q.   Okay.  Now, do you remember this**

3  **meeting with -- well, strike that.  I'm getting**

4  **ahead of myself.  Excuse me.**

5       **(Deposition Exhibit No. 36 was**

6  **marked for identification.)**

7       **(Pause.)**

8  **BY MR. LINDSMITH:**

9   **Q.   You have been handed Exhibit 36.  It**

10  **looks like a three-page set of notes.  I don't**

11  **see a date of generation on this, but at the**

12  **top it talks about points to cover in the**

13  **meeting with Ed Cooper regarding acquisition.**

14       **Do you know what this document is?**

15  **Does this look familiar to you?**

16   A.   It appears that the document

17  reflects questions, concerns, thoughts, that's

18  surfacing right after the letter of intent was

19  signed.

20   **Q.   So this is preacquisition?**

21   A.   Yes.

Page 274

1   **Q.   Okay.  On the first page under C,**

2  **the Moran acquisition, it says: "Number 1, DTA**

3  **has brought this potential acquisition to the**

4  **table by its own effort."  That's a fair**

5  **statement?**

6   A.   Yes.

7   **Q.   I guess I had that misplaced in the**

8  **chronology so we will go on to another**

9  **document.**

10       MR. LYMAN:  I think you meant to say

11  Carol had it misplaced.

12       MR. LINDSMITH:  Brian, you can keep

13  it there.  I just wanted to reflect I came to

14  Carol's rescue.

15       (Deposition Exhibit No. 37 was

16  marked for identification.)

17       BY MR. LINDSMITH:

18   **Q.   We had seen before notes for a**

19  **reminder, we have meeting with Cooper.  Those**

20  **notes were August 4 of '05.  Here we now have**

21  **an outline for meeting with Ed Cooper, August 8**

Page 275

1  of '05.

2       And again, would these have been

3  notes that you or your husband or both of you

4  would have put together?

5   A.   I think these were primarily my

6  observations.

7   **Q.   Did you -- do you remember if you**

8  **were with Mr. Cooper around this time?**

9       I'm just looking to see if there was

10  something later that I have.  And I don't

11  really see that.

12       What I -- my question is:  Is this

13  an outline for a meeting that you're going to

14  have with him or are you going to be meeting

15  with him on that day or do you recall?

16   A.   I believe that this is an expansion

17  on something we have already seen.

18   **Q.   Would that have been two exhibits**

19  **ago?  It does look -- it tracks the memo that**

20  **we saw in Number 35.**

21   A.   Okay.  I think number 35 is the

Page 276

1  cliff notes of Number 37.

2   **Q.   Okay.**

3   A.   I believe that this one is more

4  expanded and perhaps the answer is the

5  questions.

6   **Q.   This does have more information on**

7  **it than other one.  For example, on the first**

8  **page, Item 3, it's written:  "The sales**

9  **forecast.  I anticipate 3 million in new DWP**

10  **this year from the combined enterprise of DTA**

11  **and Moran."  Let me stop there.**

12       **So you were anticipating that from**

13  **that combined acquisition the combination would**

14  **go from 16 million to 19 million?**

15   A.   No, no.  No.  This is what we're

16  going to bring to Nationwide in the first few

17  months.  That's what we were -- our goal was to

18  take Nationwide in that first.

19   **Q.   So it would new DWP to Nationwide?**

20   A.   Yes.

21   **Q.   Okay.  So when you say further in**

Page 277

A401106
**BRENDA DIANE TAMARIZ-WALLACE      MARCH 4, 2010**

---

**Page 278**

1  that paragraph, "I predict we can generate,
2  $6,100,000 in new DWP, 5,800,000 in commercial,
3  you're talking about that's the amount that
4  would be converted, which would be new DWP to
5  Nationwide?
6      A.   Right.
7      Q.   Okay.  And then we get back to some
8  positives, some of which you mentioned before.
9  But then we get to a what I want, Part B.  But
10  you put it a little bit differently.  Here you
11  say in Item 1: "The need to be a hybrid in
12  order to generate and own more market share
13  preparatory for transition to Nationwide."
14          What are you talking about there?
15      A.   One way to describe this is feedback
16  to Nationwide on the IAA itself.  Observations,
17  because we were the first.  We were pretty
18  much, I guess, a frontier ground on this
19  commercial.  So I am explaining observations of
20  how to increase their market sharing.
21      Q.   And in Item 2 it looks like it's

---

**Page 279**

1  kind of in the same thread.  You say:
2  "Exceptions for licensing.  Allow us to be
3  Nationwide licensed and licensed with our other
4  carriers for at least five years, reevaluated
5  in three years."
6          Do you see that?
7      A.   Uh-huh.  Yes.
8      Q.   I mean, is that what you wanted to
9  be able to be licensed with Nationwide and
10  licensed with the other carriers on the Moran
11  side for as long as five years?
12      A.   That was consistent with the pro
13  forma that I had been given for the debt
14  service in that five-year span of time, as well
15  as, as I said, this is an observation of how
16  this acquisition could be improved and more
17  profitable for Nationwide premium.
18      Q.   You mean up to this time you were
19  allowed to -- I want to make sure I'm
20  understanding this.
21      A.   Okay.

---

**Page 280**

1      Q.   During this two-year window we have
2  been talking about, of course, you're
3  converting -- hoping to convert business to
4  Nationwide.  The business that stays on the
5  Moran side, you're allowed to service it and
6  renew it, but you're not allowed to make new
7  sales with new customers on the Moran side?
8      A.   For --
9      Q.   Is that right?
10      A.   Essentially, yes.
11      Q.   So what you were asking for was the
12  ability to be freed up to not just write
13  renewals, but to write new business on the
14  Moran side?
15      A.   Uh-huh.  Oh, yes.
16      Q.   Thank you.
17          I think I'm finally on the same page
18  with you.  I think I understand now what you
19  have been talking about.  Believe it or not, I
20  didn't quite connect all of that together.
21      A.   So the light goes on.

---

**Page 281**

1      Q.   Yeah.
2          And I take it that that connect then
3  kind of rolls into naturally with the point
4  three you have here, "Move back the two-year
5  associate limitation of not being able to write
6  business into other carriers for five years."
7  So basically during this time the associates
8  were -- during that two-year period they were
9  only allowed to do renewals, but you wanted
10  them to be able to write new business with
11  other carriers for as long as five years?
12      A.   Uh-huh.  Yes.
13      Q.   Now, did you have an understanding
14  that when Nationwide looks at requests like
15  this they have to look at all of their agents
16  and their entire program, so if they allowed
17  something of the type you're asking for here,
18  they have to consider the impact on the rest of
19  the entire IAA program?
20      A.   I understood that, but in the spirit
21  of the fact that they had already made

---

BRENDA DIANE TAMARIZ-WALLACE      MARCH 4, 2010

1  concessions and changes in the basic contract
2  to allow these acquisitions to occur, I was
3  simply giving feedback as to how it could be
4  improved.  And maybe -- but since the contract
5  had already been altered on the exclusivity.
6      **Q.   You mean the agent's contract?**
7      A.   Yes.  And the fact that I was by
8  necessity of the success of the acquisition I
9  was already functioning in a broker capacity
10  necessarily for the acquisition to be
11  accomplished.
12      (Deposition Exhibit No. 38 was
13  marked for identification.)
14      BY MR. LINDSMITH:
15      **Q.   I have handed you what's been marked**
16  **Exhibit 38, which appears to be an e-mail from**
17  **Mr. Holtkamp, a sales officer at Nationwide to**
18  **yourself dated the next day from the memo we**
19  **just saw, August 9, 2005.  And -- I mean, is**
20  **this a document you would have received that**
21  **has Tamariz's note at the bottom?**
                                    Page 282

1      A.   Yes.
2      **Q.   And in Paragraph 3 he says:  "In**
3  **addition, I would like to assist you in regards**
4  **to the dual appointments of some of your**
5  **existing office staff.  The mid Atlantic region**
6  **will support the direct employment of existing**
7  **DTA employees with the carriers involved in the**
8  **acquisition.  This will be a variation on the**
9  **Nationwide IAA program which allows for the**
10  **acquired associates only to maintain dual**
11  **appointments."  Let me stop there.**
12      **So what's being discussed here is**
13  **that your producers in your agency, Diane**
14  **Tamariz agency will -- who are supposed to be**
15  **appointed only with Nationwide, they will be**
16  **allowed to have appointments with other**
17  **insurance carriers serviced by Moran?**
18      A.   Say that one more time, please.
19  Repeat that the way you just said that.
20      **Q.   That basically your producers in**
21  **your Diane Tamariz's agency will have -- will**
                                    Page 283

1  **be able to have appointments with insurance**
2  **companies that work with Moran?**
3      MR. LYMAN:  Objection.  The letter
4  speaks for itself.
5      But you can answer as to your
6  understanding.
7      THE WITNESS:  I believe this was for
8  the purpose of servicing.  So this was limited
9  to service personnel, not producers.
10      BY MR. LINDSMITH:
11      **Q.   Oh, okay.  But it's servicing --**
12      A.   Acquired.
13      **Q.   -- the Moran side?**
14      A.   Yes.
15      **Q.   Okay.  Why was it needed that the**
16  **Moran side needed some help in servicing**
17  **customers on the Moran side?**
18      A.   Just the nature of the insurance
19  agency.  There was ongoing service at all times
20  and by law they couldn't affect endorsements or
21  changes or anything to the policies unless they
                                    Page 284

1  were appointed to represent the companies.
2      **Q.   Well, I guess, my question was, if**
3  **you had a staff already on the Moran side**
4  **servicing the Moran side, why did you need more**
5  **people from your agency to be able to service**
6  **that, especially if some of that business had**
7  **come over to the Nationwide side?**
8      A.   One of the reasons was that we were
9  interchanging employees from one location to
10  the other when staff members left we had
11  someone to pull from or staff members to pull
12  from that were ready to operate.
13      **Q.   Were you starting to lose some staff**
14  **on the Moran side?**
15      A.   Oh, yes.
16      **Q.   Okay.  Is that why you were asking**
17  **for permission for some of your service folks**
18  **to be able to service the Moran side --**
19      A.   Yes.
20      **Q.   -- to help with those departures?**
21      A.   Yes.
                                    Page 285

A401106
**BRENDA DIANE TAMARIZ-WALLACE      MARCH 4, 2010**

1    Q.   Okay.
2         (Deposition Exhibit No. 39 was
3    marked for identification.)
4         BY MR. LINDSMITH:
5    Q.   This is Exhibit No. 39, which is a
6    couple of e-mails or maybe just one e-mail from
7    Todd Simpson to Dave Wallace.  The subject is
8    your personal checking account.
9    A.   Yes.
10   Q.   And the only thing that drew my
11   attention to this was -- well, first of all,
12   who is Todd Simpson?
13   A.   Todd Simpson was a bookkeeper.
14   Q.   With CRMG?
15   A.   I think it was originally with DTA.
16   Q.   Okay.  Because the e-mail would
17   indicate CRMG, his e-mail address?
18   A.   And he had occasion to do their
19   books sometimes.
20   Q.   Now, this e-mail is dated November
21   22 of '05.  And again, what drew my attention

Page 286

to this was he's talking about some cash flow
2    as to the personal checking account, but he
3    says:  "I don't mind doing it for you, but
4    juggling three cash strapped entities is
5    becoming increasingly difficult as the money is
6    becoming more and more scarce."
7    A.   Right.
8    Q.   When he talks about -- and I know
9    you're not copied on this, so this may be
10   unfair.  But do you understand what he might be
11   talking about in this time frame in November of
12   '05 of three cash strapped entities?
13   A.   Yes.
14   Q.   What's your understanding of what he
15   might be talking about?
16   A.   We were beginning to see the impact
17   of the acquisition not going as predicted and I
18   was not drawing any money to live on.
19   Q.   So the three entities would be Diane
20   Tamariz & Associates, George T. Moran, Inc. and
21   CRMG?

Page 287

1    A.   Yes.
2         (Deposition Exhibit No. 40 was
3    marked for identification.)
4         BY MR. LINDSMITH:
5    Q.   You have been handed Exhibit 40,
6    which -- the first two pages of which is the
7    corporate associate agent agreement between
8    Nationwide and Diane Tamariz & Associates and
9    Moran Insurance Services, Inc., and it's
10   effective August 26, 2005.
11        Do you see that at the top?
12   A.   Yes.
13   Q.   Now, on the second page, is that
14   your signature where you're signing for both
15   Diane Tamariz & Associates and Moran Insurance
16   Services, Inc.?
17   A.   Yes.
18   Q.   Now, we can go through and read
19   this, but if you could describe in general
20   terms, what's the function, what's purpose of
21   this agreement?

Page 288

1    A.   That Moran Insurance Services, Inc.
2    would function as an associate entity of Diane
3    Tamariz & Associates through their relationship
4    with Nationwide.
5    Q.   And why was this needed?
6    A.   This was needed in order to
7    facilitate the transfer of business, retaining
8    the Moran goodwill name, and the recognition
9    for the customers just to facilitate it to keep
10   customers.
11   Q.   Basically maintaining the brand of
12   Moran?
13   A.   Yes.
14   Q.   So that for the business that was
15   placed and converted over to Nationwide, what
16   I'll call the old Moran book that became
17   Nationwide business, would be under this
18   umbrella, so to speak, of Moran Insurance
19   Services Inc.?
20   A.   Yes.
21   Q.   Is that fair?

Page 289

73 (Pages 286 to 289)

A401106
BRENDA DIANE TAMARIZ-WALLACE      MARCH 4, 2010

1    A.  Yes.
2    Q.  Okay.  Did you -- it strikes me by
3  the timing of this that you didn't really plan
4  to do this before you closed on the purchase.
5  Was this something that became apparent to you
6  that would be a good thing to do to help
7  maintain the brand and customer relations?
8    A.  Yes.  And I discussed this approach
9  with Shawn Patterson.
10      (Deposition Exhibit No. 41 was
11  marked for identification.)
12    BY MR. LINDSMITH:
13    Q.  You have been handed Exhibit 41,
14  which is a little bit out of sequence.  We're
15  going back a couple of months.  This is -- it
16  looks like an agenda dated July 13, 2005.  And
17  frame of reference it looks like it's an agenda
18  to talk about things after the first 60 days.
19      Do you see that at the top?
20    A.  Yes.
21    Q.  And the first item is Diane overview

Page 290

1  it's in reference to Larry Cook's independent
2  agency acquisition letter and conversion
3  payment request form of May 4, 2005.
4      Let me ask you generally, what is
5  this document?  What's the purpose of this
6  document?
7      You're welcome to take a look at it.
8  Take your time looking at it.
9    A.  There was a document that we have
10  already looked at, Number 34, Exhibit Number
11  34.
12    Q.  The conversion payment request form?
13    A.  Yes.
14      There was a similar document
15  presented to me, obviously, of May 4th, 2005,
16  following settlement requesting my signature.
17  This document is intended to highlight and
18  question what appeared to be inconsistencies
19  and deficiencies between the independent agency
20  acquisition program and the boilerplate program
21  and what I was actually involved in, and the

Page 292

1  and then George overview.  Do you remember a
2  meeting like this where folks came together
3  looking for 60 days, including Mr. Moran?
4    A.  Yes.
5    Q.  And the third item there is review
6  of rollover volume to Nationwide.  And there's
7  reference to in Item D, "We're on track to move
8  5.2 million to Nationwide.  Looks like after 90
9  days we need to move up to 400 to 500 or more a
10  month for next 12 months."
11      I'm just reading that out because
12  this is consistent with Mr. Moran being aware
13  of this whole process and the purpose of this?
14    A.  Yes.
15      (Deposition Exhibit No. 42 was
16  marked for identification.)
17    BY MR. LINDSMITH:
18    Q.  Ms. Tamariz-Wallace, you have been
19  handed what's been marked Exhibit 42, which
20  appears to be a memo from you and Mr. Wallace
21  to Dick Kelly, dated November 18, 2005.  And

Page 291

1  actual agreements and discussions that we had
2  had regarding this as a specifically a
3  commercial lines acquisition.
4    Q.  In the second bullet point it
5  appears to be -- do I read this right, that in
6  the non bold language that's what -- that is
7  something that Nationwide has written and the
8  bold is your response to that?  Is that how you
9  read this?
10    A.  No.  The way I read this and the way
11  I understand what happened with this is that I
12  was taking the actual document and evaluating
13  it in terms of what I was actually doing.
14    Q.  Okay.  Well, what's the issue there
15  in that second bullet point about not
16  qualifying for a post conversion bonus by
17  November of '05?  Was there some concern that
18  you were not qualifying for a post conversion
19  bonus?
20    A.  Yes.
21    Q.  What was that?

Page 293

**BRENDA DIANE TAMARIZ-WALLACE      MARCH 4, 2010**

1    A.   Because -- although I was spending
2  all of my time and total energy into the
3  commercial acquisition rollover, I was being
4  held accountable for retention of personal
5  lines -- of the original personal lines at a
6  level of 90 percent.
7    **Q.   On the DTA side?**
8    A.   On the DTA side.
9    **Q.   Okay.**
10   A.   When my attentions were wholly
11 consumed by this new type of program that is
12 not contemplated in the documents they have
13 asked me to sign.
14   **Q.   Well, did you understand, though,**
15 **that if you hadn't made the acquisition that to**
16 **qualify for the bonus you still would have had**
17 **to been able to retain 90 percent of your**
18 **personal lines?**
19   A.   No, I was not told that until I saw
20 this document put before me for my signature,
21 which generated my what's going on here.  I

Page 294

1  didn't understand.
2    **Q.   What is your typical -- what was**
3  **your typical retention for personal lines, I**
4  **guess, prior to the acquisition?**
5    A.   I would say that my retention was in
6  the high 80s and that was extremely -- I mean,
7  that was highly unusual to be in the high 80s.
8  But to make it a 90 percent retention in the
9  face of what was happening was just basically
10 ridiculous.
11   **Q.   Had you ever been held to a standard**
12 **of 90 percent?**
13   A.   Never.
14   **Q.   The post conversion bonus, though,**
15 **being something different from your contingency**
16 **bonuses, right?**
17   A.   Yes.
18   **Q.   So were you concerned that -- and**
19 **this -- but this -- you had a preconversion**
20 **bonus, right?**
21   A.   Yes.

Page 295

1    **Q.   And you already got that?**
2    A.   Yes.
3    **Q.   What was the post conversion bonus**
4  **to be?  What was the amount of that, do you**
5  **remember?**
6    A.   It was -- no, I didn't remember, but
7  what I do remember is the intent of it was to
8  reconcile actual against projected.
9    **Q.   And was it at least your plan that**
10 **you would be able to use that post conversion**
11 **bonus toward the remaining obligation for the**
12 **purchase price of Moran?**
13   A.   Yes.
14   **Q.   On the second page there's a fourth**
15 **bullet point referencing a Paragraph Number 8**
16 **that says -- and there's something in quotes**
17 **that says:  "I understand and agree that**
18 **certain conditions in the environment and**
19 **marketplace can change and that Nationwide**
20 **makes no guarantee that" -- I think that's a**
21 **typo -- "any policy will be converted to**

Page 296

1  **Nationwide.  These changes include" -- "these**
2  **changes including regulatory and legislative**
3  **activities and rate adjustments may impact my**
4  **ability to convert policies to Nationwide."**
5  **Let me stop there.**
6    **Is that something you were concerned**
7  **about that you had signed a document that said**
8  **something to that effect?**
9    A.   Based on the fact that this was now
10 November '05 --
11   **Q.   Yes.**
12   A.   -- I was beginning to see that
13 things were not going as planned.  And the
14 underwriting appetites had considerably
15 changed.  Which I think the document speaks for
16 itself here in the things that I was trying to
17 point out to the company.
18   **Q.   I'm sorry.  If we can go back to**
19 **Exhibit 34.  Actually, the language that I had**
20 **read that you appeared to have been quoting, I**
21 **think I understand where that language came**

Page 297

75 (Pages 294 to 297)

A401106
BRENDA DIANE TAMARIZ-WALLACE      MARCH 4, 2010

1   from.
2        This is the conversion payment
3   request form that we talked about earlier.
4   It's Exhibit 34. And this is the one that
5   shows your signature of December 2, 2004.
6   Toward -- about two thirds of the way down on
7   the first page here it says -- it's the third
8   paragraph from the bottom, it says: "I
9   understand and agree that certain conditions in
10  the environment and marketplace can change and
11  that Nationwide makes no guarantee that any
12  policy will be converted to Nationwide. These
13  changes including regulatory and legislative
14  activities and rate adjustments may impact my
15  ability to convert policies to Nationwide.
16  Other underwriting guidelines and/or processing
17  activities that may affect the conversion
18  should be discussed with the state team members
19  and the underwriting officers."
20       Do you see where I've been reading?
21  A.   Yes.

Page 298

1   Q.   And then you signed this document
2   and you did read this before you signed it, did
3   you not?
4   A.   I did.
5   Q.   So you understood that Nationwide
6   certainly could not guarantee whether even a
7   single policy could be converted over to DTA?
8   A.   Once again, how do I say this?
9   Let's see. I understand what this says about
10  rates, underwriting, but the problem that I
11  came to understand, the root of the problem is
12  the fact that I hadn't been given certain
13  information that was vital for me to assess my
14  ability to make the acquisition successful,
15  specifically with the implementation of the new
16  Allied direction in the company.
17  Q.   And that hit in '07?
18  A.   That began --
19  Q.   I'm sorry. That began at the end of
20  '05, beginning of '06?
21  A.   Middle of '05 forward.

Page 299

1   Q.   Well, while we're on this topic, let
2   me mark this.
3        (Deposition Exhibit No. 43 was
4   marked for identification.)
5        BY MR. LINDSMITH:
6   Q.   You have been handed Exhibit 43,
7   which is another conversion payment request
8   form, but this one you signed in April -- on
9   April 13, 2006.
10       Do you see that on the second page?
11  A.   Yes.
12  Q.   So, now, this is a year and five
13  months later. It's after Allied has hit, as
14  you described it, and this document reflects on
15  the first page that, in fact, a preconvert -- a
16  preconversion payment was made in the amount of
17  $361,214.07.
18       Do you see that in Item 1?
19  A.   Yes.
20  Q.   That's kind of in the range we
21  talked about earlier.

Page 300

1        And then following those
2   definitions -- in the first paragraph following
3   those indented definitions it says: "In the
4   event that I fail to meet the converted premium
5   estimate outlined above by the end of the
6   effective period, I agree to reimburse
7   Nationwide for the difference between the
8   preconversion payment and 7 percent of the
9   amount of actual converted premium."
10       And then it talks about how
11  reimbursement will be made. And then the next
12  paragraph says: "Due to not using a separate
13  tracking number to track converted policies, I
14  further understand and agree that the total
15  amount of converted premium will be determined
16  by the amount of my agency's new business, DWP,
17  written during effective period minus
18  $1,213,506.26 of my agency's new business, DWP,
19  which reflects an estimate of the amount of new
20  business I would have written during this
21  period without the merger."

Page 301

76 (Pages 298 to 301)

BRENDA DIANE TAMARIZ-WALLACE      MARCH 4, 2010

1      Do you see where I have been
2  reading?
3      A.   I see that.
4      Q.   Let me stop there.
5           What is the purpose -- now, we've
6  read the words here, but what is the purpose of
7  what you thought at the time this was
8  accomplishing?
9      A.   First of all, I refused to sign
10  this.  This was a slight of hand by the agency
11  manager, John Paul Persard.  This document was
12  brought to me by Greg Taylor.  He flew from
13  Columbus to bring this document to me to review
14  this document.  John Paul represented in this
15  document one thing to me.  I signed it trusting
16  his representation only to find out later that
17  I had just increased the amount I had to
18  produce by 1.2 million, totally opposite of
19  what he said to me.
20      Q.   Where did you sign this?  Here in
21  Baltimore?

Page 302

1      A.   I signed this -- I can tell you
2  exactly where I signed this.  At the Woodfire
3  restaurant when John Paul said meet me there, I
4  want to talk to you about this.  He --
5      Q.   Is that here in this area?
6      A.   It was right up the street from the
7  office.
8      Q.   Okay.
9      A.   This was intended to clean up some
10  stuff from the original deal going back to
11  2005.
12      Q.   The signature there, do you know
13  whose signature that is?
14      A.   It's either Taylor or John Paul
15  Persard, but I remember this very clearly.
16      Q.   Why do you say, "this was a slight
17  of the hand"?  I mean, was this among a stack
18  of documents or what?
19      A.   No.  Because the way he explained it
20  to me -- because I didn't understand it all.  I
21  said, what is this?  This is Greek.  What are

Page 303

1  they talking about 1.2 million minus the
2  agency's new business, DWP?  Oh, we're giving
3  you a break.  We're helping you out.  Go ahead,
4  sign it.  I've got to take this back.
5           I signed it only to find out after
6  the fact that what it really meant was that it
7  was increasing my production.  It wasn't
8  solving anything for me.
9      Q.   It was increasing your production
10  that if you didn't meet that increased
11  production it increased your likelihood that
12  you would have to pay back the preconversion
13  payment?
14      A.   Basically, the way -- it finally
15  dawned on me what they were doing, because the
16  tracking numbers had been so messed up they
17  couldn't tell me the actual amount that I had
18  transitioned, that this was a fix-it plan.
19      Q.   But this all had to do with whether
20  or not you would have to pay back the
21  preconversion payment, right?

Page 304

1      A.   Exactly.
2      Q.   Okay.
3      A.   But I say exactly.  I believe so,
4  but then I was already recognizing that they
5  weren't doing what they said they were going to
6  do and taking the business.  So I'm caught
7  looking at this retroactive signing a document
8  back to May of 2005, a year later, and in this
9  document it says that I'm assuming
10  responsibilities for things that didn't -- that
11  weren't true, but the biggest discrepancy was
12  the way that he described this to me and the
13  amount of business that I would have to write
14  to clear this up.  I was so disappointed to
15  find out that I had been misled on this.
16           So I point you back to Exhibit 34,
17  the one I had originally signed --
18      Q.   Right.
19      A.   -- this has been changed.
20      Q.   Right.
21      A.   Due to not using a separate tracking

Page 305

77 (Pages 302 to 305)

1  number to track converted policies.  So this
2  document, the way I understood it, represented
3  a change to the original document that I signed
4  and superseded that document a year after the
5  fact.  So that's why I said it was a slight of
6  hands.  I didn't understand it.
7        I signed it under the urging of John
8  Paul Persard, but I was so angry after that,
9  that I had been lied to, I couldn't see
10  straight.
11     **Q.   When did you come to the conclusion**
12  **you had been lied to?**
13     A.   When I started asking more questions
14  about it in the following weeks and I was
15  getting answers from people like Greg Taylor
16  and -- this was a clean-up job on a messy
17  situation from the beginning of the
18  acquisition.  That's the only way I know how to
19  describe this.
20        MR. LINDSMITH:  Why don't we stop
21  there for the day.  Just for the record, we

Page 306

1  have not concluded this deposition.  There's
2  some more things to cover, and quite frankly, I
3  haven't had a chance to even -- Robin has
4  indicated that there's still some documents
5  being copied from the production.
6        I think as a practical matter it
7  probably turns out that it may be more
8  efficient to spend time with Ms.
9  Tamariz-Wallace instead of me spending the
10  whole day with Mr. Wallace to cut down what I
11  go over with him significantly.  So we will
12  convene again at a later date.
13        MR. LYMAN:  So agreed.
14        (Whereupon, the proceeding was
15  adjourned at 5:29 p.m.)
16
17
18
19
20
21

Page 307

A401106
BRENDA DIANE TAMARIZ-WALLACE      MARCH 4, 2010

**A**

**ability** 10:14 21:14 116:7
189:14 190:13 272:14
280:12 297:4 298:15
299:14
**able** 10:17 19:20 21:5
31:5 49:11 57:3 58:7
61:12 111:2 114:11
116:3,4 129:14 130:8
134:21 143:6 180:19
189:12 206:8 240:5
246:16 250:19 258:9
269:18 270:9 271:5
279:9 281:5,10 284:1
285:5,18 294:17
296:10
**abnormal** 37:2
**ABP** 257:2,3
**abrupt** 152:5
**abruptly** 172:15
**absolute** 23:2
**absolutely** 111:11 115:20
161:20 219:9 256:13
261:9
**accept** 28:5
**acceptable** 76:6,12
230:11
**acceptance** 25:15
**accepted** 167:13 180:8
**access** 128:4 246:19
**accommodate** 268:12
**accomplished** 282:11
**accomplishing** 302:8
**account** 124:16,17,20
125:17 126:20 153:1,1
198:16 286:8 287:2
**accountable** 294:4
**accountant** 99:21 187:3
202:12
**accounting** 100:3 123:7
**accounts** 118:2 126:11
158:13 159:9,11,14
**achieving** 201:16
**acknowledged** 103:8
**acquire** 46:10,14 47:2
106:7 107:4 118:15
178:6 205:8
**acquired** 108:14 118:20
127:10 135:20 138:17
138:17 283:10 284:12
**acquiring** 34:1,7,12,20
47:6 55:6 115:5 179:12
185:3
**acquisition** 3:15 4:4
34:13,15 39:13 40:1
48:5 50:9 55:5 58:12
82:7 83:18,18 85:18
87:18 90:13 91:6,13,18
92:1,16 93:15 94:2,7
95:8,10,17 97:17 98:4
98:12 100:8 101:14
102:11 104:10 105:12
105:20 106:9 117:14
129:19 130:2,10,16
132:7 134:19 135:19
138:4,8,10 142:5,6,7
142:21 143:19 150:8
152:12 153:10 156:20
163:17 165:8 169:9
170:8 187:7,11 188:18
188:21 193:17 194:13

194:21 204:18 218:7
229:2 232:6 240:3,6,10
243:16 244:2,4 248:21
249:4,5 258:7 274:13
275:2,3 277:13 279:16
282:8,10 283:8 287:17
292:2,20 293:3 294:3
294:15 295:4 299:14
306:18
**acquisitions** 96:20
179:10 205:12 282:2
**acquistion** 5:14
**action** 195:14,15,16
196:7,18 199:12
**active** 9:9 53:3 54:6 58:11
136:12 172:9
**actively** 35:1 47:1 128:11
**activities** 94:10,17 297:3
298:14,17
**actual** 40:3 42:2 43:12
53:20 83:7 104:19
109:20 127:12 169:6
169:19 212:1 232:14
235:20 246:5 259:3
293:1,12 296:8 301:9
304:17
**acute** 148:14,18
**adapt** 189:14
**adaptability** 189:12
**adapted** 47:4
**add** 84:2 126:9
**added** 200:16
**addendum** 30:6
**adding** 241:13
**addition** 283:3
**additional** 44:4 58:4
122:19 178:4 204:17
**address** 7:10,12,15 18:18
18:21 286:17
**addressing** 107:16
**adds** 234:8
**adjourned** 307:15
**adjusted** 121:10
**adjustments** 297:3
298:14
**admirably** 118:4
**advance** 160:15 246:15
247:4 254:7
**advantage** 115:18
**advertise** 187:6
**advice** 56:17 57:5,17
**advisable** 25:17
**advisers** 176:16 202:9,18
**advisors** 84:12 85:9,20
86:1
**affect** 91:21 284:20
298:17
**afford** 19:20
**agencies** 15:17 34:1,8,20
34:21 47:5,13,16,18
50:6 131:1 205:8
232:16 244:6
**agency** 3:9 4:4 15:3,21
17:1,8,16 18:2,21 21:7
21:17 30:20 31:6,8,9
31:14,18 32:2,20,21
33:1,13,15,18 34:12,15
34:17 35:6 39:10,13,16
40:1 41:8,15 45:4,7,9
46:10,15 47:2 48:5,6
48:18 49:8 50:8,12
51:12 53:4,9 54:6,9,17

56:6,14,14,16 58:3,17
59:10,12,13,15,17
62:21 63:3,15,21 71:2
71:4 72:2,16 73:19
74:18 76:10,10 79:16
80:12 81:16 83:19 86:1
89:11,13 91:6,19,20
95:17 100:8 102:11
103:4 105:14 106:7,14
108:4,8 110:4 111:20
112:21 113:3 117:7,8
118:15,20 120:21
121:4 127:11 129:3,5
129:15 130:16 131:3,5
131:6 133:10,12 135:2
136:3,14 138:11,13,16
141:6 145:12 154:18
156:13 162:8,17,18
172:9 179:10,12,12,15
181:1 182:18 184:15
186:16 187:6 188:14
190:6,20 191:8,12
192:2,6 194:12,14,21
199:14 203:10 204:11
204:14,17 206:1
208:16 214:1 229:2
230:20 232:5 236:15
236:16 243:16 244:2
265:11 283:13,14,21
284:19 285:5 292:2,19
302:10
**agency's** 64:6 74:11
301:16,18 304:2
**agenda** 5:21 151:9
290:16,17
**agendas** 130:14
**agent** 3:7 5:20 9:8 13:11
14:7 16:3 17:6,19
20:11,20 21:11 25:18
27:8,9 28:2,14,21 29:9
31:7 32:12 37:3 56:15
58:5 98:11 101:19,19
102:17 136:10,13
162:9 204:20 269:9
288:7
**agents** 15:13,17 37:11
38:5,6 40:7,15 41:10
41:18,18 67:7,8,9,16
88:17 97:5,7 117:6
281:15
**agent's** 3:8 282:6
**aggressive** 94:1
**ago** 96:21 97:17 98:12
276:19
**agree** 88:17 164:20 183:4
183:5 235:4 296:17
298:9 301:6,14
**agreeable** 171:16
**agreed** 25:8 307:13
**agreement** 3:7,8,9 5:6,7
5:20 24:12 25:1 30:6,7
30:20 32:14 54:5,7,16
59:10,14 60:17 64:5
79:4,5 108:11 119:1,4
171:4 188:12 190:12
239:19 244:13 246:5
247:11,11,13,16 248:1
248:13 249:18 250:13
250:17 251:10 252:13
257:11 288:7,21
**agreements** 293:1
**ahead** 262:9 266:9 274:4

304:3
**akin** 155:13
**al** 1:8
**Allied** 154:15,20,21
155:13 156:4,7,12,12
156:15 157:8,9,11,19
158:15,17,21 198:17
199:6 200:2 267:14
272:18 273:1,9,17,19
299:16 300:13
**allow** 103:3 268:3 272:18
279:2 282:2
**allowed** 143:17 146:5
279:19 280:5,6 281:9
281:16 283:16
**allows** 283:9
**alter** 25:11
**alteration** 25:19
**altered** 282:5
**altogether** 72:10 172:2
234:3
**amazing** 117:19
**amend** 25:12
**amendment** 25:19
**amount** 13:14 88:18
143:7,8,9 170:15,16
213:21 230:8 245:9
246:7 249:13 251:12
258:15,17 278:3 296:4
300:16 301:9,15,16,19
302:17 304:17 305:13
**amounts** 59:16
**analysis** 4:3 89:18,20,21
176:17
**analyst** 84:12
**and/or** 298:16
**angry** 264:15 306:8
**Annapolis** 2:20 7:13
17:13 42:17
**Anne** 14:11 209:8
**annoying** 262:2
**annual** 171:18
**annuities** 163:5
**answer** 26:14 28:10
31:11 35:2 36:21 57:8
60:9 61:21 65:4 68:8
68:13 108:6 114:3
128:3,6 129:7,18
165:16 168:4 180:4
189:18 218:20 220:5
225:9 231:9,10 233:14
233:18 236:21 237:14
240:7 243:20 248:10
253:6 277:4 284:5
**answered** 57:21 58:1
195:4
**answering** 246:4
**answers** 306:15
**anticipate** 277:9
**anticipated** 49:20 107:5
240:16 258:12
**anticipating** 232:12
234:9 277:12
**anticipation** 258:6 260:9
**anybody** 192:11
**anymore** 146:3 151:8,10
183:8 271:10
**AOA** 120:6
**apart** 130:17
**apologize** 67:20 249:10
**apparent** 130:14 152:15
290:5

**apparently** 85:19
**appeal** 67:1
**appear** 92:15 93:14 165:9
228:14 250:5
**APPEARANCES** 2:1
**appeared** 292:18 297:20
**appears** 82:17 84:10
99:14 165:4 167:3
173:3 210:3 212:13
215:1 235:20 239:3
244:13,16 249:5
259:17 274:16 282:16
291:20 293:5
**appetite** 130:4 131:3,12
134:7,11 145:5 155:7
158:2,4,6,15 160:9,21
161:15
**appetites** 158:16 297:14
**applauded** 95:11
**application** 3:10 78:1
120:20 121:9,11
**applications** 120:21
121:1,2 190:16 263:21
**applied** 272:17 273:7,8,9
273:10,13
**apply** 202:17
**applying** 121:18 176:1
**appoint** 79:6
**appointed** 283:15 285:1
**appointments** 78:14,15
78:17 283:4,11,16
284:1
**appraisal** 178:12
**appraiser** 179:2,8 202:13
210:11
**appreciate** 66:20 77:9
210:11
**approach** 38:3 115:2
124:17 228:17 290:8
**approached** 39:8,11,15
44:19
**approaching** 41:9
**approval** 23:5 268:20
269:4,7,12
**approved** 124:20,21
**approximate** 9:2 130:9
**approximately** 33:2
35:21
**approximation** 74:12
**April** 119:9 148:3 149:12
151:17 242:16 255:18
259:19,19 300:8,9
**area** 22:2 29:6 35:13,14
87:16 303:5
**areas** 14:19 160:13
205:14
**arena** 73:2 76:10 157:8
**arguing** 126:19
**arm** 162:17,20,21
**arrangement** 86:8 88:9
**Arundel** 14:11 209:8
**aside** 16:16 109:5 153:11
199:9
**asked** 34:19 45:4 66:21
87:20 113:21 195:4
211:13 252:4 294:13
**asking** 10:7 60:13 70:12
106:19 185:16 197:15
235:6 236:21 256:16
280:11 281:17 285:16
306:13
**assess** 189:12 299:13
**assessment** 89:12

A401106
**BRENDA DIANE TAMARIZ-WALLACE        MARCH 4, 2010**

## B

**B** 1:8 3:5 84:11 103:16
  229:3 256:5 278:9
**back** 20:21 33:14 35:9
  42:6 48:17,18 63:10,12
  65:17 96:10 117:4
  124:3 126:15 127:2
  137:16,20 174:4
  176:20 181:7 193:14
  196:3 207:18 217:11
  224:2 234:20,21
  243:18 245:17 248:17
  254:16 263:3,12,17
  264:3 268:5 269:17
  270:5,19 278:7 281:4
  290:15 297:18 303:10
  304:4,12,20 305:8,16
**bad** 18:10 89:14 114:17
  126:8
**balance** 115:1
**ballpark** 128:16
**Baltimore** 302:21
**bank** 91:10 176:3 213:3
  220:10 232:8 233:21
  234:1 235:19 237:11
  254:2,3,16
**banks** 214:12,12 253:21
**barrier** 266:4
**barring** 105:8
**base** 75:18,18 109:7
  112:1,2,4,5,11 127:20
  171:17 241:15 273:19
**based** 15:2,7 66:6 128:13
  171:18 240:12 258:12
  297:9
**baseline** 108:17
**basement** 204:6
**basic** 282:1
**basically** 105:8 119:11
  122:12 130:21 179:13
  180:20 234:3 240:16
  271:7,9 281:7 283:20
  289:11 295:9 304:14
**basis** 9:6 96:19 234:20
  237:10
**Bates** 46:4 82:19 210:19
  211:1,2,3 238:4
**Bay** 228:6
**becoming** 28:20 29:9
  145:3 287:5,6
**bed** 148:12
**began** 69:21 70:10,15
  299:18,19
**beginning** 10:21 12:5
  17:16 51:6 68:3 90:19
  110:9 155:17 222:4
  238:8 239:6 269:21
  287:16 297:12 299:20
  306:17
**begins** 63:20 257:7
**believe** 32:7 35:11 42:12
  43:3 47:15 53:14 54:2
  58:21 60:15 65:12,17
  66:2,4 74:15 76:20
  77:2 78:4,13,20 84:20
  88:8,13,19 90:10 92:19
  95:18 101:12 102:4
  107:9 133:2 138:20
  147:1 148:21 164:10
  168:8 169:13 186:11
  188:8 192:7 194:6

197:2 198:7 200:15
  206:6 211:9,12 215:12
  215:18 216:7 219:18
  220:14 221:2 222:1,17
  222:19 224:21 229:12
  230:5 239:13 241:8
  245:2 252:18,18
  256:12,12 265:8
  269:20 276:16 277:3
  280:19 284:7 305:3
**believing** 182:20
**bell** 238:18
**belong** 236:15
**beneficial** 40:6
**benefit** 29:12 129:13
  221:13 224:8 230:20
  230:20 251:18
**benefits** 28:15,20 29:1,5
  29:8,14 58:4,7 205:6
**best** 20:8 21:4 55:8 92:7
  111:8 129:12 147:10
  147:14 168:16 196:17
  196:17 205:16 206:4
**better** 34:5 36:13 69:1
  103:18 128:13 148:11
**beyond** 57:14 58:1 89:3
  89:20 107:14 120:10
  120:13 161:14,15
  175:21 176:1 184:17
  200:2
**big** 73:2 95:20 181:16
  234:2,10
**bigger** 160:3 182:2
**biggest** 29:4 305:11
**Bill** 4:1 173:5,7 174:3
**billing** 123:7 126:13
  263:7
**bind** 24:4 124:3
**binding** 123:11
**biographical** 10:21
**bit** 16:10 22:13 26:6
  33:11 51:13,17 92:9
  133:15 157:2 203:1
  230:16 278:10 290:14
**blend** 42:14 111:7
**blending** 127:15
**blew** 120:1,3
**blocks** 165:10
**blood** 116:17
**blows** 142:19
**board** 67:3,6,11 108:5
**Bob** 136:4
**bogged** 118:18
**boilerplate** 292:20
**bold** 293:6,8
**bonds** 220:19 221:8
**BONNIE** 1:20
**bonus** 44:1,9 101:9
  103:21 104:4,6,9,12,14
  104:20 105:4,11,13
  106:2 107:20 112:4
  227:1,6 246:15 258:3,5
  258:7,10 293:16,19
  294:16 295:14,20
  296:3,11
**bonuses** 20:17 295:16
**book** 50:3,4 73:15 74:11
  75:16 107:6 132:12,16
  133:9,17 135:10
  137:15 138:17 139:9
  142:13 144:4,8,9
  145:11 154:2,9,13

158:1 183:8,10,18
  205:19,21 206:21
  207:17 208:3,11,14,15
  208:17,19 209:14,15
  209:15 232:15 233:12
  289:16
**bookends** 31:2
**bookkeeper** 286:13
**books** 54:12 127:14 142:1
  205:13 206:16 286:19
**bordering** 94:5
**borrowed** 246:7
**bother** 189:20
**bottom** 78:7 79:9 82:19
  91:11 164:3,7,9 170:13
  175:3,7 210:4 217:3
  249:6,12 259:17
  282:21 298:8
**bought** 55:16 106:13
  110:5 129:15 131:9,13
  132:5,11 135:11 138:2
  139:4,17 143:12
  150:18 159:5 206:14
  207:1,3,17 208:13
  230:3
**bound** 264:1
**box** 177:1,7 203:13
  210:14 241:20
**brand** 115:5 155:21
  265:3 289:11 290:7
**BRDR** 85:1
**break** 67:20 68:10,16
  127:3,7 203:1 209:17
  304:3
**breaking** 152:11,13
**breaks** 67:19
**Brenda** 1:10 3:2 7:2,11
  222:9 223:2
**Brian** 2:17 127:3 275:12
**BRICKER** 2:5
**briefly** 10:20
**bring** 18:14 24:21 102:9
  106:3 238:14 277:16
  302:13
**bringing** 96:9 273:19
**broached** 131:10
**broker** 102:9,18 120:12
  282:9
**brokerage** 117:12
**brought** 33:16 42:9
  206:20 275:3 302:12
**BROWN** 2:18
**budge** 70:6
**build** 15:3,17 38:14
**builders** 76:7
**building** 21:7 41:15 51:3
  51:5 79:17 82:5
**built** 17:1 39:10 153:17
**bulb** 54:21
**bullet** 203:5,14 239:15
  293:4,15 296:15
**bulleted** 210:13
**bunch** 88:1
**business** 3:10,18 4:5
  12:16 25:6 28:5 35:7
  38:8,14 47:5 51:13,21
  52:1,3,7,11 53:8 55:3,7
  55:12,13,15 57:13,17
  57:18,19 58:12 75:10
  76:6 79:7 85:12 88:6,8
  89:4,13,14,15 92:3,5,8
  94:8 97:5 102:9 106:8

106:12 107:14 108:3
  109:11 110:12,13
  113:20 114:1,19,19
  115:5,6 117:7 121:16
  121:17,18 122:4,7
  124:6,18 125:7 126:8
  126:17 132:1,13
  135:14,15 142:20
  143:4,13,15,20 144:1
  144:17 146:3 151:12
  153:12,19 154:3,11
  155:1 156:1,17,18
  157:12,13,19 158:1,7
  160:1,6 162:7 163:9,13
  178:6,20 180:4,7,9,14
  180:19 181:10,12,20
  181:20 182:11 183:3
  183:18,21 184:4,7,8,10
  184:15 189:15 190:5
  190:10,18 191:8 192:4
  193:18 194:5,13,20
  195:2,3 197:1,5,17
  200:19 202:9,18 213:9
  219:6 222:6,8 223:17
  224:20,20 225:6
  230:21 231:7 232:5,8
  234:10 240:11,20
  244:1 263:8 269:18,21
  270:9,21 271:3,5 273:4
  280:3,4,13 281:6,10
  285:6 289:7,14,17
  301:16,18,20 304:2
  305:6,13
**Buster** 71:11
**busy** 110:11
**buy** 89:10 91:19 130:21
  131:8,10 134:13 142:1
  142:12 144:4,8,9
  207:16 208:2,4,7 214:1
**buyer** 256:3
**buyer's** 256:5
**buying** 38:19
**buyout** 239:18
**buzz** 116:12 233:2

## C

**C** 7:1 275:1
**calculated** 107:20 258:5
**calculations** 74:2
**call** 48:17 50:19 62:18
  68:21 72:13 127:3
  133:16 243:18 259:5
  289:16
**called** 7:3 16:8 30:12,13
  39:12 102:19 209:7
**calling** 243:18
**calls** 48:9 49:4,7 191:15
  236:19 243:17
**calm** 265:1
**cancel** 40:11 64:11
**cancellation** 64:5,15 65:9
  67:1 126:5 137:11
**cancelled** 136:14
**cap** 78:2 79:15,20 80:5,15
  282:9
**capacity** 54:18,19 273:20
  282:9
**capital** 84:12 85:9,21
  176:16 224:4
**capitalize** 145:2
**captive** 101:18,19,21

**BRENDA DIANE TAMARIZ-WALLACE      MARCH 4, 2010**

189:16
care 12:12,13 110:15
career 11:21 12:2,3 51:13
51:18
Carol 77:8,11,12,13
275:11
Caroline 149:14
Carol's 275:14
carrier 106:15 113:5,18
123:20 265:3
carriers 102:10 109:13
110:15,19 113:5
123:10 180:11 183:18
239:21 261:5 266:9
268:5 269:19 270:10
272:16 279:4,10 281:6
281:11 283:7,17
carrier-wise 142:17
carries 240:13
case 1:6 13:15 19:18
46:17 64:14 97:4
111:15 143:11 144:7
146:13,13 149:17
153:16 180:12 194:2
197:3 262:2,4 263:1,11
264:8,11
cases 38:5
cash 70:14,15 135:1
170:18 171:3,7,11
206:17,21 207:4,18
287:1,4,12
Casually 187:14
casualty 14:16
categories 63:7
caught 305:6
cause 197:18
caused 126:7 130:1,15
171:10 261:14
causes 144:14
causing 154:12
cease 64:2
center 199:14 263:6
certain 37:12 41:18 88:18
160:13 166:14 196:18
211:21 213:21 256:13
296:18 298:9 299:12
certainly 54:19 106:2
108:2,2 251:1 299:6
certainty 165:16
certified 252:16
Cessation 63:15
chain 175:16
challenge 22:3 118:4
challenges 199:4 267:11
chance 218:17 307:3
change 25:11,19 28:4,4
30:18 61:10,11 113:7
114:20,21 145:5 155:7
159:16,19 160:4,10
161:6 199:6,7 296:19
298:10 306:3
changed 52:19 130:4
131:11 198:17 263:7
297:15 305:19
changes 282:1 284:21
297:1,2 298:13
changing 25:7 54:21
113:4 114:18 158:17
160:21
channel 156:5
characterize 55:11
charge 85:18 88:17

Charles 223:2
charts 250:5
check 45:10 122:11
260:17
checked 49:16
checking 286:8 287:2
choice 78:3 81:4 85:20
113:4 115:11 162:10
choose 28:5 65:10 160:13
chosen 64:16
Chris 265:13
chronology 51:10 136:8
242:15 275:8
chunks 182:5
circumstances 105:9
134:1
citizens 97:6
clarification 140:11
clarify 75:7 102:3 191:6
classroom 14:6
clean 303:9
cleanly 72:18
clean-up 306:16
clear 64:21 70:4,5 75:12
121:20 137:3 146:11
171:8 181:18 187:18
193:19 243:7 259:1
305:14
cleared 244:7
clearly 193:15 303:15
Client 52:9
clients 76:19 268:12
cliff 277:1
close 22:4 30:1 74:15
104:21 107:3 111:12
119:4,7 178:16 258:21
closed 141:14,14 290:4
closely 95:9
closing 119:12 141:17
170:18 213:5 228:1
247:15 252:9 255:13
255:14,20 259:3,10,19
259:21
club 42:17 45:20 53:2
54:5
cluster 152:9
codes 210:12
collateral 91:10 99:2,5
237:8
collected 264:2
collective 242:5
college 11:3,5,8,15 12:1,2
14:4,9,10 15:4,5
colliding 117:12
color 210:12
Columbus 2:7 302:13
column 195:18 196:5
columns 195:15
combination 48:3 211:20
277:13
combined 128:19 232:5
277:10,13
come 17:14 37:19 42:3
47:12 51:1 60:20 64:4
85:10 104:19 107:6
110:18 111:17 114:2
122:7 123:11 127:2
143:4 148:10 176:21
186:15 190:6 193:21
247:2 248:18 285:7
306:11
comes 42:6 88:10 112:3

169:16 232:7 237:3
comfortable 69:14
coming 88:21 110:1
156:8 158:16 213:9
230:5,15,21 231:1
263:12 265:14 267:9
267:15
comma 95:6
comment 91:12 201:12
238:16
Commerce 220:8 228:6
commercial 72:21 73:1,4
73:14,15,16 74:13,17
74:21 75:10,14,16 76:8
76:17 98:2 112:20
120:14,19 121:9 122:8
124:11 138:12 143:20
144:1 145:5 154:4
155:21 156:17 157:8
157:13 158:11 159:3
199:6 203:14,15
214:11 260:19 261:8
264:9 267:3 278:2,19
293:3 294:3
commission 74:3 108:18
108:19,21 109:8,16
110:3,20 111:19,21
112:1,2,5 144:18
234:19 241:2,5,13
commissions 19:15,16
20:8 110:6,7 112:4
184:13,14 240:4
241:15 272:20
commitment 175:14
214:7 229:11
committed 213:20 214:5
common 68:2 125:4
Communication 4:1
communications 173:18
174:19
community 14:4,9,10
15:4,5 204:21
comp 76:16 98:20 99:2,5
124:19 125:6,7,9,11
126:1,3,5 181:20
183:21
companies 53:9 59:9
75:17 111:18 115:11
284:2 285:1
company 8:11 9:7,9,18
23:18 25:8,11,21 29:3
36:14,18 39:3 40:7,11
41:16 53:10,16 54:1
60:6 66:7,8,10 79:5,6
83:1 101:18 119:13
120:15,16 137:7 140:7
140:9 155:5 159:19
164:6 178:11 187:17
191:13,14 201:9
221:13 236:17 242:21
247:12 297:17 299:16
company's 54:12 223:3
247:17
compare 27:18
compared 111:4
compatibility 193:10
compensation 19:13
30:13 62:21 63:3,4,16
63:21 104:13
compete 64:16 65:10
competing 65:14
competition 115:16

competitive 22:11 205:15
206:3
competitor 115:17
competitors 116:15
complaints 197:5
complete 11:17 156:15
completed 12:2 78:14
263:21
completely 75:13 158:16
270:14
completion 87:17 195:17
compliance 201:18
220:15
compliant 141:7
complicated 233:17
263:1
comprised 67:6
computer 120:3 123:6
155:18 156:10 158:8
190:14 192:14 193:6,8
263:20 265:9 273:5
concealed 160:19
concentrate 204:12
concentrated 98:2
concept 15:2 34:1,7
39:11 103:2 106:6
113:4,16
concern 189:6 213:7
238:9,12 293:17
concerned 172:14 197:4
219:14 295:18 297:6
concerning 61:10 255:13
concerns 189:2 215:9
274:17
concessions 282:1
conclude 224:15
concluded 307:1
conclusion 152:18 177:2
238:15 306:11
condition 149:9 206:10
248:6
conditions 25:7 59:13
296:18 298:9
conducting 156:17
conference 127:3 168:17
169:4
confidential 191:11
confidentiality 185:14
186:13 189:11 247:10
conform 203:19
confused 106:5 215:8
223:5
confuses 257:3
connect 280:20 281:2
connected 204:19
connection 248:12
consent 25:18 26:11 28:7
61:14 62:14 160:16
consented 102:15
consider 281:18
considerably 297:14
consideration 139:3
201:2
considered 171:18
consistency 38:3
consistent 38:2 74:4
145:14 226:19 257:10
267:5 279:12 291:12
constantly 153:1
consult 202:8
consultant 195:3 200:19
consultation 196:14

consulting 86:8 87:5,16
87:19
consumed 294:11
contact 85:13
contained 59:13
contemplated 240:2
294:12
contents 253:3
Conti 149:14
contingencies 112:5
184:18 240:18,19
272:20
contingency 44:1,9 74:9
105:4,13 107:20 145:2
227:1,5 239:19,21
240:4,13 246:15 258:6
295:15
contingent 87:5,16,19
170:15 247:13
continue 107:11 183:20
204:16 239:20 247:16
continued 100:9 153:10
241:11
continues 202:7
continuing 238:14
248:16
contract 18:5 24:17 26:5
30:18 38:19 60:5 62:17
64:12,15 72:14 137:9
141:7 161:3 171:5
191:1 192:17,18,21
248:8 282:1,4,6
contracting 76:8 262:3
262:14
contractor 16:3 19:1
20:20 21:11 28:2,14,20
29:9
contractors 76:1,7 157:7
158:20 159:1
contracts 60:21 61:9
control 219:5
controlling 54:12
convene 307:12
convergence 154:8
conversation 3:13 48:13
51:2 53:1 54:4 90:11
91:7,9 101:12 103:11
110:1 116:8 175:17
215:16
conversations 48:11 49:4
98:3 166:18 216:15
conversion 5:10 6:2
101:5,8,9 102:21
112:17 113:4 141:11
141:18 203:13 204:15
250:7 251:1 257:6
258:13 261:15 292:2
292:12 293:16,18
295:14 296:3,10 298:2
298:17 300:7
conversions 153:11,19
184:20 185:1 232:14
250:9 260:20
convert 103:13 112:19
229:7,20 234:16 272:1
280:3 297:4 298:15
converted 30:19 32:20
103:6 104:2 114:6
234:18 236:2 272:2
278:4 289:15 296:21
298:12 299:7 301:4,9
301:13,15 306:1

A401106
**BRENDA DIANE TAMARIZ-WALLACE      MARCH 4, 2010**

converting 280:3
Cook 3:14 90:11,12
Cook's 292:1
Coop 5:12 260:2,3
Cooper 3:16 5:14,16
  92:16,20 93:1,4,9
  94:14,15 97:19 99:18
  101:13 103:11 175:17
  175:21 229:12 260:3
  274:13 275:19,21
  276:8
cooperate 219:3
copied 83:10,13 99:18
  173:6 249:11 287:9
  307:5
copy 82:17 85:1,4,5
  210:6 221:19 223:12
  242:19 252:16
core 117:17
corporate 3:9 5:20 9:8
  30:20 32:21 56:6,15
  58:3,6,17 73:11 78:18
  78:21 81:16 94:2,6,8
  95:11 97:6,8,18 98:19
  160:8 252:17 288:7
corporately 199:7
corporation 79:1,2 97:8
  223:9,20
corporations 223:9
correct 33:10 101:20
  109:17 186:16 212:17
  234:15 252:14 258:21
correlates 94:3
correspondence 239:3,11
cost 34:11 219:3
counsel 7:6 56:17 57:5,6
  57:7,10,14 68:11,15
  149:7 168:12 173:14
  173:14,17 251:18
  252:2,21
Counsel's 252:21
count 49:11
counter 4:14 217:5,6
Country 228:6
County 209:8,9
couple 78:6 105:3 148:16
  150:14 165:17 169:8
  175:1 222:3 242:13
  286:6 290:15
coupled 158:1
course 37:3 153:8 171:11
  190:11 219:15 280:2
courses 15:9
court 1:2,16 77:18
cover 5:13 177:14,20
  194:12 229:19 246:9
  274:12 307:2
coverage 38:16 116:3
  123:7 264:1
coverages 25:16 38:18
covers 229:6
co-op 260:1,5
Craig 99:15,19 173:5
  212:14
credit 5:7 79:14 121:17
  122:11 176:2 245:14
  246:8,13 251:9,12
  253:15 256:6 272:19
credits 30:14 63:5
critical 185:15
CRMG 52:5 82:20 83:1
  164:6 238:4,4 243:7,15

243:20 286:14,17
  287:21
Crofton 80:7 81:9,20
CRS 69:17
CRSs 122:14
CSR 32:14
CSRs 197:11,13
culminate 95:8
cultural 120:8,9,11,13
culture 123:1
curious 48:15 170:21
  242:8
current 7:10 8:4 52:6,10
  91:3
currently 7:17,21 8:2
  80:14
Customary 8:19
customer 36:7 38:20
  75:18,18 76:21 112:20
  112:21 115:10,16
  126:4 127:20 196:4
  199:14 203:6 219:10
  262:14 263:3,13,16
  266:15 273:19 290:7
customers 21:20 50:5
  52:2 64:17 66:12 75:19
  76:4 112:12 113:6,8,11
  113:13 114:10 115:2
  116:16,20 122:9,10,15
  122:16 123:15,18
  137:16 144:16,16
  154:10 157:18 160:1
  172:15 233:2 263:9
  264:15 272:15 280:7
  284:17 289:9,10
customer's 38:20
cut 307:10
cycle 21:17,18
C.P.A 99:20 100:9,11,13
  100:16,18 212:16
C.P.A.s 101:1

D
D 2:10,17 7:1 171:14
  223:2 291:7
damage 130:1,21 143:12
  143:14
Dan 71:11
Daniel 84:11
Darrow 2:18 56:21 57:1
data 128:5
database 120:7 273:14
date 24:14 25:20 27:14
  46:19 52:20 56:9 59:5
  78:13 97:3 99:17 119:2
  125:3 164:3 167:7
  195:17 214:6 217:3
  239:5 250:2 255:18,20
  259:18 262:20 274:11
  307:12
dated 3:11,12,17,18,20
  3:21 4:6,8 5:5,18,19
  6:1 78:5 79:11 82:18
  162:10 165:6 167:5
  175:4 212:15 216:5
  227:17 228:14 235:12
  238:4 242:16 249:21
  250:14 256:21 282:18
  286:20 290:16 291:21
dates 78:7 165:20 176:6
  191:4,5

Dave 4:10,16,17 5:4 51:1
  51:4 90:11 164:9
  210:15 215:6,10
  242:19 244:3 286:7
Dave's 92:19 151:15
  215:15
David's 95:2
dawned 304:15
day 8:2 44:15 99:16
  209:12 217:4 228:14
  257:10 276:15 282:18
  306:21 307:10
days 9:6,6 17:13 59:1
  117:11 118:7,11 119:4
  119:11,18 165:6 233:3
  235:13 252:7,7 260:13
  262:5 267:8 290:18
  291:3,9
day-to-day 8:11 121:6
deadline 254:15 263:2
  272:3
deal 73:12 96:6 98:21
  99:6 106:11 151:7
  160:20 175:19 178:16
  179:6 207:21 212:3
  216:9 227:20 228:1,20
  228:21 229:2,3 231:11
  238:14 244:19 245:6
  303:10
dealing 122:8 158:9
dealt 198:20
Deal/Churchton 35:13
debt 232:2 253:21 279:13
debts 59:16 234:21
December 165:20 177:15
  177:17 212:15 215:17
  225:18 257:1 298:5
decided 22:1 44:12,16
  46:21
deciding 196:12
decision 44:20 45:5 46:20
  141:16,21 142:1,3
  159:21 160:3,5,8
  187:19
decisions 23:7,9,10,11,14
  23:19 57:18 170:6
  202:5,16
decision-maker 170:3
declaration 225:5
decline 125:1
declined 126:1
decreases 21:14
deduction/key 217:19
deems 25:17
defeat 106:11
Defendants 1:9 2:16
defensive 265:1
deferred 30:13 63:4
  98:20 99:2,5 245:13
deficiencies 292:19
define 120:13
defined 48:6
definitely 87:10 96:16
  108:5,7
definitions 301:2,3
degree 11:4,13,16
delicate 49:1 115:1
deliver 262:11 266:14
delivering 247:15
delivery 12:13
demanding 22:18
demands 59:17

department 47:17,21
  78:19
departure 156:16 157:9
departures 285:20
depended 22:7,7 53:13
  134:4
dependent 23:16 116:7
  184:21 248:14
depending 122:15
deposition 10:10 12:12
  24:3,7 26:20 27:3
  55:19 56:2 77:5,9
  82:12 84:6,10 90:3
  92:10,14 99:10,14
  161:21 163:19 164:2
  164:21 165:4 166:20
  167:3 172:20 173:3
  176:8 194:7,11 209:19
  212:9,13 214:18
  215:19 216:2,18
  219:19 221:15 225:10
  227:11 228:10 235:7
  237:20 238:20 242:9
  244:9 251:4,8 255:7,11
  256:16 259:13 274:5
  275:15 282:12 286:2
  288:2 290:10 291:15
  300:3 307:1
depositions 68:3
derived 224:19
describe 8:13,14 158:5
  278:15 288:19 306:19
described 10:2 79:16
  300:14 305:12
describing 15:14 105:13
  127:12
description 3:6 40:1,3
designed 219:4
desired 201:17
destabilization 113:2
determine 99:1
determined 130:9 301:15
Deveaux 71:13 72:1,8
  185:20 186:9 217:17
  248:5,9
develop 89:9 162:16
developing 146:9
development 14:8
devote 9:3
devoted 74:21 159:1
Diane 1:8,10 3:2 4:16,17
  4:19 5:4 7:2,11 58:18
  59:10 60:4 79:1 80:9
  90:20 105:6 111:16
  136:14 138:18 142:13
  145:18 146:18 162:19
  163:4 164:9 167:4
  188:15 193:19 194:13
  204:7 208:3 220:21
  221:10 222:9 223:2
  225:16,19 232:5 240:4
  240:17 243:15 260:1
  283:13,21 287:19
  288:8,15 289:2 290:21
Diane's 210:10
Diane-Meeting 5:11
diaries 69:1
diaster 280:10
Dick 6:1 39:18,19,20 42:8
  291:21
died 151:16,19
dies 91:14

difference 53:18 120:11
  301:7
differences 120:14
different 11:19 15:12
  34:19 35:5 38:6 62:17
  75:17,17,19 78:6 80:9
  120:15,20,21 123:1
  124:9,13 132:1 154:11
  156:4 160:17,21
  161:10,11,12 189:9
  211:18 216:8 228:7
  233:4 263:12 295:15
differently 149:20 278:10
difficult 115:7 134:1
  287:5
difficulties 115:21
difficulty 117:21 118:7
  270:1
dig 116:4
digit 86:17
diligence 169:17 185:5
  186:15,19 187:2,4
  190:11 191:20 193:3,4
  193:5
direct 47:4 51:19,21
  52:17 223:4,10,15
  243:3,7,20 283:6
directing 19:1
direction 96:16 145:6
  273:21 299:16
directional 199:7
directly 64:8 270:13
disappointed 305:14
disaster 208:8 265:5
disbursements 249:15
disclaimer 200:8,21
  202:6
disclose 161:13
disclosed 130:15 156:1
disclosure 254:8,8
discontinue 25:14 36:9
discovered 29:6 129:19
discrepancy 305:11
discretion 23:4 26:7 28:6
  271:18 272:7 283:12
  290:8 298:18
discussing 48:7 83:17
discussion 30:8 33:15
  39:2 85:10 114:2 115:3
  118:6,17 175:21
  183:17 210:12
discussions 33:12 34:7
  50:19,21 58:11 69:2,9
  69:15,21 91:18 115:9
  118:9 174:21 217:11
  293:1
disruptive 156:13
dissolved 9:10
distribution 156:4
DISTRICT 1:2,3
disturbed 118:2
doctor 13:4,6
doctor's 16:17
document 24:8 27:4,6,7
  28:17,18 31:1 56:3,12
  56:13 59:3 61:19 62:6
  63:12 68:6,9 85:8 90:7
  93:20 119:19 141:12
  162:6,6 164:3,8,18
  165:6 167:7 168:1,1,3
  194:15,18 198:15

A401106
**BRENDA DIANE TAMARIZ-WALLACE       MARCH 4, 2010**

215:3 242:6 244:17
248:17 249:21 251:16
251:19 255:2 257:5,13
257:19 269:12 274:14
274:16 275:9 282:20
292:5,6,9,14,17 293:12
294:20 297:7,15 299:1
300:14 302:11,13,14
302:15 305:7,9 306:2,3
306:4
**documented** 130:11
**documents** 13:15 31:14
46:1,3 50:15 68:4,20
70:7 72:13 104:7
111:11 118:6,18 129:7
129:13 139:14 142:5
173:21 191:6 211:5
225:2 233:16 253:1,2,4
253:16 262:21 270:6
270:20 294:12 303:18
307:4
**doing** 29:7 38:9 61:14
114:18,19 116:21
118:14 154:13 155:21
161:13,19 202:11
243:17 273:4 287:3
293:13 304:15 305:5
**dollar** 46:15 181:11
**dollars** 153:9 170:16
180:2,3 181:9 226:10
256:7
**Donna** 71:8 172:18 186:7
187:10 217:16 218:10
**doors** 48:21
**dormant** 137:8
**Dorrigan** 193:9
**double** 94:5
**doubt** 83:14,14
**downs** 21:19
**downside** 91:13
**downstairs** 82:5
**draft** 83:6,10 84:4 165:12
166:16 167:9 195:8,10
**dramatically** 183:3,5
**draw** 20:7
**drawing** 287:18
**drew** 286:10,21
**driver** 133:21
**drop** 112:14 223:14
**dropped** 45:9 180:1
230:16
**drops** 112:14
**DTA** 105:6 107:11,18
108:17 109:6 124:11
145:15 147:10,16,17
147:19 149:19 150:21
151:12 152:1 153:6,7
153:15,18 154:7 159:4
208:7 210:9 211:1,14
226:4,9 234:7 239:17
241:8 275:2 277:10
283:7 286:15 294:7,8
299:7
**DTL** 217:7
**dual** 268:10 283:4,10
**due** 59:17 125:15 169:17
185:5 186:15,18 187:1
187:4 190:11 191:20
193:3,3,5 301:12
305:21
**Duke** 2:19
**Dulaney** 2:12

**duly** 7:4
**duties** 8:16
**dwell** 110:11
**DWP** 277:9,19 278:2,4
301:16,18 304:2
**dying** 151:17
**D.C** 11:3 90:21 91:3

**E**

**E** 3:5 7:1,1
**Eagan** 138:14,14,16
139:5 142:1 205:19
206:16,20 208:3,14
**Eagans** 207:10
**earlier** 62:19 141:11
205:20 208:13 217:2
218:8 233:1 265:7
298:3 300:21
**early** 17:13,13 38:12 43:4
95:15 144:7 147:3
230:14
**earnings** 29:15 30:8,12
63:5 65:2,13 90:21
91:4
**ease** 273:4
**easier** 72:9 88:4
**easiest** 142:15
**easy** 121:14
**ECKLER** 2:5
**economic** 29:8,12 43:19
44:4 133:21
**economically** 15:21
**economy** 92:5
**Ed** 3:16 5:14,16 92:16,20
97:19 99:18 101:13
175:17 229:12 260:3
274:13 275:21
**Edgewater** 149:15
191:21
**education** 11:1
**effect** 122:3 297:8
**effective** 25:20 78:8
288:10 301:6,17
**efficient** 72:20 307:8
**effort** 113:14 122:19
130:2 275:4
**efforts** 48:3 54:4 194:3
244:3
**either** 11:21 49:17 183:10
192:20 209:15 234:10
260:7 303:14
**electronic** 85:5
**eligible** 106:12
**eliminate** 269:17 272:3
**embrace** 97:7
**emphasize** 81:14
**employ** 247:17
**employed** 7:18
**employee** 3:7 15:18,19
24:18 32:9,10,15,16
217:19 243:3 247:12
265:5
**employees** 32:4,6,21 58:7
64:6 122:13,14 217:16
218:3 283:7 285:9
**employment** 247:11,16
248:13 283:6
**encounter** 116:10
**encountered** 115:12
**encouraged** 73:12
**encouragement** 40:15,18

**encouraging** 41:21
**endeavor** 94:10,17
**ended** 121:15 137:8
**endorsements** 284:20
**energy** 294:2
**enforced** 64:12 128:8
**engage** 185:5
**engaged** 118:14
**engagement** 90:1
**enjoying** 115:10 180:21
225:5
**enroll** 205:16
**enrolled** 11:7
**enrollment** 12:2
**enter** 59:9
**enterprise** 277:10
**entire** 61:8 113:8 120:3
155:20 188:21 193:16
198:15 281:16,19
**entirely** 25:14 113:11
156:21 161:14 201:5
264:4
**entities** 254:1 287:4,12
287:19
**entitled** 65:13 87:18
**entity** 58:19 78:8 79:6
85:11 128:18 145:16
289:2
**environment** 266:4
296:18 298:10
**envision** 183:15
**equals** 108:17
**equipment** 79:17
**escrow** 246:10
**especially** 266:10 285:6
**ESQ** 2:17
**ESQUIRE** 2:4,10
**essential** 184:9,12
**essentially** 26:5 280:10
**establish** 25:13 199:13,18
**estimate** 111:8 150:15
301:5,19
**estimated** 104:12,14
**estimating** 9:20
**et** 1:8
**evaluate** 85:12 191:7
**evaluated** 43:18 88:6
**evaluating** 89:4 98:19
100:10 293:12
**evaluation** 89:18,20,21
301:4
**event** 64:2 149:5 188:8,9
301:4
**events** 10:14 66:18
242:15
**eventually** 21:16 110:18
135:21
**everybody** 41:6,7 77:11
146:16
**evidence** 250:21
**evolution** 70:8
**evolved** 70:1
**exact** 35:15 258:17
**exactly** 11:11 33:4 48:2
86:16 87:13 89:1 94:3
94:7,21 104:21 124:7
130:19 140:14 143:7
153:14 169:14 176:5
203:20 258:16 259:11
262:17 268:8 272:10
303:2 305:1,3
**EXAMINATION** 3:1 7:6
**examined** 7:5

**example** 22:3 37:17 53:19
54:20 193:6 195:14
199:12 254:1 277:7
**examples** 46:9,13 157:4
**exams** 15:8
**exceed** 170:16 199:14
**excel** 29:5 200:18
**exception** 255:4
**exceptions** 268:3 279:2
**excess** 86:5
**excluded** 157:15
**excluding** 241:2
**exclusion** 157:16
**exclusive** 101:21 102:17
117:11 120:12 147:18
**exclusivity** 102:12,16
282:5
**excuse** 22:4 86:13 105:19
161:11 203:2 213:6
217:5 247:14 274:4
**executing** 247:15
**executive** 108:20
**exhibit** 24:3,7 26:20 27:3
55:19 56:2 77:5 82:12
82:16 84:6,10 90:3,7
92:10,14 99:10,14
161:21 162:5 163:19
164:2,21 165:4 166:20
167:3 172:20 173:3
176:8,12 177:14 194:7
194:11 209:19 210:2
211:6 212:9,13 214:18
215:19 216:2,18,21
219:19 220:2 221:15
221:18 225:10,14
227:11,15 228:10,13
235:7,10 237:20 238:3
238:20 239:2 242:9,13
244:9,12 247:19 249:3
251:4,8 252:13 255:7
255:11 256:16,20
259:13,16 274:5,9
275:15 282:12,16
286:2,5 288:2,5 290:10
290:13 291:15,19
292:10 297:19 298:4
300:3,6 305:16
**exhibits** 6:3 276:18
**existing** 34:21 64:7 80:12
158:1,11 159:3 283:5,6
**exit** 48:7,8 184:1 226:8
270:14 272:7
**expand** 101:7
**expanded** 277:4
**expansion** 39:3 79:16
204:17 276:16
**expect** 254:6,7
**expectation** 117:16
199:15 230:15
**expected** 121:19 267:1
**expecting** 263:3
**expects** 239:17
**expense** 211:12
**expenses** 19:10,21 34:14
53:20,21,21 54:13
226:12
**experience** 16:12 34:11
37:6 55:6,9 73:16
113:1 114:17 123:13
126:8 261:5,7
**experienced** 157:20
**experiment** 35:14,16,17

**expert** 51:20
**explain** 65:21 66:9
113:16 127:1 144:15
157:2 245:9 263:14
**explained** 40:5 303:19
**explaining** 278:19
**explanation** 142:16,16
199:3
**expressed** 49:8 189:6
**expression** 167:18 168:9
**expressly** 247:13
**extended** 29:15 30:8,12
63:5 65:2,13 90:21
91:4 97:2 126:10
272:13
**extent** 8:10 60:9 62:7
89:15 99:7
**extremely** 264:15 295:6
**eye** 108:7
**e-mail** 3:17 4:6,8 5:5,18
5:19 99:15 210:4,18,21
210:21 212:14 239:7
242:18 243:11 269:15
282:16 286:6,16,17,20
**e-mails** 210:3 242:14
286:6
**E-2** 236:1

**F**

**F** 2:4 63:10,14
**face** 295:9
**faced** 117:18
**faces** 106:4
**facilitate** 289:7,9
**facing** 161:17
**fact** 23:2 30:5 87:6 98:18
101:13 116:13 143:11
177:6,20 181:12 184:1
184:5 194:3 202:10
244:16 253:7 260:16
281:21 282:7 297:9
299:12 300:15 304:6
306:5
**factor** 156:19
**fail** 301:4
**failed** 129:20
**failing** 129:20 130:10
**failure** 130:2 142:21
161:12,16
**failures** 134:5
**fair** 13:14 69:16 107:21
109:9 196:19 224:15
232:16 233:13 234:11
234:12 235:3 240:20
275:4 289:21
**faith** 145:1
**fall** 43:4,4 53:1 54:5
130:17
**familiar** 74:6 83:2 90:16
128:21 162:13 166:10
239:11 274:15
**family** 12:12 13:1
**far** 218:9 241:15 267:1
**Farrah** 195:20
**fast** 94:7 263:4
**favored** 76:13 205:14
**Fax** 4:1
**faxed** 223:12,13 248:19
**FCA** 13:17 16:8
**features** 44:4
**February** 238:13 239:7

A401106
**BRENDA DIANE TAMARIZ-WALLACE        MARCH 4, 2010**

**Federal** 176:2 245:14
246:8 251:12
**fee** 86:4,6 87:5,16,19 88:9
88:13,21
**feedback** 278:15 282:3
**feel** 40:16,18 157:3
236:21 255:1
**feeling** 95:16
**fees** 108:20
**felt** 41:2,10
**field** 16:14
**fight** 269:5
**figure** 98:11 127:15
129:2 178:10 248:18
**figures** 86:19 258:17
**FILE** 1:21
**filled** 220:10 222:19
**filling** 121:8 190:15
**final** 89:12 195:9 244:19
247:1 250:11
**finalized** 207:20,21
**finally** 245:6 280:17
304:14
**finance** 96:6,8 213:8,10
**financed** 206:17
**financial** 4:15,19 81:10
81:11 84:12 95:19
100:10 162:8,9,16,20
162:21 163:1,2 219:16
219:17 220:3,9 225:15
228:9
**financials** 81:14
**financing** 96:2 213:19,21
220:16
**find** 16:20 17:4 97:2
129:7,21 130:4 155:15
213:18 214:8 244:6
254:3 302:16 304:5
305:15
**finding** 228:3
**findings** 176:15
**fine** 192:20 237:19 242:2
**finish** 118:17 202:21
**firm** 100:3
**first** 7:4 14:1 17:10 24:17
25:3 27:20 32:1,9 47:1
50:18,21 51:14 61:7
62:14 72:18 78:7 81:17
82:20 84:14 85:8 97:15
98:8,9 103:20 108:14
113:18 117:11 118:7
118:10,13 119:11,18
120:2,2 125:5,9,13,14
126:9 127:10 132:6
143:3 166:3 167:19
170:13 173:7 176:19
178:15 200:9 208:8,10
210:2,4 211:14 213:5
220:8 222:5,12 224:2
228:7 233:3 239:15
241:18 242:3,18 245:5
245:17 246:20 262:4
267:8 273:6,21 275:1
277:7,16,18 278:17
286:11 288:6 290:18
290:21 298:7 300:15
301:2 302:9
**fiscal** 144:10 226:1 241:3
**fit** 120:9 131:3 158:14
190:16 265:10
**fitting** 158:21
**five** 86:19 171:16 225:21

265:13 279:4,11 281:6
281:11 300:12
**five-year** 279:14
**fix** 152:16
**fix-it** 304:18
**flew** 302:12
**flow** 135:1 287:1
**focus** 50:11 72:20 157:10
157:11 158:18 169:18
203:10
**focused** 110:16
**focusing** 43:5 211:4
233:5
**folks** 57:17 149:5,6 152:6
152:9 187:4,8 210:7,8
211:20 219:2 228:7
267:11 285:17 291:2
**follow** 97:7 242:15
**followed** 49:3 197:21
**following** 48:9 49:6 64:3
90:10 250:4 292:16
301:1,2 306:14
**follows** 7:5 95:9 210:21
252:13,17
**font** 249:11
**forced** 110:21 261:12
**forecast** 277:9
**foregoing** 59:9
**forget** 52:8
**forgive** 25:5
**form** 5:10 6:2 47:8 58:19
125:13 166:8 200:11
217:1 247:18,19 257:6
269:7,11 292:3,12
298:3 300:8
**forma** 103:15 109:20,21
211:2,6,15 212:1 230:6
230:8 233:16 240:12
250:6,11 279:13
**formal** 11:1 53:8 54:8
**formas** 89:6 210:9,12
**format** 200:18
**formats** 211:18
**formula** 105:21
**forth** 217:11
**forward** 63:11 232:7
299:21
**found** 17:15,18 18:3,7
110:4 155:19
**four** 63:10,11 67:3 265:4
**fourth** 213:7 251:16
296:14
**frame** 36:3,12,13 58:10
75:13 118:19 148:15
152:8 217:10 226:4
238:13 270:21 287:11
290:17
**framework** 34:16
**Frank** 63:10
**frankly** 156:6 189:19
214:4 307:2
**freed** 280:12
**frequently** 45:10
**front** 35:4,12 68:9 155:18
156:9 158:8 162:7
222:5 273:5
**frontier** 278:18
**Frustrated** 151:8
**frustration** 38:6,10 153:2
**frustrations** 21:2 36:17
36:18 37:6 154:12
**fulfill** 143:17

**full** 7:10 128:20 214:7
**full-time** 9:14,17 10:1
162:9
**function** 204:21 253:8
257:14 288:20 289:2
**functional** 126:18
**functioning** 282:9
**fund** 231:3,6 232:2 233:9
**funded** 142:10
**funding** 99:5 134:18,20
142:5 207:8,13 217:7
228:3,20 229:4,10
247:5
**funds** 252:6,9
**further** 63:12 81:7
277:21 301:14
**future** 29:12 205:12
217:20
**FYE** 241:3

------

**G**

**G** 7:1
**Gainesville** 122:1 260:19
261:4
**gaining** 39:12
**gains** 224:4
**Game** 228:15
**gears** 37:8
**gem** 213:11
**general** 13:3 31:15 41:8
55:12 63:6 76:15 92:5
111:3 124:18 125:5,9
125:12,14,21 126:2
211:18 288:19
**generally** 8:16 22:12,21
110:4 111:2,6 132:10
234:7 292:4
**generate** 184:14 278:1,12
**generated** 226:20 238:17
238:18 294:21
**generating** 112:13
**generation** 109:8 274:11
**genuinely** 172:8
**geographically** 205:14
**George** 4:13,14 8:1,4 9:3
9:14 11:2,12 48:13
50:12 51:1,3 72:16
83:6 108:12,20 111:17
111:21 114:18 116:14
116:14 117:17 128:9
131:9,10 134:13
136:17 137:16,20
138:7 139:17,19 140:1
140:5,6,19 142:12,17
142:18 143:1,13,15
144:17,19,20 145:18
146:6,19 147:12
163:17 165:5 166:15
170:9 171:15 185:4,8
185:11,20 186:5
187:16,18 188:12,17
192:4,8,12 204:1,19
205:6 213:5 216:15
216:5 217:6,16 227:21
238:9 244:17,18
247:12,14 248:10,14
257:8 287:20 291:1
**George's** 209:9 215:12
216:9 218:20
**getting** 17:9 34:4 62:13
69:14 101:17 105:14

111:4,13 118:18 130:5
130:6 152:21 190:3
193:14 197:20 219:1
220:15 266:10 274:3
306:15
**give** 18:8 20:18 31:5,12
37:17 49:13 54:20
57:16 68:1 74:11 111:7
116:3 137:19 157:1,4
161:5,9 179:3 207:13
211:7 233:18 236:20
246:19 264:12 272:19
272:19
**given** 97:1 103:18 161:18
178:12 195:9 207:9
262:20 263:16 270:14
271:7 279:13 299:12
**giving** 53:11 61:13 65:1
282:3 304:2
**Global** 3:19
**Gloucester** 2:19
**go** 10:1 15:11 27:10,16
32:16 50:10 60:16 63:1
63:9 68:4 96:11 103:15
108:16 122:11 124:3
129:14 146:6 177:21
182:4,17 187:5,7 192:1
192:5,14 196:3 213:18
214:8,11,11 224:2
226:7 230:3 240:18,19
241:14,15 261:20
262:9 275:8 277:14
288:18 297:18 304:3
307:11
**goal** 16:4 73:3 145:10
151:11 179:13 181:12
181:15 190:2,4 199:18
205:9 230:11 277:17
**goals** 18:12 73:11 94:1,3
94:6 95:9 97:8 98:6,12
98:14 145:1
**goes** 65:17 95:4 98:18
105:8 174:4 205:11
217:7 236:7 240:17
270:5,19 280:21
**going** 10:7,10 13:13
20:21 21:12,13 32:16
36:4 38:9 40:11 42:21
46:18 58:3 59:20 61:18
63:1 66:13 68:3 72:3
73:8 74:14 83:16 93:19
97:8 103:19 106:6
109:12 110:14 111:19
111:20 112:14 114:21
114:21 115:3,9 116:10
117:16 119:10 122:18
125:19 127:16 129:11
134:19 149:3 154:19
161:1,6,13,19 163:16
166:18 169:21 171:9
174:20 177:15 189:9
189:14 191:5 194:2
198:19,19 206:13
208:6 219:3 220:15
228:3 232:15 234:1,5,6
242:7 246:10 257:15
258:18 271:4 273:3
276:13,14 277:16
287:17 290:15 294:21
297:13 303:10 305:5
**good** 7:8 18:9 41:14
73:15,16 89:14 92:9

94:8 97:6 140:10
144:21 210:10 219:7
290:6
**goodness** 117:9
**goodwill** 289:8
**Gorman** 198:3,4
**gotten** 177:17
**gradual** 146:17
**graduate** 16:2
**graduated** 20:19
**grand** 153:10 234:4
**great** 29:3 113:17 210:13
267:3
**Greek** 303:21
**Green** 242:19 243:2,13
**Greg** 5:2 228:16 235:19
302:12 306:15
**grew** 31:18 32:8 71:5
153:11
**Griffith** 100:4
**gross** 108:18,19,21
109:16
**ground** 48:10 278:18
**grounds** 66:1
**group** 13:5 52:9 243:16
**grow** 20:3 35:7 40:7
108:3 153:10 154:10
163:13
**growing** 35:14 41:15
57:13,14 96:20 97:16
107:11 130:6 238:12
**grown** 19:19 128:15
153:7
**growth** 20:12 31:9 38:8
94:1,8 108:6 130:6
153:15 181:5,6 205:14
**guarantee** 59:4 60:8,10
201:15,21 202:1,3
253:9,10,12,13 254:9
255:4 296:20 298:11
299:6
**guaranteed** 60:3 166:1
166:13
**guaranteeing** 253:14
**guarantees** 59:12
**guarded** 191:10
**guess** 11:20 14:5 15:21
17:9 33:3 34:4 36:12
36:16 39:1,9 43:15
53:19 56:12 72:12
87:3 91:9 106:5 107:16
112:17 129:1 133:16
134:15 151:13,21
156:11 167:6 191:3,9
197:3,16 211:18 215:8
231:3 272:5 275:7
278:18 285:2 295:4
**guideline** 122:3
**guidelines** 121:16,19
298:16
**gun** 136:7,7
**guru** 90:14
**gyrations** 216:8

------

**H**

**H** 3:5
**half** 150:17 166:9 170:16
175:12 180:3 226:9
256:6,11
**Hamilton** 249:7
**hand** 75:15 302:10

303:17
handed 24:6 27:3 56:1 77:15,18,18 82:16 84:9 90:6 92:13 99:13 162:3 162:5 164:1 165:3 167:2 173:2 176:12 194:10 210:1 212:12 214:21 216:1,21 220:2 221:18 225:14 227:15 228:13 235:10 238:2 239:2 242:12 251:8 255:10 256:20 259:16 274:9 282:15 288:5 290:13 291:19 300:6
handle 150:7 243:19
handled 158:8 244:3
handling 149:12
hands 306:6
handwriting 78:9
handwritten 78:8
happen 46:15 73:12 91:13,20 105:12 139:12 146:10,11 185:12 200:5 206:13 231:11,18 253:17
happened 13:10 43:8 48:4 69:7 92:5 137:10 137:15 149:4 151:3 155:3 159:5 171:3,6 208:6 233:1 257:21 261:10,11 264:7 293:11
happening 23:10 105:20 117:9,14 152:3 154:12 154:19 206:9 217:10 295:9
happens 254:4 272:8
happy 124:8 231:15
hard 38:7 117:17 133:20 133:21
harder 22:13,19
hardy 209:14,15
hard-nosed 94:8
harming 126:4
head 73:20 128:11 193:19
heading 59:3 61:2 62:20 63:14,17 92:15 162:7 167:13 177:1 249:4 257:6
health 14:17 16:16 144:11 206:10
healthy 108:8
hear 204:4
heard 30:2 38:4,6 115:19 174:3
hearing 117:4
hefty 106:1
held 294:4 295:11
hello 77:11,12
help 18:7 68:7 96:8 143:1 143:12 144:10,13 169:2 205:7 210:11 217:8 232:7 250:1 251:19 284:16 285:20 290:6
helpful 116:11 144:20
helping 304:3
helps 126:21
Hennessy 56:18
hey 48:18
hi 77:13 113:17

high 11:1 86:19 93:15 107:19 177:3,5,8 264:17 295:6,7
higher 111:6 118:1 264:5 264:6,11,13
highlight 292:17
highly 295:7
HILLMAN 2:18
hindered 95:12
hindering 95:16
hindrance 94:5 95:8
hire 79:17
hired 14:7 186:18
historic 240:1
history 10:8,10 12:3 29:4 31:6,14
hit 116:13 119:14 134:18 207:8 210:15 299:17 300:13
Hodes 2:11
hold 119:10 129:11
holds 105:21
Holtkamp 269:15 282:17
home 76:7 193:9 265:14
Homewood 7:13
honest 174:2 233:18
honestly 45:21 81:6 129:6 233:14 250:3
hope 234:17 235:1
hoped 144:2 153:19 183:14 184:3,20 185:1 188:13 233:4,6 265:10
hoped-for 233:12
hopefully 154:10 181:16
hoping 182:10,11,14,16 182:18 183:1 184:4 234:17 280:3
Hospice 151:16
hours 192:8,12
hunting 229:15
hurdle 113:8
hurdles 101:3 103:16
hurried 254:14
husband 42:9,19 46:21 55:2 69:8 140:20 164:12 170:10 192:10 239:4 276:3
husband's 142:1 164:6 223:17 224:16
hybrid 278:11
hypothetical 46:10
H-O-L-T-K-A-M-P 269:16

I
IA 203:11,15,17 204:3,13
IAA 40:4 104:7 186:21 253:8 278:16 281:19 283:9
IC 17:19 18:5 19:1 20:10 31:7 58:5 90:21 91:3
idea 43:1 113:10 116:9 156:8 172:2 175:12 231:2 249:19 271:3
ideal 232:11
identical 27:20
identification 24:4 26:21 55:20 77:6 82:13 84:7 90:4 92:11 99:11 162:1 163:20 165:1 166:21 172:21 176:9 194:8

209:20 212:10 214:19 215:20 216:19 219:20 221:16 225:11 227:12 228:11 235:8 237:21 238:21 242:10 244:10 251:5 255:8 256:17 259:14 274:6 275:16 282:13 286:3 288:3 290:11 291:16 300:4
identified 29:2
identify 21:6 46:19 130:8 176:13 225:13 244:15
identifying 195:16
ignoring 224:4
ill 148:3
illness 148:6
imagine 13:14
immediate 204:11
immediately 152:16 155:4 169:16
impact 21:13 117:11 127:19 155:1 158:11 189:2 281:18 287:16 297:3 298:14
impacting 154:17,17 156:20
impacts 100:11 112:9
implement 202:9
implementation 43:12 199:5 201:4 299:15
important 42:7 145:4,12 202:16 218:2
impossible 125:13
impression 97:1 187:15 187:21
impressions 95:2
improved 279:16 282:4
inadvertent 173:17
inappropriate 66:4
inasmuch 175:15
incentive 30:13 63:4
include 248:7 297:1
included 6:3 29:15 67:16 116:13 121:17
including 25:13 59:15 74:9 149:6 188:1 199:15 291:3 297:2 298:13
income 4:17 103:15 144:18 222:6,13 223:8 224:3,4,5,9,13,16,19 226:9,11,21 237:10 239:21 241:14
inconsistencies 292:18
incorporated 226:4
incorrect 197:8
increase 171:11,18 172:1 172:1 210:14 240:5 278:20
increased 130:3 302:17 304:10,11
increases 21:13
increasing 304:7,9
increasingly 287:5
indebtedness 59:19
indented 301:3
independent 4:4 16:3 17:6,8 20:20 21:11 27:9 28:2,14,20 29:9 39:13 50:6,8 133:10,12 141:6 155:14 156:5 189:15 194:12,21

204:17,20 205:7 229:1 261:5,6 292:1,19
indicate 82:20 128:14 210:19 220:8 250:18 286:17
indicated 35:3 62:9 74:3 150:20 164:6 194:1 205:20 307:4
indicates 24:13 84:13,14
indicating 95:1 231:14
indication 178:17,18 179:4
indirectly 64:8
individual 58:5 146:12
individually 59:11 140:2 192:8
induce 59:8 64:9,10
induces 64:8
inducing 64:10
ineligible 180:9,19 184:7
infectious 148:7,12
information 102:17,415 152:21 160:19 201:1,3 202:4,15 211:13 277:6 299:13
informed 73:8
initial 69:9 115:11 118:11
input 54:15 252:21
inside 267:2
insisted 189:11
insistent 186:13
installment 246:17 247:6
installments 245:18 246:21
institutions 228:9
instructional 8:18
instructions 68:2
insurance 1:6 12:13 14:15 16:13,13,16 21:15 22:3,13,18,20 25:6,16 26:10 47:6,17 47:21 53:3 59:9 61:12 64:11 78:19 103:5 110:8 115:11 127:14 131:7,20 132:5 133:4 136:4,9,21 137:2,6 138:3,15 140:7 142:7 162:8 167:14 204:8 208:14,21 221:3,11 236:17 239:20 269:8 283:17 284:1,18 288:9 288:15 289:11,18
insure 25:10
intended 81:9 183:9 292:17 303:9
intent 50:16 72:14 108:2 135:18 229:2 244:17 274:18 296:7
intention 155:19
interacting 170:8
interaction 55:2
interactions 66:6
interchanging 285:9
interest 49:8 93:15 167:18 168:9
interested 45:15,17 48:7 49:15,15 73:10 197:4
interface 119:21
interfere 10:14
interim 126:4
interviewed 14:6
introduce 113:17

introduced 188:5 273:3,6
introducing 113:3,16
introduction 33:21 157:8 158:2 199:5
intrude 10:8
invariably 114:2
invasion 267:14
invested 146:8
investigate 99:3
invited 42:10,11 53:1
involved 40:15 51:20 88:19 173:20 217:17 218:4,16 283:7 292:21
involvement 53:3
involving 38:5
in-house 197:11
Island 18:19 81:19
Islands 81:18
issue 38:3 68:14 95:14,21 96:4,16 198:19 240:15 251:2 253:2 266:3 293:14
issued 123:9,11 264:3 266:18
issues 37:20 119:21 120:8 120:9 123:6,8,21 127:12 248:15 257:18
issuing 13:11
item 101:4 103:16 195:16 199:11,12 203:4 217:15 228:21 232:4 235:21 260:12,19 262:1 267:7 268:2,5 277:8 278:11,21 290:21 291:5,7 300:18
items 196:7,8,18 210:13

J
January 139:16 213:6 227:17 228:15 231:13 235:13 269:15
Jim 242:19 243:13
job 34:17 41:14 101:15 101:17 102:7 118:3 123:5 154:13 218:20 252:3 306:16
jobs 12:3
John 302:11,14 303:3,14 306:7
joint 142:2
Jones 4:1 173:5,7 174:3 174:17,20,21
Judy 243:14
juggling 287:4
July 78:9 82:18 290:16
jumbo 175:8,15
jumping 136:7,7
June 56:9 59:5 79:11 89:19 148:1,15,17 176:20 206:12 226:1,1 241:4

K
K 91:1
Katz 2:11
keenly 73:9,9
keep 115:3 191:11 272:16 275:12 289:9
Kelly 6:1 39:18,19,20 42:8,18 53:2 249:6

| | | | | |
|---|---|---|---|---|
| 291:21 | **L** | life 14:16 21:17,18 221:2 | 33:7 35:5 36:5 49:17 | **M** |
| **kept** 59:14 73:7 114:12 | | 221:11,13 | 50:2 81:17,20 209:3 | |
| **Kevin** 193:9 | **language** 161:7 293:6 | **light** 54:21 266:9 280:21 | 285:9 | **mad** 263:9 |
| **key** 72:11 217:15 218:3 | 297:19,21 | **Lightfoot** 260:21 | **locations** 81:16,16 82:2,9 | **magnitude** 264:12 |
| 247:12 248:11 265:5 | **lapse** 64:11 | **likelihood** 304:11 | **lock** 146:13 248:4 | **mail** 47:4 51:21 123:8 |
| **kind** 8:12,20 10:13 18:10 | **large** 29:3 75:16 154:9,9 | **likewise** 22:15 | **long** 7:14 34:12 35:20 | **mailing** 52:2 53:19 |
| 20:11 31:2,5 41:4,11 | 157:7 158:19,19 159:9 | **limit** 25:14 118:12 269:18 | 62:20 70:2,2,2 71:2 | **maintain** 134:2 154:10 |
| 42:2 48:19 49:21 51:4 | 239:17 | 270:3,18 271:20 | 100:12 121:3 123:19 | 268:11 283:10 290:7 |
| 53:7 55:1 68:2,21 | **largely** 144:5 225:6 | **limitation** 25:20 281:5 | 124:4,10 159:11 | **maintained** 241:6 |
| 69:20 75:1 87:7 91:3 | **larger** 118:1 157:18 | **limited** 59:15 89:2 118:10 | 202:14 232:19 262:15 | **maintaining** 289:11 |
| 95:4,14 98:7 107:15 | 160:1 | 284:8 | 279:11 281:11 | **major** 36:18 73:10 |
| 109:4 111:14 115:8 | **Larry** 3:14 90:11,12 | **LINDSMITH** 2:4 3:3 7:7 | **longer** 181:9 203:2 | **majority** 41:17 104:15 |
| 116:10 118:16,19 | 292:1 | 24:5 26:15 27:1 28:12 | 261:11 | 161:6 170:7 |
| 127:18 136:6 157:2 | **late** 97:3 147:3 148:3 | 30:2,4 31:16 37:5 | **longest** 120:18 | **manage** 20:3 124:14 |
| 160:1,6 162:6 164:15 | 205:4 | 55:21 60:12 62:4 65:8 | **look** 28:16 42:6 46:11 | 273:18 |
| 164:18 170:21 175:13 | **Lately** 9:5 | 68:18 71:20 77:7,14 | 68:7 83:2,4 90:16 | **managed** 12:13 31:19 |
| 184:2 215:4 216:3,13 | **launch** 199:2 | 82:14 84:8 90:5 92:12 | 93:18 94:16 97:12 | 72:20 |
| 217:8,9 218:14 228:17 | **Laurel** 131:7 207:9 | 99:12 127:5 137:1,5 | 109:5,18 111:10 128:5 | **management** 8:14 12:6 |
| 229:11 232:19 238:12 | 208:11,16,17,19 209:2 | 140:3,8,12 162:2 | 154:9 162:13 164:16 | 12:14 52:9 73:7 94:9 |
| 242:14 246:14 260:8 | 209:7,15 | 163:21 165:2 167:1 | 168:7 190:13 191:13 | 94:16 130:12 183:17 |
| 263:15 279:1 281:3 | **law** 201:18 284:20 | 168:5 173:1 174:1,6,10 | 192:14,15 195:8,10 | 243:16 273:14 |
| 300:20 | **laws** 25:7 | 174:14,18 175:2 | 197:1 200:8 205:7 | **manager** 39:16 45:4,7,9 |
| **kinds** 25:16 92:4 121:5 | **lawyer** 187:2 237:7 | 176:10 189:21 191:17 | 215:5 223:13 227:16 | 302:11 |
| 127:19 | **lawyers** 57:16 68:2 | 194:9 209:4,10,16,21 | 239:11 244:19 245:5 | **manner** 190:14 |
| **knew** 20:2 124:7 183:2,7 | **laying** 48:10 | 212:11 214:20 215:21 | 250:6,19 252:2 254:19 | **March** 1:12 27:14 119:2 |
| 186:5,7,9 218:9,10 | **lead** 51:4 | 216:20 219:21 221:17 | 274:15 276:19 281:15 | 257:4 |
| 267:15 | **leafing** 118:5 | 225:12 227:13 228:12 | 292:7 | **mark** 300:2 |
| **knocking** 48:20 | **learned** 21:16 38:12 | 231:12 235:9 237:5,18 | **looked** 13:16 43:19 47:3 | **marked** 24:3,7 26:20 |
| **know** 10:9 11:18,21 | 123:2 125:1 | 238:1 239:1 242:11 | 50:14 61:1 70:7,14 | 27:3 55:19 56:2 77:5 |
| 20:21 26:18 36:18 37:3 | **leave** 114:14 151:2 | 244:11 251:6 253:11 | 131:2 292:10 | 77:15 82:12,16 84:6,10 |
| 38:8 41:8 42:7 43:16 | 156:14 | 255:9 256:18 259:15 | **looking** 28:16 31:13 42:4 | 90:3,7 92:10,14 99:10 |
| 45:17 46:2,14 48:10,12 | **leaves** 243:18 | 273:15 274:8 275:12 | 47:1 54:11,12 96:1,7 | 99:14 162:1,4,5 163:20 |
| 49:2,14,16 55:6,10,18 | **leaving** 66:12 122:14 | 275:17 282:14 284:10 | 103:12 110:12 199:11 | 164:2 165:1,4 166:21 |
| 57:5,6,16 58:8 60:10 | 151:14 152:1 272:15 | 286:4 288:4 290:12 | 202:1 209:13 230:19 | 167:3 172:21 173:3 |
| 60:10 62:2 65:6,7 | 272:16 | 291:17 300:5 306:20 | 236:5 241:8,17 242:4 | 176:9,12 194:8,11 |
| 67:17 72:8 76:8 78:11 | **Lee** 195:19 | **line** 13:6 54:6,11 94:16 | 247:9 248:20 276:9 | 209:20 210:2 212:10 |
| 81:6 83:11,13 84:21 | **left** 69:8 114:15 127:6,11 | 95:6 97:15 98:9 105:5 | 291:3 292:8 305:7 | 212:13 214:19 215:1 |
| 86:15,17 87:10,11 89:1 | 150:8 151:8 152:6,9 | 125:2 174:16 205:13 | **looks** 50:15 70:10 78:5 | 215:20 216:2,19 |
| 89:1 91:8 94:18,19,21 | 181:6,7 184:5 219:3,8 | 221:3 222:6,10 223:14 | 90:8 98:9 119:18 | 219:20 221:16 225:11 |
| 95:2,3,20 96:10,14 | 236:3 285:10 | 224:6 226:11 240:13 | 164:14 195:13 210:3,5 | 227:12,15 228:11 |
| 100:11,20 101:10 | **left-hand** 259:17 | **lines** 25:16 37:7 38:7 | 211:1,17 215:4 216:3 | 235:8 237:21 238:3,21 |
| 103:21 104:15 109:19 | **legal** 57:17 | 81:13 121:12 139:9 | 217:1 220:12 223:1 | 242:10,13 244:10 |
| 109:19 115:3,17 116:4 | **legislative** 297:2 298:13 | 144:4,16 145:16 | 230:17 235:11 243:12 | 251:5,8 255:8,11 |
| 117:10,18 118:17 | **letter** 3:11,12,21 50:15 | 203:14 205:21 227:5 | 250:6 257:1,2 274:10 | 256:17,20 259:14 |
| 120:6,11 123:4,9 126:3 | 72:13 82:17 83:2,7 | 293:3 294:5,5,18 295:3 | 278:21 281:14 290:16 | 274:6 275:16 282:13 |
| 126:21 127:8 133:21 | 84:11,16,18 87:5 165:8 | **list** 5:11 47:12,20 48:1 | 290:17 291:8 | 282:15 286:3 288:3 |
| 135:8,13,14 137:12 | 167:4 169:2,3,4 171:14 | 49:16 50:1 88:1 220:18 | **lose** 126:7 128:1 285:13 | 290:11 291:16,19 |
| 140:1 143:7 146:20 | 177:14,20 229:2 | 260:1,14 266:20 | **losing** 269:21 | 300:4 |
| 153:14 155:5 162:12 | 241:20 274:18 284:3 | **listed** 223:9 | **loss** 172:14 223:8,20 | **market** 23:10,15,16,20 |
| 165:15,15 166:12 | 292:2 | **little** 16:10 22:12 26:6 | 225:5,6 232:12 233:2 | 35:14 36:10 38:3 39:12 |
| 168:12,13 169:20 | **letterhead** 84:13 167:4 | 33:11 36:17 51:2,13,17 | 234:10 | 50:4 76:1 115:15 157:7 |
| 171:4 177:12 186:9 | 220:7 | 57:12 101:2 106:5,7 | **lost** 113:10 121:17 147:11 | 161:14 213:19 214:11 |
| 192:9 193:12 195:13 | **letters** 47:3,4,5,8,13 48:9 | 133:15 134:1 138:12 | 262:10 265:5 | 266:11 278:12,20 |
| 195:18 196:11,17 | 83:12,17 | 157:2 178:14 203:1,2 | **lot** 45:12 48:8,9 68:4,19 | **marketer** 42:13 |
| 198:2,2 202:19 206:14 | **let's** 15:11 68:16 101:16 | 206:1 215:8 259:20 | 107:17 112:18 146:8 | **marketing** 12:14 20:13 |
| 209:2 211:19 212:5,20 | 103:15 125:4 218:12 | 278:10 290:14 | 171:3 | 51:19 53:5,10 54:4,16 |
| 213:13 215:2,11 224:9 | 261:20 299:9 | **live** 287:18 | **loved** 29:6,7 | 223:4,11,15 224:20 |
| 224:11 225:4,8 231:16 | **level** 8:15 94:4 96:2 103:8 | **LLP** 2:5 | **low** 177:3,4,8 | **marketplace** 116:1 |
| 233:7,17,20 234:5 | 117:20 153:2 154:1 | **loan** 3:10 78:2,3 79:15,20 | **lower** 134:3 | 296:19 298:10 |
| 235:1 236:20 237:15 | 294:6 | 80:6,15,20 81:4,5 | **Luanne** 13:5 | **markets** 91:14 160:7 |
| 241:7 242:8 243:19,21 | **levels** 240:1 | 175:8,15 176:4 184:10 | **lucky** 273:11 | **marred** 51:15 52:14 |
| 249:17 252:4 253:20 | **leveraged** 131:2 135:1 | 207:16 208:2 232:3 | **lukewarm** 49:3 | **Maryland** 1:3,11 2:14,20 |
| 254:6 258:16 261:11 | **liabilities** 59:19 60:4 | 233:10,10 246:5,12 | **LYMAN** 2:17 26:13 28:9 | 7:13 26:10 209:3 |
| 266:12 267:21 274:14 | **liability** 63:20 76:15 | 248:21 249:4,13 | 29:19,21 31:10 36:20 | **Mason** 11:2,12 |
| 287:8 303:12 306:18 | 124:19 125:5,10,12,14 | 251:11 259:4 | 60:7 61:18 65:3 71:16 | **match** 120:1 |
| **knowingly** 102:8 | 125:21 126:2 | **loans** 138:12 175:15 | 77:12 136:20 137:3 | **matched** 142:17 |
| **knowledge** 55:8,12 225:2 | **license** 78:17 | 207:14 214:12,16 | 140:1,4 168:2 173:19 | **material** 43:7 |
| **known** 180:8 | **licensed** 47:16,18 268:4,4 | **located** 17:11 203:15 | 174:2,8,11,15 189:17 | **materials** 43:18 |
| **knows** 71:16 | 268:10 279:3,3,9,10 | 205:13 | 191:15 209:2,6,14 | **math** 43:20 171:20 |
| **KORTE** 2:10 77:13 | **licensing** 47:14,15,18 | **location** 16:20 17:4,11,15 | 218:3 236:18 237:13 | 230:18 241:12 |
| **Kurt** 66:16 | 15:6 266:3 268:3 279:2 | 17:18 18:3,4,9,10,14 | 253:5 273:11 275:10 | **matter** 307:6 |
| | 226:21 126:2 | 18:17 19:4,20 32:2 | 284:3 307:13 | |
| | **lied** 306:9,12 | | | |

BRENDA DIANE TAMARIZ-WALLACE       MARCH 4, 2010

maximize 206:8 207:10
maximizing 110:17
maximum 171:16
mean 12:3 14:15 21:18
  22:6 23:15 34:21 38:11
  38:17 40:17,21 41:4
  43:21 48:16,17,21 54:7
  54:21 65:19 75:18
  78:21 91:17 92:3,6
  94:18 95:4,14 97:10,11
  101:21 104:11 106:10
  106:13,15 109:4 110:5
  110:21 114:7 117:15
  118:3,12 120:9 124:10
  124:12 127:13,21
  130:21 140:8 144:12
  152:21 153:8 157:16
  162:21 174:9,11
  178:18 179:9,20
  190:20 192:10 193:10
  194:6 195:12 196:16
  199:11 200:10 203:20
  216:10 218:14 220:6
  221:9 224:12 233:20
  234:4,9 236:13 240:16
  241:3,19,20 252:20
  253:1,20 254:18
  257:15 258:11 259:2
  260:7 266:5 271:4,20
  272:3 279:8,18 282:6
  282:19 295:6 303:17
meaning 93:7 124:17
  192:19 257:8
meaningful 190:13
means 60:11 107:21
  122:11 144:17 237:8
  241:7
meant 34:20 275:10
  304:6
measure 219:5
mechanism 258:8
mediation 149:1,2,4
medical 10:3,4,8,10
medication 10:13
meet 45:7 73:11 98:5
  185:7 187:7,10,12
  188:4 192:12 301:4
  303:3 304:10
meeting 3:15 5:13,15
  21:7 41:8 42:5,10,15
  43:14 45:1,20 92:16,20
  93:1,9 96:10 97:19
  99:17 215:6,7,10 260:1
  260:7,9 274:3,13
  275:19,21 276:13,14
  291:2
meetings 45:11 96:15
  169:6,15
members 155:10,11
  285:10,11 298:18
memo 3:20 6:1 235:18,20
  276:19 282:18 291:20
memorandum 165:5,13
  173:4
memory 43:1
mention 243:14,15
mentioned 198:21 200:3
  255:19 278:8
merger 301:21
messages 94:2
messed 304:16
messes 126:5

messy 306:16
met 42:8 45:3 80:18
  148:21 149:7 171:10
  192:8 254:15
methodology 126:20
mid 147:3 158:19 177:3,4
  283:5
middle 105:5 155:16
  157:7 299:21
midst 156:18
midterm 125:7
migrate 137:16
migration 146:18,20
migrations 147:6
Mike 56:21 57:1 138:14
  138:15
million 46:15 70:11,16
  73:21 74:6 86:5,8,18
  104:1,16 105:7 106:1
  107:2,3,19 108:8,19
  108:20,21 109:7,8
  127:21 128:15 129:15
  129:17 132:19 135:12
  139:11 143:5 144:8,9
  153:9 154:2 166:1,13
  170:15,16,17,19 172:3
  175:9,9,12 177:4,5,6
  178:3,6,11,13,14,19
  179:20 180:2,2 181:9
  181:10,11,11 183:8,10
  205:21 206:20 220:19
  221:8,12 226:10 229:1
  229:3,5,6,13,14,16,18
  229:19 230:2,3,9,18,18
  231:15,17,19 232:6,15
  233:8,9,12 234:3,5,6,8
  236:2,3 237:2 245:7,7
  246:9,10 249:13,14,15
  251:13 256:5,7,11
  258:13 277:9,14,14
  291:8 302:18 304:1
mind 15:13 28:19 37:19
  42:3,6 43:7 58:15
  88:11 130:10 148:5
  169:16 183:11,14,16
  204:4 205:3 287:3
mine 100:14
minimum 117:15 217:18
  218:4 238:10
minor 76:18
minus 301:17 304:1
minute 31:2 48:14 51:11
  83:3 102:14 117:10
  181:6 199:9 240:1
  254:18
minutes 254:19
misinformation 199:11
mislead 197:18 220:6
misleading 197:2 198:7
misled 305:15
misplaced 275:7,11
misrecalled 150:5
misrepresented 153:4
missed 262:19,20 263:1
missing 272:6
misspoke 222:21
mistake 23:21
mistakes 23:18
mod 126:6
mode 265:1
model 162:9 267:2
money 87:7 96:12 98:19

146:9 164:17 166:9
  190:3 213:19 214:9
  219:4 240:5 287:5,18
mono 148:7
month 44:16 291:10
monthly 45:11
months 96:21 97:17
  98:12 101:8,8,14 103:1
  103:9,12,13 118:13
  119:12 123:14,19
  124:5 125:6,10,19
  127:10 141:12,13
  225:21,21 226:21
  259:20 270:5 277:17
  290:15 291:10 300:13
Moran 4:14 8:1,4 9:3,14
  33:13,18 48:14 49:7
  50:20 55:5 58:11 66:13
  69:2,10,13 71:21 72:2
  72:7,16,16 75:15 76:17
  80:2 82:5,7,18 85:12
  88:7 91:18 95:17 100:8
  102:11 103:4 106:7,14
  107:1 108:12,19 109:6
  109:11 110:4 111:17
  111:21 112:21 113:3
  114:12,18 120:5,6
  121:8 122:7,14 127:10
  128:1,9 129:3,14 130:1
  131:9,10 134:13 136:4
  136:9,17,20 137:1,6,17
  137:20 138:7,17,18
  139:17,19 140:1,5,6,10
  140:19 142:12,17,19
  143:2,13,16 144:8,11
  144:17,19,20 145:9,13
  145:19 146:7,19
  147:12 149:6 150:18
  151:12 158:14,20
  159:5 160:20 163:17
  164:4 165:5,11,14
  166:15 167:14 169:6
  169:10,11,17 170:1,6
  171:1,4,15 172:8,9
  178:4 179:12,17 180:1
  180:11,20,21 181:8,16
  181:21 182:5 183:3,19
  184:5,6,11 185:8 186:7
  186:16 187:5 188:12
  188:12 189:11,13
  190:20 191:10 192:2,6
  193:16,18 194:1 204:1
  204:8,19 206:14,15
  210:8 211:14 216:13
  217:6,16,16,18 219:16
  228:16 230:2,21
  231:19 232:1,2 233:9
  234:6,10,19 236:3,5,15
  239:4,20 240:18 241:9
  241:10,15 244:17,18
  244:21 247:13,14,21
  248:5,7,8,11 250:18
  256:11 257:8 258:11
  259:10 262:6,8,15
  264:20 265:9,19
  266:21 267:2,11
  268:11,17 269:8 275:2
  277:11 279:10 280:5,7
  280:14 283:17 284:2
  284:13,16,17 285:3,4
  285:14,18 287:20
  288:9,15 289:1,8,12,16

289:18 291:3,12
  296:12
Moran's 50:12 83:19
  145:11 167:15 182:17
  241:1
morning 7:8
mortgage 254:2,4
mother 151:15
move 39:1 69:5 126:16
  212:7 281:4 291:7,9
moved 145:20 146:1
  181:1
move890 145:11
moving 116:15 144:15
  145:17 189:15
multi-lining 196:5 203:7
  203:11
mutual 1:6 51:8
mutually 40:6

_____ N _____

N 7:1
NADP 14:7 15:11 24:12
  27:8
name 7:10 52:6,10,13,16
  52:18 58:17 71:12,16
  100:2 131:5,19 132:1
  136:20 138:13 139:1
  174:3 195:19,19 196:6
  208:12 209:5,6,7 223:5
  248:11 269:14 289:8
named 187:5 195:19,20
  195:20
names 223:6
NAPD 19:7
narrative 204:10
Nationwide 1:6 9:8 13:16
  14:1,2,6 15:12 16:12
  18:8 20:9,11 21:3 22:1
  22:10,16 23:2 24:19
  26:7 28:3 29:2 31:20
  33:17 34:6 37:8 39:8
  39:15 40:4 47:21 62:13
  63:20 64:12,15,16,18
  65:10,14 73:1,14 75:9
  75:14 76:4,13 78:18,19
  88:10,14,20 90:14 93:5
  93:21 95:16 96:2,7,13
  97:7 98:10 100:17,20
  100:21 101:19 102:1,7
  102:10,18 103:6 106:8
  106:12,14 107:6 108:3
  108:8 110:17 111:5,20
  112:3,20 113:18 114:7
  114:16 116:2,2 117:1,5
  117:8 120:17 121:2,11
  122:10 123:12,14
  126:15,19 130:4 131:4
  131:11 134:6,14,17
  135:15,21 136:13
  137:11,12 143:4,6,14
  144:2,6,10 145:1 146:3
  147:18 149:7 151:1,2,8
  151:9 156:16 157:6,16
  157:17 158:1,15
  160:12 162:8 166:1,13
  166:18 168:15,19
  175:7,14 176:2,3,3
  179:15,21 180:8
  181:18 182:4,8 183:19
  184:8 190:17,19 191:7

192:12 194:5,19
  201:14 202:7,16,19
  203:12 204:14 205:16
  206:5 207:13 208:7
  210:8 212:18,19 213:8
  213:20 227:5 229:4,7
  229:10,15,19,20 230:4
  230:16,19 231:2,5,14
  233:10,11 234:21
  236:2 239:18 240:11
  240:12 243:15 245:14
  246:8,19 247:4 250:9
  251:12 253:13,14
  254:10 259:4 265:11
  266:9 268:4,13 277:16
  277:18,19 278:5,13,16
  279:3,9,17 280:4
  281:14 282:17 283:9
  283:15 285:7 288:8
  289:4,15,17 291:6,8
  293:7 296:19 297:1,4
  298:11,12,15 299:5
  301:7
Nationwide's 61:10
  85:13 98:13 103:11
  134:10 182:7 186:21
  205:9 268:20
natural 21:6
naturally 281:3
nature 12:10 15:5,14
  19:12 92:3 132:6 148:5
  214:14 265:16 284:18
near 104:19 116:9 175:6
  249:12
necessarily 37:15 38:13
  76:5 102:8 104:11
  109:12 112:7 144:12
  180:5,6 282:10
necessary 202:15
necessity 282:8
need 10:6 12:19 26:16
  28:17 29:17 103:13
  118:19 160:14,15
  177:21 202:3 207:16
  208:2 213:10 233:15
  243:18 278:11 285:4
  291:9
needed 153:7,18,21 202:5
  246:21 252:8 284:15
  284:16 289:5,6
needing 23:5
needs 21:20 38:20 199:14
negative 256:6
negatives 260:13,14,17
  266:21 268:6
negotiate 169:6
negotiating 168:10
  187:16
negotiation 70:3
negotiations 73:9 171:12
  172:8 227:21 248:4
negotiator 70:4
neither 218:9
net 110:13,14
networking 188:9
never 30:2 154:18 155:6
  156:1 194:2 204:3
  267:15 271:11 295:13
new 14:7 15:17 39:11
  42:1 78:8 107:14
  113:17 115:6 121:16
  121:18 122:3,4,10,15

123:10 148:2,17
151:14 153:11 155:5
155:21 156:19 158:2,4
158:6 159:7,11 184:13
202:10 205:1 207:14
265:3 273:20 277:9,19
278:2,4 280:6,7,13
281:10 294:11 299:15
301:16,18,19 304:2
**nice** 51:8
**niche** 52:1
**nine** 96:20 97:17 98:12
196:6
**noes** 30:1
**non** 293:6
**Noncompetition** 247:10
**noncompliance** 151:6
**nonexclusive** 103:4
**nonexistent** 265:14
**nonpayment** 59:18
**nonrenewed** 159:10,15
**nonstandard** 132:12,14
133:8,15 134:8 135:17
137:10
**normally** 121:1
**Notary** 7:4
**notation** 223:13
**note** 5:2,4,8 61:18 86:3
168:2 210:13 236:6
245:9,12 246:6 247:1
251:10 254:11 256:6,7
264:19 282:21
**notes** 3:13 4:21 5:1,3
68:20 90:9,15 92:15,19
94:13 95:2 164:11,12
215:2,3,5,15 216:3
217:1,4,6 227:16
228:14,17 235:11,15
235:16,18 254:1
256:10 260:6 274:10
275:18,20 276:3 277:1
**notice** 13:15 25:18 26:11
28:6 59:18 61:13 99:17
118:6 161:5,9,19 249:5
**noticed** 220:6
**November** 210:4 286:20
287:11 291:21 293:17
297:10
**number** 25:2 49:14 60:18
77:16 82:19 104:21
105:5 128:21 129:10
133:9 149:5 152:6
198:13 212:19 217:15
222:7,10 226:17 230:5
236:9 239:16 240:8,11
241:5 248:19 250:4
258:18 263:6 267:7,16
275:2 276:20,21 277:1
292:10,10 296:15
301:13 306:1
**numbered** 105:18 108:16
165:18 248:20
**numbers** 31:13 46:14
107:9 109:16,18,21
128:10 130:3 182:8
210:19 250:6 304:16
**numerous** 94:1
**nurse** 12:8
**nursing** 12:5,7,10

---

**O**

---

**O** 7:1
**objection** 26:13 28:9
31:10 36:20 60:7 61:19
65:3 168:2 174:12
189:17 191:15 231:8
236:18 237:13 253:5
284:3
**objections** 174:16
**objective** 204:12,16
**objectives** 96:19 97:16
201:17
**obligation** 296:11
**obligations** 59:20 60:5
256:4
**observation** 279:15
**observations** 276:6
278:16,19
**observed** 59:14 158:6
**obstacles** 95:19
**obvious** 54:19
**obviously** 29:5 106:15
125:18 228:1 292:15
**occasion** 9:21 188:4,6
286:18
**occur** 64:3 142:6 154:8
282:2
**occurred** 115:13 137:12
142:8 147:6 150:17
179:16 184:20 218:21
**occurrence** 125:4
**occurring** 185:1
**occurs** 240:3
**October** 9:19,20 167:5,14
175:4
**odd** 12:3
**offer** 58:4,7
**offered** 20:17
**office** 16:17 17:12 18:2
19:10,21 32:19 35:12
35:12,20 36:8,9 45:10
80:9 81:9,10 82:4
120:4 148:10 149:13
191:21 193:9 203:21
204:5 210:10,20 252:5
265:14 283:5 303:7
**officer** 8:7 54:8 66:14
282:17
**officers** 8:6 66:11 213:2
298:19
**official** 54:18
**oh** 2:7 86:13 91:11
115:20 117:9 209:1
213:3 221:4 222:1
227:4 243:9 244:5
255:17 260:3,3 280:15
284:11 285:15 304:2
**okay** 8:3 10:19 11:15,18
13:4,7 14:14 20:15
21:1 32:15 33:20 34:3
36:2 39:1 46:7,18
57:15 59:2 60:16,19
62:9 63:13 66:19 71:17
71:19 75:4,6,21 79:3,8
80:8 84:5 85:7 87:15
89:17 91:11 96:18
97:20 98:7,16 99:7
100:19 103:10 105:3
111:13 119:10 128:12
129:1 132:4 135:20
138:2 152:8 160:5
166:19 169:18 171:13
173:16 174:14 175:18

176:7 177:15 182:3
183:1 186:12 190:9
192:1,9 196:2,16
197:12 198:1 200:7
201:11 202:2 203:8
204:3,9 209:1 212:2,4
213:3,5 214:3 215:14
216:17 219:15 220:17
221:4,12 224:15 226:6
227:8 229:13 230:13
232:4 234:13,16
235:21 237:6,19
241:19 242:6,17
243:11 244:7 245:5
247:8 249:2,20 254:11
255:1,6 258:14 259:3,9
259:12 261:10 262:9
263:6 265:4 267:10,13
267:16,19 268:2
269:11,17 270:12
271:14 272:11,17
273:16 274:2 275:1
276:21 277:2,21 278:7
279:21 284:11,15
285:16 286:1,16 290:2
293:14 294:9 303:8
305:2
**old** 81:19 123:20 289:16
**once** 62:7 92:2 114:6
129:7 160:8 179:3
190:10 204:14 224:21
227:20 264:7 299:8
**ones** 50:10
**one-and-a-half** 170:17,19
175:9 181:8,11
**one-page** 164:3 255:13
**one-year** 15:1
**ongoing** 284:19
**onsite** 187:5
**on-call** 9:5
**open** 103:3 208:9
**opened** 18:3 32:1 35:5,11
35:20
**opening** 80:8
**operate** 285:12
**operated** 26:5
**operating** 35:1
**operation** 36:11 72:19
80:19 85:12 123:13
253:9
**operations** 9:11 54:16
76:8 88:7 89:13 105:15
127:15,16 145:15
162:9 191:13
**opinion** 176:15 178:17
236:19
**opportunities** 260:13
**opportunity** 21:5 40:10
40:13 41:3 44:1 89:4
98:5 107:13 116:18
117:6 146:6 195:10
205:1,16 206:4 207:9
207:10 208:15 267:4
**opposed** 76:9 142:13
**opposite** 302:18
**optimistic** 107:17
**optional** 201:5
**order** 79:4 102:7 150:7
213:10 241:9 252:8
264:12 278:12 289:6
**ordinary** 74:8 153:7
**organic** 130:6

**orientation** 120:15
**oriented** 8:19
**original** 24:12 85:5
145:10 270:20 294:5
303:10 306:3
**originally** 267:4 286:15
305:17
**outlets** 183:20,20
**outline** 3:19 5:15 275:21
276:13
**outlined** 301:5
**outset** 271:12,13
**outside** 99:21 115:16
**overall** 12:14
**overcome** 113:7 115:15
115:21
**overview** 228:16 290:21
291:1
**owner** 111:16,17,18
119:13 133:3
**owners** 124:6
**ownership** 220:21 221:9

---

**P**

---

**P** 7:1 242:19 243:9
**package** 40:3 45:19 112:6
234:3 252:15
**packet** 40:5 42:9 43:15
43:19 44:2 46:17 47:9
47:11
**page** 3:2,6 24:13,15 25:1
27:11,17,17 30:5 56:8
59:2,3 60:18 78:7 79:8
79:14,15 82:20 86:3
91:12 167:10,11
170:13 171:13 176:19
176:21,21 177:13
178:1 196:1,4 197:7
198:12,13,14 199:10
200:4,9 202:21 203:4,6
204:9,10 210:2 211:1,2
211:3,14 222:5,5,12
223:11,12 224:2 226:8
245:2,3,5 247:8 248:18
248:19,21 249:3
251:16 257:1 275:1
277:8 280:17 288:13
296:14 298:7 300:10
300:15
**pages** 27:10 62:19 63:10
63:11 121:3,4,10,12
196:3,4 250:4 288:6
**paid** 19:4,10 53:9 80:16
80:17 86:10 87:6,10
88:14 104:20 135:3,5,7
135:9 170:5,17,18,19
171:14 172:4 175:13
207:1 219:1 225:7
245:8,10 246:15 259:9
**paper** 53:20
**paragraph** 25:1 27:17,19
27:20,21 60:17,21 61:7
61:9 62:18 64:1 84:14
90:20 93:21 95:5,5
96:18 104:15 105:5,19
107:15 108:16 111:15
165:19 167:19,20
171:14 175:6 213:4,7
236:4 239:16 245:11
247:9 278:1 283:2
296:15 298:8 301:2,12

**paragraphs** 25:2 105:3
165:19
**paralegal** 77:8
**parameters** 18:11
**parenthesis** 220:20 221:8
**part** 25:4 59:7 62:17
63:19 77:3 78:1 88:13
148:11 163:8,12,13
172:3 184:9,12 185:2
187:3 193:3,12 194:20
209:7,8 218:15 223:7
223:14 227:2 240:6
244:1,3,5 246:16 255:5
259:9 278:9
**participant** 10:1,2
**participate** 45:5 134:19
169:5
**participating** 9:17
**particular** 17:11 37:19
39:14 42:4,5 43:5
55:14,15 66:14 93:15
94:6 197:5 199:10
261:8
**particularly** 41:9 118:3
125:4 267:21
**Partly** 261:17
**partners** 97:5
**partnership** 29:2 222:20
223:1,10
**partnerships** 223:8
**parts** 211:21
**party** 85:2
**part-time** 8:12,20 10:2
36:7 129:2
**pass** 15:8 183:2
**path** 11:21 12:3
**patient** 12:13
**Patterson** 290:9
**Paul** 302:11,14 303:3,14
304:20
**Pause** 274:7
**pay** 19:21 20:1 53:15
87:2,8,13 132:20
134:21 141:2 170:4,5
178:7 207:18 234:20
239:17 240:6 304:12
304:20
**payable** 166:3 229:5
236:6
**paying** 86:20 110:15,19
178:3 184:9 233:10
234:21 254:3
**payment** 5:10 6:2 54:1
59:16 166:2 178:4
257:6,18 258:1 259:7
292:3,12 298:2 300:7
300:16 301:8 304:13
304:21
**payments** 70:9,17 166:9
169:21 232:2 234:20
245:14
**payout** 217:20
**PDF** 200:11,18
**peak** 129:3 149:18 152:2
**Pearce** 5:2 228:16 235:19
**penalty** 219:2
**pending** 68:13
**penetration** 205:15
**Pennsylvania** 88:20
**people** 48:17 67:4 72:1
121:7,7 122:2,6 147:8
148:13 150:8,9 156:14

189:3,3 191:12 265:2
265:19 268:17 285:5
306:15
perceive 154:21
percent 73:4 74:13,13,16
74:16 86:6,18 98:1
103:21 104:2,16 105:7
105:21 107:5 110:6
111:9 145:11 171:17
179:14,21 180:20
182:1,4,6,17 186:2
188:13,19 221:9 229:5
230:15,17,19,21 231:1
231:3,6,7 241:13
264:16 294:6,17 295:8
295:12 301:8
percentage-wise 264:14
performance 59:12
171:19 199:13,19
performed 29:13 59:14
period 21:9 31:19 70:3
102:21 126:10 127:8,9
148:9 149:11 152:3
172:10 178:5 225:17
268:21 270:9 272:1,9
272:12 281:8 301:6,17
301:21
permission 115:4 271:7
285:17
permit 102:2 187:9
Persard 302:11 303:15
306:8
person 98:8 147:7 149:15
personable 49:5
personal 4:15 10:4
138:12 139:8 144:4,16
145:16 202:8,11,18
205:13,20 220:3
221:19 286:8 287:2
294:4,5,18 295:3
personally 10:8 56:15
218:17
personnel 284:9
person's 209:5
perspective 122:5,6
Pessin 2:11
phase 233:6
phases 148:14
phone 45:10 48:8 49:3,6
243:19
phrase 65:6
Phyllis 243:9,14
physically 192:1,3,5
physician's 13:1,5
pick 69:19 125:21 126:3
126:11
picked 100:17
picking 100:21
picture 3:19 234:2
pie 109:17 116:8
piece 110:11 115:6 263:7
pieces 109:16
place 131:7,20 132:5
133:4,9 136:2 138:3,15
142:7 180:9,10,19
208:14,21 209:3
241:18 272:15
placed 135:18,21 180:14
289:15
Plaintiff 1:7 2:3 7:6
plan 3:18 4:5 38:7,8 48:8
92:7 104:6 162:7,16

180:20 181:2,3 185:2
194:13,20 195:2,9,14
195:15 196:5 197:1,5
197:17 201:20 204:15
218:15 228:16 244:1
271:12,15 272:7 290:3
296:9 304:18
planned 17:6 240:17
297:13
planning 109:18 203:7
plans 18:12 143:19
platform 154:15 155:5,13
155:14 156:5,10,13,15
158:3,15,17,21 159:7
189:15,16 198:17
199:6 273:5
please 7:9 8:13 24:11
56:5 66:9 176:14
210:13 283:18
plus 87:12 170:15 171:17
172:3 178:3
PNC 241:1
point 9:16 16:1,2 22:11
34:5 43:16 47:18 57:13
95:15,19 103:10 116:5
124:15 141:13 150:1
152:11,14 163:10
203:5 213:16 215:13
226:13 231:20 234:14
235:4,21 239:15 269:2
281:3 293:4,15 296:15
297:17 305:16
pointed 46:20
pointing 227:8
points 4:12 5:13 215:6
216:5,12 217:15 260:8
274:12
Points-Meeting 4:9
policies 25:15 47:7 123:9
123:10,10,12,21 124:7
124:20 137:11,13
148:2,17 157:12,13
266:17,18 284:21
297:4 298:15 301:13
306:1
policy 12:9 123:15
126:9 221:12 264:3
296:21 298:12 299:7
policyholders 22:19 64:7
64:10,18 203:12
pondering 239:7
portfolio 76:18
portion 239:18
position 32:10 54:8,9
93:5 102:9 103:12
168:10 205:15 206:4
215:12
positioned 184:6
positives 266:21 267:6
278:8
possibilities 21:12 145:2
possibility 201:10
possible 83:17,18 143:18
164:16 182:21 187:7
193:18
possibly 261:1
post 82:6 258:7 293:16
293:18 295:14 296:3
296:10
posture 265:1
potential 30:11 43:19
110:17 191:11 275:3

practical 307:6
practice 12:6,12,15,17
13:2 83:16,21 114:7
practices 125:17
preacquisition 104:6,12
185:16 188:7 258:3,10
259:6 274:20
precise 226:17
preconversion 295:19
300:16 301:8 304:12
304:21
preconvert 300:15
predict 278:1
predicted 287:17
preferable 165:21
prefix 82:21 164:7
preliminary 167:17
263:15
premium 15:20 21:12
22:1 31:8 38:19 40:7
61:10 66:12,13 73:19
74:6 77:4 107:1 109:7
118:1 128:1,8,14 129:4
134:6 179:14 180:21
181:10,12 182:17
188:14 204:14 229:7
229:19 232:1 236:5,14
236:14,16 237:3 250:8
264:2,3 279:17 301:4,9
301:15
premiums 23:3 26:8 28:4
98:1
preparation 225:3
preparatory 278:13
prepare 224:10 225:1
prepared 89:12,18
117:14,20 164:12
211:19,20 216:12
230:6 235:16 240:12
260:6,8 267:19
preparing 195:2 202:9
prepay 104:9
prescribe 25:9
present 49:1 205:15
206:3,4
presentation 42:5 43:11
presentations 42:3
presented 40:9,13 41:1,2
41:4,7 43:21 46:16
155:17 156:4 292:15
presenting 41:5,19
president 8:5 93:7
press 42:21
pretty 30:1 73:15 130:13
133:14 141:20,21
152:11 153:3 228:2
278:17
previously 156:19
preying 117:6
price 70:9,11 84:11,19
86:4,5,6,7 115:14
140:13 164:17 165:21
166:12 169:20 170:13
172:4 178:16,19
229:13 231:7 245:7
249:12 256:4 270:1
296:12
prices 25:9,10
Pricing 61:2
primarily 81:13,14 276:5
primary 12:12 158:18
204:21

prime 229:6
Prince 209:8
principal 34:17 49:2 64:6
principals 49:15
printing 53:21
prior 26:11 27:16 28:6
52:16,21 55:5 60:21
61:13 145:4 185:3
226:12 295:4
privilege 68:14
pro 89:6 103:15 109:20
109:20 210:9,11 211:2
211:5,15 212:1 230:6,7
233:16 240:12 250:6
250:11 279:12
probably 9:19 18:4 36:1
59:1 90:10 104:1 128:3
130:13 140:6,10
143:10 224:17 307:7
problem 8:18 37:14
66:11 113:6 197:3
200:3 262:18 299:10
299:11
problematic 198:8
problems 37:21 197:19
232:13
problem-solving 54:19
proceed 168:9
proceeding 307:14
process 48:5 102:12
120:20 121:21 124:16
126:12 147:17 150:8
151:17 152:1 169:9
170:8 174:4 193:13
203:13 261:15 271:8
291:13
processes 121:15 202:10
265:16 267:2
processing 298:16
produce 302:18
produced 15:20 46:2
85:2 164:5 174:12
210:18,19 238:3
producer 32:17 36:8
71:11 147:19,20
producers 35:6 71:8 72:7
72:10,11 145:17,21
146:2,14,18 147:9,11
147:16,18 149:19,21
150:12,20 151:4,14
152:1,19 185:7,19
189:13 190:6 232:12
283:13,20 284:9
producing 74:21 75:9
product 22:7,8 37:10
production 80:18 82:21
173:17 186:3 304:7,9
304:11 307:5
productively 217:17
218:3
products 61:2 81:12
120:19 163:1,2,5
professional 15:6
profile 205:12
profit 110:14 222:11
241:2
profitable 31:18 34:14
41:15 279:17
profitably 39:10
profit-loss 222:8
program 13:17 14:3,7,8
14:21 15:1,1,7,11,14

16:5,8 17:7,10 18:1
19:4,8,19 20:10 29:10
39:13 40:1,6 42:1 43:6
43:8,12 44:3 50:9
85:19 101:14 104:8
117:15 130:16 152:12
153:3 157:9 162:10
180:16 186:21 194:21
248:21 249:4 253:9,18
258:4,10 281:16,19
283:9 292:20,20
294:21
programs 15:13 20:17
37:12 53:6 201:4,15
202:10
progress 68:21 69:2,20
93:13 164:18
progressed 176:1
project 155:21 156:20
projected 230:9 296:8
projections 73:3 250:8,8
projects 53:14
promise 29:11
promised 124:16 125:18
184:18 185:2
promissory 5:7 217:6
236:6 245:8,12 246:6
251:10 256:6,7,10
proper 272:19
properly 101:15 237:4
257:20 262:11
property 14:16 236:1
proposal 166:8,9 236:1
proposed 43:8 165:10
249:5
proprietary 120:17,18
protest 59:18
provide 20:9,11 88:2,3,4
89:3 96:3 175:8,15
219:16 234:19 247:5
provided 31:21 63:21
201:1,3 263:13
provides 247:9
prudent 95:10
Public 7:4
pull 285:11,11
pulling 108:20
purchase 33:13 70:9,11
79:17,17 86:5,6,7
108:11,12 119:3 132:7
132:9,17 140:13
164:16 169:20 170:13
172:4 178:19 188:11
190:12 231:6 245:7
248:6 249:12,18
250:12,17 255:14
256:4 257:10 290:4
296:12
purchased 257:8
purchaser 206:15
purchasers 245:13
purchasing 33:15 72:15
purpose 79:16 80:5 89:2
106:11 134:4 167:21
188:18,21 193:16
240:10 284:8 288:20
291:13 292:5 302:5,6
purposes 255:3
pursue 44:13 46:21 49:19
50:2
pursuing 45:15
push 37:9,10,10

**BRENDA DIANE TAMARIZ-WALLACE       MARCH 4, 2010**

pushing 213:9
put 35:6 40:4 47:20 48:1
126:15 134:6 149:20
199:8 276:4 278:10
294:20
puts 196:6
putting 265:2
P.A 2:11,18 4:20 58:18
59:11 60:4 225:16,20
p.m 307:15

**Q**

qualify 101:9 105:6
294:16
qualifying 293:16,18
quantitative 127:18
quarter 166:3 204:16
question 34:19 36:16
43:9 45:6 49:21 57:9
67:18 68:8,12,13 87:3
87:21 108:7 111:14
112:17 129:8 151:13
156:11 169:12 170:2
184:2 193:14 197:16
208:1 211:19 220:1,17
221:5 230:13 231:4
232:20 233:15 236:12
238:17,19 240:7 246:1
257:12 270:2 272:4
276:12 285:2 292:18
questioning 174:16
questions 10:6 56:12
103:18 113:21 165:17
175:1 195:4,5 222:4
253:8 274:17 277:5
306:13
quick 220:1
quicker 266:10
quickly 15:16 252:5
QUINTIN 2:4
quit 172:15
quite 117:13 230:16
280:20 307:2
quitting 146:4,5
quotas 25:13
quote 22:4 115:4 262:11
262:12,18,21 263:3,12
263:16
quoted 263:18
quotes 266:16 296:16
quoting 265:17 297:20

**R**

R 7:1
raise 22:1 23:3 26:8
raised 22:10
Ralph 209:10
range 74:5 86:10,19
110:7 111:9 140:16
177:3,3,3,4,5,7,10,21
300:20
rapidly 152:6
rate 21:13 37:20 88:16
182:12 297:3 298:14
rates 21:12,19 22:2,10
38:9,12,13,15 61:11
110:20 111:3,4 134:3
299:10
ratios 22:4
reach 145:1
reached 152:11,13

reaction 113:19
read 25:4 27:21 59:7 61:8
63:19 64:13 71:1 97:10
118:8 174:8 200:8
221:6,9 237:12 241:3
254:11,13 257:15
260:10 272:2 288:18
293:5,9,10 297:20
299:2 302:6
reading 25:5 26:2 59:21
84:4 87:4 94:11 105:15
109:2,4,9 166:5 170:12
210:16 214:6 221:1
237:9 242:1 254:13,17
291:11 298:20 302:2
reads 77:9 220:20 225:15
ready 252:6 260:20
285:12
reaffirmed 28:3
reaffirming 61:15
real 74:14 106:3 108:6
109:18 113:6 260:12
266:3
realities 119:17
reality 116:10,12,13
117:18 119:14 126:18
233:3 260:17
realization 130:19
realize 92:8
realized 267:4,8
realizing 153:2
really 18:16 37:20 42:21
45:21 54:15 55:18
57:15 68:1 69:6 75:20
75:20 81:8 95:2 115:6
116:4 117:19 127:14
128:5 137:21 174:11
189:12 197:19 202:17
205:3 238:16 245:15
271:19 276:11 290:3
304:6
reason 49:17 57:3,7,19
66:12 68:1 87:15
118:5 143:12 145:3
148:1 200:15 207:2,6
248:6 250:16 252:1
reasonable 117:15
reasons 49:18 148:16
285:8
rebuild 145:8,12
rebuilding 147:17
recall 10:14 39:6 97:21
99:8 118:7 129:10
147:2,6 169:11 246:18
259:11 276:15
recalling 150:11
receive 11:4,13 239:20
245:13
received 18:5 59:8 84:19
96:17 192:3 282:20
receiving 19:13 239:10
reception 32:19
recess 68:17 127:4
209:18
recognition 131:17 289:8
recognize 24:8 27:4 56:3
77:20 84:16 90:9 92:18
164:8 194:15 211:5
216:6 227:16 238:6
239:14 250:3 251:9
recognized 129:19
recognizes 240:9

recognizing 240:9 305:4
recollect 239:13
recollection 20:8,14
47:10 69:6 98:13
129:12 147:10,14
168:17 193:15 217:9
226:20 255:19
recommend 202:7
recommendation 85:14
recommendations 89:10
recommended 85:15
reconcile 296:8
record 7:9 12:20 24:10
26:17 30:1 68:1 77:8
108:10 121:1 137:4
176:13,13 222:16
225:13 243:6 244:14
255:16 259:1 306:21
records 128:4 164:5
recruit 151:14
reevaluated 279:4
Refer 203:14
reference 34:6 47:18
75:13 148:16 165:8
228:5 270:3 290:17
291:7 292:1
referenced 28:18 39:2
198:18 270:20
references 239:5
referencing 97:11 296:15
referrals 145:15 181:7
184:7
referred 270:6
referring 39:6 78:11
101:10 104:3 109:10
128:19 140:5 208:20
261:2 266:6,12 267:14
reflect 275:13
reflected 227:4
reflecting 235:15
reflection 133:20 215:15
reflects 274:17 300:14
301:19
refresh 217:8
refusal 143:4
refused 114:13 126:21
134:14 151:9 302:9
regarding 5:14 253:8
274:13 293:2
regardless 85:7 112:2
146:1 200:14 232:14
regards 283:3
region 73:5,6,8 283:5
regional 17:12 18:2 73:2
73:3 93:7 94:4 96:19
97:19 103:7 252:5
region's 98:1
registered 12:8
regular 93:12 100:18
regularly 73:12
regulations 25:7,9,12
61:3
regulatory 297:2 298:13
reimburse 301:6
reimbursement 301:11
reinforced 97:1
reinstatement 67:13
related 58:14 141:17
228:3
relating 80:2
relations 290:7
relationship 40:12 51:3,5

53:8 248:11 289:3
relationships 172:13
218:6 219:11,12
relative 23:15,16 45:1
relatively 143:8
relevant 23:20
relied 57:14
remain 217:17 218:3
241:10
remaining 174:12 296:11
remember 11:10,11
15:10 18:18 35:15,21
36:2 39:21 42:16 44:21
47:14 48:1,2 52:13,16
52:18,20 71:1 74:1,2
85:3 86:20 87:2,8,12
88:11 90:15 91:2 92:21
100:2,5 135:8 139:15
140:14 141:14 161:7,8
176:5 188:9 239:10
243:17 256:9 258:14
258:17 269:14 274:2
276:7 291:1 296:5,6,7
303:15
remembered 140:16
remind 243:14
reminder 5:11 259:21
275:19
removed 260:21
removing 144:18
renew 280:6
renewal 125:3 126:12
134:3 262:4,13,20
renewals 112:12 149:13
280:13 281:9
renewed 125:5,6
renewing 125:10
rent 19:5
repair 143:12,14
repayments 237:11
repeat 136:19 283:19
repeatedly 72:21 181:19
replace 64:11
REPORTED 1:20
reporter 77:18
REPORTERS 1:16
reports 68:21 93:12 96:9
represent 27:19 61:6
225:20 257:20 285:1
representation 302:16
representations 66:7
represented 121:13
158:12 183:19 248:14
302:14 306:2
representing 78:18 98:5
represents 199:3 216:8
request 5:10 6:2 216:9
257:6 292:3,12 298:3
300:7
requested 79:14 249:13
requesting 292:16
requests 281:14
require 103:9
required 171:7 194:20
201:2 217:14
requirement 107:10
requirements 21:8 80:19
requires 75:1
requiring 247:16
rescue 275:14
research 81:7
resell 263:8

resided 7:14
residential 76:9
resign 261:1
resistance 115:12
resolutions 252:17
resolved 208:10
resource 143:3 204:21
respect 51:9 54:7 83:20
respected 204:20
respective 49:7
response 48:19 49:2
283:9
responses 48:15
responsibilities 97:4
305:10
responsibility 195:18
201:6
responsible 195:17 196:6
196:7,13 201:8,10
218:5
rest 64:13 148:12 211:6
281:18
restabilize 142:18 145:8
restaurant 303:3
restrict 25:14
restructure 145:8
result 201:16
resulted 245:6 269:7
retain 58:8 85:21 294:17
retained 89:2
retainer 87:11
retaining 289:7
retains 25:11
retention 52:9 112:9,11
112:13 116:7 122:16
196:5 203:6,11 294:4
295:3,5,8
rethink 191:5
retirement 261:13
retroactive 305:7
return 4:17 128:12,18
221:19 222:6,12,20
223:1,6 224:3
reunderwriting 155:20
157:21
revenue 19:20 73:2,3
74:3,9 111:19,21
112:13,14 113:12
116:5 128:14 135:2
207:1 211:6,15 237:3
241:2,18 242:5
revenues 250:8
review 251:19 291:5
302:13
reviewed 44:18
revolting 123:1
reward 41:3,11,20 43:20
Rexrode 133:5,7
ridiculous 122:21 295:10
Riggins 85:16,17 169:1
169:11,14 210:6
211:13 230:6 252:6
254:14
right 10:19 16:6 17:17
23:3,21 24:1 25:11,13
26:19 50:13,13,17 58:9
61:10 62:11 63:2 65:1
69:11 74:10 79:2 80:11
80:13 82:1 86:11,17
97:12 99:8,9 100:15
102:13,19 103:7,21
104:20 105:16 107:1,4

A401106
**BRENDA DIANE TAMARIZ-WALLACE**      **MARCH 4, 2010**

107:12,12 108:9
109:14 119:3,6,8
122:13 128:16 131:21
136:6 139:21 140:3
143:3 144:2 146:17
160:16 170:12 174:4
177:16 178:8 180:10
180:17 181:1 182:18
184:5,8,16 185:21
186:1,5,14 188:3 190:8
193:11 197:13 204:2
206:1 207:3,15 210:14
212:7 214:2 218:18
221:1 226:15 227:7
232:10 235:2 244:6
245:13 258:19,20
263:5 268:16 270:7
271:1 274:18 278:6
280:9 287:7 293:5
295:16,20 303:6
304:21 305:18,20
**right-hand** 164:7 223:12
**ring** 238:17
**risk** 25:10 121:3,5 126:4
218:14
**Rita** 265:14
**Road** 2:12 7:13 18:19
81:19
**Robin** 2:10 307:3
**role** 8:4,11,12 14:1 51:11
54:6,11 100:6 129:3
169:14,17 195:1
218:11
**roll** 206:5 270:21 271:2,4
**rolled** 271:6,10
**rolling** 271:8
**rollover** 121:14 195:15
218:7 241:9 291:6
294:3
**rolls** 281:3
**roofer** 76:19
**roofers** 76:4,12
**roofing** 76:5 77:2
**root** 299:11
**rose** 118:4
**rough** 73:21 74:12
171:20 230:18
**routinely** 121:4
**rules** 25:9,12 61:3
**ruling** 67:10
**run** 55:12 72:19 110:13
126:3
**running** 92:8 120:7
**rush** 252:3
**Russ** 71:13 217:16
218:10
**RUSSO** 1:20
**RVP** 93:6
**R-E-X-R-O-D-E** 133:7

_____
S

**S** 2:6 3:5 7:1 223:8,9,19
**salary** 20:5 170:1,5
171:14,17 172:4 178:4
178:7 225:7
**sale** 5:6 119:1 163:5
185:14 187:16 191:11
244:14
**sales** 19:19 162:8 165:21
166:12 277:8 280:7
282:17

**sample** 47:3
**samples** 192:3
**Sandy** 195:6
**sat** 195:3
**satellite** 80:7,9 203:15,18
**Saving** 228:6
**saw** 61:9 71:7 116:12
117:10 128:12 139:1
165:7 167:8 193:8
200:11 217:4 233:2
267:5 276:20 282:19
294:19
**saying** 63:20 69:13 78:16
102:15 103:13 122:3
134:10,16 179:8 189:8
197:12 200:17 204:4
243:14 257:7 267:17
**says** 25:5 26:18 62:3,8
63:15 64:4 65:7 78:8
79:15 87:17 90:20
91:12 93:21 96:18
97:15 101:3 103:20
105:5,8,19 108:17
161:4,7 165:19,21
166:12 168:8 170:14
171:14 175:6 177:7,14
194:12,17 199:12
200:21 201:14 202:7
203:10,14 204:3,10
210:9 211:14 212:19
213:4 215:6 216:4
217:4,14,15 221:7
228:15 229:1,18 232:4
238:8 239:6,17 240:8
241:1 245:11 247:11
249:14 255:11 256:4
257:9 259:21 260:12
275:2 283:2 287:3
296:16,17 298:7,8
299:9 301:3,12 305:9
**SBR** 228:7
**scarce** 287:6
**scenario** 46:16,17 107:16
107:17 233:12
**schedule** 79:13 87:20
222:8 223:7
**scheduled** 45:11
**schedules** 195:12
**scheme** 234:4
**school** 11:1,19
**scratch** 15:3 17:2 71:5
**SDM** 243:16
**seamless** 121:15 122:1
**search** 205:1
**season** 43:2
**Seasoned** 122:14
**second** 14:13 27:11 32:15
35:9 45:13,16 59:2
90:20 101:9 150:17
167:19 171:13 177:13
211:7 213:4 226:7
239:16 243:11 245:11
246:17,20 247:5,6,8
256:14,21 288:13
293:4,15 296:14
300:10
**secondary** 148:7
**Section** 62:18,20
**secure** 14:18
**secured** 229:4,10 245:12
**securing** 30:11
**security** 62:21 63:3,15,21

217:7 236:6,14 237:7
252:12
**see** 26:1 30:17,18 45:18
46:1 59:21 60:1 61:4
63:17 74:1 79:20 83:9
91:15 94:11 98:8
104:17 109:2,3 119:1
122:16 128:17 142:15
157:3 166:5 176:4,19
190:16 192:15 194:17
195:19 196:9 199:20
200:19 201:19 205:17
210:16 217:21 218:12
222:11,18 223:15,21
226:11 227:4 232:9
233:15 236:8 237:7
246:12 249:1,8 250:2
254:7 258:19 269:21
274:11 276:9,11 279:6
287:16 288:11 290:19
297:12 298:20 299:9
300:10,18 302:1,3
306:9
**seeing** 74:1,2 90:15
140:17 195:12 210:10
233:19
**seeking** 61:14
**seen** 45:21 68:20 81:1
83:12 90:17,18 215:5
216:4 217:2 235:12
275:18 276:17
**self-employed** 7:20
**self-generated** 16:21
**sell** 21:15 22:3,13,20
48:18 81:11,13 102:17
179:5 244:18
**seller** 69:17 91:14 133:3
179:5
**selling** 16:13 38:12,13
49:9 116:14
**semesters** 15:7,8
**send** 47:13 83:16
**sending** 143:13
**sense** 40:17 81:15 111:3
137:19
**sensitive** 49:1
**sent** 47:5 82:17 83:5,12
85:6 165:13,14 191:7
210:5
**sentence** 202:6 203:9
239:16
**separate** 34:21 75:1
163:15 192:11 199:10
246:12 256:10 301:12
305:21
**September** 7:16 24:14
84:19 85:8 95:15 99:16
148:4 149:12 162:11
163:3 165:7
**sequence** 290:14
**serious** 48:13 50:19,21
72:13
**seriously** 240:9
**service** 36:7 122:1 134:2
149:14 199:14 232:2
263:6 268:11,15,18
271:5,7,10 272:2
279:14 280:5 284:9,19
285:5,17,18
**serviced** 283:17
**services** 88:2,3,4 89:3,16
136:5,9,18,21 137:6

138:18 200:21 201:3,5
201:16 204:8 269:8
288:9,16 289:1,19
**servicing** 284:8,11,16
285:4
**set** 18:11 104:8 136:9
154:9 178:16 192:15
204:5 235:11 274:10
**settled** 123:5 183:13
**settlement** 5:9 165:20
166:2 171:9 175:10
192:19 252:7 255:12
258:9,11 292:16
**seven** 150:2,12 151:4
165:6 226:21 266:8
**Severn** 228:6
**share** 39:12 40:8 97:5
152:18 278:12
**shared** 83:19 152:20
154:18
**shareholder** 108:14
**shares** 108:13 140:19
141:2,4,6 185:3
**sharing** 241:2 254:10
278:20
**Sharks** 116:19
**Shawn** 290:9
**sheet** 5:9 194:12 255:12
**shepherding** 123:4
**shop** 114:8,11
**shopping** 113:20 114:1
**short** 11:6 68:17 127:4
209:18
**show** 118:21 165:9
220:18 242:7 246:6
252:20
**showed** 244:2
**shown** 222:7
**shows** 99:18 164:18
171:17 173:5 177:2
210:6 221:8 222:6,10
223:19,20 226:8
249:12 298:5
**shrink** 183:3,5
**sick** 151:20
**side** 12:16 121:8 122:7
124:11 128:1 150:21
153:6,18 154:7 158:20
159:4 164:7 170:3
190:17 192:11 193:18
193:19 223:12 234:6,7
234:10,11 259:17
262:6,7 264:20 279:11
280:5,7,14 284:13,16
284:17 285:3,4,7,14,18
294:7,8
**Siebert** 99:16,19 173:6
212:14,16
**Siebert's** 100:6
**sign** 161:3 171:5 247:21
248:12 252:4,8,11
255:3 294:13 302:9,20
304:4
**signature** 24:15 27:12
56:9 59:4 79:9 165:10
167:11,15 245:2,3
249:6 251:15 256:1,21
257:1,2,3 288:14
292:16 294:20 298:5
303:12,13
**signatures** 264:1
**signed** 26:5 30:10 61:1,16

62:6 72:12 79:5 119:3
171:1 188:11 190:12
191:1 192:17,18,21
229:3 244:17,20,21
251:10,20 254:12
256:10 274:19 297:7
299:1,2 300:8 302:15
303:1,2 304:5 305:17
306:3,7
**significant** 30:18 40:14
40:17 53:19 71:11
76:21 77:4 143:8 145:6
163:8
**significantly** 41:21
161:11,12 240:14
264:14 307:11
**signing** 28:3 103:21
104:3 288:14 305:7
**similar** 16:7 47:17 248:8
292:14
**simple** 234:2
**simplest** 141:16
**simply** 38:18 85:4 255:13
282:3
**Simpson** 286:7,12,13
**single** 299:7
**singling** 41:9
**sitting** 10:11 197:6
**situation** 146:13 306:17
**six** 33:5 72:3,4,5 123:14
123:19 124:5 125:6,10
150:2,4,5,11 153:1
225:20 226:21 258:16
266:3
**six-month** 204:11
**sizable** 76:18 108:3
**size** 50:3,4 73:18 107:1
132:16 139:9 183:2
210:14
**sized** 108:8
**skill** 92:9
**skillset** 42:14 75:2
**sky** 109:17 116:9
**slight** 302:10 303:16
306:5
**slightly** 34:19
**slow** 260:20 261:14
**slowed** 261:16,18
**small** 20:16,17 35:11,12
35:16 143:9,10 157:12
157:13 158:7 159:1
249:11
**smaller** 157:19
**Smelled** 116:17
**smile** 106:3
**Smith** 242:19 243:9
**smooth** 121:21
**social** 188:8
**sole** 23:4 28:6 108:13
111:17
**solely** 26:7 201:5
**solicit** 64:6,7
**solicited** 64:17
**Solomon** 81:18
**Solomons** 81:19
**Solomon's** 18:19
**solving** 8:18 304:8
**somebody** 50:1
**sorry** 8:7 12:21 15:4
28:11 29:20 40:19
43:13 50:8 77:19 84:5
137:1 139:14 159:2

A401106
BRENDA DIANE TAMARIZ-WALLACE        MARCH 4, 2010

177:13 203:8 221:6
222:1,2,20 223:4 225:9
226:13,15 235:17
249:21 255:17 262:9
273:7,7,12 297:18
299:19
sought 14:5 78:2
sound 74:6 86:11 107:3
119:2,8 128:16,20,20
166:10 177:16 258:20
sounded 69:12 151:21
sounds 16:7 50:17 153:5
154:9 258:19
source 145:14
span 279:14
speak 11:21 94:5 248:5
289:18
speaking 22:12 234:7
speaks 60:8 61:20 168:3
284:4 297:15
special 41:3 42:13 88:9
specialized 51:21 154:3
specialty 52:17 109:13
181:20 184:10 223:3
223:10,15 224:20
243:3,7,20
specialtydirect.com
242:20
specific 15:7 23:11 31:13
41:10 49:13 52:2,20
89:9 92:6 188:17,20
201:18
specifically 41:20 66:10
72:16 129:8 135:13
157:6 158:10 188:10
201:9 219:4 293:2
299:15
specifics 20:18 200:6
specified 25:21
speculation 191:16 231:8
speed 254:13,17 266:14
spell 14:12 133:6
spend 168:6 254:19 307:8
spending 294:1 307:9
spirit 281:20
spoke 193:9
spread 210:15
spreadsheets 250:5
spring 50:16 73:17 108:5
151:5
stab 74:14
stabilizing 206:12
stable 241:10
stack 89:17 303:17
staff 79:18 123:16 149:14
150:6 153:17,21 154:1
154:7,17 155:10,11
203:15 204:13 263:9
264:20 266:21 283:5
285:3,10,11,13
staffed 36:6 153:5
staffing 150:7,10,11,16
stage 50:16
stages 245:10
stamped 46:4
standard 123:13 194:19
295:11
standards 22:17 23:4
26:9 28:5 61:11 199:13
199:19,20
stands 43:6 52:8 201:13
start 145:17 146:10,21

154:20
started 13:16 16:19 31:7
33:12 151:15 155:4,8,9
156:14 173:9 306:13
starting 154:21 285:13
starts 243:13
state 7:9 47:19 149:8
201:18 212:20 213:2
298:18
stated 94:1,6 95:9 96:19
97:8,16 181:19
statement 4:15 97:18
220:9 242:3 255:13
275:5
statements 4:19 219:16
219:17 220:3,7 225:15
STATES 1:2
status 80:14 136:17 137:7
stay 109:12 148:13 172:9
178:10 181:21 182:5
184:11 218:16 232:1
268:14
stayed 112:21 228:20
stays 280:4
step 42:1 51:10 150:6
stick 126:19
sticking 125:16
stock 5:6 119:1,3 132:7
141:6,17 146:14
188:11 244:14,18
stocks 220:19 221:7
stood 124:8
stop 9:17 12:7 13:7 26:9
59:20 64:13 95:13 97:9
106:4 160:13 170:20
203:17 205:1 229:8,20
240:1 247:19 277:11
283:11 297:5 302:4
306:20
store 35:4,12
storefront 204:13
storm 267:9
straight 306:10
strapped 287:4,12
strategy 48:7 184:1
270:14
stream 116:6 237:3
241:18
streams 113:12
street 2:6,19 303:6
strictly 197:21
strike 227:10 274:3
strikes 98:3 290:2
stronger 96:1
structure 58:6 86:4 88:16
88:21 110:3 170:14
structured 171:2
struggle 20:2 98:7
struggling 191:9 209:12
stuff 16:17 303:10
styled 167:17 211:5
subject 25:6 49:1 65:20
92:4 203:5 210:8 286:7
submission 176:6
submit 121:3,16
submitted 263:8
submitting 263:11
Subparagraph 63:10
64:4
subparagraphs 64:1
subpoena 85:3
subsidies 20:12,13

subsidy 20:12
success 91:21 214:14,15
218:6,7 219:6 282:8
successful 29:13 87:17
179:16 181:4 202:4
231:17 299:14
suddenly 146:16
sufficient 19:19
sufficiently 161:10 255:2
suggested 18:13 47:8
suggestions 18:14
suggests 35:18 216:11
239:8
Suite 2:13
suited 196:17
summarize 15:16 189:8
summary 77:10 177:1
summer 147:15
SunTrust 228:5,17,18
235:19
superior 267:1
superseded 306:4
support 32:19 36:10
94:10,17 96:21 97:2
98:21 122:1,2 225:2
237:11 253:17 283:6
supported 95:12
supposed 142:6 143:1
283:14
sure 24:2,2 29:12 31:17
35:10 43:10,10 64:20
75:8 81:8 83:6 84:1
85:1 87:14 102:5 107:9
109:15,21 111:11
138:1 165:16 173:13
206:13 207:11 211:8
211:11,15 218:21
228:19 242:1 251:3
254:15 256:15 257:16
266:9 279:19
surfacing 274:18
surgery 13:3
surprise 117:20
surprised 194:3
survive 15:21 130:5
145:7
suspended 102:12,16
switch 37:8 56:13
sworn 7:4
synergistic 108:6
system 120:3,7 155:19
193:7,8 263:18,19
265:9,17,17 272:18
273:8,14
systems 190:14 192:14

--- T ---

T 3:5 8:1,4 9:3,14 72:16
108:12 111:17,21
128:9 131:9,10 134:13
137:16,20 138:7
139:17,19 140:1,5,6,19
142:12,17,18 143:2,13
143:15 144:17,19,20
145:18 146:6,19
147:12 163:17 185:4
204:1 244:18 247:12
247:14 248:11 257:8
287:20
table 170:3 275:4
tag 229:14

take 16:11 21:10,17
34:10,12 44:11 45:13
64:21 67:20 68:10,16
74:14 79:19,20 81:5
83:3,15 93:17 100:12
106:2 111:10 115:8
117:7 124:4,9,10 125:6
147:5 166:7 189:10
196:11 198:16 203:1
209:16 218:8 219:11
230:10 254:2 256:14
264:19 265:21 277:18
281:2 292:7,8 304:4
taken 68:17 109:20 127:4
158:13 209:18 228:18
takes 92:9 124:5 143:15
talent 146:9
talented 29:7
talents 21:6 42:14
talk 25:3 31:3 62:16
68:15 101:16 119:17
149:4 218:17 290:18
303:4
talked 101:13 141:9,11
169:10 205:19 208:14
298:3 300:21
talking 4:9,12 26:6 44:10
45:14 66:15 68:11
101:17 103:1 112:3,10
115:13 116:6 119:14
127:7,8 139:2 140:6,9
152:9 157:3,5 158:5
178:3 182:13 187:1
188:6 193:4 208:11
213:13 215:6 216:4,11
258:2 260:8 265:6,18
267:10 268:8 278:3,14
280:2,19 287:1,11,15
304:1
talks 105:4 212:18
274:12 287:8 301:10
Tamariz 4:20 58:18
59:10 60:4 79:1 111:16
136:14 138:18 142:13
145:18 146:18 162:19
163:4 167:5 170:3
188:15 193:19 194:13
203:10 204:7 207:2
208:3 220:21 221:10
225:16,19 234:11
240:4,18 262:6 283:14
287:20 288:8,15 289:3
Tamariz's 204:11 205:12
282:21 283:21
Tamariz-Wallace 1:8,10
3:2 7:2,8,12 24:6 27:2
56:1 68:19 77:17 80:10
82:15 127:6 162:3
176:11 222:9 223:3
227:14 241:14 251:7
256:19 291:18 307:9
tapped 91:5
target 205:13
task 244:5
tasks 196:13
tax 4:17 128:12,18
221:19 222:5
Taylor 302:12 303:14
306:15
teacher 123:3
team 191:7,20 298:18
technology 119:20,21

265:4 266:8
TELEPHONE 1:17
tell 8:3 13:21 16:10,19
31:6,15 33:4 39:5 48:4
50:18 51:17 57:4 67:21
68:8 69:20 88:5 90:8
93:18 94:18 103:17
111:2 120:2 128:7
158:10 160:15 161:4
161:16 165:13 174:6
188:12,18,20 197:7
224:11 250:10 254:18
303:1 304:17
telling 161:1 179:2
202:19 263:19 273:4
tense 257:9
term 16:9 35:17 69:1
116:12 167:19
terminate 64:2
terminated 137:9 151:6
termination 65:18,20
66:1,2
terms 16:11 25:9,13
31:15 54:7 59:13 73:19
101:17 110:20 127:21
136:8 150:21 163:5,16
164:16 166:2 169:7,19
169:20 171:10 189:13
206:10 224:3 228:21
242:4 253:3 266:16
267:6 288:20 293:13
testified 7:5
testify 10:17
testimony 218:9
Thank 209:10 226:6
227:8 244:7 280:16
thereabouts 73:18
150:18
thick 162:6
thing 10:13 18:4 32:3,18
61:8 63:1 68:12 109:6
122:21 125:19 133:13
215:4 219:8 286:10
290:6 302:15
things 17:5 29:15 31:7
34:15 44:9 49:21 62:13
91:13,20 92:4 116:1,21
127:20 190:17 196:12
197:10 198:9 201:9
211:10 234:4 240:8
250:7 261:21 290:18
297:13,16 305:10
307:2
think 10:13 18:4 32:3,18
33:8,8 35:2 36:1 45:17
55:11 57:21 60:10 63:9
66:17 68:6,14 69:8
70:16,18 77:17 81:6
85:4 86:7,17 87:4
88:20 97:14 98:18 99:4
107:5,8 108:12 109:10
109:17 113:15 118:4
119:6 130:11 131:19
138:20 139:10 150:4
150:14,21 159:18
161:18 179:1 183:12
186:16 191:2 200:13
210:7,20 214:4,7
220:20 233:14 237:1
240:7,8 241:17 255:19
261:12 275:10 276:5
276:21 280:17,18

286:15 296:20 297:15
297:21 307:6
**thinking** 33:4 65:5 87:11
132:18,21 208:19
226:3 228:8 231:16
235:5
**third** 2:6 86:3 95:6 203:4
203:14 204:16 213:6
291:5 298:7
**thirds** 298:6
**third-party** 85:3
**Thirty** 71:3
**thought** 43:17 44:16
57:20 91:3 122:20
129:6,8,9 166:7 182:3
186:18 203:3 208:16
209:4 230:1 236:1
271:19 302:7
**thoughts** 164:15,19
231:18 274:17
**Thousand** 133:2
**thread** 279:1
**three** 9:6 74:5 82:10
118:13 119:12 121:4
121:10 161:3 170:19
171:15,20 175:15
185:19 196:4 217:15
217:18 218:3,4,16
238:11 247:17 252:7
259:20 267:3 279:5
281:4 287:4,12,19
**three-and-a-half** 74:5
153:9 154:1
**three-page** 274:10
**three-year** 21:9
**threshold** 115:9,9 241:11
**throw** 258:18
**thumbnail** 175:7
**tie** 99:4
**tied** 269:20
**tier** 269:18
**ties** 240:14 268:5
**tighten** 23:3 26:8
**tightened** 22:16
**Tim** 85:16,17 169:1 210:6
210:9 211:13 230:6
252:5
**time** 9:3,13 12:6 15:12,19
17:14 19:14 20:6,21
21:10,21 22:16 23:2,8
25:17 26:4 31:3,19
32:20 33:1 34:5,11,17
36:3,13,19,19 42:12
43:1 44:6,11 45:3,8,14
45:16 51:12 52:14
55:17 56:13,18 58:10
58:20 64:8 67:21 70:8
70:17,21 71:7 73:13
74:3 79:21 85:17 90:13
91:4,4,8 93:2,4,17 96:3
100:13 101:1,5,8,20
102:16 103:2,5,9,20
104:7 106:8 107:2,7
110:16 114:15 120:18
123:20 125:20 126:11
130:9 131:4 132:4,17
135:3 136:13 140:4,18
144:7 146:9 148:9,11
148:18,20 149:8,11,18
151:2 152:8 156:7
159:12 163:3,16
164:19 166:8,10 168:6

170:5 172:5,7,10
173:11 175:11 178:2,5
178:7,7 183:12 193:21
202:5 203:18 205:4
208:6 213:16 215:13
215:17 217:10 226:3
229:9 230:1,2,7,14
231:2,13,16,20 232:11
232:17 233:5,7 234:14
235:4,21 236:7 238:13
239:8 240:3 243:2,4
252:10,19 253:20,21
254:5,5 262:15 263:3
265:7 268:21 270:21
271:14 273:21 276:8
279:14,18 281:7
283:18 287:11 292:8
294:2 302:7 307:8
**timed** 131:16
**timelines** 199:16
**times** 133:21 161:4 169:8
284:19
**timing** 290:3
**title** 216:11
**today** 10:12 46:8 60:2
66:21 128:7,8 129:13
136:18 137:7 197:1,6
210:10
**today's** 10:12
**Todd** 286:7,12,13
**told** 57:6,7,11 66:10
72:21 96:11,13 100:21
121:20 134:17 141:5
148:13 154:16 155:6
155:16 156:9 180:16
189:1 193:12,15 207:7
213:18 214:8 231:21
233:21 234:1 253:18
270:13 271:11 273:2
274:1 294:19
**Toll** 100:4
**tool** 178:15 179:3
**top** 73:20 79:14 92:16
97:2 185:19 203:9
204:10 215:2,6 216:4
217:5 223:12 228:15
238:8 243:11 255:12
259:21 265:2 274:12
288:11 290:19
**topic** 141:1 300:1
**total** 109:6 112:1,2,5
156:19 157:9,21 226:8
232:15 233:11 294:2
301:14
**totally** 116:6 263:1
302:18
**touch** 45:12 157:3
**tough** 70:4
**town** 209:7
**Towson** 1:11 2:14
**track** 105:6 137:21
228:20 291:7 301:13
306:1
**tracking** 301:13 304:16
305:21
**tracks** 222:7 276:19
**tradesmen** 76:7
**trainer** 123:3
**training** 8:18 31:20 155:4
155:9,9 156:12 265:13
265:18 266:1
**transaction** 100:7 139:5

139:6 164:15 170:14
194:1
**transcribes** 77:10
**transcript** 6:3
**transfer** 117:7 141:4,16
146:14 179:13 193:17
289:7
**transferred** 140:19
179:21 188:15
**transfers** 190:5
**transition** 10:5 114:13
115:2 121:21 124:1
127:13,13 129:20
143:6 144:1,9 151:12
154:16 155:18 172:13
179:15 182:11 184:15
188:19 194:4 206:1,12
218:6 219:6 240:10
268:12 278:13
**transitioned** 13:12 27:8
144:5 159:14 240:20
304:18
**transitioning** 107:18
110:12 142:20 156:18
**transitions** 184:19
218:21
**travel** 149:10
**Travelers** 266:10
**treated** 122:10
**trend** 269:21
**tried** 123:21 126:9
**triggered** 111:14
**Trinity** 11:2,5,8
**Triple** 102:19 180:14
**true** 34:11 172:17 180:15
182:10,14 202:14
218:13,13 240:21
252:12 305:11
**truly** 154:17
**trust** 97:4 208:5
**trusting** 302:15
**truth** 161:16
**truthfully** 117:13
**try** 35:7 46:18 69:5
103:19 114:15 123:4
126:11 130:20 131:18
163:12 214:12 238:14
265:1
**trying** 40:20 41:12 57:16
57:18 98:11 99:1
115:18 116:5 120:4,6
124:14 125:20 127:15
127:17,18 129:1 144:6
150:14 154:6 180:18
191:2,3,4 193:2,5
237:1,16 241:21
242:15 246:13 248:18
270:17 272:5 297:16
**turn** 86:9 91:14 263:4
**turned** 23:19 197:2
**turns** 307:7
**two** 9:6 15:7 19:18 25:2,3
27:10 32:8 53:9 60:21
63:2,6 67:8,9,16 91:14
101:3 108:4 147:11
167:6 196:3 210:3
211:9 219:8 232:16
235:13 240:8,11
245:17 252:7,7 256:10
267:1 271:2,9,21
276:18 288:6 298:6
**two-page** 173:4

**two-plus-year** 152:3
**two-thirds** 217:13
**two-year** 15:1 270:3,8,18
270:21 271:20 272:3,9
272:12 280:1 281:4,8
281:10
**type** 36:8 50:5 75:19
79:13 94:2,7 155:14
235:12 281:17 294:11
**typed** 215:1
**types** 63:2
**typical** 55:1 110:7 295:2
295:3
**typically** 74:20 110:6
237:7
**typo** 212:20 273:9 296:21

---

**U**

**uh-huh** 12:18 13:6 16:18
26:12 27:15 29:16 30:9
30:15,21 36:15 39:4,20
42:20 43:3 44:14 47:10
52:12 53:17 57:2 58:13
67:15 68:5 69:3 70:13
74:19 82:8 91:16 94:12
101:6 105:10 119:15
136:1 137:14 155:12
175:5 199:17 200:1
203:16 210:17 213:12
222:14 224:7 235:14
245:1 247:3 255:15
259:8 260:4,15,18
279:7 280:15 281:12
**uh-huhs** 29:21
**Uh-uh** 13:20 87:1
**Uh-uhs** 29:21
**ultimate** 86:7 190:4
**ultimately** 18:20 48:12
49:8 50:11 70:17 72:14
86:10 100:7 156:3
171:1,6 178:5 179:4
180:13 197:13 208:2
246:14 269:3
**umbrella** 289:18
**unable** 112:19 148:10
149:10 268:11
**uncompetitive** 66:13
**unconditional** 59:16
**undergraduate** 11:14
**undermines** 97:4
**undersigned** 59:11
**understand** 21:21 23:1
26:4 28:1 40:20 41:12
55:4 58:9 60:2 63:2,6
91:19 103:17 106:18
106:21 110:19 111:1
127:17 129:12 142:4
144:6 146:15,17 154:6
156:3,6 167:15 179:11
181:4 187:20 191:3
193:1,2,5,6 199:8
201:7 207:12 208:18
232:21 241:21 245:15
246:14 254:4,20 257:7
257:16 270:17 271:15
272:6 280:18 287:10
293:11 294:14 295:1
296:17 297:21 298:9
299:9,11 301:14
303:20 306:6
**understanding** 55:15
60:14 62:1 127:19

134:15 165:9 191:18
194:18 203:20 224:18
231:5 271:20 279:20
281:13 284:6 287:14
**understood** 23:8,13,14
23:17 25:8 30:10 61:15
62:5,10,10,12 64:21
144:13 160:2,11,12
180:1 187:16 194:2
201:19 218:15 231:21
233:7 250:20 251:1
255:2 271:3,21 281:20
299:5 306:2
**undertook** 138:4 265:21
**underwriter** 158:9 261:3
261:4
**underwriters** 122:2
125:8,11
**underwriting** 22:17 23:4
26:9 28:4 61:11 88:8
124:17 125:17 126:20
155:7 159:17,19 160:4
160:9 161:15 198:11
198:21 199:15 261:15
297:14 298:16,19
299:10
**unfair** 45:6 169:12
287:10
**unhappy** 151:1 264:20
**union** 176:2 245:14 246:8
246:13 251:12 253:15
**unique** 42:14
**UNITED** 1:2
**University** 11:2,12
**unknown** 156:19
**unpredictable** 91:20
**unrelated** 163:15
**unsigned** 82:17 84:21
**unusual** 179:10 295:7
**upcoming** 216:13
**upfront** 171:3,7 206:18
206:21 207:4 245:8,11
257:17 258:1
**uphold** 67:12,14
**ups** 21:19
**urging** 306:7
**use** 16:8 36:12 91:5 95:10
99:2 115:18 130:20
134:5 150:21 201:3
236:13 240:5 246:16
273:6 296:10
**usually** 133:20 254:6
**utilizing** 91:9

---

**V**

**Vaguely** 238:7
**Valley** 2:12
**valuable** 57:20
**valuation** 4:3 176:17,20
177:1
**value** 59:8 177:2 178:20
179:4,17
**variation** 283:8
**variety** 8:17 49:18 50:5
**vehicle** 73:10
**verbal** 40:2 96:21
**veteran** 39:9
**vetting** 173:20
**viable** 184:11
**vice** 8:5 93:7
**vicinity** 140:15

A401106
**BRENDA DIANE TAMARIZ-WALLACE      MARCH 4, 2010**

view 174:19 210:15
virtue 189:10
virus 148:8
vision 42:1
visit 214:12 216:13
vital 299:13
volatile 133:16
volume 124:13 291:6
vs 1:7

---

**W**

wage 224:5,9
wait 117:9 126:2 254:18
waiver 174:19
waives 59:17
walk 103:19
Walker 66:16
wall 134:18 207:8,13
Wallace 4:10,16,18 44:12
51:12 52:21 54:3 82:18
83:11 90:19 93:1 97:12
99:15 101:3 103:19
173:4 187:3 196:7
197:10 210:5,9 212:14
215:7,10 216:12 220:4
221:20 222:18 223:2
225:7 235:16 242:7,20
243:12,13 267:20
286:7 291:20 307:10
Wallace's 242:21
want 10:7,9,11,20 24:21
25:3,4 28:13,21 31:3
37:9,9,11 39:1 40:16
43:17 48:18 51:10 57:6
57:8 62:16 64:3,20
67:21 68:7,10 69:1
71:11 77:7 93:18 94:9
103:16 113:7 114:11
114:17,20 118:17
119:17 126:14,15
146:2 151:7 172:8
173:13 185:11,12
207:11 211:9 213:8
222:3 236:20 248:12
254:18 267:16,17
268:2 272:21 278:9
279:19 303:4
wanted 26:8 43:15 44:13
44:17 50:1 57:4 63:9
70:5,5,15 73:1 93:10
93:10,10,12 102:18
124:15 146:20 160:14
163:10 169:18 190:3
231:11 248:4 250:20
272:12,14 275:13
279:8 281:9
wanting 191:10
Washington 11:3
wasn't 34:16 38:2,12,13
40:2 48:20 100:21
106:15 118:10 125:14
139:4 145:20 146:13
146:15 156:9 171:9
181:13 183:9,16
184:21 202:1 206:8,13
207:9 219:13 234:18
253:18 304:7
water 116:17
way 37:16 38:14 40:5
41:2,5 43:21 47:6 51:2
71:14 73:2 80:20 87:4

95:12 98:2 104:7
110:13 114:18 117:13
129:18 130:5 141:17
142:7 155:21 156:16
157:20 163:10 172:4
176:20 180:16 190:17
192:20 200:20 204:15
207:20,21 217:14
218:19,20 219:5
231:11 234:2 246:18
248:10 257:19,19
278:15 283:19 293:10
293:10 298:6 303:19
304:14 305:12 306:2
306:18
ways 101:2 129:21
wayside 50:11
weather 21:17
week 9:3 120:2 123:11
124:3 213:5 239:6
weekend 192:13
weeks 167:6 306:14
welcome 27:18 28:16
61:7 64:13 68:15 83:3
93:17 168:6 292:7
went 11:18 67:3 100:10
113:1 116:20 129:2
134:17 135:15 136:4
146:16 147:8,9,12
151:3 160:20 166:15
190:20 192:19
weren't 48:20 124:8
145:16 158:9,21 186:3
305:5,11
we'll 13:13 31:1 33:10
44:8 45:17 48:14 99:3
102:14 108:10 118:16
127:2 202:21 261:21
we're 20:21 30:16 45:17
64:20 68:1,3 75:12
101:17 102:21 113:17
134:18 136:6 137:3
140:5,5 141:1 149:3
158:4 188:6 233:5
277:15 290:14 291:7
300:1 304:2,3
we've 139:1 215:5 302:5
WFG 84:12 85:9,21
176:16
Whatsoever 186:21
wholesale 78:3 81:4
162:10
wholly 294:10
wife 55:2 71:8,21 72:7
172:18 185:20 188:2
willing 96:3 175:8 231:5
window 103:3 114:4
141:8,12,13,18 280:1
Wisefeld 195:6
wish 250:1
witness 7:3 28:11 29:20
30:3 31:12 37:1 62:2
65:5 71:18 189:19
231:10 237:1,15 253:7
273:13 284:7
wondering 260:5
Woodfire 303:2
word 14:13 116:14
161:11 164:4 226:12
255:12
worded 237:4 257:20
words 35:4 130:20

157:17 253:14 302:6
work 12:11 13:8 18:1
48:10 89:6 102:8
125:19 127:16 130:14
175:19 194:4 206:11
210:13 254:9 284:2
worked 72:1 180:16
189:3 191:20 253:18
Workers 76:16 124:19
125:5,7,9,11,21 126:3
126:5 181:19 183:21
working 7:21 8:2,10 9:14
19:4 101:4 102:6
120:12,12 151:1 154:4
173:9 200:18 212:19
252:6
works 171:21 213:10
worksheet 200:18
world 117:11,12 232:11
260:12 261:6
worse 260:21
worth 178:13 179:1,8
wouldn't 22:6 37:1 87:6
88:17 125:8 183:7
187:9 207:13 248:15
WP 109:1
WRG 186:16
write 22:18 48:17 61:12
76:14 102:1,2 106:17
107:14 125:3 126:1
146:2 159:21 160:6
169:2,3 269:18 270:9
272:18,21 273:16
280:12,13 281:5,10
305:13
writes 101:7 191:14
213:7
writing 25:15 26:9 125:2
160:13 169:4 215:9
237:16
written 40:3 95:6 103:17
107:1 122:4 123:20
124:2 128:8 129:4
148:2,17 167:18
168:11,14,16,17
176:15 179:14 188:14
198:6 199:20 220:19
234:1 236:4 250:21
260:16 269:12 277:8
293:7 301:17,20
wrong 71:12 86:14
126:13 161:11 186:17
197:17 209:13 221:3
253:4
wrongful 66:3
wrote 73:14 110:8 124:11
133:13
www.depo.com 1:18
W-2 224:9,12,16

---

**X**

X 3:5

---

**Y**

yacht 42:17 45:20 53:2
54:5
yeah 7:11 18:11 22:14
23:6,13 29:11 46:4
49:10 51:7 69:17 75:5
77:3 92:6 106:20
110:21 118:12 122:13

127:2 136:6 137:2,6
146:15 150:13 154:15
159:8 174:1,10 183:9
213:1 221:7 224:17
228:1,19 232:19 246:3
252:3 256:15 257:13
258:21 269:6 281:1
year 11:10,11 18:4 35:15
36:1 37:8,8,10,11,12
43:1,2 105:15,20
107:18 113:20 114:1
126:2 128:13 217:19
221:20 224:13,19
226:2,5,9 241:3 246:20
277:10 300:12 305:8
306:4
years 17:10 19:18 37:4
38:11 55:13 71:3 106:3
108:4 114:20 115:10
122:9 159:13 160:12
170:19 171:15,16,21
189:4 217:18,20 218:4
218:16 229:5 232:3
238:11 247:18 266:9
271:2,9,21 279:4,5,11
281:6,11
Yeses 30:1

---

**Z**

zoon 210:15

---

**$**

$1 86:5 183:10
$1,213,506.26 301:18
$10,000 86:13
$100,000 86:11 87:13
$12 129:15 179:20 181:9
183:7 229:1 230:2
$150,000 79:15
$16 129:17 234:3
$2 220:19 221:8,12
$2.3 246:8 249:13 251:13
$20,000 81:4
$200,000 134:21
$210,000 105:11
$250,000 256:8
$3 86:7 166:1,13 170:15
172:3 175:12 178:3,6
178:11,19 245:7
249:12 256:5
$300,000 262:3
$361,214.07 300:17
$4 143:5 144:8,9 154:1
205:21 206:20
$414,000 172:2
$474,896 226:17
$5 104:16
$50,000 217:18 246:10
$500,000 128:1 245:9,12
247:6
$51,000 225:6
$51,687 223:20
$6,100,000 278:2
$7 237:2
$8 233:8

---

**0**

03 43:4 53:1
04 50:16 59:5 73:18 78:9
79:11 85:9 99:16 150:4
163:3 165:20 175:4

177:15,18 205:4
05 119:7,9 150:17 151:5
152:2 155:2,3 204:16
227:17 231:13 235:13
242:16 257:4 271:16
273:1 275:20 276:1
286:21 287:12 293:17
297:10 299:20,21
06 7:16,16 166:3 299:20
07 152:10 166:3 299:17
08 147:2,15,19 148:2
151:5,18,19 166:4
09 9:20

---

**1**

1 3:7 24:3,8 27:14 78:9
165:20 198:13 199:11
217:15 229:5 239:16
247:19 260:19 275:2
278:11 300:18
1,300,000 241:4
1,500,000 166:2
1-5-05 4:21
1-6-05 5:1
1-7-05 5:2
1-800-288-3376 1:17
1.2 302:18 304:1
1.4 108:19
1.7 108:21 109:8
1.8 249:15
1:09-cv-667 1:6
10 3:18 74:13 110:6
161:21 162:5 182:1,6
196:1 198:13,14
199:10 254:19 264:16
10,000 87:12
10-28-04 4:2
10-8-04 3:21
100 2:6 220:20 221:9
11 3:19 107:2,3 111:9
119:2 127:21 129:15
163:19 164:2
11-18-05 6:1
11-5-09 5:19
12 3:20 62:18,19,20 64:1
106:1 107:3,19 108:19
111:9 164:21 165:4
222:6 229:5 230:3,18
232:3 234:5 291:10
12-29-04 4:11
12-30-04 4:12 216:5
12-31 218:12
12-31-04 4:20 217:3
12-7-04 4:6,8
13 3:21 60:17 166:20
167:3 196:4 197:7
203:4 290:16 300:9
138,000 171:17
14 4:1 25:1 27:17,20
60:21 106:1 107:19
172:20 173:3
14-3 101:8,13 103:1,12
141:12 176:8,12
177:15 204:9 254:19
264:16
15.5 109:1,7
16 4:4 82:18 129:10
194:7,11 232:6,15
233:12 234:8 277:14
161 3:18
162,000 227:6

A401106
**BRENDA DIANE TAMARIZ-WALLACE      MARCH 4, 2010**

**163** 3:19
**164** 3:20
**1649** 7:12
**166** 3:21
**17** 4:6 209:19 210:2,4
**172** 4:1
**176** 4:3
**18** 4:8 24:14 212:9,13
 291:21
**19** 4:9 128:15 214:18
 215:1 277:14
**194** 4:4
**1989** 15:15 24:14 36:14
**1991** 32:2
**1992** 27:14 30:16 31:3

_____
**2**

**2** 3:8 26:20 27:4 46:14
 70:11 105:5 223:7,14
 229:4,14,18 236:4,9
 257:2 260:12 262:1
 278:21 298:5
**2-11-05** 5:3 238:5
**2.25** 245:7 246:9
**2.376** 177:4
**2.4** 178:13
**2.493** 177:5
**2.5** 132:18 135:12 245:10
**2.6** 178:14
**2.617** 177:6
**20** 4:12 74:13,16 121:3,11
 122:9 215:19 216:2
**200** 108:13 132:21
**200,000** 133:1
**2002** 36:4 51:16 100:14
**2003** 4:18 33:16 36:12,13
 39:2,8 54:5 221:20
 225:4
**2004** 4:16 30:19 31:4
 32:21 33:6,9,11 56:9
 61:16 62:12 82:2,19
 84:19 89:19 162:11
 165:7 167:5,14 176:20
 210:5 212:15 215:7
 220:4 225:18 241:4
 257:2 298:5
**2005** 82:2 119:2 129:16
 228:15 239:8 255:18
 259:18 282:19 288:10
 290:16 291:21 292:3
 292:15 303:11 305:8
**2006** 131:14,15 135:11
 138:3 300:9
**2007** 128:13 130:13
 131:13
**2008** 139:12,15 144:7,8
**2010** 1:12
**209** 4:6
**21** 4:14 56:9 59:5 79:11
 216:18,21
**212** 4:8
**21204** 2:14
**214** 4:9
**21401** 2:20
**21409** 7:13
**215** 4:12
**216** 4:14
**219** 4:15
**22** 4:15 165:7 219:19
 220:2 239:7 286:21
**221** 2:19 4:17

**225** 4:19
**226** 211:1
**227** 4:21 211:2
**228** 5:1
**23** 4:17 221:15,18
**235** 5:2
**237** 5:3
**238** 5:4
**24** 3:7 4:19 101:8 103:1,9
 103:13 125:19 141:12
 141:13 225:10,14
 245:3 270:5
**242** 5:5
**244** 5:6
**25** 4:21 55:13 227:11,15
**250** 249:15,16 256:11
**251** 5:7
**255** 5:9 211:3
**256** 5:10
**259** 5:11
**26** 3:8 5:1 228:10,13
 288:10
**27** 5:2 235:7,10
**274** 5:13
**275** 5:15
**28** 5:3 175:4 237:20
 238:3
**28-A** 223:15
**282** 5:18
**286** 5:19
**288** 5:20
**29** 5:4 215:7 238:20
 239:2 255:18
**29th** 119:9
**290** 5:21
**291** 6:1

_____
**3**

**3** 3:9 25:1 55:19 56:3
 64:4 73:20 86:6,18,18
 93:21 103:21 175:8
 228:21 229:3,13 263:6
 267:7,16 268:2 277:8,9
 283:2
**3-B** 269:17
**3-D** 272:17
**3-11-2005** 250:15
**3.5** 73:21 105:7 108:18
**30** 5:5 73:4 74:16,16
 97:21 114:20 176:20
 241:4 242:9,13
**300** 6:2
**300,000** 262:1
**31** 5:6 222:10 244:9,12
 257:4
**31st** 147:4
**3161** 18:19
**32** 5:7 251:4,9
**33** 5:9 176:21 178:1
 255:7,11
**338** 82:20
**34** 5:10 256:16,20 292:10
 292:11 297:19 298:4
 305:16
**340** 238:4
**35** 5:11 259:13,16 276:20
 276:21
**350** 91:1 258:20 259:5
**350,000** 74:4 104:17
 108:18 259:2
**36** 5:13 274:5,9

**360** 258:20 259:5
**360,000** 259:2
**37** 5:15 275:15 277:1
**38** 5:18 282:12,16
**39** 5:19 286:2,5

_____
**4**

**4** 1:12 3:10 77:5,16 95:5
 104:1 108:16 111:15
 139:11 165:19 233:8
 234:6 259:18 275:20
 292:3
**4th** 292:15
**4-6-05** 5:5
**40** 5:20 230:19,21 231:1,7
 241:13 288:2,5
**400** 2:13 291:9
**41** 5:21 290:10,13
**410-263-3131** 2:21
**410-938-8800** 2:15
**42** 6:1 291:15,19
**43** 6:2 300:3,6
**43215** 2:7

_____
**5**

**5** 3:11 82:12,16 96:18
 104:1 171:17 227:17
 229:6,19 230:3,18
 231:15,17 232:4 236:1
 264:16
**5,800,000** 278:2
**5.1** 230:9,10,11
**5.16** 258:13
**5.2** 291:8
**5.6** 230:10
**5:29** 307:15
**50** 230:17
**500** 291:9
**500,000** 166:3 246:20
**54,166** 224:5
**55** 3:9

_____
**6**

**6** 3:12 84:6,10 105:7,21
 228:15 242:16 268:5
**60** 119:4 290:18 291:3
**600,000** 90:21
**614-227-2300** 2:8
**66** 231:3,6

_____
**7**

**7** 3:3,13 27:17 90:3,7
 104:1,16 203:4,13
 212:15 224:6 231:19
 235:13 236:3,5 301:8
**7-13-05** 5:21
**7-16-04** 3:11
**70s** 12:5
**720** 106:1
**77** 3:10

_____
**8**

**8** 3:15 92:10,14 167:5
 275:21 296:15
**8-8-05** 5:17
**8-9-05** 5:18
**80s** 11:9,9 295:6,7
**800,000** 140:15
**82** 3:11
**84** 3:12

**840,000** 106:2
**89** 13:9,10 14:19 61:1
 62:10
**89,786** 222:7 224:5

_____
**9**

**9** 3:17 84:19 86:13 99:10
 99:14,16 162:11
 167:14 223:11,13
 282:19
**9-15-04** 164:4
**9-22-04** 3:20
**9-7-04** 3:14
**9-8-04** 3:16 92:17
**9-9-04** 3:12,17,18
**90** 3:13 59:1 86:10 107:5
 117:11 118:7,10
 119:11,18 179:13,20
 180:20 182:4,16 186:2
 188:13,19 230:15
 233:3 260:13 262:5
 267:8 291:8 294:6,17
 295:8,12
**90-day** 127:8,9 260:17
**901** 2:12
**91** 32:3
**92** 3:15 61:1 62:10
**99** 3:17