

EXHIBIT

_1_

3-4-10        bL



EMPLOYEE AGENT

# AGENT

# EMPLOYMENT

# AGREEMENT

1987 Edition

# AGENT'S EMPLOYMENT AGREEMENT

This Agreement, made September 18, 19 89, between NATIONWIDE MUTUAL INSURANCE COMPANY, NATIONWIDE MUTUAL FIRE INSURANCE COMPANY, NATIONWIDE LIFE INSURANCE COMPANY, NATIONWIDE GENERAL INSURANCE COMPANY, NATIONWIDE PROPERTY AND CASUALTY INSURANCE COMPANY, NATIONWIDE VARIABLE LIFE INSURANCE COMPANY, AND COLONIAL INSURANCE COMPANY OF CALIFORNIA, insurance corporations duly organized and existing under the laws of the States of Ohio and California, with their principal offices located at Columbus, Ohio and Anaheim, California, hereinafter called the "Companies," and

Brenda Diane Tamariz of 233 Edgewater Road

Edgewater    Maryland    Anne Arundel    Street-Route

hereinafter called "Agent,"

City    State    County

Witnesseth:

1. Definitions. As used in this Agreement:

   a. The word "Companies" and the names "Nationwide Mutual Insurance Company," "Nationwide Mutual Fire Insurance Company," "Nationwide Life Insurance Company," "Nationwide General Insurance Company," "Nationwide Property and Casualty Insurance Company," "Nationwide Variable Life Insurance Company," and "Colonial Insurance Company of California," shall be understood and interpreted to apply only to the specific company or companies which the Agent has been licensed to represent, and for those companies authorized to do business in the state of Agent's residency.

   b. Whenever used in this Agreement, the term "Agent's Employment Agreement" or the word "Agreement" shall mean any contract in writing, captioned "Agent's Employment Agreement" between Companies and the Agent executing the Agreement.

2. Agent agrees to devote the entire time during such training period as the Companies require, faithfully and diligently to such training programs and other activities as the Companies may direct. After the Agent completes such training programs and successfully passes any required state licensing exams as are required by the Companies, the Companies agree to enroll the Agent and Agent agrees to enroll in the New Agent Development Program or New Business Agent Program of the Companies. Should Agent fail to complete the required training program or fail to pass the required licensing examinations within the time designated by the Companies, in their sole judgment, Agent will not be eligible for enrollment in the New Agent Development Program or New Business Agent Program.

3. Agent agrees to devote the entire time during his employment hereunder faithfully and diligently to the services of the Companies. Agent further agrees that during his employment he/she will not be licensed as an agent, solicitor, representative, or broker for any other insurance company and will not directly or indirectly place any insurance whatsoever with or through any other insurance company or the agent, representative, or broker thereof, unless authorized and directed to do so by the Companies.

4. The Agent will do all things necessary to secure and keep in effect any required license to represent the Companies as an Agent and will not solicit insurance on behalf of the Companies with reference to any type of insurance for which he/she is not licensed by the appropriate Department of Insurance.

5. Agent agrees that within the following state(s) only will solicit and procure applications for fire, casualty, health and life insurance and will render such services to policyholders and perform such other incidental duties as may be requested from time to time by the Companies: Maryland

6. During such periods as Agent attends the New Agent Development Program Schools, or New Business Agent Program Schools, Agent will necessarily be required to work irregular hours. During these periods, Agent's hourly rate of pay will be not less than $11.25¢ for the first 40 hours, and not less than one and one-half times said rate for any hours in excess of the maximum 40 hours. Companies guarantee that Agent's total weekly pay will be $450.00 for all work performed up to 60 hours.

NADP·NBAP
EMPLOYEE AGENT FINANCING

This Assignment shall be effective immediately upon receipt of notification of it by Nationwide Financial Services, Inc., Colonial Insurance Company of California, and Insurance Intermediaries, Inc.

This Assignment shall terminate only upon the voluntary or involuntary termination of this Agreement. Nationwide Financial Services, Inc., Colonial Insurance Company of California, and Insurance Intermediaries, Inc., shall continue to make payments under this Assignment to Nationwide Mutual Insurance Company until notified in writing by Nationwide Mutual Insurance Company that this Assignment has terminated as provided herein (such notice to be given as soon as practicable).

11. Agent agrees that he/she will not, either directly or indirectly by and for himself or as agent for another or through others as agent, engage in or be licensed as an agent, solicitor, representative or broker in any way connected with the sale, advertising or solicitation of fire, casualty, health or life insurance in the area described below for a period of one year from the date of the voluntary or involuntary termination of employment with the Companies or, should the Companies find it necessary by legal action to enjoin Agent from competing with the Companies, one year after the date such injunction is obtained in the following area: Within Twenty Five miles of the principal place of business located at _____ 2500 Riva Rd., S.E. _____ Annapolis, Maryland   21401 _____.

   (Street Address)                                      (Town and State)

12. In any jurisdiction where a covenant similar to that appearing in paragraph 11 is held to be invalid either by statute or by judicial decision, the Agent agrees that upon termination of this Agreement he/she shall thereafter refrain from further solicitation or servicing of policyholders of the Companies and from interfering in any way for a period of one year with existing policies and policyholders in the geographical area described in paragraph 11 or such other period being the longest period permitted by law less than one year.

13. In the event that the Companies are successful in any suit or proceeding brought or instituted by the Companies to enforce any of the provisions of this Agreement or on account of any damages sustained by the Companies by reason of the violation by the Agent of the terms and provisions of this Agreement to be performed by the Agent, Agent agrees to pay to the Companies reasonable attorneys' fees to be fixed by the court.

14. The insurance business being subject to changing laws, regulations and conditions, it is understood and agreed that each Company will prescribe rules, regulations, prices and terms under which it will insure risks, and each Company retains the right to change, alter or amend such rules, regulations, prices and terms, including the right to establish quotas and to limit, restrict, or discontinue entirely the acceptance or writing of any policies, coverages, lines or kinds of insurance, at any time it deems it advisable to do so, and without notice to or consent of the Agent, and any such change, alteration, amendment or limitations shall become effective on the date specified by the Company.

   In order to maximize productivity and lower operating expenses to the benefit of the customer, agent and Companies, the Companies are investing in a computerized transaction and record-keeping system with our agency force. Agents Office Automation (AOA) is designed to assist the agent and ultimately reduce expenses. During the transitional period, the Company will utilize and accept transmittal of both hardcopy and electronic transactions. This dual system will not continue indefinitely. On the date that total policies in force of agents using the AOA system represent 70% of the Company's personal lines policies in force, the Company will notify you that the dual system (hardcopy and electronic transactions) will continue to operate for only one year after that date. Six months after notification, the Company reserves the right to require all transactions to be through the AOA system.

15. The Agent shall be liable to the Companies for all expenses, loss or damage suffered by the Companies on account of any violation of or refusal or failure to comply with the terms of this Agreement. The Companies shall have the right to institute legal proceedings to enjoin the employee from doing any act in violation of this Agreement or to enforce the specific performance of all the agreements on the part of the Agent. The rights and remedies reserved by the Companies hereunder shall be construed and held to be cumulative and not exclusive of any other right or remedy available to the Companies.

26.  **Legal Action Under This Agreement.** It is agreed that no action, suit, proceeding at law or in equity shall be brought under this contract unless it is commenced and process is served within three years after the cause of action for which suit is brought. If the limitations set forth in this paragraph are prohibited by the statutes of the state in which this Agreement is issued, then these limitations shall be deemed amended to agree with the minimum period of limitation permitted by such statutes.

IN WITNESS WHEREOF, the Companies have caused their corporate names to be subscribed hereto and the Agent has set his/her hand and seal on this ____18____ day of __September__, 19 _89_.

> NATIONWIDE MUTUAL INSURANCE COMPANY
> NATIONWIDE MUTUAL FIRE INSURANCE COMPANY
> NATIONWIDE LIFE INSURANCE COMPANY
> NATIONWIDE GENERAL INSURANCE COMPANY
> NATIONWIDE PROPERTY AND CASUALTY INSURANCE COMPANY
> NATIONWIDE VARIABLE LIFE INSURANCE COMPANY
> COLONIAL INSURANCE COMPANY OF CALIFORNIA

BY _____
   Agency Manager or Agency Manager — Business

   _____
                    Agent



EXHIBIT
2

3-4-10          6L

# AGENT'S AGREEMENT

**PREFACE**

It is the intent of this Agreement to define the conditions governing the business relationship between the parties involved. Only if both parties understand their duties and responsibilities can a mutually satisfactory relationship be established and maintained. The overall objectives of this Agreement are:

1. To provide a relationship which will result in the best possible service to the customer.
2. To assist the Agent in establishing and maintaining a growing agency which is profitable to both the Agent and the Companies.
3. To maintain the Companies' financial strength at the level necessary to protect the policyholders' interest.

**AGENCY APPOINTMENT**

Nationwide Mutual Insurance Company, Nationwide Mutual Fire Insurance Company, Nationwide Life Insurance Company, Nationwide General Insurance Company, Nationwide Property and Casualty Insurance Company, Nationwide Variable Life Insurance Company, and Colonial Insurance Company of California, collectively referred to in this Agreement as "we," "us," "Nationwide" or the "Companies," insurance corporations organized and existing under the laws of the States of Ohio and California with their principal offices located at Columbus, Ohio, and Anaheim, California appoint, for those Companies which are authorized in the State listed below,

<u>    Brenda Diane Tamariz    </u>

Name

referred to in this Agreement as "you" or the "Agent" of

<u>  3161 Old Solomons Island Road  </u>  <u>  Edgewater  </u>  <u>  Maryland  </u>  <u>  Anne Arundel  </u>

Street-Route                    City                    State                    County

as an agent to represent the Companies in <u>  Maryland  </u>, while properly licensed so to act in accordance with the

State

provisions of this Agreement. This Agreement is to become effective <u>  March 1  </u>, 19 <u>92</u>.

1. **Independent Contractor.** The parties agree that the purpose of this Agreement will be best served by your acting as an independent contractor. Therefore, it is agreed that you are an independent contractor for all purposes. In accordance with the provisions of the Tax Equity and Fiscal Reponsibility Act of 1982, this is to remind you that, since you are an independent contractor and not an employee, you are solely responsible for paying all federal, state, and local estimated income and self-employment taxes as well as the timely and correct reporting and paying of all taxes. As an independent contractor, you have the right to exercise independent judgment as to time, place, and manner of soliciting insurance, servicing policyholders, and otherwise carrying out provisions of the Agreement. Insurance being a closely regulated business, it is understood that it will be necessary for us to provide you with certain manuals, forms, records, and such other materials and supplies as are necessary in the conduct of an insurance business. All such property furnished to you by the Companies or on behalf of the Companies shall remain the property of the Companies and be returned to them in good condition upon any cancellation of this Agreement. We may offer to you, from time to time, training, counsel, and guidance based upon our accumulated experience in the sale and servicing of business. However, it is understood that you may reject or accept such offers at your discretion.

2. **Expenses.** As an independent contractor, you will pay all expenses in connection with your Nationwide insurance agency. You will not incur any indebtedness on behalf of us in connection with expenses resulting from your Nationwide agency.

3. **Licenses.** As an independent contractor, you will be responsible for securing and keeping in effect any required license to represent us as an agent. You agree not to solicit any lines of insurance unless you have the required license authorizing you to do so.

Set forth below are the types of licenses you hold and the date acquired:

| License | Date | Year |
|---|---|---|
| Casualty | October 11, | 19 89 |
| Health and Accident | October 11 | 19 89 |
| Fire and Inland Marine | October 11 | 19 89 |
| Life | October 11 | 19 89 |
| Variable Life | | 19 |

4. **Exclusive Representation.** It is agreed and understood that you will represent us exclusively in the sale and service of insurance. Such exclusive representation shall mean that you will not solicit or write policies of insurance in companies other than those parties to this Agreement, either directly or indirectly, without the written consent of these Companies. It is not intended that the incidental use of voluntary or statutory state or federal insurance plans, or other similar agreements, shall be a violation of this clause.

5. **General Conduct and Representation.** You will maintain a good reputation in the community which you serve and will direct your efforts in the field of insurance toward advancing the business and interest of the Companies to the best of your ability. In the conduct of your business, you will comply with all applicable insurance laws and regulations.

6. **Company Funds.** All funds coming into your possession from customers as premiums or considerations for insurance policies issued by the Companies are funds of the Companies received by you in a fiduciary capacity and shall be immediately remitted to us. If any such funds are not remitted to us, we shall have a first lien on all compensation due or which may become due you to the extent of such funds. Each of the Companies is authorized to deduct the entire amount of such funds due, either before or after the cancellation of this Agreement, from any compensation due you.

7. **Compensation.** Any compensation due you under this Agreement from any of the Companies, may be paid, to you, on their behalf, by any of the other Companies. For all services rendered under this Agreement by you, you shall be compensated solely in accordance with the General Conditions and the Schedules of each Company, attached hereto and made a part hereof except for such additional compensation payable to you under paragraph 11.

   It is agreed that we will pay you any and all original and renewal commissions earned by you, but not credited to your account at the time of entering into this Agreement, on business written by you while employed by us under our Agent's Employment Agreement. It is understood, however, that we may deduct from any compensation due you under this Agreement any commissions previously credited to your account while an employee agent, which subsequently become unearned as a result of the termination or lapse of any policy or coverage.

   Should any Company desire to amend its General Conditions or Schedules, notification in writing of such amendment shall be given to you prior to its effective date, and shall become a part of this contract on its effective date.

8. **Overpayment of Compensation.** Any compensation paid to you for premiums later returned or credited to the customer or any other overpayment of compensation shall be a debt due us from you. In addition to all other rights available to us as a creditor, we shall have the right to deduct such compensation or overpayment from any future compensation due you.

9. **Cancellation.** This Agreement shall be in force until cancelled by either party.

   This Agreement shall automatically cancel upon the date your license to act as an agent for the Companies is revoked or cancelled, or upon death. Further, due to the personal nature of our relationship you or the Companies have the right to cancel this Agreement at any time after written notice has been delivered to the other or mailed to the other's last known address. It is understood that the Agent shall have access to the Agents Administrative Review Board, and its procedures, as it may exist from time to time.

10. **Service to Customer Upon Cancellation.** Upon cancellation of this Agreement, it is understood that the Companies retain the right to continue to provide insurance services to any and all customers and to continue to solicit such customers for additional business.



11. **Agency Security Compensation.**

    a.   Computation of Deferred Compensation Incentive Credits.

For each full calendar year you act as an agent for the Companies, beginning in the first year your annual DCIC Class Earnings equal or exceed the Threshold Amount, until you are age sixty-five (65), the Companies will credit to your account as Deferred Compensation Incentive Credits the percentage set forth below of your DCIC Class Earnings. The Threshold Amount is four times the minimum amount of earnings for which Deferred Compensation Incentive Credits will be credited as set forth in the table below and as further adjusted from time to time in accordance with this paragraph 11-a. DCIC Class Earnings are identified as your annual original and renewal service fee earnings, including earnings from Nationwide Financial Services, Inc., but excluding earnings from joint underwriting associations, reinsurance facilities, auto insurance plans, the variable life policy known as "Investment Life," and line 19 auto business, and limiting earnings from Colonial Insurance Company business to 25% of such earnings. If you entered into an Agent's Agreement providing for an Agents Security Compensation Plan for the first time prior to January 1, 1987, qualification for Deferred Compensation Incentive Credits will occur on the earlier of the satisfaction of the requirement set forth above or the completion of your fifth year of service as an agent with the Companies, crediting all years of service under an Agent's Employment Agreement, Agency Representative Agreement, or Agent's Agreement.

          0% of such earnings under $13,100.00.
          3% of such earnings from $13,100.00 to $19,599.99.
          6% of such earnings from $19,600.00 to $26,299.99.
         10% of such earnings from $26,300.00 to $32,799.99.
         15% of such earnings from $32,800.00 to $462,100.00.
          0% of such earnings in excess of $462,100.00.

It is understood that the Deferred Compensation Incentive Credit formula set out above is applicable to credits calculated for the calendar years of 1987 and 1988 only. For each succeeding two (2) year period, the formula ranges shall be adjusted based on fifty (50) percent of the percentage change that has occurred in the Consumer Price Index (CPI) for all Urban Consumers, U.S., City Average, All Items during the preceding two (2) year period. (The change in the CPI will be measured over a two year period based on the month of June, with formula changes, if any, effective the following January 1.) These changes will be communicated prior to their effective date and shall supersede the previous formula.

    b.   Extended Earnings Payable Upon Qualified Cancellation of this Agreement.

When you qualify for the Deferred Compensation Incentive Credits, you will also qualify for extended earnings payable upon qualified cancellation of this Agreement. Upon qualified cancellation of this Agreement an amount equal to the renewal service fees paid to you by each Company for the last full twelve (12) calendar months immediately proceeding such cancellation subject to the following exceptions:

    (1)   Renewal service fees earned from joint underwriting associations and state automobile insurance plans shall be excluded.

    (2)   For purposes of extended earnings renewal services shall be reduced by 50% on reinsurance facility and line 19 auto business.

    (3)   Extended Earnings on Nationwide General business shall be calculated at 70% of the last 12 months total compensation paid to you on such business.

    (4)   Extended Earnings on Colonial business shall be calculated at 25% of the last 12 months total compensation paid to the Agent.

    (5)   Extended Earnings will be retroactively reduced by the amount of renewal commissions originally included in the extended earnings calculation on any commercial policy or account which does not renew in the 12 months following cancellation of this agreement on which policy or account you were paid $20,000 or more in renewal commissions during the preceding 12 month period. This chargeback will not apply if cancellation of this agreement occurs due to your death, permanent and total disability, or attainment of age 65.



c.   Amounts Payable Upon Qualified Cancellation.

  (1)  **If you live until retirement,** you will receive your Extended Earnings, provided you have completed five years of service with the Companies as an agent. In addition, you will receive Deferred Compensation Incentive Credits in accordance with the provisions outlined in paragraph 11-c(3) and 11-d(2).

  (2)  **If you die or become totally and permanently disabled** which results in the cancellation of this Agreement, provided that you have completed five years of service with the Companies as an agent, you or your beneficiary, or the estate of your beneficiary will receive your Extended Earnings and 100% of your accumulated Deferred Compensation Incentive Credits.

  (3)  **If at the time this Agreement is cancelled** for reasons other than death or total and permanent disability you have completed at least five years of service with the Companies as an agent, you will receive the Extended Earnings. Deferred Compensation Incentive Credits will be paid to you in accordance with the following schedule and the provisions of paragraph 11-d(2):

    (a)  50% of Benefit Payable — When age plus length of service as agent equals the sum of 45.

    (b)  10% Additional Benefit Payable for each year of service after the sum of 45 as defined in paragraph (a) above is attained, subject to a maximum under (a) and (b), of 100% of such benefit.

d.   Provisions for Payment

After deducting any amount paid to you under this paragraph for cancellation or termination of any prior Agreement, or as extended renewal service fees under any former agreement, or any amounts due the Companies from you, the Companies will pay to you, or should you not survive, your beneficiary or the estate of your beneficiary:

  (1)  Your Extended Earnings divided into ten (10) equal parts as follows:

    Commencing within sixty (60) days following qualified cancellation of this Agreement:

    The first part shall be payable in twelve (12) equal monthly installments, each monthly installment after the first on the first day of subsequent consecutive months.

    The remaining parts shall be paid in equal annual installments, the first annual installment payable thirty (30) days after payment of the last monthly installment and each other annual installment thereafter on the anniversary of that date until paid. At your election prior to your cancellation, such annual installments may be made in equal monthly payments.

(2) The amount of Deferred Compensation Incentive Credits to which you are entitled payable in ten (10) equal parts as follows:

Commencing sixty (60) days after your death or total and permanent disability which results in the cancellation of this Agreement, or sixty (60) days after other qualified cancellation of this Agreement.

It is understood that in the event such payments would commence prior to age 60, for reasons other than death or total and permanent disability, such payments shall be reduced to the percentages shown in the following table:

| Age At Which Benefit Payments Commence | Percent of Accrued Benefits To be Paid |
|---|---|
| 60 | 100.00% |
| 59 | 94.34% |
| 58 | 89.00% |
| 57 | 83.96% |
| 56 | 79.21% |
| 55 | 74.73% |
| 54 | 70.50% |
| 53 | 66.51% |
| 52 | 62.74% |
| 51 | 59.19% |
| 50 | 55.84% |
| Under 50 | None |

*These sums shall be payable as outlined in d-(1) above.*

(3) Election for Different Payment.

At your written election, received by the Companies prior to the time of cancellation of this Agreement, the Companies will agree to make payments of Extended Earnings and/or Deferred Compensation Incentive Credits under one of the following methods. Amounts payable as Deferred Compensation Incentive Credits, regardless of election, are not payable prior to your reaching age fifty (50) except in the case of death or total and permanent disability.

(a) To make payments in not less than three (3) nor more than ten (10) equal parts.

Commencing within sixty (60) days after qualified cancellation or such other later date as provided by the election and the terms of this Agreement, and the parts shall be payable as in d-(1) above.

(b) To pay to you the amounts payable in accordance with paragraph 11, under one of the following three forms of annuity benefits. Such benefits to be determined as actuarial equivalent amounts in accordance with such interest rates and mortality tables as adopted by the Companies for this purpose.

1. Life Annuity — No Death Benefit
2. Life Annuity — Installment Refund, or
3. Life Annuity — Joint and Survivorship

Payments shall commence within sixty (60) days after qualified cancellation or such other later date as provided by the election and the terms of this Agreement.

    (c)   To divide the amounts payable to you as you elect, paying part in equal annual installments, not less than three (3) nor more than ten (10), with the balance payable under subparagraph (b) above.

        The amount payable as equal annual installments shall be paid as provided in subparagraph (a) and the balance as in subparagraph (b).

  (4)   Payment in Event of Employment.

        If this Agreement is cancelled as a result of your employment by the Companies, payments to you shall be deferred until your separation from the Companies, death or total and permanent disability. At that time, payment shall commence as provided by this paragraph 11 as if employment had not intervened.

e.    Qualified Cancellation.

    Unless you have induced or attempted to induce, either directly or indirectly, policyholders to lapse, cancel, or replace any insurance contract in force with the Companies, the cancellation of this Agreement shall be a qualified cancellation for the purpose of this Agreement.

f.    Cessation of Agency Security Compensation.

    All liability of the Companies for Agency Security Compensation provided for in paragraph 11 and its subparagraphs shall cease and terminate in the event any one or more of the following shall occur:

  (1)   You either directly or indirectly, by and for yourself or as an agent for another, or through others as their agent, engage in or be licensed as an agent, solicitor, representative, or broker or in anyway be connected with the fire, casualty, health, or life insurance business, within one year following cancellation within a 25 mile radius of your business location at that time; or

  (2)   You fail to return in good condition, within ten days, all materials, records, and supplies furnished to you by the Companies during the course of this Agreement, together with any copies thereof; or

  (3)   After cancellation of this Agreement, you directly or indirectly induce, attempt to induce, or assist anyone else in inducing or attempting to induce policyholders to lapse, cancel, or replace any insurance contract in force with the Companies; furnish any other person or organization with the name of any policyholder of the Companies so as to facilitate the solicitation by others of any policyholder for insurance or for any other purpose.

g.    The Agency Security Compensation is intended to be in lieu of the compensation and/or benefits awarded by any state statute or regulation. If you elect any benefits of any such statute or regulation then the amount of such benefits so received shall be deducted from the benefits due you under paragraph 11. If the exact amounts of any such statutory or regulatory benefits are known at the time of the cancellation of this Agreement, then this deduction shall be immediately made and the balance of such benefits under paragraph 11 shall commence as provided for under the provision of paragraph 11. If the exact amount of such statutory or regulatory benefits are not known at the time of the cancellation of this Agreement, then the payment of any benefits under paragraph 11 shall be deferred until such time as the amount of such statutory or regulatory benefits becomes known.

h.    Amendments and Termination.

    The Companies hope and expect to continue the Agency Security Compensation Plan indefinitely, and every effort has been made to meet future conditions. In order to protect you and the Companies against unforeseen conditions however, the right to amend or terminate this plan is necessarily reserved by the Companies. The Companies may terminate this plan by notification, at least sixty (60) days prior to such termination, in writing. No change in the Plan or termination however can alter or modify rights or benefits received or granted prior to such change or termination.

12. **Agent's Activities After Cancellation.** (Applicable only to agents entering an independent contractor's agreement for the first time on and after July 1, 1969.)

You agree that if the Agreement is cancelled within a period of five years from the date of your first contract as an agent with the Company, you will not, either directly or indirectly, by and for yourself or as agent for another or through others as their agent, engage in or be licensed as an agent, solicitor, representative, or broker or in any way be connected with the fire, casualty, health, or life insurance business, within a 25 mile radius of your last business location for a period of one year from the date of the voluntary or involuntary cancellation of this Agreement or, should we find it necessary by legal action to enjoin you from competing with us, one year after the date such injunction is obtained.

In any jurisdiction where a covenant similar to that appearing above is held to be invalid either by statute or by judicial decision, you agree upon cancellation of this Agreement you shall thereafter refrain from further solicitation or servicing of policyholders of the Companies and from interfering in any way for a period of one year with existing policies and policyholders in the geographical area described above.

In the event that we are successful in any suit or proceeding brought or instituted by us to enforce any of the provisions of this Agreement or on account of any damages sustained by us by reason of the violation by you of the terms and/or provisions of this Agreement, you agree to pay to us such reasonable attorneys' fees as are permitted by statute and fixed by the court.

13. **Agent Number.** For the benefit of the Companies and the agent, a number is assigned to each agent to facilitate more efficient use of the Companies computer system. This number is the property of the Companies and may be reassigned for identification within that system. Your name will be printed for your benefit on billings and materials received by our policyholders. If this agreement is cancelled, your name will be removed as soon as possible, but you acknowledge that occasional error may cause it to continue to be printed.

14. **Pricing, Products, Rules, and Regulations.** The insurance business being subject to changing laws, regulations, and conditions, it is understood and agreed that each Company will prescribe rules, regulations, prices, and terms under which it will insure risks, and each Company retains the right to change, alter or amend such rules, regulations, prices, and terms, including the right to limit, restrict, or discontinue entirely the acceptance or writing of any policies, coverages, lines or kinds of insurance, at any time it deems it advisable to do so, and without notice to or consent of the Agent, and any such change, alteration, amendment or limitation shall become effective on the date specified by the Company.

In order to maximize productivity and lower operating expenses to the benefit of the customer, agent and Companies, the Companies are investing in a computerized transaction and record-keeping system with our agency force. Agents Office Automation (AOA) is designed to assist the agent and ultimately reduce expenses. During the transitional period, the Company will utilize and accept transmittal of both hardcopy and electronic transactions. This dual system will not continue indefinitely. On the date that total policies in force of agents using the AOA system represent 70% of the Company's personal lines policies in force, the Company will notify you that the dual system (hardcopy and electronic transactions) will continue to operate for only one year after that date. Six months after notification, the Company reserves the right to require all transactions to be through the AOA system.

15. **Authorization to Direct Bill.** The agent and the Companies agree that it is to their mutual benefit for the Companies to bill the policyholders directly. The agent hereby gives the Companies permission to use his name on those billings and for use of his name for a reasonable period following the cancellation of his Agreement.

16. **Extent of Authority.** You will obligate us only to the extent authorized by the rules and regulations set forth by us from time to time, or as may be authorized in writing by an officer of the Companies.

17.  **Amendments or Modifications.** Except as otherwise provided herein, this Agreement may be changed, altered, or modified only in writing signed by you and an officer of the Companies.

18.  **Assignment of Agreement.** The Companies rely upon your particular personal abilities in carrying out your obligations under this Agreement, therefore, no assignment of your rights, responsibilities, or any sums due you under this Agreement shall be made without prior written consent signed by an officer of the Companies.

19.  **Agreement Defined, Prior Agreements Superseded.** Whenever used in this Agreement, the term "Agreement" shall mean any contract in writing captioned "Standard Agent's Agreement," "Master Agent's Agreement," "Agent's Employment Agreement," "Corporate Agency Agreement" or "Agent's Agreement" between you and the Companies executing this Agreement. The execution and delivery of this Agreement shall supersede and take the place of any prior Agreement, provided that the execution and delivery of this Agreement shall not affect your obligation to pay any money due the Companies from you under the provisions of any other agreement, written or oral, nor shall the execution of this Agreement nullify any negotiated compensation Agreement, differing from the schedules of compensation attached to former Agreements, entered into between you and the Companies on cases written prior to the execution of that Agreement.

20.  **Severability.** If any clause or part of this Agreement shall be held invalid for any reason, then such invalidity shall not affect any part of this Agreement and the parts thereof not invalid sha I remain in full force and effect.

21.  **Legal Action Under This Agreement.** It is agreed that no action, suit, proceeding at law or in equity shall be brought under this contract unless it is commenced and process is served within three years after the cause of action for which suit is brought. If the limitations set forth in this paragraph are prohibited by the statutes of the state in which this Agreement is issued, then these limitations shall be deemed amended to agree with the minimum period of limitation permitted by such statutes.

IN WITNESS WHEREOF, the Agent has signed his name and the Companies have caused their corporate names to be affixed by their duly authorized representative to duplicate copies hereof.

> NATIONWIDE MUTUAL INSURANCE COMPANY
> NATIONWIDE MUTUAL FIRE INSURANCE COMPANY
> NATIONWIDE LIFE INSURANCE COMPANY
> NATIONWIDE GENERAL INSURANCE COMPANY
> NATIONWIDE PROPERTY AND CASUALTY INSURANCE COMPANY
> NATIONWIDE VARIABLE LIFE INSURANCE COMPANY
> COLONIAL INSURANCE COMPANY OF CALIFORNIA

By _Richard J Kesey_                          _3-1-92_
    For the Companies                          (Date)

_Brenda Diane Tamariz_                          _3-1-92_
    Agent                          (Date)

# ADDENDUM TO PAGE - 3 -

## Independent Contractor Agent's Agreement

This addendum is provided to update Paragraph 11 of the Agent's Agreement.

The formula applicable to calculate Deferred Compensation Incentive Credits for the calendar year of 1991 is as follows:

> 0% of such earnings under $14,300.
> 3% of such earnings above that to $21,400.
> 6% of such earnings above that to $28,700.
> 10% of such earnings above that to $35,800.
> 15% of such earnings above that to $504,200.
> 0% of such earnings thereafter.

Please file this with your Agent's Agreement for reference purposes.

NOTE - A copy of the above addendum should be attached to ALL Independent Contractor Agent's Agreement.

Master
1991 Edition

All States except
Massachusetts



## CORPORATE AGENCY AGREEMENT

### Preface

It is the intent of this Agreement to define the conditions governing the business relationship between the parties involved.   Only if both parties understand their duties and responsibilities can a mutually satisfactory relationship be established and maintained.   The overall objectives of this Agreement are:

1.   To provide a relationship which will result in the best possible service to the customer and continue a relationship with the Principal.

2.   To assist the Agency in establishing and maintaining a growing agency which is profitable to both the Agency and the Companies.

3.   To maintain the Companies' financial strength at the level necessary to protect the policyholder's interests.

### Agency Appointment

Nationwide Mutual Insurance Company, Nationwide Mutual Fire Insurance Company, Nationwide Life Insurance Company, Nationwide General Insurance Company, Nationwide Property and Casualty Insurance Company, Nationwide Assurance Company, Nationwide Insurance Company of Florida, Colonial County Mutual Insurance Company, and Nationwide Lloyds, collectively referred to in this Agreement as, "we," "us," "Nationwide" or the "Companies," insurance corporations organized and existing under the laws of the States of Ohio, Wisconsin and Texas with their principal offices located at Columbus, Ohio appoint, for those Companies which are authorized in the State listed below.

<u>Diane Tamariz & Associates, PA</u>
Name

referred to in this Agreement as "Agency" of

<u>    3147 Solomons Island Rd., Edgewater    </u> , to
Address

serve as an agent for Nationwide in <u>     MD 21037     </u> ,
State

while properly licensed so to act in accordance with the provisions of this Agreement.   Whenever used in this Agreement the term "Principal" shall mean Diane Tamariz-Wallace.

1.   <u>Agency Operation</u>.   The Agency shall determine the time, place, and manner of soliciting insurance, servicing policyholders, and otherwise carrying out the provisions of this Agreement.   Such services shall be performed by, or under the supervision of, the Principal.   In no event will the name "Nationwide" or "Colonial" be utilized as a part of the Agency name.   Insurance being a closely regulated business, it is

understood that it will be necessary for Nationwide to provide the Agency with certain manuals, forms, records, and such other materials and supplies as are necessary in the conduct of an insurance business. All such property furnished to agency by Nationwide or on behalf of Nationwide shall remain the property of Nationwide and be returned to them in good condition upon any cancellation of this Agreement. Nationwide may offer to the Agency and its employees, from time to time, training, counsel, and guidance based upon its accumulated experience in the sale and servicing of business; however, it is understood that the Agency may reject or accept such offers at its discretion.   In order to comply with the requirements of the Tax Equity and Fiscal Responsibility Act of 1982, this is to remind you that the Agency is a corporation and is an independent contractor and not an employee and, as such independent contractor, is solely responsible for paying all federal, state, and local taxes as well as the timely and correct reporting, withholding, and paying of all taxes.

2.   Expenses.   Agency will pay all expenses in connection with its Nationwide insurance agency.   Agency will not incur any indebtedness on behalf of Nationwide in connection with expenses resulting from its Nationwide agency.

3.   Licenses.   Agency will be responsible for securing and keeping in effect any required license, as well as those of any officer or employee, to represent Nationwide as an agent.   Agency agrees not to solicit any lines of insurance unless it has the required license authorizing it to do so.

4.   Exclusive Representation.   It is agreed and understood that the Agency, its Principal, directors, officers and employees, will represent Nationwide exclusively in the sale and service of insurance. Such exclusive representation shall mean that they will not solicit or write policies of insurance in companies other than those parties to this Agreement, either directly or indirectly, without the written consent of Nationwide.   It is not intended that the incidental use of voluntary or statutory state or federal insurance plans, or other similar agreements, shall be a violation of this clause.

5.   General Conduct and Representation.   The Agency through its Principal, directors, officers, and employees will maintain a good reputation in the community which it serves and will direct its efforts in the field of insurance toward advancing the business and interest of Nationwide to the best of Agency's ability.   In the conduct of Agency business, the Agency will comply with all applicable insurance laws and regulations.

6.   Company Funds.   All funds coming into the Agency's possession from customers as premiums or considerations for insurance policies issued by Nationwide are funds of Nationwide received by Agency in a fiduciary capacity and shall be immediately remitted to Nationwide. If any such funds are not remitted, Nationwide shall have a first lien on all sums due or which may become due Agency to the extent of such funds.   Each of the Companies is authorized to deduct the entire

amount of such funds due, either before or after the cancellation of this Agreement, from any sums due the Agency.

7. Compensation. Any sums due the Agency under this Agreement from any of the Companies may be paid on their behalf to Agency by any of the other Companies. For all services rendered under this Agreement by the Agency, it shall be compensated solely in accordance with the General Conditions and the Schedules of each Company, attached hereto and made a part hereof except for such additional sums payable to Agency under paragraph 11.

Should Nationwide desire to amend its General Conditions or Schedules, written notification of such amendment shall be given to the Agency prior to its effective date, and shall become a part of this contract on its effective date.

8. Overpayment of Compensation. Any sums paid to the Agency for premiums later returned or credited to the customer or any other overpayment of sums shall be a debt due Nationwide from the Agency. In addition to all other rights available to Nationwide as a creditor, Nationwide shall have the right to deduct such sums or overpayment from any future sums due the Agency.

9. Cancellation. This Agreement shall be in force until canceled by either party.

This Agreement shall automatically cancel upon the date the Agency's or its Principal's appointment or license to act as an agent for Nationwide is revoked or canceled, or upon death, permanent and total disability or retirement of the Principal of the Agency. Further, the Agency or Nationwide have the right to cancel this Agreement at any time with or without cause, after written notice has been delivered to the other or mailed to the other's last known address. It is understood that the Agency shall have access to the Agents Administrative Review Board, and its procedures, as may exist from time to time.

10. Service to Customer Upon Cancellation. Upon cancellation of this Agreement, it is understood that Nationwide retains the right to continue to provide insurance services to any and all customers and to continue to solicit such customers for additional business.

11. Agencies Activities After Cancellation. Agency agrees that if the Agreement is canceled prior to Agency meeting the qualification under Paragraph 12 of this Agreement or five years from the effective date of Agency Principal's first Agency Agreement with Company, the Agency, Principal or any other licensed employee will not, either directly or indirectly, by and for themselves or as agents for another or through others as their agent, engage in or be licensed as an agent, solicitor, representative, consultant or broker or in any way be connected with the fire, casualty, health or life insurance business, within a 25-mile radius or any business location of the Agency or any business location of the Principal or licensed employee for a period of one year from the date of the voluntary or involuntary cancellation

of this Agreement, or should the Companies find it necessary by legal action to enjoin Agency from competing with the Companies, one year after the date such injunction is obtained.

In any jurisdiction where a covenant similar to the one appearing in the paragraph above is held to be invalid either by statute or by judicial decision, the Agency, the Principal, or any licensed employee agree that upon cancellation of this Agreement, the Agency, its Principal and employees shall thereafter refrain from further solicitation of servicing of policyholders of the Companies and from interfering in any way for a period of one year with existing policies and policyholders in the geographical area described in the aforementioned paragraph.

In the event that the Companies are successful in any suit or proceeding brought or instituted by them to enforce any of the provisions of this Agreement, or on account of any damages sustained by them by reason of the violation by the Agency, the Principal, or any licensed employee of the terms and/or provisions of this Agreement, the Agency, Principal, or licensed employee jointly and severally agree to pay to the Companies such reasonable attorney's fees as are permitted by statute and/or fixed by the court.

12. Agency Security Compensation.

   a. Computation of Deferred Compensation Incentive Credits.

   For each full calendar year the Agency acts as an agent for the Companies, beginning in the first year its annual DCIC Class Earnings equal or exceed the Threshold Amount, until August 1, 2019, the Companies will credit to the Agency's account as Deferred Compensation Incentive Credits the percentage set forth below of its DCIC Class Earnings. The Threshold Amount is four times the minimum amount of earnings for which Deferred Compensation Incentive Credits will be credited as set forth in the table below and as further adjusted from time to time in accordance with this paragraph 12-a. DCIC Class Earnings are identified as the Agency's annual original and renewal service fee earnings, including earnings from Nationwide Financial Services, Inc., but excluding earnings from joint underwriting associations, reinsurance facilities, auto insurance plans, the variable life policy known as "Investment Life," and line 19 auto business, and limiting earnings from Nationwide Assurance Company business to 25% of such earnings.

   0% of such earnings under $16,900.00
   3% of such earnings from $16,900.00 to $25,200.00
   6% of such earnings from $25,201.00 to $33,700.00
   10% of such earnings from $33,701.00 to $42,200.00
   15% of such earnings from $42,201.00 to $1,000,000.00
   10% of such earnings in excess of $1,000,000.00

   It is understood that the Deferred Compensation Incentive Credit formula set out above is applicable to credits calculated for the

calendar years of 2003 and 2004 only.  For each succeeding two (2) year period, the formula ranges shall be adjusted based on fifty (50) percent of the percentage change that has occurred in the Consumer Price Index (CPI) for all Urban Consumers, U.S., City Average, All Items during the preceding two (2) year period. (The change in the CPI will be measured over a two year period based on the month of June, with formula changes, if any, effective the following January 1.)   These changes will be communicated prior to their effective date and shall supersede the previous formula.

b.   Extended Earnings Payable Upon Qualified Cancellation as an Agency.

When the Agency qualifies for the Deferred Compensation Incentive Credits, it will also qualify for extended earnings payable upon qualified cancellation of this Agreement.   Upon qualified cancellation of this Agreement an amount equal to the renewal service fees paid to the Agency by each company for the last full twelve (12) calendar months immediately proceeding such cancellation subject to the following exceptions:

(1)   Renewal service fees earned from joint underwriting associations and state automobile insurance plans shall be excluded.

(2)   For purposes of extended earnings renewal services shall be reduced by 50% on reinsurance facility and line 19 auto business.

(3)   Extended earnings on Nationwide General business shall be calculated at 70% of the last 12 months total compensation paid to you on such business.

(4)   Extended earnings on Nationwide Assurance Business shall be calculated at 25% of the last 12 months total compensation paid to the agent.

(5)   Extended earnings will be retroactively reduced by the amount of renewal commissions originally included in the extended earnings calculation on any policy or commercial account which does not renew in the 12 months following cancellation of this agreement on which policy or account the Agency was paid $20,000 or more in renewal commissions during the preceding 12 month period.  This chargeback will not apply if cancellation of this agreement occurs due to death, permanent and total disability, or attainment of age 65 of the Principal of the Agency.

c.   Amounts Payable Upon Qualified Cancellation.

(1)   Upon qualified cancellation for reasons of death or total and permanent disability of the Principal which results in the cancellation of this Agreement, Nationwide will pay the

Agency the amount of Extended Earnings determined under subparagraph 12-b hereof plus 100% of the amount of Deferred Compensation Incentive Credits determined under subparagraph 12-a hereof.

(2)   If Nationwide cancels this Agreement for reasons other than death or total and permanent disability of the Principal, Nationwide will pay to Agency 100% of the amount of Extended Earnings determined under subparagraph 12-b hereof plus a percentage of Deferred Compensation Incentive Credits based upon the following table, subject to the limits of paragraph 12d.(2)

  (a)   50% of Benefit Payable – On August 13, 1994.

  (b)   10% Additional Benefit Payable for each year after the date listed in paragraph (2)(a) above is attained, subject to a maximum under (a) and (b) of 100% of such benefit.

d.   Provisions for Payment.

After deducting any amount paid to Agency under this paragraph for cancellation or termination of any prior Agreement by Agency, or any amounts due Nationwide from Agency, Nationwide will pay to Agency:

(1)   Agency's Extended Earnings divided into ten (10) equal parts as follows:

Commencing within sixty (60) days following qualified termination of this Agreement:

This first part shall be payable in twelve (12) equal monthly installments, each monthly installment after the first, on the first day of subsequent consecutive months.

The remaining parts shall be paid in equal annual installments, the first annual installment payable thirty (30) days after payment of the last monthly installment and each other annual installment thereafter on the anniversary of that date until paid. At Agency's election, such annual installments may be made in equal monthly payments.

(2)   The amount of Deferred Compensation Incentive Credits to which Agency is entitled payable in ten (10) equal parts as follows:

Commencing sixty (60) days after the death or total and permanent disability of the principal, which results in the cancellation of this Agreement, or sixty (60) days after the other qualified cancellation of this Agreement.

It is understood that in the event such payment would commence prior to August 1, 2014 (the Starting Date), for reasons other than the death or total and permanent disability of the principal, such payments shall be reduced to the percentages shown in the following table:

| DISCOUNTED BENEFIT SCHEDULE, AGES 50 TO 60 | |
| --- | --- |
| Age At Which Benefit Payments Commence | Percent. Of Accrued Benefits To Be Paid |
| 60 | 100.00% |
| 59 | 94.34% |
| 58 | 89.00% |
| 57 | 83.96% |
| 56 | 79.21% |
| 55 | 74.73% |
| 54 | 70.50% |
| 53 | 66.51% |
| 52 | 62.74% |
| 51 | 59.19% |
| 50 | 55.84% |
| Under 50 | None |

These sums shall be payable as outlined in d(1) above.

(3)   Election for Different Payment.

At Agency's written election, received by Nationwide prior to the time of cancellation of this Agreement, Nationwide will agree to make payments of Extended Earnings and/or Deferred Compensation Incentive Credits in not less than three (3) nor more than ten (10) equal. parts, commencing within sixty (60) days after qualified cancellation or such other later date as provided by the election and the terms of this Agreement, and the parts shall be payable as in d(1) above.

Amounts payable as Deferred Compensation Incentive Credits, regardless of election, are not payable prior to August 1, 2004, except in the case of the death or total and permanent disability of the Principal.

(4)   Payment in Event of Employment of the Principal.

If this Agreement is canceled as a result of the employment of the Principal of the Agency by the Companies, payments shall be deferred until the separation of the Principal as an employee from the Companies, or death or total and permanent disability of the Principal.   At that time, payment shall commence as provided by this paragraph 12 as if employment had not intervened.

e.    Qualified Cancellation.

Unless Agency, Agency's Principal, or any employee of Agency
induced or attempted to induce, either directly or indirectly,
policyholders to lapse, cancel, or replace any insurance contract
in force with Nationwide, the cancellation of this Agreement
shall be a qualified cancellation for the purpose of this
Agreement.

f.    Cessation of Agency Security Compensation.

All liability of Nationwide for Agency Security Compensation
provided for in paragraph 12, and its subparagraphs shall cease
and terminate in the event any one or more of the following shall
occur:

(1)    Agency, Agency's Principal, or any employee of Agency,
either directly or indirectly, by and for themselves or as
agent for another, or through others as their agent, engage
in or be licensed as an agent, solicitor, representative, or
broker, or in any way be connected with the fire, casualty,
health, or life insurance business within one year following
cancellation within a twenty-five (25) mile radius of
Agency's business location at the time of cancellation; or

(2)    Agency fails to return in good condition, within ten days,
all materials, records, and supplies furnished to Agency by
Nationwide during the course of this Agreement, together
with any copies thereof; or

(3)    After cancellation of this Agreement, Agency, Agency's
Principal, or its employees solicit or attempt to solicit
existing policyholders at any time, or directly or
indirectly induces, attempts to induce or assists anyone
else in inducing or attempting to induce policyholders to
lapse, cancel, or replace any insurance contract in force
with Nationwide; furnish any other person or organization
with the name of any policyholder of Nationwide so as to
facilitate the solicitation by others of any policyholder
for insurance or for any other purpose.

g.    The Agency Security Compensation is intended to be exclusive of
the compensation and/or benefits awarded by any state statute or
regulation.    If the Agency elects any benefits of any such
statute or regulation, then the amount of such benefits so
received shall be deducted from the benefits due Agency under
paragraph 12.    If the exact amounts of any such statutory or
regulatory benefits are known at the time of the cancellation of
this Agreement, then this deduction shall be immediately made and
the balance of such benefits under paragraph 12 shall commence as
provided for under the provision of paragraph 12.    If the exact
amount of such statutory or regulatory benefits are not known at
the time of the cancellation of this Agreement, then the payment

of any benefits under paragraph 12 shall be deferred until such time as the amount of such statutory or regulatory benefits becomes known.

h.    Amendments and Termination.

Nationwide hopes and expects to continue the Agency Security Compensation Plan indefinitely, and every effort has been made to meet future conditions.    In order to protect the Agency and Nationwide against unforeseen conditions, however, the right to amend or terminate this plan is necessarily reserved by Nationwide.  Nationwide may terminate this plan by notification, at least sixty (60) days prior to such termination, in writing. No change in the Plan or termination, however, can alter or modify rights or benefits received or credited prior to such change or modification.

13.    Pricing, Products, Rules and Regulations.    The insurance business being subject to changing laws, regulations and conditions, it is understood and agreed that each Company will prescribe rules, regulations, prices and terms under which it will insure risks, and each Company retains the right to change, alter or amend such rules, regulations, prices and terms, including the right to limit, restrict, or discontinue entirely the acceptance of writing any policies, coverages, lines or kinds of insurance, at any time it deems advisable to do so, and without notice to or consent of the agent, and any such change, alteration, amendment or limitations shall become effective on the date specified by the Company.

In order to maximize productivity and lower operating expenses to the benefit of the customer, agent and Companies, the Companies are investing in a computerized transaction and record-keeping system with our agency force.    Agents Office Automation (AOA) is designed to assist the agent and ultimately reduce expenses.    During the transitional period, the Company will utilize and accept transmittal of both hard copy and electronic transactions.  This dual system will not continue indefinitely.  On the date that total policies in force of agents using the AOA system represent 70% of the Company's personal lines policies in force, the Company will notify you that the dual system (hard copy and electronic transactions) will continue to operate for only one year after that date.    Six months after notification, the Company reserves the right to require all transactions to be through the AOA system.

14.    Agency Number.  For the benefit of the Companies and the Agency, a number is assigned to each Agency to facilitate more efficient use of the Companies' computer system.    This number is the property of the Companies and may be reassigned for identification within that system. The Agency name will be printed for the Agency's benefit on billings and materials received by our policyholders.  If this Agreement is canceled, the Agency name will be removed as soon as possible, but the Agency acknowledges that occasional error may cause it to continue to be printed.

15. <u>Extent of Authority</u>.   Agency, through its employees, will obligate Nationwide only to the extent authorized by the rules and regulations set forth by Nationwide from time to time, or as may be authorized in writing by an officer of Nationwide.

16. <u>Authorization to Direct Bill</u>.   The Agency and the Companies agree that it is to their mutual benefit for the Companies to bill the policyholders directly.   The Agency hereby gives the Companies permission to use its name on those billings and for use of its name for a reasonable period following the cancellation of this Agreement.

17. <u>Amendments or Modifications</u>.   Except as otherwise provided herein, this Agreement may be changed, altered, or modified only in writing signed by Agency and an officer of Nationwide.

18. <u>Assignment of Agreement</u>.   No assignment of Agency's rights, responsibilities, or any sums due Agency under this Agreement shall be made without prior written consent signed by an officer of Nationwide.

19. <u>Agreement Defined, Prior Agreements Superseded</u>.   Whenever used in this Agreement, the term "Agreement" shall mean any contract in writing captioned "Standard Agent's Agreement," "Master Agent's Agreement," or "Corporate Agency Agreement," between Agency and Nationwide executing this Agreement.   The execution and delivery of this Agreement shall supersede and take the place of any prior Agreement, provided that the execution and delivery of this Agreement shall not affect Agency's, principal's, or licensed employees, obligation to pay any money due Nationwide from the principal or Agency under the provisions of any other Agreement, written or oral, nor shall the execution of this Agreement nullify any negotiated compensation agreement, differing from the Schedules of Compensation attached to former Agreements, entered into between the Agency and the Companies on cases written prior to the execution of this Agreement.

20. <u>Severability</u>.   If any clause or part of this Agreement shall be held invalid for any reason, then such invalidity shall not affect any other part of this Agreement and the parts thereof not invalid shall remain in full force and effect.

21. <u>Legal Action Under This Agreement</u>.   It is agreed that no action, suit, proceeding at law or in equity shall be brought under by this contract unless it is commenced and process is served within three years after the cause of action for which suit is brought.   If the limitations set forth in this paragraph are prohibited by the statutes of the state in which this Agreement is issued, then these limitations shall be deemed amended to agree with the minimum period of limitation permitted by such statutes.

## GUARANTY

FOR VALUE RECEIVED, and to induce the above Insurance Companies to enter into the foregoing Agency Agreement with Diane Tamariz & Associates, PA, ("Agency"), the undersigned, individually, hereby guarantees the performance by Agency of all the terms and conditions contained in said Agency Agreement to be performed, kept and observed by said Agency, including but not limited to the unconditional payment of all amounts and debts due from Agency, and hereby waives demand, protest, and notice of non-payment of any and all said indebtedness, liabilities, and obligations. The undersigned principal further covenants that over 50% of the voting shares of Agency are and will remain beneficially owned by the Principal.

Further, as principal I understand that I am included within Paragraph 12e and f of this and all former agreements as Principal and in my individual capacity. Specifically, any compensation due as individual is merged into the conditions as principal.

Furthermore, Principal warrants that this is the only Agency Agreement with the Companies for licensed employees of the Corporate Agency except for Associate Agent agreements of the Agency.

Date: __6.21.04__

_B Diane Tamariz Wallace_
(Principal)

## SIGNATURE PAGE

If the agent earns commissions for business written in a state other than the agent's resident state, and the non-resident state does not allow the payment of commissions to a corporation, those commissions will be paid to, and reported as income to, the principal agent as an individual under the principal's tax identification number.  Such commission will not be reported as corporate income.

The effective date of this agreement is July 1, 2004, or, the first of the month following receipt of a copy of this completed signature page in Centralized Licensing, Nationwide Insurance, Columbus, Ohio.

IN WITNESS WHEREOF, Agency and Nationwide have caused their corporate names to be affixed by their duly authorized representative to duplicate copies hereof.

NATIONWIDE MUTUAL INSURANCE COMPANY
NATIONWIDE MUTUAL FIRE INSURANCE COMPANY
NATIONWIDE LIFE INSURANCE COMPANY
NATIONWIDE GENERAL INSURANCE COMPANY
NATIONWIDE PROPERTY AND CASUALTY INSURANCE COMPANY
NATIONWIDE LIFE AND ANNUITY INSURANCE COMPANY
COLONIAL INSURANCE COMPANY OF WISCONSIN

By _____    6-24-04
     (for) the Companies                      (DATE)

By _____    6.21.04
     Diane Tamariz Wallace
     President of the Agency                 (DATE)

Corporate Name:

DIANE TAMARIZ & ASSOCIATES  PA

Tax-Payer Identification Number:

20- REDACTED 2014

14109569611        PAGE.03        JUN 24 2004 21:12



EXHIBIT
4
3-4-10



**Nationwide**
Federal Credit Union

## Business Loan Application

Page 1 of 2

Credit Union Account Number: _____ (if already assigned)

State & Agent Number: 19-11855 (if assigned)

Name: Brenda Diane Tamariz Wallace

Social Security Number: 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

Home Address: 2417 Vineyard La, City Crofton, ST Md, Zip 21114

Home Phone Number: (410) 451-1361

Mobile Number: (410) 279-6644

E:mail address: tamarid@nationwide.com

County: Anne Arundel    Own/Rent: own

Payment $ 1295.00

Date of Birth: 7 /54

Mother's Maiden Name: McCoin

Name of Agency: (if applicable)
Diane Tamariz & Associates, PA

Hire Date: 9.18.89    Tax ID Number: 20- 2014

Agency Address: 3147 Solomon Island Rd City Edgewater, ST Md 21037

Agency Phone Number: (410) 956-3758 Agency Fax Number: (410) 956-9611

Type of Organization: ___ Sole Proprietor ___Partnership X Corporation
___ LLC ___ Other              new entity eff 7.1.04

06/25/2004  08:38  14109569611    PAGE  02

14189569611          PAGE.04                                      JUN 24 2004 21:12

Page 2 of 2 - Loan Application

### Type of Credit Requested   (N/A for RAE Loans)

| Loan Type | $ Requested | Purpose |
|---|---|---|
| CAP Loan | 150,000.00 | Agency expansion; purchase equipment, purchase building, hire staff, etc., |
| Transition Loan | | Transition from a financed agent to an Independent Contractor |
| Transferred Business Loan | | Used to purchase a Nationwide Block of Business |
| Acquisition Loan | ?? | Used to purchase a non-Nationwide Book of Business (Independent Agency) |
| Replacement Agency Executive Loan | | Replacement Agency Executive purchase of Nationwide block of business |
| Wholesale Choice Loan | 20,000 | To increase financial product sales through the addition of a financial lines associate agent |
| Agency Executive Loan | | New Agency Executive program |

Comments: _____

_____

_____

You warrant the truth of the above information and you realize that it will be relied upon by Us in deciding whether or not to grant the credit applied for. You hereby authorize Us, Our employees and agents to investigate and verify any information provided to Us by You. You authorize Us to accept Your facsimile signature on this application and agree that Your facsimile signature will have the same legal force and effect as Your original signature. You assume any risk that may be associated with permitting Us to accept Your facsimile signature. You further understand that by submitting this application, You are authorizing Us to gather personal and private information about you and to make a credit decision based on that information. You agree to cooperate fully with Us, and to waive any privacy rights You may have in order for Us to gather the financial information needed in order to make a decision on Your loan application.

NFCU is required by law to request, verify and maintain documentation regarding your identity for safety and security.

Signature: _Brenda Diane Tamariz Wallace, Director_
               DIANE TAMARIZ + ASSOCIATES, PA

Date: _6-21-04_

PAGE  03                                      06/25/2004 08:38   14189569611

SO.ƎÐAq    TT969560TⱯT                                    ƐT:TS Ɐ00S ⱯS NUႱ

## PERSONAL FINANCIAL STATEMENT                     Page 1 of 2

Name: **DIANE TAMARIZ - WALLACE**

Social Security Number: **226 - 86 - 0884**

Address: **2417 Vineyard Lane Crofton Md 21114**

CONDITION AS OF (date) **March 30, 2004**

| NFCU ASSETS ~ 6000.00 | | LIABILITIES | |
|---|---|---|---|
| Cash AB+T Wachovia | $ ~5000.00 ~ 22000.00 | Real Estate 2417 Mortgage / 1st | $ 156,600 |
| Securities (Stocks, Bonds) Schwab Fidelity | funds 11,000. 22,000 | 2nd Real Estate Mortgage/HELOC | 14,208 |
| Real Estate 2417 Owned 7722 | # 250,000. 502,000. | Loan 2003 Honda Indebtedness (Auto loans) | 23,000. |
| Employee IRAS Incentive Savings Plan (excluding DCIC & Extended Earnings) | 269,942.00 multiple | Other Secured loans (Boat, RV etc) | 110,640. |
| Autos  Make Year 2003 Honda Pilot | 28,500 | Credit Card/Line totals   Bus+Personal | includes CD wallace - 60,000. |
| 1998 Nuro Sport | 7,000 | Contractual Lease Payments | Furn - Office 29,000.00 |
| 1987 Morris 56' San Boat | 200,000. | Other Unsecured loans NFCU | 5540.00 |
| 1991 Echells 30 San Boat | 25,000 | 5th Deferral Student Loan | 52,576. |
| Life 1.5 million Cdw Life 1.6 million | CV 14,000.00 | Student Loan | 16,000 |
| Other Assets- Itemize Personal P.1 500 | 300,000. | Commerce First | 84,998. ②|
| Personal Effects Jewelry | 30,000. | Total Liabilities | $ 552,562.00 |
| Retired 401k RSC Spec Direct Mktg | 420,000. | Net Worth (assets – liabilities) | 1,257,881.00 |
| Total Assets | $ 1,810,443.00 | Total Liabilities and Net Worth | $ 1,810,443.00 |



## LIST LOANS AND LEASES OUTSTANDING (Attach add'l sheet if necessary)

| Company | Balance | Payment | Security |
|---|---|---|---|
| Stated above | | | |
| | | | |
| | | | |
| | | | |

14109569611                   PAGE.06

| Annual Income | | | Annual Expenditures | | |
|---|---|---|---|---|---|
| Salary, Wages (W-2) C, D, Wallace | $ | 200,000. | Mortgage or Rent payment | $ | 14,400. |
| Net Profit from Business (Sch C or S-Corp) DTA | | 158,767 | Other-Itemize (include installment payments) Boat Sallie Mae | | 10,500 2,400 |
| Income from investments/ Income | | Blob 3. | | | |
| Other Income | | 5650 per month | Total Credit Card payments | | 60,000 |
| Total Income | $ | 308,767 | Total Expenses | $ | 87,600. |

I have carefully read the information contained in this Statement and am providing this Statement to Nationwide Federal Credit Union for the purpose of inducing Nationwide Federal Credit Union to extend or continue credit or other business relationship from time to time in whatever form. I hereby certify that this Statement is a true and correct exhibit of my financial condition and may be treated by Nationwide Federal Credit Union as a continuing statement thereof until replaced by a new statement or until I specifically notify Nationwide Federal Credit Union in writing of any changes therein. In consideration of any such credit or other business relationship, I agree if at any time this Statement shall prove incorrect or misleading, in Nationwide Federal Credit Union's judgement, as a statement of my then condition, or if at any time by reason of insolvency, application for receiver, or at any act or omission on my part, such credit or other obligation is, in Nationwide Federal Credit Union' judgement, prejudiced or impaired, all or any of my obligations to Nationwide Federal Credit Union, whether direct, indirect, contingent or fixed, shall stand immediately due and payable without demand upon or notice to me. I hereby authorize Nationwide Federal Credit Union to obtain a consumer report or reports to be used in connection with this Statement or the credit or other business relationship to which it relates and to obtain and exchange credit information from and with other credit grantors and consumer reporting agencies. I authorize Nationwide Federal Credit Union to retain all information and reports for its files.

## If this statement is given in connection with credit in Ohio, the following disclosure applies:

The Ohio laws against discrimination require that all creditors make credit equally available to all creditworthy members, and that credit reporting agencies maintain separate credit histories on each individual upon request. The Ohio Civil Rights Commission administers compliance with this law.

Signature _B Draue-Santamy Wallace_____ Date _____

EXHIBIT

5

3-4-10        tt

July 16, 2004

Mr. George T. Moran
Moran Insurance
696 Ritchie Hwy
Severna Park, MD 21146-3981

Dear George:

Thank you for the opportunity to explore the possibilities of acquisition.

Diane and I look forward to creating a very positive experience for all parties.  Since this is our first, we want it to be our best.  We want this understood at the beginning that this agreement is between you and Diane.  Naturally Nationwide is financing this arrangement and they have blessed it.

Following is the preliminary sequence of events:

- Confidentiality Agreement signed (see attached)

- Initial gathering of information through the due diligence review.  These are the documents needed:

    1. Most recent balance sheet and income statements
    2. Review of general corporate financial documentation:
        a. Corporate tax returns for past three years
        b. Insurance agency licenses
    3. Revenue and expense review:
        a. Agency office expenses (actual) and next year projected expenses
        b. The number of accounts over $250,000
    4. Carrier relationships:
        a. Commissions by carrier and product
        b. Carriers represented, OCY
    5. Book of business review:
        a. Loss runs, by carrier for past three years
        b. Retention ratios
        c. Prior Marsh-Berry evaluation
            - If the prior evaluation is available, we will inquire with Marsh-Berry if they can update the report rather than repeating the process.

- A team of people from Nationwide, lead by Patrick Lee, will head-up the review and coordinate with representatives from Marsh-Berry.

- Once the due diligence is complete, you and Diane will sit down to discuss what you each want to achieve.  I'd like to suggest Donna and I be present as well.

- Develop a letter of understanding that both parties agree to and ask for Nationwide's financial blessing.

- Have the lawyers make it official.

In the interim, we'd like you and Donna to meet the Nationwide team with Diane and I, possibly for lunch or dinner.

George, we are very excited at the prospect of joining forces.

Thank you for this opportunity. At any time should anything go awry or doesn't feel right ---- call me.

This will be a very powerful extension of your company. We look forward to a huge success for all of us!


Cordially,


C. David Wallace

CRMG    000339
HPK/NATIONWIDE/Tamariz/Docs Received from Wallace



EXHIBIT

6

3-4-10

September 9, 2004

Ms. Diane Tamariz-Wallace
Diane Tamariz & Associates
3147 Solomons Island Road
Edgewater, MD 21037

Dear Ms. Tamariz-Wallace:

As we discussed previously, WFG Capital Advisors LP is pleased to provide you with a proposal to assist you in meeting your strategic goals and objectives related to growth through acquisition. This letter is an outline of the services that WFG can provide Diane Tamariz-Wallace (the Company) in developing and executing a successful acquisition strategy.

## SERVICES

**"Full Scope Buy Side Services"** – Should the Company engage WFG to provide our normal "full scope buy side services" in executing a successful agency acquisition strategy, our services would include the following:

I.   **Identification of Acquisition Candidates/Targets** – Based upon the acquisition criteria provided by the Company, WFG will identify potential acquisition targets based on a pre-defined territory. The pre-defined territory could be based on such criteria as county, city or even zip code. Our primary identification source for such potential targets are "paid for" databases utilized by WFG.

II.  **Initial Contact/Solicitation** – Based on the identification of candidates, WFG will make initial contacts/solicitation with prospects to gauge interest in pursuing a possible transaction with the Company. This will be performed on a "no name" basis and will include a combination of letter solicitation and phone calls. In addition, during the initial contact phase, preliminary qualification or disqualification will be performed based upon acquisition criteria.

III. **Assessment of Acquisition Candidates** – WFG will make an initial assessment of prospective acquisition candidates to determine strategic fit. Qualification or disqualification will be determined based upon criteria

M
September 9, 2004
Page 2 of 4

outlined by the Company (i.e. revenue, location, historical growth, management depth, etc).

IV.   **Operational and Financial Assessment** – Once a target has been identified and expressed initial interest in exploring a potential transaction, WFG would perform an initial/preliminary cultural, operational and financial assessment to help determine the strategic fit of the candidate. WFG will arrange for an initial site visit with the acquisition candidate during this phase.

V.   **Valuation** – If there is continued interest to pursue the candidate by the Company, WFG would perform a "Benchmark" valuation on the acquisition candidate to be used as the basis for determining the transaction price and structure. The "Benchmark" analysis provides the Company with an understanding of the fair market value of the business through blending multiple methods of valuation. In addition, it assesses current market conditions and identifies other key intangible values within the specific targeted company.

VI.   **Transaction Structuring** – Using the information obtained during the financial and operational assessment and valuation process, WFG would determine an appropriate transaction price and structure (asset/stock purchase, up front/deferred consideration, as well as the tax consequences of the proposed transaction). Typically, a range of values and structures would be presented to help the Company determine the most desirable transaction structure (e.g. stock, cash, notes, etc.).

VII.   **Negotiation** – WFG would lead the efforts to negotiate the deal price, terms, and conditions with an acquisition candidate and their advisor(s). This includes such agreements as the purchase agreement, employment agreements, non-competes and other transaction related documents. WFG would coordinate this function with the appropriately determined professional designates within the Company.

VIII.   **Due Diligence Services** – WFG would assist the Company in performing due diligence which would typically include financial, operational and legal due diligence. Generally, due diligence assistance is designed to meet the specific requirements of our client. A report on WFG's findings and notable exceptions can be provided to the Company upon completion of due diligence.

IX.   **Transaction Agreement Review** – WFG will provide consultation to your attorney on transaction legal documents and related schedules. Example agreements include, Asset Purchase Agreements, Employment Agreements, Non-compete Agreements, Restrictive Agreements, etc.

M
, September 9, 2004
Page 3 of 4

   **X.**    **Integration Management** – WFG can assist the Company in developing and executing post-acquisition integration strategies. Assistance provided addresses transition team establishment, communication planning, employee issues and ongoing oversight of the integration strategy, serving as an advisor to the transition team and the Company management.

**Fee Terms and Conditions**

We strive to develop a fee arrangement that is both feasible and economically reasonable for both our client and WFG. A brief summary of each fee option is as follows:

**Fee Structure** would consist of a standard retainer fee, consulting fee, and a contingent consulting fee based upon successful completion of an acquisition by the Company. More specifically, the fee structure would be as follows:

➤ **Retainer** – A retainer of $10,000 would be payable to WFG upon execution of an agreed upon engagement letter. The retainer would cover services I. thru IV. listed in the section above. If, within 120 days, WFG is unable to provide one credible lead, as defined by a meeting between the Company and an acquisition candidate, $5,000 of the initial retainer fee would be refunded to the Company.

➤ **Consulting Fee** – For serious prospects, defined as prospects which the Client decides to pursue after the initial meeting, an additional $5,000 Consulting Fee would be payable to WFG that would cover services V. thru X.

➤ **Contingent Consulting Fee** – Upon completion of a successful acquisition, WFG would be entitled to a Contingent Consulting Fee which is based on a percentage of the total purchase price as outlined below.

| Total Purchase Price | Fee |
|---|---|
| o  Up to $1,000,000 | 5.0% of the Total Purchase Price |
| o  Amounts in excess of $1mm | 3.0% of the Total Purchase Price |

In addition, we would offset any amounts due WFG by the amount of the retainer and consulting fee paid by the Company.

Our minimum fee would be $50,000 on any completed transaction, including offset of any retainer and consulting fee as described above.
{Fees are subject to change based on the size of the transaction}

➤ **Travel Expenses** – WFG would be reimbursed for travel expenses which would include reimbursable mileage, travel (e.g. airfare), meals, and hotel. **WFG would not charge the Company for postage.**

DRDR  000015
HPK /Tamarix-Wallace/DocRecd11.09.09

**DTA0000015**

M
September 9, 2004
Page 4 of 4

We aim to provide premium service to all clients that we work with. Please let me know if you have any comments or questions on the information noted above. Our goal is to make this financially feasible for both you and WFG. You may reach me directly at (717) 780-7816.

Sincerely,



Daniel B. Price
Financial Analyst



Conversation with Larry Cook----9.7.2004

Background…$12MM acquisition, 90% conversion (IWIF is $3MM and Specialty carriers are $1.5MM)  therefore $7.5MM is potential to convert to NW.

Diane has about $600K in DCIC and her extended earnings are about $350K……for sake of conversation $550K + $350K = $900K….(Larry did say if needed he would make a case to include Diane's current DCIC—I guessed it would be about $150 to $200K)…..

Options---on a $2.5MM to $3MM acquisition……

A.   All NW + payment schedule
1.   Does it have to be a cash deal?
2.   His advise is to stretch it over a 2-5 year deal and pay balance out of operating……since most sellers do not want a huge hit in one year.

B. Other option…..is to finance with local resources…….I pointed out how is this accomplished with NW owning the book…..he replied on that which converts to NW is their book.  The IWIF and Specialty carriers are Diane's property.

Larry said 75-80% of sellers take 2-4 year payouts………this would be a structured payout…….

Two plans:
1.   Simple the offer is 80%……..of the sales price and 20% is based on incentives—retention and new business. (obviously the percentage can be 70% and 30% on the back end depending on the evaluation and how much you agree to pay—ie selling price)
2.   Second way…pay seller a consulting fee…..to help convert business. Pay a fee to on the $3MM structure…and we pay X down and the consulting fee is the balance.

Larry pointed out that the "Choice Plus" with this kind of a deal would put Diane in the highest contingency……and business planner can plug in numbers to determine what this will be—based on Diane's current agencies growth and profit then overlay acquisition.  Then see where you would be at the end of 2004 and 2005 with both.  Obviously the acquired companies cash flow is a big consideration…..

On the down side…….things happen with an acquisition------(1) the seller dies; (2) markets can turn……

My thoughts:

My point is we should see if a 90% renewal, 80% and down to 70% to see if the deal makes sense……..

Then plug in……..
1. Nationwide funding-----$900K to $1.1MM
2. Signing bonus—3% + 4%
3. Contigency……

Then comes:
1. the sales price
2. the terms
(I think we need to show George –the agency values at $2.4-2.6MM…our offer is $2MM with bonuses showing you how to realize $3.5MM over the next 6 years)

Here is a sample—of the offer…….The terms…for the sale…$1MM in cash—with the second $1MM paid over 3 years (payable quarterly) plus bonuses paid over the following 3 years……..bonus based on:
Here is how this works—based on the first year……..$125K paid quarterly ($500K annually)----
First year….. for a 3% premium growth and a minimum of 90% retention and a loss ratio below 50%……annually…….
Second year……2% premium growth and a minimum of 85% retention and loss ratio of 50%  or lower.
Third year…….1% premium growth and minimum of 80% retention and loss ratio of 50% or lower.

Additional incentives for additional points in premium growth and lesser numbers for loss ratios……

Should there be more of a concentration on the NW book?  Of course, George does not have much control over retention issues with NW…..

Acquisition…….9.7.04



1. In working with the support materials that Nationwide provides for the acquisition process, nowhere does it limit size of acquisition or lead an agent to believe anything other than Nationwide fully supports the financing of this type of growth.

2. Early in this acquisition process when our intent to follow this path aggressively there was no mention of the apparent mailing program that has been offered and implemented in the name of other agents. In fact we cleared specific targeted agencies, locations that we planned to expand to in various monthly reports If there were any issues in any of these targeted agencies, we should have been so informed early in the process.

3. Nationwide has stated aggressive growth goals in numerous corporate messages. This type of acquisition exactly correlates with those corporate goals. Yet here at the regional level there seems to be a hindrance, bordering on doublespeak, to the stated corporate goals.  This particular acquisition is exactly the type of fast, hard-nosed, good business growth that corporate has said that they want.  Management should endeavor to support our activities.

4. From the standpoint of use of corporate assets to finance acquisitions, this decision has been made long ago and in fact there are dozens of examples that have been publicized in various company publications, So why then if would there be any hindrance to culminate a acquisition that so closely follows the stated goals? This acquisition is not only a prudent use of corporate assets but should be applauded and supported rather than hindered in any way.

5. On a regional basis when we stated our objectives of growing through acquisitions some nine months ago, the verbal support was there and the impression was given and reinforced that this support extended to the very top. To find at this late date that this is indeed not the case undermines the trust and responsibility that as agents we share as business partners and as good corporate citizens and as Nationwide agents that embrace and follow stated corporate goals. This support is more than a philosophical stance; it is a real world commitment of personal assets to further the growth of the company. In making these personal commitments it is in the best interest of Nationwide to make this commitment reciprocal. This is the support that we ask for at this time.

6. There is a curious stance, perhaps a flaw in the positioning of the growth plan that agents commit to in that our personal pension assets cannot grow as we direct funds instead to follow company growth and personal growth goals. With these pension funds halted in their growth as the cash flow has been redirected to growth. Yet when funding prerequisites limit the size of growth by being tied to the pension fund there is a catch-22, a paradox that makes one question what the real corporate goal is.

CRMG    000325
HPK/NATIONWIDE/Tamariz/Docs Received from Wallace

7. We are committed to growth, Nationwide says they are committed to growth, yet we find that suddenly there is a "rule " that ties that growth to the size of the pension fund that can no longer grow as the funds that were committed to it are now supporting growth. –So we can't grow? I doubt that this is neither the intent nor the correct implementation of guidelines.

8. Personal commitment. A bond of trust, working towards common goals, all things that we not only believe in but support with our time and assets. That's right, we "put our money where our mouth is". Now that we have taken this path, it is incredible that there seems to be a fatal flaw in the process that actually prevents agents- and Nationwide from achieving the often repeated corporate goals of growth.

**Dave Wallace**

EXHIBIT

9

3-4-10

**From:**  Dave Wallace [dwallace@specdir.com]
**Sent:**  Thursday, September 09, 2004 7:07 PM
**To:**  Craig Siebert
**Cc:**  Diane Tamariz/Wallace

**Subject:** Update

Craig, the meeting with George last Friday went very nicely........if we had a contract with us, I think he would have signed it.

We have the LOI signed.

Second, Wednesday evening.....we had a very good meeting with Nationwide state officers.....the light was green when we went into the meeting and greener when we left.

Two hurdles----we have them working on:

A. Conversion time:
To expand the conversion time from 15 months to 24 months to qualify for the second conversion bonus.

B. Income proforma
Right now there is a 3% signing bonus.....on probably $5--to $7MM.......then another 4% on that which converted........should there have been an overestimate on the signing bonus......it is deducted from the conversion bonus. Taaking $5MM at a combined 7%.....is $350,000.....in bonus.

2. The contingency bonus is a factor of loss ratio/premium and profit.........but this can be as high as 6% of direct written premium.......Diane is on track for qualifying for this from DTA--and could be 6% of $3.5MM which--if the creek does not flood--could be $210,000 bonus even if the acquisition does not happen.

3. However with the acquisition happening........next year if the formula holds........this 6% could be on $12 to 14MM--that's a heafty $720,000 to $840,000.....in bonus........it certainly does not take to many years of this to bring a real smile on our faces.

4. So the base line is DTA = $350,000 gross commission on $3.5MM and Moran $1.4MM gross commission on $12MM--and George not pulling executive fees.........we will have $1.750M gross commission on 15.5 of DWP.

5. On the bonus side......of signing only-----$350,000 + DTA gross commission $350,000 and Moran gross commission $1.4 = $2.1MM in first year. However this will probably be $350M + $350M + $1MM= but $1.7 is nothing to sneeze at. NW is working on the income proforma.......

6. Assuming $1MM from Moran and $350M from DTA + $350M signing bonus = $1.7MM and if the contingency kicks in....of say $720,000..........that would be $2.420M in commission.......first year.....obviously when we apply expenses to this......we'll have the full picture.

We will need to determine the conversion rate for the book......which will influence total revenue.

Next let's discuss the money for the acquisition.

The initial due diligence came in valuing the compay at $2.4 to $2.6MM. George's range is a low of $2.6 to $3.6 high. We are thinking about $3MM......with $1MM at settlement and the balance with kickers over 5 09 years--that is $1.5 which would give him $2.5MM and $500K in kickers.

DRDR 000018

DTA0000018

As of now we qualify for $1MM from NW credit union and we are not concerned about the $500K for kickers...it's teh $1.5MM in the middle that has us concerned. Last night we asked NW to expand the rules.....and either finance the $1.5MM or give us a guarantee letter (or promissory note) from corporate that they stand behind the $1.5MM since it will be their book anyway........this gives George collateral.

I am sending you another email spreading out the payments.

So---with all of this.....we anticipate a spreadsheet with the best case and worst case income proformas......to you mid week.........you have George's expenses......and Diane's---then we'd like you to come up with best case and worst case cash flow. The $1MM is at one percent over prime paid over 12 years. We think we can pay the rest out of cash flow........especially with the bonuses. However we are going to CommerceFirst to see if Rick (next week) can provide us with a $1MM line of credit for DTA......this would only be used in dire need but it would make Diane and I feel a lot better to have this in our back pocket.

Next steps---we will get you the proforma.....it would be great if we could have a pencil.....of best and worst case...and if you can attend the meeting with us...right now (subject to Diane's schedule) is set for 2PM Tuesday at CommerceFirst.

Once we get the green light from NW corporate..........we are meeting with George Friday or Monday......to do a trial close.......then the NW due diligence team comes in a pulls 25 cases to determine what should convert and
at the same time WFG Capital Advisors do their evaluation...it could happen in the next two weeks.......and if the due diligence teams find this to be a cherry.......with no surprises.......we should be golden.

Craig, thank you.

Dave

EXHIBIT

10

3-4-10        μ



Nationwide®

Business Plan For
Nationwide Insurance Agency
Financial Sales Operations:
*Full-Time Financial Agent Model;*
*Wholesale Choice Program*

Date  9-9-04

Prepared By: Brian G. Quick

# Contents:

| | |
|---|---|
| Business Plan Summary | Page 3 |
| Business Plan | Page 4 |
| Business Plan Installation Action Planning | Appendix A |
| Financial Agency Model Installation Checklist | Appendix B |
| Agency Financial Sales Engagement Contract | Appendix C |
| Activity = Success Calculator Printout | Appendix D |

OCT 05 2004 13:17 FR AGENCY DEVELOPMENT   614 249 0123 TO 93020          P.03/18

# Business Plan: *Summary*

**Note to the Nationwide Agent:** With your cooperation, the Agency Models team has aided in the development of this plan for the Wholesale Choice Associate Agent Loan Program. It is our strong mutual desire that by following this plan you will profitably grow your agency. However, it is important for you to recognize that the implementation of this plan is entirely optional and solely your responsibility. Nationwide cannot and does not guarantee the plan as outlined will result in achieving the desired objectives.

The Principal Agent strongly feels that having an in-house financial associate would allow the agency to market an additional, value-added service, help perpetuate the agency's commitment as a full-service agency, increase customer retention and loyalty, and increase the agency's revenue. We believe we have an attractive and competitive portfolio of financial products and services, along with a base of existing in-house customers and prospective customers within the community to achieve the production goals associated with the Wholesale Choice Associate Agent Loan Program.

The **Diane Tamariz-Wallce & Associates Agency** has selected an excellent candidate, **Brian G. Quick (Associate Agent)** to help the agency provide financial services to our existing policyholders and within the community. **Brian Quick** is an experienced financial professional and is very knowledgeable with financial products concepts and financial product lines.

We have identified results-based activities to ensure the growth in the financial lines. Therefore, the learning curve will be shortened and he will be able to meet the sales goals as planned.

- State **Specific Goals** of the Business Plan (from the AFS Engagement Commitment)
- Summarize **Agency History** in financial sales and decisions leading to the evolution of the business plan
- Summarize the salient features of the **S.W.O.T.** analysis and their **Impact** on the overall plan
- Summarize the **Action Planning** steps required to install the business plan

# Business Plan:  *S.W.O.T. Analysis*

**Strengths of the Agency:  Strengths are skills and abilities specific to an agency, and are also directly controlled by the agency.** As such, the following strengths are *internal* factors within the business.

- **Agency Staff: Both the Principal Agent Diane** and Jim Coolbaugh, with 30 years of Nationwide Financial experience, posses the life and financial product knowledge to assist and further develop **Brian. Brian** has passed the required tests and has the ability and experience to reach the sales goals. **Brian** performed exceptionally well on his LIMRA test, is licensed in life, and has holds his NASD Series 6/63. **Brian** desires to attend Nationwide-sponsored schools on financial products and services as soon as possible.

  *Edit: Summarize experience of existing agency staff relative to:*
  o  Principal: Diane Tamariz-Wallace
    - Over the past 15 years Diane has built and is continuing to build a very successful Nationwide agency. She has approximately 2,000+ current clients including a large business clientele. She is focused on growing the Financial Services Division with the same tenacity and professionalism she has grown her existing business.

  o  Full Time Financial Associate   James T. Coolbaugh
    Jim has over 30 years experience with Nationwide. His # 1 focus is to get the Diane Tamariz-Wallce & Associate to Presidents Club and beyond.   Jim has a thorough knowledge of all phases of the Financial Sales process. He plans on being a mentor to the Financial Services team members as he winds down his fruitful career with Nationwide.

  o  Licensed Associates   Marc Dorman
    Marc is the operations Director of the office. He is currently the second highest producer in the Financial Services division.  Marc has been a natural in this field and looks forward to continuing to grow into his MDRT potential.

  o  Customer Service Representatives
    - All the CSRs are licensed and rewarded for their production. They have been big contributors toward the growth of life sales this year.

- **Contacts:** The agency has over 3,500 and growing policyholders with whom **Brian** can work to identify and cultivate financial services.
- **Brian** has an expansive list of professional contacts from which to generate sale leads. Through his past 7 years experience in the financial services field **Brian** has developed many business relationships and professional contacts. He also grew up in the area and is very active in many community organizations.

*Edit: Summarize the agency's potential target market for financial services from:*

o  Existing P&C Policyholders
o  Acquisition
o  Existing Commercial Accounts
o  Professional Organization Contacts
o  Community Contacts

- **Physical Facility:** Through planned expansion and acquisitions the office location and décor will be very professional. The office will be spacious and very inviting. There will be ample office space, and adequate facilities for privacy during financial services meetings.

*Edit: Comment on the agency's physical attributes:*
o  Office locations: The Edgewater, Crofton & Severna Park locations provide access to the growing and financially stable communities of Anne Arundel County.
o  Hanover/Arundel Mills satellite
o  Dedicated space for privacy for financial services meetings wil be provided.

- **Impact on Planning:** *Edit: Comment on the impact of these features on the plan.*
    - **Currently the Edgewater location is adequate. It has already been determined that the financial services division will have it own office that will display the professional image that a financial service company needs to project.**
    - **Severna Park will be the Financial Base**

*Weaknesses of the Agency:* **Weaknesses are skills and abilities that may be insufficient or lacking in an agency, and are also directly controlled by the agency.** As such, the following weaknesses, like strengths, are *internal* factors within the business.

- **Time Constraints.** At present the **Principal Agent** does not have adequate time to devote to the financial services needs of the book.

- **Other.** *Edit: Summarize other agency weaknesses relative to financial sales:*
  - Agency physical facility, location, décor
    - The current facility is currently not suitable for meetings with clients. Therefore most client meetings will take place outside of the office. The corporate office on Jennifer Road is available.
  - Staff experience/training
    Currently the Financial Services Division does not have a dedicated customer service representative. There will be a need for a licensed CSR to handle underwriting, compliance and other sales support.
    The P&C staff needs constant support and reminders to ask about financial products.
  - Budget issues
    - Marketing: seminars, direct mail, business lunches etc...
    - Staffing

- **Impact on Planning:** *Edit: Comment on the impact of these features on the plan. As the Financial Services Division of Diane Tamariz-Wallace & Associates Diane is focused on providing a professional office with qualified staff.*
  - •

*Opportunities for the Agency:*  An opportunity is a possibility for positive change that exists within the business environment, but is not within the direct control of the business itself.  For this reason, opportunities are *external* factors facing the business.

Increase agency revenue.  The Wholesale Choice Loan Program can help increase the agency's revenues.  Research indicates that 12% of P&C clients intend to buy financial products within the next 12 months.

*Edit: Summarize with dollar amounts from Engagement Contract.*

- Increase agency Awards and Recognition opportunities. Many awards and recognition opportunities are dependent upon attaining significant levels of financial sales, particularly with regard to life insurance sales.

*Edit: Identify the A&R goal stated in the Engagement Contract.*

- Increase internal marketing opportunities.  The Wholesale Choice Loan program can help the agency capitalize on sales potential in the agency's book.  The Associate Agent is attuned to the untapped financial services market of the agency's policyholders and can uncover both financial and additional P&C needs.

- Increase customer retention.  Customer retention increases with the more product lines the policyholders have with the agency.  One-stop-shopping for both P&C and financial needs for the agency's policyholders helps foster the Principal Agent's goal of the "trusted advisor."

- Increase Contingency Bonus.  Additional revenues will increase the opportunity for additional DCIC and extended earnings.

- Impact on Planning: *Edit: Comment on the impact of these features on the plan.*

*Threats to the Agency:* A threat is a possibility for negative change that exists within the business environment, but is not within the direct control of the business itself. For this reason, threats, like opportunities, are *external* factors facing the business.

- **External Forces.** Market conditions and volatility, tax changes, changes in economic activity, etc, are but some external factors that can negatively impact financial services growth.

- **Competition.** The insurance and financial services industries are in a near constant state of change; current market and competitive forces are profoundly impact the way financial products and services are delivered. Successful Nationwide agents have continued to grow their businesses regardless of the competition.  Key characteristics of success include:
  - high value/high quality portfolio of products and services
  - frequency and  perceived value of contact with customers
  - exemplary customer service
  - consistent delivery of valuable financial advice and dedication that would be unusual for them to find from any other provider.

- **Regulatory Issues.** Compliance and regulatory changes can have an impact the agency's opportunities for sales.

- **Impact on Planning:** *Edit: Comment on the impact of these features on the plan.*

# Appendix A. *Action Planning Steps to Install Business Plan*

**Action Plan Step #1.** *Objective: Associate Agent Preparation*

A.   Develop and order Associate Agent identifier and business cards for Associate Agent.    MARC DONE

B.   Provide Associate Agent with the appropriate phone numbers (i.e., Wholesale Office1-888-333-4202), the contact numbers AFS, Mutual Fund desk, and underwriter information.    BRIAN from Adrian 9/17

C.   Make available web access to AFS, Best of America, Sales & Services, and website.    Brian 9/17

D.   Make available access to life rating programs and Investment view programs.

E.   Make a list of customers 40 years of age and over (up to 55 years of age).

      Rob

F.   Make a list of agency policyholders 55 years of age and over.
      Rob

G.   Complete agency order form on AFS web site and order all agent/customer product kits.  Review the process with **Associate Agent** and staff (if needed).

H.   Schedule attendance for the Variable Investment Products school (VIP) and periodically attend training through the AFS website and Centra sessions.

I.   Installation Path.    Adrian assists with set-up

**Action Plan Step #2.** *Objective: Installing Agency Supported Activities*

A.   Send a correspondence out to the policyholders introducing **Associate Agent** to them and explaining how he can help them reach their life and financial goals.   DIANE

B.   **Associate Agent** will work all the existing files (###) to generate financial service leads.

C.   Utilize the existing agency referral program to make contacts with policyholder's age 40 and over.  This activity will be done once per week and the status/results to be returned to principal agent at the end of the following week.   Diane Care Review Sheets.  9/17 meeting

D.   Agency will purchase annuity and life leads for **Associate Agent** as needed.

E.   Send out 25 "Need Based Financial Services" letters weekly using the agency's Alpha-split.

F.   Send out 10 "Retirement Planning" letters per week, Age 40 plus.

G.   Send out 10 "CD Alternative" letters per week to 55 and older clients.

H.   Send out 5 IBRP brochures/proposals to commercial professional account list per week.

I.   **Principal Agent** oversee the following:
   1.   Training and development
   2.   The activities and ethics of the **Associate Agent** including:
      a. Insurance laws and regulations
      b. Adherence to underwriting and administrative rules
      c. Complete and accurate information on all applications
      d. Prompt submission of monies and applications
      e. Acceptable service to customers

**Action Plan Step #3.** *Objective: Installing Associate Agent Activities*

A.    Identify **4** additional business/professionals quarterly and make cold calls.

B.    **Associate Agent** has an extensive client list of over 200 people that he can contact for life, annuity, and financial offerings. Brian will systematically contact and follow-up on all leads on a bi-weekly basis.

C.    Work on contact lists from the previous week to focus on setting appointments.

D.    Conduct # financial seminars annually (Months).

E.    Follow-up on the "Retirement Planning," "CD Alternative," and "IBRP brochures" that were previously mailed.

F.    Develop a solid Financial Planning Team, which includes a CPA an attorney (estate attorney preferred) to consult with and attend the financial seminars.

G.    **Associate Agent** will meet with **Primary Agent** weekly to review activity and production levels. Diane   will set day and time

H.    **Associate Agent** will conduct annual care review to help increase persistency and identify additional needs and uncover new sales opportunities.

**Action Plan Step #4.** *Objective: Goal Planning*

A.    Action Items 2 and 3 above help to form the basis for the annual sales
       goals. The **Activity = Success Calculator** is designed to show the
       agency's production, the activity required to reach associate agent income
       goals, and to calculate what is needed to qualify for the loan waiver. A
       printout specific to this business plan is attached in Appendix D.

B.    In order to meet the commission goal ($70,000) for **year one(9/04-9/05)**,
       161 total sales per year are needed.  This equates to the following sales
       breakdown:

       114 Life sales (or, 2.1sales per week)
       6 Annuity sales (or, .1 sales per week)
       41 Mutual Funds sales (or, .8 sales per week)

C.    To meet the commission goal ($91,000) for **year two 2006,** This 30% increase
       can be accomplished by increasing average commission per sales and product by
       30%.

# Appendix B. *Financial Business Model Installation Checklist:*

**Financial Business Model Installation Checklists** have been developed for each of the primary models to aid Sales Managers and Agents in the successful installation of the model within the agency.

A copy of the checklist for the model adopted by this agency is attached.

# Appendix C. *Agency Financial Sales Engagement Contract*

The **Agency Financial Sales Engagement Contract** is designed to identify a level of commit to financial sales within the agency, based upon the selection of an agency model, and awards and recognition goal, and a premium/commission goal.

A copy of the completed Engagement Contract specific to this agency is attached.

# Appendix D.   *Activity = Success Calculator Printout*

The **Activity = Success Calculator** is designed to show the agency's production, the activity required to reach associate agent income goals, and to calculate what is needed to qualify for the loan waiver.

A printout specific to this business plan is attached.

*Agent / Associate Value Calculator*

| **Please Enter Your Data In the Column Below:** | | **Associate activity to reach goal:** | | **Agent income Calculator:** | |
|---|---|---|---|---|---|
| **Desired Associate income:** | $ 70,000 | **Total commission needed to reach goal:** | $ 82,353 | Total Revenue | $ 82,353 |
| | | | | Less Associate Commiss. | $ 70,000 |
| **Associate share of commission:** | 85.00% | - Life Commission | $ 65,882 | Less Salary Paid | $ - |
| | | - Annuity Commission | $ 8,235 | Less Overhead/Benefits | $ 6,000 |
| **Associate base salary** | $ * | - Mutual Fund Commiss. | $ 8,235 | Additional Income/year to the agency | $ 6,353 |
| | | | | Additional DCIC | $ 12,353 |

| **What % of the total commission is generated by:** | | **Number of sales per year to reach Commission Goal:** | | **Total Agent Compensation:** | $ 18,706 |
|---|---|---|---|---|---|
| - Life (Avg 36.0%) | 80.00% | - Life | 114 | | |
| - Annuity (Avg 60.0%) | 10.00% | - Annuity | 6 | Note: Adjust agent data field for Desired Associate income downward until agent income is zero for breakeven point | |
| - Mutual Fund (Avg 4.0%) | 10.00% | - Mutual Funds | 41 | | |
| Total --> | 100.00% | - Total Annual Sales | 161 | | |

| **Average Commission per Sale by product** | | **Sales Per Week to Reach Goal:** | | **Commissions needed over next 24 months for 100% loan forgiveness** | $ 123,796 |
|---|---|---|---|---|---|
| Life* ($ 580 Co. Avg) | $ 580 | - Life | 2.3 | | |
| Annuity ($ 1,350 Co. Avg) | $ 1,350 | - Annuity | 0.1 | **Commissions needed over next 24 months for 75% loan forgiveness** | $ 103,796 |
| Mutual fund ($ 200 Co. Avg) | $ 200 | - Mutual Funds | 0.8 | | |
| * $580 Avg. based on tier 1 producer | | | | | |

| **Additional overhead costs for hiring associate per month:** | $ 500 | **Associate Income Breakdown:** | |
|---|---|---|---|
| | | Associate Base Salary | $ - |
| **Using most recent quarter-end Information, total total commissions over the last 24-month period (benchmark)** | $ 43,796 | plus associate % of total commission | $ 70,000 |
| | | Total Associate Income | $ 70,000 |

| **How much will you you borrow:** | $ 20,000 |
|---|---|

** TOTAL PAGE.18 **



# Career Profile+ *Candidate Report*



### For Brian Quick
Identification #: 1284255

Administrator: Diane Tamariz
Version: U.S. Financial Services

Nationwide -- Independent ExSel Users
Date: 8/14/2004

## Executive Summary

**Career Profile+ Rating: 19**

Based on this candidate's past performance, available natural market, and employment and financial stability, compared with other candidates with similar work experience this candidate is likely to:

• Exceed most candidates in first-year production and put forth above-average effort toward meeting organizational objectives

• Continually set difficult yet attainable goals personally and for those around him or her

• Display above-average productivity and high desire to succeed

• Have an above-average chance of staying with the company during the first contract year

### Selection Considerations

• Provide in-depth product training. It is important that the candidate fully believe in a product before he or she is able to successfully market it. See page 6 for more information.
• Allow the candidate to participate in his or her own goal-setting plans on a regular basis. See page 7 for more information.
• Provide frequent updates that require the candidate to give details on how he or she is attempting to reach goals. See page 8 for more information.
• Conduct regular meetings for the candidate to update you on progress, as procrastination may be an issue if not confronted early. See page 9 for more information.
• This candidate states that he or she is mostly confident meeting the personal, technical, and sales aspects of the position. However, it is unlikely a candidate will have no concerns regarding a new sales position, and it is highly recommended to use the interview questions provided to get a better understanding of the candidate's concerns.

© 2003 LIMRA International, Inc. All Rights Reserved. LIMRA Services, Inc., a wholly owned subsidiary of LIMRA International.

OCT 05 2004 13:18 FR AGENCY DEVELOPMENT   614 249 0123 TO 92030                P.18/18



Outline of global picture—we want this to be a WIN-WIN for both parties:

1. We are in agreement with the stock deal.
2. Everything said after this requires a double asterisk, in that, a lot depends on NW's due diligence on commercial and private lines.
3. Here is what we want to accomplish today---the price and terms.

Sales package:

1. Even with the softness in the brokerage market as reported yesterday by WFG.......we want to show you how a total package of $3.6MM can be realized to you.
2. The preliminary evaluation is between $2.4 and $2.6MM. We have picked $2.5MM as a baseline.
3. Then $500M as a performance bonus—this takes us to $3MM.
4. Then rounding out the package is your annual salary at $130M for five years—totaling $650M.
5. The grand total would be $3.6MM

Our proposed terms—we have $2MM available today or we can collateralize $2MM—our preference would be to spread it out and provide you a sizable collateral:

1. $500M at settlement—hopefully in the next 60 days.
2. $500M paid at the end of 5 years.
3. $1.5MM paid over 5 years at $300M annually.
4. $500M performance bonus paid something like this…front end loaded….$200M on 2005 performance, $150M paid on 2006 performance, then the balance of $150K—paid $50M in each of 2007/8/9.
5. Your salary annually would be $130M.

We think this would be very workable regarding cash flow/potential softness in the market/expansion/and minimizes your tax ramifications.

Do we have a deal?

We will formalize this agreement in the next two business days and we would ask for an exclusive.

In turn, we would like to schedule the various people for the next stage of due diligence—which could start next week.

George—we want this to be WIN-WIN for both parties and we believe we have accomplished it!

Dave & Diane

Moran…9.15.04

CRMG   000348
HPK/NATIONWIDE/Tamariz/Docs Received from Wallace

EXHIBIT

12

3-4-10

TO:       George Moran

FROM:     Diane Tamariz-Wallace

RE:       Acquisition Letter of Understanding

DATE:     9.22.04

George, the purpose of this letter is to outline our understanding as of Monday's conversation regarding the acquisition of Moran Insurance (Moran) by Diane Tamariz & Associates, PA (DTA). This is a nonbinding letter. The points are as follows:

1. The acquisition is subject to Nationwide (NW) and DTA's due diligence as appropriate and NW's corporate approval.
2. Further the acquisition is subject to NW corporate review and approval regarding financing.
3. Balance sheet remains and conveys in tact to DTA.
4. Settlement date of 12.1.04 is preferable.
5. Sales price of $3,000,000, guaranteed by NW, with payment terms of $1,500,000 at settlement, $500,000 payable in first quarter of 2006, 2007 and 2008.
6. George's salary at $200,000 annually beginning 2005 and based on performance to be discussed and agreed upon. The tenure would be for a minimum of three years to a maximum of five years. A consulting arrangement thereafter is open to discussion.
7. Performance bonus to be determined.
8. Review and evaluation of rental lease on current premises.

Items not discussed but need addressing:
1. Exclusivity for 90 days or until settlement.
2. Corporate life insurance assignment to be determined.
3. A non-compete to be prepared and agreed upon.

Any other considerations relative to this sale should be discussed and agreed to at this point.

Upon the letter of understanding agreement and necessary approvals from NW, we will then prepare a formal sales agreement.

George, we think this covers the waterfront.

We continue to be excited about the possibilities and we look forward to working with you. Together we can take the Moran agency to a new level. This will make us all proud.

Cordially,                                    Agreed,


Diane Tamariz-Wallace, Principle           George Moran, Principle

CRMG   000353
HPK/NATIONWIDE/Tamariz/Docs Received from Wallace



269 **EXHIBIT**

13

3-4-10

## Diane Tamariz & Associates, PA

3147 Solomons Island Road • Edgewater, MD 21037
410.956.3758 • 410.279.6644 CELL • 410.956.9611 FAX
Diane_Tamariz_Agency@nwagent.com

October 8, 2004

Mr. George T. Moran, President
George T. Moran Inc.
T/A Moran Insurance
696 Ritchie Hwy
Severna Park, MD 21146

Dear George:

After having the pleasure of meeting with you, Diane Tamariz & Associates, PA ("DTA") is pleased to submit a preliminary written expression of interest to acquire the stock of George T. Moran Inc. T/A Moran Insurance ("Moran").

This non-binding, preliminary expression of interest is intended solely to indicate the basis upon which DTA would, subject to satisfactory completion of due diligence and other conditions described below, consider proceeding with such acquisition. Therefore, it is not intended to create any legally binding obligation between DTA and Moran.

Consummation of the proposed transaction is conditioned upon the negotiation and execution of a Definitive Agreement ("Agreement"). Moran agrees not to enter into discussions or negotiations with any other party during negotiation of the Agreement. This period of exclusivity will expire 60 days from the signing of this letter. The drafting of the Agreement is dependent on the terms outlined in the due diligence section below. Final terms of the Agreement may differ materially from the terms outlined below should additional fact finding, found in the course of due diligence, warrant changes.

This indication of interest remains open until 12 o'clock noon Eastern Time, October 12, 2004.

### Purchase Price and Structure of Transaction

Based on the limited information supplied to date, and subject to revision following the receipt of further information, due diligence, and Nationwide corporate approval, DTA would expect to structure the acquisition of 100% of the stock of Moran as follows:

1) Total amount to be offered would be $3 million dollars plus a contingent amount, not to exceed a total of $500,000; the total amount offered shall be composed of the following:
   a. $1,500,000 would be paid in cash upon closing of the transaction.
   b. $1,500,000 would be paid over a three year period, $500,000 per year and guaranteed by Nationwide. The resulting annual payments of $500,000 per

*Private and Confidential*

year are to be made within 120 days of each respective anniversary of the closing of the transaction.  Further, annual interest of 4% will be paid on the $1,500,000 balance.  The 4% interest on the notes will accrue until the actual date of payment.  For example, should the first annual payment of $500,000 be paid 120 days after the anniversary date, the interest will be $75,000 instead of $60,000.  ~~The interest will be $40,000 for the second year and $20,000 the third year.~~  These payments will be paid within the 120 days as outlined above.

c.  Assuming satisfaction of financial hurdles to be agreed upon by both parties prior to the signing of the Agreement, the contingent portion, not to exceed $380,000 in total and to be paid over a 5 year period, will be paid in increments not to exceed $76,000 within 120 days of each respective anniversary of the closing of the transaction.  In addition to the financial hurdles described above, the contingent amount of consideration shall also be conditional upon the satisfactory negotiation and signing of a rental lease for Moran's current office location.

d.  The salary paid to George Moran for a minimum of 3 years and maximum of 5 years is agreeable providing assigned duties and obligations are performed.  The base salary annually will be $138,000 plus a 5% annual increase will be considered based on performance.

e.  The rental lease, on current premises, needs to be reviewed and evaluated.  Generally it is understood the lease payments will be under fair market value for three years, then move to fair market value plus an agreed upon escalate clause annually.  The lease arrangements will be negotiated, however DTA's intention is to remain in the building for a period of 10 to 15 years or more.

f.  Corporate life insurance assignment to DTA for George Moran to be determined.

g.  Additional performance remuneration to be considered.

h.  Settlement date of December 1, 2004 is preferred.

## Due Diligence

The execution of any Agreement will be subject to completion of customary due diligence, which will include (without limitation) a review of corporate strategy, insurance products, markets and marketing, distribution, operations, technology, legal matters, human resource matters, general corporate matters, and financial and tax matters.  Additionally, access to management and key personnel would be required throughout the due diligence process.

*Purchase price may be adjusted depending on due diligence.*

## Conditions to Closing

The closing of the transaction contemplated by this proposal is subject to the following conditions:

1) Satisfactory completion of due diligence, as described above, on Moran;
2) Execution of Agreement governing the transaction;

*Private and Confidential*

3) The signing of non-competition, non-solicitation, and employment agreements by employees of Moran deemed crucial to ongoing operations;
4) Agreement by current producers of Moran to compensation contracts that are agreeable to both counterparties; and
5) Any necessary corporate, legal, and regulatory approvals needed for consummation of the transaction.
6) Nationwide Corporate Approval
7) No significant change in Moran's balance sheet, including working capital, as of the closing date.

## Confidentiality

This indication of interest is confidential and, except as required by law, shall not be disclosed to third parties (other than third parties serving as advisors in connection with this transaction) until after execution of the Agreement.

## Other Terms and Conditions

Each party will be responsible for its respective costs associated with the transaction. This includes, but is not limited to, advisory fees, legal fees, accounting fees, and regulatory fees. In the event that a closing does not occur based upon findings in due diligence, material changes in the financial position of either party, or similar such circumstances neither party shall be responsible for costs incurred by the other in conjunction with the contemplated transaction.

DTA believes that there are numerous benefits to both parties should an acquisition occur. DTA looks forward to negotiating final terms of an Agreement in connection with the stock acquisition of Moran. If the terms of this indication of interest are satisfactory, please sign the following applicable section.

Sincerely,                                    Accepted on October 9, 2004

Diane Tamariz & Associates, PA                Moran Insurance

By _Diane Tamariz Wallace_                    By _____

Diane Tamariz Wallace, Principal              George T. Moran, President

*Private and Confidential*



FAX COMMUNICATION TO BILL JONES 410-269-5609
CC:   Diane Tamariz
      Craig Siebert


TO:        Bill Jones

FROM:      Dave Wallace

RE:        Purchase agreement

DATE:      10.28.04

Bill, good morning!

Attached is the letter of agreement between Diane (Diane Tamariz and Associates, PA) and George Moran (Moran Insurance).

Our request of you is to prepare a purchase agreement. An now that we have agreement with the buyer, we simply want this agreement to be neutral....fair to both sides but not big-time slanted in our favor.

Our intention is to get agreement regarding the sale of this business from George to Diane and myself. We are in the process of phase 2 of due diligence, which should be complete by Friday. We anticipate that report from WFG Capital Advisors Monday. Craig has met with the individual performing this study.

Next will be a proforma and business plan. All of the paper work will then be presented to Nationwide's corporate management for approval. We would like to have this purchase, properly executed by both parties, and included in the paperwork going to NW. We anticipate the business plan and proforma will be complete next week—by November 5th. Our goal is to have the purchase agreement from you next week, if possible.

The thumbnail is that NW is willing to provide a jumbo loan for $3MM with $1.5MM at settlement and then three payments of $500M over the next three years plus interest. The last $1.5MM is in a guarantee. You will see the other points in the LOI.

Following that, I have asked Craig to develop a cash flow analysis including and excluding contingencies from Nationwide.

Should we need a meeting, please let me know.  Thank you in advance for your assistance.

Should you have questions, please feel free to call me at the numbers below: office 410-280-1720/ cell 410-703-2227 or email dwallace@specdir.com

moran.bill.jones.pa.10.28.04

EXHIBIT

15

34/0

B



# George T. Moran, Inc.
*Severna Park, Maryland*

## VALUATION ANALYSIS

*prepared by*



C A P I T A L   A D V I S O R S LP

As of June 30, 2004

**DTA001312**

DRDR 001314
HPK /Tamariz-Wallace/DocRecd11.23.09

December 15, 2004

Ms. Diane Tamariz-Wallace
**Diane Tamariz & Associates**
3147 Solomons Island Road
Edgewater, MD 21037

Dear Ms. Tamariz-Wallace:

WFG Capital Advisors LP (WFG) was retained by you to perform a "benchmark" valuation of George T. Moran, Inc. (the "Company") on behalf of Diane Tamariz & Associates (the "Client") as of June 30, 2004 (the valuation date). In particular, we were asked to perform a limited analysis to determine an estimate of the fair market value of the Company.

We have performed such services in the form of a fair market range valuation. The purpose of this benchmark of value is to determine an estimate of the fair market value of the Company as of the valuation date. The objective of a benchmark valuation is to express an indication of value of a business, business ownership interest, or security that lacks the performance of additional procedures that are required in a fully-compliant valuation. A benchmark of value has the following qualities:

1. It is expressed as a single dollar amount or as a range;
2. It is based upon consideration of only limited relevant information;
3. The consultant performs only limited procedures to collect and analyze the information, which such consultant considers necessary to support the conclusion presented; and
4. The valuation is based upon conceptual approach (es) deemed by the consultant to be most appropriate.

Although the purpose of this business valuation consulting assignment is to determine the reasonable value of the subject interest, the Client has requested only limited analyses to be performed. Based on these limitations, WFG will not be rendering an opinion of value based on the standards established by the National Association of Certified Valuation Analysts, nor will it be following the standards of the American Society of Appraisers or The Institute of Business Appraisers. It is also understood that WFG is not being engaged to perform an audit as defined by the American Institute of Certified Public Accountants, but rather the necessary analysis of only those records deemed necessary to perform this benchmark valuation.

**DTA001313**

DRDR  001315
HPK /Tamariz-Wallace/DocRecd11.23.09

Based on the review and analysis of WFG and only for the purpose described in the Overview of this benchmark valuation, the fair market value range of the Company as of the valuation date is as follows:

**Fair Market Value as of June 30, 2004**          **$2,376,000 and $2,617,000**

Had the consultant been supplied with additional information, and if a full business valuation had been performed based on these standards, our determination of value may have been substantially different.

As previously stated, this assignment was performed using a limited amount of information. Users of this report who are unfamiliar with the facts and circumstances surrounding this assignment may be misled. Therefore, it is neither recommended nor permitted for this report to be distributed to a third party that is unfamiliar with the circumstances.

Based on the information noted above, the following valuation analysis has been performed and included in the attached report. We are grateful for the opportunity to provide you with our valuation services. Please feel free to contact us should you have any questions.

Very truly yours,

**WFG Capital Advisors** LP


Robert J. Lieblein
Managing Principal


**DTA001314**

DRDR 001316
HPK /Tamariz-Wallace/DocRecd11.23.09

# Table of Contents

Introduction
  Purpose of Engagement                              5
  Source Data                                        5
  Valuation Date                                     6
  Definition of "Benchmark" analysis                 6
  Discussion of Valuation Methodology                6
Key Value Drivers                                    8
Business Operations
  Business Description                              11
  Ownership                                         13
  Carrier Relationships                             13
  Contingent Income                                 14
  Client Revenues                                   14
Employee Efficiency
  Summary                                           16
  Producers                                         17
  Restrictive Covenants                             18
Financial Summary and Industry Comparison
  Income Statement – Revenues                       19
  Income Statement – Expenses                       21
  Balance Sheet                                     23
Valuation Analysis
  Description of Valuation Tests                     25
  Review of Normalizing Adjustments                 25
  Capitalization of Earnings Methodology            27
  Market Multiple-Based Methodology                 31
  Valuation Summary                                 33
National and Industry Economic Overview             34
Statement of Assumptions and Limiting Conditions    43
Attachments
  I – Transaction Pricing and Structure

**DTA001315**
*Harrisburg, Pennsylvania*
*Phone: (717) 780-7800*
DRDR  001317
HPK /Tamariz-Wallace/DocRecd11.23.09

# Overview

**Purpose of the Engagement**

WFG has been retained by the Client to provide an evaluation of the Company, including our opinion with respect to its fair market value as of June 30, 2004. This valuation is being conducted to establish the fair market value of the Company for the Client's use with respect to a possible acquisition of the Company.

The opinions expressed herein are solely for the purpose above mentioned and may not be relied upon in any manner or for any other purposes without prior written approval of WFG. Our opinion of fair market value is defined to be a value at which a willing seller and a willing buyer, both being informed of the relevant facts about the business, could reasonably conduct a transaction, neither party acting under any compulsion to do so.

**Source Data**

Financial statements and other data used in this report have been furnished by and are the responsibility of the management of the Company. No attempt has been made to verify the data and all information is presumed to be true and accurate.

WFG's calculations have been based upon the following information:

1. Tax Returns for the Company's fiscal years-ended June 30, 2004, 2003 and 2002, prepared by the Company's outside accounting firm
2. Financial statements compiled by the Company's outside accounting firm for the fiscal years-ended June 30, 2004 and 2003.
3. An internal Income Statement for the fiscal year-ended June 30, 2004, provided by the Company
4. Internal Commission and Book of Business reports for the thirteen month period ended August 31, 2004 provided by the Company
5. A Book of Business Report by Producer for the fiscal year ended June 30, 2004 provided by the Company
6. A Company provided Excel workbook that included historical financial results and future financial projections compiled by the Company
7. Company provided carrier reports with loss ratios, contingent income, premium and commission amounts for the calendar year ended December 31, 2003
8. Information from the "Confidential Agency Questionnaire" provided by the Client and the Company
9. Information gathered from the Company's website and through numerous conversations and correspondence with George T. Moran and Diane Tamariz-Wallace
10. Information from The Academy of Producer Insurance Studies (APIS)
11. Industry information from Mergerstat and SNL Financial
12. Transaction databases compiled by Mergerstat, SNL Financial and Pratt's Stats
13. Other items referenced throughout the report

**DTA001316**

WFG Capital Advisors LP
Comprehensive Financial Solutions
5
*CONFIDENTIAL INFORMATION*
*Harrisburg, Pennsylvania*
*Phone: (717) 780-7800*
DRDR  001318
HPK /Tamariz-Wallace/DocRecd11.23.09

Certain amounts or totals in various tables or schedules contained in this report may be in slight variance with amounts or totals in other tables or schedules. Any such variance is not material and is due to rounding, timing or other similar events.

## Valuation Date

The valuation date is June 30, 2004. Events or trends that materialized after the valuation date may not be addressed in the opinion of fair market value except as such trends and events would have been reasonably known as of the valuation date. WFG assumes no obligation to update or supplement this opinion to reflect any facts that may arise subsequent to the report date.

## Definition of a "Benchmark" analysis

The "Benchmark" analysis provides the Client with an understanding of the fair market value potential of the business. Fair market value is defined to be a value at which a willing seller and a willing buyer, both being informed of the relevant facts about the business, could reasonably conduct a transaction, neither party acting under compulsion to do so. This is done by carefully blending multiple methods used by most acquiring entities. In addition, it carefully assesses current market conditions and identifies other key intangible values within the specific company. The results provide the Client with parameters of fair market value in addition to providing all the underlying valuation methodologies and rationale. It is a proven benchmark guide that allows the Client to effectively determine a "reasonable" price for a business in a proposed sale.

## Discussion of Valuation Methodology

A combination of a market multiple-based approach and an earnings-based approach is used to assess the fair market value of the Company.

Using a market multiple-based approach, purchase transactions for companies in a similar line of business and of comparable size are used as a benchmark in calculating the value of the Company. Adjustments are then made to this value for various items such as strength of management, competitive advantage in the Company's location, and retention of key agents/salespeople. Using a market multiple-based approach, "normalized" EBITDA (earnings before interest, taxes, depreciation, and amortization) is used as the benchmark basis for the valuation.

Normalized EBITDA is used to gain a better view on the financial performance of a company and to provide a comparison of similar companies in the industry, including market-based owners' and other general employees' compensation, fringe benefits, and reasonable discretionary spending. Also, normalized EBITDA eliminates the effects of financing and accounting decisions that vary among different companies and creates parity of results. Aberrations and non-recurring revenues and expenditures are also removed or adjusted to further reflect the "going concern" contribution of profit that the business is likely to generate without the inclusion of non-recurring or unusual events. Interest is taken out of the equation because some companies may opt to be more financially conservative and keep more cash on hand than is necessary, while other companies may prefer to leverage themselves with more debt. Taxes are not included because of differing tax structures and situations such as net operating loss (NOL)

*WFG Capital Advisors LP*
*Comprehensive Financial Solutions*

6

*CONFIDENTIAL INFORMATION*

**DTA001317**
*Harrisburg, Pennsylvania*
*Phone: (717) 780-7800*
DRDR 001319
HPK /Tamariz-Wallace/DocRecd11.23.09

deductions that differ from company to company. Finally, depreciation and amortization are not included due to differing policies on the choice of depreciation schedules and the life cycle of the Company. A startup or early-stage company will have higher depreciation and amortization costs because of the purchase of equipment, furniture, etc. than a more mature company with most of its infrastructure in place.

Using an earnings-based approach, a valuation is determined based on a company's capacity to generate future earnings and cash flow. We have selected the Capitalization of Earnings method to determine an estimated fair market value for the Company.

Using an earnings-based approach, an advisor can select several methods, including Discounted Projected Future Earnings method or Capitalization of Earnings Method. We believe that the Discounted Future Earnings Method, which converts multiple years of projected future earnings into a current value, is the most preferable of all valuation methodologies. However, unless projected future earnings can be accurately quantified based on such things as long-term contracts or historical trends that are quite stable, buyers are frequently suspicious of valuations based on this method. This method also tends to be highly sensitive to subjective assumptions, including the terminal value, which represents the hypothetical sale price that the company may sell for in some future period. Therefore, Capitalization of Earnings method is often chosen over the Discounted Projected Future Earnings method.

Using the Capitalization of Earnings method, a capitalization rate, (expressed as a percentage) is used to convert after-tax earnings into a present value. The capitalization of earnings process is applied to an amount representing some measure of projected economic income for some single period to convert that economic income amount to an estimate of present value. Capitalization procedures can be used with expected, current, historical or normalized measures of economic income.

*WFG Capital Advisors LP*
*Comprehensive Financial Solutions*

7

*CONFIDENTIAL INFORMATION*

**DTA001318**
*Harrisburg, Pennsylvania*
*Phone: (717) 780-7800*
DRDR 001320
HPK /Tamariz-Wallace/DocRecd11.23.09

# Key Value Drivers

To make the determination where the market range of an insurance agency will fall, an evaluation of the market value proposition must be conducted. The market generally looks for different key areas within a business that will provide a unique service proposition, stability, and/or profitability. It is essential to understand the key areas of the business that the market will assess in its valuation of a company. The following outlines several of the salient categories that most of the market looks for and areas that act to enhance value of a business. Most items denoted fall within an intangible category and, while they do not present clear economic value, must be incorporated into the valuation methodology.

**Size and Scale** – A business should have size and scalability to qualify for optimal consideration. Businesses that have from one to three principals or leaders, and who are all sales focused and driven, rarely are viewed as platform candidates. The market looks for sales infrastructure, sound operations leadership in addition to certain key administrative professionals to balance out the business's top line.

Financial size is equally as important. The market looks for businesses that have demonstrated strong financial performance and that can drive profitability to the company's earnings.

**Distribution Relationships** – This generally refers to exclusive, long-term distribution contracts that capture production from a particular regional or national source. Acquirers that are already in the market look upon these as very valuable from a synergistic perspective. They see an opportunity to cross sell more products through a captive distribution channel. This represents one key factor in differentiating a platform acquisition.

**Aggregation of Production Compensation Agreements** – A business's ability to achieve the highest level of production-based compensation, or contingent commission, adds value. From an economic perspective, this enhances a potential acquirer's portfolio of carrier relationships, particularly if the business possesses a unique carrier relationship that provides top level compensation. This can create synergistic value to the market and should be taken into consideration.

**Operating Proficiency and Profitability** – Operating proficiency and overall return on revenues are key economic value creators. An evaluation of pending inventory, placed cases, or premium by headcount are key metrics that add value if the result reflects consistent proficiency. Also, a business that demonstrates the ability to work fluidly with the ebbs and flows of case traffic by appropriately deploying processing personnel, can really add increased value. It is equally important to have seasoned personnel that can work in a constantly changing environment. If a business possesses the ability to be able to grow quickly, manage its workflow efficiently, and increase profitability on a per unit basis, significant worth is added to the company. Finally, a company that has demonstrated above industry average loss experience and possesses a well underwritten book of business presents itself as a much more attractive prospect in the market.

*WFG Capital Advisors LP*
*Comprehensive Financial Solutions*

8

*CONFIDENTIAL INFORMATION*

**DTA001319**
*Harrisburg, Pennsylvania*
*Phone: (717) 780-7800*
DRDR 001321
HPK /Tamariz-Wallace/DocRecd11.23.09

**Technology** – Value is created when a business is able to deploy an efficient, cost effective, systematic approach to its operations. Value is further enhanced when proprietary or unique applications such as web technology, application order taking, status, rating, or underwriting is used. Essentially, leveraging technology to create an efficient operation is of significant value to certain acquirers.

**Internal Growth Rate** – Historical growth rates are also important for adding value. If management can navigate through market cycles and demonstrate the ability to continuously add new business through new products, carriers, and distribution, this adds value to the company. Trending is very important and if the business can weather the storms of the market, they will be ascribed additional value.

**Product Margins** – Another key issue is the net retention of revenues on a per unit basis. What is the business receiving in gross compensation and what is it paying to its distribution to acquire the revenue? If the company is rapidly adding new distribution and demonstrating revenue growth through aggressively paying compensation, this does not necessarily support a platform qualification or higher multiple. The market may view this as a high-risk maneuver and is cautious of companies that pay an inordinate level of compensation to producers and operate on thin margins and inferior service. The best model is one that demonstrates good fluid growth through superlative service.

**Management Infrastructure** – A business that possesses depth and breadth of management across all core channels definitely presents itself as a solid platform for growth. If the management further demonstrates a cultural environment that is conducive to growth, this again enhances value.

**Product Diversity or Niche** – If there are proprietary product offerings or they have a form of exclusive right to certain distribution channels or carriers, this greatly enhances the company to be viewed as a platform and receive additional value consideration. Also, a business that has a broad product offering demonstrates the ability to be counter-cyclical or at least be able to ride out market downturns due to their diversity. This enables them to spread market risk throughout numerous products and carrier relationships. Businesses that are entirely commodity-based and reside in easily accessed markets generally hold the least value and will generally be assessed as a revenue acquisition.

**Operating Model** – A business that demonstrates a boutique environment, or one that provides "high touch" service, is ascribed greater valuation consideration. This denotes more repeat business, greater penetration among producers, better product submissions, and accolades from carriers and other industry professionals. The translation is lower marketing costs, better underwriting results, and better financial metrics within the business.

**Brand Name Recognition** – A business that has a well-recognized industry name presents a great deal of goodwill value. A company that is easily identified within the industry based on its name or that of its principals solidifies its presence as a stalwart. Management depth within the business is another key value factor. All areas of business operations that are represented with industry professionals present very significant value. These intangibles translate into one key

*WFG Capital Advisors LP*
*Comprehensive Financial Solutions*
9
*CONFIDENTIAL INFORMATION*
**DTA001320**
*Harrisburg, Pennsylvania*
*Phone: (717) 780-7800*
DRDR 001322
HPK /Tamariz-Wallace/DocRecd11.23.09

point: the business is well grounded, stable, and possesses real going concern value to the market.

**Recurring Revenue** -- An assessment of the in-force business by policy year, estimated persistency, and future commission streams are important. Renewal income minimizes risk factors for an acquirer and adds economic value to any transaction. While a robust renewal stream may not qualify the company as a platform, it certainly helps to support rationalization for a greater purchase consideration through risk reduction.

These items clearly increase the market value of a business operation. Not all of the above have to be met in order to maximize the value of a business. It is intended to outline some of the more general areas that enhance its market value.

**DTA001321**
*Harrisburg, Pennsylvania*
*Phone: (717) 780-7800*
DRDR  001323
HPK /Tamariz-Wallace/DocRecd11.23.09

# Business Operations and Financial Analysis

**Business Description**

George T. Moran, Inc., a C-corporation operating under the name of Moran Insurance, located in Severna Park, Maryland, is a multi-line insurance agency that serves over 1,500 individuals/businesses in Anne Arundel County, Maryland, metropolitan Baltimore, Washington, D.C. and the Eastern shore of Maryland regions. The Company writes both personal and commercial lines and is licensed to conduct business in 19 states. The majority of the Company's business is derived from direct retail sales to commercial clients; however, a portion of business is also derived from brokered business for local agents as well as through retail sales to personal clients.

George T. Moran founded the Company is 1977 and remains the President and sole owner of the organization. Currently, the Company employs ten insurance professionals who include: four producers (including the Company owner), an office manager and five customer service representatives. Through its appointments with over 20 insurance carriers and several wholesale brokers the Company can meet most any individual or business insurance need for its clients.

Note: The Company operates on a June 30th fiscal year end basis. Also, certain tables and their accompanying commentary are based on the thirteen month period ended August 31, 2004. Based on conversations and correspondence with George T. Moran it was revealed that Mr. Moran was unable to run certain reports for the twelve month period ended June 30, 2004 on his internal accounting system. Tables and commentary provided in this valuation that are based on reports which encompass the thirteen month period described above are provided for comparison and discussion purposes. According to George T. Moran, his organization is fairly stable and the percentages, inferences and conclusions drawn from the thirteen month reports provide a fairly accurate picture of the Company's overall operations.

**DTA001322**

DRDR 001324
HPK /Tamariz-Wallace/DocRecd11.23.09

**George T. Moran, Inc.**
**Income Statements**
**For the Fiscal Years Ended June 30, 2004 and 2003**

| | 2004 | 2003 |
|---|---|---|
| REVENUE: | | |
| Commission Income | $ 1,462,629 | $ 1,376,556 |
| Miscellaneous Income | 417 | 2,893 |
| TOTAL REVENUE: | 1,463,047 | 1,379,449 |
| EXPENSES: | | |
| *Selling Expenses* | | |
| Advertising | 13,936 | 17,197 |
| Auto Expense | 15,768 | 17,420 |
| Commissions Expense | 46,385 | 60,343 |
| Entertainment | 4,442 | 4,450 |
| Travel Expense | 3,017 | 6,852 |
| Underwriting | 4,544 | 1,894 |
| *Total Selling Expenses* | 88,092 | 108,156 |
| *Administrative Expenses* | | |
| Salaries – Officer | 433,116 | 330,000 |
| Salaries – Other | 544,363 | 515,777 |
| Legal & Accounting | 19,744 | 9,121 |
| Bad Debt Expense | 1,560 | 274 |
| Data Processing | 5,133 | 7,086 |
| Donations | 4,555 | 6,035 |
| Dues & Subscriptions | 9,110 | 11,990 |
| Employee Benefits | 35,221 | 51,514 |
| Insurance Expense | 38,776 | 31,020 |
| Miscellaneous Expense | 2,801 | 4,335 |
| Office Supplies & Expense | 8,246 | 16,118 |
| Outside Service | 9,324 | 992 |
| Printing | 4,057 | 2,673 |
| Postage | 9,494 | 7,531 |
| Professional Meetings | 4,391 | 3,690 |
| Rent & Utilities | 60,778 | 66,793 |
| Repairs & Maintenance | 43,230 | 43,072 |
| Pension Expense | 24,551 | - |
| Payroll Taxes | 51,539 | 48,870 |
| Taxes & Licenses | 3,800 | 4,032 |
| Training and Development | 6,953 | 4,255 |
| Telephone | 9,843 | 10,199 |
| Website | 5,672 | 5,734 |
| *Total Administrative Expenses* | 1,336,257 | 1,181,110 |
| TOTAL EXPENSES | 1,424,349 | 1,289,266 |
| OPERATING PROFIT | 38,697 | 90,183 |
| OTHER INCOME (EXPENSE) | | |
| Gain (Loss) - Sale of Asset | 2,115 | - |
| EBITDA | 40,813 | 90,183 |
| Depreciation | 36,879 | 31,019 |
| Amortization | - | - |
| EBIT | 3,933 | 59,164 |
| Interest (Income) | (2,199) | (5,199) |
| Interest Expense | - | 1,573 |
| Corporate Income Taxes | 2,282 | 15,842 |
| NET INCOME | $ 3,850 | $ 46,948 |

**DTA001323**

DRDR  001325
HPK /Tamariz-Wallace/DocRecd11.23.09

## Ownership

The Company operates as a C-Corporation. The Company currently has 1,000 common shares authorized and is 100% owned by George T. Moran.

## Carrier Relationships

The Company is appointed with over 20 insurance companies. Below is an analysis of the top ten insurance carriers by commissions earned during the Company's fiscal year ended June 30, 2004 and the carrier's respective A.M. Best ratings:

| George T. Moran, Inc. Top Ten Carrier Analysis | | | |
|---|---|---|---|
| Carrier | 2004 Commissions | Percentage of Total | AM Best Rating |
| Montgomery Mutual Insurance Co. | $   228,470 | 18.6% | A |
| Injured Workers Insurance Fund | 182,778 | 14.9% | N/A |
| The Hartford | 115,329 | 9.4% | A+ |
| CNA Insurance Companies | 111,368 | 9.1% | A |
| State Auto Insurance | 70,011 | 5.7% | A+ |
| Chubb Insurance Group | 61,639 | 5.0% | A++ |
| Travelers Insurance | 59,259 | 4.8% | A+ |
| Zurich Insurance Services | 45,598 | 3.7% | A |
| Philadelphia Insurance Company | 40,290 | 3.3% | A+ |
| AIG Aviation, Inc. | 38,250 | 3.1% | A |
| Total Commissions from Top Ten Carriers | $   952,991 | | |
| Total Commissions Earned in 2004 | $  1,228,127 | | |
| Top Ten Carriers as a Percentage of the Total Commissions Earned | 77.60% | | |

As can be noted from the analysis above, nearly 78% of the commissions earned are derived from these ten insurance carriers with the top two making up over 33% of the commissions earned in fiscal year 2004. The top ten carriers have sound A.M. Best ratings with ratings of A or better. The above table indicates that the company does have a fair amount of carrier concentration risk as the majority of the Company's commission income is derived from the top four carriers. However, this is normal for smaller agencies and the strong A.M. Best ratings provides additional comfort related to carrier risk.

In addition to its carrier relationships the Company also writes business through several wholesale brokers. These brokerage relationships provide the company with access to numerous carriers with which the Company is not directly appointed.

*WFG Capital Advisors LP*
*Comprehensive Financial Solutions*

13

*CONFIDENTIAL INFORMATION*

**DTA001324**
*Harrisburg, Pennsylvania*
*Phone: (717) 780-7800*
DRDR  001326
HPK /Tamariz-Wallace/DocRecd11.23.09

## Contingent Commissions

Contingent commissions represent excess bonuses earned by an insurance agency or broker based upon retention rates, loss ratios and overall profitability of the business that is being written. Contingent commissions are typically paid yearly by carriers based on prior year results. Contingent commissions can represent a significant portion of an agency or brokers net revenues and overall net income. The Company collected contingent commission in fiscal year 2004 from six carriers totaling $149,125 or 10.2% of the Company's total commission income. The Company collected contingent commission in fiscal year 2003 from four carriers totaling $73,001 or 5.3% of the Company's total commission income. The table below details contingent commissions received by carrier for fiscal years 2004 and 2003.

| George T. Moran, Inc. Contingent Commission Analysis | | |
| --- | --- | --- |
| Carrier | 2004 | 2003 |
| Chubb | 5,794 | 25,963 |
| CNA | 14,075 | 28,878 |
| Hartford | 4,482 | - |
| IWIF | 100,830 | - |
| Montgomery Mutual | - | 14,978 |
| State Auto | 10,347 | 3,182 |
| Zurich | 13,597 | - |
| Total | 149,125 | 73,001 |

## Client Revenues

The Company maintains a large volume of clients. During the thirteen month period from August 1, 2003 to August 31, 2004 the company wrote business for approximately 1,376 clients. Commission earned from the Company's top 25 clients represented approximately 36% of the total commission income over the thirteen month period. The Company's top ten clients by commission earned represented nearly 25% of the total commission earned over the respective time period. This ratio is not inconsistent with smaller agencies, particularly ones with a high percentage of revenue derived from commercial property and casualty lines. The table below details the Company's top 25 clients by commission income and each respective client's contribution to overall Company commission income for the thirteen month period ended August 31, 2004.

**DTA001325**

DRDR 001327
HPK /Tamariz-Wallace/DocRecd11.23.09

| George T. Moran, Inc. 13 Month Top 25 Client Analysis August 1, 2003 to August 31, 2004 | | | |
|---|---|---|---|
| Client | Commission | Percentage of Total Commission | Premium |
| Gordon Contractors, Inc. | 68,540 | 5.52% | 778,192 |
| Sensenich Propeller Co. | 55,277 | 4.46% | 582,293 |
| Providence Center, Inc. | 37,728 | 3.04% | 336,896 |
| Wm. D. Euille & Associates | 33,077 | 2.67% | 208,971 |
| E.C. Ernst, Inc. | 22,304 | 1.80% | 333,587 |
| Admiral, Inc. | 18,069 | 1.46% | 160,210 |
| Elcon Enterprises, Inc | 17,974 | 1.45% | 299,573 |
| Norris E. Taylor Contractors | 17,437 | 1.41% | 138,451 |
| Elite Restoration, Inc | 16,418 | 1.32% | 134,473 |
| MCA Construction, Inc. | 16,248 | 1.31% | 92,396 |
| U.S. Naval Academy | 15,324 | 1.24% | 105,940 |
| Mead Tree & Turf Care, Inc. | 12,817 | 1.03% | 118,134 |
| Mercier's Inc. | 11,541 | 0.93% | 106,385 |
| Energy Works Lancaster, LLC | 11,532 | 0.93% | 81,553 |
| R. Norton Company, Inc. | 10,653 | 0.86% | 89,028 |
| Snyder Development Corporation | 9,456 | 0.76% | 85,654 |
| East Coast Building Services, Inc. | 8,716 | 0.70% | 76,097 |
| Virginia Roofing, Inc. | 8,644 | 0.70% | 102,392 |
| Digging and Rigging, Inc. | 8,615 | 0.69% | 123,065 |
| Maryland Recycle Company, Inc. | 8,449 | 0.68% | 130,352 |
| The Harbour School | 8,404 | 0.68% | 70,983 |
| Mid-Atlantic Roofing, Inc. | 8,271 | 0.67% | 81,726 |
| ArborCare, Inc. | 8,002 | 0.64% | 115,722 |
| John E. Harms Jr. | 7,990 | 0.64% | 54,957 |
| Ed's Tree Service, Inc. | 7,933 | 0.64% | 74,438 |
| Top 25 Total | 449,419 | 36.22% | 4,481,467 |
| Company Total | 1,240,755 | | 11,659,394 |

*WFG Capital Advisors LP*
*Comprehensive Financial Solutions*

15

*Harrisburg, Pennsylvania*
*Phone: (717) 780-7800*

**DTA001326**

DRDR 001328
HPK /Tamariz-Wallace/DocRecd11.23.09

*CONFIDENTIAL INFORMATION*

# Employee Efficiency

In analyzing income and expense statements for the Company for the past year, ratios have been compared to APIS studies for the periods of 2003 and 2002. Results shown are for APIS agencies with net revenues of $1,000,000 to $2,000,000. Historical profit and loss statements for the most recent fiscal years are shown on page 12. Note: References to total revenue or percentages based off of total revenue do not include interest income or income derived from the sale of assets. In addition, some measures of employee efficiency are skewed away from industry averages due to the fact that the Company owner removes the majority of the Company's profit at the end of each fiscal year and expenses this excess compensation as a salary expense.

## Summary

The Company employed 10 employees as of the valuation date, including the Company owner. As of the fiscal year ended June, 30, 2004, the Company generated revenue per employee of $146,305. As a basis for comparison, the revenue per employee results achieved by the peer group per the APIS were $87,749 for the Southeast region and $90,489 per the National study.

Compensation per employee (which includes all employee benefits and payroll taxes) was $108,879 for the fiscal year ended June 30, 2004. As a basis for comparison, compensation per employee for the peer group per the APIS is $55,901 for the Southeast region and $59,156 per the National study.

The "spread" is the difference between revenue per employee and compensation per employee and can be a better indication of productivity than the revenue per employee computation. The greater the "spread", the more opportunity for profits after other agency expenses have been taken into consideration. The "spread" for the Company for the fiscal year ended June 30, 2004 was $37,426. The spread for the peer group per the APIS was $31,848 for the Southeast region and $31,333 per the National study. This indicates that although the Company's cost of compensation and revenue is dramatically higher then its APIS peer group, the Company has been able to achieve a greater margin of productivity then its peer group as the Company's spread is markedly higher then its peer group. This point is further exacerbated by the fact that the Company's owner removes the majority of the Company's profits as a bonus for himself at each fiscal year end.

Total payroll for the Company for the calendar year ended December 31, 2003 was $977,479 or 66.8% of the Company's revenues. The APIS peer group studies reported payroll as a percentage of revenue of 35.6% and 37.3% for the Southeast region and National APIS studies, respectively. Employee benefits totaled $35,221 or 3.6% of payroll and 2.4% of revenues as of the fiscal year ended June 30, 2004 compared to 9.5% and 3.4%, respectively, for the APIS Southeast region study and 9.0% and 3.3%, respectively, for the National APIS study group. Total compensation for the fiscal year ended June 30, 2004, including sales salaries, commissions and owner's/officers salaries, was $1,088,790 or 74.4% of the agency's revenues as compared to 63.7% and 65.4% for the APIS Southeast region and National studies, respectively. A comparison of these productivity measurements is illustrated as follows:

*WFG Capital Advisors LP*        16        *Harrisburg, Pennsylvania*
*Comprehensive Financial Solutions*      *Phone: (717) 780-7800*
*CONFIDENTIAL INFORMATION*

**DTA001327**

DRDR 001329
HPK /Tamariz-Wallace/DocRecd11.23.09

| George T. Moran, Inc. Measure of productivity and efficiency | | APIS 2002 and 2003 | |
| --- | --- | --- | --- |
| | Actual 2004 | National Report | Southeast Report |
| Number of Employees | 10.0 | 15.4 | 16.5 |
| Revenue per Employee | $ 146,305 | $ 90,489 | $ 87,749 |
| Compensation Per Employee | $ 108,879 | $ 59,156 | $ 55,901 |
| Spread Per Employee | $ 37,426 | $ 31,333 | $ 31,848 |
| Payroll/Revenues | 66.8% | 37.3% | 35.6% |
| Benefits/Payroll | 3.6% | 9.0% | 9.5% |
| Benefits/Revenues | 2.4% | 3.3% | 3.4% |
| Compensation/Revenues | 74.4% | 65.4% | 63.7% |

## Producers

The Company currently employs four producers, including the Company's owner and President George T. Moran. Producers are paid on a nearly 100% commission basis, the remaining portion of each respective producers income is paid as salaries to the producers by the Company for management or supervisor roles within the Company. What follows is a breakdown of commission income and premiums generated for the Company by producer for the fiscal year ended June 30, 2004. Note: references to commission totals below do not include life and benefit commission or contingent commission.

| George T. Moran, Inc. 2004 Production Analysis | | | | |
| --- | --- | --- | --- | --- |
| | Commission | Percentage of Commission | Premium | Percentage of Premium |
| Russell G. DeVoe | 423,661 | 34.50% | 4,089,395 | 35.46% |
| Donna R. Moran | 369,351 | 30.07% | 3,415,614 | 29.62% |
| No Producer Listed | 153,017 | 12.46% | 1,120,030 | 9.71% |
| Special Account Department[1] | 77,068 | 6.28% | 631,500 | 5.48% |
| George T. Moran | 73,087 | 5.95% | 630,670 | 5.47% |
| Morgan & Cheves, Inc. | 64,318 | 5.24% | 1,120,364 | 9.71% |
| Bond Department | 44,632 | 3.63% | 155,590 | 1.35% |
| Preferred Insurance Services | 11,716 | 0.95% | 176,990 | 1.53% |
| Levine/Webster Insurance | 2,900 | 0.24% | 96,679 | 0.84% |
| Steven G. Burns | 2,900 | 0.24% | 28,891 | 0.25% |
| Bay Area Insurance Agency, Inc. | 2,654 | 0.22% | 17,693 | 0.15% |
| A.W. Hargrove Insurance Agency | 1,579 | 0.13% | 22,557 | 0.20% |
| The Solutions Group | 428 | 0.03% | 10,093 | 0.09% |
| L&W Insurance Agency | 384 | 0.03% | 5,487 | 0.05% |
| Gunn-Mowery Insurance | 330 | 0.03% | 11,016 | 0.10% |
| KT&D, Inc. | 102 | 0.01% | 508 | 0.00% |
| Total | 1,228,127 | 100.00% | 11,533,077 | 100.00% |

*WFG Capital Advisors LP*
*Comprehensive Financial Solutions*

17

*CONFIDENTIAL INFORMATION*

*Harrisburg, Pennsylvania*
*Phone: (717) 780-7800*

**DTA001328**

DRDR 001330
HPK /Tamariz-Wallace/DocRecd11.23.09

1: Special Account Department refers to small commercial accounts that generate less than $1,000 in commission and are direct billed by the respective carriers.

Based on the information detailed in the above table, Russell D. DeVoe and Donna R. Moran were the Company's leading producers with a combined contribution to Company commission income of $793,012 or 64.6% of the Company's commission income (excluding contingent commissions and life and benefit commissions) for fiscal year 2004.   Commission income generated from outside agency's through brokered business by the Company was $84,411 or 6.87% of total commission income (excluding contingent commissions and life and benefit commissions) for fiscal year 2004.   Several producer line items shown above are general production accounts for the Company and are not linked to any one respective producer.

## Restrictive Covenants

A major issue impacting an agency's value is the degree by which the agency can protect its customer relationships from competition from its producers in the event their employment is terminated. This protection is typically provided via restrictive covenants entered into by each producer. The Company has executed standard non-compete / non-solicit agreements with each of its employees, including customer service representatives and general office staff.   The executed agreements are binding for three years from the employee's respective termination date.

**DTA001329**
DRDR  001331
HPK /Tamariz-Wallace/DocRecd11.23.09

# Financial Summary and Industry Comparison

In analyzing income and expense statements for the Company for the past year, ratios have been compared to APIS studies for the periods of 2003 and 2002. Results shown are for APIS agencies with net revenues of $1,000,000 to $2,000,000. Historical profit and loss statements for the most recent fiscal years are shown on page 12. Note: References to total revenue or percentages based off of total revenue do not include interest income or income derived from the sale of assets unless specifically detailed.

*Income Statement*

Revenues

Revenue numbers stated in the table below were derived from the Company's internal financial reports on Excel provided by George T. Moran, internal financial reports from the Company's accounting system and the outside accountant's financial reports. Because numerous sources were used to compile this information the total revenue numbers do not foot to those shown on the income statement detailed on page 12 of this valuation. The variation is immaterial for the purposes of this valuation.

The Company generates a majority of its revenue through commercial insurance product sales. With the exception of contingent income, the percentage of revenue derived from each respective revenue generating line item has remained fairly consistent over the time period analyzed. The table below presents a detailed analysis of revenue.

| George T. Moran, Inc. Fiscal Years 2004 and 2003 Revenue Analysis | | | | |
|---|---|---|---|---|
| | 2004 Revenue | 2004 Percentage of Revenue | 2003 Revenue | 2003 Percentage of Revenue |
| Personal Lines Commission | 172,081 | 11.68% | 167,692 | 12.25% |
| Commercial Lines | 1,057,143 | 71.74% | 1,041,040 | 76.03% |
| Special Accounts | 77,163 | 5.24% | 77,163 | 5.64% |
| Life & Benefits | 13,273 | 0.90% | 2,266 | 0.17% |
| Contingent | 149,125 | 10.12% | 73,001 | 5.33% |
| Interest Income | 2,199 | 0.15% | 5,199 | 0.38% |
| Gain on Sale of Assets | 2,115 | 0.14% | - | 0.00% |
| Other | 417 | 0.03% | 2,893 | 0.21% |
| Total | 1,473,516 | 100.00% | 1,369,255 | 100.00% |

Over the thirteen month period from August 1, 2003 to August 31, 2004 the company wrote business across 34 different insurance product lines generating total commission income of $1,240,775 (excluding contingent commissions and life and benefit commissions) on $11,659,394 of premiums. The top five product lines by commission income generated over 80% of the Company's commission income. This concentration of commission income across product lines creates somewhat of a product line concentration risk. If the Company were to lose

**DTA001330**

*WFG Capital Advisors LP*
*Comprehensive Financial Solutions*                    19                    *Harrisburg, Pennsylvania*
*Phone: (717) 780-7800*
*CONFIDENTIAL INFORMATION*
DRDR   001332
HPK /Tamariz-Wallace/DocRecd11.23.09

carrier appointments with those carriers that underwrite the top five product lines the Company's commission income would be dramatically affected unless additional/replacing carrier appointments could be attained.

A table detailing commission income and premium generation by line of business for the above referenced thirteen month time period is presented bellow.

| | | | | | |
|---|---|---|---|---|---|
| **George T. Moran, Inc.** | | | | | |
| **13 Month Revenue Analysis** | | | | | |
| **August 1, 2003 to August 31, 2004** | | | | | |
| Type of Business | Commission | Percentage of Commission | Premium | Percentage of Premium |
| Package | 362,258 | 29.20% | 2,564,428 | 21.99% |
| Workers Compensation | 281,506 | 22.69% | 4,515,470 | 38.73% |
| Commercial Auto | 190,134 | 15.32% | 1,443,195 | 12.38% |
| General Liability-Simplified | 82,988 | 6.69% | 809,377 | 6.94% |
| Homeowners | 77,165 | 6.22% | 521,146 | 4.47% |
| Personal Auto | 75,568 | 6.09% | 567,313 | 4.87% |
| Bonds | 49,984 | 4.03% | 190,090 | 1.63% |
| Commercial Umbrella | 47,995 | 3.87% | 439,896 | 3.77% |
| Commercial Property | 9,653 | 0.78% | 83,776 | 0.72% |
| Directors & Officers Liability | 9,004 | 0.73% | 80,097 | 0.69% |
| Business Owners Policy | 7,814 | 0.63% | 52,225 | 0.45% |
| Errors and Omissions | 7,769 | 0.63% | 87,487 | 0.75% |
| Equipment Floater | 5,363 | 0.43% | 31,159 | 0.27% |
| Commercial Crime | 4,611 | 0.37% | 26,117 | 0.22% |
| Dwelling Fire | 3,909 | 0.32% | 27,559 | 0.24% |
| Miscellaneous Professional Liability | 3,091 | 0.25% | 29,794 | 0.26% |
| Builders Risk | 2,888 | 0.23% | 25,360 | 0.22% |
| Personal Umbrella / Excess | 2,851 | 0.23% | 25,808 | 0.22% |
| Garage Liability | 2,702 | 0.22% | 26,673 | 0.23% |
| Miscellaneous Commercial Coverage | 2,266 | 0.18% | 27,252 | 0.23% |
| Flood | 1,710 | 0.14% | 13,902 | 0.12% |
| Boat | 1,685 | 0.14% | 12,585 | 0.11% |
| Transportation / Cargo | 1,662 | 0.13% | 8,435 | 0.07% |
| Commercial Inland Marine | 1,473 | 0.12% | 9,821 | 0.08% |
| Installation Floater | 1,438 | 0.12% | 9,161 | 0.08% |
| Commercial Excess Liability | 896 | 0.07% | 10,545 | 0.09% |
| Farm Owners | 441 | 0.04% | 3,717 | 0.03% |
| Boiler & Machinery | 414 | 0.03% | 2,760 | 0.02% |
| Aviation | 397 | 0.03% | 5,288 | 0.05% |
| General Liability-Non-Simplified | 334 | 0.03% | 2,664 | 0.02% |
| Malpractice | 315 | 0.03% | 3,147 | 0.03% |
| Personal Inland Marine | 227 | 0.02% | 1,332 | 0.01% |
| Motor Home / RV | 176 | 0.01% | 1,243 | 0.01% |
| Motor Cycle | 72 | 0.01% | 572 | 0.00% |
| **Total** | 1,240,755 | 100.00% | 11,659,394 | 100.00% |

As with a majority of seasoned and adequately managed insurance agencies, renewal business commission income provides a majority of the company's commission income. As detailed by

**DTA001331**

DRDR  001333
HPK /Tamariz-Wallace/DocRecd11.23.09

the table below renewal business for straight renewals, rewrites and renewal rewrites to new carriers represented 89.6% of the Company's commission income (excluding contingent commissions and life and benefit commissions) over the thirteen month time period from August 1, 2003 to August 31, 2004. Over the same time period, new business accounted for $129,286 or 10.4% of commission income (excluding contingent commissions and life and benefit commissions) on premium of $975,494. In essence, this indicates that over the thirteen month time period the Company's four producers on average produced respectively $32,322 of new commission income on an average premium volume of $243,874 per producer. The table below provides a breakdown of new verse renewal business over the thirteen month time period previously outlined.

| George T. Moran, Inc. 13 Month New Verse Renewal Business Analysis August 1, 2003 to August 31, 2004 | | | | |
|---|---|---|---|---|
| | Commission | Percentage of Commission | Premium | Percentage of Premium |
| New Business | 129,286 | 10.42% | 975,494 | 8.37% |
| Renewal | 981,684 | 79.12% | 9,390,542 | 80.54% |
| Rewrite | 36,292 | 2.93% | 391,477 | 3.36% |
| Renewal-Rewritten: New Carrier | 93,493 | 7.54% | 901,882 | 7.74% |
| Total | 1,240,755 | 100.00% | 11,659,394 | 100.00% |

## Expenses

Total expenses for the Company for fiscal year ended June 30, 2004 represented 97.4% of the Company's revenues versus 90.4% and 91.7% for the Southeast region and National APIS peer groups, respectively. This resulted in a pretax profit margin for The Company of 2.6% versus a pretax profit margin of 9.6% and 8.3% for the Southeast region and National APIS peer groups, respectively. The Company operates on a markedly lower profit margin then its peer group; this is a result of the Company owner paying himself a bonus which consists of the majority of the Company's profits at the end of the fiscal year. A breakdown of expense categories followed by a more detailed explanation of each expense category follows:

| Expense Catagories (by percentage of revenue) | | | |
|---|---|---|---|
| | | APIS 2002 and 2003 | |
| | Actual 2004 | Southeast Report | National Report |
| Selling Expenses | 6.0% | 18.1% | 18.3% |
| Administrative Expenses | 91.3% | 72.3% | 73.4% |
| Total Expenses (Pretax) | 97.4% | 90.4% | 91.7% |

*WFG Capital Advisors LP*
*Comprehensive Financial Solutions*

21

*CONFIDENTIAL INFORMATION*

**DTA001332**
*Harrisburg, Pennsylvania*
*Phone: (717) 780-7800*
DRDR 001334
HPK /Tamariz-Wallace/DocRecd11.23.09

*Selling Expenses*

Total selling expenses for the Company represented 6.0% of the Company's revenues for the fiscal year ended June 30, 2004 versus 18.1% and 18.3% for the Southeast and National APIS peer groups, respectively. Selling expenses as a percentage of revenue compared to the APIS peer groups are significantly lower due to the classification of commissions for several producers as officer salaries compensation or management salaries versus commission selling expenses. Selling expenses are also impacted by the owner paying himself a bonus which consists of the majority of the Company's profits at the end of the fiscal year. Below is a summary of selling expense percentages for the Company and for the APIS peer groups:

| Selling Expenses (by percentage of revenue) | | | |
|---|---|---|---|
| | | *APIS 2002 and 2003* | |
| | Actual 2004 | Southeast Report | National Report |
| Sales Salaries and Commission | 3.2% | 14.4% | 14.1% |
| Advertising and Promotion | 1.0% | 1.5% | 1.7% |
| Automobile | 1.1% | 1.2% | 1.4% |
| Travel and Entertainment | 0.5% | 1.0% | 1.1% |
| Other Sales Expenses | 0.3% | | 0.0% |
| Total Selling Expenses | 6.0% | 18.1% | 18.3% |

*Administrative Expenses*

Total administrative expenses for the Company represent 91.3% of the Company's revenues versus 72.3% and 73.4% for the Southeast region and National APIS peer groups, respectively. A summary of administrative expense percentages for the Company and for the APIS peer group are as follows:

| Administrative Expenses (by percentage of revenue) | | | |
|---|---|---|---|
| | | *APIS 2002 and 2003* | |
| | Actual 2004 | Southeast Report | National Report |
| Executive or Owner Compensation | 29.6% | 19.0% | 19.5% |
| Office or Staff Salaries | 37.2% | 21.2% | 23.2% |
| Insurance | 2.7% | 4.7% | 5.3% |
| Rent and Leases | 4.2% | 4.1% | 3.9% |
| Other Administrative Expenses | 17.7% | 23.3% | 21.5% |
| Total Selling Expenses | 91.3% | 72.3% | 73.4% |

**DTA001333**

DRDR  001335
HPK /Tamariz-Wallace/DocRecd11.23.09

As noted above under selling expenses, executive or owners compensation as a percentage of revenue compared to the APIS peer groups is skewed away from industry averages due to the classification of commissions for several producers as officer salaries compensation or management salaries versus commission selling expenses. Administrative expenses are also skewed away from industry averages as a result of the Company owner paying himself a bonus which consists of the majority of the Company's profits at the end of the fiscal year.

*Balance Sheet*

The balance sheet measures financial strength at a point in time. WFG has reviewed the balance sheet for the Company as of the valuation date, as well as of June 30, 2003. As of the valuation date, the Company reported current assets of $961,985 and current liabilities of $671,320. This leaves the Company with a working capital balance of $290,665.

The Current Ratio (current assets divided by current liabilities) is a good measure of an agency's ability to meet its current obligations with current assets. The typical benchmark for most firms is a ratio of 1:1 or greater. For the fiscal year ended June 30, 2004 the Company had a current ratio of 1.43.

The Company maintains fixed assets related to the operations of the business. Those fixed asset balances have remained fairly constant over the time period analyzed. On June 30, 2004, property and equipment before accounting for accumulated depreciation was $447,206; property and equipment less accumulated depreciation (Net Property & Equipment) was $22,413. This indicates that the overwhelming majority of available depreciation expense on the income statement has already been taken in fiscal previous years.

The Company's liabilities consist of accounts payable to insurance companies of $587,591, accounts payable other $50,529 and advanced premium received of $33,199. Cumulatively, current liabilities equaled $671,320; the Company has no long-term liabilities.

The table below is a summary of balance sheet results for the periods ended June 30, 2004 and 2003, respectively.

**DTA001334**

DRDR  001336
HPK /Tamariz-Wallace/DocRecd11.23.09

| George T. Moran, Inc. Balance Sheets As of June 30, 2004 and 2003 | | |
|---|---|---|
| | 2004 | 2003 |
| **ASSETS** | | |
| *Current Assets* | | |
| Cash | | |
| Cash - Operating Account | $ 4,287 | $ 8,058 |
| Cash - Premium Account | 51,897 | 470,594 |
| Petty Cash | 250 | 250 |
| Money Market Account | 121,392 | - |
| Cash - Operating Account | 50,073 | - |
| Cash - Premium Account | 361,281 | - |
| *Total Cash* | 589,180 | 478,902 |
| Marketable Securities | - | 61,204 |
| Accounts Receivable - Trade | 238,231 | 303,807 |
| Accounts Receivable - Direct Bill Commission | 93,204 | 86,972 |
| Accounts Receivable - Other | 412 | 493 |
| *Prepaid Expenses, Deposits & Taxes* | | |
| Prepaid Insurance | 12,068 | 4,876 |
| Prepaid Expenses | 5,092 | 5,923 |
| Prepaid Interest - Loan | - | - |
| Prepaid Rent | 10,000 | 10,000 |
| Prepaid Federal Income Taxes | 9,744 | 3,799 |
| Prepaid State Income Taxes | 4,054 | 1,079 |
| *Total Prepaid Expenses, Deposits & Taxes* | 40,958 | 25,677 |
| *Total Current Assets* | 961,985 | 957,055 |
| *Property & Equipment* | | |
| Furniture and Equipment | 113,453 | 114,493 |
| Computer Equipment | 89,675 | 94,111 |
| Leasehold Improvements | 244,078 | 244,078 |
| Less: Accumulated Depreciation | (424,793) | (416,111) |
| *Net Property & Equipment* | 22,413 | 36,572 |
| **TOTAL ASSETS** | 984,398 | 993,627 |
| **LIABILITIES AND EQUITY** | | |
| *Current Liabilities* | | |
| Accounts Payable - Insurance Companies | $ 587,591 | $ 575,805 |
| Accounts Payable - Other | 50,529 | 52,971 |
| Advanced Premium Received | 33,199 | 55,623 |
| *Total Current Liabilities* | 671,320 | 684,398 |
| *Stockholders' Equity* | | |
| Common Stock | 1,000 | 1,000 |
| Retained Earnings | 312,079 | 308,229 |
| *Total Stockholders' Equity* | 313,079 | 309,229 |
| **TOTAL LIABILITIES AND EQUITY** | $ 984,398 | $ 993,627 |

| Financial Analysis | | |
|---|---|---|
| Current Assets | 961,985 | 957,055 |
| Current Liabilities | 671,320 | 684,398 |
| Working Capital | 290,665 | 272,656 |
| Current Ratio | 1.43 | 1.40 |

**DTA001335**
DRDR 001337
HPK /Tamariz-Wallace/DocRecd11.23.09

# Valuation Analysis

## Description of Valuation Tests

Fair market value is the amount at which a company would sell between a willing buyer and a willing seller, both fully informed of relevant facts and with equity in both. Fair market value is distinguished from the *price* that may be paid by any specific buyer. The *price* paid by a specific buyer may deviate from fair market value, either higher or lower, depending upon the structure of the transaction and other considerations unique to the transaction.

Key factors used to determine the fair market value of the Company's operations include the firm's capacity to provide future earnings and cash flow for shareholders as measured by past performance, management's business plan and overall industry conditions.

In order to estimate the future earnings and cash flow of the Company, a review of the operations, book of business and business prospects was completed. In addition, a financial analysis was completed with respect to past and present trends in revenues, expenses, earnings and cash flow in order to project future earnings and cash flow. In the financial analysis, pro forma adjustments were made to the Company's existing revenues and expenses in order to reflect likely changes resulting from a third-party ownership. These pro-forma adjustments are shown below under "Review of Normalizing Adjustments".

## Review of Normalizing Adjustments, Income Statement

Most privately-held companies are managed to reflect minimum profits for tax planning purposes. Therefore, one must take the historical financial statements and make what is referred to as "pro forma normalizing adjustments" to determine the "true" earnings and cash flow potential of the business. For purposes of our analysis, the most common indicator of cash flow and in turn, fair market value, is normalized EBITDA (earnings before interest, taxes, depreciation and amortization).

Normalizing adjustments are made to the Company's financial statements to reflect expenses that a potential buyer would not incur if the Company were acquired. Examples would be above-market compensation for owners/shareholders, family members, and other key employees, company-funded perks like luxury automobiles and country club dues, and one-time events like sponsorship of sporting events. These adjustments are taken out to gain a truer picture of the future profits of the Company if it was acquired.

The following table and notes explain the normalizing adjustments made to the Company's financial statements. These adjustments are important because they can make an impact on how the Company is valued. A significant reduction in operating expenses will cause operating earnings to increase and thus also increase the value of the Company.

**DTA001336**

DRDR 001338
HPK /Tamariz-Wallace/DocRecd11.23.09

| George T. Moran, Inc. Normalized EBITDA Results | | |
|---|---|---|
| | | Fiscal Year-ended June 30, 2004 |
| Unadjusted EBITDA | $ | 40,813 |
| Normalizing Adjustments | | |
|     Aviation Publications | 1 | 1,000 |
|     Contributions | 2 | 4,555 |
|     Helix Litigation | 3 | 16,092 |
|     Home Internet Service | 4 | 720 |
|     Insurance | 5 | 20,669 |
|     Owner Bonus | 6 | 300,116 |
|     Total Normalizing Adjustments | | 343,152 |
| Adjusted EBITDA | $ | 383,964 |

*Explanation of Adjustments to Historical Financial Statements*

1. <u>Aviation Publications</u> – Based on conversations with George T. Moran, personal aviation publication costs are included in the dues and subscriptions expenses shown on the Company's financial statements.

2. <u>Contributions</u> – Contributions are made by the Company to a charity golf outing, this expense is reflected under donations on the Company's financial statements.

3. <u>Helix Litigation</u> – George Moran is a defendant in a lawsuit from Helix Construction Services, Inc. and India K. Sutherland; the legal fees for this ongoing expense are reflected on the Company's financial Statements.

4. <u>Home Internet Service</u> – Based on conversations with George Moran, the Company pays for Mr. Moran's home internet service, "Friendlynet Computer Service". This expense is reflected under the data processing line item on the Company's financial statements.

5. <u>Insurance</u> – Based on conversations with George Mason and a review of the Company's internal financial statements, the Company pays the following personal insurance expenses for Mr. Moran and/or the Company's employees: Aircraft Insurance: $1,500 annum, Auto Insurance: $3,000 annum, Homeowners Insurance: $3,500 annum, Flood Insurance: $241 annum, Officer Long-term Care: $8,843 annum and Officer Life Insurance: $3,585 annum.

*WFG Capital Advisors LP*
*Comprehensive Financial Solutions*

26

*CONFIDENTIAL INFORMATION*

*Harrisburg, Pennsylvania*
*Phone: (717) 780-7800*

**DTA001337**
DRDR  001339
HPK /Tamariz-Wallace/DocRecd11.23.09

6. Owner Bonus – The Company's owner, George T. Moran, pays himself a bonus that amounts to a majority of the Company's profits for each fiscal year. With respect to fiscal year 2004, Mr. Moran received a base salary plus commission compensation of $133,000. At the end of the fiscal year Mr. Moran paid himself the majority Company's profits for that fiscal year of $300,116, thus reducing taxable profits for the Company. The net result was an overstatement of owner's compensation expense for the 2004 fiscal year of $300,116 on the financial statements developed by the Company's outside accounting firm and in turn the Company's 2003 tax returns.

Note: The following items were not reflected as adjustments but are footnoted for valuation purposes.

Section 125 Plan – The Company has established a "Section 125" plan, this is a discretionary expense. However, this expense has not been normalized as it is assumed that this expense will continue under new Company ownership. The Section 125 expense as reflected on the Company's internal financial statements for fiscal year end 2004 was $805.

Simple IRA – The Company has established a Simple IRA plan, the expense for this retirement plan, which was $24,551 for fiscal year 2004, is reflected under the pension expense line item on the Company's income statement. Retirement plans are considered discretionary expenses. However, this expense is part of the current employees' compensation plan and it is expected that this expense will continue under new Company ownership.

**Capitalization of Earnings Methodology**

*Background on Use of Capitalization of Earnings*

In order to value the Company using a capitalization of earnings method, a capitalization rate has to be calculated. The capitalization rate is used to place a value on the earnings stream of the Company. The riskiness of the earnings stream plays a role in the capitalization rate to be used with riskier earnings streams garnering higher capitalization rates, similar to that in the investment world. An example of this principle would be an investor demanding a higher rate of return from a corporate bond than from a safer government bond or bank certificate of deposit.

The Ibbotson Buildup Method is used to calculate the capitalization rate for the Company. The risk-free rate of the 20-year Treasury note forms the foundation with risk premiums added on top of this rate. Risk premiums have been taken from analyses conducted by Ibbotson Associates and have been included in order to take into account the riskiness of the free cash flow stream for shareholders and the industry. Specifically, the common stock equity risk premium, small stock risk premium and industry risk premium are published amounts and not subjective numbers. The Company Specific Premium is subjective in nature and is discussed in further detail. The discount rate is the sum of all these risk premiums and the risk-free rate.

In order to factor in future growth of the earnings stream, an estimate of the perpetual growth rate of the Company is then subtracted out of the net discount rate. The higher the estimated rate of growth in earnings, the lower the capitalization rate, which results in a higher company valuation. This sustainable growth rate variable also incorporates the long-term inflation rate.

**DTA001338**
DRDR  001340
HPK /Tamariz-Wallace/DocRecd11.23.09

The resulting difference is the base capitalization rate, which is then used to capitalize the Company's earnings. The following table provides a summary of the Ibbotson Buildup Model and the calculated capitalization rate for the Company.

*Ibbotson Buildup Model*

| Ibbotson Buildup Method | |
|---|---|
| Risk-free Rate of Return (as of 6/30/04) | 5.45% |
| Common Stock Equity Risk Premium | 7.00% |
| Small Stock Risk Premium | 9.20% |
| Plus/Minus Industry Risk Premium | -2.96% |
| Company Specific Premium | -2.50% |
| Net Discount Rate | 16.19% |
| Less: Long-Term Growth Rate | 4.50% |
| Base Capitalization Rate | 11.69% |

*Specific Risk Premium Analysis*

Specific risk premiums are based upon judgments of the business and industry risk surrounding the business. Specific risk premiums relate to key-factors of historical and projected growth, profitability and stability of the business and the overall industry. Positive specific risk premiums indicate an overall risk to the business. An example of this would be dependence of the business upon one key individual or operating within one market. Negative specific risk premiums indicate stability and increase value of a company. An example of this would be a well-diversified product mix that would allow the business to remain profitable in an underperforming market. An analysis of the specific risk premiums for the Company and corresponding explanations are provided below:

| Calculation of Company Specific Premium | |
|---|---|
| Depth of Management | -1.00% |
| Importance of Key Personnel | 1.00% |
| Stability of Industry | -0.50% |
| Diversification of Customer Base | 0.00% |
| Diversification /Stability of Carriers | -0.50% |
| Geographic Locations | -0.50% |
| Stability of Earnings | -0.50% |
| Earnings Margins | 0.00% |
| Financial Structure | 0.50% |
| Other Intangibles | -1.00% |
| Company Specific Premium | -2.50% |

*WFG Capital Advisors LP*
*Comprehensive Financial Solutions*

28

*CONFIDENTIAL INFORMATION*

**DTA001339**
*Harrisburg, Pennsylvania*
*Phone: (717) 780-7800*
DRDR 001341
HPK /Tamariz-Wallace/DocRecd11.23.09

*1. Depth of Management* – The Company's President and Owner has operated the business since its founding in 1977. In addition, Mr. Moran is supported by three other officers all of which are experienced insurance professionals or general managers.

*2. Importance of Key Personnel* – Three of the Company's four officers are also top producers with the agency. The remaining officer is the office manager. George Moran, Owner / President is married to Donna Moran, Treasurer and Producer; Russell DeVoe, Vice President and Producer is married to Joan DeVoe, Secretary and Office Manager. The risk of losing multiple officers/company managers at one time is fairly substantial given the relationships among the respective officers.

*3. Stability of Industry* – The insurance industry has been very stable over its history. Although there have been periods of instability marked by world and economic events, overall the industry has historically remained firm. The industry is well regulated which also ensures stability of carriers and availability of insurance.

*4. Diversification/Stability of Carriers* – The Company represents approximately 20 insurance carriers. The carriers represented are all high quality carriers with strong AM Best ratings. The quality of the carriers represented by the agency is due to the company's reputation in the industry with the customer as well as the respective insurance carriers.

*5. Geographic Location* – The Company is licensed to write business in 19 states and has a large footprint within Anne Arundel County, Maryland, metropolitan Baltimore, Washington, D.C. and the Eastern shore of Maryland regions

*6. Stability of Earnings* – Based on the financial statements prepared by the Company's outside accounting firm and provided by the Company, the Company's adjusted EBITDA and operating income has been fairly strong over the two year time period analyzed and have historically been profitable per conversations with George T. Moran.

*7. Financial Structure* – The Company is a C-corporation which creates a double taxation effect for the Company's shareholders.

*8. Other Intangibles* – The Company has been in existence since 1977. According to conversations with Diane Tamariz-Wallace the company, through its owner who expected to remain with the Company for three to five years post transaction, has an outstanding reputation in the community and numerous community contacts and professional affiliations.

*Long-Term Growth Rate*

The long-term growth rate represents the historical average growth rate of the United States economy since the 1920's. The growth rate by industry varies but the overall growth rate during this time period has ranged between 3% and 4.5%. It is predicted that the terminal value growth rate for any business will be consistent with historical long-term growth factors of the United States economy. Therefore, a terminal value growth rate factor of 4.5% has been used as the projected long-term growth rate for the Company. This is consistent with the economic factors discussed above.

*WFG Capital Advisors LP*
*Comprehensive Financial Solutions*

29

*CONFIDENTIAL INFORMATION*

**DTA001340**
*Harrisburg, Pennsylvania*
*Phone: (717) 780-7800*
DRDR 001342
HPK /Tamariz-Wallace/DocRecd11.23.09

*Calculation of Adjusted Cash Flow*

| Calculation of Adjusted Cash Flow | |
|---|---:|
| Net Income Before Tax | $    6,132 |
| Proforma Adjustments | 343,152 |
| Adjusted Net Income Before Tax | 349,284 |
| Less: Federal Taxes at 35% | 122,249 |
| After Tax Net Income | 227,035 |
| Add: Depreciation and Amortization | 36,879 |
| Adjusted Cash Flow | $    263,914 |

*Capitalization of Earnings Indicated Value*

| Capitalization of Earnings Indicated Value | |
|---|---:|
| Adjusted Cash Flow | $    263,914 |
| Capitalization Rate | 11.69% |
| Indicated Value of Capitalized Earnings (Rounded) | $ 2,257,602 |

*Sensitivity Analysis*

| | Capitalization of Earnings: Sensitivity Analysis | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Baseline Cash Flow | | | | | | | |
| | 263,914 | | | | Long Term Growth Rate | | | |
| Discount Rate | 5.5% | 5.0% | 4.5% | 4.0% | 3.5% | 3.0% | 2.5% | 2.0% |
| 14.19% $ | 3,036,981 $ | 2,871,748 $ | 2,723,567 $ | 2,589,928 $ | 2,468,790 $ | 2,358,478 $ | 2,257,602 $ | 2,165,001 |
| 14.69% | 2,871,748 | 2,723,567 | 2,589,928 | 2,468,790 | 2,358,478 | 2,257,602 | 2,165,001 | 2,079,698 |
| 15.19% | 2,723,567 | 2,589,928 | 2,468,790 | 2,358,478 | 2,257,602 | 2,165,001 | 2,079,698 | 2,000,862 |
| 15.69% | 2,589,928 | 2,468,790 | 2,358,478 | 2,257,602 | 2,165,001 | 2,079,698 | 2,000,862 | 1,927,784 |
| 16.19% | 2,468,790 | 2,358,478 | 2,257,602 | 2,165,001 | 2,079,698 | 2,000,862 | 1,927,784 | 1,859,857 |
| 16.69% | 2,358,478 | 2,257,602 | 2,165,001 | 2,079,698 | 2,000,862 | 1,927,784 | 1,859,857 | 1,796,553 |
| 17.19% | 2,257,602 | 2,165,001 | 2,079,698 | 2,000,862 | 1,927,784 | 1,859,857 | 1,796,553 | 1,737,417 |
| 17.69% | 2,165,001 | 2,079,698 | 2,000,862 | 1,927,784 | 1,859,857 | 1,796,553 | 1,737,417 | 1,682,050 |
| 18.19% | 2,079,698 | 2,000,862 | 1,927,784 | 1,859,857 | 1,796,553 | 1,737,417 | 1,682,050 | 1,630,103 |

The above analysis presents the valuation results of different discount rates and long-term growth rates. The intent of the sensitivity analysis is to determine a range of value for the Company based upon different but reasonable discount rates and long-term growth rates. In the above analysis, equity discount rates ranging from 14.19% to 18.19% have been analyzed in order to determine a sensitivity range for development of an appropriate Capitalization of Earnings value. As noted in the shaded sensitivity area, the range of value is determined to be between $2,468,790 and $2,079,698 depending upon the different discount and long-term growth rates. A summary of the Capitalization of Earnings analysis is as follows:

*WFG Capital Advisors LP*
*Comprehensive Financial Solutions*                    30

*CONFIDENTIAL INFORMATION*

*Harrisburg, Pennsylvania*
*Phone: (717) 780-7800*

**DTA001341**
DRDR  001343
HPK /Tamariz-Wallace/DocRecd11.23.09

| Summary of Capitalization of Earnings Analysis | | | |
|---|---|---|---|
| | Low Range | Mid Range | High Range |
| Sensitivity Analysis - Capitalization of Earnings | $ 2,079,698 | $ 2,257,602 | $ 2,468,790 |
| Add: Adjustment for Working Capital | $ 200,566 | $ 200,566 | $ 200,566 |
| Capitalization of Earnings Including Working Capital | $ 2,280,264 | $ 2,458,168 | $ 2,669,356 |
| Selected Value - Rounded | $ 2,280,000 | $ 2,458,000 | $ 2,669,000 |

Working capital should represent approximately 30 days of operating expenses for an insurance agency, any working capital above that amount is considered excess working capital. Net excess working capital was calculated by taking the Company's fiscal year end 2004 operating expenses, adjusting for normalizing adjustments and dividing it by twelve and then subtracting that number from the Company's fiscal year end working capital balance.

| Calculation of Net Excess Working Capital | |
|---|---|
| | 2004 |
| Adjusted Cash, cash equivalents and liquid current assets | $ 961,985 |
| Subtract out liabilities | - 671,320 |
| Excess Liquid assets | 290,665 |
| Subtract out 30 days of operating expense for working capital | - 90,100 |
| Net excess working capital | $ 200,566 |

## Market Multiple-Based Valuation Methodology

Acquisition transactions of firms that are in the same line of business and that are of comparable size to the Company have been compiled in order to obtain baseline multiples of EBITDA. The range of these multiples is then used for valuation of the Company.

| George T. Moran, Inc. Market Multiple Analysis | | | |
|---|---|---|---|
| | Low Range | Mid Range | High Range |
| Market Range Multiple of EBITDA | 5.75 | 6.00 | 6.25 |

The values shown reflect what privately held acquirers have actually paid for property and casualty insurance agency's with a well established business model and diversified product mix. Market multiples can vary greatly from one transaction to the next. The range of value is dependent upon a number of factors including, but not exclusive to agency size and scale, distribution relationships, operating profitability and management. An agency, that is well-established, represents strong historical carrier relationships, maintains a client base that is well-diversified and profitable and contains a strong management team focused on quality of business and growth will tend to garner higher market multiples than other agencies, that do not possess these qualities. As discussed under the "Capitalization of Earnings" section, the Company has

*WFG Capital Advisors LP*
*Comprehensive Financial Solutions*     31     *CONFIDENTIAL INFORMATION*     *Harrisburg, Pennsylvania*
*Phone: (717) 780-7800*

**DTA001342**

DRDR  001344
HPK /Tamariz-Wallace/DocRecd11.23.09

some unique intangible characteristics that result in a market multiple range that is on the upper end of the range for sellers of privately held agencies.

The multiples analyzed above reflect the results of a transaction with a privately held agency and do not reflect the impact of a bank acquisition of the Company as a platform acquisition or a revenue acquisition nor a transaction with a public broker. Due to the size and scale of the Company, a transaction with a privately held agency is deemed most likely when using the market multiple approach. The multiples reflected above indicate that the most likely acquisition scenario for the Company would be with another privately held agency located in the Company's geographic operating area or a company that is looking to expand into this region. Please note that such data does not differentiate fixed purchase price versus variable, performance-based pricing, which can materially affect the overall transaction structure.

For further discussion of valuation multiples, please refer to the sections at the end of this report titled, **"Transaction Pricing and Structure"** which is an abstract of our recent publication, _Financial Insights 2004 Agency and Brokerage M & A Sourcebook_.

*Calculations of Fair Market Value and Summary of Results*

Given the preceding values, the Company's mid range fair market value based on comparable transactions are shown below:

| Calculation of Fair Market Value | | |
|---|---|---|
| Selected Multiple | | 6.00 |
| Subject Company's Adjusted EBITDA          X | $ | 383,964 |
| Indication of Fair Market Value Based on | | |
| Adjusted EBITDA (Rounded) | $ | 2,300,000 |
| Plus: Adjustment for Working Capital | | 200,566 |
| Indication of Fair Market Value Based on | | |
| Adjusted EBITDA (Rounded) and Working Capital | $ | 2,500,000 |

| Summary of Market Multiple-Based Valuation Method | Low Range | | Mid Range | | High Range | |
|---|---|---|---|---|---|---|
| Fair Market Value | $ | 2,207,795 | $ | 2,303,786 | $ | 2,399,778 |
| Add: Working Capital Adjustment | $ | 200,566 | $ | 200,566 | $ | 200,566 |
| Fair Market Value (Rounded) | $ | 2,408,000 | $ | 2,504,000 | $ | 2,600,000 |
| FMV - Multiple of EBITDA | | 6.27 | | 6.52 | | 6.77 |
| FMV - Multiple of Revenue | | 1.65 | | 1.71 | | 1.78 |

**DTA001343**

DRDR  001345
HPK /Tamariz-Wallace/DocRecd11.23.09

## Valuation Summary

The following table summarizes the values of the Company based on the methodologies discussed previously.

| Conclusion of Value | | | | | |
|---|---|---|---|---|---|
| | Low Range | | Mid Range | | High Range |
| Market Multiple-Based Method | $ 2,408,000 | $ | 2,504,000 | $ | 2,600,000 |
| Capitalization of Earnings Method | $ 2,280,000 | $ | 2,458,000 | $ | 2,669,000 |
| Average Value | $ 2,344,000 | $ | 2,481,000 | $ | 2,634,500 |
| Weighted Average Value | $ 2,376,000 | $ | 2,492,500 | $ | 2,617,250 |
| Selected Value | $ 2,376,000 | $ | 2,493,000 | $ | 2,617,000 |
| Multiple of EBITDA | 6.19 | | 6.49 | | 6.82 |
| Multiple of Revenue | 1.62 | | 1.70 | | 1.79 |

After combining all of the foregoing elements, including (i) normalizing financial statement adjustments; (ii) search of relevant databases for comparable transactions; (iii) selection of the appropriate multiple(s) and benefit stream to which to apply the multiple(s); and (iv) calculation of appropriate cash flow baseline, we believe that the fair market value for the George T. Moran, Inc. using a weighted average market multiple-based approach (75%) and capitalization of earnings approach (25%) is in the range of $2,376,000 and $2,617,000.

*WFG Capital Advisors LP*
*Comprehensive Financial Solutions*

33

*CONFIDENTIAL INFORMATION*

**DTA001344**

*Harrisburg, Pennsylvania*
*Phone: (717) 780-7800*

DRDR 001346
HPK./Tamariz-Wallace/DocRecd11.23.09

# National and Industry Economic Overview

## 2003/2004 Economic Update and Outlook

### 2003 in Review

*Summary*

Following a strong third quarter of 2003, the U.S. economy slowed sharply during the fourth quarter, but continued to show strength throughout many of the economic sectors. The gross domestic product (GDP), which is the broadest measure of the economy's health, posted a less-than-expected fourth quarter figure, but still offered compelling evidence that the economy is on the road to recovery.

*Gross Domestic Product (GDP)*

The U.S. Department of Commerce reported that the nation's economy grew at an annual rate of 4.0 percent in the fourth quarter of 2003. With the help of this year's strong second half, the economy grew by 3.1 percent for 2003. This marks an improvement over the 2.2 percent increase in 2002 and is the strongest showing since 3.7 percent increase in 2000. Growth in the fourth quarter was due in large part to the increase in business investments in equipment and software, business inventories, and exports, but was offset by the deceleration in consumer spending.

*Consumer Spending and Confidence*

Consumer spending, which accounts for two-thirds of all economic activity in the United States, grew at a rate of 206 percent during the fourth quarter of 2003. This compares with the 6.9 percent increase in the previous quarter of 2003, which was the largest increase since the first quarter of 1988, up from a 3.3 percent increase in the second quarter. The third quarter increase was fueled largely by federal tax cuts and mortgage refinancing, which tapered off during the fourth quarter. For the year, consumer spending increased by 3.1 percent, compared with a 3.4 percent increase in 2002. Consumer expenditures increased the fourth quarter GDP by only 1.84 percentage points. This compares with a GDP increase of 4.89 percentage points in the previous quarter and a 2.34 percentage point increase in the second quarter of 2003.

During the fourth quarter of 2003, consumer confidence fell, as the Conference Board, which surveys 5,000 households, reported that its index of Consumer Confidence was 91.3 in December, down from 92.5 in November. While the index was lower than expected, it was still the second-highest level since 93.7 reading in September 2002 and significantly higher than the March 2003 low of 61.4. Conference Board numbers above 100.0 mean a growing economy. A figure between 80.0 and 100.0 suggests slow growth, while a reading below 80.0 indicates a recession.

*WFG Capital Advisors LP*
*Comprehensive Financial Solutions*
34
*CONFIDENTIAL INFORMATION*
**DTA001345**
*Harrisburg, Pennsylvania*
*Phone: (717) 780-7800*
DRDR  001347
HPK /Tamariz-Wallace/DocRecd11.23.09

*Government Spending*

During the fourth quarter of 2003, government spending increased slightly at a rate of 0.8 percent, compared with an increase of 1.8 percent during the third quarter. During the fourth quarter, federal government spending increased by 0.7 percent, compared with a 1.2 percent increase in the previous quarter. National defense spending increase by 1.8 percent during the fourth quarter, compared with a decrease of 1.3 percent in the previous quarter and a robust 41.9 percent increase in the second quarter, which was attributed to the war in Iraq. State and local government spending, still hampered by budget woes, increased by 0.9 percent in the fourth quarter of 2003, after increasing by 2.1 percent in the previous quarter.

*Business Investments*

Business investments, which have lagged since the 2001 recession, continued to show signs of significant improvement during the fourth quarter of 2003. Business spending, or nonresidential fixed investment, increased at a rate of 6.9 percent during the fourth quarter after growing by 12.8 percent in the previous quarter. Business expenditures on equipment and software continued to increase while spending on structures decreased.

*Business Inventories*

Another encouraging sign during the fourth quarter of 2003 was the increase in business inventories, which have been kept at low levels during the most recent quarters. The increase in business inventories increased the fourth-quarter GDP by 0.61 percentage points after decreasing the previous quarter's GDP by 0.13 percentage points. Businesses built up inventories at a rate of $6.1 billion in the fourth quarter of 2003, after reducing their inventories of unsold goods at a $9.1 billion annual rate in the third quarter and a $4.5 billion annual rate in the second quarter of the year. Reduced inventories often are seen as promising for the future, as it means that companies must quickly increase production and potentially hire more employees once stronger demand is firmly established. During the recession, businesses cut production sharply and discounted merchandise to get rid of stockpiles of unsold goods, which was a key source of weakness for the economy.

*Exports*

A shirking of the trade deficit from its record high in the second quarter of 2003 continued to help spur economic growth during the fourth quarter. Exports rose by 19.1 percent in the fourth quarter, following an increase of 9.9 percent in the third quarter and a 1.1 percent decrease in the second quarter. During the fourth quarter, the trade deficit decreased from last quarter's annualized rate of $505.2 billion in real terms to $500.7 billion. The trade deficit increased the fourth quarter GDP by 0.19 percentage points after increasing the previous quarter's GDP by 0.8 percentage points.

---

*WFG Capital Advisors LP*
*Comprehensive Financial Solutions*

35

*CONFIDENTIAL INFORMATION*

**DTA001346**
*Harrisburg, Pennsylvania*
*Phone: (717) 780-7800*
DRDR 001348
HPK /Tamariz-Wallace/DocRecd11.23.09

*Consumer Prices and Inflation Rates*

During the fourth quarter of 2003, inflationary pressures continued to remain low. The U.S. Department of Labor reported that the Producer Price Index for finished goods, which measures inflationary pressures before they reach consumers, advanced 0.3 percent in December 2003, following a 0.3 percent decline in November and a 0.8 percent increase in October. The costs of intermediate goods increased in December by 0.5 percent after decreasing by 0.2 percent in November and rising by 0.4 percent in October. Prices for crude oil rose by 2.0 percent in December, following increases of 0.2 percent in November and 2.6 percent in October. Prices for finished goods other than foods and energy decreased by 0.1 percent in December and November after increasing by 0.5 percent in October. Prices for energy goods rose 1.8 percent in December, following a 1.2 percent decrease in the previous month. Finished consumer food prices increased by 0.2 percent in December, compared with a 0.3 percent drop in November.

*Interest Rates*

The Federal Reserve Board (FRB) decided to keep its target for the federal funds rate unchanged at 1.0 percent. The target rate has been stable at 1.0 percent since the June 25 2003 meeting of the Federal Open Market Committee (FOMC). The Fed decreased its target for the federal funds rate by 50 basis points to 1.25 percent in November 2002.

*Unemployment*

The unemployment rate decreased to 5.9 percent in the fourth quarter of 2003, down slightly from 6.1 percent in the previous quarter. The number of unemployed persons was 8.4 million in December, compared with 9.0 million in September 2003. During the fourth quarter, manufacturing job losses declined at a slower pace than the previous three quarters of 2003, while employment in temporary help services continued its upward trend.

*Stock and Bond Markets*

The year 2003 was the first up year for the stock market since 1999, which was the last up year for any major index. The fourth quarter continued the upward trend started in the second and third quarters, turning 2003 into a "real success story" that brought gains that "were the sort of thing some investors had begun to despair of ever seeing again," as *The Wall Street Journal* phrased it. Double-digit gains were the norm across indexes for 2003 as follows: 25.32 percent for the Dow Jones Industrial Average (DJIA); 50.01 percent for the NASDAQ Composite Index; 26.38 percent for the Standard and Poor's 500 Index (S&P 500); 29.44 percent for the Wilshire 5000; and 45.37 percent for the Russell 2000.

According to *The Wall Street Journal*, myriad factors contributed to the success of 2003 -- of which the most important are the economic recovery and the lowest interest rates in 45 years. The economic recovery, in turn, was prompted by low interest rates, tax cuts, a weaker dollar, and low inventory levels. Analysts emphasize that the future performance of the market will depend largely on the general state of the economy and on future strong corporate earnings growth.

---

*WFG Capital Advisors LP*
*Comprehensive Financial Solutions*

36

*CONFIDENTIAL INFORMATION*

*Harrisburg, Pennsylvania*
*Phone: (717) 780-7800*

**DTA001347**
DRDR 001349
HPK /Tamariz-Wallace/DocRecd11.23.09

*Construction*

According to the U.S. Department of Commerce, housing starts increased 1.7 percent to 2.088 million units in December 2003 from 2.054 million units in November. This is a 15.0 percent increase over the December 2002 rate of 1.815 million units. Building permits, a more leading indicator of demand for new homes, increased by 3.3 percent in December to an annual rate of 1.924 million units, up from 1.863 million units in the previous month. This is a 0.9 percent increase over the December 2002 rate of 1.907 million units.

*Manufacturing*

According to the Federal Reserve, industrial production, which is the total output of factories and mines in the United States, rose by 0.1 percent in December 2003 after decreasing by 1.0 percent in November. During the fourth quarter, total industrial production increased at an annual rate of 6.2 percent, compared with an increase of 3.8 percent during the previous quarter.
Manufacturing posted a gain of 0.3 percent in December and rose at an annual rate of 6.6 percent during the fourth quarter, compared with an increase of 3.7 percent in the third quarter. Capacity utilization, the percentage of production capacity manufacturers actually use, was unchanged at 75.8 percent in December, but was up from a 74.9 percent rate at the end of the third quarter of 2003. The current capacity utilization rate of 75.8 percent is 5.5 percentage points below its 1972-2002 average rate of 81.3 percent.

## 2004 Economic Outlook

Based on the economic figures from the fourth quarter of 2003, in which most indicators grew at an increased pace, it can be suggested that the U.S. economy is continuing its recovery from the recession of 2001. While the economy grew at a slower pace during the fourth quarter, due in large part to the decreasing impact of federal tax cuts and mortgage refinancing on consumer spending, it is expected to continue its growth pattern during 2004.

According to Consensus Economics, Inc., publisher of *Consensus Forecasts - USA*, the real GDP is expected to grow by 4.4 percent during the first quarter of 2004 and by 4.2 percent in the following quarter (percentage change from previous quarter, seasonally adjusted annual rates). For 2004 and 2005, the real GDP growth rate is expected to be 4.6 percent and 3.6 percent, respectively (average percentage change on previous calendar year), as can be seen in *Exhibit 2*. In the long term, the real GDP is expected to grow by 3.3 percent for 2005-2008 and by 3.2 percent for 2009-2103 (average percentage change over previous year).

Interest rates on three-month Treasury bills and 10-year Treasury notes will rise over the next two years, according to the forecasters of *Consensus Forecasts - USA*. According to the survey, three-month Treasury bills will rise from 1.1 percent at the end of April 2004 to 1.9 percent by the end of January 2005. The interest rate on 10-year Treasury notes will climb to 4.6 percent by the end of April 2004 and will continue to increase to 5.1 percent by the end of January 2005. Both the three-month and the 10-year Treasury rates are expected to experience an upward trend over the next 10 years. According to the survey, the three-month Treasury rate will average 3.7 percent over 2005-2008 and 4.4 percent for 2009-2013. The 10-year Treasury bond yield is expected to average 5.3 percent for 2005-2008 and 5.4 percent for 2009-2013.

**DTA001348**

*The Livingston Survey* in December 2003 posted more optimistic expectations about the level of corporate profits and stock prices than they did in June 2003. *The Livingston Survey* predicts that the S&P 500 index will rise steadily during 2004 and 2005. The December 19, 2003, survey estimates the index will reach 1142.5 by June 30, 2004, and forecasts levels of 1195.0 and 1256.2 for December 31, 2004, and December 31, 2005, respectively. This issue of *The Livingston Survey* reports the median value across the 25 forecasters on the survey panel. The same source forecasts that after-tax corporate profits will rise 14.7 percent during 2004 and 19.4 percent in 2005.

| Historical Economic Data 1998 - 2002 and Forecasts 2003 - 2013 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Historical Data | | | | | Consensus Forecasts | | | |
| | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 - 2008 | 2009 - 2013 |
| Real GDP | 4.30 | 4.10 | 3.80 | 0.30 | 2.40 | 2.70 | 4.00 | 3.33 | 3.20 |
| Industrial Production | 5.60 | 4.30 | 4.70 | -3.50 | -0.80 | 0.10 | 4.30 | 4.28 | 3.60 |
| Personal Consumption | 4.80 | 4.90 | 4.30 | 2.50 | 3.10 | 3.00 | 3.50 | 3.03 | 2.90 |
| Nonresidential Investment | 12.50 | 8.10 | 7.80 | -5.20 | -5.70 | 2.10 | 9.20 | 6.50 | 4.50 |
| Government Spending | 1.90 | 3.90 | 2.70 | 3.70 | 4.40 | 3.30 | 2.20 | NA | NA |
| CPI | 1.60 | 2.70 | 3.40 | 1.60 | 2.40 | 2.30 | 1.70 | 2.13 | 2.30 |
| Unemployment Rate | 4.50 | 4.20 | 4.00 | 4.70 | 5.80 | 6.10 | 6.00 | NA | NA |
| Housing Starts (millions) | 1.60 | 1.67 | 1.57 | 1.60 | 1.71 | 1.76 | 1.68 | NA | NA |

*Source of historical data: www.bea.gov, www.census.gov.*
*Source of consensus forecasts: Consensus Forecasts - USA, April 7 and July 14, 2003, www.consensuseconomics.com*

Note: Part of the contents of the economic outlook section of this valuation report are quoted from the Economic Outlook Update published by Business Valuation Resources, LLC, 2003 reprinted with permission. The editors and Business Valuation Resources, LLC, while considering the contents to be accurate as of the date of publication of the Update, take no responsibility for the information contained therein. Relation of this information to this valuation engagement is the sole responsibility of the author of this valuation report.

## The Insurance Industry and the Brokerage, Agency and Distribution System Update and Outlook

### *Insurance Market Background*

The insurance industry offers products and services that enable businesses and individuals to mitigate or eliminate unwanted risk. Major risks covered by insurance include property loss, liability for damage caused to others and reimbursement for loss caused by death, disability and/or sickness.

The U.S. insurance industry is enormous. Each major type of insurance (property and casualty, life and health) is sold by hundreds of insurance companies, which range in size and scope from those that write business on a national scale to those so small they serve only a single community.

A primary driver of the financial health of the insurance industry is the "State" of the rate cycle. As we discuss below, the industry has entered into a period of "softening" rates.

### Softening P & C Market

The Council of Insurance Agents & Brokers (CIAB) conducts a quarterly survey of median rates changes among most major property and casualty firms. As of December 2003, the report strongly suggested some pockets of rate stabilization. The fundamentals of the property and casualty market have certainly improved when compared to the catastrophic events of 9/11. It

**DTA001349**

*Harrisburg, Pennsylvania*
*Phone: (717) 780-7800*
DRDR  001351
HPK /Tamariz-Wallace/DocRecd11.23.09

appears that for the most part, the product pricing cycle among the majority of primary markets, has peaked and is trending downward.



| | Q3 01 | Q4 01 | Q1 02 | Q2 02 | Q3 02 | Q4 02 | Q1 03 | Q2 03 | Q3 03 | Q4 03 | Q1 04 Est | Q2 04 Est | Q3 04 Est | Q4 04 Est |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Business Interruption | 21% | 29% | 29% | 21% | 16% | 13% | 9% | 5% | 3% | 2% | 2% | 2% | 0% | 0% |
| Commercial Auto | 20% | 21% | 22% | 24% | 18% | 16% | 11% | 11% | 6% | 7% | 5% | 5% | 3% | 3% |
| Commercial Property | 28% | 39% | 36% | 34% | 24% | 21% | 6% | 1% | 0% | 0% | 0% | 0% | 0% | -2% |
| General Liability | 19% | 23% | 24% | 24% | 18% | 19% | 14% | 11% | 7% | 6% | 5% | 4% | 3% | 2% |
| Umbrella | 25% | 48% | 47% | 50% | 35% | 34% | 26% | 18% | 11% | 11% | 10% | 10% | 8% | 8% |
| Workers' Compensation | 18% | 20% | 22% | 26% | 19% | 21% | 17% | 14% | 10% | 9% | 8% | 8% | 6% | 6% |



| | Q3 01 | Q4 01 | Q1 02 | Q2 02 | Q3 02 | Q4 02 | Q1 03 | Q2 03 | Q3 03 | Q4 03 | Q1 04 Est | Q2 04 Est | Q3 04 Est | Q4 04 Est |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Broker E & O | | | | | | | 27% | 24% | 20% | 21% | 18% | 16% | 14% | 14% |
| Construction Risks | | | 43% | 36% | 33% | 22% | 17% | 13% | 12% | 10% | 10% | 8% | 8% | |
| D & O | | | 38% | 34% | 31% | 29% | 21% | 18% | 13% | 12% | 11% | 10% | 9% | |
| Employment Practices | | | 29% | 18% | 23% | 18% | 16% | 12% | 10% | 8% | 6% | 6% | 5% | |
| Medical Malpractice | | | 70% | 57% | 56% | 51% | 46% | 28% | 33% | 25% | 22% | 20% | 20% | |
| Surety Bonds | | 18% | 17% | 14% | 18% | 17% | 13% | 7% | 7% | 5% | 5% | 3% | 3% | |
| Terrorism | | | | | 21% | 12% | 5% | 2% | 1% | 0% | 0% | 0% | -1% | |

The tables above strongly suggest that linear trends among leading lines will continue downward during the course of 2004. What does this mean for the brokerage market? Note the following:

Continued compression in rates among brokers, requires a more intensive approach to generating new business. Essentially, as brokers were enjoying the "lift" from product renewal rates in prior years, they are now forced to actually increase new client relationships to compensate for those lost to competition as well as accounts renewed at lower premiums. This clearly intensifies competition for new commercial client markets, especially among middle market brokers. This

*WFG Capital Advisors LP*
*Comprehensive Financial Solutions*

39

*CONFIDENTIAL INFORMATION*

*Harrisburg, Pennsylvania*
*Phone: (717) 780-7800*

DTA001350
DRDR 001352
HPK /Tamariz-Wallace/DocRecd11.23.09

presents a real challenge for brokers to maintain historical growth rates. With elevated competition, and flattening or declining revenues per account, the struggle forces many brokers to increase marketing activities, spend more on client relations, offer innovative solutions, all of which further compounds expenses and compresses profit margins.

*Carrier Impact*

Various financial and industry factors have begun to develop that may hinder future rate increases in the foreseeable future:

**Improving Capital Markets**
The recent rise in the equity markets provides confidence to investors and businesses alike that economic times are starting to improve. As a result, insurance carriers will start to see the financial markets open up allowing them easier access to raise more capital through means such as offerings of trust preferred securities or stock. As these companies raise more capital, they can become more aggressive in trying to attain new business within the lines they currently compete in or expand to different markets. This increased aggressiveness will likely put a ceiling on any further premium increases due to the increased competition.

**Rising Interest Rates**
As the economy improves, interest rates should begin to rise and therefore help to increase these companies' investment income. Companies choosing to increase market share by holding the line on premium increases now should have a cushion from their rising investment income thereby allowing them to maintain their financial results if they choose to go this route. Conversely, carriers may face surplus depletion if they opt to follow the market on stabilizing product rates before any material changes in the economy, or interest rates occur.

**Increased Industry Competition**
Now that carriers in general have improved their operational and financial statures with the help of the hard market, they can turn their focus to growing their revenue base and market share. Carriers could begin to cherry-pick competitors' profitable customers by offering more favorable terms. Pressure on premium pricing will certainly escalate competitive quoting, pushing rate concessions to maintain the most profitable accounts.

**Demand-side pressures**
Customers looking to cut costs are exploring different alternatives in order to rein in risk management and insurance costs. Customers may choose to more aggressively shop quotes, or explore greater self-insurance in an attempt to stabilize costs. This will further curtail the price increases carriers can continue to apply. These factors increase the odds that premiums will begin to stabilize through the first half of 2004. While this does not necessarily mean that a soft market is imminent, future rate increases are likely going to be tempered if they occur at all. Unless an unforeseen, major catastrophic event suddenly shrinks capacity or an economic downturn in the capital markets begin to erode carrier surplus, a return to the rate increases seen in 2002 is unlikely to occur. Carriers who are convinced that product rate stabilization will have long-term negative implications to their financial position may consider merger, or disposition. The risk to many carriers lies in stagnant investment portfolio performance while having to trim product rates in order to maintain market share.

*WFG Capital Advisors LP*
*Comprehensive Financial Solutions*

40

*CONFIDENTIAL INFORMATION*

**DTA001351**
*Harrisburg, Pennsylvania*
*Phone: (717) 780-7800*
DRDR  001353
HPK /Tamariz-Wallace/DocReed11.23.09

*Brokerage Impact*

The related effect on the brokerage market will be that they will not be able to sustain revenue "lift" on premium rate increases that they could during the previous years. There are five main avenues brokers should focus on in order to confront the market obstacles that lie ahead.

## Low Organic Growth Rates

A 2003 study of the leading brokers in insurance indicated interesting results. The segment of leading U.S. based brokers, reflected 2003 overall revenue growth of 16.3%. Of this, however, only 11.2% was organic growth, or pure revenue generated from existing sources. When further analyzed among each of the industry leaders, certain brokers stood out as being very heavily leveraged on acquired growth and lacked the ability to sustain respectable organic results.

Revenue Growth (Overall vs Organic)
Dollar Amounts in Millions

| | Overall Growth % | Organic Growth % | Acquired/ Other Growth % | Overall Growth $ | Organic Growth $ | % of Overall Growth that is Organic |
|---|---|---|---|---|---|---|
| | for Year Ended December 31, 2003 vs Year Ended December 31, 2002 | | | | | |
| Aon Corporation | 14.2% | 9.0% | 5.2% | $ 704.0 | $ 447.6 | 63.6% |
| Arthur J. Gallagher & Co. | 14.6% | 11.2% | 3.4% | 148.8 | 114.5 | 77.0% |
| Brown & Brown, Inc. | 22.9% | 5.9% | 16.9% | 95.4 | 24.8 | 26.0% |
| Hilb, Rogal & Hobbs Co. | 24.4% | 5.5% | 18.9% | 109.1 | 24.6 | 22.5% |
| Hub International Ltd. | 30.2% | 12.0% | 18.2% | 66.4 | 26.4 | 39.8% |
| Marsh & McLennan Co., Inc. | 16.2% | 13.0% | 3.2% | 958.0 | 768.3 | 80.2% |
| USI Holdings Corp. | 8.1% | 4.7% | 3.4% | 26.6 | 15.4 | 58.0% |
| Willis Group Holdings Ltd. | 19.7% | 15.0% | 4.7% | 341.0 | 260.3 | 76.3% |
| Composite | 16.3% | 11.2% | 5.1% | $ 2,449.3 | $ 1,681.8 | 68.7% |
| Median | 17.9% | 10.1% | 4.9% | | | 60.8% |

Growth rates reflect only the risk and insurance brokerage related segments of each company.

Organic growth rates exclude the effects of acquisitions and currency fluctuations.

(a) Brown & Brown growth rates based on core commissions and fees, which excludes contingent commissions.

Source: Public Filings and Other Research Materials / Source Documents

*WFG Capital Advisors LP*
*Comprehensive Financial Solutions*

41

*CONFIDENTIAL INFORMATION*

**DTA001352**
*Harrisburg, Pennsylvania*
*Phone: (717) 780-7800*

DRDR 001354
HPK /Tamariz-Wallace/DocRecd11.23.09



When you assess the performance of the leading public brokers against the prospect of further rate stabilization, it becomes much more apparent that this segment may be on the cusp of a very difficult cycle. Also, it is very reasonable to expect that the results among the industry leaders are indicative of the results sustained among private brokers. While the possibility of an anomaly exists, it is reasonable to expect that organic growth rates will continue to decrease.

## Operating Efficiency
Using technology and assessments of staffing proficiency, if appropriate, are necessary to improve productivity and margins.

## Joint Venturing
Partnering with peer firms can create a formidable model for many brokers. As with acquisitions, there are numerous synergies that can be made available through the formation of a strategic alliance. Partnering can be an attractive alternative to sale because the owners do not typically relinquish control of their business. This strategy can also serve as a precursor to a succession plan.

## Acquisitions
With capital costs remaining very low, employment of an acquisition strategy in order to gain economies of scale and synergies from a business combination may be a very viable option for many brokers.

*WFG Capital Advisors LP*
*Comprehensive Financial Solutions*

42

*CONFIDENTIAL INFORMATION*

**DTA001353**
*Harrisburg, Pennsylvania*
*Phone: (717) 780-7800*

DRDR 001355
HPK /Tamariz-Wallace/DocRecd11.23.09

# Statement of Assumptions and Limiting Conditions

This benchmark range valuation report is subject to the following contingent and limiting conditions:

1. Information, estimates, and opinions contained in this report are obtained from sources considered reliable; however, WFG has not independently verified such information and no liability for such sources are assumed by WFG. The Company and its management warranted to us that the information supplied to us was complete and correct to the best of their knowledge. It has been assumed that all facts and circumstances that would significantly affect the valuation results have been disclosed to us. Any significant errors in, or omissions from, the information supplied to us will have a corresponding effect on our analyses and conclusions.

2. This report has been made only for the purpose stated and shall not be used for any other purpose. Possession of this report, or a copy thereof, does not carry with it the right of publication of all or part of it, nor may it be used for any purpose without the previous written consent of WFG, and in any event only with proper authorization.

3. None of the contents of this valuation report shall be conveyed to any third party or to the public through any means without the express written consent of WFG.

4. No investigation of titles to property or any claims on ownership of the property by any individuals or company has been undertaken. Unless otherwise stated in our report, title is assumed to be clear and free of encumbrances and as provided to WFG.

5. The various estimates of value presented in this report apply to this benchmark valuation only and may not be used out of the context presented herein. Any other use of this report may lead the user to an incorrect conclusion for which WFG assumes no responsibility.

6. No responsibility is taken for changes in market conditions and no obligation is assumed to revise this report to reflect events or conditions that occur subsequent to the date hereof.

7. We have compiled summary financial information and related financial data that are contained in the report and various appendices. The data in these appendices represent financial information and financial data extracted from the Company's historical financial statements as well as other sources. The financial summaries presented in the appendices do not constitute complete presentations of the Company's financial statements in accordance with generally accepted accounting principles.

8. The benchmark valuation estimate of fair market value reached in this report is based on the definition of fair market value as stated in the introduction section. An actual transaction in the shares may be concluded at a higher or lower value, depending on the circumstances surrounding the company, the appraised business interest, and/or the

*WFG Capital Advisors LP*                    43                    *Harrisburg, Pennsylvania*
*Comprehensive Financial Solutions*                                                    Phone: (717) 780-7800
                                    *CONFIDENTIAL INFORMATION*

**DTA001354**

DRDR  001356
HPK /Tamariz-Wallace/DocRecd11.23.09

motivations and knowledge of both the buyers and the sellers at that time. WFG makes no guarantees as to what values individual buyers and sellers may reach in an actual transaction.

9. It should be specifically noted that the valuation assumes the business will be competently managed and maintained by financially sound owners over the expected period of ownership. This benchmark valuation does not entail an evaluation of management's effectiveness, nor are we responsible for future marketing efforts and other management or ownership actions upon which actual results will depend.

10. No opinion is intended to be expressed for matters that require legal or other specialized expertise, investigation, or knowledge beyond that customarily employed by advisors valuing businesses.

11. Neither WFG Capital Advisors, nor any individuals associated with this report shall be required by reason of this report to give testimony or appear in court or other legal proceedings, unless specific arrangements therefore have been made.

12. It is assumed that there are no regulations of any government entity to control or restrict the use of the underlying assets unless specifically referred to in the report and that the underlying assets will not operate in violation of any applicable government regulations, codes, ordinances, or statutes.

13. Valuation reports may contain prospective financial information, estimates, or opinions that represent the view of Client management about reasonable expectations at a particular point in time, but such information, estimates, or opinions are not offered as predictions or as assurances that a particular level of income or profit will be achieved, or that specific events will occur.

14. We assume that there are no hidden or unexpected conditions of the business that would adversely affect value, other than as indicated in this report.

*WFG Capital Advisors LP*
*Comprehensive Financial Solutions*

44

*CONFIDENTIAL INFORMATION*

**DTA001355**
*Harrisburg, Pennsylvania*
*Phone: (717) 780-7800*

DRDR 001357
HPK /Tamariz-Wallace/DocRecd11.23.09

EXHIBIT

16

3-4-16

*CONFIDENTIAL*

Nationwide

---

# Independent Agency Acquisition Business Plan for the Diane Tamariz Agency

---

Acquiring Agent:       Brenda D. Tamariz-Wallace
Sales Director:        Timothy Riggins
Sales Manager:         Richard Kelly
Business Consultant:   Sandie Weisfeld
Date:                  November 7, 2004

| Disclaimer |
| --- |

The services and information provided herein are for your consideration only. It is not required that you use the services or information provided; implementation of any of the programs or services is entirely optional and solely your responsibility. Nationwide cannot and does not guarantee that any of the programs or services will result in achieving your desired objectives, or that they are in compliance with your specific state laws. Nationwide continues to recommend that you consult with your personal attorney and business advisors when preparing to implement new programs or processes.

# TABLE OF CONTENTS

*Executive Summary* ....................................................................................................... 1
*Storefront Analysis* ....................................................................................................... 1
    *STOREFRONT ACTION PLAN* ................................................................................ 3
*Operations Integration* ................................................................................................ 4
    *TAMARIZ AGENCY ORGANIZATIONAL CHART* .................................................... 4
    *INDEPENDENT AGENCY STAFF HIRE REQUIREMENTS* ........................................ 5
    *INDEPENDENT AGENCY STAFF ORIENTATION* ..................................................... 6
*Rollover Strategies for All Product Lines* .................................................................. 7
    *ROLLOVER ACTION PLAN – Personal Lines* ......................................................... 7
    *ROLLOVER ACTION PLAN – Commercial* ............................................................ 10
*Loss Ratio Containment* ............................................................................................ 12
*Customer Retention and Multi-lining Plan* ............................................................. 13
*Customer Acquisition* ................................................................................................ 14
*Market Expansion* ...................................................................................................... 15
*Technology* .................................................................................................................. 16
*Financial Analysis* ..................................................................................................... 17
*Conclusions* ................................................................................................................ 17

## Executive Summary

Effective December 1, 2004, Diane Tamariz will purchase the Moran Insurance Agency of Severna Park, MD. The Moran Insurance Agency is an independent agency (IA), which services the insurance needs of over 1,500 individuals and businesses in the metropolitan DC, Baltimore and Annapolis areas. In 2003, the Moran Agency was projected to have approximately $12 M in premium billings. The overwhelming majority of the portfolio is derived from commercial product lines with the balance of the book in personal lines. The premium by product line is summarized in the following table:

### INDEPENDENT AGENCY PREMIUM SUMMARY

| Product Line | Premium | % of Portfolio | Rollover % estimate |
|---|---|---|---|
| Commercial | $10.15M | 84.6% | 70% |
| Personal Lines – Auto | $1.5M | 12.5% | 60% |
| Personal Lines – Home | $350,000 | 2.9% | 60% |
| TOTAL | $12M | | |

## Storefront Analysis

The Tamariz Agency will operate 4 storefronts by 3rd Qtr-05. The main storefront, located in Edgewater, MD, will function as the personal lines service hub for the entire enterprise as well as a retail sales outlet. The Agency is opening a satellite in Gambrills, MD effective 12/1/04 and another satellite is planned in Arundel Mills, MD next year. Tamariz will retain the Moran Agency office space, along with the current staff, as the 3rd satellite location. Capitalizing upon the strengths of the IA, both in terms of product focus and staffing, commercial lines sales and service for the enterprise will be managed out of the IA satellite. In addition, Life and Financial Products sales and services, a core Agency competency, will be located in the IA satellite. The map below plots the location of all 4 storefronts. The action plan that follows serves as an outline for the rollover and growth opportunities for the Tamariz Agency IAA.

### TAMARIZ AND SATELLITE LOCATIONS



*Tamariz - Moran Independent Agency Acquisition*

The Tamariz has 4 selected storefront locations in markets that reflect outstanding growth opportunity. The table below summarizes this potential in terms of population density, projected growth and market vehicles.  However, Nationwide penetration, on both the Auto and Home Owners lines is generally under 14%.  Moreover, with the exception of Severna Park, there is little Nationwide agent representation in these zip codes.  The Tamariz Agency, which is growing at an 18% annual rate and has an aggressive marketing program in place, is well positioned to seize this sales opportunity and penetrate these markets in all product lines.

### DEMOGRAPHIC MARKET POTENTIAL

| Geography | Storefront Locations | Households | 5 Yr Projected HH Growth Rate '03-'08 | Market Vehicles | Vehicles per Household | NI Agents | NI Auto Penetration | NI Home Penetration |
|---|---|---|---|---|---|---|---|---|
| 21012 ARNOLD | | 8,202 | 8.3% | 16,801.00 | 2.10 | 0 | 9.8% | 11.3% |
| 21035 DAVIDSONVILLE | | 2,570 | 8.9% | 6,321.00 | 2.50 | 0 | 13.4% | 14.2% |
| 21037 EDGEWATER | X | 6,853 | 8.9% | 14,337.00 | 2.10 | 1 | 13.2% | 15.4% |
| 21076 HANOVER | X | 3,080 | 10.5% | 6,777.00 | 2.20 | 1 | 8.5% | . 9.0% |
| 21113 ODENTON | | 8,359 | 13.7% | 15,489.00 | 1.90 | 1 | 10.9% | 10.8% |
| 21114 CROFTON | | 10,011 | 13.6% | 19,178.00 | 1.90 | 1 | 7.6% | 9.3% |
| 21144 SEVERN | | 11,062 | 11.2% | 21,656.00 | 2.00 | 0 | 11.3% | 9.6% |
| 21146 SEVERNA PARK | X | 9,359 | 7.2% | 20,831.00 | 2.20 | 6 | 9.9% | 12.0% |
| 21154 STREET | X | 2,308 | 12.8% | 5,166.00 | 2.20 | 0 | 8.2% | 7.1% |
| TOTAL | | 61,804 | | | | | | |

The Storefront Action Plan addresses the assimilation of the IA location as another storefront in the Tamariz Agency.

## STOREFRONT ACTION PLAN

| Action Item | Completion Date | Responsibility | Required? (Yes/No) |
|---|---|---|---|
| 1. Renegotiate and assume lease agreement for IA office space with George Moran, landlord. | 11/12/04 | Tamariz | Y |
| 2. Affix Nationwide logo decal to window. Send photo to acquisition coordinator, Monica Brady. | 12/31/04 | Tamariz | Y |
| 3. Order new Nationwide signage to be place atop the existing IA lighted street sign. | 6/05 | Tamariz | Y |
| 4. Create a "Vision, Mission and Strategic Intent" Commitment which establishes the Agency's foundation and position for future expansion. The Commitment statement includes:<br>• Critical success factors 2005 and forward for the enterprise and each satellite location<br>• Critical commitment statement for each associate including sales planning, compensation and professional growth goals<br>• Establish the basis for the entire organization to work together as a team to accomplish the vision. | 1/05 | Tamariz | Y |
| 5. Change agency's website & customer billing to reflect name, address and 1 central telephone number for service support. | 12/31/04 | Dorman | Y |
| 6. Complete IT inventory. No additional workstations required, however the IT platform will be upgraded to accommodate the Applied system. | 12/31/04 | Dorman | Y |
| 7. Incorporate Nationwide SPL, business cards, letterhead and marketing materials for the enterprise. | 12/31/04 | Dorman | Y |
| 8. Continue using e-file system in IA satellite. Add e-filing using the Aprez system in all locations. | 3/31/05 | Tamariz | Y |
| 9. Begin using transactional filing (TF) methodology in the Tamariz storefronts. Train staff on using TF and account history documentation. This will be used as the e-filing methodology when the scanning system is implemented. | 1/1/05 | Dorman | Y |
| 10. Negotiate new YP contracts via Wahlstrom Group. Add satellite locations to Yellow Page (YP). | 2005 | Tamariz | Y |
| 11. Upgrade to Avaya telephone system for all sites. | 12/31/04 | Tamariz | Y |
| 12. Implement call-handling strategy across the enterprise.<br>• Calls come into the specified retail outlet<br>• Personal Lines service calls are redirected to the Edgewater Service Hub for handling.<br>• Commercial and Financial Lines service calls are directed to Severna Park for handling.<br>• Sales calls are handled in the retail outlet. | 1/1/05 | Tamariz | Y |
| 13. Evaluate profitability of each satellite location and each profit center (Personal Lines, Commercial Lines and Financial Lines). | 12/31/05 | Tamariz | Y |

*Tamariz – Moran Independent Agency Acquisition*

## Operations Integration

Tamariz has structured the acquisition to assume the IA staff in its entirety, including the IA owner, George Moran, and the IA storefront. The staff integration will capitalize upon the complimentary skills sets, portfolio potential and systems that each agency brings to the enterprise, e.g. Commercial Lines, Personal Lines, Life/Financial lines sales and service, marketing, retention and operations. Commercial and Life/Financial sales and service will be operate out of the IA satellite while Personal Lines will operate out of the Edgewater location.

The Organizational Chart below delineates the structure and staffing of the Tamariz Agency enterprise. The Staffing Plan that follows outlines the process that will be used to coordinate redeployment of staff to cover all locations and integrate employees from both agencies. Candidates for the open positions listed in the Organizational Chart are currently being recruited for immediate hire.

### TAMARIZ AGENCY ORGANIZATIONAL CHART



*Tamariz - Moran Independent Agency Acquisition*

## INDEPENDENT AGENCY STAFF HIRE REQUIREMENTS

| | Action Item | Completion Date | Responsibility | Required? (Yes/No) |
|---|---|---|---|---|
| 1. | Assign Dorman as point person to coordinate staff hiring, credentialing, training, development and performance. | Completed | Dorman | Y |
| 2. | Compile list of employees in preparation for background screenings. Forward to IA Coordinator. | 11/15/04 | Tamariz/Monica Brady | Y |
| 3. | Complete Agent/Staff Put-on Packet, perform required due diligence and obtain proper licensing paperwork. Forward to SSS unit. | 12/1/04 | Dorman, Donna Moran, Monica Brady | Y |
| 4. | Hire owner of IA/staff to remain in satellite location for 5 years. | Complete | Tamariz | Y |
| 5. | Secure Associate Agent 3rd-Party Agreements from IA Coordinator. Complete for all hires. | 12/1/04 | Tamariz | Y |
| 6. | Update existing non-compete / non-solicit agreements with ALL staff to update agreements in place with the Moran corporation. | 12/31/04 | Tamariz | Y |
| 7. | Combine Employee Handbooks from both Agencies. Review and sign Employee Handbook with all staff members. | 1/1/05 | Dorman | Y |
| 8. | Update Employee Compensation and Benefit Plan.<br>• Roll IA hires into Tamariz health plan.<br>• Evaluate current program and make sales incentive adjustments.<br>• Implement customer retention incentives.<br>• Implement premium conversion incentives. | 1/1/05 | Dorman, Dave Wallace, Tamariz, George Moran | Y |
| 9. | Add new hires to agency's Errors & Omissions (E&O) coverage policy as of the acquisition date. | 12/1/04 | Dorman | Y |
| 10. | Purchase E&O tail coverage for acquisition. | 12/1/04 | Tamariz, George Moran | Y |
| 11. | Schedule meeting with IA staff to discuss the Moran Agency succession and personal career path opportunities. Then schedule introduction with Tamariz.<br>• Schedule IA group staff meeting with Tamariz.<br>• Schedule Individual meetings with Tamariz.<br>• Supply each staff with packet of Nationwide promotional materials. | 12/15/04 | George Moran, Tamariz, IA staff | Y |
| 12. | Schedule all-staff "kick-off"/holiday event. In additional to all staff, invite regional sales operations personnel who have been instrumental in the IA negotiation. Provide Nationwide promotional items and welcome gift to the Agency. | 12/31/04 | Dorman | Y |
| 13. | Implement Transactional Account filing system. | 1/1/05 | Tamariz | Y |
| 14. | Relocate personal lines account files from IA to Edgewater service location. | 12/31/04 | Dorman | Y |
| 15. | Relocate all commercial lines account files (Nationwide and brokerage) from Edgewater to IA service location. | 12/31/04 | Dorman | |
| 16. | Establish separate Banking accounts for Nationwide premium, Brokerage premium and operating accounts.<br>• Set up a unique escrow account for each location.<br>• Use accounts from prior IA. | 12/31/04 | Tamariz | Y |
| 17. | Establish fiduciary treasury cash handling policy training for all staff. | 12/31/04 | Tamariz, Dorman | Y |
| 18. | Train remittance process for Nationwide and brokerage using hands-on experience and on-line training module. | 1/1/05 | Dorman, Nationwide Compliance | Y |

*Tamariz - Moran Independent Agency Acquisition*

## INDEPENDENT AGENCY STAFF ORIENTATION

| Action Item | Completion Date | Responsibility | Required? (Yes/No) |
|---|---|---|---|
| 1. Post 2005 Sales Plan and results for each location to track sales:<br>• Weekly, monthly and quarterly objectives for the location<br>• Weekly, monthly and quarterly objective for each staff<br>• Update weekly, monthly and quarterly sales results | 1/1/05 | Dorman | Y |
| 2. Complete skills assessment tool on all staff. | 3/1/05 | Dorman | Y |
| 3. Implement Nationwide training<br>• Producer Installation Path for all producers and CSRs<br>• Customer Service Installation Path for CSRs | 3/1/05 | Dorman | Y |
| 4. Implement 'recognizing sales opportunity' training<br>• Life Event<br>• Value Based understanding of customer need and purchase motivation | 1/1/05 | Dorman | Y |
| 5. Implement team-building exercises/events. Utilize consulting project for a series of staff meetings dedicated to team-building. | 1/1/05 | Dorman | Y |
| 6. Schedule special staff training program<br>• Compliance – Financial (Whipple) and Personal Lines (Hearne)<br>• Home Care First –Brenda Watkins, inspectors<br>• SIU – Don Jones<br>• Claims (all lines) – Phil Rosinsky<br>• Auto – matrix – Deb Hamilton<br>• Home Owners – Loretta Johnson<br>• Commercial – Lightfoot, CFUS, Services<br>• AOA – Dick Kelly | | Dorman - coordinator | Y |
| 7. Accommodate office space as needed in each location for staff redeployment. | 1/1/05 | Dorman | Y |
| 8. Hold weekly staff meetings at new location for first month and bi-weekly thereafter. | 1/1/05 | Dorman | Y |
| 9. Establish operating hours for each location (<br>• Severna Park 8:15 am – 5:15pm M-F<br>• Edgewater 8 – 7 M-Thurs, F 8-5, Sat 9-1<br>• Crofton – 8 – 7 M-Thurs, F 10-5, Sat 9-1<br>• Arundel Mills – TBD | 1/1/05 | Dorman | Y |
| 10. Ensure Compliance standards in all locations<br>• Adhere to Gryphon "Do Not Call" requirements<br>• ICQ for Homeowners (use approved Word Track)<br>• Adhere to the Customer Experience Initiative<br>• Ensure use of signed privacy statement<br>• Ensure compliance with TQS benchmarks<br>• Ensure adherence to branding standards | 1/31/05 | Dorman | Y |

## Rollover Strategies for All Product Lines

The Tamariz Agency will coordinate renewals for commercial, auto and property policyholders and handle the IA customers as new business to the Agency. The IA will continue to operate as usual for the first 45-60 days placing business with existing carriers until IA staff is appointed with Nationwide. The rollover strategy is summarized in the following Action Plan.

### ROLLOVER ACTION PLAN – Personal Lines

| Action Item | Completion Date | Responsibility | Required? (Yes/No) |
|---|---|---|---|
| 1. Notify Sales Manager and Service Center of who will serve as IA rollover single point of contact. | 12/1/04 | Tamariz | Y |
| 2. Complete III's brokerage agreement. Confer with III about independent carrier appointments. | 12/1/04 | Tamariz, Dave Schmidt | Y |
| 3. Relocate Personal Lines files to the Edgewater office. This location will serve as the headquarters for the rollover and future Personal Lines sales/svc. | 12/31/04 | Tamariz, Dorman | Y |
| 4. Establish rollover objectives for the IA office, per producer. (Weekly production quota by associate) | 12/1/04 | Tamariz, Moran | Y |
| 5. Meet with "critical" IA carriers for direct appointment. 30-day window of notification required prior to closing the sale. | 12/31/04 | Tamariz and Moran | |
| 6. Acquire appointments to existing independent carriers for non-qualifying Nationwide business. | 12/31/04 | Tamariz | Y |
| 7. Draft version of introductory letter for IA PHs. Use different version for each policy type (Personal, Commercial or Financial). | 12/31/04 | Tamariz, Wallace and Moran | Y |
| 8. Mail Introductory Letter to each policyholder 45 days prior to renewal. | As policy renews | Wallace | Y |
| 9. Place "Client Care/Introductory" phone calls to each IA personal lines customer. | As policy renews | Tamariz, Moran | Y |
| 10. Send complete list of clients to Service Center within 15 days of closing IA purchase. The list is generated by renewal date to parallel the "introductory call" schedule. | 12/15/04 | Tamariz | Y |
| 11. Rollover accounts will be entered into the AOA system by the Service Center. The assigned Agency rollover staff will be required to review the account information prior to any customer contact. | 1/1/05 | Gainesville Service Center | Y |
| 12. Print policy screen (Applied application) or Dec page for each renewal policy | 12/31/05 | Dorman | Y |
| 13. Develop "Account Checklist" to verify required information available/needed for each PH. Check policy file and automated system for compilation of information. | 12/31/05 | Dorman | Y |
| 14. Complete "Account Checklist" for auto and property policies. | 12/31/05 | Dorman | Y |
| 15. Attach current DEC page to Account Checklist with any special instructions. | 12/31/05 | Dorman | Y |
| 16. Forward monthly batch to Service Center or service staff for processing. | 12/31/05 | Tamariz | Y |
| 17. Document list of policies sent to service staff for processing. | 12/31/05 | Dorman | Y |
| 18. Order underwriting reports CLU, MVRs and credit. | 12/31/05 | Service Center | Y |

*Tamariz - Moran Independent Agency Acquisition*

### ROLLOVER ACTION PLAN – *Personal Lines (continued)*

| Action Item | Completion Date | Responsibility | Required? (Yes/No) |
|---|---|---|---|
| 19. Complete Underwriting Memos. | 12/31/05 | Dorman | Y |
| 20. Underwriting completed and inputs risks into AOA | 12/31/05 | Service Center | Y |
| 21. Release policy into AOA's New business decision screen - "hold status" | 12/31/05 | Service Center | Y |
| 22. Match policy list sent to Service Center with "Beginning of Day". | 12/31/05 | Dorman | Y |
| 23. Insure proper placement of business from Service Center. | 12/31/05 | Staff | Y |
| 24. If service questions arise, review new business inquiry screen. Return original submission packet, copy of the underwriting reports, Quote & Quote letter and a hot print copy of the new business decision screen. | 12/31/05 | Service Center | Y |
| 25. Schedule Home Care inspection with customers.<br>• Design the Agency intro letter with response postcard inviting the PH to schedule Home Care Review.<br>• Mail letter to PH by homeowner's renewal date.<br>• Present home inspection as an "annual customer" service to the PHs.<br>• Home Care Rep present free gift to the customer at the time of inspection provided by the Agency. | 3/31/05 | Tamariz, Brenda Watkins (Home Care) | Y |
| 26. Each Associate assigned to the rollover will be responsible for a weekly contact/conversion list. The associate will be required to:<br>• Follow the Agency developed word script for interaction with the IA. The approach will mirror the Agency's process for utilizing the Customer Premium Change Report).<br>• Introduce themselves as their personal insurance assistant.<br>• Introduce the corporate and Agency services available (EFT, varied products)<br>• Verify all account information following a CARE Review process.<br>• Update Account Inquiry Database with accurate information<br>• Track customer relationship, conversion, pivot and sales opportunities developed. | Ongoing to be completed by 12/31/05. | Tamariz, Producers | Y |
| 27. Monitor carrier response to rollover initiative and adjust customer contact schedule accordingly. | Ongoing to be completed by 12/31/05. | Tamariz, Moran | Y |
| 28. Distribute revised quote packet to appropriate staff. | | Producers | Y |
| 29. Contact Customer to verify coverage and complete auto/home checklist. | | Producers | Y |
| 30. Discuss payment plan options and multi-line opportunities. | | Producers | Y |

*Tamariz - Moran Independent Agency Acquisition*

## ROLLOVER ACTION PLAN – Personal Lines (continued)

| Action Item | Completion Date | Responsibility | Required? (Yes/No) |
|---|---|---|---|
| 31. Request customer sign application and initial DEC page (Mail policy or schedule office appointment) | | Producers | Y |
| 32. Collect trailing documents | | Producers | Y |
| 33. Logs in new business log | | Producers | Y |
| 34. Collects money and remits | | Producers | Y |
| 35. Makes File Label and files | | Producers | Y |
| 36. Identify non-qualifying business and determine placement alternatives. | 1/31/05 | Tamariz, Moran | Y |
| 37. Complete the necessary Change of Record forms for excess market business, as applicable. | 1/31/05 | Tamariz, Moran | Y |

*Tamariz - Moran Independent Agency Acquisition*

## ROLLOVER ACTION PLAN – Commercial

| Action Item | Completion Date | Responsibility | Required? (Yes/No) |
|---|---|---|---|
| 1. Establish performance standards with the Service Center to exceed customer/Agency needs and expectations including: <br>• Underwriting timelines <br>• Quote/pricing timelines <br>• Policy changes and policy issue timelines <br>• Policy delivery to Agency | 1/31/05 | Tamariz, Lee, Ferer, Lightfoot, CFUS | Y |
| 2. Develop individual Commercial Producer conversion, retention and new sales objectives. <br>• Assess and ensure comfort level with transition. <br>• Establish Commercial Learning Path. <br>• Conduct field training (product, commercial remittance and servicing procedures. <br>• Establish AOA training schedule. <br>• Develop sales plan emphasizing multi-line to personal and Life/Financial product lines. <br>• Implement conversion and Financial sales incentive compensation. <br>• Implement conversion and sales results tracking tool to monitor performance. <br>• Schedule performance reviews with each producer quarterly | 1/31/05 | Tamariz, Moran Dorman, CFUS, Sales Manager | Y |
| 3. Continue sending quarterly electronic "Agency Commercial Newsletter" to PHs <br>• Verify customer e-mail address. <br>• Secure Compliance approval of the Newsletter. <br>• Preserve previous customer satisfaction and prior service levels. | On-going to be completed by 12/31/05 | Tamariz, Moran, Commercial Producers | Y |
| 4. Run list of Commercial PHs by: <br>• SIC Code – information to identify Nationwide eligibility <br>• Renewal Date – information that will dictate the rollover schedule and sequence of underwriting protocol | Completed | Tamariz, Moran Producers | Y |
| 5. Initiate re-underwriting process. <br>  1. Segment policies by SIC code. <br>  2. Compile historical data relevant to the account. <br>  3. Scan TDs and forward to underwriting. <br>  4. Analyze 3-year past pricing position. | On-going to be completed by 12/31/05 | Tamariz, Commercial Producers, CFUS, Bill Lightfoot | Y |
| 6. Develop the Nationwide applications and quote for the risk. <br>• Conduct complete account analysis. <br>• Use the re-underwriting to train IA Commercial Producer and service staff. <br>• Develop the quote. Consider pricing credits applicable for the risk. Policy retention is a priority consideration within profitability requirements. | On-going to be completed by 12/31/05 | Service Center, Commercial Producers | Y |

*Tamariz - Moran Independent Agency Acquisition*

## ROLLOVER ACTION PLAN – *Commercial (continued)*

| Action Item | Completion Date | Responsibility | Required? (Yes/No) |
|---|---|---|---|
| 7. Prepare to issue the policy<br>• ICP Policy – generate the application on a hold status in preparation for the face-to-face meeting with the customer<br>• Non ICP Policy – submit manual application to underwriting for policy issue in prep for the face-to-face meeting with the customer. | On-going to be completed by 12/31/05 | Commercial Producers | Y |
| 8. Conduct field visit and/or in-office consultation for each PH.<br>• Meet and greet – preserve IA relationship and transition to Nationwide and Tamariz Agency.<br>• Conduct field underwriting inspection: MVRs, photos and safety program recommendations.<br>• Establish audit process and intervals.<br>• Secure approval PH signature on the Nationwide application.<br>• Secure down payment, as appropriate.<br>• Introduce Personal Lines/Financial services and "fact find" the customer's current program and develop interest. | On-going to be completed by 12/31/05 | Commercial Producers | Y |
| 9. Submit and issue Nationwide policy<br>• Verify policy issued as requested<br>• Verify accuracy of all billing and communications to PH | On-going to be completed by 12/31/05 | Commercial Producers | Y |
| 10. Deliver policy to customer<br>• Review policy details<br>• Assess customer relationship.<br>• Address any issues that could affect on-going retention. | On-going to be completed by 12/31/05 | Tamariz, Moran | Y |
| 11. Secure appointment for Personal Lines/Financial products follow-up meeting (as determined in the fact-finding session). | At the time of policy delivery | Commercial Producers, Life Financial Producer | Y |
| 12. Send "Thank You" follow-up letter to the PH. Include Agency Identifier and Personal lines and Life/Financial SPLs<br>• Train how to recognize all cross sell opportunities e.g. life event and business event opportunities.<br>• Create an incentive compensation program to promote cross sell referrals.<br>• Maintain a consistent exchange of pivot referrals between operations. | On-going to be completed by 12/31/05 | Tamariz, Moran | Y |

## *Loss Ratio Containment*

The agency plans to implement the described Loss Containment Plan to minimize potential adverse loss trends after closing the IAA.

| *Action Item* | *Completion Date* | *Responsibility* | *Required? (Yes/No)* |
|---|---|---|---|
| 1. Assign IA staff who is responsible for the claims intervention program for the enterprise for all product lines. | 1/1/05 | Kenny | Y |
| 2. Schedule loss control training for enterprise staff<br>• SIU<br>• Claims<br>• Home Care | 1/31/05 | Dorman | Y |
| 3. Update account files for waived coverage forms and written coverage change requests (PIP, UMC, Loss of Use, coverage changes)<br>• Maintain original form in binder file<br>• File copy in customer account file<br>• Notate change in AOA account history | 1/1/05 | Dorman | Y |
| 4. The agency will identify losses using prior carrier claims information available from the IA, CLU reports to identify PHs with severe losses ($5K and greater), frequency (3 or more claims) and unlisted drivers (ADDs Report). | On-going to be completed by 12/31/05 | Kenny | Y |
| 5. The Agency will insure proper placement of business by Nationwide Company with appropriate coverages for the risk. | On-going to be completed by 12/31/05 | All producers, CFUS, underwriters | Y |
| 6. The Agency will implement an expanded Loss Containment Program"<br>• Print and analyze Daily Claims Report available on the Agency Desktop.<br>• Review Notice of Loss on each claim.<br>• Determine and direct claims that can be subrogated. Initiate 3-way call with customer and responsible carrier.<br>• Intervene with open claims for subrogation and reserve recovery | On-going daily claims review | Kenny | Y |
| 7. Implement a review of Worker Comp | 1/31/05 | Tamariz, Moran | Y |
| 8. The agency will request from underwriting quarterly policy loss listings to monitor and review policies with loss challenges. | Quarterly 2005 | Kenny | Y |
| 9. The agency will collect all unpaid balances before writing customer a new policy for brokered and non-brokered PHs. | 1/1/05 | Dorman | Y |

## Customer Retention and Multi-lining Plan

The Tamariz Agency will focus on retention and multi-lining of the IA policyholders throughout the Nationwide conversion process.

| Action Item | Completion Date | Responsibility | Required? (Yes/No) |
|---|---|---|---|
| 1. Verify inclusion of all customer information in ChoicePoint Retention program.  Enroll new tracking number(s) in Gold Plan. | 1/15/05 | Wallace | Y |
| 2. Custom design a retention program<br>• Series of event triggered mailings<br>• Series of product triggered mailings<br>• Track sales and retention results<br>• Expected results – improve retention ratio by 2-3 points per product line. | 1/31/05 | Wallace | Y |
| 3. Order promotional items, SPLs and Identifier with Agency information and make available to all new customers. | 12/31/04 | Wallace | Y |
| 4. Call and/or send postcard to past due customers. | 1/1/05 and on-going | Wallace | Y |
| 5. Implement usage of EFT and credit card payments. | 1/1/05 and on-going | Wallace | Y |
| 6. Send thank you cards to all new business, including conversions from IAA customers. | 1/1/05 and on-going | Wallace | Y |
| 7. Cross refer between Profit Centers<br>• Refer Life and Financial leads to Agency Financial Specialists (located in the IA satellite).<br>• Refer Personal Lines referrals to Personal Lines sales staff (located in Edgewater).<br>• Refer Commercial Lines to Commercial staff (located in IA satellite). | 1/1/05 and on-going | Wallace | Y |
| 8. Establish service standards for routine service calls and renewals to exceed customer expectations. | 1/1/05 and on-going | Wallace | Y |
| 9. Marketing initiatives to the existing PHs designed to promote multi-lining promotes customer retention. | 1/1/05 and on-going | Wallace | Y |

## Customer Acquisition

Over the next 12 to 18 months, the IA satellite office will primarily focus on rolling business to Nationwide. In addition to the rollover, the Agency plans to conduct the following activities to promote new premium from current customers and acquire new customers to the Agency.

| *Action Item* | *Completion Date* | *Responsibility* | *Required? (Yes/No)* |
|---|---|---|---|
| 1.  Add new locations to current Yellow Page advertising | 1/31/05 | Tamariz | Y |
| 2.  Utilize the Home Builders Association (HBA) of MD for seminars <br> • Sponsor breakfast for the MD group at the national HBA, Orlando, FL <br> • Sponsor breakfast seminar for MD HBA featuring topics such as: Builder's Risk, WC and effective retirement planning | <br><br>1/16 – 1/19/05 <br><br>1/22/05 | <br><br>Tamariz, Moran, Wallace <br><br>Tamariz, Moran, Vilec and Bates | Y |
| 3.  Contact Center of Influences, i.e. realtors and bankers, for formal referral relationship. <br> • Lunch seminar featuring Life/Financial products. | Quarterly-05 | Tamariz, Vilec, Bates | Y |
| 4.  Get Acquainted dessert talks targeting existing Personal Lines customers segmented by age and product ( e.g. 1st time home buyers, youthful drivers, Flood, Inland Marine, Replacement Cost vs. Market Cost, etc.) | Quarterly-05 | Tamariz, Vilec, Bates | Y |

## Market Expansion

The Tamariz Agency immediate 6-month objective is to concentrate upon the assimilation of the IA storefront, staff and premium to the Agency and to Nationwide. Once the conversion plan is well underway, the 3rd Quarter-05 objective will be to continue expansion via additional independent agency acquisition. George Moran, a well-connected and well-respected independent agent in the community, will function as the primary resource for this new opportunity search. Tamariz profile of future acquisitions will target personal line books located in geographically favorable growth areas where the competitive position and penetration present the best opportunity for roll to Nationwide. Tamariz intends to rebalance the Agency's product mix by acquiring personal lines independents and capitalizing upon the Life and Financial opportunities they will provide.  The Market Expansion Action Plan summarizing this effort follows.

| Action Item | Completion Date | Responsibility | Required? (Yes/No) |
|---|---|---|---|
| 1. Conduct analysis to identify desired markets and competitive position. | 6/1/05 | Tamariz, Sales Manager, Business Consultant | Y |
| 2. Develop a list of potential IAA candidates.  All peer group independent agency interaction will be used as an opportunity to discuss the value of converting to Nationwide. | 6/30/05 | Moran | Y |
| 3. Approach identified independent agencies for consideration of sales to Tamariz. | 6/30/05 and on-going | Moran | Y |
| 4. Evaluate interested prospects as IAAs | 6/30/05 and on-going | Moran | Y |

*Tamariz - Moran Independent Agency Acquisition*

## Technology

| Action Item | Completion Date | Responsibility | Required? (Yes/No) |
|---|---|---|---|
| 1. Complete New Office Installation Form and send to the SSS unit. (Form located on agency dashboard) | 12/31/04 | Tamariz/SSS | Y |
| 2. Order new tracking number(s) for satellite. | 12/31/04 | Tamariz/SSS | Y |
| 3. Set up new AOL office number. | 12/31/04 | Tamariz/SM | Y |
| 4. Order Necessary ID's: VPN, Lotus Notes, AOA. | 12/31/04 | Tamariz | Y |
| 5. Order DSL or appropriate connectivity (T1 with Nationwide takes 45 days) | 12/31/04 | Tamariz | Y |
| 6. Load Agency Anywhere and VPN software. | 12/31/04 | Tamariz | Y |
| 7. Contact Phone Company and assume telephone number. Switch billing addresses to primary location. (Evaluate rollover option to main office for proper coverage and questions.) | 12/31/04 | Tamariz | Y |
| 8. Complete technology site survey. Inventory hardware, software, connectivity, and phone system. | 12/31/04 | Tamariz | Y |
| 9. Order and install appropriate hardware and software. | 1/1/05 | Tamariz | Y |
| 10. Install Applied system in Agency satellite locations | 1/31/05 | Tamariz | Y |
| 11. Purchase of Applied e-filing. | 1/31/05 | Tamariz | Y |
| 12. Ensure name change in Billing system <br> • Producer data system <br> • Access authorization <br> • Change computer - utilities, default, name | 1/1/05 | Tamariz | Y |

## Financial Analysis

This Business Plan is accompanied by a detailed Pro-forma (Attachment) that outlines the premium production, revenue and financial projections.   Please review the Attachment for assumptions and analysis.

## Conclusions

The Tamariz Agency believes that this acquisition will support Nationwide's objective for generating profitable DWP growth through independent agency acquisition.  Tamariz was attracted to the Moran Agency for several significant reasons:

- Professional and community stature of George Moran, IA Principal
- For a minimum of 5 years, Moran will be dedicated to the successful retention and growth of the IA
- Size, product mix and profitability of this IA portfolio
- Acquisition of an experienced staff
- Acquisition of a satellite location in a desirable market
- Acquisition of an untapped portfolio for Life/Financial cross sales
- Moran's desire to work with Tamariz to identify and acquire additional independent agencies.

By implanting the initiatives as outlined in this Business plan, the Agency can effectively manage the conversion and profitable diversification of the acquisition and continued growth of the core Agency.  By hiring the IA principal, George Moran, Tamariz will ensure that the transition to Nationwide will be seamless to the customers and successful for all concerned.

Page 1 of 1

EXHIBIT

*17*

3-4-10

## Dave Wallace

| | |
|---|---|
| **From:** | Dave Wallace [dwallace@specdir.com] |
| **Sent:** | Tuesday, December 07, 2004 9:23 AM |
| **To:** | Phyllis Smith |
| **Subject:** | FW: Moran DTA Proformas |
| **Attachments:** | DTA--Moran only.Proforma - Conservative Case.11.17.04.xls; DTA Moran Proforma - Conservative Case - 11.17.04.xls; DTA Moran Proforma_11.17 Final Revised.xls |

Phyllis, can you print out the last Final Revised.

Dave

-----Original Message-----
**From:** Dave Wallace [mailto:dwallace@specdir.com]
**Sent:** Wednesday, November 17, 2004 4:55 PM
**To:** Tim Riggins
**Cc:** Dick Kelly; Jim Holtkamp; Ed Cooper; Diane Tamariz/Wallace
**Subject:** Moran DTA Proformas

Tim, good seeing you today at Diane's office and we appreciate your help.

Attached are the proformas per our discussion.  The color codes work great and please note the bulleted items in the right box.  To increase the size of the spreads, just hit view and zoom up.

Dave

DRDR 000226
HPK /Tamarix-Wallace/DocRecd11.09.09

**DTA000226**

Diane Tamariz Agency
Independent Agency Acquisition
Proforma - Revenue
Conservative  Case 11/16/04

**Assumptions:**

Year 2004 Commission Rates and Conversion Rates

| | |
|---|---|
| DTA Commission Rate: | 10% |
| Moran (non-IWIF) Commission Rate: | 10% |
| Moran IWIF Commission Rate: | 10% |
| Percentage of Moran IWIF to Convert: | 100% |
| Percentage of Moran Standard Auto to Convert: | 80% |
| Percentage of Moran Non-Standard Auto to Convert: | 80% |
| Percentage of Moran Property to Convert: | 88% |

New Business Annual Growth Rates

| | | |
|---|---|---|
| | DTA | 15% |
| | Moran | 10% |

New Business Annual Retention Rates

| | | |
|---|---|---|
| | DTA | 89% |
| | Moran - IWIF | 90% |
| | Moran - Standard Auto | 87% |
| | Moran - Non-Standard Auto | 90% |
| | Moran - Property | 87% |

Specialty-placed Business    Conversion Rate   50%

Contingency and Agency Acquisition Bonus Rates

| | |
|---|---|
| Contingency Percentage | 5% |
| Agency Acquisition Percentage, Y1 | 3% |
| Agency Acquisition Percentage, Y2 | 4% |

* Eligible Available Premium '04 =   $8,631,174

* Total Converted by Year ending '05 =   $4,724,265

* Total Converted after 15 months (early '06) =   $6,017,153

* NW Cost per $1 of Acquired Direct Written Premium =   $0.4986

| REVENUE                  YEAR=> | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|
| **COMMISSIONS** | | | | | | | |
| **DTA** | | | | | | | |
| Total Premium (after attrition) | $4,000,000 | $3,560,000 | $3,702,400 | $3,903,896 | $4,124,132 | $4,365,993 | $4,620,908 |
| PLUS: New Business (Growth) | 50% | $600,000 | $684,000 | $729,960 | $781,478 | $839,522 | $905,243 |
| Confrom Personal Lines | $4,000,000 | $400,000 | $480,000 | $576,000 | $691,200 | $829,440 | $995,328 |
| Total DTA Premium | $4,000,000 | $4,560,000 | $4,866,400 | $5,209,856 | $5,596,810 | $6,034,955 | $6,533,479 |
| Total Commission Earned through DTA | $400,000 | $456,000 | $486,640 | $520,986 | $559,681 | $603,495 | $653,348 |
| **MORAN** | | | | | | | |
| Personal Standard Auto | $1,422,610 | $1,058,088 | $1,035,694 | $1,004,536 | $974,399 | $945,167 | $916,812 |
| PLUS: Growth | 50% | $132,261 | $119,035 | $115,464 | $112,000 | $108,640 | $105,391 |
| Total Premium | $1,322,610 | $1,190,349 | $1,154,659 | $1,119,999 | $1,086,399 | $1,053,807 | $1,022,193 |
| Commission Rev. | $132,261 | $119,035 | $115,464 | $112,000 | $108,640 | $105,391 | $102,219 |
| Personal Lines Non-Standard Auto | $246,000 | $196,800 | $199,260 | $199,260 | $199,260 | $199,260 | $199,260 |
| PLUS: New Business: Growth | 50% | $24,600 | $22,140 | $22,140 | $22,140 | $22,140 | $22,140 |

DRDR   000227
K    Dirk · Wallace
DTA000227

Diane Tanarai Agency
Independent Agency Acquisition
Proforma - Revenue
Conservative Case 11/16/04

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Total Premium | | $221,400 | $221,400 | $221,400 | $221,400 | $221,400 | $221,400 | $221,400 | $221,400 |
| Commission Earned | | $22,140 | $22,140 | $22,140 | $22,140 | $22,140 | $22,140 | $22,140 | $22,140 |
| **Personal Line – Property** | | | | | | | | | |
| PLUS New Business Growth | | $206,756 | $297,186 | $288,270 | $279,602 | $271,233 | $263,096 | | |
| Total Premium | | $34,856 | $34,159 | $33,134 | $32,140 | $31,176 | $30,241 | | |
| Commission Earned | | $945,593 | $931,345 | $921,405 | $311,762 | $302,410 | $293,337 | | |
| PLUS New Business (Growth) | | $34,734 | $33,134 | $32,140 | $31,176 | $30,241 | $29,334 | | |
| Total Personal Lines Premium | | $1,753,342 | $1,707,383 | $1,662,804 | $1,619,562 | $1,577,617 | $1,536,930 | | |
| PLUS New Business (Growth) | | $2,548,979 | $4,243,629 | $4,362,215 | $4,362,115 | $4,362,115 | $4,362,115 | | |
| Total Premium | | $466,806 | $603,165 | $484,679 | $484,679 | $484,679 | $484,679 | | |
| Commission Earned | | $3,015,825 | $4,846,794 | $4,846,794 | $4,846,794 | $4,846,794 | $4,846,794 | | |
| | | $501,582 | $484,679 | $484,679 | $484,679 | $484,679 | $484,679 | | |
| Total Commission Earned through Moran | | $3,834,041 | $5,348,221 | $5,505,527 | $5,617,668 | $5,743,223 | $5,881,334 | | |
| **Total Commercial Premium** | | $10,147,383 | $11,922,005 | $12,376,187 | $12,834,040 | $13,355,795 | $13,951,744 | | |
| **GRAND TOTAL NATIONWIDE PREMIUM** | | $4,724,265 | $6,017,153 | | | | | | |
| Total Acquired Direct Written Premium | | | $0.4986 | | | | | | |
| **PURCHASE RATIO @ $3MM** | | | | | | | | | |
| WIF Premium (after attrition) | | $2,720,608 | $2,720,608 | $2,720,608 | $2,720,608 | $2,720,608 | $2,720,608 | | |
| PLUS New Business (Growth) | | $302,290 | $302,290 | $302,290 | $302,290 | $302,290 | $302,290 | | |
| Total Premium | | $3,022,898 | $3,022,898 | $3,022,898 | $3,022,898 | $3,022,898 | $3,022,898 | | |
| Commission Earned | | $302,290 | $302,290 | $302,290 | $302,290 | $302,290 | $302,290 | | |
| **Brokered non-Converted Amounts** | | | | | | | | | |
| Personal Standard Auto | | $192,261 | $115,067 | $100,108 | $87,094 | $75,772 | $65,922 | | |
| Personal Non-Standard Auto | | $24,600 | $22,140 | $19,926 | $17,933 | $16,140 | $14,526 | | |
| Personal Property | | $20,374 | $18,195 | $15,830 | $13,772 | $11,981 | $10,424 | | |
| Brokered_non-Converted Commission Earned - Personal | | $17,777 | $15,540 | $13,586 | $11,880 | $10,389 | $9,087 | | |
| from Commercial NW Eligible not retained | | $210,081 | $189,073 | $170,165 | $153,149 | $137,834 | $124,051 | | |
| from Commercial - Other Brokered TIA - not retained | | $511,385 | $460,247 | $414,222 | $372,800 | $335,520 | $301,968 | | |
| Brokered Converted Commission Earned - Commercial | | $72,147 | $64,922 | $58,439 | $52,595 | $47,335 | $42,602 | | |
| Total non-Converted Commission Earned on Moran Book | | $59,924 | $80,072 | $72,025 | $64,475 | $57,725 | $51,689 | | |
| **CONTINGENCIES** | | | | | | | | | |
| Total Pers-IWFP; DTA&Moran | | $10,147,383 | $11,922,005 | $12,376,187 | $12,834,040 | $13,355,795 | $13,951,744 | | |
| Contingency Earned | | $507,369 | $596,100 | $618,809 | $641,702 | $667,790 | $697,587 | | |
| Total IWFP thru Moran | | $3,022,898 | $3,022,898 | $3,022,898 | $3,022,898 | $3,022,898 | $3,022,898 | | |
| Contingency Earned | | $151,145 | $151,145 | $151,145 | $151,145 | $151,145 | $151,145 | | |
| **Nationwide ACQUISITION BONUS** | | | | | | | | | |
| Agency Acquisition Bonus - One time Payments Y1, Y2 | | $180,515 | $240,686 | | | | | | |
| **FINANCIAL** | | | | | | | | | |
| Clarkton Satellites_ncial | | $25,600 | $31,250 | $39,063 | $48,828 | $61,035 | $76,294 | | |
| Cross-sell to Moran Book | | $160,000 | $200,000 | $250,000 | $312,500 | $390,625 | $488,281 | | |
| Total Revenue - DTA&Moran | | $2,370,981 | $2,870,925 | $2,744,783 | $2,880,713 | $3,045,348 | $3,244,689 | | |

DTA000228
DRDR
000228
09.09

# NFCU Loan Amortization Schedule

**Enter Values**

| | |
|---|---|
| Loan Amount | $1,500,000.00 |
| Annual Interest Rate | 5.75 % |
| Loan Period in Years | 12 |
| Number of Payments Per Year | 1 |
| Start Date of Loan | 12/1/2004 |
| Optional Extra Payments | $ |

**Loan Summary**

| | |
|---|---|
| Scheduled Payment | $ 176,471.51 |
| Scheduled Number of Payments | 12 |
| Actual Number of Payments | 12 |
| Total Early Payments | $ |
| Total Interest | $ 617,658.11 |
| | $ 617,658.11 |

Lender Name:

| Pmt No. | Payment Date | Beginning Balance | Scheduled Payment | Extra Payment | Total Payment | Principal | Interest | Ending Balance | Cumulative Interest |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 12/1/2005 | $ 1,500,000.00 | $ 176,471.51 | $ | $ 176,471.51 | 90,221.51 | 86,250.00 | $ 1,409,778.49 | $ 86,250.00 |
| 2 | 12/1/2006 | 1,409,778.49 | 176,471.51 | | 176,471.51 | 95,409.25 | 81,062.26 | 1,314,369.25 | 167,312.26 |
| 3 | 12/1/2007 | 1,314,369.25 | 176,471.51 | | 176,471.51 | 100,895.28 | 75,576.23 | 1,213,473.97 | 242,888.49 |
| 4 | 12/1/2008 | 1,213,473.97 | 176,471.51 | | 176,471.51 | 106,696.76 | 69,774.75 | 1,106,777.21 | 312,663.25 |
| 5 | 12/1/2009 | 1,106,777.21 | 176,471.51 | | 176,471.51 | 112,831.82 | 63,639.69 | 993,945.39 | 376,302.94 |
| 6 | 12/1/2010 | 993,945.39 | 176,471.51 | | 176,471.51 | 119,319.65 | 57,151.86 | 874,625.74 | 433,454.80 |
| 7 | 12/1/2011 | 874,625.74 | 176,471.51 | | 176,471.51 | 126,180.53 | 50,290.98 | 748,445.21 | 483,745.78 |
| 8 | 12/1/2012 | 748,445.21 | 176,471.51 | | 176,471.51 | 133,435.91 | 43,035.60 | 615,009.31 | 526,781.38 |
| 9 | 12/1/2013 | 615,009.31 | 176,471.51 | | 176,471.51 | 141,108.47 | 35,363.04 | 473,900.83 | 562,144.41 |
| 10 | 12/1/2014 | 473,900.83 | 176,471.51 | | 176,471.51 | 149,222.21 | 27,249.30 | 324,678.62 | 589,393.71 |
| 11 | 12/1/2015 | 324,678.62 | 176,471.51 | | 176,471.51 | 157,802.49 | 18,669.02 | 166,876.13 | 608,062.73 |
| 12 | 12/1/2016 | 166,876.13 | 176,471.51 | | 166,876.13 | 157,280.75 | 9,595.38 | 0.00 | 617,658.11 |

| Pmt No. | Payment Date | Beginning Balance | Scheduled Payment | Extra Payment | Total Payment | Principal | Interest | Ending Balance | Cumulative Interest |
|---------|--------------|-------------------|-------------------|---------------|---------------|-----------|----------|----------------|---------------------|

DRDR  000230
HPK /Tamarix-Wallace/DocRecd11.09.09

DTA000230

| Pmt No. | Payment Date | Beginning Balance | Scheduled Payment | Extra Payment | Total Payment | Principal | Interest | Ending Balance | Cumulative Interest |
|---------|--------------|-------------------|-------------------|---------------|---------------|-----------|----------|----------------|---------------------|

DRDR 000231
HPK /Tamarix-Wallace/DocRecd11.09.09
DTA000231

**Projected Premium Billings**

**Revenue**

|  |  |  |  | $12,000,000 | MORAN | Best Practices 2003 (AV agency) |
|---|---|---|---|---|---|---|
| Commercial P&C |  |  | 1101600 |  | 85.00% | 44.5 |
| Personal P&C |  |  | 194400 |  | 15.00% | 37.6 |
| Gross Commissions |  |  | 1296000 |  |  |  |
| Commission & Fees |  |  |  |  |  |  |
| Acct # | Description |  |  |  |  |  |
| 400 | a/b comm |  |  | $466,560 | 31.52% |  |
| 401 | d/b comm |  |  | $829,440 | 56.04% |  |
| 402 | group /individual L&H |  |  | $12,000 | 0.81% | 4 |
| 403 | contingent |  |  | $170,000 | 11.48% | 8.2 |
| 404 | P&C Service fees |  |  | $0 | 0.00% | 0.6 |
| 405 | Investments |  |  | $2,200 | 0.15% | 1 |
| 406 | misc |  |  | $0 | 0.00% | 0.6 |
| Total Revenues |  |  |  | $1,480,200 | 100.00% | 96.5 |
| 501d | Brokerage  commission expense |  |  | $53,000 | -3.58% | 1.4 |
| Net Revenues |  |  |  | $1,427,200 | 98.42% | 98.6 |
| Expenses |  |  |  |  |  |  |
| Employment expense |  |  |  |  |  |  |
| 500a | Owner's Compensation |  |  | $142,296 | 9.97% |  |
| 500b | Management Fees |  |  | $21,150 |  |  |
| Executive Payroll |  |  |  | $163,446.00 | 11.45% |  |
| 501b | Producer commissions |  |  | $199,702 | 13.99% |  |
| 501p | sales incentive pers'l lines |  |  | $0 |  |  |
| Production Payroll |  |  |  | $199,702.00 | 13.99% |  |
| 502a | Service payroll |  |  | $166,502 | 11.57% |  |
| 502b | Support payroll |  |  | $74,207 | 5.20% |  |
| 502c | casual |  |  | $0 | 0.00% |  |
| Service payroll expense |  |  |  | $240,709.36 | 16.87% |  |
|  | group benefits |  |  | $29,209 | 2.05% |  |
|  | payroll tax |  |  | $42,204 | 2.96% |  |
|  | Simplified IRA |  |  | $24,551 | 17.25% |  |
|  | Section 125 plan expense |  |  | $805 | 0.06% |  |
|  | Payroll Processing |  |  | $1,801 | 0.13% |  |
| benefit expense |  |  |  | $98,559.91 | 22.44% | 8.9 |
| Total Compensation Expense |  |  |  | $702,427.27 | 49.22% | 61 |
|  | advertising & prom |  |  | $14,000.00 | 0.98% | 1.6 |

HPKaTamarix-Wallace DocRecd11.09.09

CRDR_000232

DTA000232

| Code | Description | Amount | Subtotal | Percent | Value |
|---|---|---|---|---|---|
| 601dm | auto | $3,000 | | | |
| 601gm | | $5,700 | | | |
| 601rd | | $5,700 | | | |
| 601sb | | $3,000 | | | |
| | total auto expense | | $17,400.00 | 1.22% | 1.6 |
| 602 | contributions | | $5,000.00 | 0.35% | |
| 603a | dues | $5,400 | | | |
| 603b | subscriptions | $3,800 | | | |
| 603c | und.expense | $4,500 | | | |
| | NAIS AcctComp | $7,800 | | | |
| 603d | legal | $0 | | | |
| | total dues, subs, underwriting | | $21,500.00 | 1.51% | 1 |
| 604dm | training | $900 | | | |
| 604gm | | $900 | | | |
| 604rd | | $900 | | | |
| 604 sb | | $2,000 | | | |
| 604staff | | $2,000 | | | |
| | total training | | $6,700.00 | 0.47% | 0.5 |
| 605 | postage/delivery | | $9,500.00 | 0.67% | 0.9 |
| 606 | telephone | | $7,700.00 | 0.54% | 1.6 |
| 607dm | cell phones | $300 | | | |
| 607jd | | $300 | | | |
| 607gm | | $500 | | | |
| 607sb | | $300 | | | |
| 607rd | | $500 | | | |
| | total cell phones | | $1,900.00 | 0.13% | |
| 608dm | meetings | $225 | | | |
| 608gm | | $310 | | | |
| 608rd | | $0 | | | |
| | meetings | $100 | | | |
| | | | $535.00 | 0.04% | |
| | travel | $2,400 | | | |
| | | $0 | | | |
| | | $700 | | | |
| | | $0 | | | |
| | | $0 | | | |
| | Promotion/entertainment | $150 | $3,100.00 | 0.22% | |

DRDR 000233
HPM/Tamarix-Wallace/DocRecd11.09.09
DTA000233

| Code | Description | Sub-amount | Amount | Percent | T&E |
|---|---|---|---|---|---|
| 610gm | | $4,000 | | | |
| 610rd | | $200 | | | |
| 610sb | | $300 | | | |
| total promotion/entertainment | | | $14,350.00 | 0.30% | |
| 613 | website/newsletter | | $5,700.00 | 0.40% | |
| Business Development Expense | | | $97,485.00 | 6.83% | T&E 13 |
| 700 | rent | $95,200 | | | |
| | utilities | $0 | | | |
| | property tax | $0 | | | |
| | repairs & maint | $0 | | | |
| 710 | | | $95,200.00 | 0.00% | 4.4 |
| Total Occupancy Expense | office supplies | | $95,200.00 | 6.67% | |
| 701 | printing | | $6,500.00 | 0.46% | supplies & printing 1.8 |
| 702 | licenses and taxes | | $4,050.00 | 0.28% | |
| 703 | insurance | | $3,800.00 | 0.27% | 0.3 |
| 704 | accounting | | $15,000.00 | 1.05% | 1.9 |
| | legal | | $3,200.00 | 0.22% | |
| | data processing | | $2,000.00 | 0.14% | professional fees .8% |
| 705 | Applied, Phone, Copier | | $5,200.00 | 0.36% | 2.2 |
| 706 Equip Maint | furn/fixtures | $2,551 | $14,500.00 | 1.02% | 0.6 |
| Depreciation | computers | $3,363 | | | |
| | leasehold | $2,122 | | | |
| Total Depreciation | bad debt | | $8,036.00 | 0.56% | 1.4 |
| 707 | life ins | | $6,000.00 | 0.42% | 0.2 |
| 708 | Officers LTC | | $3,800.00 | 0.27% | 0.2 |
| 712 | interest | | $8,850.00 | | 1.7 |
| 709 | Auto Moran | $0 | | | |
| | auto DeVoe | $0 | | | |
| | computers | $0 | | | |
| | misc. | | $0.00 | 0.00% | 1.7 |
| interest | | | $6,000.00 | 0.42% | 1.3 |
| TOTAL OPERATING EXPENSES | | | $182,136.00 | 12.76% | 16.4 |
| EXPENSES | | | $982,048.27 | 68.81% | |
| profit | | | $445,151.73 | 31.19% | 12.7 |

DRDR_000234
HPK Tamarix-Wallace@DocRecd11.09.09
DTA000234

| Employee | Position | Base Salary | Disability Insurance | Best Practices 2003 |
|---|---|---|---|---|
| Executive Payroll | Owner/Pres | | | $138,000 |
| Russ | VP/account exec | 106466 | | 106466 |
| Donna | account exec | 93246 | | 93246 |
| | | | | 14.19% |
| Production Payroll | | | | $199,702 |
| Carolyn Hearn | PI/CSR | 35520 | | $35,520 |
| Pat Elliott | CL/CSR | 35178 | | $35,178 |
| Ted Kenney | | 31400 | | $31,400 |
| Kerri Morin | CL/CSR | 25834 | | $25,834 |
| Joyce Thompson | CL/CSR | 35533 | | $35,933 |
| Service Payroll | | | | $163,865 |
| Joan | Accounting Mgr. | 49959 | | $49,959 |
| Wendy | Adm Asst | 22856 | | $22,856 |
| Support Payroll | | | | $72,815 |

Total — casual labor — $0 — $574,382
401k (3% matching with all employees) — $17,231
Number of employees — 10.0
Comp per employee — $10.50 — 65828

Revenue Per Employee — $139,067 — 106742

Spread per employee — $139,056 — 42913

Payroll tax

| | | |
|---|---|---|
| DTA Payroll tax | | |
| FICA 6.2%: | | |
| Diane | 87,900 | |
| Support | 268,000 | |
| Total FICA Payroll | 355,900 | |
| FICA Tax | 22,066 | |
| Fed Unemployment | 448 | |
| State Unemployment | 1,292 | |
| Medicare 1.45% | 5,161 | |
| Total Tax | 28,966 | |

| | |
|---|---|
| Payroll tax | |
| ...6.2%: | |
| ...Burns | 87,900 |
| | 87,900 |
| | 87,900 |
| | 163,865 |
| | 72,815 |
| FICA Payroll | 500,380 |
| | 31,024 |
| ...ployment Tax | 560 |

DRDR_000235
.../Tapes/...Ware/DocRecd11.09.09
DTA000235

State Unemployment Tax
Medicare 1.45%
503B

1,615
8,329
41,627

Satellite Payroll Tax
FICA 6.2%;

| | |
|---|---|
| Diane | 0 |
| Support | 43,000 |
| Total FICA Payroll | 43,000 |
| FICA Tax | 2,666 |
| Fed Unemployment | 56 |
| State Unemployment | 162 |
| Medicare 1.45% | 624 |
| Total Tax | 3,507 |

DRDR  000236
HPK /Tamarix-Wallace/DocRecd11.09.09
DTA000236

4.5

DRDR  000237
HPK /Tamarix-Wallace/DocRecd11.09.09
DTA000237

Diane Tamariz Agency
Independent Agency Acquisition
Proforma - Revenue
Conservative Case 11/17/04

**Assumptions:**

Year 2004 Commission Rates and Conversion Rates

| | |
|---|---|
| Moran Commission Rate: | 10% |
| Percentage of Moran Standard Auto to Convert: | 80% |
| Percentage of Moran Non-Standard Auto to Convert: | 80% |
| Percentage of Moran Property to Convert: | 88% |

New Business Annual Growth Rates

| | Moran | 10% |
|---|---|---|

New Business Annual Retention Rates

| | |
|---|---|
| Moran - Standard Auto | 87% |
| Moran - Non-Standard Auto | 90% |
| Moran - Property | 87% |

Right-side notes:

* Eligible Available Premium '04 = **$8,631,174**
* Total Converted by Year ending '05 = **$4,724,265**
* Total Converted after 15 months (early '06) = **$6,017,153**
* NW Cost per $1 of Acquired Direct Written Premium = **$0.4986**

**REVENUE**

| MORAN  YEAR-> | 11/1/2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|
| Personal Line – Standard Auto | | $1,058,088 | $1,035,604 | $1,004,536 | $974,399 | $945,167 | $916,812 |
| PLUS New Business Growth | | $132,260 | $119,085 | $115,464 | $112,000 | $108,640 | $105,381 |
| Total Premium | | $1,190,349 | $1,154,689 | $1,119,999 | $1,086,399 | $1,083,807 | $1,022,193 |
| Commission Earned | | $119,035 | $115,464 | $112,000 | $108,640 | $105,381 | $102,219 |
| Personal Line – Non-Standard Auto | | $196,800 | $199,260 | $199,260 | $199,260 | $199,260 | $199,260 |
| PLUS New Business Growth | | $221,400 | $221,400 | $221,400 | $221,400 | $221,400 | $221,400 |
| Total Premium | | $221,400 | $221,400 | $221,400 | $221,400 | $221,400 | $221,400 |
| Commission Earned | | $22,140 | $22,140 | $22,140 | $22,140 | $22,140 | $22,140 |
| Personal Line – Property | | $306,796 | $297,166 | $288,270 | $279,622 | $271,233 | $263,096 |
| PLUS New Business Growth | | $34,856 | $34,159 | $33,134 | $32,160 | $31,176 | $30,241 |
| Total Premium | | $341,593 | $331,345 | $321,405 | $311,762 | $302,410 | $293,337 |
| Commission Earned | | $34,159 | $33,134 | $32,140 | $31,176 | $30,241 | $29,334 |
| **Total Personal Lines Premium** | $1,819,374 | $1,753,342 | $1,707,383 | $1,662,804 | $1,619,862 | $1,577,847 | $1,596,890 |
| Commercial | | $2,548,979 | $4,243,629 | $4,265,806 | $4,363,115 | $4,362,115 | $4,362,115 |
| PLUS New Business (Growth) | | $666,846 | $603,165 | $484,679 | $484,679 | $484,679 | $484,679 |
| Total Premium | | $3,015,825 | $4,846,794 | $4,846,794 | $4,846,794 | $4,846,794 | $4,846,794 |
| Commission Earned | | $301,582 | $484,679 | $484,679 | $484,679 | $484,679 | $484,679 |
| **Total Commercial Premium** | $2,045,546 | | | | | | |
| Total Commission Earned through Moran | | $613,602 | $1,104,592 | $1,141,412 | $1,265,553 | $1,381,108 | $1,519,219 |
| | | $276,554 | $163,643 | $253,647 | $275,012 | $306,913 | $337,604 |
| | | $818,216 | $1,268,235 | $1,395,059 | $1,534,565 | $1,688,011 | $1,855,923 |
| | | $81,822 | $126,824 | $139,506 | $153,456 | $168,802 | $185,682 |
| | | $558,738 | $782,241 | $790,466 | $800,092 | $811,263 | $824,055 |
| **TOTAL NATIONWIDE ELIGIBLE PREMIUM** | $8,631,174 | $5,587,383 | $7,055,605 | $7,166,331 | $7,237,230 | $7,320,840 | $7,418,264 |
| Total Acquired Direct Written Premium | $6,716,000 | $4,724,265 | $6,017,153 | | | | |
| PURCHASE RATIO @ $3MM | | | $0.4986 | | | | |

## Diane Tamariz & Associates, PA -- Moran Acquisition
### Profit & Loss Proforma

| | DTA E 2004 | DTA E 2005 | Satellite E 2005 | Moran E 2005 | Combined E 2005 | Combined E 2006 | Combined E 2007 | Combined E 2008 | Combined E 2009 | Combined E 2010 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Ordinary Income/Expense** | | | | | | | | | | |
| **Income** | | | | | | | | | | |
| F&C Consultations | 416,000.00 | | 40,000.00 | 861,028.06 | 1,317,028.06 | 1,571,171.10 | 1,611,741.11 | 1,662,062.91 | 1,717,028.51 | 1,779,591.51 |
| Financial | | | 25,000.00 | 100,000.00 | 125,000.00 | 231,250.00 | 289,082.50 | 361,328.13 | 451,660.16 | 564,575.20 |
| Specialty Place (non-Converted) | | | 100.00 | 89,924.07 | 89,924.07 | 80,472.14 | 72,025.14 | 64,474.81 | 57,724.73 | 51,699.00 |
| Acquisition Bonus | 180,514.60 | | | | 180,514.60 | 240,686.13 | 0.00 | 0.00 | 0.00 | 0.00 |
| Contingencies | 597,369.13 | | | | 635,144.03 | 747,245.14 | 769,954.21 | 793,846.89 | 816,934.64 | 848,723.08 |
| **Total Income** | 1,103,883.73 | | 65,000.00 | 1,202,057.04 | | 2,870,824.52 | 2,744,782.98 | 2,880,712.74 | 3,043,348.04 | 3,246,588.61 |
| **Expense** | | | | | Expense Growth 5% | | | | | |
| Advertising and promotion | 13,933.07 | 13,000.00 | 2,000.00 | 20,000.00 | 35,000.00 | 35,000.00 | 35,000.00 | 35,000.00 | 35,000.00 | 35,000.00 |
| Automobile Expense | 4,725.81 | 5,000.00 | | | 5,000.00 | 5,250.00 | 5,512.50 | 5,788.13 | 6,077.53 | 6,381.41 |
| Bank Service Charge | 877.08 | 1,000.00 | 100.00 | | 1,100.00 | 1,155.00 | 1,212.75 | 1,273.39 | 1,337.06 | 1,403.91 |
| Contingent Bonus | | | 20,000.00 | | 20,000.00 | 76,000.00 | 76,000.00 | 76,000.00 | 76,000.00 | 76,000.00 |
| Consultations | 1,662.86 | 2,000.00 | | 5,000.00 | 7,000.00 | 7,350.00 | 7,717.50 | 8,103.38 | 8,508.54 | 8,933.97 |
| Dues and Subscriptions | 1,670.47 | 1,600.00 | 500.00 | 13,700.00 | 15,800.00 | 16,590.00 | 17,419.50 | 18,290.48 | 19,205.00 | 20,165.25 |
| E&O Expense | 1,379.66 | 5,000.00 | 500.00 | 6,000.00 | 11,500.00 | 12,075.00 | 12,678.75 | 13,312.69 | 13,978.32 | 14,677.24 |
| Total Education/Training | 3,642.17 | 3,800.00 | 500.00 | 6,700.00 | 10,800.00 | 11,340.00 | 11,907.00 | 12,502.35 | 13,127.47 | 13,783.84 |
| **Employee Benefits** | | | | | | | | | | |
| Total CEO Packs | 1,079.33 | 5,000.00 | 0.00 | 0.00 | 5,000.00 | 5,250.00 | 5,512.50 | 5,788.13 | 6,077.53 | 6,381.41 |
| Group Dental | 335.56 | 1,079.33 | 180.00 | 0.00 | 1,259.33 | 1,322.24 | 1,388.36 | 1,457.77 | 1,530.66 | 1,607.20 |
| Group Health | 14,064.53 | 9,996.93 | 1,438.00 | 14,248.00 | 25,704.00 | 26,989.20 | 28,338.66 | 29,755.59 | 31,243.37 | 32,805.54 |
| Corporate Car | 8,847.00 | 20,000.00 | | 1,000.00 | 20,000.00 | 21,000.00 | 22,050.00 | 23,152.50 | 24,310.13 | 25,525.63 |
| Cell Phone | 6,275.69 | 6,500.00 | 500.00 | 1,900.00 | 8,400.00 | 8,820.00 | 9,261.00 | 9,724.05 | 10,210.25 | 10,720.77 |
| 401K Expense | 4,865.00 | 11,040.00 | 1,200.00 | 17,231.47 | 29,361.47 | 31,039.54 | 32,591.52 | 34,221.10 | 35,932.15 | 33,381.76 |
| **Total Employee Benefits** | 31,033.10 | 53,410.12 | 2,898.00 | 33,411.47 | 91,719.39 | 94,430.99 | 99,142.04 | 104,099.14 | 101,164.10 | 110,422.30 |
| Computer/Equipment Rental | 2,891.14 | 3,000.00 | 0.00 | 0.00 | 3,000.00 | 3,150.00 | 3,307.50 | 3,472.88 | 3,646.52 | 3,828.84 |
| Insurance - General Office | 2,728.17 | 2,800.00 | 500.00 | 3,538.00 | 6,338.00 | 6,654.90 | 6,987.65 | 7,337.03 | 7,703.88 | 8,089.07 |
| Insurance - Key Man Life | | 0.00 | 0.00 | 13,185.00 | 13,185.00 | 13,185.00 | 13,185.00 | 13,185.00 | 13,185.00 | 13,185.00 |
| Interest Expense | 13,352.12 | 13,400.00 | 0.00 | 0.00 | 13,400.00 | 14,070.00 | 14,773.50 | 15,512.18 | 16,287.78 | 17,102.17 |
| Interest on NYC/U Lease | | 86,250.00 | | | 86,250.00 | 81,002.36 | 75,576.83 | 69,774.75 | 63,639.69 | 57,151.86 |
| Interest on Moran Payable | | | | | 0.00 | 60,000.00 | 40,000.00 | 20,000.00 | 0.00 | 24,278.70 |
| Total Leased Office Equipment | 2,212.56 | 2,300.00 | | 16,723.00 | 19,023.00 | 19,974.15 | 20,972.86 | 22,021.50 | 23,122.58 | 8,265.44 |
| Licenses and Permits | 1,021.14 | 3,000.00 | | 3,800.00 | 6,800.00 | 7,140.00 | 7,497.00 | 7,871.85 | 8,265.44 | 8,678.71 |
| Miscellaneous | 833.91 | 1,000.00 | 500.00 | 1,000.00 | 2,500.00 | 2,625.00 | 2,756.25 | 2,894.06 | 3,038.77 | 3,190.70 |
| Office Expense/Applied, Phone, Copier | 813.60 | 1,000.00 | | 14,500.00 | 15,500.00 | 16,275.00 | 17,088.75 | 17,943.19 | 18,840.35 | 19,782.36 |
| Office Supplies | 8,000.00 | 7,300.00 | 1,000.00 | 6,500.00 | 15,000.00 | 15,750.00 | 16,537.50 | 17,364.38 | 18,232.59 | 19,144.23 |
| Payroll Expense | 301,194.30 | 388,000.00 | 43,000.00 | 574,283.95 | 985,382.36 | 1,034,651.48 | 1,086,384.05 | 1,140,703.25 | 1,059,238.42 | 1,112,723.24 |
| Payroll Taxes | | 28,966.33 | 3,507.00 | 41,527.13 | 74,000.48 | 77,902.50 | 76,212.50 | 85,694.80 | 89,948.64 | 94,445.44 |
| Total Postage and Delivery | 7,493.25 | 7,600.00 | 2,150.00 | 9,560.00 | 19,250.00 | 20,212.50 | 21,223.13 | 22,284.28 | 23,398.50 | 24,568.42 |
| Printing and Reproduction | 4,919.21 | 5,000.00 | 1,500.00 | 4,030.00 | 10,530.00 | 11,077.50 | 11,631.38 | 12,212.94 | 12,823.59 | 13,464.77 |
| Professional Development | 2,312.70 | 2,500.00 | 0.00 | 2,500.00 | 5,000.00 | 5,250.00 | 5,512.50 | 5,788.13 | 6,077.53 | 6,381.41 |
| Total Professional Fees | 11,635.71 | 8,500.00 | 0.00 | 3,850.00 | 12,350.00 | 13,125.00 | 13,781.25 | 14,470.31 | 15,193.83 | 15,953.52 |
| Total Recruiting | 11,160.86 | 3,000.00 | 0.00 | 0.00 | 3,000.00 | 3,150.00 | 3,307.50 | 3,472.88 | 3,646.52 | 3,828.84 |
| Rent | 30,000.00 | 30,000.00 | 24,000.00 | 95,200.00 | 149,200.00 | 149,200.00 | 149,200.00 | 149,200.00 | 149,200.00 | 149,200.00 |
| Rental Repairs | 8,327.52 | 8,400.00 | 500.00 | 3,000.00 | 11,900.00 | 12,495.00 | 13,119.75 | 13,775.74 | 14,464.53 | 15,187.75 |
| Security | 993.55 | 1,200.00 | 0.00 | 0.00 | 1,200.00 | 1,260.00 | 1,323.00 | 1,389.15 | 1,458.61 | 1,531.54 |
| Telephone | 11,120.06 | 11,000.00 | 3,000.00 | 8,000.00 | 22,000.00 | 23,100.00 | 24,255.00 | 25,467.75 | 26,741.14 | 28,078.19 |
| Translation Service | 26.23 | 50.00 | | | 50.00 | 52.50 | 55.13 | 57.88 | 60.78 | 63.81 |
| Total Travel & Ent | 993.55 | 26,190.00 | | 8,895.00 | 28,785.00 | 30,224.25 | 31,735.46 | 33,322.24 | 34,988.35 | 36,737.76 |
| T/value/Newsletter | 16,790.30 | 8,000.00 | 2,000.00 | 5,700.00 | 7,700.00 | 5,985.00 | 6,284.25 | 6,598.46 | 6,928.39 | 7,274.80 |
| Utilities | 5,743.05 | 6,000.00 | 1,500.00 | | 7,500.00 | 7,875.00 | 8,268.75 | 8,268.75 | 8,268.75 | 8,268.75 |
| **Total Expense** | 480,966.26 | 691,076.47 | 109,155.00 | 900,007.96 | 1,704,239.43 | 976,199.48 | 1,942,933.94 | 886,289.83 | 1,907,297.56 | 1,978,909.94 |
| **Net Ordinary Income** | -20,966.26 | | -44,155.00 | 302,049.08 | 656,741.24 | 978,379.48 | 801,844.04 | 886,293.83 | 1,138,050.48 | 1,265,738.87 |
| Less: Loan Repayment | | | | | 93,921.51 | 91,409.25 | 100,893.28 | 106,896.76 | 112,831.82 | 119,319.53 |
| Contingencies (payment through contingencies) | | 408,807.26 | | | 500,000.00 | 500,000.00 | 500,000.00 | 500,000.00 | 0.00 | 0.00 |
| **Net Income** | | | | | 576,555.83 | 380,989.24 | 200,948.76 | 279,593.08 | 1,025,218.66 | 1,146,439.22 |

* Nationwide guarantee planned not to be activated ... payment to Moran (found in Loan Repayment '06, '07, & '08) made through contingencies
* Original $1.5MM Nationwide loan complete in 2017

Prepared 11/16/2004

DRDR_000239
Tamariz v. Wallace/Decertified11-09.09
DTA000239

## Diane Tamariz Agency
## Independent Agency Acquisition
## Proforma - Revenue
## Conservative Case 11/17/04

**Assumptions:**

| Year 2006 Commission Rates and Conversion Rates | |
|---|---|
| Moran Commission Rate: | 10% |
| Percentage of Moran Standard Auto to Convert: | 80% |
| Percentage of Moran Non-Standard Auto to Convert: | 80% |
| Percentage of Moran Property to Convert: | 88% |

New Business Annual Growth Rates

| New Business Annual Retention Rates | Moran | 10% |
|---|---|---|
| Moran - Standard Auto | | 87% |
| Moran - Non-Standard Auto | | 90% |
| Moran - Property | | 87% |

* Eligible Available Premium '04 = **$8,631,174**

* Total Converted by Year ending '05 = **$4,724,265**

* Total Converted after 15 months (early '06) = **$6,017,153**

* NW Cost per $1 of Acquired Direct Written Premium = **$0.4986**

### REVENUE

| YEAR=> | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|
| **MORAN** | | | | | | | |
| *Personal Line – Standard Auto* | $1,722,010 | $1,058,088 | $1,035,604 | $1,006,536 | $974,399 | $945,167 | $916,812 |
| PLUS New Business Growth | | $732,261 | $119,055 | $115,464 | $112,000 | $108,640 | $105,381 |
| Total Premium | | $379,349 | $1,154,659 | $1,119,999 | $1,086,399 | $1,053,807 | $1,022,193 |
| Commission Earned | | $119,035 | $115,464 | $112,000 | $108,640 | $105,381 | $102,219 |
| *Personal Line – Non-Standard Auto* | $246,000 | $196,800 | $199,260 | $199,260 | $199,260 | $199,260 | $199,260 |
| PLUS New Business Growth | | $36,600 | $22,140 | $22,140 | $22,140 | $22,140 | $22,140 |
| Total Premium | | $221,400 | $221,400 | $221,400 | $221,400 | $221,400 | $221,400 |
| Commission Earned | | $22,140 | $22,140 | $22,140 | $22,140 | $22,140 | $22,140 |
| *Personal Line – Property* | $348,564 | $306,736 | $297,186 | $288,270 | $279,622 | $271,233 | $263,096 |
| PLUS New Business Growth | | $34,856 | $34,159 | $33,134 | $32,140 | $31,176 | $30,241 |
| Total Premium | | $341,395 | $331,345 | $321,405 | $311,762 | $302,410 | $293,337 |
| Commission Earned | | $34,159 | $33,134 | $32,140 | $31,176 | $30,241 | $29,334 |
| **Total Personal Lines Premium** | $1,919,774 | $1,753,982 | $1,707,383 | $1,662,804 | $1,619,562 | $1,577,617 | $1,536,930 |
| **Commercial** | $2,043,041 | $2,548,979 | $4,243,629 | $4,362,115 | $4,362,115 | $4,362,115 | $4,362,115 |
| PLUS New Business (Growth) | | $464,546 | $603,165 | $484,679 | $484,679 | $484,679 | $484,679 |
| Total Premium | $2,004,543 | $3,013,525 | $4,846,794 | $4,846,794 | $4,846,794 | $4,846,794 | $4,846,794 |
| Commission Earned | | $301,382 | $484,679 | $484,679 | $484,679 | $484,679 | $484,679 |
| *Commercial* | | $613,662 | $1,104,592 | $1,141,412 | $1,255,853 | $1,381,108 | $1,519,219 |
| PLUS New Business (Growth) | | $204,554 | $163,643 | $253,647 | $279,012 | $306,913 | $337,604 |
| Total Premium | | $818,216 | $1,268,235 | $1,395,059 | $1,534,565 | $1,688,021 | $1,856,823 |
| Commission Earned | | $81,822 | $126,824 | $139,506 | $153,456 | $168,802 | $185,682 |
| Total Commission Earned through Moran | | $558,738 | $762,241 | $790,466 | $800,092 | $811,243 | $824,055 |
| **Total Commercial Premium** | $6,714,000 | $5,834,921 | $5,346,221 | $5,903,527 | $5,617,668 | $5,743,231 | $5,861,394 |
| **TOTAL NATIONWIDE ELIGIBLE PREMIUM** | $8,631,174 | $5,587,583 | $6,017,153 | $7,166,331 | $7,237,230 | $7,320,840 | $7,418,264 |
| Total Acquired Direct Written Premium | | $4,724,265 | | | | | |
| PURCHASE RATIO @ $3MM | | $0.4986 | | | | | |

Diane Tamatz Agency
Independent Agency Acquisition
Proforma - Revenue
Conservative Case 11/17/04

DRDR 000241
DTA000241

## Diane Tamariz & Associates, PA -- Moran Acquisition
### Profit & Loss Proforma

| Ordinary Income/Expense | DTA E 2004 | DTA E 2005 | Satellite E 2005 | Moran E 2005 | Combined E 2005 | Combined E 2006 | Combined E 2007 | Combined E 2008 | Combined E 2009 | Combined E 2010 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Income** | | | | | | | | | | |
| P&C Commissions | 416,000.00 | 40,000.00 | | 861,028.06 | 1,317,028.06 | 1,571,741.10 | 1,613,741.11 | 1,662,692.91 | 1,717,028.51 | 1,779,699.33 |
| Financial | | 23,000.00 | | 100,000.00 | 123,000.00 | 231,234.00 | 289,062.90 | 361,328.13 | 451,660.16 | 564,575.20 |
| Spcialty Place (non-Converted) | | | | 99,924.07 | 99,924.07 | 80,473.14 | 80,473.14 | 64,474.81 | 27,734.73 | 51,689.00 |
| Acquisition Bonus | 180,514.60 | | | | 180,514.60 | 240,686.13 | 0.00 | 0.00 | 0.00 | 0.00 |
| Contingencies | 507,366.13 | | | 151,144.90 | 653,514.03 | 747,245.14 | 769,594.23 | 792,846.89 | 818,934.64 | 848,732.28 |
| **Total Income** | 400,000.00 | 1,160,883.73 | 507,366.13 | 1,202,097.04 | 2,370,980.77 | 2,870,824.52 | 2,744,782.98 | 2,880,212.74 | 3,045,348.04 | 3,244,685.81 |
| **Expense** | | | | | | Expense Growth: 5% | | | | |
| Advertising and promotion | 15,933.07 | 13,000.00 | 40,000.00 | 20,000.00 | 35,000.00 | 35,000.00 | 35,000.00 | 35,000.00 | 35,000.00 | 35,000.00 |
| Automobile Expense | 4,725.91 | 5,000.00 | 2,000.00 | 0.00 | 5,000.00 | 5,250.00 | 5,512.50 | 5,788.13 | 6,077.53 | 6,381.41 |
| Bank Service Charges | 877.08 | 1,000.00 | 100.00 | 0.00 | 1,100.00 | 1,155.00 | 1,212.75 | 1,273.39 | 1,337.06 | 1,403.91 |
| Contingent Bonus | | | 20,000.00 | 0.00 | 20,000.00 | 76,000.00 | 76,000.00 | 76,000.00 | 76,000.00 | 76,000.00 |
| Contributions | 1,662.86 | 2,000.00 | 0.00 | 5,000.00 | 7,000.00 | 7,350.00 | 7,717.50 | 8,103.38 | 8,508.54 | 8,933.97 |
| Dues and Subscriptions | 1,570.47 | 1,600.00 | 500.00 | 13,700.00 | 15,800.00 | 16,590.00 | 17,419.50 | 18,290.48 | 19,205.00 | 20,165.25 |
| E&O Expense | 1,379.66 | 5,000.00 | 500.00 | 6,000.00 | 11,500.00 | 12,075.00 | 12,678.75 | 13,312.69 | 13,978.32 | 14,677.24 |
| Total Education/Training | 3,642.17 | 3,600.00 | 500.00 | 6,700.00 | 10,800.00 | 11,340.00 | 11,907.00 | 12,502.35 | 13,127.47 | 13,783.84 |
| **Employee Benefits** | | | | | | | | | | |
| Total CEO Perks | 1,493.33 | 5,000.00 | 0.00 | 0.00 | 5,000.00 | 5,250.00 | 5,512.50 | 5,788.13 | 6,077.53 | 6,381.41 |
| Group Dental | 358.56 | 1,079.23 | 180.00 | 0.00 | 1,259.23 | 1,322.24 | 1,388.16 | 1,457.77 | 1,530.66 | 1,607.20 |
| Group Health | 14,064.53 | 9,595.00 | 1,428.00 | 14,280.00 | 25,304.00 | 26,989.20 | 28,338.66 | 29,755.59 | 31,243.37 | 32,805.54 |
| Corporate Car | 8,847.00 | 20,000.00 | 0.00 | 0.00 | 20,000.00 | 21,000.00 | 22,050.00 | 23,152.50 | 24,310.13 | 25,525.63 |
| Cell Phone | 6,273.59 | 6,500.00 | 0.00 | 1,900.00 | 8,400.00 | 8,820.00 | 9,261.00 | 9,724.05 | 10,210.25 | 10,720.77 |
| 401k Employee | 4,860.00 | 11,040.00 | 1,290.00 | 14,900.00 | 29,561.47 | 31,039.54 | 32,591.52 | 34,221.10 | 35,932.15 | 33,381.76 |
| Total Employee Benefits | 31,023.10 | 55,410.12 | 2,898.00 | 33,411.47 | 91,719.59 | 94,420.69 | 99,142.04 | 104,099.14 | 106,184.10 | 110,423.30 |
| Computer/Equipment Rental | 2,897.14 | 3,000.00 | 0.00 | 0.00 | 3,000.00 | 3,150.00 | 3,307.50 | 3,472.88 | 3,646.52 | 3,828.84 |
| Insurance - General Office | 2,728.17 | 2,800.00 | 0.00 | 3,538.00 | 6,338.00 | 6,654.90 | 6,987.65 | 7,337.03 | 7,703.88 | 8,089.07 |
| Insurance - Key Man Life | | 0.00 | 0.00 | 13,185.00 | 13,185.00 | 13,185.00 | 13,185.00 | 13,185.00 | 13,185.00 | 17,102.17 |
| Interest Expense | 13,352.52 | 13,400.00 | 0.00 | 0.00 | 13,400.00 | 14,070.00 | 14,773.50 | 15,512.18 | 16,217.78 | 57,151.86 |
| Interest on NFCU Loan | | 86,250.00 | | | 86,250.00 | 81,082.26 | 75,576.23 | 69,774.75 | 63,699.69 | 0.00 |
| Interest on Moran Payable | | | | | 0.00 | 60,000.00 | 40,000.00 | 20,000.00 | 0.00 | 24,878.70 |
| Total Leased Office Equipment | 2,212.56 | 2,300.00 | | 16,723.00 | 19,023.00 | 19,974.15 | 20,972.86 | 22,021.50 | 23,122.58 | 8,678.71 |
| License and Permits | 3,021.14 | 3,000.00 | 500.00 | 3,000.00 | 6,500.00 | 7,140.00 | 7,497.00 | 7,871.85 | 8,265.44 | 3,190.70 |
| Miscellaneous | 933.91 | 1,000.00 | | 1,500.00 | 2,500.00 | 2,625.00 | 2,756.25 | 2,894.06 | 3,038.77 | 19,782.35 |
| Office Expense/Applied, Phone, Copier | 813.60 | 1,000.00 | 1,000.00 | 14,500.00 | 15,500.00 | 16,275.00 | 17,088.75 | 17,943.19 | 18,840.35 | 19,144.22 |
| Office Supplies | 8,000.00 | 7,500.00 | | 6,500.00 | 15,000.00 | 15,750.00 | 16,537.50 | 17,364.38 | 18,232.59 | 1,112,723.34 |
| Payroll Expense | 201,199.30 | 268,000.00 | 43,000.00 | 574,383.16 | 985,383.16 | 1,034,651.48 | 1,086,384.05 | 1,140,703.25 | 1,059,738.42 | 94,445.04 |
| Payroll Taxes | | 28,596.35 | 3,597.00 | 41,571.13 | 74,000.48 | 77,200.50 | 81,585.51 | 85,664.80 | 89,948.04 | 26,586.42 |
| Total Postage and Delivery | 7,493.25 | 7,600.00 | 2,150.00 | 9,500.00 | 19,250.00 | 20,212.50 | 21,223.13 | 22,284.28 | 23,398.50 | 13,664.77 |
| Printing and Reproduction | 4,919.21 | 5,000.00 | 1,500.00 | 4,050.00 | 10,550.00 | 11,077.50 | 11,631.38 | 12,212.94 | 12,823.59 | 6,381.41 |
| Professional Development | 2,332.70 | 2,500.00 | 0.00 | 2,500.00 | 5,000.00 | 5,250.00 | 5,512.50 | 5,788.13 | 6,077.53 | 15,193.52 |
| Total Professional Fees | 11,656.71 | 8,500.00 | 0.00 | 4,000.00 | 12,500.00 | 13,125.00 | 13,781.25 | 14,470.31 | 15,193.83 | 3,828.84 |
| Total Recruiting | 11,160.86 | 3,000.00 | 0.00 | 0.00 | 3,000.00 | 3,150.00 | 3,307.50 | 3,472.88 | 3,646.52 | 149,200.00 |
| Repairs/Newsletter | 30,000.00 | 30,000.00 | 24,000.00 | 95,200.00 | 149,200.00 | 149,200.00 | 149,200.00 | 149,200.00 | 149,200.00 | 15,187.75 |
| Rent | 8,327.52 | 8,400.00 | 500.00 | 3,000.00 | 11,900.00 | 12,495.00 | 13,119.75 | 13,775.74 | 14,464.52 | 1,531.54 |
| Total Repairs | 593.35 | 1,200.00 | 0.00 | 1,000.00 | 1,200.00 | 1,260.00 | 1,323.00 | 1,389.15 | 1,458.61 | 28,078.19 |
| Staff Appreciation | 11,120.06 | 11,000.00 | 3,000.00 | 8,000.00 | 22,000.00 | 23,100.00 | 24,255.00 | 25,467.75 | 26,741.14 | 63.81 |
| Security | 56.23 | 50.00 | | 50.00 | 50.00 | 52.50 | 55.13 | 57.88 | 60.78 | 36,174.76 |
| Equipment | 16,799.90 | 8,600.00 | 2,000.00 | 8,083.00 | 28,783.00 | 30,224.25 | 31,735.46 | 33,322.24 | 34,988.35 | 6,983.39 |
| Validation Services | | | | 5,700.00 | 5,700.00 | 5,985.00 | 6,284.25 | 6,598.46 | 6,928.39 | 8,268.25 |
| Total Travel & Ent | 5,743.05 | 6,900.00 | 1,500.00 | | 7,500.00 | 7,875.00 | 8,268.75 | 8,268.75 | 8,268.75 | 1,978,909.04 |
| Telephone | 480,966.26 | 695,076.47 | 109,155.00 | 900,091.96 | 1,704,233.43 | 1,894,416.01 | 1,842,538.94 | 1,894,422.91 | 1,907,397.56 | 1,138,000.48 |
| Utilities | 480,966.26 | -44,153.00 | | | | | 100,893.28 | 106,606.76 | 112,701.82 | 119,319.69 |
| Less Repayment | | 458,807.36 | 302,095.08 | | 666,747.34 | 976,398.49 | 801,844.04 | 986,789.83 | 1,138,005.48 | 1,265,773.87 |
| **Net Income** | -480,966.26 | | | | 90,221.51 | 55,499.25 | 500,000.00 | 500,000.00 | 500,000.00 | 0.00 |
| **Profit Income** | | | | | 576,525.83 | 380,389.24 | 300,948.76 | 379,293.08 | 1,015,231.66 | 1,166,439.33 |

* Nationwide guarantee planned not to be activated ... payment to Moran (found in Loan Repayment '06, '07, & '08) made through contingencies
* Original $1.5MM Nationwide loan complete in 2017

Prepared 11/16/2004

DRDR_000242
P/T Docketcl 1.09.09
DTA000242

Diane Tamariz Agency
Independent Agency Acquisition
Proforma - Revenue
Conservative Case 11/16/04

| Assumptions: | |
| --- | --- |
| Year 2004 Commission Rates and Conversion Rates | |
| DTA Commission Rate: | 10% |
| Moran (non-IWIF) Commission Rate: | 10% |
| Moran IWIF Commission Rate: | 10% |
| Percentage of Moran IWIF to Convert: | 100% |
| Percentage of Moran Standard Auto to Convert: | 80% |
| Percentage of Moran Non-Standard Auto to Convert: | 80% |
| Percentage of Moran Property to Convert: | 88% |
| Percentage of Moran NW Eligible Commercial to Convert: | 91% |
| Percentage of Moran Other Brokered Commercial TBA to Convert: | 90% |
| New Business Annual Growth Rates | |
| DTA | 15% |
| Moran | 10% |
| New Business Annual Retention Rates | |
| DTA | 89% |
| Moran - IWIF | 90% |
| Moran - Standard Auto | 87% |
| Moran - Non-Standard Auto | 90% |
| Moran - Property | 87% |
| Moran - NW Eligible Commercial | 90% |
| Moran - Other Brokered Commercial TBA | 90% |
| Specialty-placed Business | |
| Conversion Rate | 50% |
| Contingency and Agency Acquisition Bonus Rates | |
| Contingency Percentage | 5% |
| Agency Acquisition Percentage, Y1 | 3% |
| Agency Acquisition Percentage, Y2 | 4% |

| | |
| --- | --- |
| * Eligible Available Premium '04 = | $8,631,174 |
| * Total Converted by Year ending '05 = | $4,724,265 |
| * Total Converted after 15 months (early '06) = | $6,017,153 |
| * NW Cost per $1 of Acquired Direct Written Premium = | $0.4986 |

| REVENUE | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| YEAR=> | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
| COMMISSIONS | | | | | | | |
| **DTA** | | | | | | | |
| Total Premium (after attrition) | $4,000,000 | $3,560,000 | $3,702,400 | $3,903,896 | $4,124,132 | $4,365,993 | $4,632,908 |
| PLUS New Business (Growth) | $0 | $600,000 | $684,000 | $729,960 | $781,478 | $839,522 | $905,243 |
| Crofton Satellite Personal Lines | | $400,000 | $480,000 | $576,000 | $691,200 | $829,440 | $995,328 |
| Total DTA Premium | $4,000,000 | $4,560,000 | $4,866,400 | $5,209,856 | $5,596,810 | $6,034,955 | $6,533,479 |
| Total Commission Earned through DTA | $400,000 | $456,000 | $486,640 | $520,986 | $559,681 | $603,495 | $653,348 |
| **MORAN** | | | | | | | |
| Personal Line - Standard Auto | $1,322,610 | $1,058,088 | $1,035,604 | $1,004,536 | $974,399 | $945,167 | $916,812 |
| PLUS New Business Growth | $0 | $132,261 | $119,035 | $115,464 | $112,000 | $108,640 | $105,381 |
| Total Premium | $1,322,610 | $1,190,349 | $1,154,639 | $1,119,999 | $1,086,399 | $1,053,807 | $1,022,193 |
| Commission Earned | $132,261 | $119,035 | $115,464 | $112,000 | $108,640 | $105,381 | $102,219 |
| Personal Line - Non-Standard Auto | $246,000 | $196,800 | $199,260 | $199,260 | $199,260 | $199,260 | $199,260 |
| PLUS New Business Growth | $0 | $24,600 | $22,140 | $22,140 | $22,140 | $22,140 | $22,140 |
| Total Premium | $246,000 | $221,400 | $221,400 | $221,400 | $221,400 | $221,400 | $221,400 |
| Commission Earned | $24,600 | $22,140 | $22,140 | $22,140 | $22,140 | $22,140 | $22,140 |
| Personal Line - Property | $348,564 | $306,736 | $297,186 | $288,270 | $279,622 | $271,233 | $263,096 |
| PLUS New Business Growth | $0 | $34,856 | $34,159 | $33,134 | $32,140 | $31,176 | $30,241 |
| Total Premium | $348,564 | $341,593 | $331,345 | $321,405 | $311,762 | $302,410 | $293,337 |
| Commission Earned | $34,856 | $34,159 | $33,134 | $32,140 | $31,176 | $30,241 | $29,334 |
| Total Personal Lines Premium | $1,917,174 | $1,753,342 | $1,707,383 | $1,662,804 | $1,619,562 | $1,577,617 | $1,536,930 |
| **Commercial - NW Eligible** | $4,668,459 | $2,548,979 | $4,243,629 | $4,362,115 | $4,362,115 | $4,362,115 | $4,362,115 |
| PLUS New Business (Growth) | $0 | $466,846 | $603,165 | $484,679 | $484,679 | $484,679 | $484,679 |
| Total Premium | $4,668,459 | $3,015,825 | $4,846,794 | $4,846,794 | $4,846,794 | $4,846,794 | $4,846,794 |
| Commission Earned | $466,846 | $301,582 | $484,679 | $484,679 | $484,679 | $484,679 | $484,679 |
| **Commercial - Other Brokered TBA** | $2,045,541 | $813,662 | $1,106,592 | $1,141,412 | $1,255,553 | $1,381,108 | $1,519,219 |
| PLUS New Business (Growth) | $0 | $204,554 | $163,643 | $253,647 | $279,012 | $306,913 | $337,604 |
| Total Premium | $2,045,541 | $818,216 | $1,268,725 | $1,395,059 | $1,534,565 | $1,688,021 | $1,856,823 |
| Commission Earned | $204,564 | $81,822 | $126,824 | $139,506 | $153,456 | $168,802 | $185,682 |
| Total Commission Earned through Moran | | $558,738 | $782,241 | $790,466 | $800,092 | $811,243 | $824,055 |
| Total Commercial Premium | $6,714,000 | | | | | | |
| GRAND TOTAL NATIONWIDE PREMIUM | | $10,147,383 | $11,922,005 | $12,376,187 | $12,834,040 | $13,355,795 | $13,951,744 |
| Total Acquired Direct Written Premium | | $4,724,265 | $6,017,153 | | | | |
| PURCHASE RATIO @ $33MM | | | $0.4986 | | | | |
| IWIF Premium (after attrition) | $3,022,898 | $2,720,608 | $2,720,608 | $2,720,608 | $2,720,608 | $2,720,608 | $2,720,608 |
| PLUS New Business (Growth) | | $302,290 | $302,290 | $302,290 | $302,290 | $302,290 | $302,290 |
| Total Premium | $3,022,898 | $3,022,898 | $3,022,898 | $3,022,898 | $3,022,898 | $3,022,898 | $3,022,898 |
| Commission Earned | | $302,290 | $302,290 | $302,290 | $302,290 | $302,290 | $302,290 |
| Brokered non-Converted Amounts | | | | | | | |
| Personal Standard Auto | | $132,261 | $115,067 | $100,108 | $87,094 | $75,772 | $65,922 |
| | | $24,600 | $22,140 | $19,926 | $17,933 | $16,140 | $14,526 |

DRDR2000243
PK / 13012-1-Walker DocRec 219.09
DTA000243

Diane Tamariz Agency
Independent Agency Acquisition
Proforma - Revenue
Conservative  Case 11/16/04

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Personal Property | | $20,914 | $18,195 | $15,830 | $13,772 | $11,981 | $10,424 |
| Brokered, non-Converted Commission Earned - Personal | | $17,777 | $15,548 | $13,586 | $11,880 | $10,389 | $9,087 |
| From Commercial NW Eligible not retained | | $210,081 | $189,073 | $170,165 | $153,149 | $137,834 | $124,051 |
| From Commercial - Other Brokered TBA - not retained | | $511,385 | $460,247 | $414,222 | $372,800 | $335,520 | $301,968 |
| Brokered, non-Converted Commission Earned - Commercial | | $72,147 | $64,932 | $58,439 | $52,595 | $47,335 | $42,602 |
| Total brokered, non-Converted Commission Earned on Moran Book | | $89,924 | $80,472 | $72,025 | $64,475 | $57,725 | $51,689 |
| **CONTINGENCIES** | | | | | | | |
| Total Premium (non-IWIF): DTA&Moran | | $10,147,383 | $11,922,005 | $12,376,187 | $12,834,040 | $13,355,795 | $13,951,744 |
| Contingency Earned | | $507,369 | $596,100 | $618,809 | $641,702 | $667,790 | $697,587 |
| Total IWIF Premium: Moran | | $3,022,898 | $3,022,898 | $3,022,898 | $3,022,898 | $3,022,898 | $3,022,898 |
| Contingency Earned | | $151,145 | $151,145 | $151,145 | $151,145 | $151,145 | $151,145 |
| **Nationwide ACQUISITION BONUS** | | | | | | | |
| Agency Acquisition Bonus - One time Payments Y1, Y2 | | $180,515 | $240,686 | | | | |
| **FINANCIAL** | | | | | | | |
| Crofton Satellite Financial | | $25,000 | $31,250 | $39,063 | $48,828 | $61,035 | $76,294 |
| Cross-sell to Moran Book | | $100,000 | $200,000 | $250,000 | $312,500 | $390,625 | $488,281 |
| **Total Revenue DTA-Moran** | | $2,370,981 | $2,870,825 | $2,744,783 | $2,880,713 | $3,045,348 | $3,244,689 |

DRDR  000244
HPK /Tamarix-Wallace/DocRecd11.09.09

**DTA000244**

# NFCU Loan Amortization Schedule

| Enter Values | |
|---|---|
| Loan Amount | $ 1,500,000.00 |
| Annual Interest Rate | 6.75 % |
| Loan Period in Years | 12 |
| Number of Payments Per Year | 1 |
| Start Date of Loan | 12/1/2004 |
| Optional Extra Payments | $ - |

Lender Name:

| Loan Summary | |
|---|---|
| Scheduled Payment | $ 176,471.51 |
| Scheduled Number of Payments | 12 |
| Actual Number of Payments | 12 |
| Total Early Payments | $ - |
| Total Interest | $ 617,658.11 |

$ 617,658.11

| Pmt No. | Payment Date | Beginning Balance | Scheduled Payment | Extra Payment | Total Payment | Principal | Interest | Ending Balance | Cumulative Interest |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 12/1/2005 | $ 1,500,000.00 | $ 176,471.51 | $ - | $ 176,471.51 | $ 90,221.51 | $ 86,250.00 | $ 1,409,778.49 | $ 86,250.00 |
| 2 | 12/1/2006 | 1,409,778.49 | 176,471.51 | - | 176,471.51 | 95,409.25 | 81,062.26 | 1,314,369.25 | 167,312.26 |
| 3 | 12/1/2007 | 1,314,369.25 | 176,471.51 | - | 176,471.51 | 100,895.28 | 75,576.23 | 1,213,473.97 | 242,888.49 |
| 4 | 12/1/2008 | 1,213,473.97 | 176,471.51 | - | 176,471.51 | 106,696.76 | 69,774.75 | 1,106,777.21 | 312,663.25 |
| 5 | 12/1/2009 | 1,106,777.21 | 176,471.51 | - | 176,471.51 | 112,831.82 | 63,639.69 | 993,945.39 | 376,302.94 |
| 6 | 12/1/2010 | 993,945.39 | 176,471.51 | - | 176,471.51 | 119,319.65 | 57,151.86 | 874,625.74 | 433,454.80 |
| 7 | 12/1/2011 | 874,625.74 | 176,471.51 | - | 176,471.51 | 126,180.53 | 50,290.98 | 748,445.21 | 483,745.78 |
| 8 | 12/1/2012 | 748,445.21 | 176,471.51 | - | 176,471.51 | 133,435.91 | 43,035.60 | 615,009.31 | 526,781.38 |
| 9 | 12/1/2013 | 615,009.31 | 176,471.51 | - | 176,471.51 | 141,108.47 | 35,363.04 | 473,900.83 | 562,144.41 |
| 10 | 12/1/2014 | 473,900.83 | 176,471.51 | - | 176,471.51 | 149,222.21 | 27,249.30 | 324,678.62 | 589,393.71 |
| 11 | 12/1/2015 | 324,678.62 | 176,471.51 | - | 176,471.51 | 157,802.49 | 18,669.02 | 166,876.13 | 608,062.73 |
| 12 | 12/1/2016 | 166,876.13 | 176,471.51 | - | 166,876.13 | 157,280.75 | 9,595.38 | 0.00 | 617,658.11 |

DRDR  000245
HPK /Tamarix-Wallace/DocRecd11.09.09
DTA000245

| Pmt No. | Payment Date | Beginning Balance | Scheduled Payment | Extra Payment | Total Payment | Principal | Interest | Ending Balance | Cumulative Interest |
|---------|--------------|-------------------|-------------------|---------------|---------------|-----------|----------|----------------|---------------------|

DRDR 000246
HPK./Tamarix-Wallace/DocRecd11.09.09

DTA000246

| Pmt No. | Payment Date | Beginning Balance. | Scheduled Payment | Extra Payment | Total Payment | Principal | Interest | Ending Balance | Cumulative Interest |
|---------|--------------|--------------------|-------------------|---------------|---------------|-----------|----------|----------------|---------------------|

DRDR  000247
HPK /Tamarix-Wallace/DocRecd11.09.09

DTA000247

| | | | MORAN | Best Practices 2003 (Av agency) |
|---|---|---|---|---|
| **Projected Premium Billings** | | $12,000,000 | | |
| **Revenue** | | | | |
| Commercial P&C | 1101600 | | 85.00% | 44.5 |
| Personal P&C | 194400 | | 15.00% | 37.6 |
| Gross Commissions | 1296000 | | | |
| **Commission & Fees** | | | | |
| Acct # | Description | | | |
| 400 | a/b comm | $466,560 | 31.52% | |
| 401 | d/b comm | $829,440 | 56.04% | |
| 402 | group /individual L&H | $12,000 | 0.81% | 4 |
| 403 | contingent | $170,000 | 11.48% | 8.2 |
| 404 | P&C Service fees | $0 | 0.00% | 0.6 |
| 405 | Investments | $2,200 | 0.15% | 1 |
| 406 | misc | $0 | 0.00% | 0.6 |
| **Total Revenues** | | $1,480,200 | 100.00% | 96.5 |
| 501d | Brokerage commission expense | $53,000 | -3.58% | 1.4 |
| **Net Revenues** | | $1,427,200 | 96.42% | 98.6 |
| **Expenses** | | | | |
| **Employment expense** | | | | |
| 500a | Owner's Compensation | $142,296 | 9.97% | |
| 500b | Management Fees | $21,150 | | |
| **Executive Payroll** | | $163,446.00 | 11.45% | |
| 501b | Producer commissions | $199,702 | 13.99% | |
| 501p | sales incentive pers'l lines | $0 | | |
| **Production Payroll** | | $199,702.00 | 13.99% | |
| 502a | Service payroll | $166,502 | 11.87% | |
| 502b | Support payroll | $74,207 | 5.20% | |
| 502c | casual | $0 | 0.00% | |
| payroll expense | | $240,709.36 | 16.87% | |
| group benefits | | $29,209 | 2.05% | |
| payroll tax | | $42,204 | 2.96% | |
| Simplified IRA | | $24,551 | 17.25% | |
| Section 125 plan expense | | $805 | 0.06% | |
| Payroll Processing | | $1,801 | 0.13% | |
| benefit expense | | $98,569.91 | 22.44% | 8.9 |
| Total ...ensation Expense | | $702,427.27 | 49.22% | 61 |
| advertising & prom | | $14,000.00 | 0.98% | 1.6 |

| Code | Description | Amount | Amount | % | FTE |
|---|---|---|---|---|---|
| 601dm | auto | $3,000 | | | |
| 601gm | | $5,700 | | | |
| 601rd | | $5,700 | | | |
| 601sb | | $3,000 | | | |
| total auto expense | | | $17,400.00 | 1.22% | 1.6 |
| 602 | contributions | | $5,000.00 | 0.35% | |
| 603a | dues | $5,400 | | | |
| 603b | subscriptions | $3,800 | | | |
| 603c | und.expense | $4,500 | | | |
| | NAIS AcuComp | $7,800 | | | |
| 603d | legal | $0 | | | |
| total dues, subs, underwriting | | | $21,500.00 | 1.51% | 1 |
| 604dm | training | $900 | | | |
| 604gm | | $900 | | | |
| 604rd | | $900 | | | |
| 604 sb | | $2,000 | | | |
| 604staff | | $2,000 | | | |
| total training | | | $6,700.00 | 0.47% | 0.5 |
| 605 | postage/delivery | | $9,500.00 | 0.67% | 0.9 |
| 606 | telephone | | $7,700.00 | 0.54% | 1.6 |
| 607dm | cell phones | $300 | | | |
| 607jd | | $300 | | | |
| 607gm | | $500 | | | |
| 607sb | | $300 | | | |
| 607rd | | $500 | | | |
| total cell phones | | | $1,900.00 | 0.13% | |
| 608dm | meetings | $225 | | | |
| 608gm | | $310 | | | |
| 608rd | | $0 | | | |
| 608rd | | $100 | | | |
| | | | $635.00 | 0.04% | |
| | travel | $2,400 | | | |
| | | $0 | | | |
| | | $700 | | | |
| | | $0 | | | |
| | | $0 | | | |
| | | | $3,100.00 | 0.22% | |
| | Promotion/entertainment | $150 | | | |

DRDR_000249
HPK Tamarix-Wallace DocRecd11.09.09
DTA000249

| Code | Description | Detail | Amount | % | T&E |
|---|---|---|---|---|---|
| 610gm | | | $4,000 | | |
| 610rd | | | $200 | | |
| 610ab | | | $300 | | |
| | total promotion/entertainment | | $4,350.00 | 0.30% | T&E 13 |
| 613 | | | $5,700.00 | 0.40% | |
| | Business Development Expense | | $97,485.00 | 6.83% | |
| 700 | rent | $95,200 | $95,200.00 | 0.00% | |
| | utilities | $0 | | | |
| | property tax | $0 | | | |
| | repairs & maint | $0 | | | 4.4 |
| 710 | | | | | |
| | Total Occupancy Expense | | $95,200.00 | 6.67% | |
| 701 | office supplies | | $6,500.00 | 0.46% | supplies & printing 1.8 |
| 702 | printing | | $4,050.00 | 0.28% | 0.3 |
| 703 | licenses and taxes | | $3,800.00 | 0.27% | 1.9 |
| 704 | insurance | | $15,000.00 | 1.05% | |
| | accounting | | $3,200.00 | 0.22% | |
| | legal | | $2,000.00 | 0.14% | professional fees .8% |
| 705 | data processing | | $5,200.00 | 0.36% | 2.2 |
| 706 Equip Maint | Applied, Phone, Copier | | $14,500.00 | 1.02% | 0.6 |
| Depreciation | furniture/fixtures | $2,551 | | | |
| | computers | $3,363 | | | |
| | leasehold | $2,122 | | | |
| | Total Depreciation | | $8,036.00 | 0.56% | 1.4 |
| 707 | bad debt | | $6,000.00 | 0.42% | 0.2 |
| 708 | life ins | | $3,800.00 | 0.27% | 0.2 |
| 712 | Officers LTC | | $8,850.00 | | |
| 709 | interest | | | | 1.7 |
| | Auto Moran | $0 | | | |
| | auto DeVoe | $0 | | | |
| | computers | $0 | | | |
| | misc. | | $0.00 | 0.00% | 1.7 |
| | | | $6,000.00 | 0.42% | 1.3 |
| | TOTAL OPERATING EXPENSES | | $182,136.00 | 12.76% | 16.4 |
| | TOTAL EXPENSES | | $982,048.27 | 68.81% | |
| | | | $445,151.73 | 31.19% | 12.7 |

HPK/Teamarx-Wallace/DocRecd11.09.09

DRDR 000250

DTA000250

| Employee | Position | Base Salary | Disability Insurance | Best Practices 2003 | | |
|---|---|---|---|---|---|---|
| | | | | | | $236,680 |
| Executive Payroll | Owner/Pres | 138000 | | $138,000 | | |
| Russ | VP/account exec | 106456 | | 106456 | | |
| Donna | account exec | 93246 | | 93246 | | |
| | | | | 14.19% | | |
| Production Payroll | | | | $199,702 | | |
| Carolyn Hearn | PL/CSR | 35520 | | $35,520 | | |
| Pat Elliott | CU/CSR | 35178 | | $35,178 | | |
| Ted Kenney | | 31400 | | $31,400 | | |
| Kerri Morin | CL/CSR | 25834 | | $25,834 | | |
| Joyce Thompson | CL/CSR | 35933 | | $35,933 | | |
| Service Payroll | | | | $163,865 | | |
| Joan | Accounting Mgr. | 49959 | | $49,959 | | |
| Wendy | Adm Asst | 22856 | | $22,856 | | |
| Support Payroll | | | | $72,815 | | |
| | | casual labor | | $0 | $0 | |
| Total | | | | $574,382 | | |
| 401k (3% matching with all employees) | | | | $17,231 | | |
| Number of employees | | | | 10.0 | | |
| Comp per employee | | | | $10.50 | 65828 | |
| Revenue Per Employee | | | | $139,067 | 108742 | |
| Spread per employee | | | | $139,056 | 42913 | |

Payroll tax
FICA 6.2%
87,900
87,900
87,900
163,865
72,815
500,380
31,024
560

DTA Payroll tax
FICA 6.2%:
Diane                87,900
Support              268,000
Total FICA Payroll   355,900
FICA Tax             22,066
Fed Unemployment     448
State Unemployment   1,292
Medicare 1.45%       5,161
Total Tax            28,966

DRDR 000251

DTA000251
EPK /Tamarix-Wallace/DocRecd11.09.09

State Unemployment Tax
Medicare 1.45%
503B

1,615
8,329
41,527

Satellite Payroll Tax
FICA 6.2%:
Diane
Support                  0
                    43,000
Total FICA Payroll  43,000
FICA Tax             2,666
Fed Unemploymer         56
State Unemploymen      162
Medicare 1.45%         624
Total Tax            3,507

DRDR  000252
HPK /Tamarix-Wallace/DocRecd11.09.09

DTA000252

4.5

DRDR  000253
HPK /Tamarix-Wallace/DocRecd11.09.09

DTA000253

| Employee | Position | Base Salary | Disability Insurance | Best Practices 2003 |
|---|---|---|---|---|
| **Executive Payroll** | Owner/Pres | 138000 | | $138,000 |
| Russ | VP/account exec | 106456 | | 106456 |
| Donna | account exec | 93246 | | 93246 |
| | | | | |
| **Production Payroll** | | | | $199,702  14.19% |
| Carolyn Hearn | PL/CSR | 35520 | | $35,520 |
| Pat Elliott | CL/CSR | 35178 | | $35,178 |
| Ted Kearney | CL/CSR | 31400 | | $31,400 |
| Kerri Morin | CL/CSR | 25834 | | $25,834 |
| Joyce Thompson | CL/CSR | 35933 | | $35,933 |
| **Service Payroll** | | | | $163,865 |
| | | | | |
| Joan | Accounting Mgr. | 49959 | | $49,959 |
| Wendy | Adm Asst | 22856 | | $22,856 |
| **Support Payroll** | | | | $72,815 |
| | | casual labor | | $0 |
| **Total** | | | | $574,382 |
| 401k (3% matching with all employees) | | | | $17,231 |
| Number of employees | | | | 10.0 |
| Comp per employee | | | | $10.50  65828 |
| Revenue Per Employee | | | | $139,067  108742 |
| Spread per employee | | | | $139,056  42913 |

Payroll tax
FICA 6.2%:

| | |
|---|---|
| DTA Payroll tax | |
| FICA 6.2%: | |
| Diane | 87,900 |
| Support | 288,000 |
| Total FICA Payroll | 355,900 |
| FICA Tax | 22,066 |
| Fed Unemployment | 448 |
| State Unemployment | 1,292 |
| Medicare 1.45% | 5,161 |
| Total Tax | 28,966 |

87,900
87,900
87,900
163,865
72,815
500,380
31,024
560

PK /Tamarx-Wallace/DocRecd11.09.09
DRDR 000254
DTA000254

| Satellite Payroll Tax | |
| --- | --- |
| FICA 6.2%: | |
| Diane | 0 |
| Support | 43,000 |
| Total FICA Payroll | 43,000 |
| FICA Tax | 2,666 |
| Fed Unemploymer | 56 |
| State Unemploym | 162 |
| Medicare 1.45% | 624 |
| Total Tax | 3,507 |

| State Unemployment Tax | |
| --- | --- |
| Medicare 1.45% | |
| 503B | 1,615 |
| | 8,329 |
| | 41,527 |

DRDR  000255
HPK /Tamarix-Wallace/DocRecd 11.09.09

DTA000255

Page 1 of 1

## Dave Wallace



**EXHIBIT**
_13_
_3-4-10_   _AL_

**From:**    Dave Wallace [dwallace@specdir.com]
**Sent:**    Tuesday, December 07, 2004 12:33 PM
**To:**    Craig Siebert
**Subject:** Update and questions

Update on acquisition:

Craig, Nationwide State is still working the numbers and tonight at 8:30—-then hopefully it will be submitted. In addition, we are preparing a revenue/expense statement for our needs. We anticipate the initial comments for HO either Friday or Monday. Then the final approval could happen by December 15th. George is standing by. He thinks it will take him two weeks or so to review with his lawyers. Our hope is to close before the end of the year.

George is OK with closing the first week of January. Is there any advantage or disadvantage to us or him, other than it gives him a year to pay taxes on a January close?

Diane and I have a meeting with Rick Morgan Monday at 11AM. We are asking him to review the submission for three reasons: (1) a credit line of $100 to $150K; (2) collateralize the Non-Nationwide business—IWIF--$3MM and Brokered $1MM. This throws off $400K to $500K annually; (3) he would like to review the whole submission.

Our concern is that Nationwide may only want to finance business coming to them. We are pushing that they need to finance the whole works in order to get the gem.

By the way, on Diane's exit plan with NW...she gets one times annual earnings. This number will eventually be $1.5 to $2MM and we'll keep IWIF and brokered or sell it off separately. NW will only own the business coming to them.

Personal income tax question:

1.  As of 12.7—-Owner's distribution $69K and payroll $31K. The $31K has had payroll taxes out of it. I am expecting another $10K this year either distribution or payroll.
2.  Diane will probably show $5 or $10K from DTA in 04.
3.  I am guessing that DTA will show a loss this year.
4.  SDM, I don't know whether it will breakeven or show a loss.
5.  Diane cracked her IRA in 04 for legal expenses that we estimate to be $50 to $65K with no taxes out of it.

Since DTA only has two months in 04 as a sole proprietor and, I assume, a full year closing Feb. 28th (or when she incorporated). Should we move some funds between companies....the minimize taxes?

What are your thoughts?

Dave

DRDR 000260
HPK /Tamarix-Wallace/DocRecd11.09.09

**DTA000260**

EXHIBIT

19

3-4-10

Talking Points –Meeting with Dave Wallace

Meeting December 29, 2004

I know nothing of the financial success of Diane Tamariz & Associates, other than the fact they will owe Nationwide $2,000,000.  Therefore, I will need to have the following security incorporated into the $1,000,000 promissory note and non-compete agreement:

    a.  Personal and corporate indemnification
    b.  Acceleration of payment triggered by; failure to pay an installment on time; insolvency or bankruptcy, material judgment against DTA; dissolution or liquidation of DTA, material breach of lease by tenant; material adverse change in financial condition of DTA
    c.  Non-compete Agreement signed by Moran is null and void in event of default of promissory note
    d.  Confession of Judgment – a provision to allow Moran to have a judgment entered against the debtor by merely filing a complaint and a copy of the note with the court
    e.  Cross default with lease which would constitute a default in the note which would trigger the non-compete clause to become null and void.

All in red presents problems—first the non-compete is not negotiable; second tieing the lease to the note will not work.  The two must stand separate.  Not only does this not work for DTA, it does not work for Nationwide.  The non-compete is in Diane's contract and is in cement.

These conditions are in lieu of a Stock Pledge Agreement and an Asset Security Agreement.  George said this was not necessary.

Contingency Bonus Agreement – since interest of 4% on promissory notes should amount to approximately $80,000 the bonus agreement would be up to $84,000 per year with a 5 year aggregate of $420,000

DTA understands that George T. Moran, Inc. intends to pay as a bonus to Moran all of its undistributed earnings through the close of business on the date of the closing.

DTA agrees to pay George T. Moran as additional compensation 100% of the Incentive Compensation (2004 profit sharing and contingency agreement pay outs) earned through 12/31/2004, as they are received.

The maroon is acceptable to us.  However, we did provide the $2MM upfront instead of the $1.5MM and gave in on the $250K contingency for his accepting the $1MM note.

Actions:
1. sent info to Bill Jones for comment....is there a way to work around this and give George the security he needs.
2. the contingency of $250K is first payment and here is a letter of credit for $750K payable over three years at $250K a year.

Moran.response.meeting.with.George.12.29.04

CRMG     000462
HPK/NATIONWIDE/Tamariz/Docs Received fromWallace



EXHIBIT

20

3-4-10

12.30.04--Talking points with George:

1. George, good day yesterday.....my eyes were rolling across the table.

2. I want to go over the talking points--we are OK with:

   a. contingency bonus agreement.
   b. pulling of undistributed earnings prior to settlement so that the balance sheet is reflective of 6/30/04.
   c. We agree to the paying of the contingency when received.

3. Since we are strong enough to get $2MM from Nationwide, you should feel good with our note...especially since you will be at the helm and things remain relatively the same except a preferred new carrier, an energetic partner and more new business horsepower.

4. BUT—Diane feels the spirit of the agreement is out of balance with your last four bulleted talking points and she is wringing her hands about this. Quite frankly I did not realize the ramifications.

5. **The non-compete is not negotiable and it will cause the Nationwide funding to go away....it is in Diane's contract and it is in cement. Second, the tying of the lease to the note is not acceptable also to Nationwide. An these are two separate transactions.**

6. Diane is uncomfortable with the proposed change in the payments and prefers the $200K/$300K/$500K plan. The reason is that it is a change in what was given to Nationwide. We discovered today that Nationwide is putting the $2MM in motion **NOW,** this year, to pay out in accord with our settlement dates in January.

7. George—when you overview the money in this deal, it is somewhat overwhelming:

   a. $3MM sale
   b. $500M bonus potential
   c. $200M undistributed earnings
   d. $250M contingency
   e. $760M in salary over 5 years
   This is a lot of money ($4.7MM) ---Plus 5 years of sharing in the success of the agency. Plus the assurance of the continuation of the Moran legacy and the opportunity of you being able to still be associated in a future role after the 5 years.

8. We really do not want to go to the lawyers and have them work this out...our goal early on was for us to have agreement and have the lawyers seal the deal. This is still important to us. We want to make this deal work but we, jointly need to overcome this latest hurdle.

9. Our goal is to pay the note off in advance and want no prepayment penalties. You simply have to trust us regarding the note.

10. Are we in agreement....and can we move forward?

11. Monday I will have the revised Purchase agreement and lease ready to take to the lawyers but will send to you in advance—I intentionally kept in the strikethroughs for the working version and a second version without the strikethroughs in final form.

Moran.talking points.12.30.04

CRMG   000484
HPK/NATIONWIDE/Tamariz/Docs Received fromWallace

EXHIBIT

21

3-4-10   jk

The counter to George Moran—no promissory note from DTA—all secured funding.

1. $1.5MM at settlement
2. $500K due March 31, 2006
3. $500K due March 31, 2007
4. $500K due March 31, 2008

Secured Funding sources [Nationwide $2,000,000 and DTA $750K credit line through Commerce1st Bank plus $250K from Moran Incentive Compensation(2004 profit sharing and contingency agreement payouts) due in March]

1. Nationwide $2,000,000—payable $1.5MM at settlement; $300K payable 3/31/06; $200K payable 3/31/07
2. DTA--$250K contingency paid in March put into escrow and $200K payable 3/31/06
3. DTA--$300K payable 3/31/07
4. DTA--$500K payable 3/31/08

The contingency Bonus Agreement of $500,000 is in payable at $100,000/ year in March 31, 2006-7-8-9-10 providing DTA/Moran achieve 5% contingency bracket and providing Moran is employed by DTA during the full year the contingency is earned. Payable when the contingency is received.

DTA understands the George T. Moran, Inc. intends to pay as a bonus to Moran all of its undistributed earnings through the close of business on the date of closing. However that day's balance sheet must show funds equal or greater that June 30, 2004 balance sheet. No delayed payments are allowed and the books are reviewed and approved by our CPA..

Other required points:
1. The three key employees (George Moran, Donna Moran and Russ DeVoe) must remain productively involved at Moran for a minimum of three years or a $50,000 deduction/ key employee is made in that year and all future years against the payout.
2. Moran Inc. must retain 95% of business on fiscal year using a base line from the prior year's fiscal year end books (June 30th) exclusive of DTA producer's sales. For every 1% below 95% the deduction is $11,600 from the payout annually (this is based on the Fiscal year ending June 30, 2004 showing annual premium of $11,600,000). This is in effect through fiscal year ending June 30th, 2007.
3. The lease is for a three years with an option out annually with written notice 90 days in advance of the renewal.

Moran.counter.12.31.04

Needed from George...for Craig

1. December 31, 2004 financial statement
2. Detailed schedule of balance sheet accounts
3. Audit of escrow account
4. Analysis of debts due
5. Supporting documentation of agency billings

Moran.document.request.1.6.05

EXHIBIT

_22_

3-4-10   _K_

# Personal Financial Statement
## for
## Dave & Diane Wallace
## 2004

DRDR  000724
HPK /Tamarix-Wallace/DocRecd11.09.09

**DTA000724**

# CommerceFirst

**C¹**

*RAISING BANKING TO THE POWER OF BUSINESS*

## PERSONAL FINANCIAL STATEMENT

Complete this form for: (1) each proprietor, or (2) each limited partner who owns 20% or more interest and each general partner, or (3) each stockholder owning 20% or more of voting stock , or (4) any person or entity providing a guaranty on the loan.

Name B. Diane Tamariz-Wallace     Business Phone (410) 956-3758

Residence Address 2417 Vineyard Lane     Residence Phone (410) 451-7361

City, State, & Zip Code Crofton , MD 21114

Business Name of Applicant / Borrower Diane Tamariz & Associates PA

| ASSETS | (omit cents) | LIABILITIES | (omit cents) |
|---|---|---|---|
| Cash on hand & in Banks | $ 1000 | Accounts Payable | $ — |
| Savings Accounts | $ | Notes Payable to Banks and Others | $ — |
| IRA or Other Retirement Accounts | $ 1,190,000 | (Describe in Section 2) | |
| Accounts & Notes Receivable | $ 200,000 | Installment Account (Auto) | $ 19,703.05 |
| Life Insurance - Cash Surrender Value | $ 20,000 | Mo. Payments $ 658.71 | |
| (Complete Section 8) | | Installment Accounts (Other) | $ 108,549 |
| Stocks and Bonds | $ 2,000,000 100% ownership of Diane Tamariz & Associates | Mo. Payments $ 889 | |
| (Describe in Section 3) | | Loans on Life Insurance | $ —0— |
| Real Estate | $ 550,000 | Mortgages on Real Estate | $ 155,760 |
| (Describe in Section 4) | | (Describe in section 4) | |
| Automobile – Present Value | $ 28,000 | Unpaid Taxes | $ 10,852.94 |
| Other Personal Property | $ 368,000 | (Describe in Section 6) | |
| (Describe in Section 5) | | Other Liabilities | $ 80,000 |
| Other Assets | $ | (Describe in Section 7) | |
| (Describe in Section 5) | | Total Liabilities | $ 374,864 |
| | | Net Worth | $ |
| TOTAL | $ 4,357,000 | TOTAL | $ |

## Section 1. Sources of Income

| | | Contingent Liabilities | |
|---|---|---|---|
| Salary | $ 145,000 | As Endorser or Co-Maker | $ |
| Net Investment Income | $ | Legal Claims and Judgments | $ |
| Real Estate Income | $ | Provision for Federal Income Tax | $ |
| Other Income (Describe Below)* | $ | Other Special Debt | $ |

Description of Other Income in Section 1.

*Alimony or child support payments need not be disclosed in "Other Income" unless it is desired to have such payments counted toward total income.

## Section 2. Notes Payable (Use attachments if necessary. Each attachment must be identified as part of this statement and signed)

| Name & Address of Noteholder | Original Balance | Current Balance | Pay. Amt. | Frequency (mo., etc.) | How Secured or Endorsed Type of Collateral |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

DRDR_000725
HPK /Tamarix-Wallace/DocRecdId .09.09
**DTA000725**

**Section 3.** Stocks & Bonds

| Number of Shares | Name of Securities | Cost | Market Value Quotation / Exchange | Date of Quotation | Total Value |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |

**Section 4.** Real Estate    (List each parcel separately.  Use attachment if necessary.  Each Attachment must be identified as part of this statement and signed.)

| | Property A | Property B | Property C |
|---|---|---|---|
| Type of Property | Primary Residence | Rental Property | |
| Address | 2417 Vineyard Lane Crofton, MD 21114 | 7732 Heritage Dr Annandale, VA 22003 | |
| Date Purchased | 4/18/03 | 1968 | |
| Original Cost | 135,000 | | |
| Present Market Value | 300,000 | 60K 500K | |
| Name & Address of Mortgage Holder | Nationwide Advantage Mortg 7760 Office Plaza Dr. South West Des Moines, IA 50266-2330 | — | |
| Titled in Name(s) Of | Brenda Diane Wallace | Diane Tamariz & Meodore Tamariz | |
| Mortgage Balance | $155,760 | Ø | |
| Monthly Payment | $1271 | Ø | |
| Status of Mortgage | Active | Paid. | |

**Section 5.** Other Assets    (Describe, and if any is pledged as security, state name and address of lienholder, amount of lien, terms of payment and if delinquent, describe delinquency.)

Boats- O'Susannah $190K & The Phoenix $18K

Antiques - 160K

**Section 6.** Unpaid Taxes    (Describe in detail, as to type, to whom payable, when due, amount, and to what property, if any, a tax lien attaches.)

$10,852  to  IRS

**Section 7.** Other Liabilities    (Describe in detail.)

**Section 8.** Life Insurance Held    (Give face amount and cash surrender value of policies - name of insurance company and beneficiaries.)

Dave Wallace   - $ 1,000,000 Life policy

Diane Tamariz-Wallace - $ 3,000,000 Life policy

The undersigned acknowledges and agrees that CommerceFirst Bank may utilize outside credit reporting services to obtain information on the undersigned in order to permit CommerceFirst Bank to appropriately evaluate the extension of any business or personal credit.  I certify the above information and the statements made in any and all attachments are true and accurate as of the stated date. These statements are made for the purpose of obtaining a loan.  I understand that false statements are sufficient reason for CommerceFirst Bank to decline my loan request

Signature: _B Diane Tamariz Wallace_    Date: 12/22/04    S.S. # REDACTED 3884

DRDR 000726
HPK /Tamarix-Wallace/DocRecd 1.09.09
**DTA000726**

Signature: _____    Date: _____    S.S. #: _____



EXHIBIT
23
3-4-10

# Income Tax Return
## for
## Dave & Diane Wallace
## 2003

DRDR 000682
HPK /Tamarix-Wallace/DocRecd11.09.09
**DTA000682**

Dec 20 04 03:43p     Siebert Kullman, P.A.        4102669940                p.2

Form **1040**  Department of the Treasury- Internal Revenue Service
**U.S. Individual Income Tax Return**  2003  (99)  IRS Use Only- Do not write or staple in this space.

For the year Jan. 1–Dec. 31, 2003, or other tax year beginning , 2003, ending , 20     OMB No. 1545-0074

| Label (See instructions on page 19.) | Your first name and initial CHARLES D | Last name WALLACE | Your social security number REDACTED 1986 |
|---|---|---|---|
| | If a joint return, sp. first name & initial BRENDA DIANE | Last name TAMARIZ-WALLACE | Spouse's social security number REDACTED 0884 |
| Use the IRS label. Otherwise, please print or type. | Home address (number and street). If you have a P.O. box, see page 19. 2417 VINEYARD LANE | | Apt. no. |
| | City, town or post office, state, and ZIP code. If you have a foreign address, see page 19. CROFTON     MD 21114 | | ▲ **Important!** You must enter your SSN(s) above. |

Presidential Election Campaign (See page 19.)  Note. Checking "Yes" will not change your tax or reduce your refund.
Do you, or your spouse if filing a joint return, want $3 to go to this fund? ▶   You [ ] Yes [X] No   Spouse [ ] Yes [X] No

**Filing Status**
Check only one box.
1 [ ] Single
2 [X] Married filing jointly (even if only one had income)
3 [ ] Married filing separately. Enter spouse's SSN above and full name here. ▶
4 [ ] Head of household (with qualifying person). (See page 20.) If the qualifying person is a child but not your dependent, enter this child's name here. ▶
5 [ ] Qualifying widow(er) with dependent child. (See page 20.)

**Exemptions**
6a [X] Yourself. If your parent (or someone else) can claim you as a dependent on his or her tax return, do not check box 6a
b [X] Spouse
c Dependents:

| (1) First name    Last name | (2) Dependent's social security number | (3) Dependent's relationship to you | (4) Ck. if qualifying child for child tax credit (see pg. 21) |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

If more than five dependents, see page 21.

No. of boxes checked on 6a and 6b **2**
No. of children on 6c who:
• lived with you
• did not live with you due to divorce or separation (see page 21)
Dependents on 6c not entered above
Add numbers on lines above ▶ **2**

d Total number of exemptions claimed

**Income**

Attach Forms W-2 and W-2G here. Also attach Form(s) 1099-R if tax was withheld.

If you did not get a W-2, see page 22.

Enclose, but do not attach, any payment. Also, please use Form 1040-V.

| 7 | Wages, salaries, tips, etc. Attach Form(s) W-2 | 7 | 54,166 |
|---|---|---|---|
| 8a | Taxable interest. Attach Schedule B if required | 8a | |
| b | Tax-exempt interest. Do not include on line 8a | 8b | |
| 9a | Ordinary dividends. Attach Schedule B if required | 9a | |
| b | Qualified dividends (see page 23) | 9b | |
| 10 | Taxable refunds, credits, or offsets of state and local income taxes (see page 23) | 10 | |
| 11 | Alimony received | 11 | |
| 12 | Business income or (loss). Attach Schedule C or C-EZ | 12 | 89,786 |
| 13a | Capital gain or (loss). Attach Schedule D if required. If not required, check here ▶ [ ] | 13a | -7,355 |
| b | If box on line 13a is checked, enter post-May 5 capital gain distributions 13b | | |
| 14 | Other gains or (losses). Attach Form 4797 | 14 | -17,825 |
| 15a | IRA distributions 15a | b Taxable amount (see page 25) | 15b | |
| 16a | Pensions and annuities 16a | b Taxable amount (see page 25) | 16b | |
| 17 | Rental real estate, royalties, partnerships, S corporations, trusts, etc. Attach Schedule E | 17 | -51,687 |
| 18 | Farm income or (loss). Attach Schedule F | 18 | |
| 19 | Unemployment compensation | 19 | |
| 20a | Social security benefits 20a | b Taxable amount (see page 27) | 20b | |
| 21 | Other income. List type & amt. (see page 27) | 21 | |
| 22 | Add the amounts in the far right column for lines 7 through 21. This is your total income ▶ | 22 | 81,795 |

**Adjusted Gross Income**

| 23 | Educator expenses (see page 29) | 23 | |
|---|---|---|---|
| 24 | IRA deduction (see page 29) | 24 | |
| 25 | Student loan interest deduction (see page 31) | 25 | |
| 26 | Tuition and fees deduction (see page 32) | 26 | |
| 27 | Moving expenses. Attach Form 3903 | 27 | |
| 28 | One-half of self-employment tax. Attach Schedule SE | 28 | 6,343 |
| 29 | Self-employed health insurance deduction (see page 33) | 29 | 8,236 |
| 30 | Self-employed SEP, SIMPLE, and qualified plans | 30 | |
| 31 | Penalty on early withdrawal of savings | 31 | |
| 32a | Alimony paid b Recipient's SSN ▶ 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 | 32a | 36,000 |
| 33 | Add lines 23 through 32a | 33 | |
| 34 | Subtract line 33 from line 22. This is your adjusted gross income ▶ | 34 | |

For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see page 77.
DAA

50DRDR 000683

PK Tamarix-Wallace Batesecd11.09.09

**DTA000683**

Dec 20 04 03:44p    Siebert Kullman, P.A.        4102669940                P.3

Form 1040 (2003)  CHARLES D WALLACE & BRENDA DIANE TAMARIZ-WALLACE        REDACTED 1986 Page 2

| | | | | |
|---|---|---|---|---|
| **Tax and Credits** | 35 | Amount from line 34 (adjusted gross income) | 35 | 31,216 |
| | 36a | Check ☐ You were born before January 2, 1939, ☐ Blind. **Total boxes** | | |
| | | ☐ Spouse was born before January 2, 1939, ☐ Blind. checked ▶ 36a | | |
| **Standard Deduction for—** | b | If you are married filing separately and your spouse itemizes deductions, or you were a dual-status alien, see page 34 and check here ▶ 36b | | |
| | 37 | Itemized deductions (from Schedule A) or your standard deduction (see left margin) | 37 | 55,140 |
| **• People who checked any box on line 36a or 36b or who can be claimed as a dependent, see page 34.** | 38 | Subtract line 37 from line 35 | 38 | -23,924 |
| | 39 | If line 35 is $104,625 or less, multiply $3,050 by the total number of exemptions claimed on line 6d. If line 35 is over $104,625, see the worksheet on page 35 | 39 | 6,100 |
| | 40 | Taxable income. Subtract line 39 from line 38. If line 39 is more than line 38, enter -0- | 40 | 0 |
| | 41 | Tax (see page 36). Check if any tax is from: a ☐ Form(s) 8814 | | |
| **• All others:** | b | ☐ Form 4972 | 41 | 0 |
| Single or Married filing separately, $4,750 | 42 | Alternative minimum tax (see page 38). Attach Form 6251 | 42 | |
| | 43 | Add lines 41 and 42 ▶ | 43 | |
| Married filing jointly or Qualifying widow(er), $9,500 | 44 | Foreign tax credit. Attach Form 1116 if required | 44 | |
| | 45 | Credit for child and dependent care expenses. Attach Form 2441 | 45 | |
| | 46 | Credit for the elderly or the disabled. Attach Schedule R | 46 | |
| Head of household, $7,000 | 47 | Education credits. Attach Form 8863 | 47 | |
| | 48 | Retirement savings contributions credit. Attach Form 8880 | 48 | |
| | 49 | Child tax credit (see page 40) | 49 | |
| | 50 | Adoption credit. Attach Form 8839 | 50 | |
| | 51 | Credits from: a ☐ Form 8396 b ☐ Form 8859 | 51 | |
| | 52 | Other credits. Check applicable box(es): a ☐ Form 3800 | | |
| | | b ☐ Form 8801 c ☐ Specify | 52 | |
| | 53 | Add lines 44 through 52. These are your total credits ▶ | 53 | |
| | 54 | Subtract line 53 from line 43. If line 53 is more than line 43, enter -0- ▶ | 54 | 0 |
| **Other Taxes** | 55 | Self-employment tax. Attach Schedule SE | 55 | 12,686 |
| | 56 | Social security and Medicare tax on tip income not reported to employer. Attach Form 4137 | 56 | |
| | 57 | Tax on qualified plans, including IRAs, and other tax-favored accounts. Attach Form 5329 if required | 57 | |
| | 58 | Advance earned income credit payments from Form(s) W-2 | 58 | |
| | 59 | Household employment taxes. Attach Schedule H | 59 | |
| | 60 | Add lines 54 – 59. This is your total tax ▶ | 60 | 12,686 |
| **Payments** | 61 | Federal income tax withheld from Forms W-2 and 1099 ... 61 ... 10,712 | | |
| If you have a qualifying child, attach Schedule EIC. | 62 | 2003 estimated tax payments and amount applied from 2002 return 62 | | |
| | 63 | Earned income credit (EIC) 63 | | |
| | 64 | Excess social security and tier 1 RRTA tax withheld (see page 56) 64 | | |
| | 65 | Additional child tax credit. Attach Form 8812 65 | | |
| | 66 | Amount paid with request for extension to file (see page 56) 66 | | |
| | 67 | Other pymt. from: a ☐ Form 2439 b ☐ Form 4136 c ☐ Form 8885 67 | | |
| | 68 | Add lines 61 through 67. These are your total payments ▶ | 68 | 10,712 |
| **Refund** | 69 | If line 68 is more than line 60, subtract line 60 from line 68. This is the amount you overpaid | 69 | |
| Direct deposit? See page 56 and fill in 70b, 70c, and 70d. | 70a | Amount of line 69 you want refunded to you ▶ | 70a | |
| | ▶ b | Routing number ▶ c Type: ☐ Checking ☐ Savings | | |
| | ▶ d | Account number | | |
| | 71 | Amount of line 69 you want applied to your 2004 estimated tax ▶ 71 | | |
| **Amount You Owe** | 72 | Amount you owe. Subtract line 68 from line 60. For details on how to pay, see page 57 ▶ | 72 | 1,994 |
| | 73 | Estimated tax penalty (see page 58) 73 20 | | |

| **Third Party Designee** | Do you want to allow another person to discuss this return with the IRS (see page 58)? ☒ Yes. Complete the following. ☐ No |
|---|---|
| Designee's name ▶ PREPARER | Phone no. ▶    Personal identification number (PIN) ▶ |

| **Sign Here** | Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge. | | |
|---|---|---|---|
| Joint return? See page 20. | Your signature | Date | Your occupation OUTSIDE SALES | Daytime phone number 410-280-1720 |
| Keep a copy for your records. | Spouse's signature. If a joint return, both must sign. | Date | Spouse's occupation INSURANCE AGENT | |

| **Paid Preparer's Use Only** | Preparer's signature | | Date 12/20/04 | Check if self-employed ☐ | Preparer's SSN or PTIN P00308157 |
|---|---|---|---|---|---|
| | Firm's name (or yours if self-employed), address, and ZIP code | SIEBERT KULLMAN, P.A. 180 ADMIRAL COCHRANE DR STE 230 ANNAPOLIS       MD 21401-7366 | | EIN 32- | REDACTED 274 |
| | | | | Phone no. | |

DRDR  000684

DAA  10/15 INT        45        FTP        59 TOT        **DTA000684**

Dec 20 04 03:44p    Siebert Kullman, P.A.        4102669940            p.4

| SCHEDULES A&B | Schedule A-Itemized Deductions | OMB No. 1545-0074 |
|---|---|---|

(Form 1040)

(Schedule B is on back)

**2003**

Department of the Treasury
Internal Revenue Service  (99)      ► Attach to Form 1040.  ► See Instructions for Schedules A and B (Form 1040).

Attachment Sequence No.  **07**

Name(s) shown on Form 1040
CHARLES D WALLACE & BRENDA DIANE TAMARIZ-WALLACE

Your social security number
REDACTED 1986

| | | | | |
|---|---|---|---|---|
| Medical and Dental Expenses | Caution. Do not include expenses reimbursed or paid by others. | | | |
| | 1  Medical and dental expenses (see page A-2) | 1 | | |
| | 2  Enter amt. from Form 1040, line 35 |  2  | | |
| | 3  Multiply line 2 by 7.5% (.075) | 3 | | |
| | 4  Subtract line 3 from line 1. If line 3 is more than line 1, enter -0- | | 4 | 0 |
| Taxes You Paid (See page A-2.) | 5  State and local income taxes | 5 | 7,603 | |
| | 6  Real estate taxes (see page A-2) | 6 | 1,675 | |
| | 7  Personal property taxes | 7 | | |
| | 8  Other taxes. List type and amount ► | | | |
| | 9  Add lines 5 through 8 | | 9 | 9,278 |
| Interest You Paid (See page A-3.) | 10  Home mortgage interest and points reported to you on Form 1098 | 10 | 30,205 | |
| | 11  Home mortgage interest not reported to you on Form 1098. If paid to the person from whom you bought the home, see page A-3 and show that person's name, identifying no., and address ► | | | |
| Note. Personal interest is not deductible. | | 11 | | |
| | 12  Points not reported to you on Form 1098. See page A-3 for special rules | 12 | 49 | |
| | 13  Investment interest. Attach Form 4952 if required. (See page A-4.) | 13 | | |
| | 14  Add lines 10 through 13 | | 14 | 30,254 |
| Gifts to Charity | 15  Gifts by cash or check. If you made any gift of $250 or more, see page A-4 | 15 | 15,608 | |
| If you made a gift and got a benefit for it, see page A-4. | 16  Other than by cash or check. If any gift of $250 or more, see page A-4. You must attach Form 8283 if over $500 | 16 | | |
| | 17  Carryover from prior year | 17 | | |
| | 18  Add lines 15 through 17 | | 18 | 15,608 |
| Casualty and Theft Losses | 19  Casualty or theft loss(es). Attach Form 4684. (See page A-5.) | | 19 | |
| Job Expenses and Most Other Miscellaneous Deductions (See page A-5.) | 20  Unreimbursed employee expenses-job travel, union dues, job education, etc. Attach Form 2106 or 2106-EZ if required. (See page A-5.) | | | |
| | | 20 | | |
| | 21  Tax preparation fees | 21 | | |
| | 22  Other expenses-investment, safe deposit box, etc. List type and amount ► | | | |
| | | 22 | | |
| | 23  Add lines 20 through 22 | 23 | | |
| | 24  Enter amt. from Form 1040, line 35 |  24  | | |
| | 25  Multiply line 24 by 2% (.02) | 25 | | |
| | 26  Subtract line 25 from line 23. If line 25 is more than line 23, enter -0- | | 26 | 0 |
| Other Miscellaneous Deductions | 27  Other-from list on page A-6. List type and amount ► | | 27 | |
| Total Itemized Deductions | 28  Is Form 1040, line 35, over $139,500 (over $69,750 if married filing separately)? | | | |
| | ☒ No.   Your deduction is not limited. Add the amounts in the far right column for lines 4 through 27. Also, enter this amount on Form 1040, line 37. | | 28 ► | 55,140 |
| | ☐ Yes.  Your deduction may be limited. See page A-6 for the amount to enter. | | | |

For Paperwork Reduction Act Notice, see Form 1040 Instructions.

Schedule A (Form 1040) 2003

DAA

DRDR  000685
HPK /Tamarix-Wallace/DocRecd11.09.09
**DTA000685**

Dec 20 04 03:45p   Siebert Kullman, P.A.      4102669940         p.5

| SCHEDULE C | Profit or Loss From Business | OMB No. 1545-0074 |
|---|---|---|
| (Form 1040) | (Sole Proprietorship) | 2003 |

▶ Partnerships, joint ventures, etc., must file Form 1065 or Form 1065-B.

Department of the Treasury
Internal Revenue Service   (99)     ▶ Attach to Form 1040 or 1041.   ▶ See Instructions for Schedule C (Form 1040).

Attachment
Sequence No. 09

Name of proprietor

**BRENDA DIANE TAMARIZ-WALLACE**

Social security number (SSN)

REDACTED 0884

A  Principal business or profession, including product or service (see page C-2 of the instructions)

**INSURANCE SALES**

B  Enter code from pages C-7, 8, & 9
▶ 524210

C  Business name. If no separate business name, leave blank.

**DIANE TAMARIZ & ASSOCIATES**

D  Employer ID number (EIN), if any

E  Business address (including suite or room no.) ▶  3161 SOLOMONS ISLAND ROAD
   City, town or post office, state, and ZIP code     EDGEWATER       MD 21037

F  Accounting method:   (1) ☐ Cash   (2) ☒ Accrual   (3) ☐ Other (specify) ▶

G  Did you "materially participate" in the operation of this business during 2003? If "No," see page C-3 for limit on losses ........  ☒ Yes  ☐ No

H  If you started or acquired this business during 2003, check here ............................... ▶ ☐

**Part I    Income**

| | | |
|---|---|---|
| 1 | Gross receipts or sales. Caution. If this income was reported to you on Form W-2 and the "Statutory employee" box on that form was checked, see page C-3 and check here ▶ ☐ | 1 | 358,100 |
| 2 | Returns and allowances | 2 | |
| 3 | Subtract line 2 from line 1 | 3 | 358,100 |
| 4 | Cost of goods sold (from line 42 on page 2) | 4 | |
| 5 | Gross profit. Subtract line 4 from line 3 | 5 | 358,100 |
| 6 | Other income, including Federal and state gasoline or fuel tax credit or refund (see page C-3) | 6 | 967 |
| 7 | Gross income. Add lines 5 and 6 ▶ | 7 | 359,067 |

**Part II    Expenses. Enter expenses for business use of your home only on line 30.**

| | | | | | | |
|---|---|---|---|---|---|---|
| 8 | Advertising | 8 | 3,457 | 19 | Pension and profit-sharing plans | 19 | |
| 9 | Car and truck expenses (see page C-3) | 9 | 8,280 | 20 | Rent or lease (see page C-5): | | |
| | | | | a | Vehicles, machinery, and equipment | 20a | 2,460 |
| 10 | Commissions and fees | 10 | | b | Other business property | 20b | 22,744 |
| 11 | Contract labor (see page C-4) | 11 | | 21 | Repairs and maintenance | 21 | 1,163 |
| 12 | Depletion | 12 | | 22 | Supplies (not included in Part III) | 22 | |
| 13 | Depreciation and section 179 expense deduction (not included in Part III) (see page C-4) | 13 | 55,620 | 23 | Taxes and licenses | 23 | 7,720 |
| | | | | 24 | Travel, meals, and entertainment: | | |
| | | | | a | Travel | 24a | 383 |
| 14 | Employee benefit programs (other than on line 19) | 14 | 1,598 | b | Meals and entertainment | | 10,525 |
| 15 | Insurance (other than health) | 15 | 7,834 | c | Enter nondeductible amount included on line 24b (see page C-5) | | 5,263 |
| 16 | Interest: | | | d | Subtract line 24c from line 24b | 24d | 5,262 |
| a | Mortgage (paid to banks, etc.) | 16a | | 25 | Utilities | 25 | 4,532 |
| b | Other | 16b | 8,570 | 26 | Wages (less employment credits) | 26 | 87,718 |
| 17 | Legal and professional services | 17 | 2,343 | 27 | Other expenses (from line 48 on page 2) | 27 | 41,832 |
| 18 | Office expense | 18 | 7,765 | | | | |
| 28 | Total expenses before expenses for business use of home. Add lines 8 through 27 in columns ▶ | | | | | 28 | 269,281 |

| | | | |
|---|---|---|---|
| 29 | Tentative profit (loss). Subtract line 28 from line 7 | 29 | 89,786 |
| 30 | Expenses for business use of your home. Attach Form 8829 | 30 | |
| 31 | Net profit or (loss). Subtract line 30 from line 29. | | |
| | • If a profit, enter on Form 1040, line 12, and also on Schedule SE, line 2 (statutory employees, see page C-6). Estates and trusts, enter on Form 1041, line 3. | 31 | 89,786 |
| | • If a loss, you must go to line 32. | | |
| 32 | If you have a loss, check the box that describes your investment in this activity (see page C-6). | | |
| | • If you checked 32a, enter the loss on Form 1040, line 12, and also on Schedule SE, line 2 (statutory employees, see page C-6). Estates and trusts, enter on Form 1041, line 3. | 32a ☐ | All investment is at risk. |
| | • If you checked 32b, you must attach Form 6198. | 32b ☐ | Some investment is not at risk. |

For Paperwork Reduction Act Notice, see Form 1040 instructions.

DRDR 000686
HPSA/accounting Division/2003 Recd11.09.09
**DTA000686**

Dec 20 04 03:45p    Siebert Kullman, P.A.       4102669940       p.6

BRENDA DIANE TAMARIZ-WALLACE                       REDACTED-0884
Schedule C (Form 1040) 2003    INSURANCE SALES                          Page 2

**Part III    Cost of Goods Sold (see page C-6)**

| | |
|---|---|
| 33 | Method(s) used to value closing inventory:    a ☐ Cost    b ☐ Lower of cost or market    c ☐ Other (attach explanation) |
| 34 | Was there any change in determining quantities, costs, or valuations between opening and closing inventory? If "Yes," attach explanation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ Yes    ☐ No |

| | | | |
|---|---|---|---|
| 35 | Inventory at beginning of year. If different from last year's closing inventory, attach explanation | 35 | |
| 36 | Purchases less cost of items withdrawn for personal use | 36 | |
| 37 | Cost of labor. Do not include any amounts paid to yourself | 37 | |
| 38 | Materials and supplies | 38 | |
| 39 | Other costs | 39 | |
| 40 | Add lines 35 through 39 | 40 | |
| 41 | Inventory at end of year | 41 | |
| 42 | Cost of goods sold. Subtract line 41 from line 40. Enter the result here and on page 1, line 4 | 42 | |

**Part IV    Information on Your Vehicle.** Complete this part only if you are claiming car or truck expenses on line 9 and are not required to file Form 4562 for this business. See the instructions for line 13 on page C-4 to find out if you must file Form 4562.

43   When did you place your vehicle in service for business purposes? (month, day, year)▶ . . . . . . . . . . . . . . . . . . .

44   Of the total number of miles you drove your vehicle during 2003, enter the number of miles you used your vehicle for:

a   Business . . . . . . . . . . . . .    b   Commuting . . . . . . . . . .    c   Other . . . . . . .

| | | | |
|---|---|---|---|
| 45 | Do you (or your spouse) have another vehicle available for personal use? | ☐ Yes | ☐ No |
| 46 | Was your vehicle available for personal use during off-duty hours? | ☐ Yes | ☐ No |
| 47a | Do you have evidence to support your deduction? | ☐ Yes | ☐ No |
| b | If "Yes," is the evidence written? | ☐ Yes | ☐ No |

**Part V    Other Expenses.** List below business expenses not included on lines 8-26 or line 30.

| | |
|---|---|
| BANK CHARGES | 161 |
| CLEANING | 2,080 |
| CONTRACT SERVICES | 23,506 |
| COMPUTER EXPENSE | 1,750 |
| DUES & SUBSCRIPTIONS | 642 |
| EDUCATION & BOOKS | 1,050 |
| POSTAGE | 1,866 |
| TELEPHONE | 10,385 |
| COURIER / FED EX | 392 |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

| | | |
|---|---|---|
| 48 | Total other expenses. Enter here and on page 1, line 27 . . . . . . . . . . | |

DAA

HPK-Tamarix-Wallace/Bag Recd11.09.09

DRDR 000687

DTA000687

DRDR  000688
HPK /Tamarix-Wallace/DocRecd11.09.09
**DTA000688**

Déc 20 04 03:46p    Siebert Kullman, P.A.        4102669940              p.7

| | | |
|---|---|---|
| SCHEDULE D<br>(Form 1040) | **Capital Gains and Losses**<br>▶ Attach to Form 1040.     ▶ See Instructions for Schedule D (Form 1040).<br>▶ Use Schedule D-1 to list additional transactions for lines 1 and 8. | OMB No. 1545-0074<br>**2003**<br>Attachment<br>Sequence No.   12 |
| Department of the Treasury<br>Internal Revenue Service   (99) | | |

Name(s) shown on Form 1040
CHARLES D WALLACE & BRENDA DIANE TAMARIZ-WALLACE

Your social security number
REDACTED 1986  u

**Part I     Short-Term Capital Gains and Losses-Assets Held One Year or Less**

| (a) Description of<br>property (Example:<br>100 sh. XYZ Co.) | (b) Date<br>acquired<br>(Mo., day, yr.) | (c) Date sold<br>(Mo., day, yr.) | (d) Sales price<br>(see page D-6 of<br>the instructions) | (e) Cost or other basis<br>(see page D-6 of<br>the instructions) | (f) Gain or (loss) for<br>the entire year<br>Subtract (e) from (d) | (g) Post-May 5 gain<br>or (loss)*<br>(see below) |
|---|---|---|---|---|---|---|
| 1 | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| **2** | Enter your short-term totals, if any, from<br>Schedule D-1, line 2 | **2** | | | |
| **3** | Total short-term sales price amounts.<br>Add lines 1 and 2 in column (d) | **3** | | | |
| **4** | Short-term gain from Form 6252 and short-term gain or (loss) from Forms 4684,<br>6781, and 8824 | | **4** | | |
| **5** | Net short-term gain or (loss) from partnerships, S corporations, estates, and trusts<br>from Schedule(s) K-1 | | **5** | | |
| **6** | Short-term capital loss carryover. Enter the amount, if any, from line 8 of your<br>2002 Capital Loss Carryover Worksheet | | **6** | | |
| **7a** | Combine lines 1 through 5 in column (g). If the result is a loss, enter the result.<br>Otherwise, enter -0-. Do not enter more than zero | | **7a** | | 0) |
| **b** | Net short-term capital gain or (loss). Combine lines 1 through 6 in column (f) | | **7b** | 0 | |

**Part II     Long-Term Capital Gains and Losses-Assets Held More Than One Year**

| (a) Description of<br>property (Example:<br>100 sh. XYZ Co.) | (b) Date<br>acquired<br>(Mo., day, yr.) | (c) Date sold<br>(Mo., day, yr.) | (d) Sales price<br>(see page D-6 of<br>the instructions) | (e) Cost or other basis<br>(see page D-6 of<br>the instructions) | (f) Gain or (loss) for<br>the entire year<br>Subtract (e) from (d) | (g) Post-May 5 gain<br>or (loss)*<br>(see below) |
|---|---|---|---|---|---|---|
| 8    SALE OF MAXIMUM INS SVCS LLC | VARIOUS | 12/01/03 | 7,355 | | 7,355 | 7,355 |
| | | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| **9** | Enter your long-term totals, if any, from<br>Schedule D-1, line 9 | **9** | | | |
| **10** | Total long-term sales price amounts.<br>Add lines 8 and 9 in column (d) | **10** | 7,355 | | |
| **11** | Gain from Form 4797, Part I; long-term gain from Forms 2439 and 6252; and<br>long-term gain or (loss) from Forms 4684, 6781, and 8824 | | **11** | | |
| **12** | Net long-term gain or (loss) from partnerships, S corporations, estates, and trusts<br>from Schedule(s) K-1 | | **12** | | |
| **13** | Capital gain distributions. See page D-2 of the<br>instructions | | **13** | | |
| **14** | Long-term capital loss carryover. Enter the amount, if any, from line 13 of your<br>2002 Capital Loss Carryover Worksheet | | **14** | | |
| **15** | Combine lines 8 through 13 in column (g). If zero or less, enter -0- | | **15** | | 7,355 |
| **16** | Net long-term capital gain or (loss). Combine lines 8 through 14 in column (f) | | **16** | 7,355 | |
| | Next: Go to Part III on the back. | | | | |

*Include in column (g) gains and losses from column (f) from sales, exchanges, or conversions (including installment payments received) after
May 5, 2003. However, do not include gain attributable to unrecaptured section 1250 gain, "collectibles gains and losses" (as defined on page
H-8 of the instructions) or eligible gain on qualified small business stock (see page D-4 of the instructions).

For Paperwork Reduction Act Notice, see Form 1040 instructions.                    Schedule D (Form 1040) 2003
MA

DRDR  000689
HPK (Tamariz_Wallace)DocRecd11.09.09

**DTA000689**

Déc 20 04 03:46p    Siebert Kullman, P.A.       4102869940         P.8

CHARLES D WALLACE & BRENDA DIANE TAMARIZ-WALLACE   REDACTED 1986

Schedule D (Form 1040) 2003                                                              Page 2

| Part III | Taxable Gain or Deductible Loss | |
|---|---|---|

17a Combine lines 7b and 16 and enter the result. If a loss, enter -0- on line 17b and go to line 18.

If a gain, enter the gain on Form 1040, line 13a, and go to line 17b below ........... | 17a | 7,355

b Combine lines 7a and 15. If zero or less, enter -0-. Then complete Form 1040 through line 40 ........... | 17b | 7,355

Next: ● If line 16 of Schedule D is a gain or you have qualified dividends on Form 1040, line
9b, complete Part IV below.

● Otherwise, skip the rest of Schedule D and complete the rest of Form 1040.

18 If line 17a is a loss, enter here and on Form 1040, line 13a, the smaller of (a) that loss or
(b) ($3,000) (or, if married filing separately, ($1,500)) (see page D-7 of the instructions) ........... | 18 | (          )

Next: ● If you have qualified dividends on Form 1040, line 9b, complete Part IV below (but skip lines 19 and 20).

● Otherwise, skip Part IV below and complete the rest of Form 1040.

| Part IV | Tax Computation Using Maximum Capital Gains Rates | |
|---|---|---|

If line 16 or line 17a is zero or less, skip lines 19 and 20 and go to line 21. Otherwise, go to line 19.

19 Enter your unrecaptured section 1250 gain, if any, from line 18 of the worksheet on page D-7 ........... | 19 |

20 Enter your 28% rate gain, if any, from line 7 of the worksheet on page D-8 of the instructions ........... | 20 |

If lines 19 and 20 are zero, use the worksheet on page D-11 of the instructions to figure
the amount to enter on lines 35 and 53 below, and skip all other lines below.

21 Enter your taxable income from Form 1040, line 40 ........... | | | 21 |

22 Enter the smaller of line 16 or line 17a, but not less than zero ........... | 22 | |

23 Enter your qualified dividends from Form 1040, line 9b ........... | 23 | |

24 Add lines 22 and 23 ........... | 24 | |

25 Amount from line 4g of Form 4952 (investment interest expense) ........... | 25 | |

26 Subtract line 25 from line 24. If zero or less, enter -0- ........... | | 26 |

27 Subtract line 26 from line 21, if zero or less, enter -0- ........... | | 27 |

28 Enter the smaller of line 21 or:

● $56,800 if married filing jointly or qualifying widow(er);
● $28,400 if single or married filing separately; or ........... | 28 |
● $38,050 if head of household

If line 27 is more than line 28, skip lines 29-39 and go to line 40.

29 Enter the amount from line 27 ........... | 29 | |

30 Subtract line 29 from line 28. If zero or less, enter -0- and go to line 40 ........... | 30 | |

31 Add lines 17b and 23 ........... | 31 | | |

32 Enter the smaller of line 30 or line 31 ........... | 32 | |

33 Multiply line 32 by 5% (.05) ........... | | 33 |

If lines 30 and 32 are the same, skip lines 34-39 and go to line 40.

34 Subtract line 32 from line 30 ........... | 34 | |

35 Enter your qualified 5-year gain, if any, from
line 8 of the worksheet on page D-10 ........... | 35 | |

36 Enter the smaller of line 34 or line 35 ........... | 36 | |

37 Multiply line 35 by 8% (.08) ........... | | 37 |

38 Subtract line 35 from line 34 ........... | 38 | |

39 Multiply line 38 by 10% (.10) ........... | | 39 |

If lines 26 and 30 are the same, skip lines 40-49 and go to line 50.

40 Enter the smaller of line 21 or line 26 ........... | 40 | |

41 Enter the amount from line 30 (if line 30 is blank, enter -0-) ........... | 41 | |

42 Subtract line 41 from line 40 ........... | 42 | |

43 Add lines 17b and 23 ........... | 43 | | |

44 Enter the amount from line 32 (if line 32 is blank, enter -0-) ........... | 44 | |

45 Subtract line 44 from line 43 ........... | 45 | |

46 Enter the smaller of line 42 or line 45 ........... | 46 | |

47 Multiply line 46 by 15% (.15) ........... | | 47 |

48 Subtract line 46 from line 42 ........... | 48 | |

49 Multiply line 48 by 20% (.20) ........... | | 49 |

50 Figure the tax on the amount on line 27. Use the Tax Table or Tax Rate Schedules, whichever applies ........... | | 50 |

51 Add lines 33, 37, 39, 47, 49, and 50 ........... | | 51 |

52 Figure the tax on the amount on line 21. Use the Tax Table or Tax Rate Schedules, whichever applies ........... | | 52 |

53 Tax on all taxable income. Enter the smaller of line 51 or line 52 here and on Form 1040, line 41 ........... | | 53 |

* If lines 20 and 20 are more than zero, see Lines 31 and 43 on page D-9 for the amount to enter.

DAA

DRDR 000690

HRX_Tamarix-Wallace/DocRecd11.09.09

DFA000690 003

Dec 20 04 03:47p      Siebert Kullman, P.A.        4102669940        p.9

Schedule E (Form 1040) 2003

Attachment Sequence No. 13    Page 2

Name(s) shown on return. Do not enter name and social security number if shown on other side.

Your social security number

CHARLES D WALLACE & BRENDA DIANE TAMARIZ-WALLACE          REDACTED-1986

**Part II** Income or Loss From Partnerships and S Corporations   Note. If you report a loss from an at-risk activity for which any amount is not at risk, you must check column (e) on line 28 and attach Form 6198. See page E-1.

27  Are you reporting losses not allowed in prior years due to the at-risk or basis limitations, passive losses not reported on Form 8582, or unreimbursed partnership expenses? ............................ ☐ Yes  ☒ No

If you answered "Yes," see page E-6 before completing this section.

Caution: The IRS compares amounts reported on your tax return with amounts shown on Schedule(s) K-1.

| 28 | (a) Name | (b) Enter P for partnership; S for S corp. | (c) Check if foreign partnership | (d) Employer identification number | (e) Check if any amount is not at risk |
|---|---|---|---|---|---|
| A | SPECIALTY DIRECT MARKETING INC | S | | 52-REDACTED 699 | |
| B | | | | | |
| C | | | | | |
| D | | | | | |

| | Passive Income and Loss | | | Nonpassive Income and Loss | | |
|---|---|---|---|---|---|---|
| | (f) Passive loss allowed (attach Form 8582 if required) | (g) Passive income from Schedule K-1 | (h) Nonpassive loss from Schedule K-1 | (i) Section 179 expense deduction from Form 4562 | (j) Nonpassive income from Schedule K-1 | |
| A | 0 | | 51,687 | | | |
| B | | | | | | |
| C | | | | | | |
| D | | | | | | |

| 29a | Totals | | | | |
|---|---|---|---|---|---|
| b | Totals | | | 51,687 | |

| 30 | Add columns (g) and (j) of line 29a ............................................ | 30 | 0 |
|---|---|---|---|
| 31 | Add columns (f), (h), and (i) of line 29b ............................................ | 31 | ( 51,687 ) |
| 32 | Total partnership and S corporation income or (loss). Combine lines 30 and 31. Enter the result here and include in the total on line 41 below ............................ | 32 | -51,687 |

**Part III** Income or Loss From Estates and Trusts

| 33 | (a) Name | (b) Employer identification number |
|---|---|---|
| A | | |
| B | | |

| | Passive Income and Loss | | Nonpassive Income and Loss | |
|---|---|---|---|---|
| | (c) Passive deduction or loss allowed (attach Form 8582 if required) | (d) Passive income from Schedule K-1 | (e) Deduction or loss from Schedule K-1 | (f) Other income from Schedule K-1 |
| A | | | | |
| B | | | | |

| 34a | Totals | | | | |
|---|---|---|---|---|---|
| b | Totals | | | | |

| 35 | Add columns (d) and (f) of line 34a ............................................ | 35 | |
|---|---|---|---|
| 36 | Add columns (c) and (e) of line 34b ............................................ | 36 | |
| 37 | Total estate and trust income or (loss). Combine lines 35 and 36. Enter the result here and include in the total on line 41 below ............................ | 37 | |

**Part IV** Income or Loss From Real Estate Mortgage Investment Conduits (REMICs)—Residual Holder

| 38 | (a) Name | (b) Employer identification number | (c) Excess inclusion from Schedules Q, line 2c (see page E-6) | (d) Taxable income (net loss) from Schedules Q, line 1b | (e) Income from Schedules Q, line 3b |
|---|---|---|---|---|---|
| | | | | | |

| 39 | Combine columns (d) and (e) only. Enter the result here and include in the total on line 41 below ...... | 39 | |
|---|---|---|---|

**Part V** Summary

| 40 | Net farm rental income or (loss) from Form 4835. Also, complete line 42 below | 40 | |
|---|---|---|---|
| 41 | Total income or (loss). Combine lines 26, 32, 37, 39, and 40. Enter the result here and on Form 1040, line 17 ▶ | 41 | -51,687 |
| 42 | Reconciliation of Farming and Fishing Income. Enter your gross farming and fishing income reported on Form 4835, line 7; Schedule K-1 (Form 1065), line 15b; Schedule K-1 (Form 1120S), line 23; and Schedule K-1 (Form 1041), line 14 (see page E-5) | 42 | |
| 43 | Reconciliation for Real Estate Professionals. If you were a real estate professional (see page E-1), enter the net income or (loss) you reported anywhere on Form 1040 from all rental real estate activities in which you materially participated under the passive activity loss rules | 43 | |

DAA

HPK /Tamariz-Wallace/DocRecd11.09.09

DRDR 000691

**DTA000691**

Dec 20 04 03:48p   Siebert Kullman, P.A.        4102669940        p.10

| SCHEDULE SE | Self-Employment Tax | OMB No. 1545-0074 |
|---|---|---|
| (Form 1040) | | **2003** |
| Department of the Treasury Internal Revenue Service   (99) | ▶ Attach to Form 1040. ▶ See Instructions for Schedule SE (Form 1040). | Attachment Sequence No.   **17** |

| Name of person with self-employment income (as shown on Form 1040) | Social security number of person with self-employment income ▶ |
|---|---|
| BRENDA  DIANE      TAMARIZ-WALLACE | REDACTED-0884 |

## Who Must File Schedule SE

You must file Schedule SE if:

- ▶ You had net earnings from self-employment from other than church employee income (line 4 of Short Schedule SE or line 4c of Long Schedule SE) of $400 or more or
- ▶ You had church employee income of $108.28 or more. Income from services you performed as a minister or a member of a religious order is not church employee income (see page SE-1).

Note. Even if you had a loss or a small amount of income from self-employment, it may be to your benefit to file Schedule SE and use either "optional method" in Part II of Long Schedule SE (see page SE-3).

Exception. If your only self-employment income was from earnings as a minister, member of a religious order, or Christian Science practitioner and you filed Form 4361 and received IRS approval not to be taxed on those earnings, do not file Schedule SE. Instead, write "Exempt-Form 4361" on Form 1040, line 55.

## May I Use Short Schedule SE or Must I Use Long Schedule SE?

| 1 | Net farm profit or (loss) from Schedule F, line 36, and farm partnerships, Schedule K-1 (Form 1065), line 15a | 1 | |
| 2 | Net profit or (loss) from Schedule C, line 31; Schedule C-EZ, line 3; Schedule K-1 (Form 1065), line 15a (other than farming); and Schedule K-1 (Form 1065-B), box 9. Ministers and members of religious orders, see page SE-1 for amounts to report on this line. See page SE-2 for other income to report | 2 | 89,786 |
| 3 | Combine lines 1 and 2 | 3 | 89,786 |
| 4 | Net earnings from self-employment. Multiply line 3 by 92.35% (.9235). If less than $400, do not file this schedule; you do not owe self-employment tax ▶ | 4 | 82,917 |
| 5 | Self-employment tax. If the amount on line 4 is:<br>• $87,000 or less, multiply line 4 by 15.3% (.153). Enter the result here and on Form 1040, line 55.<br>• More than $87,000, multiply line 4 by 2.9% (.029). Then, add $10,788.00 to the result. Enter the total here and on Form 1040, line 55. | 5 | 12,686 |
| 6 | Deduction for one-half of self-employment tax. Multiply line 5 by 50% (.5). Enter the result here and on Form 1040, line 28 | 6 | 6,343 |

For Paperwork Reduction Act Notice, see Form 1040 Instructions.                    Schedule SE (Form 1040) 2003

JAA

DRDR  000692
HPK /Tamarix-Wallace/DocRecd11.09.09

**DTA000692**



EXHIBIT

24

3-4-10

# Financial Statements
## of
# Diane Tamariz & Associates, PA
## December 31, 2004

DRDR_000674
HPK /Tamarix-Wallace/DocRecd11.09.09

**DTA000674**

9:24 AM
01/07/05
Accrual Basis

# Diane Tamariz & Associates
## Balance Sheet
### As of December 31, 2004

|  | Dec 31, 04 |
|---|---|
| **ASSETS** | |
| **Current Assets** | |
| **Checking/Savings** | |
| AB&T Escrow | 16,587.20 |
| Cash-checking sub 1 | 704.85 |
| Cash-operating account | -7,250.52 |
| Cash-payroll account | 1,399.59 |
| Cash-primary savings | 32,739.86 |
| Cash-savings sub 1 | 5.00 |
| **Total Checking/Savings** | 44,185.98 |
| **Accounts Receivable** | |
| Accounts Receivable | 162,000.00 |
| **Total Accounts Receivable** | 162,000.00 |
| **Other Current Assets** | |
| Petty Cash | 50.00 |
| Premiums advanced | -8,377.38 |
| Short Term Loan to Dave Wallace | 2,600.00 |
| Short Term Loan to Specialty DI | 16,713.12 |
| **Total Other Current Assets** | 10,985.74 |
| **Total Current Assets** | 217,171.72 |
| **Fixed Assets** | |
| Automobiles | 2,793.01 |
| Furniture & fixtures | 41,434.21 |
| Leasehold improvements | 31,631.24 |
| Office equipment | 19,247.38 |
| **Total Fixed Assets** | 95,105.84 |
| **Other Assets** | |
| Loans to SDM 2003 | 200,000.00 |
| Security Deposit 3147 | 2,500.00 |
| Security Deposit Satellite | 2,000.00 |
| **Total Other Assets** | 204,500.00 |
| **TOTAL ASSETS** | 516,777.56 |
| **LIABILITIES & EQUITY** | |
| **Liabilities** | |
| **Current Liabilities** | |
| **Accounts Payable** | |
| Accounts Payable | 13,777.81 |
| **Total Accounts Payable** | 13,777.81 |
| **Credit Cards** | |
| **Credits Cards** | |
| Amex 11006 | 5,819.91 |
| Amex Open 01009 | 42,757.67 |
| Home Depot Credit Card | 2,171.74 |
| Office Depot CC | 2,902.36 |
| Sam's Club | 2,296.04 |
| Credits Cards - Other | -204.00 |
| **Total Credits Cards** | 55,743.72 |
| **Total Credit Cards** | 55,743.72 |

DRDR 000675
HPK /Tamarix-Wallace/DocRecd11.09.09
**DTA000675**

9:24 AM
01/07/05
Accrual Basis

# Diane Tamariz & Associates
## Balance Sheet
### As of December 31, 2004

|  | Dec 31, 04 |
|---|---|
| **Other Current Liabilities** | |
| Note payable @131.00 | 1,092.54 |
| Note payable @195.21 | 2,346.70 |
| Payroll Liabilities | 7,504.29 |
| Short Term Loan | -200.00 |
| **Total Other Current Liabilities** | 10,743.53 |
| **Total Current Liabilities** | 80,265.06 |
| **Long Term Liabilities** | |
| 2002 Tax Liability | 6,690.58 |
| CAP Loan | 100,000.00 |
| Commerce First LOC | 143,624.70 |
| Note payable-Noreast ($498) | 11,455.00 |
| Note payable-Noreast ($588.02) | 12,349.42 |
| **Total Long Term Liabilities** | 274,119.70 |
| **Total Liabilities** | 354,384.76 |
| **Equity** | |
| Customer Retention Management G | -112.50 |
| Opening Bal Equity | 85,112.08 |
| Owner's Capital | 86,000.00 |
| **S Distribution** | |
| Credit Cards | -4,487.87 |
| Crofton expenses | |
| Storage Units Personal | -1,249.62 |
| Utilities-Crofton | -143.00 |
| Crofton expenses - Other | 901.12 |
| **Total Crofton expenses** | -491.50 |
| Daves stuff | -4,239.23 |
| Insurance-NBLH Life | -1,433.79 |
| Insurance-NTW Life 1 | -2,628.00 |
| Medical | -352.04 |
| Miscellaneous | -2,822.02 |
| S Distribution - Other | -14,008.14 |
| **Total S Distribution** | -30,462.59 |
| Uncleared Check from March '04 | -25,764.79 |
| Net Income | 47,620.60 |
| **Total Equity** | 162,392.80 |
| **TOTAL LIABILITIES & EQUITY** | 516,777.56 |

DRDR 000676
HPK /Tamarix-Wallace/DocRecd11.09.09

**DTA000676**

9:23 AM
01/07/05
Accrual Basis

# Diane Tamariz & Associates
## Profit & Loss
### January through December 2004

|  | Jan - Dec 04 |
| --- | --- |
| **Ordinary Income/Expense** | |
| **Income** | |
| Brokered Commissions | |
| Nationwide Payroll | |
| ILH Commission | 21,117.84 |
| Nationwide Contingency Bonus | 33,459.58 |
| P&C Commission | 162,000.00 |
|  | 254,855.54 |
| Total Nationwide Payroll | 450,315.12 |
| Reimbursed Expenses | 3,483.38 |
| **Total Income** | 474,896.34 |
| **Expense** | |
| 401k Expense | |
| Advertising and promotion | 3,377.50 |
| Automobile Expense | 22,585.59 |
| Bank Fees | 2,980.19 |
| Bookkeeping Expense | 918.44 |
| Casual Labor | 6,267.11 |
| Contract services | 658.00 |
| Contributions | 24,091.08 |
| Dues and Subscriptions | 1,702.00 |
| E&O Expense | 980.94 |
| Education | 804.80 |
| NTC Agency School | 970.00 |
| Education - Other | 1,154.60 |
| Total Education | 2,124.60 |
| **Employee Benefits** | |
| CEO Perks | |
| Gartmore Funds | 450.00 |
| Group HLA | 120.00 |
| Group Life | 132.95 |
| Group LT Disability | 347.76 |
| Group Medical | 898.88 |
| Group ST Disability | 111.36 |
| Key Person Life | 1,500.00 |
| Total CEO Perks | 3,560.95 |
| Group Dental | 298.80 |
| Group Health | 10,750.51 |
| Marc's Car | 8,316.53 |
| Telephone | 4,075.85 |
| Employee Benefits - Other | 1,167.26 |
| Total Employee Benefits | 28,169.92 |
| Equipment Rental | 2,117.50 |
| Insurance - General Office | 2,640.43 |
| Interest Expense | 9,141.66 |
| Leased Office Equipment | |
| Copier Lease | 1,660.26 |
| Total Leased Office Equipment | 1,660.26 |
| Licenses and Permits | 2,043.14 |
| Miscellaneous | 487.81 |
| Office Expense | 1,454.43 |
| Office Supplies | 7,088.80 |
| Payroll Expenses | 206,232.18 |
| Postage and Delivery | |
| Courier & Fed Ex | 356.63 |
| Postage and Delivery - Other | 4,628.26 |
| Total Postage and Delivery | 4,984.89 |
| Printing and Reproduction | 3,03 |
| Professional Development | 1,354.91 |

DRDR 000677
HPK /Tamarix-Wallace/DocRecd11.09.09
DTA000677

9:23 AM
01/07/05
Accrual Basis

# Diane Tamariz & Associates
## Profit & Loss
### January through December 2004

|  | Jan - Dec 04 |
|---|---|
| **Professional Fees** |  |
| Accounting | 2,062.00 |
| Legal Fees | 3,717.25 |
| Professional Fees - Other | 10,587.50 |
| **Total Professional Fees** | 16,366.75 |
| **Recruiting** |  |
| Background Investigation Fees | 652.00 |
| Recruiting - Other | 6,000.00 |
| Total Recruiting | 6,652.00 |
| Rent | 22,500.00 |
| **Repairs** |  |
| Building Repairs | 4,514.69 |
| Janitorial Exp | 2,412.96 |
| Total Repairs | 6,927.65 |
| Satelite Office | 4,679.04 |
| Security | 374.82 |
| Suspense | 535.92 |
| Taxes | 6,724.00 |
| Telephone | 8,281.04 |
| Translation Services | 15.30 |
| **Travel & Ent** |  |
| Entertainment | 698.96 |
| Meals | 7,142.07 |
| Travel & Ent - Other | 4,985.56 |
| Total Travel & Ent | 12,826.59 |
| **Utilities** |  |
| Gas and Electric | 3,246.66 |
| Oil | 309.21 |
| Water | 671.83 |
| Total Utilities | 4,227.70 |
| **Total Expense** | 427,013.49 |
| Net Ordinary Income | 47,882.85 |
| **Other Income/Expense** |  |
| **Other Income** |  |
| Interest Income | 149.75 |
| Total Other Income | 149.75 |
| **Other Expense** |  |
| Other Expenses | 412.00 |
| Total Other Expense | 412.00 |
| Net Other Income | -262.25 |
| **Net Income** | 47,620.60 |

DRDR  000678
HPK /Tamarix-Wallace/DocRecd11.09.09

**DTA000678**



1.5.05

I have talked to three people in last 24 hours and each has a different approach.

1. Bill Jones—the deal has changed—what is you price...and it isn't $3MM plus here are the reasons why each of these points won't fly.

2. Tom Hennessy—prepare a letter and let's simply do the deal....we'll get financing or a letter of credit and be done with it.....let's move along.

3. Rob Lieblein—feels I should go beck to George and say we gave you the $2MM up front and the $250K contingency. That reduces your risk to $750K. Here are a couple points to give you security...now let's move on and you take back the promissory note of $750K payable over three years.

Craig Seibert's point is each approach has merit.....but Craig thinks George will stonewall Rob's approach and Bill's may be to harsh. The ideal way to go is to get funding and be done with it. He is trying to contact Suntrust and set up me calling Greg Pence. Second, he was very impressed with Carol Kasper—she called him and had the decision maker in the room. The conversation was very professional the underwriter asked all the tough questions. Craig gave it an A++. Craig also thought Alan Hyatt at Severn Saving would be a good contact. The guy at BayCountry was out till next Monday. Craig thinks we go with three banks...he also thinks we should pull the plug on Commerce1st/SBA. He does not think we need it.

Craig parting shot was -- we ask George what security can he give us against the non-compete?

Moran.notes.1.5.05

EXHIBIT
24
3-4-10

1.6.05

Game Plan for Moran

Overview for Greg Pearce--Suntrust

1. My wife and I own two businesses......her business is an insurance agency which she has developed over 15 years in Edgewater. It is a Nationwide agency.
2. Nationwide corporate wants to expand market share.
3. We have a $12MM independent agency acquisition deal.
   a. the letter of intent is signed
   b. the deal is for $3MM and we have secured funding from NW for $2MM—(payable over 12 years at 1% over prime) which covers the $5MM of premium which will convert to NW.
   c. we have structured the deal to pay out of the $1MM in three payments of $200K 3.31.06; $300K 3.31.07 and $500K 3.31.08 with a promissory note
   d. in the late negotiations—we hit a speed bump—and now have to find a way to secure our promissory note—with either a letter of credit or line of credit for $1MM which in essence covers the other $7MM which we will own and stay with various carriers.
   e. the acquisition alone will throw off a net cash in first year of $361K, second year of $896K, third year $786K and fourth year $761K, fifth year $823K
4. We are scheduled to go to settlement 1.18, 1.19 but definitely before January 31st.
5. The combined business of Diane agency and the acquisition will be about $16MM and whoever comes forward to help us will be the bank we do business with.
6. Our CPA is Craig Seibert—and lawyer is Tom Hennessy (Will Simmons) and Bill Jones in the background.

CRMG   000482
HPK/NATIONWIDE/Tamariz/Docs Received from Wallace

EXHIBIT
27
3-4-10

TO:        Greg Pearce – SunTrust Bank

FROM:      Dave Wallace

RE:        Funding for $1MM

DATE:      1.7.05

Greg, enclosed is a loan package for the Moran acquisition.

To overview:
A. Enclosed is the WFG Capital Advisors due diligence of Moran; the letter of intent; the submission from Maryland Corporate Nationwide to Home Office Nationwide in Columbus; personal tax returns; Moran tax returns; Diane Tamariz & Assoc. financials; Moran's June 30th year end financials.
B. The independent (WFG) evaluation of Moran is between $2.3MM and $2.6MM but the owner wanted $3.5MM. We settled on $3MM plus performance bonuses.
C. The evaluation submitted by Nationwide isolates the acquisition and does not consider the combined revenue from DTA.
D. Diane without the acquisition in 2004 was recognized by a President's award which puts her in the top 5% NW agents of 5,000 salesforce. Her Edgewater agency has $3.5MM in premium.
E. Other important points:
   1. The $2MM funding from Nationwide is secured by Diane's retirement and retained earnings. This represents $5MM of premium from Moran that we anticipate will convert to Nationwide. Please understand that once this premium moves to NW, they will own these customers. We own the revenue stream.
   2. The other $7MM Moran premium is what we are looking for a security for the promissory note payable – March 31, 2006 of $200K; March 31 2007 of $300K; March 31 2008 of $500K. We anticipate the $1MM to either be a letter of credit or line of credit. Further, with the strong cash flow in #3 we may not have to tap the letter or line.
   3. Please note the strong cash flow position of the acquisition only which generates in year one $361K; year two $896K; year three $786K; year four $761; year five $823K. These are nets after payment of $3MM amortized over 12 years as was originally submitted to Nationwide. This is a conservative estimation.
   4. Should you have any questions, feel free to call Craig Seibert or myself.
   5. We are on somewhat of a short time fuse since we want to go to settlement preferably January 18 or 19 with January 25 and 31 as back-ups. Others have a head start on you all and we anticipate

preliminaries back next week.  Further once this acquisition takes
place we will have a $16MM a year company and whoever steps up
assisting us with this last part of the effort will get a new customer.

Greg, once again Diane and I would like to meet you early next week.  I will be
going to a conference Thursday and Friday.  Diane will joining me Friday.  I think
it is important to put a face to this request.

Please let me know if this suits the appetite of SunTrust.

Thank you in advance for your assistance in this matter.

Moran.suntrust.greg.pearce.1.7.05

CRMG    000481
HPK/NATIONWIDE/Tamariz/Docs Received from Wallace



2.11.05

George, our concern is what assurances do we have that you will be around for a minimum of 3 years?

We need to feel secure and here is the deal as we see it.

1. Settlement of $2.25MM.
2. $500K secured over 3 years from Nationwide—payable at $300K 3/31/06; $200K 3/31/07.
3. $1MM over 3 years from DTA—payable $200K 3/31/06; $300K 3/31/07; $500K 3/31/08 and contingent upon the $1.4MM revenue matched annually. If not matched, a $1.00 in revenue is deducted against each $1.00 of the annual payment from DTA. Should the revenue exceed the $1.4MM annually, it is to DTA's discretion regarding an additional bonus. This portion is based on George in a leadership active role with the agency.
4. Salary $138K annually with a 5% increase based on performance for a period of a minimum of 3 years. Employment contract in force for 3 years.
5. Bonus is $500K over 5 years minus the interest paid on the promissory note based on making the 5% contingency and the conversion schedule to Nationwide.
6. Lease is 3 years with option of 1 year thereafter.


Optional street deal:
1. Settlement of $2MM with $200K hold-back for 45 days.
2. $1MM payable in three installments based on $1.4MM in revenue annually. If not matched, a $1.00 in revenue is deducted against each $1.00 of the annual payment from DTA. Should the revenue exceed the 41.4MM annually, it is to DTA's discretion regarding an additional bonus. This portion is based on George in a leadership active role with the agency.

EXHIBIT

29

3-4-10

Dave & Diane,

I hope you are enjoying the snow!

For the past week I have been pondering your email of February 22, 2005. Without a long narrative, I will just get to how I think we can make this work and satisfy your lenders' concerns.

1. The only major issue is the post closing retention adjustment. I will agree to such an adjustment if structured as follows.
   - Commission revenue needs to be defined as to exclude contingency/profit sharing income. Since DTA expects to pay for a large portion of the buy-out through a NW contingency agreement it would be unlikely that Moran Insurance would continue to receive contingency income from its' carriers at historical levels. Moran's P&C commission revenue excluding profit sharing for FYE 6/30/2004 was $1,300,000. This would be the commission number to be maintained.
   - I will agree to a retention adjustment subject to an absolute minimum purchase price of $2,750,000. In the event commission revenues exceed the $1,300,000. Moran is entitled to additional compensation for the business subject to a maximum purchase price of $3,250,000.
   - If we have to have an adjustment it will have to "cut both ways."

2. A lesser issue – I will agree to the post closing escrow of $50,000 for a period of 60 days with the understanding that tangible net worth exceeding $313,000 will be paid to me within 60 days. As you can see, all adjustments have to "cut both ways."

3. As you know from previous correspondence, my salary was increased back in November to $160,000. I will expect this salary to continue along with the annual increases we discussed earlier. Up to this point, we have not discussed benefits and expense reimbursements. Assuming we get through items 1 & 2 we need to have a conversation concerning benefits and expense reimbursements to make sure we start off without any misunderstandings and surprises.

I am sure I'll hear from you soon.

George T. Moran
Moran Insurance
696 Ritchie Hwy
Severna Park, MD 21146-3981
410.544.3422.x115
800.544.3164

**Dave Wallace**

EXHIBIT

30

3-4-16

| | |
|---|---|
| From: | Dave Wallace [dwallace@specdir.com] |
| Sent: | Wednesday, April 06, 2005 4:02 PM |
| To: | 'Jim Green' |
| Subject: | RE: Agency Mailing X2 |

Phyllis, remind Judy---no mention of Nationwide or Diane and no mention of CRMG or SDM on the Agency Acquisition Management Group calls--also remember when she is doing this calling, if she leaves a call back--we need to know how to handle that--since the phone will answer CRMG--SPECIALTY DIRECT.

She is to get phone appointments.

Tomorrow get her aside and tell her we want her for the rest of the week.  We had a brief discussion about pay....here is what I'd like to do.  Start her at $9.00/ hour and after 90 days move her to $10.00 per hour but this is not a commitment.  We will review her performance weekly.

So that you know...in our conversation she said she had been making $10 at her old job but I now have learned Diane was paying her $8...what I would like to propose is $9 now and upon good performance...move her up to $10.

Dave

-----Original Message-----
From: Jim Green [mailto:jgreen@specdir.com]
Sent: Wednesday, April 06, 2005 12:41 PM
To: PSmith@specdir.com
Cc: Dwallace@specdir.com
Subject: Agency Mailing X2

Phyllis:

I spoke with Dave briefly before he left for his PM meeting.  He'd like to re-mail the Agency mailing.  Lets talk about when to schedule this.  We can have Judy follow-up on these in much the same way as she is doing on the bank mailings.

Jim

1

EXHIBIT

_31_

3-4-16   6A

AGREEMENT FOR SALE OF STOCK

THIS AGREEMENT is made this __11ᵗʰ__ day of __March__ 2005, between GEORGE T. MORAN, Trustee of the George T. Moran Revocable Living Trust ("Seller"), and B. DIANE TAMARIZ-WALLACE ("Purchaser").

## RECITALS

WHEREAS, Seller owns all of the issued and outstanding shares of GEORGE T. MORAN, INC., a Maryland corporation with its principal office in Severna Park, Maryland (the "Company");

WHEREAS, Seller desires to sell, and the Purchaser desire to buy, such shares on the terms herein stated.

NOW THEREFORE, the Parties agree as follows.

1.  SALE OF SHARES.  Seller shall sell and transfer to Purchaser, and Purchaser shall purchase and acquire from Seller, all of the outstanding shares of the Company, consisting of 200 common shares without par value.  Immediately after Closing, Purchaser shall create a new class of preferred stock, which shall be non-voting, without par value, and with a non-cumulative dividend right to $100.00 per share.  Commensurate with creating the preferred stock, the Company will issue one share to Seller, which share shall be non-transferable and subject to the Company's discretionary right to redeem the same.

2.  PURCHASE PRICE.  The total purchase price for the shares is Three Million Dollars ($3,000,000.00).  At Closing, Purchaser will deliver Two Million Two Hundred Fifty Thousand Dollars ($2,250,000.00) in certified or wired funds, a promissory note for Five Hundred Thousand Dollars ($500,000.00), and a second promissory note for Two Hundred Fifty Thousand Dollars ($250,000.00).

The $500,000.00 promissory note will be secured by Purchaser's right to receive deferred payments from Nationwide Federal Credit Union.  The $250,000.00 promissory note will be secured by the Company and personally guaranteed by B. Diane Tamariz-Wallace and C. David Wallace.   The promissory notes shall bear simple interest at 4% per annum.  As to the $500,000.00 promissory note, a first payment of Two Hundred Fifty Thousand and zero hundredths Dollars ($250,000.00), plus interest, shall be due and payable not later than 60 days after the first anniversary of Closing Date; and a second and final payment of Two Hundred Fifty Thousand and zero hundredths Dollars ($250,000.00), plus interest, shall be due and payable not later than 60 days after the second anniversary of Closing Date.  As to the $250,000.00 promissory note, a first payment of interest only shall be due and payable not later than 120 days after the first anniversary of Closing Date; a second payment of interest only shall be due and payable not later than 60 days after the second anniversary of Closing Date; and a third and final payment of Two Hundred Fifty Thousand and zero hundredths Dollars ($250,000.00), plus

Page 1 of 35

f.     No Adverse Change. There shall not have been any change between the date of the most recent financial statements and the Closing Date which has had or will be likely to have a material adverse effect on the business, operations, financial condition or reasonably foreseeable prospects of the Company, and a certificate shall have been delivered to Purchaser to such effect signed by the Seller and such executive officers of the Company as Purchaser may request.

g.     Consents and Approvals. The Company and/or Seller shall have obtained, at its sole expense, all necessary consents and approvals, in form and substance satisfactory to Purchaser, required under all agreements pertaining to the business of the Company, and satisfying any approval or permit or licensing requirements for consummation of this transaction and necessary to carry on the business of the Company, including without limitation associate agent appointments required by Nationwide Insurance Enterprise..

h.     UCC Lien Search. Purchaser shall have received a satisfactory UCC lien search on the Company from the Maryland State Departments of Assessments and Taxation, and the appropriate agency or office of each state in which the Company does business, and from the appropriate office in each county in which the Company has business operations. Such lien searches will be conducted by an entity or individual acceptable to Purchaser at Purchaser's sole expense.

i.     Non Competition and Confidentiality Agreement; Employment Agreement. A key employee of the Company is George T. Moran. This Agreement is expressly contingent on George T. Moran executing and delivering at Closing an employment agreement requiring him to continue in the Company's employ for at least three (3) years, in the form attached as EXHIBIT ONE.

j.     No Injunction, etc. No action, proceeding, investigation or legislation shall have been instituted, threatened or proposed before any court, governmental agency or legislative body to enjoin, restrain, prohibit or obtain substantial damages in respect of, or which is related to or arises out of this Agreement or the consummation of the transactions contemplated hereby, or which is related to or arises out of the business or operations of the Company, if such action, proceeding, investigation or legislation, in the reasonable judgment of Purchaser or its counsel, would make it inadvisable to consummate such transactions.

5.     SELLER'S CONTINGENCIES     The obligations of the Company and the Seller to effect the transaction contemplated hereby shall be subject to the fulfillment at or prior to the Closing Date of the following conditions:

a.     Representations and Warranties. The representations and warranties of Purchaser set forth below shall be true and correct in all material respects as of the Closing Date with the same effect as though made on and as of such date.

b.     Performance. Purchaser shall have performed in all material respects, at or prior to the Closing Date, all acts in accordance with its covenants set forth herein

Page 5 of 35

6.    REPRESENTATIONS AND WARRANTIES OF COMPANY AND SELLER

    a.    Representations and Warranties of the Company. The Company represents and warrants to the Purchaser that the statements contained in this Section are correct and complete as of the date of this Agreement and will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the date of this Agreement throughout this Section).

        1.    Organization, Qualification, and Corporate Power.

            A.    The Company is a corporation duly organized, validly existing, and in good standing under the laws of the State of Maryland. The Company is duly qualified to conduct business and is in good standing under the laws of each jurisdiction where such qualification is required. The Company has full corporate power and authority and all licenses, permits, and authorizations necessary to carry on the businesses in which it is engaged and to own and use the properties owned and used by it.

            B.    The Seller has delivered to the Purchaser correct and complete copies of the charter and bylaws of the Company, as amended to date. The minute books of the Company contain accurate and complete records of all meetings of and material corporate action taken by the Company's shareholders, its board of directors and any committees of the board of directors. The stock certificate books and the stock record books of the Company are correct and complete. The Company is not in default under or in violation of any provision of its charter or bylaws.

            C.    The Board of Directors of the Company has duly and validly approved this Agreement and the transactions contemplated hereby.

            D.    The Company has the full authority and legal capacity to execute and deliver this Agreement and all other documents pertaining to this stock sale to be executed and delivered by the Company and to consummate the transactions contemplated herein. No other proceedings on the part of the Company or the Seller are necessary to consummate the transactions contemplated herein. This Agreement when executed, will constitute the legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws and subject to general principles of equity, regardless of whether such enforceability is considered in a proceeding in equity or at law.

        2.    Capitalization. The entire authorized capital stock of the Company consists of 200 shares of common stock, without par value, (herein, the "Stock") all of which shares are issued and outstanding. All of the issued and outstanding shares (A) have been duly authorized, are validly issued, fully paid and non-assessable, (B) are held beneficially and of record by the Seller, and (c) were not issued in violation of any agreement or other understanding, and are not subject to any pre-emptive rights. None of the Stock was issued in violation of any federal or state securities laws. Other than this Agreement, there are no outstanding or authorized options,

Page 6 of 35

warrants, purchase rights, subscription rights, conversion rights, exchange rights or other contracts or commitments that could require the Company to issue, sell or otherwise cause to become outstanding any of its capital stock. There are no outstanding or authorized stock appreciation, phantom stock, profit participation or similar rights with respect to the Company. There are no voting trusts, proxies or other agreements or understandings with respect to the voting of the capital stock of the Company. There are no commitments of the Company to repurchase, redeem or otherwise acquire any shares of capital stock of the Company, as the case may be, or requiring the Company to vote or to dispose of any shares of capital stock of the Company, as the case may be. The sale and delivery of the Stock to the Purchaser pursuant to this Agreement will vest in the Purchaser all right, title and interest in and to all of the issued and outstanding capital stock of the Company, free and clear of all encumbrances (other than encumbrances created or suffered by the Purchaser).

3. **Noncontravention**. Neither the execution and the delivery of this Agreement by the Company, nor the consummation of the transactions contemplated hereby, will violate any constitution, statute, regulation, rule, injunction, judgment, order, decree, ruling, charge or other restriction of any government, governmental agency or court to which the Company is subject, or any provision of the charter or bylaws of the Company; or conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel or require any notice under any agreement, contract, lease, license, instrument or other arrangement to which the Company is a party or by which it is bound or to which any of its assets is subject (or result in the imposition of any security interest upon any of its assets). The Company does not need to give any notice to, make any filing with, or obtain any authorization, consent or approval of any government or governmental agency or third party in order for the Parties to consummate the transactions contemplated by this Agreement. The Company has obtained any and all required consents or approvals, including without limitation any and all carrier contracts in effect on Closing Date.

4. **Title to Assets**. The Company has good and marketable title to, or a valid leasehold interest in, the properties and assets used by it, located on its premises or shown on the most recent balance sheet dated February 28, 2005 (the "Most Recent Balance Sheet") contained in the Financial Statements (defined below) or acquired after the date of the Most Recent Balance Sheet, free and clear of all security interests, except for properties and assets disposed of in the ordinary course of business since the date of the Most Recent Balance Sheet. The facilities and equipment owned or leased by the Company are in good operating condition and repair and free from any material defects, reasonable wear and tear excepted, and are suitable for the uses for which they are being used and are performing the functions for which they were intended. The properties, assets, equipment and rights owned, licensed or leased by the Company constitute all properties (whether real or personal, tangible or intangible), assets and rights necessary for the Company to conduct its business after the Closing as it is presently being conducted and as it will be conducted on the Closing Date. Notwithstanding the foregoing, the Parties acknowledge that Seller owns the building in which the Company presently conducts business, and leases a portion of the building to the Company.

A.     For purposes of this Agreement, "Taxes" means (1) any and all federal, state, local, foreign and other taxes, assessments and other governmental charges, duties, impositions and liabilities, including taxes based upon or measured by gross receipts, income, profits, sales, use and occupation and value added, ad valorem, transfer, gains, franchise, capital stock, severance, withholding, payroll, recapture, employment, excise, unemployment insurance, social security, business license, occupation, business organization, stamp and environmental property taxes and levies or assessments for unclaimed property under applicable escheat or unclaimed property laws, together with all interest, penalties and additions imposed with respect to such amounts; (2) any liability imposed by applicable law for the payment of taxes of another person, and (3) any liability for the payment of taxes imposed by contract or otherwise. "Tax Return" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto and any amendment thereof.

B.     The Company has filed all Tax Returns required to be filed by it prior to the date of this Agreement, and such Tax Returns are true and correct in all material respects and are completed and compliant in accordance with applicable law. SCHEDULE B lists all jurisdictions in which Tax Returns are required to be filed by the Company (or have been required since the inception of the Company) and the types of Tax Returns required to be filed in each such jurisdiction. No claim has been made to the Company by any taxing authority in a jurisdiction where the Company does not or did not file Tax Returns to the effect that the Company is or may be subject to taxation by that jurisdiction.

C.     The Company has (1) timely paid all Taxes due and payable by it and all Taxes payable without the necessity of a Tax Return, (2) timely paid all Taxes for which a notice of assessment or collection has been received and (3) properly reserved for any Taxes that may become due and payable up to Closing Date.

D.     Neither the Internal Revenue Service (the "IRS") nor any other taxing authority has asserted any claim for Taxes in writing, or, to knowledge of the Company, is threatening to assert any claims for Taxes. No tax deficiency notice or notice of assessment or collection has been received in writing by the Company or the Seller. No audit or other examination of any Tax Return of the Company is presently in progress, nor has the Company been notified in writing or orally of any request for such an audit or other examination. No power of attorney to deal with Tax matters or waiver of any statute of limitations with respect to Taxes has been granted by the Company.

E.     The Company has withheld or collected and paid over to the appropriate governmental authorities (or are properly holding for such payment) all Taxes required by law to be withheld or collected with respect to its operations, including withholdings on payments to the Company for sales and use taxes or payments by the Company to employees or independent contractors on account of federal, state and foreign income Taxes, the Federal Insurance Contribution Act,  the Federal Unemployment Tax Act, and the Maryland Unemployment Tax Act..

Page 10 of 35

F.    There are no liens for Taxes upon the assets of any of the Company.

G.    No item of income or gain reported by the Company for financial accounting purposes for any period ending prior to or on the date of this Agreement is required to be included in taxable income for any taxable period after the date of this Agreement.

H.    The Company has made or will make available to Purchaser true copies of all Tax Returns that the Company has filed since its inception and true copies of all correspondence and other written submissions to or communications with any taxing authorities.

I.    The Company (1) has not agreed to and is not required to make any adjustment pursuant to Section 481(a) of the Code or has no knowledge that the IRS has proposed in writing any such adjustment or change in accounting method with respect to the Company, and (2) has no application pending with the IRS or any other taxing authority requesting permission for any change in accounting method.

J.    The Company is not and has not been a party to any joint venture, partnership or other arrangement or contract that could be treated as a partnership for U.S. federal income tax purposes.

K.    There are no Tax rulings, requests for rulings or closing agreements relating to the Company which could affect the liability for Taxes or the amount of taxable income of the Company for any period (or portion of a period) after the date of this Agreement.

L.    There are no outstanding commitments or waivers extending the statutory period(s) of limitations applicable to any claim for, or the period for the collection or assessment of, Taxes of the Company for any taxable period.

M.    The Company has disclosed on its federal income Tax Returns all positions taken therein, nondisclosure of which could give rise to penalties for substantial understatement of federal income tax within the meaning of Section 6662 of the Code. The Company has not participated in any "reportable transactions" as such phrase is defined in Treasury Regulation Section 1.6011-4.

11.   Intellectual Property.

A.    The Company owns or has the right to use pursuant to license, sublicense, agreement or permission all intellectual property necessary for the operation of the businesses of the Company as presently conducted, including, without limitation, the *AccuComp* franchise. The Company owns all right, title and interest in the trade names and/or service marks "George T. Moran, Inc.", trading as "Moran Insurance". Each item of intellectual property owned or used by the Company immediately prior to the Closing hereunder will be owned or available for use by the Company on identical terms and conditions immediately subsequent to

Page 11 of 35

the Closing hereunder. The Company has taken all necessary action to maintain and protect each item of intellectual property that it owns or uses.

B.    The Company has not interfered with, infringed upon, misappropriated or otherwise come into conflict with any intellectual property rights of third parties, and the Company has never received any charge, complaint, claim, demand or notice alleging any such interference, infringement, misappropriation or violation (including any claim that the Company must license or refrain from using any intellectual property rights of any third party). To the knowledge of the Company, no third party has interfered with, infringed upon, misappropriated or otherwise come into conflict with any intellectual property rights of the Company.

C.    SCHEDULE C identifies each item of intellectual property that any third party owns and that the Company uses pursuant to license, sublicense, agreement, or permission. The Company has delivered to the Purchaser correct and complete copies of all such licenses, sublicenses, agreements and permissions (as amended to date). With respect to each such item of intellectual property, as identified in SCHEDULE C;

I.    the license, sublicense, agreement or permission covering the item is legal, valid, binding, enforceable and in full force and effect;

ii.    the license, sublicense, agreement or permission will continue to be legal, valid, binding, enforceable and in full force and effect on identical terms following the consummation of the transactions contemplated hereby;

iii.    no party to the license, sublicense, agreement or permission is in breach or default and no event has occurred which with notice or lapse of time would constitute a breach or default or permit termination, modification or acceleration thereunder;

iv.    no party to the license, sublicense, agreement or permission has repudiated any provision thereof;

v.    with respect to each sublicense, the representations and warranties set forth in subsections (I) through (iv) above are true and correct with respect to the underlying license;

vi.    the underlying item of intellectual property is not subject to any outstanding injunction, judgment, order, decree, ruling or charge;

vii.    no action, suit, proceeding, hearing, investigation, charge, complaint, claim or demand is pending or, to the knowledge of the Company, is threatened which challenges the legality, validity or enforceability of the underlying item of intellectual property; and

Page 12 of 35

viii.   the Company has not granted any sublicense or similar right with respect to the license, sublicense, agreement or permission.

12.   <u>Contracts and Commitments</u>.   All of the Company's material commitments, contracts or obligations, whether written or oral, express or implied, are listed and described in SCHEDULE D. The Company has delivered to Purchaser true and complete copies of all of the written contracts, leases and agreements, and a summary of the terms of any oral agreement, commitment, contract or obligation described in SCHEDULE D (collectively, the "Scheduled Contracts"). The Scheduled Contracts are valid and in full force and effect; each is a legal, valid and binding contract; there has been no threatened cancellation thereof to the knowledge of the Company;  there are no outstanding disputes under the Scheduled Contracts; each is with unrelated third parties and was entered into on an arms-length basis in the ordinary course of business; all will continue to be binding in accordance with their terms after consummation of the transactions contemplated herein; there is no material default (or an event which, with the giving of notice or lapse of time or both would be a material default) by the Company; and there is no pending, or to the knowledge of either the Company or the Seller any threatened, bankruptcy, insolvency or similar proceeding with respect to any other party to the Scheduled Contracts.   The Company's agency   agreements with its carriers disclose the premiums, fees and commissions paid to the Company in compliance with applicable law.  Other than the Scheduled Contracts, there are no contracts, leases, agreements or other instruments to which the Company is a party or is bound (other than insurance policies) which could either singularly or in the aggregate have an adverse effect on the value of the Company.

13.   <u>Notes, Accounts Receivable and Accounts Payable</u>.   The accounts receivable reflected on the Financial Statements arose in the ordinary course of business and, except as reserved against on the Financial Statements, are collectible in the ordinary course of business and consistent with past practices, free of any claims, rights or defenses of any account debtor. No accounts payable of the Company will be over forty-five (45) days old at the Closing Date.

14.   <u>Insurance, Bonds</u>.   True and correct copies of all insurance policies and bonds maintained by the Company, and all endorsements thereto, have been made available to Purchaser.  All such policies are valid, outstanding and enforceable and, taken together, provide commercially reasonable insurance coverage for the operations of the Company.  All such policies are in full force and effect on a claims-made basis, with no premium arrearages, and will continue in full force and effect following the consummation of the transactions contemplated hereby. There are no pending claims against such insurance by the Company as to which insurers are defending under reservation of rights or have denied liability, and there exists no claim under such insurance that has not been properly filed by the Company.

15.   <u>Litigation</u>.   There is no suit, claim, action, litigation, arbitration, governmental claim, investigation, audit or proceeding pending or, to the knowledge of the Company, threatened to which the Company is a party, at law or in equity, before any court, arbitration tribunal or governmental agency.  The Company has no knowledge of any facts on

Page 13 of 35

which material claims may be hereafter made against the Company. All claims and litigation pending against the Company are fully covered by insurance, subject to applicable deductibles.

16.   Employees and Employee Benefits.

A.   SCHEDULE E contains a complete and accurate list of the following information for each employee, officer or director of the Company: name; job title; current compensation paid or payable and any change in compensation since June 30, 2004; and paid time off accrued (to be updated to the Closing Date).

B.   No employee, officer or director of the Company is a party to, or is otherwise bound by, any agreement or arrangement, including any confidentiality, noncompetition or proprietary rights agreement between such employee, officer or director and any other person that in any way adversely affects or will affect (A) the performance of his duties as an employee, officer or director of the Company, or (B) the ability of the Company to conduct its business. To the knowledge of the Company, no director, officer, or other key employee of the Company intends to terminate his employment with the Company.

C.   The Company is in compliance in all material respects with all applicable laws respecting employment and employment practices, terms and conditions of employment, wages and hours, occupational safety and health, including laws concerning unfair labor practices within the meaning of Section 8 of the National Labor Relations Act, and the employment of non-residents under the Immigration Reform and Control Act of 1986.

D.   SCHEDULE F sets forth a true, complete and correct list of all of the following (collectively referred to as "Employee Benefit Plans"):

I.   "Employee Benefit Plans," as defined in Section 3(3) of the Employee Retirement Security Act of 1974, as amended and the rules and regulations promulgated thereunder (collectively, "ERISA"), and all benefit plans as defined in §6039D of the Internal Revenue Code, which are currently or have been at any time maintained or contributed to by the Company, or with respect to which the Company has any Liability or obligations to any current or former officer, employee or service provider of the Company or the dependents of any thereof; and

ii.   all other bonus, compensation, employee benefit, profit sharing, stock option, severance, supplemental unemployment, layoff, salary continuation, health, life insurance, disability, group insurance, vacation, holiday, sick leave, fringe benefit, change in control, consulting, independent contractor, professional services, confidentiality or non-competition agreements or any other similar plan, agreement, policy or understanding (whether oral or written) which are currently maintained or contributed to by the Company or with respect to which the Company has or could have any liability or obligations to any current or former officer, employee or service provider of the Company or the dependents of any thereof.

Page 14 of 35

E.      The Company does not maintain an employee benefit plan that is a defined benefit plan within the meaning of §3(35) of ERISA, nor has the Company ever maintained, sponsored or been obligated to contribute to any employee benefit plan that is or was (1) subject to Title IV of ERISA; (2) subject to the minimum funding requirements of Section 412 of the Code or Section 302 of ERISA; (3) a multi-employer plan; or (4) a multiple employer plan as defined under the Code and ERISA.

F.      The Company has heretofore made available to Purchaser with respect to each of the employee benefit plans, true, accurate and complete copies of all plan documents, employer's annual reports for each of the last three years, the most recent determination letter from the IRS, all personnel, payroll and employment manuals and policies, a written description of any employee benefit plan not otherwise in writing and all contracts relating to any employee benefit plan. Prior to Closing, the Company shall make available to Purchaser any other information, materials or documents related to any employee benefit plan requested by Purchaser.

G.      There are no pending or, to the knowledge of the Company, threatened or anticipated claims, lawsuits or actions relating to, by, on behalf of or against any employee benefit plan (other than routine claims for benefits).

H.      The Company has performed all of its obligations under all employee benefit plans, and each employee benefit plan has been maintained and operated in full compliance with its terms, all applicable laws including §401(a) of the Internal Revenue Code and ERISA, and any applicable collective bargaining agreement. Each employee benefit plan intended to be qualified under §401(a) of the Internal Revenue Code is so qualified, and no event has occurred that could cause any employee benefit plan to become disqualified for purposes of §401(a) of the Internal Revenue Code. There have been no prohibited transactions nor breaches of fiduciary duty with respect to any employee benefit plan.

I.      The consummation of the transactions contemplated by this Agreement will not accelerate the time of vesting or payment or increase the amount of compensation to any employee, director, officer, former employee or former officer of the Company. No payment that is owed or may become due to any director, officer, Employee or agent of the Company will be non-deductible to the Company or subject to tax under Code §§162, 404, 280G or 4999 of the Internal Revenue Code; nor will the Company be required to "gross up" or otherwise compensate any such person because of the imposition of any excise tax on a payment to such person. The consummation of this Agreement will not result in the payment, vesting or acceleration of any benefit to any director, officer, employee, former employee or agent of the Company.

J.      The Company has not incurred any liability to the U.S. Department of Labor (the "DOL") or the IRS in connection with any of the employee benefit plans, and no condition exists that presents a risk to the Company of incurring any liability to the DOL or the IRS in connection with any employee benefit plan.

Page 15 of 35

K.   The Company has paid in full all amounts that are required under the terms of each employee benefit plan or funding arrangement to have been paid as of the date of this Agreement. The Company has accrued all liabilities with respect to each employee or former employee in each employee benefit plan in accordance with generally accepted accounting practices.

L.   No written or oral representation has been made to any employee or former employee promising or guaranteeing any employer payment or funding, and no employee benefit plan provides for the continuation of medical, dental, life or disability benefits or insurance coverage for any former employee for any period of time beyond the earlier of the end of the current plan year or the termination of employment (except to the extent of coverage required under the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended).

M.   Each employee benefit plan can be amended or terminated at any time without approval from any person, with no advance notice and without any liability other than for benefits accrued prior to such amendment or termination.

N.   For purposes of this Section 3(a)(xviii), the term "employee" shall be considered to include individuals rendering personal services to the Company as independent contractors and leased employees as defined in Code §414(n) and the regulations promulgated pursuant thereto.

17.   Guaranties. The Company is not a guarantor or otherwise liable for any liability or obligation (including indebtedness) of any other person.

18.   Environmental, Health, and Safety Matters.

A.   The Company is currently in compliance with all Environmental Laws (as defined below), which compliance includes the possession by the Company of all permits and other governmental authorization required under applicable Environmental Laws to operate the business as currently operated, and is in compliance with the terms and conditions thereof.

B.   The Company has not stored, disposed of or arranged for disposal of any Hazardous Substances (as defined below) on any of the real property owned or leased by the Company, except in compliance with applicable Environmental Laws.

C.   The Company has not received any communication (written or oral), whether from a governmental authority, citizen's group, employee or otherwise, that alleges that the Company is or was not in full compliance with Environmental Laws, and there are no circumstances that may prevent, interfere with, or make more expensive such full compliance in the future. There is no Environmental Claim (as defined below) pending or threatened against the Company.

Page 16 of 35

D.     There have been no actions, activities, circumstances, conditions, events or incidents, including the generation, handling, transportation, treatment, storage, release, emission, discharge, presence or disposal of any Hazardous Substances that could form the basis of any Environmental Claim against the Company, and the Company has no knowledge of any such actions, activities, circumstances, conditions, events or incidents.

E.     The following terms shall have the following meanings:

i.     "Environmental Claim" means any claim, action, cause of action, investigation or notice (written or oral) by any person alleging potential liability (including potential liability for investigatory costs, cleanup costs, governmental response costs, natural resources damages, property damages, personal injuries, or penalties) arising out of, based on or resulting from (a) the presence, or release into the environment, of Hazardous Substances at any location which is or has been owned, leased, operated or utilized by the Company, or (b) circumstances forming the basis of any violation, or alleged violation, of any Environmental Law.

ii.     "Environmental Laws" means the federal, state, regional, county or local environmental, health or safety laws, regulations, ordinances, rules and policies and common law in effect on the date hereof and the Closing Date relating to the use, refinement, handling, treatment, removal, storage, production, manufacture, transportation or disposal, emissions, discharges, releases or threatened releases of Hazardous Substances or otherwise relating to protection of human health or the environment (including ambient air, surface water, ground water, land surface or subsurface strata), as the same may be amended or modified to the date hereof and the Closing Date.

iii     "Hazardous Substances" means any toxic or hazardous waste, medical or infectious waste, pollutants or substances, including asbestos, PCBs, petroleum products, byproducts, or other hydrocarbon substances, substances defined or listed as a "hazardous waste," "hazardous substance," "toxic substance," "toxic pollutant" or similarly identified substance or mixture, in or pursuant to any Environmental Law.

19.     Certain Payments. Neither the Company nor the Seller, director, officer, agent, or employee of the Company, or any other person associated with or acting for or on behalf of any of them, has directly or indirectly (A) made any contribution, gift, bribe, rebate, payoff, influence payment, kickback or other payment to any person, private or public, regardless of form, whether in money, property, or services (1) to obtain favorable treatment in securing business, (2) to pay for favorable treatment for business secured, (3) to obtain special concessions or for special concessions already obtained, for or in respect of the Company or (4) in violation of any law or (B) established or maintained any fund or asset that has not been recorded in the books and records of the Company.

20.     Bank Accounts. SCHEDULE G contains a true and complete list of (A) the names and locations of all banks, trust companies and other financial institutes at which the Company maintains accounts of any nature and the location of all lockboxes and safe deposit boxes of the Company, (B) the names of all persons authorized to draw thereon or make

Page 17 of 35

withdrawals therefrom or have access thereto, ( C ) the names of all persons holding general or special powers of attorney from the Company, and (D) a schedule of the security and/or performance bonds with respect to each such account and/or each person authorized to draw on any such account.

21.   <u>Disclosure</u>.   No representation or warranty made herein by the Company, nor in any written statement, certificate or instrument to be furnished to Purchaser by the Company contains or will contain any untrue statement of material fact or omits or will omit to state a material fact necessary to make these statements contained herein and therein not misleading. The Company understands and intends that Purchaser and its management will rely upon the representations of the Company and the Seller made in this Agreement, and they are entitled to rely upon each and all of the same without further inquiry.

b.   <u>Representations and Warranties of the Seller</u>.   The Seller represents and warrants to the Purchaser that the statements contained in this Section are correct and complete as of the date of this Agreement and will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the date of this Agreement throughout this Section) with respect to himself.

1.   <u>Authorization and Validity</u>.   The Seller has the full authority and legal capacity to execute and deliver this Agreement, and all documents pertaining to the sale of stock contemplated by this Agreement, to be executed and delivered by the Seller and to consummate the transactions contemplated herein. No other proceedings on the part of the Company or the Seller are necessary to consummate the transactions contemplated herein. This Agreement when executed, will constitute the legal, valid and binding obligation of the Seller, enforceable against the Seller in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws and subject to general principles of equity, regardless of whether such enforceability is considered in a proceeding in equity or at law.

2.   <u>Noncontravention</u>.   Neither the execution and the delivery of this Agreement, nor the consummation of the transactions contemplated hereby, will violate any constitution, statute, regulation, rule, injunction, judgment, order, decree, ruling, charge, or other restriction of any government, governmental agency or court to which the Seller is subject; or conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which the Seller is a party or by which the Seller is bound or to which the Seller's assets is subject. Seller does not need to give any notice to, make any filing with, or obtain any authorization, consent or approval from any government, governmental agency, or third party, in order for the Parties to consummate the transactions contemplated by this Agreement. Seller has obtained any and all required consents or approvals.

3.   <u>Company Common Stock</u>.   The Seller holds of record and owns beneficially all 200 shares, authorized and issued by the Company, free and clear of any

Page 18 of 35

restrictions on transfer (other than any restrictions under the Securities Act of 1933 and state securities laws), taxes, security interests, options, warrants, purchase rights, contracts, commitments, equities, claims and demands. The Seller is a not party to any option, warrant, purchase right or other contract or commitment that could require him to sell, transfer or otherwise dispose of any capital stock of the Company (other than this Agreement). The Seller is not a party to any voting trust, proxy or other agreement or understanding with respect to the voting of any capital stock of the Company.

4.    Certain Business Relationships with the Company. The Seller, in his capacity as trustee, has not been involved in any business arrangement or relationship with the Company within the past three (3) years. However, George T. Moran, as an individual, has been a key employee of the Company since its inception. Moreover, the Seller owns the office building known as 696 Ritchie Highway, Severna Park, Maryland, and has been renting, and will continue to rent, space in the building to the Company.

5.    Disclosure.  No representation or warranty made herein by the Seller, nor in any written statement, certificate or instrument to be furnished to the Purchaser by the Seller pursuant to any document pursuant to this Agreement, contains or will contain any untrue statement of material fact or omits or will omit to state a material fact necessary to make these statements contained herein and therein not misleading. The Seller understands and intends that Purchaser and its management will rely upon the representations of the Seller made in this Agreement, and they are entitled to rely upon each and all of the same without further inquiry.

7.    INDEMNIFICATION.

a.    Indemnification of Purchaser. The Seller agrees to indemnify and hold harmless Purchaser, the Company, each officer, director, employee or agent thereof, their respective controlling persons, and their respective estates, successors, and assigns (each an "Indemnified Party"), from and against any and all claims, losses, damages, liabilities and expenses, including settlement costs and any legal or other expenses for investigating or defending any actions or threatened actions (the "Losses") reasonably incurred by such Indemnified Party as a result of:

1.    the untruth, inaccuracy or breach of any representation or warranty made by the Company and/or the Seller in this Agreement or in any document created pursuant to this Agreement, to be executed by the Company or the Seller at or prior to the Closing;

2.    the nonfulfillment or breach of any covenant, agreement or obligation of the Company and/or the Seller contained in this Agreement or any other document created pursuant to this Agreement, to be executed by the Company or the Seller at or prior to the Closing;

3.    all liability for taxes of the Company assessed that is attributable to any pre-Closing partial period, or any taxable period ending on or prior to the Closing Date to the

extent that such liability for taxes exceeds any reserve for taxes reflected on the Closing Date Balance Sheet;

        4.     any liability for errors or omissions of the Company or the Seller relating to events arising prior to the Closing Date; and

        5.     any and all liability arising out of the civil lawsuit filed in the Anne Arundel County Circuit Court, which case is styled as *Helix Constructions Services, Inc. et al. v. George T. Moran Insurance, Inc. (Case No. 02-C-03-090449)*, including any settlement thereof.

      b.    <u>Indemnification of the Seller</u>. Purchaser shall indemnify and hold harmless the Seller (also an "Indemnified Party") as of the Closing Date from and against any and all losses reasonably incurred by the Seller as a result of:

        1.     the untruth, inaccuracy or breach of any representation or warranty made by Purchaser in this Agreement or in any document created pursuant to this Agreement, to be executed and delivered by Purchaser;

        2.     the nonfulfillment or breach of any covenant, agreement or obligation of Purchaser contained in this Agreement or any document created pursuant to this Agreement, to be executed and delivered by Purchaser, unless any such nonfulfillment or breach is waived in writing by the Seller; and

        3.     any liability for errors or omissions of the Company or Purchaser relating to events arising on or after the Closing Date.

      c.    <u>Limitations on the Indemnity</u>. Each Party shall be obligated to indemnify and hold harmless the Indemnified Party pursuant to Paragraphs (a) and (b) above, up to the aggregate amount of the Purchase Price (the "Cap"). Notwithstanding the foregoing, the Seller's obligation to indemnify the Purchaser, and the Purchaser's obligation to indemnify the Seller, as it relates to fraud, criminal activities or willful misconduct shall be limitless.

      d.    <u>Notification</u>. Whenever any claim shall arise for indemnification hereunder, the Indemnified Party shall notify the indemnifying Party promptly after such Indemnified Party has actual knowledge of the facts constituting the basis for such claim, except that, in the event of any claim for indemnification hereunder resulting from or in connection with any claim or legal proceedings by a third party, such Indemnified Party shall give prompt notice to the indemnifying Party of such claim or the commencement of legal proceedings in respect of which recovery may be sought against the indemnifying Party pursuant to the provisions of this Section. The notice to the indemnifying Party shall specify, if known, the amount or an estimate of the amount of the liability arising therefrom. The Indemnified Party shall not settle or compromise any such claim without the prior written consent of the indemnifying Party unless suit shall have been instituted against the Indemnified Party and the indemnifying Party shall have failed, within fifteen (15) days after notice of institution of the suit, to take control of such suit as provided in Paragraph (e) below.

e.   Defense of Actions.  In connection with any claim giving rise to indemnity hereunder resulting from or arising out of any claim or legal proceeding by a person who is not a Party, the indemnifying Party, at its sole cost and expense, may, upon written notice to the Indemnified Party, assume the defense of such claim or legal proceeding, to the extent that the indemnifying Party admits in writing its liability to the Indemnified Party with respect to all material elements thereof.  If the indemnifying Party assumes the defense of any such claim or legal proceeding, the obligations of the indemnifying Party hereunder as to such claim or legal proceeding shall be limited to taking all steps necessary in the defense or settlement thereof and to holding the Indemnified Party harmless from and against any losses, damages, expenses or liability caused by or arising out of any settlement approved by the indemnifying Party or any judgment in connection with such claim or legal proceeding.  Each Indemnified Party agrees that it will cooperate with the indemnifying Party in the defense of any such action, the defense of which is assumed by the indemnifying Party.  Except with the consent of the Indemnified Party, the indemnifying Party shall not consent to the entry of any judgment arising from any such claim or legal proceeding which, in each case, does not include as an unconditional term thereof the delivering by the claimant or the plaintiff to the Indemnified Party of a release from all liability in respect thereof, unless the indemnifying Party has actually paid to the Indemnified Party the full amount of such judgment or settlement.  If the indemnifying Party does not assume the defense of any claim or litigation, any Indemnified Party may defend against such claim or litigation in such manner as it may deem appropriate, including the settlement of such claim or litigation, after giving notice of the same to the indemnifying Party, on such terms as the Indemnified Party may deem appropriate.  The indemnifying Party will promptly reimburse the Indemnified Party in accordance with the provisions hereof.

f.   Payment.  All indemnification hereunder shall be effected by payment of cash or delivery of a certified or official bank check in the amount of the indemnification liability or by set-off against any amounts otherwise owed by Purchaser to the Seller.

g.   Survival of Indemnification Obligations.   The Seller's obligation to indemnify Purchaser relating to all matters arising hereunder shall survive until the fourth anniversary of Closing, except that indemnification for matters related to taxes shall survive for a period of the later of (I) ninety (90) days after the expiration date of the applicable statute of limitations for assessments of taxes (including extensions) or (ii) ninety (90) days after a final determination has been made with respect to any relevant taxation matter.

8.   CLOSING DATE.   The Closing shall take place at the Law Office of William M. Simmons, 20 West Street, Annapolis, Maryland., on the 60th day after execution of this Agreement, or the first business day thereafter if the 60th day is not a business day, or on such day as soon thereafter as all initial purchase money financing is available for disbursement, unless Purchaser elects to void this Agreement pursuant to Section 4(c) or 4(d).

9.   DEFAULT BY SELLER.   If Seller fails or refuses to deliver the shares to Purchaser at Closing, Purchaser, may pursue all legal and equitable remedies..

Page 21 of 35

10.   EMPLOYMENT ARRANGEMENTS. The Company has no written employment arrangements, including without limitation, collective bargaining agreements, written employment agreements, pension plans, profit sharing plans, insurance programs, deferred compensation arrangements, fringe benefit plans, or bonus plans, except as listed on SCHEDULE F.

11.   CONDUCT OF BUSINESS.

a.   Line of Credit. The Company has a line of credit with Annapolis Bank & Trust Company, the full outstanding balance of which, if any, will be paid and which line of credit will be closed by the Company prior to Closing Date; and Seller will furnish at Closing evidence that the line of credit has been fully paid and closed.

b.   Dividends. No dividend or other distribution or payment will be declared or made with respect to the shares of the Company, and the Company will not directly or indirectly redeem, purchase or otherwise acquire any of such shares.

c.   Operations, Inspection. The Company will continue to operate its business of insurance sales in the manner heretofore operated by it. No contracts or purchase orders, other than in the ordinary course of business, will be entered into or delivered by the Company. Until the closing, a representative of Purchaser shall have the right, during normal business hours, to visit the office of the Company to observe the operation of the business and shall have access to all of the Company's records.

d.   Employee Compensation. No increase will be made in the compensation payable or to become payable by the Company to any director, officer, employee or agent.

e.   Status quo. The Company will make its best effort to preserve it's business organization, to keep available the services of its directors, officers and employees, and to preserve friendly productive relationships with its customers.

f.   Leases.   At Closing, Seller, as Landlord, and Purchaser, as Tenant, will execute a lease in the form attached as EXHIBIT TWO.

12.   ENTIRE AGREEMENT. This Agreement constitutes the entire agreement between the Parties. Seller shall deliver all Schedules and Exhibits to Purchaser for review and approval within ten days from the date of this Agreement.

13.   BENEFIT. This Agreement shall be binding upon and inure to the benefit of the respective Parties, their legal representatives, successors and assigns.

14.   NOTICES. All notices, requests, demands, and other communications hereunder shall be in writing, and shall be deemed to be duly given if hand delivered, or if mailed by first class, postage prepaid mail, to the Parties as follows:

Seller:      George T. Moran, Trustee

Page 22 of 35

George T. Moran Revocable Trust
3020 Bennett Point Road
Queenstown, Maryland 21658

with a copy to :       John P. Rhody Jr, Esq.
                       Bagley & Rhody, PC
                       2661 Riva Road, Suite 1001
                       Annapolis, Maryland 21401

Purchaser:       B. Diane Tamariz-Wallace
                 Diane Tamariz & Associates, PA
                 3147 Solomons Island Rd
                 Edgewater, MD 21037

with a copy to :       Thomas M. Hennessy, Esq.
                       Law Office of William M. Simmons
                       20 West Street, PO Box 2266
                       Annapolis, Maryland 21404-2266

SECTION 15. ENFORCEABILITY.   In the event any action or proceeding is brought by or in the right of either party to enforce any provision of this Agreement, the non-prevailing party in such action or proceeding shall pay or reimburse the prevailing party for the prevailing party's costs and expenses reasonably incurred in connection with such action or proceeding, including court costs and reasonable attorney's fees.

16.     CONSTRUCTION.   This Agreement has been executed in Anne Arundel County, Maryland, and shall be construed in accordance with the laws of the State of Maryland.

17.     COUNTERPARTS.     This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

18.     ACTIONS NECESSARY TO COMPLETE TRANSACTION.   Each Party hereby agrees to execute and deliver all such documents or instruments and to take any action as may be reasonably required in order to effectuate the transactions contemplated by this Agreement.

19.     WAIVER.   Any waiver by either Party of any breach of any term or condition of this Agreement shall not be deemed a waiver of any other breach of such term or condition, nor shall the failure of either Party to enforce such provision constitute a waiver of such provision or of any other provision, nor shall such action be deemed a waiver or release of any other Party for any claims arising out of or connected with this agreement.

20.     SCHEDULES.     The Purchaser and Seller acknowledge that the Schedules attached hereto may be incomplete. Seller shall have the opportunity to complete the Schedules prior to Closing; provided that Purchaser shall have the right to declare the Agreement null and

Page 23 of 35

void in the event 'that any additions to the Schedules after the execution of this Agreement shall have a material adverse effect on the transaction provided herein.

21.   NO BROKERS.   No person has, or will have, as a result of the transactions contemplated by this Agreement any right, interest or claim against or upon the Purchaser for any commission, fee or other compensation payable as a finder or broker because of any act or omission by the Seller of by the Company. No person has, or will have, as a result of the transactions contemplated by this Agreement, any right, interest or claim against or upon the Seller or the Company for any commission, fee or other compensation payable as a finder or broker because of any act or omission by the Purchaser. Any fee or commission payable to John Bodkin, an employee of Diane Tamariz & Associates, PA, shall not be the responsibility of Seller or the Company; and Purchaser shall indemnify and hold Seller and the Company harmless from such fee or commission.

22.   ITEMS THAT DO NOT CONVEY. Attached as SCHEDULE H is a list of personal property of Seller that is not owned by the Company and is not included in this Agreement.

IN WITNESS WHEREOF, the Parties have duly executed this agreement on the date first above written.

ATTEST :

GEORGE   T.   MORAN,   INC.,   a Maryland corporation (The "Company")

By: _____ (SEAL)
George T. Moran, President

GEORGE   T.   MORAN   REVOCABLE LIVING TRUST ("Seller")

By: _____ (SEAL)
George T. Moran, Trustee

_____ (SEAL)
B. Diane Tamariz - Wallace, Purchaser

### Joinder of Escrow Agent

William M. Simmons joins in the execution of this Agreement  to evidence his consent to act as Escrow Agent, and further agrees to hold $ 50,000.00 in escrow until such time as the Parties agree

Page 24 of 35

in writing to the post closing adjustments to the purchase price, and the escrow funds have been disbursed pursuant to that agreeent, or until otherwise ordered by a Court of Competent jurisdiction.

_____
William M. Simmons

AGREEMENT FOR SALE OF STOCK

SCHEDULE A

LIST OF DIRECTORS AND OFFICERS

1. FYE June 30, 2000
2. FYE June 30, 2001
3. FYE June 30, 2002
4. FYE June 30, 2003
5. FYE June 30, 2004
6. YTD February 28, 2005

AGREEMENT FOR SALE OF STOCK

SCHEDULE B

LIST OF JURISDICTIONS IN WHICH TAX RETURNS ARE FILED

AGREEMENT FOR SALE OF STOCK

SCHEDULE C

LIST OF INTELLECTUAL PROPERTY

1.    AcuComp Software

AGREEMENT FOR SALE OF STOCK

SCHEDULE D

LIST OF CONTRACTS AND COMMITMENTS

1.     Helix Settlement Agreement
2.     AcuComp Franchise Agreement
3.     An Carrier Contracts

AGREEMENT FOR SALE OF STOCK

SCHEDULE E

LIST OF EMPLOYEES

AGREEMENT FOR SALE OF STOCK

SCHEDULE F

LIST OF EMPLOYEE BENEFIT PLANS

Page 31 of 35

AGREEMENT FOR SALE OF STOCK

SCHEDULE G

LIST OF BANK ACCOUNTS

AGREEMENT FOR SALE OF STOCK

SCHEDULE H

LIST OF PERSONAL PROPERTY THAT DOES NOT CONVEY

AGREEMENT FOR SALE OF STOCK

EXHIBIT ONE

FORM OF KEY MAN EMPLOYMENT AGREEMENT

AGREEMENT FOR SALE OF STOCK

EXHIBIT TWO

FORM OF LEASE

# BAGLEY & RHODY, P.C.

### ATTORNEYS AT LAW

CHARLES BAGLEY, IV
cbagley@bagleyrhody.com

JOHN P. RHODY, JR.
jrhody@bagleyrhody.com

_____

MATTHEW S. BALLARD
mballard@bagleyrhody.com

BUILDING 1000 ~ SUITE 1001
2661 RIVA ROAD
ANNAPOLIS, MARYLAND 21401

410-573-1626   (ANNAPOLIS)
410-269-8065   (BALTIMORE)
301-261-8785 (WASHINGTON)
410-269-8086    (FAX)

June 16, 2005

**VIA CERTIFIED MAIL/RETURN RECEIPT REQUESTED**

Mr. Michael Weisenburger, A.V.P.
Nationwide Federal Credit Union
P.O. Box 182794
Columbus, Ohio 43218-2794

      Re:    B. Diane Tamariz-Wallace
              3147 Solomons Island Road
              Edgewater, Maryland 21037

              George T. Moran, Trustee
              George T. Moran Revocable Trust
              3020 Bennett Point Road
              Queenstown, Maryland 21658

              Our File Number: 9565.03

Dear Mr. Weisenburger:

      I represent George T. Moran, Trustee of the George T. Moran Revocable Trust ("Moran Revocable Trust").

      Pursuant to an Agreement of Sale, B. Diane Tamariz-Wallace ("Tamariz-Wallace") purchased all shares of stock owned by Moran Revocable Trust in George T. Moran, Inc. As security for the payment in full of the purchase price, Tamariz-Wallace granted a Security Agreement in her right to receive from Nationwide Federal Credit Union two (2) payments of $250,000.00 each, the first of which is to be paid not later than sixty (60) days after April 29, 2006, and the second of which is to be paid not later than sixty (60) days after April 29, 2007.

BAGLEY & RHODY, P.C.

June 16, 2005
Page 2

I am writing to advise you of this Security Agreement and the request that you place a copy of this letter and the enclosed photocopy of the Security Agreement in your file.

If you have any questions, please contact me.

Sincerely yours,

John P. Rhody, Jr.

JPR:cas
Enclosure

cc:    Thomas Hennessy, Esquire
       Mr. George T. Moran

## SECURITY AGREEMENT

THIS AGREEMENT, made this 29th day of April, 2005, between B. DIANE TAMARIZ-WALLACE, 3147 Solomons Island Road, Edgewater, Maryland 21037 (herein called "Debtor") and GEORGE T. MORAN, Trustee of the George T. Moran Revocable Trust, of 3020 Bennett Point Road, Queenstown, Maryland 21658,(herein called "Creditor"), his successors and assigns.

WHEREAS, Debtor has purchased from Creditor all of the stock of George T. Moran, Inc., a Maryland corporation; and

WHEREAS, Debtor desires to grant and to confirm to Creditor a security interest in certain collateral pursuant to Title 9 of the Commercial Law Article of the Maryland Annotated Code in consideration of the purchase price of the stock.

NOW, THEREFORE, in consideration of the transfer of the stock from Creditor to Debtor pursuant to a Stock Purchase Agreement dated March 11, 2005, Debtor grants to Creditor a security interest in Debtor's right to receive from Nationwide Federal Credit Union two payments of $250,000.00 each, the first of which is to be paid not later than 60 days after the first anniversary of this Agreement; and the second of which is to be paid not later than 60 days after the second anniversary of this Agreement.

The collateral shall secure (1) the repayment to Creditor of a Note of even date in the maximum amount of $500,000.00 at a rate of four percent (4%) per annum containing other terms and conditions to be executed by the Debtor; (2) all costs incident to the collection of the Note and to the enforcement of the Creditor's rights hereunder; and (3) interest on any such funds.

Debtor agrees that in the event of default in the payment of the principal or interest of the aforesaid note or upon breach of any of the covenants or conditions herein on the part of Debtor to be kept, observed or performed, if the default is not cured within the applicable grace period allowed by Creditor, if any, the notes, all interest thereon, and all other indebtedness secured hereby shall immediately become due and payable, in full, without notice or demand, at the election of the Creditor; and the Creditor shall have in addition to the rights hereunder and under any other agreement, all the rights, remedies and privileges with respect to repossession, and retention of the collateral, and disposition of the proceeds thereof, as are accorded by the Commercial Law Article of the Annotated Code of Maryland. No delay on the part of the Creditor in the exercise of any right or remedy shall operate as a waiver thereof. No single or partial exercise by Creditor of any right or remedy shall preclude other or further exercise, thereof or the exercise of any other right or remedy.

This Agreement shall inure to and be binding upon the successors and assigns of the parties hereto.

IN WITNESS WHEREOF, the parties have caused these presents to be executed and their seals affixed hereto.

1

WITNESS:

B/ Diane Tarmariz-Wallace

April 28, 2005
H:\Doc\BUSSALE\Tamariz500Security2.agt.wpd

2

Pro Forma Income Statements for the
acquisition of Moran by Diane Tamariz

**Projections after acquisition of Moran by Diane Tamariz**

| | Year 1 | % of Tot Rev | Year 2 | % of Tot Rev | Year 3 | % of Tot Rev | Year 4 | % of Tot Rev | Year 5 | % of Tot Rev |
|---|---|---|---|---|---|---|---|---|---|---|
| **Commissions** | | | | | | | | | | |
| NW P&C New | $ 134,191 | 8.7% | $ 147,610 | 8.8% | $ 162,371 | 9.2% | $ 178,608 | 8.6% | $ 196,469 | 10.4% |
| NW P&C Renewal | $ 10,454 | 0.7% | $ 142,607 | 6.5% | $ 270,950 | 15.6% | $ 398,201 | 21.8% | $ 526,476 | 27.7% |
| Rolled Business (to Nationwide) | $ 436,304 | 28.6% | $ 303,450 | 18.2% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Renewal on Rolled Business | $ 16,094 | 1.0% | $ 385,313 | 23.1% | $ 512,713 | 25.3% | $ 546,232 | 30.1% | $ 467,706 | 25.7% |
| Non Rolled Business (non-NW) | $ 301,218 | 19.0% | $ 56,064 | 3.4% | $ 46,760 | 2.7% | $ 39,244 | 2.3% | $ 33,084 | 1.7% |
| Total Commission | $ 901,302 | 56.7% | $ 1,035,044 | 62.0% | $ 1,092,795 | 62.5% | $ 1,192,285 | 64.0% | $ 1,243,734 | 65.5% |
| **Other Revenue** | | | | | | | | | | |
| Misc Carriers (non-Nationwide Brokerage) | $ 569,000 | 37.1% | $ 569,000 | 34.1% | $ 569,000 | 32.6% | $ 569,000 | 31.3% | $ 569,000 | 30.0% |
| | $ - | | $ - | | $ - | | $ - | | $ - | |
| | $ - | | $ - | | $ - | | $ - | | $ - | |
| | $ - | | $ - | | $ - | | $ - | | $ - | |
| | $ - | | $ - | | $ - | | $ - | | $ - | |
| | $ - | | $ - | | $ - | | $ - | | $ - | |
| Life/Financial Services | $ 65,000 | 4.2% | $ 65,000 | 3.9% | $ 75,000 | 4.3% | $ 65,000 | 4.7% | $ 65,000 | 4.5% |
| Total Other Revenue | $ 634,000 | 41.3% | $ 634,000 | 38.0% | $ 644,000 | 37.1% | $ 654,000 | 36.0% | $ 654,000 | 34.5% |
| Total Revenue | 1,535,302 | 100.0% | 1,669,044 | 100.0% | 1,736,795 | 100.0% | 1,816,285 | 100.0% | 1,897,734 | 100.0% |
| **Compensation Expenses** | | | | | | | | | | |
| Salaries - Officers (1) | $ 138,000 | 9.0% | $ 144,900 | 8.7% | $ 152,145 | 8.8% | $ 159,752 | 8.8% | $ 167,740 | 8.8% |
| Salaries - Production (2) | $ 199,702 | 13.0% | $ 208,859 | 12.5% | $ 218,501 | 12.6% | $ 229,531 | 12.6% | $ 241,008 | 12.7% |
| Salaries - Service Staff (3) | $ 163,855 | 10.7% | $ 171,239 | 10.3% | $ 178,373 | 10.3% | $ 186,341 | 10.4% | $ 197,756 | 10.4% |
| Salaries - Support (2) | $ 72,815 | 4.7% | $ 76,592 | 4.6% | $ 79,700 | 4.6% | $ 83,691 | 4.6% | $ 87,576 | 4.6% |
| Commissions - Agents/Staff | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Commissions - Management | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Bonus/Incentives | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Group Insurance (Health Only) | $ 14,280 | 0.9% | $ 14,923 | 0.9% | $ 15,531 | 0.9% | $ 16,413 | 0.9% | $ 17,234 | 0.9% |
| Insurance (Key Man Life) | $ 12,200 | 0.8% | $ 12,749 | 0.8% | $ 13,355 | 0.8% | $ 14,022 | 0.8% | $ 14,723 | 0.8% |
| Retirement/401K Plan | $ 17,232 | 1.1% | $ 18,007 | 1.1% | $ 18,863 | 1.1% | $ 19,806 | 1.1% | $ 20,796 | 1.1% |
| Payroll Tax Expense | $ 41,537 | 2.7% | $ 43,396 | 2.6% | $ 45,457 | 2.6% | $ 47,730 | 2.6% | $ 50,116 | 2.6% |
| | $ 659,621 | 43.0% | $ 689,994 | 41.3% | $ 723,131 | 41.6% | $ 759,287 | 41.8% | $ 797,252 | 42.0% |
| **G&A Expenses** | | | | | | | | | | |
| Accounting | $ 2,500 | 0.2% | $ 2,575 | 0.2% | $ 2,652 | 0.2% | $ 2,732 | 0.2% | $ 2,814 | 0.1% |
| Agent Licenses | $ 3,600 | 0.2% | $ 3,914 | 0.2% | $ 4,031 | 0.2% | $ 4,152 | 0.2% | $ 4,277 | 0.2% |
| Bad Debt | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Bank Charges | $ 100 | 0.0% | $ 103 | 0.0% | $ 106 | 0.0% | $ 109 | 0.0% | $ 113 | 0.0% |
| Cleaning | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Computer Expense/Repair & Maint. | $ 14,500 | 0.9% | $ 14,935 | 0.9% | $ 18,383 | 0.9% | $ 15,845 | 0.9% | $ 18,320 | 0.9% |
| Computer Repair & Maintenance | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Continuing Ed | $ 2,500 | 0.2% | $ 2,575 | 0.2% | $ 2,652 | 0.2% | $ 2,732 | 0.2% | $ 2,814 | 0.1% |
| Contributions & Donations | $ 5,000 | 0.3% | $ 5,150 | 0.3% | $ 5,305 | 0.3% | $ 5,464 | 0.3% | $ 5,628 | 0.3% |
| Dues & Subscriptions | $ 13,700 | 0.9% | $ 14,111 | 0.8% | $ 14,534 | 0.8% | $ 14,970 | 0.8% | $ 15,419 | 0.8% |
| Equipment Leases | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Entertainment/Travel | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Garbage Removal | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Insurance - General Liability | $ 3,536 | 0.2% | $ 3,644 | 0.2% | $ 3,753 | 0.2% | $ 3,866 | 0.2% | $ 3,982 | 0.2% |
| Insurance - E & O | $ 6,000 | 0.4% | $ 6,180 | 0.4% | $ 6,365 | 0.4% | $ 6,556 | 0.4% | $ 6,753 | 0.4% |
| Insurance - Employers Liab (EPLI) | $ 600 | 0.0% | $ 618 | 0.0% | $ 637 | 0.0% | $ 656 | 0.0% | $ 675 | 0.0% |
| Insurance - Umbrella | $ 2,100 | 0.1% | $ 2,163 | 0.1% | $ 2,228 | 0.1% | $ 2,295 | 0.1% | $ 2,364 | 0.1% |
| Insurance - Workers' Comp. | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Legal Fees | $ 1,500 | 0.1% | $ 1,545 | 0.1% | $ 1,591 | 0.1% | $ 1,639 | 0.1% | $ 1,688 | 0.1% |
| Maintenance & Repairs - Other | $ 3,000 | 0.2% | $ 3,090 | 0.2% | $ 3,183 | 0.2% | $ 3,278 | 0.2% | $ 3,377 | 0.2% |
| Maintenance Contracts | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Meetings | $ 635 | 0.0% | $ 654 | 0.0% | $ 674 | 0.0% | $ 694 | 0.0% | $ 715 | 0.0% |
| Miscellaneous | $ 1,000 | 0.1% | $ 1,030 | 0.1% | $ 1,061 | 0.1% | $ 1,093 | 0.1% | $ 1,126 | 0.1% |
| Office Supplies & Printing | $ 10,550 | 0.7% | $ 10,867 | 0.7% | $ 11,192 | 0.6% | $ 11,528 | 0.6% | $ 11,874 | 0.6% |
| Payroll Service Fees | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Policy Data Mgmt Support | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Postage & Shipping | $ 9,500 | 0.6% | $ 9,785 | 0.6% | $ 10,079 | 0.6% | $ 10,381 | 0.6% | $ 10,692 | 0.6% |
| Quoting Service | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Recruiting Advertising | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Rent/Mortgage | $ 95,200 | 6.2% | $ 95,200 | 5.7% | $ 95,200 | 5.5% | $ 95,200 | 5.2% | $ 95,200 | 5.0% |
| Security/Alarm Service | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Newsletter/Website | $ 6,700 | 0.4% | $ 5,871 | 0.4% | $ 6,047 | 0.3% | $ 6,229 | 0.3% | $ 6,415 | 0.3% |
| Personal Business Property Taxes | $ 3,000 | 0.2% | $ 3,090 | 0.2% | $ 3,183 | 0.2% | $ 3,278 | 0.2% | $ 3,377 | 0.2% |
| Telephone - Cellular Phone & Pagers | $ 1,900 | 0.1% | $ 1,957 | 0.1% | $ 2,016 | 0.1% | $ 2,076 | 0.1% | $ 2,138 | 0.1% |
| Telephone - Local & Long Distance | $ 6,000 | 0.4% | $ 6,240 | 0.4% | $ 6,427 | 0.4% | $ 6,742 | 0.4% | $ 6,904 | 0.4% |
| Training | $ 6,700 | 0.4% | $ 6,901 | 0.4% | $ 7,108 | 0.4% | $ 7,321 | 0.4% | $ 7,541 | 0.4% |
| Utilities | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Total - G&A Expenses | $ 201,023 | 13.1% | $ 204,193 | 12.2% | $ 207,466 | 11.9% | $ 210,836 | 11.6% | $ 214,306 | 11.3% |
| **Selling Expenses** | | | | | | | | | | |
| Auto Expense - Sales | $ 17,400 | 1.1% | $ 18,183 | 1.1% | $ 19,047 | 1.1% | $ 19,999 | 1.1% | $ 20,999 | 1.1% |
| Entertainment - Sales | $ 4,399 | 0.3% | $ 4,548 | 0.3% | $ 4,782 | 0.3% | $ 5,000 | 0.3% | $ 5,250 | 0.3% |
| Sales Travel - Hotel/Food/Transp. | $ 3,500 | 0.2% | $ 3,360 | 0.2% | $ 3,393 | 0.2% | $ 3,563 | 0.2% | $ 3,741 | 0.2% |
| Sales Travel - Food | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Sales Travel - Transportation | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| MVR Expense | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Yellow Pages (incl Advertising) | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Adv. & Promotion - Other | $ 20,000 | 1.3% | $ 20,900 | 1.3% | $ 21,883 | 1.3% | $ 22,967 | 1.3% | $ 24,137 | 1.3% |
| Total - Selling Expenses | $ 44,650 | 2.9% | $ 46,582 | 2.8% | $ 49,094 | 2.8% | $ 51,549 | 2.8% | $ 54,127 | 2.9% |
| **Other Expenses** | | | | | | | | | | |
| Depreciation | $ 8,686 | 0.5% | $ 8,366 | 0.5% | $ 8,787 | 0.5% | $ 9,226 | 0.5% | $ 9,688 | 0.5% |
| Amortization | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Interest | $ 6,000 | 0.4% | $ 6,270 | 0.4% | $ 6,566 | 0.4% | $ 6,844 | 0.4% | $ 7,241 | 0.4% |
| Officers' LTC | $ 8,850 | 0.6% | $ 9,249 | 0.6% | $ 9,688 | 0.6% | $ 10,172 | 0.6% | $ 10,681 | 0.6% |
| Total - Other Expenses | $ 22,686 | 1.5% | $ 23,915 | 1.4% | $ 25,062 | 1.4% | $ 26,244 | 1.4% | $ 27,620 | 1.5% |
| Total Expenses | 926,380 | 60.5% | 964,976 | 57.8% | 1,004,745 | 57.8% | 1,047,977 | 57.7% | 1,093,303 | 57.6% |
| **Net Income before Debt Service** | 607,922 | 39.5% | 704,068 | 42.2% | 732,050 | 42.1% | 768,308 | 42.3% | 804,431 | 42.4% |
| **Cash Flow Adjustments** | | | | | | | | | | |
| **Credits:** | | | | | | | | | | |
| Depreciation & Amort. | $ 14,036.00 | | $ 14,657.62 | | $ 15,354.33 | | $ 16,132.55 | | $ 16,939.18 | |
| Acquisition Income | $ 357,000.00 | | $ - | | $ - | | $ - | | $ - | |
| Subtotal | $ 371,036.00 | | $ 14,657.62 | | $ 15,354.33 | | $ 16,132.55 | | $ 16,939.18 | |
| **Charges:** | | | | | | | | | | |
| Living Expense | $ 144,000.00 | | $ 148,320.00 | | $ 152,769.60 | | $ 157,352.69 | | $ 162,073.27 | |
| Tamariz Equity Funding for Acquisition* | $ 700,000.00 | | $ - | | $ 9,000.00 | | $ 22,646.00 | | $ 22,646.00 | |
| NFCU 1a Loan Payment | $ 214,152.00 | | $ 252,000.00 | | $ 282,000.00 | | $ 282,000.00 | | $ 282,000.00 | |
| | $ 1,058,152.00 | | $ 400,320.00 | | $ 444,369.60 | | $ 452,200.69 | | $ 466,621.27 | |
| Adjusted Cash Flow | $ (80,114.43) | | $ 318,415.52 | | $ 303,045.11 | | $ 322,239.88 | | $ 354,449.35 | |

* Acquisition bonus and money in savings at NFCU will be used for this payment.

Tamariz Acquisition Cash Flow 03112005

Income Statement

** TOTAL PAGE.01 **

## Acquisition Loan Program

## NOTICE OF PROPOSED ACQUISITION

Pursuant to the terms and conditions of the Master Servicing and Participation Agreement (the "Agreement") entered into by and between Nationwide Mutual Insurance Company, an Ohio mutual insurance company ("Nationwide"); and Nationwide Federal Credit Union, a federal credit union (hereinafter, "NFCU"); dated the 31st day of January, 2000, and related to the Acquisition Loan Program ("Program") sponsored by Nationwide, by which Program Nationwide offers to assist its exclusive Nationwide agents ("Agent(s)") with a portion of the financing for the purchase of certain independent agents, independent agencies or blocks of business from independent agents (collectively hereinafter, "Independent Agents"), Nationwide hereby gives NFCU Notice of a Proposed Acquisition as follows, and requests NFCU to Originate and Participate with Nationwide in a loan ("Loan") of such portion of the purchase price ("Purchase Price") of the Independent Agent as set forth herein, and to Service the Loan as provided in the Agreement. Nationwide hereby certifies that it has reviewed the Agent's pro-forma business plan, any purchase and sale agreement and any related documents for the Independent Agent acquisition, certifies that the documents provided herewith are complete copies of such documents and plan, certifies that the proposed acquisition meets Nationwide's Program requirements for participation by the Agent, and certifies that the Agent qualifies for a Loan in the amount set forth below based on 95% of the Purchase Price of the Independent Agent, the Agent's unencumbered ASC and other factors considered by Nationwide (Please print or type)

Name of Agent: Diane Tamariz          Agent Number:  19-11855

Name of Agency:  Diane Tamariz & Assoc. PA

Legal Form and State of Agency Organization:  Corp - MD

Address of Agency:  Ste B - 2299 Johns Hopkins Rd, Gambrills MD  21054

Tele # of Agent: 410-451 9329     Fax # of Agent:  410-956-9611

Description of Acquisition and Independent Agent:

Purchase Price: $ 3,000,000.00          Loan Amount Requested: $ 2,300,000.00
                                        W/disbursements of $1,800,000.00, $250,000 and $250,000

Maximum Loan Based on the Unencumbered Balance of Agent's ASC:  $ 472,000.00

Date Acquisition Approved by Nationwide: _____

NATIONWIDE MUTUAL INSURANCE COMPANY

By: _Kelly A H_____

Print:  KELLY  A  HAMILTON _____
(Must be signed by an officer or authorized employee of Nationwide)

Pro Forma Income Statements for the
acquisition of Moran by Diane Tamartz

| | | | | | | | Projections after acquisition of Moran by Diane Tamartz | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Year 1 | % of Tot Rev | Year 2 | % of Tot Rev | Year 3 | % of Tot Rev | Year 4 | % of Tot Rev | Year 5 | % of Tot Rev |
| **Commissions** | | | | | | | | | | |
| NW P&C New | $ 134,191 | 8.7% | $ 147,610 | 8.6% | $ 162,371 | 9.3% | $ 178,608 | 9.8% | $ 196,469 | 10.4% |
| NW P&C Renewal | $ 10,484 | 0.7% | $ 142,697 | 8.5% | $ 270,953 | 15.6% | $ 398,201 | 21.9% | $ 528,475 | 27.7% |
| Rolled Business (No Nationwide) | $ 439,344 | 28.6% | $ 303,450 | 18.2% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Renewal on Rolled Business | $ 16,094 | 1.0% | $ 305,313 | 23.1% | $ 612,713 | 35.3% | $ 546,232 | 30.1% | $ 487,706 | 25.7% |
| Non Rolled Business (non-NW) | $ 301,216 | 19.6% | $ 56,064 | 3.4% | $ 46,769 | 2.7% | $ 59,244 | 2.2% | $ 33,084 | 1.7% |
| Total Commissions | $ 901,362 | 58.7% | $ 1,035,044 | 62.6% | $ 1,092,795 | 62.9% | $ 1,182,285 | 64.0% | $ 1,243,734 | 65.5% |
| **Other Revenue** | | | | | | | | | | |
| Misc Carriers (non-Nationwide Brokerage) | $ 569,000 | 37.1% | $ 569,000 | 34.1% | $ 569,000 | 32.8% | $ 569,000 | 31.3% | $ 569,000 | 30.0% |
| Life/Financial Services | $ 65,000 | 4.2% | $ 65,000 | 3.9% | $ 75,000 | 4.3% | $ 85,000 | 4.7% | $ 85,000 | 4.5% |
| Total Other Revenue | $ 634,000 | 41.3% | $ 634,000 | 38.3% | $ 644,000 | 37.1% | $ 654,000 | 36.0% | $ 654,000 | 34.5% |
| **Total Revenue** | $ 1,535,382 | 100.0% | $ 1,669,044 | 100.0% | $ 1,736,795 | 100.0% | $ 1,816,285 | 100.0% | $ 1,897,734 | 100.0% |
| **Compensation Expenses** | | | | | | | | | | |
| Salaries - Officers (1) | $ 136,000 | 9.0% | $ 144,908 | 8.7% | $ 152,145 | 8.8% | $ 159,752 | 8.8% | $ 167,740 | 8.8% |
| Salaries - Production (2) | $ 199,702 | 13.0% | $ 205,689 | 12.5% | $ 218,601 | 12.6% | $ 229,531 | 12.6% | $ 241,008 | 12.7% |
| Salaries - Service Staff (5) | $ 163,665 | 10.7% | $ 171,229 | 10.3% | $ 179,373 | 10.3% | $ 188,341 | 10.4% | $ 197,758 | 10.4% |
| Salaries - Support (2) | $ 72,815 | 4.7% | $ 76,092 | 4.6% | $ 79,706 | 4.6% | $ 83,691 | 4.6% | $ 87,876 | 4.6% |
| Commissions - Agents/Staff | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Commissions - Management | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Bonus/Incentives | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Group Insurance (Health Only) | $ 14,280 | 0.9% | $ 14,923 | 0.9% | $ 15,631 | 0.9% | $ 16,413 | 0.9% | $ 17,234 | 0.9% |
| Insurance (Key Man Life) | $ 12,200 | 0.8% | $ 12,749 | 0.8% | $ 13,355 | 0.8% | $ 14,022 | 0.8% | $ 14,723 | 0.8% |
| Retirement/401K Plan | $ 17,232 | 1.1% | $ 18,007 | 1.1% | $ 18,863 | 1.1% | $ 19,806 | 1.1% | $ 20,796 | 1.1% |
| Payroll Tax Expense | $ 41,527 | 2.7% | $ 43,398 | 2.6% | $ 45,437 | 2.6% | $ 47,730 | 2.6% | $ 50,116 | 2.6% |
| | $ 659,621 | 43.0% | $ 686,994 | 41.3% | $ 723,131 | 41.6% | $ 759,287 | 41.8% | $ 797,252 | 42.0% |
| **G&A Expenses** | | | | | | | | | | |
| Accounting | $ 2,500 | 0.2% | $ 2,575 | 0.2% | $ 2,652 | 0.2% | $ 2,732 | 0.2% | $ 2,814 | 0.1% |
| Agent Licenses | $ 3,800 | 0.2% | $ 3,914 | 0.2% | $ 4,031 | 0.2% | $ 4,152 | 0.2% | $ 4,277 | 0.2% |
| Bad Debt | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Bank Charges | $ 100 | 0.0% | $ 103 | 0.0% | $ 106 | 0.0% | $ 109 | 0.0% | $ 113 | 0.0% |
| Cleaning | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Computer Expense/Repair & Maint. | $ 14,500 | 0.9% | $ 14,935 | 0.9% | $ 15,383 | 0.9% | $ 15,845 | 0.9% | $ 16,320 | 0.9% |
| Computer Repair & Maintenance | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Continuing Ed | $ 2,500 | 0.2% | $ 2,575 | 0.2% | $ 2,652 | 0.2% | $ 2,732 | 0.2% | $ 2,814 | 0.1% |
| Contributions & Donations | $ 5,000 | 0.3% | $ 5,150 | 0.3% | $ 5,305 | 0.3% | $ 5,464 | 0.3% | $ 5,628 | 0.3% |
| Dues & Subscriptions | $ 13,700 | 0.9% | $ 14,111 | 0.8% | $ 14,534 | 0.8% | $ 14,970 | 0.8% | $ 15,419 | 0.8% |
| Equipment Leases | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Entertainment/Travel | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Garbage Removal | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Insurance - General Liability | $ 3,538 | 0.2% | $ 3,644 | 0.2% | $ 3,753 | 0.2% | $ 3,866 | 0.2% | $ 3,982 | 0.2% |
| Insurance - E & O | $ 6,000 | 0.4% | $ 6,180 | 0.4% | $ 6,365 | 0.4% | $ 6,556 | 0.4% | $ 6,753 | 0.4% |
| Insurance - Employers Liab (EPLI) | $ 600 | 0.0% | $ 618 | 0.0% | $ 637 | 0.0% | $ 656 | 0.0% | $ 675 | 0.0% |
| Insurance - Umbrella | $ 2,100 | 0.1% | $ 2,163 | 0.1% | $ 2,228 | 0.1% | $ 2,295 | 0.1% | $ 2,364 | 0.1% |
| Insurance - Workers' Comp. | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Legal Fees | $ 1,500 | 0.1% | $ 1,545 | 0.1% | $ 1,591 | 0.1% | $ 1,639 | 0.1% | $ 1,688 | 0.1% |
| Maintenance & Repairs - Other | $ 3,000 | 0.2% | $ 3,090 | 0.2% | $ 3,183 | 0.2% | $ 3,278 | 0.2% | $ 3,377 | 0.2% |
| Maintenance Contracts | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Meetings | $ 635 | 0.0% | $ 654 | 0.0% | $ 674 | 0.0% | $ 694 | 0.0% | $ 715 | 0.0% |
| Miscellaneous | $ 1,000 | 0.1% | $ 1,030 | 0.1% | $ 1,061 | 0.1% | $ 1,093 | 0.1% | $ 1,126 | 0.1% |
| Office Supplies & Printing | $ 10,550 | 0.7% | $ 10,867 | 0.7% | $ 11,192 | 0.6% | $ 11,528 | 0.6% | $ 11,874 | 0.6% |
| Payroll Service Fees | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Policy Data Mgmt Support | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Postage & Shipping | $ 9,500 | 0.6% | $ 8,785 | 0.6% | $ 10,079 | 0.6% | $ 10,381 | 0.6% | $ 10,692 | 0.6% |
| Quoting Services | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Recruiting Advertising | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Rent / Mortgage | $ 95,200 | 6.2% | $ 95,200 | 5.7% | $ 95,200 | 5.5% | $ 95,200 | 5.2% | $ 95,200 | 5.0% |
| Security/Alarm Service | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Newsletter/Website | $ 5,700 | 0.4% | $ 5,871 | 0.4% | $ 6,047 | 0.3% | $ 6,229 | 0.3% | $ 6,415 | 0.3% |
| Personal Business Property Taxes | $ 3,000 | 0.2% | $ 3,090 | 0.2% | $ 3,183 | 0.2% | $ 3,278 | 0.2% | $ 3,377 | 0.2% |
| Telephone - Cellular Phone & Pagers | $ 1,900 | 0.1% | $ 1,957 | 0.1% | $ 2,016 | 0.1% | $ 2,076 | 0.1% | $ 2,138 | 0.1% |
| Telephone - Local & Long Distance | $ 8,000 | 0.5% | $ 8,240 | 0.5% | $ 8,487 | 0.5% | $ 8,742 | 0.5% | $ 9,004 | 0.5% |
| Training | $ 6,700 | 0.4% | $ 6,901 | 0.4% | $ 7,108 | 0.4% | $ 7,321 | 0.4% | $ 7,541 | 0.4% |
| Utilities | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Total - G&A Expenses | $ 201,023 | 13.1% | $ 204,188 | 12.2% | $ 207,468 | 11.9% | $ 210,836 | 11.6% | $ 214,305 | 11.3% |
| **Selling Expenses** | | | | | | | | | | |
| Auto Expenses - Sales | $ 17,400 | 1.1% | $ 18,183 | 1.1% | $ 19,047 | 1.1% | $ 19,989 | 1.1% | $ 20,999 | 1.1% |
| Entertainment - Sales | $ 4,350 | 0.3% | $ 4,546 | 0.3% | $ 4,762 | 0.3% | $ 5,000 | 0.3% | $ 5,250 | 0.3% |
| Sales Travel - Hotel/Food/Transp. | $ 3,100 | 0.2% | $ 3,240 | 0.2% | $ 3,393 | 0.2% | $ 3,562 | 0.2% | $ 3,741 | 0.2% |
| Sales Travel - Food | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Sales Travel - Transportation | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| MVR Expense | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Yellow Pages (Incl Advertising) | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Adv. & Promotion - Other | $ 20,000 | 1.3% | $ 20,900 | 1.3% | $ 21,893 | 1.3% | $ 22,987 | 1.3% | $ 24,137 | 1.3% |
| Total - Selling Expenses | $ 44,850 | 2.9% | $ 46,868 | 2.8% | $ 49,094 | 2.8% | $ 51,549 | 2.8% | $ 54,127 | 1.3% |
| **Other Expenses** | | | | | | | | | | |
| Depreciation | $ 6,036 | 0.5% | $ 8,398 | 0.5% | $ 8,797 | 0.5% | $ 9,236 | 0.5% | $ 9,698 | 0.5% |
| Amortization | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Interest | $ 8,000 | 0.4% | $ 6,270 | 0.4% | $ 6,568 | 0.4% | $ 6,899 | 0.4% | $ 7,241 | 0.4% |
| Officers' LTC | $ 8,850 | 0.6% | $ 9,245 | 0.6% | $ 9,688 | 0.6% | $ 10,172 | 0.6% | $ 10,681 | 0.6% |
| Total - Other Expenses | $ 22,886 | 1.5% | $ 23,916 | 1.4% | $ 25,052 | 1.4% | $ 26,304 | 1.4% | $ 27,620 | 1.5% |
| **Total Expenses** | $ 928,380 | 60.5% | $ 964,976 | 57.8% | $ 1,004,745 | 57.9% | $ 1,047,977 | 57.7% | $ 1,093,303 | 57.6% |
| **Net Income before Debt Service** | $ 607,002 | 39.5% | $ 704,068 | 42.2% | $ 732,050 | 42.1% | $ 768,308 | 42.3% | $ 804,431 | 42.4% |

| Cash Flow Adjustments | | | | | |
|---|---|---|---|---|---|
| **Credits:** | | | | | |
| Depreciation & Amort. | $ 14,036.00 | $ 14,667.62 | $ 15,364.33 | $ 16,132.55 | $ 16,939.18 |
| Acquisition bonus | $ 112,659.57 | $ 150,137.75 | $ - | $ - | $ - |
| Subtotal | $ 126,695.57 | $ 164,805.37 | $ 15,364.33 | $ 16,132.55 | $ 16,939.18 |
| **Charges:** | | | | | |
| Living Expenses | $ 144,000.00 | $ 148,320.00 | $ 152,769.60 | $ 157,352.69 | $ 162,073.27 |
| CAP Loan | $ - | $ - | $ 9,600.00 | $ 22,646.00 | $ 22,646.00 |
| NFCU IA Loan Payment | $ 127,040.00 | $ 215,520.03 | $ 253,000.00 | $ 253,000.00 | $ 253,000.00 |
| SBA Loan Payment | $ 84,000.00 | $ 126,000.00 | $ 126,000.00 | $ 126,000.00 | $ 126,000.00 |
| | $ 355,040.00 | $ 489,840.00 | $ 541,569.60 | $ 559,400.69 | $ 564,121.27 |
| **Adjusted Cash Flow** | $ 378,657.14 | $ 379,033.26 | $ 205,845.11 | $ 225,039.88 | $ 257,249.35 |

Tamariz Acquisition Cash Flow 03112005.xls

Pro Forma Income Statements for the
acquisition of Moran by Diane Tamariz

| | Projections after acquisition of Moran by Diane Tamariz | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Year 1 | % of Tot Rev | Year 2 | % of Tot Rev | Year 3 | % of Tot Rev | Year 4 | % of Tot Rev | Year 5 | % of Tot Rev |
| **Commissions** | | | | | | | | | | |
| NW P&C New | $ 134,191 | 8.7% | $ 147,610 | 8.6% | $ 162,371 | 9.3% | $ 178,608 | 9.6% | $ 196,469 | 10.4% |
| NW P&C Renewal | $ 10,464 | 0.7% | $ 142,607 | 8.5% | $ 270,850 | 15.6% | $ 398,201 | 21.9% | $ 526,476 | 27.7% |
| Rolled Business (to Nationwide) | $ 438,394 | 28.6% | $ 303,450 | 18.2% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Renewal on Rolled Business | $ 16,054 | 1.0% | $ 385,313 | 23.1% | $ 612,713 | 35.3% | $ 546,232 | 30.1% | $ 487,706 | 25.7% |
| Non Rolled Business (non-NW) | $ 301,218 | 19.6% | $ 56,054 | 3.4% | $ 46,760 | 2.7% | $ 39,244 | 2.2% | $ 33,084 | 1.7% |
| Total Commissions | $ 901,382 | 58.7% | $ 1,035,044 | 62.0% | $ 1,092,785 | 62.9% | $ 1,162,285 | 64.0% | $ 1,243,734 | 65.5% |
| **Other Revenue** | | | | | | | | | | |
| Misc Carriers (non-Nationwide Brokerage) | $ 569,000 | 37.1% | $ 569,000 | 34.1% | $ 569,000 | 32.8% | $ 569,000 | 31.3% | $ 569,000 | 30.0% |
| Life/Financial Services | $ 85,000 | 4.2% | $ 85,000 | 3.9% | $ 75,000 | 4.3% | $ 85,000 | 4.7% | $ 85,000 | 4.5% |
| Total Other Revenue | $ 634,000 | 41.3% | $ 634,000 | 38.0% | $ 644,000 | 37.1% | $ 654,000 | 36.0% | $ 654,000 | 34.5% |
| **Total Revenue** | $ 1,535,382 | 100.0% | $ 1,669,044 | 100.0% | $ 1,736,785 | 100.0% | $ 1,816,285 | 100.0% | $ 1,897,734 | 100.0% |
| **Compensation Expenses** | | | | | | | | | | |
| Salaries - Offices (1) | $ 138,000 | 9.0% | $ 144,900 | 8.7% | $ 152,145 | 8.6% | $ 159,752 | 8.8% | $ 167,740 | 8.8% |
| Salaries - Production (2) | $ 199,702 | 13.0% | $ 208,689 | 12.5% | $ 218,601 | 12.6% | $ 229,531 | 12.6% | $ 241,008 | 12.7% |
| Salaries - Service Staff (5) | $ 163,985 | 10.7% | $ 171,239 | 10.3% | $ 179,373 | 10.3% | $ 188,341 | 10.4% | $ 197,758 | 10.4% |
| Salaries - Support (2) | $ 72,615 | 4.7% | $ 76,092 | 4.6% | $ 79,756 | 4.6% | $ 83,691 | 4.6% | $ 87,879 | 4.6% |
| Commissions - Agents/Staff | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Commissions - Management | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Bonus/Incentives | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Group Insurance (Health Only) | $ 14,250 | 0.9% | $ 14,923 | 0.9% | $ 15,631 | 0.9% | $ 15,413 | 0.9% | $ 17,234 | 0.9% |
| Insurance (Key Man Life) | $ 12,200 | 0.8% | $ 12,749 | 0.8% | $ 13,355 | 0.8% | $ 14,022 | 0.8% | $ 14,723 | 0.8% |
| Retirement/401K Plan | $ 17,232 | 1.1% | $ 18,007 | 1.1% | $ 18,863 | 1.1% | $ 19,806 | 1.1% | $ 20,796 | 1.1% |
| Payroll Tax Expense | $ 41,527 | 2.7% | $ 43,386 | 2.6% | $ 45,457 | 2.6% | $ 47,730 | 2.6% | $ 50,116 | 2.6% |
| Total | $ 659,621 | 43.0% | $ 689,894 | 41.3% | $ 723,131 | 41.6% | $ 759,287 | 41.8% | $ 797,252 | 42.0% |
| **G&A Expenses** | | | | | | | | | | |
| Accounting | $ 2,500 | 0.2% | $ 2,575 | 0.2% | $ 2,652 | 0.2% | $ 2,732 | 0.2% | $ 2,814 | 0.1% |
| Agent Licenses | $ 3,800 | 0.2% | $ 3,914 | 0.2% | $ 4,031 | 0.2% | $ 4,152 | 0.2% | $ 4,277 | 0.2% |
| Bad Debt | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Bank Charges | $ 100 | 0.0% | $ 103 | 0.0% | $ 106 | 0.0% | $ 109 | 0.0% | $ 113 | 0.0% |
| Cleaning | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Computer Expense/Repair & Maint. | $ 14,500 | 0.9% | $ 14,935 | 0.9% | $ 15,383 | 0.9% | $ 15,845 | 0.9% | $ 16,320 | 0.9% |
| Computer Repair & Maintenance | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Continuing Ed | $ 2,500 | 0.2% | $ 2,575 | 0.2% | $ 2,652 | 0.2% | $ 2,732 | 0.2% | $ 2,814 | 0.1% |
| Contributions & Donations | $ 5,000 | 0.3% | $ 5,150 | 0.3% | $ 5,305 | 0.3% | $ 5,464 | 0.3% | $ 5,628 | 0.3% |
| Dues & Subscriptions | $ 13,700 | 0.9% | $ 14,111 | 0.8% | $ 14,534 | 0.8% | $ 14,970 | 0.8% | $ 15,419 | 0.8% |
| Equipment Leases | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Entertainment/Travel | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Garbage Removal | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Insurance - General Liability | $ 3,538 | 0.2% | $ 3,644 | 0.2% | $ 3,753 | 0.2% | $ 3,866 | 0.2% | $ 3,982 | 0.2% |
| Insurance - E & O | $ 6,000 | 0.4% | $ 6,180 | 0.4% | $ 6,365 | 0.4% | $ 6,556 | 0.4% | $ 6,753 | 0.4% |
| Insurance - Employers Liab (EPLI) | $ 600 | 0.0% | $ 618 | 0.0% | $ 637 | 0.0% | $ 656 | 0.0% | $ 675 | 0.0% |
| Insurance - Umbrella | $ 2,100 | 0.1% | $ 2,163 | 0.1% | $ 2,228 | 0.1% | $ 2,295 | 0.1% | $ 2,364 | 0.1% |
| Insurance - Workers' Comp. | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Legal Fees | $ 1,500 | 0.1% | $ 1,545 | 0.1% | $ 1,591 | 0.1% | $ 1,639 | 0.1% | $ 1,688 | 0.1% |
| Maintenance & Repairs - Other | $ 3,000 | 0.2% | $ 3,090 | 0.2% | $ 3,183 | 0.2% | $ 3,278 | 0.2% | $ 3,377 | 0.2% |
| Maintenance Contracts | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Meetings | $ 635 | 0.0% | $ 654 | 0.0% | $ 674 | 0.0% | $ 694 | 0.0% | $ 715 | 0.0% |
| Miscellaneous | $ 1,000 | 0.1% | $ 1,030 | 0.1% | $ 1,061 | 0.1% | $ 1,093 | 0.1% | $ 1,126 | 0.1% |
| Office Supplies & Printing | $ 10,550 | 0.7% | $ 10,867 | 0.7% | $ 11,192 | 0.6% | $ 11,528 | 0.6% | $ 11,874 | 0.6% |
| Payroll Service Fees | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Policy Data Mgmt Support | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Postage & Shipping | $ 9,500 | 0.6% | $ 9,785 | 0.6% | $ 10,079 | 0.6% | $ 10,381 | 0.6% | $ 10,692 | 0.6% |
| Quoting Services | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Recruiting Advertising | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Rent / Mortgage | $ 95,200 | 6.2% | $ 95,200 | 5.7% | $ 95,200 | 5.5% | $ 95,200 | 5.2% | $ 95,200 | 5.0% |
| Security/Alarm Service | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Newsletter/Website | $ 5,700 | 0.4% | $ 5,871 | 0.4% | $ 6,047 | 0.3% | $ 6,229 | 0.3% | $ 6,415 | 0.3% |
| Personal Business Property Taxes | $ 3,000 | 0.2% | $ 3,090 | 0.2% | $ 3,183 | 0.2% | $ 3,278 | 0.2% | $ 3,377 | 0.2% |
| Telephone - Cellular Phone & Pagers | $ 1,900 | 0.1% | $ 1,957 | 0.1% | $ 2,016 | 0.1% | $ 2,076 | 0.1% | $ 2,138 | 0.1% |
| Telephone - Local & Long Distance | $ 8,000 | 0.5% | $ 8,240 | 0.5% | $ 8,487 | 0.5% | $ 8,742 | 0.5% | $ 9,004 | 0.5% |
| Training | $ 6,700 | 0.4% | $ 6,901 | 0.4% | $ 7,108 | 0.4% | $ 7,321 | 0.4% | $ 7,541 | 0.4% |
| Utilities | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Total - G&A Expenses | $ 201,023 | 13.1% | $ 204,186 | 12.2% | $ 207,466 | 11.9% | $ 210,636 | 11.6% | $ 214,205 | 11.3% |
| **Selling Expenses** | | | | | | | | | | |
| Auto Expense - Sales | $ 17,400 | 1.1% | $ 18,183 | 1.1% | $ 19,047 | 1.1% | $ 19,999 | 1.1% | $ 20,999 | 1.1% |
| Entertainment - Sales | $ 4,350 | 0.3% | $ 4,546 | 0.3% | $ 4,762 | 0.3% | $ 5,000 | 0.3% | $ 5,250 | 0.3% |
| Sales Travel - Hotel/Food/Transp. | $ 3,100 | 0.2% | $ 3,240 | 0.2% | $ 3,393 | 0.2% | $ 3,563 | 0.2% | $ 3,741 | 0.2% |
| Sales Travel - Food | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Sales Travel - Transportation | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| MVR Expense | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Yellow Pages (Incl Advertising) | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Adv. & Promotion - Other | $ 20,000 | 1.3% | $ 20,900 | 1.3% | $ 21,853 | 1.3% | $ 22,987 | 1.3% | $ 24,137 | 1.3% |
| Total - Selling Expenses | $ 44,850 | 2.9% | $ 46,868 | 2.8% | $ 49,094 | 2.8% | $ 51,549 | 2.8% | $ 54,127 | 2.9% |
| **Other Expenses** | | | | | | | | | | |
| Depreciation | $ 8,636 | 0.5% | $ 8,398 | 0.5% | $ 8,787 | 0.5% | $ 9,236 | 0.5% | $ 9,695 | 0.5% |
| Amortization | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| Interest | $ 6,000 | 0.4% | $ 6,270 | 0.4% | $ 6,568 | 0.4% | $ 6,896 | 0.4% | $ 7,241 | 0.4% |
| Officers' LTC | $ 8,650 | 0.6% | $ 9,248 | 0.5% | $ 9,658 | 0.6% | $ 10,172 | 0.6% | $ 10,681 | 0.6% |
| Total - Other Expenses | $ 22,646 | 1.5% | $ 23,916 | 1.4% | $ 25,052 | 1.4% | $ 26,304 | 1.4% | $ 27,620 | 1.5% |
| **Total Expenses** | $ 928,360 | 60.5% | $ 964,976 | 57.8% | $ 1,004,745 | 57.9% | $ 1,047,977 | 57.7% | $ 1,093,303 | 57.6% |
| **Net Income before Debt Service** | $ 607,002 | 39.5% | $ 704,068 | 42.2% | $ 732,050 | 42.1% | $ 768,308 | 42.3% | $ 804,431 | 42.4% |

Cash Flow Adjustments
Credits:

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| Depreciation & Amort. | $ 14,636.20 | $ 14,667.62 | $ 15,364.33 | $ 16,132.55 | $ 16,939.18 |
| Acquisition bonus | $ 112,959.37 | $ 150,137.75 | $ - | $ - | |
| Subtotal | $ 126,695.57 | $ 164,805.37 | $ 15,364.33 | $ 16,132.55 | $ 16,939.18 |
| | | | | | |
| Charges: | | | | | |
| Living Expense | $ 144,000.00 | $ 148,320.00 | $ 152,769.60 | $ 157,352.69 | $ 162,073.27 |
| CAP Loan | $ - | $ - | $ 9,600.00 | $ 22,346.00 | $ 22,846.00 |
| NFCU IA Loan Payment | $ 127,040.00 | $ 215,520.00 | $ 253,200.00 | $ 253,200.00 | $ 253,200.00 |
| SBA Loan Payment | $ 84,000.00 | $ 126,000.00 | $ 126,000.00 | $ 126,000.00 | $ 126,000.00 |
| Subtotal | $ 355,040.00 | $ 489,840.00 | $ 541,569.60 | $ 559,400.69 | $ 564,121.27 |
| | | | | | |
| Adjusted Cash Flow | $ 378,657.14 | $ 379,033.26 | $ 205,845.11 | $ 225,039.88 | $ 257,249.35 |

## Impact on Cash Flow of Diane Tamariz by acquiring Moran

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| **Cash in** | | | | | |
| Independent Acquisition Bonus | $ 102,660 | $ 300,275 | | | |
| Satellite Office Expansion | $ 10,000 | | | | |
| Capital Access Loan | $ - | | | | |
| Agency Net Profit | $ 607,002 | $ 704,068 | $ 732,050 | $ 768,308 | $ 804,431 |
| Contingency Commission Difference | $ - | $ 250,483 | $ 411,882 | $ 351,355 | $ 376,442 |
| Net Cash In | $ 719,661 | $ 1,254,826 | $ 1,143,932 | $ 1,119,663 | $ 1,180,873 |
| | | | | | |
| **Cash out** | | | | | |
| Payment for acquisition | $ 357,831 | $ 357,831 | $ 357,831 | $ 357,831 | $ 357,831 |
| Repayment of Cap Access Loan (if any) | | | | | |
| Tax Payment for CAP Access Loan Forgiveness | | | | | |
| Net Cash Out | $ 357,831 | $ 357,831 | $ 357,831 | $ 357,831 | $ 357,831 |
| **Net Cash Flow** | $ 361,830 | $ 896,995 | $ 786,101 | $ 761,832 | $ 823,042 |
| | | | | | |
| Cumulative Net Cash Flow | $ 361,830 | $ 1,258,825 | $ 2,044,926 | $ 2,806,758 | $ 3,629,801 |

Above does not include DCIC or extended earnings

Do you want to include contingency commissions in the cash flow? (Y/N)      Y

GENERAL INFORMATION

| | | |
|---|---|---|
| Nationwide Agent's Name | Diane Tamarz | |
| NW Agent's State (abbrv) | MD | |
| Assumed Agency Growth Rate without Acquisition | 10.0% | |
| Estimated NW Agency Loss Ratio | 37.5% | Monthly Incurred as of Nov-04 |
| 12 month P&C DWP of NW Agent | $ 3,005,435 | est. YE-04 Total P&C DWP |
| Target Acquisition's Name | Moran | |
| Type of Funding | 1 | 1 = Independent Acquisition Bonus<br>2 = Capital Access Loan |
| Type of Agent Addendum | 1 | 1 = Choice Plus<br>2 = Growth Plus<br>3 = Growth |
| Amt of DWP reviewed by NW | $ 8,631,174 | |

**Carrier Summary of Moran**

| Carrier | LOB | Moran Information | | | |
|---|---|---|---|---|---|
| | | Premium | Commission Rate | Commission | Carrier % of Total |
| Moran Total | 3 Co. Auto | $ 1,322,610 | 10% | $ 132,261 | |
| | Nonstandard | $ 246,000 | 10% | $ 24,600 | |
| | Fire | $ 348,564 | 10% | $ 34,856 | |
| | Commercial | $ 4,668,459 | 10% | $ 466,846 | |
| | Other | $ 5,068,439 | 10% | $ 506,844 | |
| | | $ 11,654,072 | | $ 1,165,407 | 100% |

Notes:

| Commercial | Assumes 100% retention of premium eligible for conversion to Nationwide | | |
|---|---|---|---|
| Other | IWIF | $ | 3,000,000 |
| | Specialty | $ | 2,068,439 |
| | TOTAL | $ | 5,068,439 |

Projections of Premium Conversion to Nationwide
for the Moran location(s)

**Brokered Retention**

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| 3 Co. Auto | 50% | 0% | | | |
| Nonstandard | 50% | 0% | | | |
| Fire | 50% | 0% | | | |
| Commercial | 50% | 50% | | | |
| Other | 0% | 0% | | | |

Note: Retention % = Tamaric actual

**Brokered Retention Rate Assumptions**

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| 3 Co. Auto | 84% | 84% | 84% | 84% | 84% |
| Nonstandard | 58% | 58% | 58% | 58% | 58% |
| Fire | 90% | 90% | 90% | 90% | 90% |
| Commercial | 90% | 90% | 90% | 90% | 90% |
| Other | | 0% | 0% | 0% | 0% |

**Nationwide Retention Rate Assumptions**

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| 3 Co. Auto | 84% | 84% | 84% | 84% | 84% |
| Nonstandard | 58% | 58% | 58% | 58% | 58% |
| Fire | 90% | 90% | 90% | 90% | 90% |
| Commercial | 90% | 90% | 90% | 90% | 90% |
| Other | | 0% | 0% | 0% | 0% |

**Commission Rate Assumptions**

| | Nationwide | | Brokerage | |
|---|---|---|---|---|
| | New | Renewal | New | Renewal |
| 3 Co. Auto | 12.00% | 10.00% | 10.00% | 10.00% |
| Nonstandard | 10.00% | 10.00% | 10.00% | 10.00% |
| Fire | 15.00% | 14.00% | 10.00% | 10.00% |
| Commercial | 13.00% | 13.00% | 10.00% | 10.00% |
| Other | 12.00% | 10.00% | 10.00% | 10.00% |

## Conversion Production Projections

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|

**Total Converted Premium**

**New Converted Premium**

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| 3 Co. Auto | $ 661,305 | $ - | $ - | $ - | $ - |
| Nonstandard | 147,600 | | | | |
| Fire | 278,851 | | | | |
| Commercial | 2,334,230 | 2,334,230 | - | - | - |
| Other | - | | - | - | - |
| **Total** | $ 3,421,986 | $ 2,334,230 | $ - | $ - | $ - |

**Renewal Converted Premium**

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| 3 Co. Auto | $ 139,535 | $ 672,706 | $ 565,073 | $ 474,661 | $ 398,715 |
| Nonstandard | $ 21,402 | 96,021 | 56,852 | 32,974 | 19,125 |
| Fire | - | 250,966 | 225,869 | 203,283 | 182,954 |
| Commercial | - | 2,100,807 | 3,991,532 | 3,592,379 | 3,233,141 |
| Other | - | - | - | - | - |
| **Total** | $ 160,937 | $ 3,122,500 | $ 4,839,327 | $ 4,303,297 | $ 3,833,936 |

**Total Converted Premium**

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| 3 Co. Auto | $ 800,840 | $ 672,706 | $ 565,073 | $ 474,661 | $ 398,715 |
| Nonstandard | 169,002 | 96,021 | 56,852 | 32,974 | 19,125 |
| Fire | 278,851 | 250,966 | 225,869 | 203,283 | 182,954 |
| Commercial | 2,334,230 | 4,435,036 | 3,991,532 | 3,592,379 | 3,233,141 |
| Other | - | - | - | - | - |
| **Total** | $ 3,582,923 | $ 5,456,729 | $ 4,839,327 | $ 4,303,297 | $ 3,833,936 |
| *Percentage Increase* | | 52.30% | -11.31% | -11.08% | -10.91% |

**Total Brokered Premium**

**Brokered Renewal Premium**

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| 3 Co. Auto | $ 558,141 | $ 471,071 | $ 397,584 | $ 335,561 | $ 283,214 |
| Nonstandard | 57,072 | 33,102 | 19,199 | 11,135 | 6,459 |
| Fire | 62,742 | 56,467 | 50,821 | 45,739 | 41,165 |
| Commercial | 2,334,230 | - | - | - | - |
| Other | - | | | | |
| **Total** | $ 3,012,184 | $ 560,640 | $ 467,604 | $ 392,435 | $ 330,837 |

**Total Brokered Premium**

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| 3 Co. Auto | $ 558,141 | $ 471,071 | $ 397,584 | $ 335,561 | $ 283,214 |
| Nonstandard | 57,072 | 33,102 | 19,199 | 11,135 | 6,459 |
| Fire | 62,742 | 56,467 | 50,821 | 45,739 | 41,165 |
| Commercial | 2,334,230 | - | - | - | - |
| Other | - | - | - | - | - |
| **Total** | $ 3,012,184 | $ 560,640 | $ 467,604 | $ 392,435 | $ 330,837 |
| *Percentage Increase* | | -81.39% | -16.59% | -16.08% | -15.70% |

## Conversion Revenue Projections

### Total Converted Nationwide Commission

**New Converted Nationwide Commission**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 3 Co. Auto | $ | 79,357 | $ | - | $ | - | $ | - | $ | - |
| Nonstandard | | 14,760 | | - | | - | | - | | - |
| Fire | | 41,828 | | - | | - | | - | | - |
| Commercial | | 303,450 | | 303,450 | | - | | - | | - |
| Other | | - | | | | - | | - | | - |
| **Total** | $ | 439,394 | $ | 303,450 | $ | - | $ | - | $ | - |

**Renewal Converted Nationwide Commission**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 3 Co. Auto | $ | 13,954 | $ | 67,271 | $ | 56,507 | $ | 47,466 | $ | 39,872 |
| Nonstandard | | 2,140 | | 9,802 | | 5,685 | | 3,297 | | 1,913 |
| Fire | | - | | 35,135 | | 31,622 | | 28,460 | | 25,614 |
| Commercial | | - | | 273,105 | | 518,899 | | 467,009 | | 420,308 |
| Other | | - | | | | | | | | |
| **Total** | $ | 16,094 | $ | 385,313 | $ | 612,713 | $ | 546,232 | $ | 487,706 |

**Total Converted Nationwide Commission**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 3 Co. Auto | $ | 93,310 | $ | 67,271 | $ | 56,507 | $ | 47,466 | $ | 39,872 |
| Nonstandard | | 16,900 | | 9,802 | | 5,685 | | 3,297 | | 1,913 |
| Fire | | 41,828 | | 35,135 | | 31,622 | | 28,460 | | 25,614 |
| Commercial | | 303,450 | | 576,555 | | 518,899 | | 467,009 | | 420,308 |
| Other | | - | | - | | | | | | |
| **Total** | $ | 455,488 | $ | 688,763 | $ | 612,713 | $ | 546,232 | $ | 487,706 |

| *Percentage Increase* | | | 51.21% | | -11.04% | | -10.85% | | -10.71% |
|---|---|---|---|---|---|---|---|---|---|

### Total Brokered Commission

**Renewal Brokered Commission**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 3 Co. Auto | $ | 55,814 | $ | 47,107 | $ | 39,758 | $ | 33,556 | $ | 28,321 |
| Nonstandard | | 5,707 | | 3,310 | | 1,920 | | 1,114 | | 646 |
| Fire | | 6,274 | | 5,647 | | 5,082 | | 4,574 | | 4,116 |
| Commercial | | 233,423 | | - | | - | | - | | - |
| Other | | - | | | | | | | | |
| **Total** | $ | 301,218 | $ | 56,064 | $ | 46,760 | $ | 39,244 | $ | 33,084 |

**Total Brokered Commission**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 3 Co. Auto | $ | 55,814 | $ | 47,107 | $ | 39,758 | $ | 33,556 | $ | 28,321 |
| Nonstandard | | 5,707 | | 3,310 | | 1,920 | | 1,114 | | 646 |
| Fire | | 6,274 | | 5,647 | | 5,082 | | 4,574 | | 4,116 |
| Commercial | | 233,423 | | - | | - | | - | | - |
| Other | | - | | - | | - | | - | | - |
| **Total** | $ | 301,218 | $ | 56,064 | $ | 46,760 | $ | 39,244 | $ | 33,084 |

| *Percentage Increase* | | | -81.39% | | -16.59% | | -16.08% | | -15.70% |
|---|---|---|---|---|---|---|---|---|---|

New Policy & Premium Projections
for the Moran location(s)

### New Production Projections

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| 3 Co. Auto | 250 | 275 | 303 | 333 | 366 |
| Non Std | 100 | 110 | 121 | 133 | 146 |
| Fire | 175 | 193 | 212 | 233 | 256 |
| Commercial | 200 | 220 | 242 | 266 | 293 |
| Other | 0 | 0 | 0 | 0 | 0 |
| **Total P&C** | **725** | **798** | **677** | **965** | **1,061** |
| per week | 14 | 15 | 17 | 19 | 20 |

### Average Annual Premium Rate Assumptions

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| 3 Co. Auto | $ 884 | $ 884 | $ 884 | $ 884 | $ 884 |
| Non Std | $ 1,950 | $ 1,950 | $ 1,950 | $ 1,950 | $ 1,950 |
| Fire | $ 547 | $ 547 | $ 547 | $ 547 | $ 547 |
| Commercial | $ 4,000 | $ 4,000 | $ 4,000 | $ 4,000 | $ 4,000 |
| Other | $ - | $ - | $ - | $ - | $ - |

### Retention Ratio Assumptions

| | | | | | |
|---|---|---|---|---|---|
| 3 Co. Auto | 84% | 84% | 84% | 84% | 84% |
| Non Std | 58% | 58% | 58% | 58% | 58% |
| Fire | 90% | 90% | 90% | 90% | 90% |
| Commercial | 90% | 90% | 90% | 90% | 90% |
| Other | 0% | 0% | 0% | 0% | 0% |

### Commission Rate Assumptions

| | New | Renewal |
|---|---|---|
| 3 Co. Auto | 12.00% | 10.00% |
| Non Std | 10.00% | 10.00% |
| Fire | 15.00% | 14.00% |
| Commercial | 13.00% | 13.00% |
| Other | 12.00% | 10.00% |

## Incremental Production Projections

### Total P&C

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| 3 Co. Auto | 230 | 446 | 653 | 855 | 1,055 |
| Non Std | 79 | 133 | 173 | 205 | 235 |
| Fire | 166 | 333 | 500 | 672 | 848 |
| Commercial | 200 | 400 | 602 | 808 | 1,020 |
| Other | - | - | - | - | - |
| *Total* | *675* | *1,311* | *1,928* | *2,540* | *3,157* |

### Average Premium

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| 3 Co. Auto | $ 884 | $ 884 | $ 884 | $ 884 | $ 884 |
| Non Std | 1,950 | 1,950 | 1,950 | 1,950 | 1,950 |
| Fire | 547 | 547 | 547 | 547 | 547 |
| Commercial | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 |
| Other | - | - | - | - | - |

### Total Premium

| New Premium | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| 3 Co. Auto | $ 110,508 | $ 121,559 | $ 133,715 | $ 147,086 | $ 161,795 |
| Non Std | 97,500 | 107,250 | 117,975 | 129,773 | 142,750 |
| Fire | 47,866 | 52,653 | 57,918 | 63,710 | 70,081 |
| Commercial | 800,000 | 880,000 | 968,000 | 1,064,800 | 1,171,280 |
| Other | - | - | - | - | - |
| *Total* | *$ 1,055,874* | *$ 1,161,462* | *$ 1,277,608* | *$ 1,405,368* | *$ 1,545,905* |
| **Renewal Premium** | | | | | |
| 3 Co. Auto | $ 46,413 | $ 221,856 | $ 387,515 | $ 546,784 | $ 702,697 |
| Non Std | 28,275 | 120,452 | 184,319 | 232,808 | 273,522 |
| Fire | 21,540 | 105,545 | 189,765 | 275,040 | 362,214 |
| Commercial | - | 720,000 | 1,440,000 | 2,167,200 | 2,908,800 |
| Other | - | - | - | - | - |
| *Total* | *$ 96,228* | *$ 1,167,852* | *$ 2,201,599* | *$ 3,221,832* | *$ 4,247,232* |
| **Total Premium** | | | | | |
| 3 Co. Auto | $ 156,922 | $ 343,415 | $ 521,230 | $ 693,870 | $ 864,492 |
| Non Std | 125,775 | 227,702 | 302,294 | 362,580 | 416,272 |
| Fire | 69,406 | 158,197 | 247,683 | 338,750 | 432,294 |
| Commercial | 800,000 | 1,600,000 | 2,408,000 | 3,232,000 | 4,080,080 |
| Other | - | - | - | - | - |
| *Total* | *$ 1,152,102* | *$ 2,329,314* | *$ 3,479,206* | *$ 4,627,201* | *$ 5,793,138* |
| *Percentage Increase* | | *102.18%* | *49.37%* | *33.00%* | *25.20%* |

## Incremental Revenue Projections

### Total Commission

**New Commission**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 3 Co. Auto | $ | 13,261 | $ | 14,587 | $ | 16,046 | $ | 17,650 | $ | 19,415 |
| Non Std | | 9,750 | | 10,725 | | 11,798 | | 12,977 | | 14,275 |
| Fire | | 7,180 | | 7,898 | | 8,688 | | 9,556 | | 10,512 |
| Commercial | | 104,000 | | 114,400 | | 125,840 | | 138,424 | | 152,266 |
| Other | | - | | - | | - | | - | | - |
| *Total* | $ | 134,191 | $ | 147,610 | $ | 162,371 | $ | 178,608 | $ | 196,469 |

**Renewal Commission**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 3 Co. Auto | $ | 4,641 | $ | 22,188 | $ | 38,751 | $ | 54,678 | $ | 70,270 |
| Non Std | | 2,828 | | 12,045 | | 18,432 | | 23,281 | | 27,352 |
| Fire | | 3,016 | | 14,776 | | 26,567 | | 38,506 | | 50,710 |
| Commercial | | - | | 93,600 | | 187,200 | | 281,736 | | 378,144 |
| Other | | - | | - | | - | | - | | - |
| *Total* | $ | 10,484 | $ | 142,607 | $ | 270,950 | $ | 398,201 | $ | 526,476 |

**Total Commission**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 3 Co. Auto | $ | 17,902 | $ | 36,773 | $ | 54,797 | $ | 72,329 | $ | 89,685 |
| Non Std | | 12,578 | | 22,770 | | 30,229 | | 36,258 | | 41,627 |
| Fire | | 10,195 | | 22,674 | | 35,255 | | 48,062 | | 61,222 |
| Commercial | | 104,000 | | 208,000 | | 313,040 | | 420,160 | | 530,410 |
| Other | | - | | - | | - | | - | | - |
| *Total* | $ | 144,675 | $ | 290,217 | $ | 433,321 | $ | 576,809 | $ | 722,945 |

| *Percentage Increase* | | 100.60% | 49.31% | 33.11% | 25.34% |
|---|---|---|---|---|---|

New NW Policy & Premium

**Premium Summary Projections**
**for the Moran location(s)**

Total Premium

|  | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| Converted Nationwide Premium | 3,421,986 | 2,334,230 | - | - | - |
| Retained Converted Nationwide Premium | 160,937 | 3,122,500 | 4,839,327 | 4,303,297 | 3,833,936 |
| New Nationwide Premium | 1,055,874 | 1,161,462 | 1,277,608 | 1,405,368 | 1,545,905 |
| New Retained Nationwide Premium | 96,228 | 1,167,852 | 2,201,599 | 3,221,832 | 4,247,232 |
| Retained Brokered Premium | 3,012,184 | 560,640 | 467,604 | 392,435 | 330,837 |
| Total Premium | 7,747,210 | 8,346,683 | 8,786,137 | 9,322,933 | 9,957,911 |
| DWP Growth Percentage |  | 7.74% | 5.27% | 6.11% | 6.81% |
| Total Nationwide Premium | 4,735,025 | 7,786,043 | 8,318,534 | 8,930,498 | 9,627,074 |
| DWP Growth Percentage |  | 64.44% | 6.84% | 7.36% | 7.80% |

| Acquisition Cost |  |  |  |  |
|---|---|---|---|---|
| Total Conv |  | 5,456,729 |  |  |  |
| IAA Purc |  | 3,000,000 | 2,500,000 | 2,000,000 | 1,500,000 |
| Cost/$1 DWP | $ 0.55 | $ 0.46 | $ 0.37 | $ 0.27 |  |

Estimated impact of acquisition by Diane Tamariz on contingency commissions

**Existing NW Agency data**

| | |
|---|---|
| NW Agency 12 month P&C DWP | $3,005,435 |
| State | MD |
| State Growth Rate | 3.8% |
| Assumed Agency Growth Rate without Acquisition | 10.0% |
| Multiple of State Growth rate without acquisition | 2.63 |
| Estimated NW Agency Loss Ratio w/ IAA | 40.0% |
| Type of Contract | 1 |

Est YE-04 Total P&C DWP

1 = Choice Plus
2 = Choice
3 = Growth
4 = Standard

Note:

| | |
|---|---|
| Tamariz Nov-04 YTD Incurred | 37.5% |
| Est Incurred LR w/ Moran book | 40% |

| Premium Impact | Prior Year End | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|---|
| Cumulative YE DWP of Existing NW Agency | $ 3,005,435 | $ 3,305,979 | $ 3,636,576 | $ 4,000,234 | $ 4,400,257 | $ 4,840,283 |
| Multiple of State Growth Rate | | 2.63 | 2.63 | 2.63 | 2.63 | 2.63 |
| Cumulative YE DWP of Moran | | $ 4,735,025 | $ 7,786,043 | $ 8,318,534 | $ 8,930,498 | $ 9,627,074 |
| Combined Agencies' Premium | | $ 8,041,004 | $ 11,422,619 | $ 12,318,768 | $ 13,330,755 | $ 14,467,357 |
| Multiple of State Growth Rate | | 44.09 | 11.07 | 2.06 | 2.16 | 2.24 |

| Contingency Impact | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| Contingency commissions without doing acquisition: (37.5% Loss Ratio and Growth Rate list in row 16) | | $ 174,886 | $ 192,375 | $ 211,612 | $ 232,774 |
| Contingency commissions including acquisition: (40% Loss Ratio and Growth Rate list in row 21) | | $ 425,369 | $ 604,257 | $ 562,968 | $ 609,216 |
| Increase in contingency commission by doing acquisition | | $ 250,483 | $ 411,882 | $ 351,355 | $ 376,442 |



EXHIBIT

32

3-4-10

# CREDIT AGREEMENT AND PROMISSORY NOTE
*(Principal & Interest)*

$2,300,000.00                                                Date: Apr 26, 2005

For value received in the amount of $2,300,000.00 ("**Loan**") from Nationwide Federal Credit Union, a federal credit union ("**NFCU**"), B. Diane Tamariz-Wallace and Diane Tamariz-Wallace & Associates, PA, an exclusive third-party agent (hereinafter, "**Borrower**") of Nationwide Mutual Insurance Company ("**Nationwide**") promises to pay to the order of NFCU, its holders, successors and/or assigns (hereinafter, "**Payee**"), 288 semi monthly installments of principal amortized over the term of the Loan and interest, beginning with the payment due on May 15th 2005, & the Last & the 15th day of each month thereafter until all unpaid portions of the Loan principal, interest and other amounts herein provided are re-paid (the "**Maturity Date**"). Interest shall accrue on the unpaid principal balance of the Loan at a variable rate adjusted quarterly equal to Prime (as hereinafter defined) plus One Percent (1%) per annum, provided that Borrower repays the Loan by automatic deductions from Borrower's compensation due from Nationwide. If Borrower terminates the automatic deduction from the Agent's compensation due from Nationwide or any part thereof at anytime during the repayment term of this Note, the rate of interest provided for herein shall be adjusted by NFCU at the time such deductions cease to a variable rate adjusted quarterly equal to Prime plus Two & one half Percent (2.50%) in order to compensate NFCU for the additional costs of processing, accounting and collection and for the additional risk of non-payment or late payment, and the amount of Borrower's monthly payments shall be adjusted as provided in a notice to be sent from Payee to Borrower. Not withstanding the foregoing or any other provision in this Credit Agreement and Promissory Note ("**Note**"), no interest rate provided for in this Note or the other Loan Documents shall ever exceed the maximum interest rate which a federal credit union is permitted to charge its members or the maximum interest rate which is permitted by applicable state law, whichever is less. "**Prime**" shall be the prime lending rate listed in the Wall Street Journal (or such other index as the parties may agree from time to time) on the Fifteenth (15th) day (or first day thereafter when such rate is published) of March, June, September and December commencing in the calendar quarter in which the any proceeds of the Loan are first disbursed, and shall be reset on the first day of each calendar quarter thereafter. Borrower understands and agrees that this Note may be freely transferred and assigned by NFCU or any subsequent holder thereof.

The term of this Loan is anticipated to be 144 months from the date proceeds are first disbursed to Borrower. Borrower understands and agrees that NFCU may adjust either the term or the amount of the monthly payment if Prime varies, resulting in a change in the interest rate charged by NFCU for this Loan. Borrower also understands and agrees that the date on which this Loan matures may be accelerated if Borrower does not continue to participate in the Agent Program to which this Loan is related.



Upon termination of Borrower's Agent's Agreement with Nationwide, upon the bankruptcy or insolvency of Borrower, upon Borrower's death or incompetence, upon the failure of Borrower to pay in full any installment hereunder when due (provided that Borrower shall have a Thirty (30) day period after receiving written notice from Payee to cure such non-payment), upon Payee's discovery that any information provided by Borrower in connection with the Loan was false or materially misleading, upon Borrower's failure to provide any other or additional information reasonably requested by Payee in connection with the Loan, and/or upon a default by Borrower of any other Loan under this or any other Program, Borrower agrees that this Loan shall be in Default, and the entire amount of the outstanding Loan balance, plus all accrued interest and other amounts provided for hereunder, shall become immediately due and payable to Payee. If Borrower's Loan shall be in Default past any applicable cure period provided herein, the unpaid balance of the Loan shall bear interest at a rate equal to the lesser of Prime plus Five Percent (5%) per annum or the maximum interest rate permitted by law from the date of Default until paid in full. Sums shall be deemed paid upon receipt of same by Payee, unless payment is made by check, in which case sums shall be deemed paid upon non-reversible payment of proceeds to the account of Payee. Borrower shall pay a "**Late Payment Fee**" of Fifteen Dollars ($15.00) if Borrower's payment is more than Ten (10) days late, and a "**Returned Check Fee**" of Twenty-five Dollars ($25.00) if Borrower pays by check and the check is returned unpaid for insufficient funds or for any other reason. There shall be no penalty for prepayment of the Loan. <u>A Default of this Loan shall constitute a Default with respect to any other loan or credit obtained by the Agent from NFCU, and this Loan shall be cross-collateralized with any other collateral in which NFCU has a security interest in connection with such other loans or credits.</u>

<u>STATUTORY LIEN.</u> IF THE BORROWER IS IN DEFAULT AS PROVIDED HEREIN OR ON ANY FINANCIAL OBLIGATION TO NFCU, FEDERAL LAW GIVES NFCU THE RIGHT TO APPLY ALL OR ANY PART OF THE BORROWER'S SHARES AND DIVIDENDS IN BORROWER'S ACCOUNTS AT NFCU AT THE TIME OF BORROWER'S DEFAULT OR ANY TIME THEREAFTER IN ORDER TO SATISFY THOSE OBLIGATIONS.   ONCE BORROWER IS IN DEFAULT, NFCU MAY EXERCISE THE RIGHTS RESERVED HEREUNDER WITHOUT FURTHER NOTICE TO BORROWER.

Payments received from Borrower shall first be applied to payment of any late charge, fees or costs incurred by Payee in connection with the Loan, including any collection costs or attorneys' fees; second to payment of accrued interest; third to the outstanding principal balance of the Loan; and fourth, to any other cost, charge or fee relating to the Program of which Payee has knowledge.

Presentment, notice of dishonor and protest are hereby waived by the Borrower, and all sureties, guarantors and endorsers hereof. This Note shall be the joint and several obligation of all makers, sureties, guarantors and endorsers, and shall be binding upon them and their heirs, personal representatives, executors, administrators, successors and assigns.



Borrower hereby transfers and assigns to Payee, its successors and/or assigns, any and all payments due Borrower under Borrower's Agent's Agreement or any Agent's Agreement executed hereafter with Nationwide (hereinafter, "Collateral") for the purpose of satisfying the Loan. This assignment of Collateral shall include all commissions, extended earnings, deferred compensation incentive credits, bonuses (including post-conversion bonuses and contingency bonuses), and any other compensation due Borrower from Nationwide under the Agent's Agreement, now or at any time hereafter, and upon the termination of the Borrower's Agent's Agreement, such amounts due the Agent shall first be applied in their entirety to any outstanding indebtedness owed to the Payee in connection with the Loan, provided however, that this requirement shall not entitle Borrower to such Collateral if Borrower defaults on such Agent's Agreement and loses its rights to such Collateral. If Borrower's Agent's Agreement with Nationwide is terminated for any reason and a new Agent's Agreement is not promptly entered into between Nationwide and Borrower, Borrower agrees that any and all amounts due from Nationwide of any nature whatsoever, whether constituting Collateral (as hereinafter defined) or not, shall first be paid to NFCU to satisfy in full any amounts due and owing under this Loan before Borrower shall be entitled to receive any remaining proceeds.

Borrower agrees that this Note shall be binding on Borrower as an individual, and if Borrower's agency is a partnership or corporation, this Note shall also be binding on Borrower's partnership or corporation. If Borrower's agency is a partnership or corporation, Borrower agrees to submit an original executed resolution which binds the partnership or corporation to this Note.

This Note was negotiated and accepted by the parties in the State of Ohio, and the Loan to be disbursed by NFCU in connection herewith is to be disbursed from Ohio. Therefore, Borrower agrees that the State of Ohio has a substantial relationship to the transaction contemplated herein, and agrees that this Note, and the rights and obligations of Borrower hereunder, shall be governed by the laws of the State of Ohio, excluding Ohio's conflicts of law provisions.

## NOTICE OF DISCLOSURE: THIS LOAN IS MADE FOR BUSINESS PURPOSES ONLY. BORROWER UNDERSTANDS THAT PAYEE MUST DISCLOSE CERTAIN INFORMATION TO NATIONWIDE, AND NATIONWIDE MUST DISCLOSE CERTAIN INFORMATION TO PAYEE RELATING TO BORROWER'S BUSINESS OPERATONS, BUSINESS PLANS AND THIS LOAN. IN ADDITION, NATIONWIDE MAY PARTICIPATE IN THE LOAN WITH PAYEE. IF NATIONWIDE PARTICIPATES IN THE LOAN, NATIONWIDE WILL BE ENTITLED TO DISCLOSURE OF CERTAIN ADDITIONAL INFORMATION RELATED TO THE LOAN. BY EXECUTING THIS NOTE, BORROWER UNDERSTANDS THAT CERTAIN INFORMATION WILL BE DISCLOSED



BETWEEN PAYEE AND NATIONWIDE, AND BORROWER
HEREBY WAIVES ANY PRIVACY RIGHTS BORROWER
MAY HAVE IN CONNECTION WITH SUCH INFORMATION.
NOTWITH-STANDING THE FOREGOING, PAYEE WILL <u>NOT</u>
DISCLOSE   ANY   INFORMATION   TO   NATIONWIDE
RELATING TO BORROWER'S CREDIT OR INFORMATION
WHICH PAYEE OBTAINS ONLY FROM BORROWER'S
CREDIT REPORT.

<u>IMPORTANT</u>:   THE LOAN PROVIDED FOR IN THIS NOTE
SHALL   REMAIN   THE   OBLIGATION   OF   BORROWER
REGARDLESS OF WHETHER NATIONWIDE REIMBURSES
PAYEE FOR ALL OR ANY PART OF THE LOAN.   IF
BORROWER   QUALIFIES   UNDER   THE   PROGRAM   FOR
REIMBURSEMENT BY NATIONWIDE OF ONLY PART OF
THE LOAN, BORROWER SHALL REMAIN LIABLE FOR ANY
REMAINING BALANCE OF THE LOAN WHICH IS NOT
REIMBURSED BY NATIONWIDE.

AGENT:                              AGENCY:

x _B Diane Tamariz Wallace_      x __DIANE TAMARIZ + ASSOCIATES PA__
Signature of Borrower               Name of Agency
                                    (Check box of legal form of agency)
x _B Diane Tamariz Wallace_         ✓Corporation   Partnership   LLC   LLP
Name of Borrower                    Sole Proprietorship
Diane Tamariz - Wallace
X _3417 Solomons Island Rd_      x _Diane Tamariz Wallace_
Address _Edgewater Md_              Signature of Authorized Officer/Partner
              _21037_
X _19-00-11855_                  x_3417 Solomons Island Rd_
Agent #                             Address _Edgewater Md 21037_


                    DIANE TAMARIZ-WALLACE, AGENT
                    DIANE TAMARIZ & ASSOCIATES PA
                    3147 SOLOMON'S ISLAND RD.
                    EDGEWATER, MD 21037

## SECURITY AGREEMENT

For value received, the undersigned exclusive third-party agent ("**Agent**") of Nationwide Mutual Insurance Company ("**Nationwide**"), grants unto Nationwide Federal Credit Union, its successors and/or assigns ("**NFCU**"), a security interest in *all commissions, extended earnings, deferred compensation incentive credits, bonuses (including post-conversion bonuses and contingency bonuses), and any other compensation now due or becoming due in the future under the Agent's Agreement or any future Agent's Agreement executed by and between Nationwide and the Agent* (collectively, "**Collateral**"). Agent represents and warrants that no one else, other than NFCU and/or Nationwide, has any interest or claim against the Collateral that has not already been disclosed to NFCU as set forth below, including any claim of an ex-spouse by virtue of a divorce order or Qualified Domestic Relations Order ("QDRO"). Subject to any other restrictions with respect to the Collateral, Agent promises not to use the Collateral as security for a loan with any other lender, creditor or any other person until any loan or loans ("**Loan**" or "**Loans**") made to Agent by NFCU in connection with any agency business development programs sponsored by Nationwide (hereinafter, the "**Program**" or "**Programs**") is/are repaid in full, without NFCU's and/or Nationwide's prior written consent.

Upon termination of the Agent's Agreement with Nationwide, upon Agent's bankruptcy or insolvency, upon Agent's death or incompetence, if Agent fails to pay in full any Loan installment when due, if Agent provides any false information in connection with a Loan and/or Loan application process, upon a default by Agent of any other Loan under this or any other Program, or if Agent fails to provide any other or additional information required or requested by NFCU or Nationwide from time to time in connection with a Loan, Agent agrees that the entire outstanding principal balance of all Loans, plus all accrued interest and other amounts, shall become immediately due and payable, and may be deducted from the Collateral to repay all Loans in full or to the fullest extent possible. **If Agent's Agreement with Nationwide is terminated for any reason and a new Agent's Agreement is not promptly entered into between Nationwide and Agent, Agent agrees that any and all amounts due from Nationwide of any nature whatsoever, whether constituting Collateral or not, shall first be paid to NFCU to satisfy in full any amounts due and owing in connection with all Loans before Agent shall be entitled to receive any remaining proceeds.**

_____ Agent has used the following amounts of the Collateral as security for loans other than for Loans from NFCU in connection with any Programs: $_____

_____ A claim against the Collateral (other than a security interest of NFCU under any Program) has been made in the following amount: $_____, by: _____.

_X_ Agent has not used any of the Collateral as security for any other loans other than Loans with NFCU in connection with the Programs, nor have any claims been made against the Collateral by any other person.

Agent agrees that this Security Agreement shall be binding on Agent as an individual, and if Agent is a partnership or corporation, this Security Agreement shall also be binding on such partnership or corporation. If Agent is a partnership, limited liability company or corporation, Agent agrees to submit an original executed resolution with this Security Agreement which binds the partnership, limited liability company or corporation to this Security Agreement.

This Security Agreement was negotiated and accepted by the parties in the State of Ohio, and the Loan to be disbursed by NFCU in connection herewith is to be disbursed from Ohio. Therefore, Agent agrees that the State of Ohio has a substantial relationship to the transaction contemplated herein, and agrees that this Security Agreement, and the rights and obligations of the parties hereunder, shall be governed by the laws of the State of Ohio, excluding Ohio's conflict of law provisions.

Agent understands and agrees that this Security Agreement may be freely transferred and assigned by NFCU or any subsequent holder hereof.

AGENT:

X _Diane Tamary Wallace_
Signature of Agent

X _B Diane Tamariz Wallace_
Name of Agent

X _2417 Vineyard Lane_
Address _Crofton, Md 21114_

X _19-00-11855_
Agent #

AGENCY:

X _Diane Tamariz a Assoc PA_
Name of Agency
(Check box of legal form of agency)
    Corporation   Partnership   LLC   LLP
    Sole Proprietorship

X _B Diane Tamary Wallace_
Signature of Authorized Officer/Partner

X _2417 Vineyard Lane_
Address _Crofton Md 21114_

Note: *If the Agency is a corporation or LLC, a certified corporate resolution authorizing the transaction must be attached. If the Agency is a partnership or LLP, a document authorizing the transaction signed by all general partners must be attached.*

## Agency Security Compensation Assignment Approved:

Nationwide Mutual Insurance Company

By: _____

Print: _____

Its: _____

Date: _____

Certified Copy of Corporate Resolutions

X _Diane Tamariz + Associates, PA_____
                              (Name of Corporation)

I, The undersigned, hereby certify to Nationwide Federal Credit Union of Columbus, Ohio, that I am President of

X _Diane Tamariz + Associates PA_____
                              (Name of Corporation)

a corporation duly organized and existing under the laws of the State of _Maryland____; that the following is true copy of resolutions duly adopted by the Board of Directors of said Corporation on the _26th_ day of _April_____ _2005_, and that such resolutions have not been rescinded or modified.

RESOLVED, that the President is hereby authorized to establish a membership share account with Nationwide Federal Credit Union, One Nationwide Plaza, Columbus, Ohio.

RESOLVED FUTHER, that the President is hereby authorized and empowered to effect loans in the name of said Corporation, to invest funds in Credit Union share accounts; make withdrawals from time to time from any such share accounts subject to the rules and regulations of the Credit Union.

RESOLVED FUTHER, that the President may execute and deliver to said Credit Union all documents, promissory notes, security agreements, mortgages, deeds of trust, assignments, commission deduction authorizations, and any other instruments necessary to effect, or incidental to the resolutions and authorizations herein set forth.

RESOLVED FURTHER, that the foregoing resolutions shall remain in full force and effect until written notice of their amendment or rescission shall have been received by said Credit Union, and that receipt of such notice shall not affect any action taken by the Credit Union prior thereto, and

I further certify that the following resolutions are in conformity with the provisions of said Corporation Charter and By-Laws.

IN WITNESS WHEREOF, SAID _B Diane Tamariz Wallace_, President of _Diane Tamariz + Associates PA_____, acting for and on behalf of said corporation has hereunto subscribed his name and caused the seal of said corporation to be hereunto affixed this _26th_____ day of _April_____ _2005_

                              X   By _Diane Tamariz Wallace_
                                              (President)

(SEAL)



# Nationwide

Federal Credit Union

**PAYROLL AUTHORIZATION FORM**

| NAME | ACCOUNT NUMBER |
|------|----------------|
| Diane Tamariz-Wallace & Assoc, PA | 5007 |

MEMBER: To expedite the processing of your application, please complete each of the following four sections and submit this form with your application.

## 1.   PAYROLL DEDUCTION AUTHORIZATION

The authorization of payroll/commission deductions entitles you to the reduced automated interest rate.

**PAYROLL OR COMMISSION DEDUCTION AUTHORIZATION AND ASSIGNMENT**

- To Treasurer: Nationwide Mutual Insurance Company
- Nationwide Mutual Fire Insurance Company
- Nationwide Life Insurance Company
  and their affiliate organizations

I hereby authorize you to make deductions from my COMMISSIONS and any other amounts due me as specified below, and to transfer to NATIONWIDE FEDERAL CREDIT UNION any and all payments for all outstanding loans due by me to the Credit Union which are due now or hereafter, and deposit same to the account of NATIONWIDE FEDERAL CREDIT UNION.

This authorization shall include all wages, commissions, and any other compensation becoming due upon me, or any time hereafter, and at the termination of my AGENT'S AGREEMENT, such amounts due me shall be applied in their entirety to my indebtedness to NATIONWIDE FEDERAL CREDIT UNION.

Agent Compensation Assignment Approved

DIANE TAMARIZ-WALLACE, AGENT
DIANE TAMARIZ & ASSOCIATES
8147 SOLOMON'S ISLAND RD.
EDGEWATER, MD 21037

Signature

Signature  B Diane Tamariz Wallace

Date 04/26/2005      Agent # 190011865

*AVP - Agency Services*

*After loan is paid off, loan payment will continue to be deducted and automatically transferred to my primary savings account. To stop this deduction, I realize I will have to complete a deduction change form from the Credit Union.*

PAYROLL DISBURSEMENT/TERM/AUTHORIZATION FORM 8/00

EXHIBIT

33

3-4-10

## SETTLEMENT SHEET

I.  **SELLER**

    a.    Credits to Seller:
           1.  Purchase Price                                    $3,000,000.00

    b.    Deductions from Seller's Proceeds:
           1.  Escrow                                      . . . -50,000.00
           2.  Wire Fees                               . . . . . . -40.00
           3.  Promissory Note                   . . -500,000.00
           4.  Promissory Note                   . . . -250,000.00

    Total Due Seller at Closing                      $2,199,960.00

II.  **BUYER**

    a.    Buyer's Obligations:
           1.  Purchase Price                    . 3,000,000.00
           2.  Attorneys Fees (est.)            . . . . 4,580.00

    b.    Buyer's Credits:
           1.  Promissory Note                   . . -500,000.00
           2.  Promissory Note                   . . -250,000.00

    c.    Total Due from Buyer at Closing        . 2,254,580.00
           Funds on Deposit (in Escrow)       -2,260,000.00
           Excess Deposit to Buyer          . . . . -5,420.00

This settlement sheet shall constitute a bill of sale for all the stock set forth in the contract between the parties dated March 11, 2005.  Seller hereby warrants to Buyer as of the date of closing that Seller is the owner of all of the stock in the Company, consisting of 200 shares of common stock, without par value, all of which are duly authorized, validly issued , fully paid, non-assessable, and not subject to any pre-emptive rights.

The parties to this Agreement hereby agree that settlement shall be adjusted for any clerical errors.

Date: April 29, 2005

BUYER:

*B. Diane Tamariz Wallace*
B.  Diane Tamariz-Wallace

SELLER:        . . . . . . . . .

GEORGE T.  MORAN  REVOCABLE  LIVING TRUST

By: _____
     George T. Moran, Trustee

April 29, 2005
H:\Doc\BUSSALE\Tamariz\Settlement.stm.wpd

1

**DTA004208**

DRDR  004214
HPK /Tamariz-Wallace/DocRecd12.10.09

May 02 04 08:53a        Larry Cook                770-461-5798            P.1



**EXHIBIT**

34

3410

## Conversion Payment Request Form

I understand that I have purchased the George T. Moran, Inc. agency with an estimated DWP of $11,654,072.00. I have completed my evaluation and have estimated that the first fifteen (15) months, (Twenty-four (24) months for commercial) new business property and casualty direct written premium, when converted to Nationwide Mutual Insurance Company or one of its affiliates or subsidiary property and casualty insurance companies that are a party to my Agent's Agreement ("Nationwide"), will be $5,160,201 ("Converted Premium Estimate"). Based on this, I am requesting the following payments from Nationwide, subject to the conditions outlined below: *Change*

*7%*

1. Pre-Conversion Payment – A Pre-Conversion lump sum payment equal to 3% of the Converted Premium Estimate and payable upon presentation to Nationwide of a properly executed purchase agreement and other required forms.

*CF—*
*Let Jim Burrel*
*know the change*
*of "end" date*
*from 15 mos to 24.*

2. Post-Conversion Payment – A Post-Conversion Payment will be calculated as 7% of the property and casualty direct written premium from Converted Policies for the fifteen (15) month, (twenty-four (24) month for commercial) period beginning on the first day of the month immediately following the Acquisition Date ("Effective Period"), minus the pre-conversion payment. The Post-Conversion Payment will be paid within two (2) months after the Effective Period or as soon thereafter as practical.

A "Converted Policy" is defined as only those policies of the acquired agency with existing renewals that have been placed with Nationwide, as well as associated Adds and Spins.

"Adds" are defined as any additional vehicles or coverages added to a policy converted from the acquired agency.

"Spins" are defined as any new Nationwide policy that is created from a policy converted from the acquired agency.

I understand and agree that the total payments, including both the Pre and Post-Conversion Payments, will not exceed 7% of the property and casualty direct written premium of the acquired agency on the Acquisition Date.

I further understand and agree that a separate tracking number will be used to track the Converted Policies and it will not be used for any other business. Only policies in this separate tracking number are eligible for consideration for conversion payments.

I understand and agree that certain conditions in the environment and marketplace can change and that Nationwide makes no guarantee that any policy will be converted to Nationwide. These changes, including regulatory and legislative activities and rate adjustments may impact my ability to convert policies to Nationwide. Other underwriting guidelines and/or processing activities that may affect the conversion should be discussed with the State Team members and the Underwriting Officers.

I understand that the Post-Conversion Payment will not be made unless at least 90% of the number of property/casualty policies that are in force in my agency at the start of the Effective Period remain in force for the first twelve (12) months of the Effective Period.

I further understand and agree that no Post-Conversion payment will be made if the Post-Conversion payment is less than the Pre-Conversion payment (before deducting the Pre-Conversion payment from the Post-Conversion payment). In this event, I agree to reimburse Nationwide for the difference between the Pre and Post-Conversion payment amounts. Reimbursement will be made via commission deductions over a twelve (12) month period, beginning within three (3) months after the Effective Period.

** TOTAL PAGE.02 **

I understand that all business presented from the acquired agency will be treated as new Nationwide applicants and underwritten accordingly and, except for the additional payments outlined above, will be treated as any other business placed with Nationwide for the purpose of compensation. All other terms and conditions of my Agent's Agreement remain unchanged.

_____    Dec 2 2004
(Agent's Signature)                       (Date)

Based on satisfaction of the conditions outlined above, Nationwide authorizes the Conversion Payments.

_____    3/31/05
AVP-Agency Planning & Performance         (Date)



EXHIBIT
35
3-4-10

GTM meeting
Acquisition

Reminder list for Diane—meeting with Coop

1. Overview—eternally grateful for opportunity and this could well be bigger than originally believed to be.
2. Real world now after 90 days—negatives and opportunities:
   a. Negatives—90 day reality check.
      1). Commercial in Gainsville not ready—had to slow down conversions and it may get worse since Lightfoot removed and will possibly resign.
      2). The miss on the $300K case is annoying
      3). Service center—billing has been changed for every piece of business submitted and we have had to resell customers—made staff very mad.
      4). Technology a disaster—lost one key employee
      5). Training—other than Chris and Rita coming from homeoffice—non existent
      6). The licensing issue is a real barrier in this environment
      7). The technology with the other carriers are light years ahead of NW—especially Travellers—much quicker getting to market

   b. Positives:
      1). The Moran staff is far superior than ever expected
      2). The processes inside Moran are a model for commercial
      3). There is even a great opportunity than I originally realized

3. What I want:
   a. Exceptions for licensing—allow us to be NW licenced and licenced with other carriers.
   b. Eliminate the two year limit of not being able to write business into the other carriers.
   c. Extend the 15 month bonus to 18 months due to the tech and Gainsville situations
   d. We have the Applied system now...allow us to write through Allied now and give credit to all and give us proper commissions and contingencies.

4. What we will gain—we will end up writing more business (more than $5MM) for NW because we will be able to market and move business into other carriers and then move to NW...(Diane –you can clean up and add other reasons).



Dta.moran.8.4.05

**DTA005130**

DRDR  005136
HPK /Tamariz-Wallace/DocRecd12.10.09



Points to cover in meeting with Ed Cooper regarding acquisition:

A. Background-----began acquisition quest 11/03 and met with Dick Kelly 12/03. We operated from the handout/manage from that date forward...Independent Agency Acquisition Program...Agency Starter Kit dated May 2003.

B. Questions:
   1. How many IA acquisitions have been consummated in past 18 months in MD/DC/DEL since program was announced?
   2. How much IA acquisition DWP does this region have at the table today, excluding our $12MM?
   3. How much is working?

C. The Moran acquisition:
   1. DTA has brought this potential acquisition to the table by it own efforts.
   2. Moran is ready to sell to DTA.
   3. The LOI letter has been signed. The bonding and trust between the parties is very apparent. The business philosophies of running a business are a perfect match.
   4. Is this $12MM acquisition, which is 90% convertible, something NW wants? It appears to be in concert with the corporate directive of growth.
   5. Is the loss ratio within the guidelines? The answer is yes.
   6. Is the mix sufficient for NW appetite?
   7. Are there any stumbling blocks with what you all have seen that would stand in the way of this acquisition taking place in next 30-45 days for DTA?
   8. Are any other NW agents or is NW Corporate by itself or through another agent competing with DTA over the Moran acquisition?
   9. Hs there been any contact we are unaware of?
   10. Is there anything we should know before proceeding with the next step?
   11. Are funds available to DTA from NW in the $2.6MM to $3MM range?

D. Sequence of events:
   1. Nowhere in the acquisition packet was DCIC ever tied to the amount of money available for acquisitions. Only a mention of collateral in a later website. The is discriminatory in scope—limiting market share purchase under program only to large agencies or very mature agencies preparing for retirement.
   2. When Diane signed the "Agency Growth Plan" never did she think it would inhibit her opportunity to grow business, especially in the acquisition mode. In fact, there is an oxymoron here...how do you grow in accord with the Corporate directive but be limited via a frozen DCIC. The point is the only agents that would have $1MM to $2MM in their DCIC would be very large (and probably not

CRMG   000327
HPK/NATIONWIDE/Tamariz/Docs Received from Wallace

growth agencies) or those ready to retire.  These re not the agents NW should want as future leaders.  Therefore the policy is incongruous.

3. Ed Cooper said in his visit to Diane's Edgewater office—"we'll carry your acquisition to the goal line"---are we all on the same team and is this still the objective?

4. This is a $12MM acquisition and we have done all the work.  Then we find out NW is selectively marketing for preferred NW agents in the agent's name.  At the same time, we were never contacted nor told about this activity...we were told we were exclusive in AA County.....because nothing was happening there and there was no activity.......is this true or not?

5. DTA is getting mixed corporate signals:

    a. sale management says...DTA you have AA county and NW will not mail on top of you but you stay out of the rest of the state.

    b. Until NW can coordinate efforts, stay out of Columbia, MD but OK to mail Howard County.  Then after August OK to mail Suffolk County in Delaware.

    c. Moran info stays in regional hands for two weeks before being analyzed.

    d. Underwriter comes form Gainesville (thanks to Patrick) and we appreciate Bill Lightfoot's efforts.

    e. Casual help from Larry Cook.......he did mention DCIC in passing but did not say it was dollar for dollar....(usually collateral is a multiple).

    f. Mike Weisburger—NWCU...very helpful but no discussion about DCIC...his big point was bring it in.....we are aggressively pressing forward and there are more incentives on the way to encourage acquisitions---he also emphasized the five year plan but that the Credit Union was there with funding for worthy purchases.

    g. DTA engages our own CPA and tax lawyer.

    h. DTA engages WFG Capital Advisors to do preliminary "due diligence".

    i. Tim Riggins ---we introduce Tim to WFG and he seems to be fascinated about PA engagement with WFG more than our deal.  We happen to be paying WFG.

    j. Reggins tells Diane she may need Plan "B" regarding additional financing...and said DCIC is one to one lending power and that we need more money for outside sources to make a deal.  The restrictor is news to us.  All lights had been green until this and one other later instance.  I went immediately to Mike Weisburger and will attempt to speak with him Tuesday.

k. DTA takes great pains to keep this acquisition under raps...
l. So far lip-service from Jim HoltKamp
m. Riggins releases email to numerous people naming the Diane and Moran......in a self serving email....
n. Diane immediately confronts Riggins regarding confidentiality and he releases a second "ass covering" email insisting on confidentiality.
o. Friday afternoon (9.3) one day before Labor Day holiday— DTA gets LOI signed by Moran...
p. One hour after that meeting (12 hours after Riggin's self serving email) Moran informs Diane that he got an unsolicited phone call from Cathy Bye (FRIDAY afternoon before a holiday).....stating that she understood George was retiring and that NW was providing agents money to buy IA's.  George told us early on in our process, he did not like Cathy nor her methods and would never sell to her. However a less scrupulous seller could have used Cathy as a leverage against DTA.......This is not in the best interest of NW.....now the growth goals set forth.
q. Diane confronted Riggins and he said it was coincential...
r. Dick Kelly said the same thing...Dick could not believe events......we think not....loose lips sink ships.......we think Cathy got a call from Gainsville or possibly corporate in Annapolis......someone broke rank......
s. Riggins admits NW mailing for selected agents for acquisitions........NW guilty of playing both sides against other.....

Conclusion.......we are not happy with the sales support thus far with this acquisition.......we have done the hard work and with the company objectives as our guide.  Corporate in Annapolis has been a hinderance.......Ed we hope you can reverse this.....because our trust level is somewhat low....in that we have gone this far...spent a lot of money and effort to find---lots of people dropping the ball.  Can you get this ship turned in the right direction?

CRMG    000329
HPK/NATIONWIDE/Tamariz/Docs Received fromWallace



EXHIBIT

37

3-4-16

*NW/Agcy Meeting*

Outline for meeting with Ed Cooper --- 8.8.05

1. Overview – we are eternally grateful for the opportunity to make this acquisition and are pleased with the state support to get the sale to the table. However this could be a much bigger opportunity to increase market share than originally believed.
2. Real world now after 90 days – opportunities, positives, recommendations, observations and sales forecast for balance of 2005 and 2006.
3. The sales forecast – I anticipate $3,000,000 in new DWP this year form the combined enterprise of DTA and Moran. In 2006, providing the following recommendations are followed – I predict we can generate $6,100,000 in new DWP – ($5,800,000 in commercial).

   a. Positives:
      1). The Moran staff is far superior than expected.
      2). Moran relationship with customers is excellent.
      3). The Moran financials are very strong.
      4). The processes inside Moran are a model for commercial and Best Practices.
      5). Patrick has really stepped up with aggressive pricing although he is beginning to wear thin.
      6). There is even greater opportunity than I originally realized for Nationwide.
   b. What I want:
      1). The need to be a hybrid in order to generate and own more market share, preparatory for transition to NW.
      2). Exceptions for licensing – allow us to be NW licensed and licensed with our other carriers for at least five years, re-evaluated in three years.
      3). Move back the two year associate limitation of not being able to write business into other carriers to five years.
      4). Confirm the 15 month acquisition bonus reconciliation to be 24 months due to the book being primarily commercial as originally agreed. Further due to the slow start-up the 24 months should be moved to 27 months.
      5). Overall on technology, we have the Applied system. Allow us to write through Allied online now.
   c. Observations:
      1). Commercial in Gainesville is not ready – I had to slow down conversions and it may get worse since Lightfoot has been removed and will possibly resign. There are some serious commercial staffing issues in Florida.
      2). The Gainesville miss on the $300,000 case was crippling.
      3). Personal lines in Gainesville – is not totally prepared...I think they are training on our work...the response has been slow.

**DTA005144**

DRDR  005150
HPK /Tamariz-Wallace/DocRecd12.10.09

4). Service center – billing has been screwed up – billings have been issued incorrectly on multiple policies --- quote at one price, released to customer at a significantly higher price. This has created credibility issues with the staff, me and the customers.

5). Technology has been disaster – lost two key employees.

6). Training – other than Dick quoting with me and offering his limited assistance plus Jim's call to HO to get Rita Kirk and Chris Dalrymple here three days last week, the training has been non-existent.

7). I have the impression that personal line has an attitude problem – people are not thinking global and that we have purchased a book of business…they continue to think one and two policies at a time. In commercial service center there is truly a lack of communication.

8). The licensing issue is a real barrier in this environment.

9). The technology with the other carriers are light years ahead of NW – they are all web based and real time coordinated for underwriters, billing and claims. We do our own credit underwriting outline. Field underwriting authority is another plus in the IA world. These departments are not segmented. The end result is the other carriers can get to market much quicker than in our system and they are ahead of us. Their billing is ahead of us 60 days out, therefore we have to work 90 days out on renewals.

4. Conclusions:

  a. Take the handcuffs off and we will develop more market share for Nationwide.

  b. We are positive about another acquisition but the reality is we need the dual culture to maximize market control.

  c. We would have the best of both worlds and Nationwide would be the benefactor.

  d. Our objective is to present a "real world" solution now that we have been in this role for 90 days and we are still learning. I need a little more freedom since I am suffering from a culture shock. I need to feel that I have a complete backing nationwide management.

5. Ed, thank you for your time…let's move forward.

Ed.cooper.DTA.Moran.8.7.05

**DTA005145**

DRDR 005151
HPK /Tamariz-Wallace/DocRecd12.10.09



EXHIBIT

_____38____

3-4-10



James E. Holtkamp
Sales Officer
Mid Atlantic Region
Phone: Phone: 410-972-2875
Fax: 410-972-2938
Annapolis, Maryland
08/09/2005 07:28 PM

To:      Diane Tamariz/MD08984/NWAGENT@NWAgent
cc:      Timothy R Riggins/Nationwide/NWIE@NWIE, Jennifer E
Bernstein/Nationwide/NWIE@NWIE, Sharon M
Hearn/Nationwide/NWIE@NWIE, Alvin L
bcc:
Subject:
License Appointments

Diane,

As you progress with the acquisition conversion, I understand that issues and challenges have surfaced that need to be addressed. I hope that we can get many of them out and work on resolutions as we get together on Friday.

I have received feedback that the time spent in your office by the HO trainers was useful for all parties involved. I have expressed my appreciation to the Tech Officer Melissa Lovely for getting those resources out to your office.

In addition, I would like to assist you in regards to the dual appointments for some of your existing office staff. The Mid Atlantic Region will support the direct appointment of existing DTA employees with the carriers involved in the acquisition. This will be a variation of the NW IAA program which allows for the acquired associates only to maintain dual appointments. The following parameters will need to be followed:

- Provide a list of the current DTA service personnel that need the dual appointments and the companies to which they are to be appointed to your Sales Manager.
- The scope of the appointments would be for service of acquired business only. No new business.
- These direct appointments can be maintained until April 1st, 2007 which is the extended conversion period of the acquisition.

A copy of this memo will be placed in the acquisition file and we will follow up on the termination of these appointments at the end of the conversion period, specifically the date note above.

I hope that this will provide some amount of relief for challenges that exist today, but I am confident that between yourself, Sales Management, and our Service center partners that we will continue to make this a success for you.

Regards,

Jim

EXHIBIT
39
3-4-10

**Dave Wallace**

| | |
|---|---|
| **From:** | Dave Wallace |
| **Sent:** | Thursday, November 05, 2009 5:05 PM |
| **To:** | 'skeener@tedards.net' |
| **Subject:** | FW: Your Personal Checking |

-----Original Message-----
From: Todd Simpson [mailto:tsimpson@crmginc.com]
Sent: Tuesday, November 22, 2005 11:34 AM
To: Dave Wallace
Subject: Your Personal Checking

Dave,
We need to do something about you personal checking account. Unless we can get some type of constant cash flow in there, I really don't know what else to do. I don't mind doing it for your but juggling 3 cash strapped entities is becomming increasingly difficult as the $$ is becomming more and more scarce. I don't know what is going on with AB&T you need to call them and discuss some of the transactions with them. It appears that they charged an overdraght on 11/21 when there was a deposit made 11/18. Also they are withdrawing money before they are making deposits, is this normal?? I've never encountered this problem with my banks: Bank of America or Navy Federal Credit Union. The bank fees are becomming a killer & it is mostly due to constantly juggling money. We need to form a game plan or Diane is going to hang us out to dry!!!
T

**DTA005736**

DRDR 005742
HPK /Tamariz-Wallace/DocRecd12.10.09

# CORPORATE ASSOCIATE AGENT AGREEMENT

This agreement is between the Nationwide Insurance Companies (hereinafter referred to as "Nationwide") and *DIANE TAMARIZ & ASSOCIATES, PA* (hereinafter referred to as "Agent") and *MORAN INSURANCE SERVICES, INC* as a Corporate Associate Agent (hereinafter referred to as Corporate Associate Agent), and is effective on August 26, 2005. Corporate Associate Agent is a Corporation with B Diane Tamariz-Wallace as President and majority shareholder.

Agent is an independent contractor agent of the Nationwide Insurance Companies and has an active Agent's Agreement setting forth the specific terms of the relationship. Nothing herein should be considered in conflict with the Agent's Agreement and if such conflict occurs, the Agent's Agreement prevails. Agent and Corporate Associate Agent have reached agreement whereby Corporate Associate Agent will work solely for Agent and Corporate Associate Agent is subject to *all* of the terms of Agent's Agreement with Nationwide including, but not limited to, exclusive representation, brokerage, and the no-competition and no-solicitation provisions.   Only DIANE TAMARIZ & ASSOCIATES, PA and MORAN INSURANCE SERVICES, Inc (represented only by B Diane Tamariz-Wallace President and majority shareholder), may represent and sign for Corporate Associate Agent with respect to this agreement. Any employee or representative of Corporate Associate Agent who may represent or sign for Corporate Associate Agent with respect to any transactions to which Nationwide is a party must also be appointed by Nationwide as an associate agent and enter into a separate associate agent agreement between Nationwide, Agent, and the associate agent. *No compensation will be paid to* Corporate Associate Agent *by Nationwide* and all business will be credited to Agent. Agent is solely responsible for compensating Corporate Associate Agent.

In consideration for Nationwide agreeing to appoint Corporate Associate Agent to lawfully represent Nationwide for the following lines of insurance:

☑ Personal Lines Property and Casualty    ☑ Life and Health    ☑ Variable Annuity

☑ Commercial Lines Property and Casualty    ☑ Nationwide General    ☑ Variable Life

Agent and Corporate Associate Agent further agree to the following:

1. Nationwide has the right to cancel the appointment of Corporate Associate Agent at any time, with or without cause. Furthermore, the cancellation of Agent will automatically cause Corporate Associate Agent 's appointment to be cancelled. Nationwide has the right to cancel Agent due to the acts or omissions, with our without cause, of Corporate Associate Agent.

2. B Diane Tamariz-Wallace will remain both President and majority shareholder of MORAN INSURANCE SERVICES, Inc    if his status as President or majority shareholder of MORAN INSURANCE SERVICES, Inc. ceases, this agreement will terminate.

3. The training, expenses, and activities of Corporate Associate Agent are Agent's responsibility and not Nationwide's.

4. Agent is responsible for obtaining Errors and Omissions coverage for all employees and representatives of Corporate Associate Agent who represent Nationwide in any transactions.

5. Agent certifies that Corporate Associate Agent meets the statutory standards set forth for the requested appointment. Agent understands that Nationwide will rely on Agent's certification and Agent agrees to hold Nationwide harmless if there are liabilities which result from the certification, including the cost of defense and or judgment arising out of any claim, litigation, or other action related to this appointment or the arrangement between Agent and Corporate Associate Agent.

6. Agent acknowledges the Associate Agent Policy as outlined in the Agency Administrative Handbook as exists from time to time and agrees that such policy is applicable to Agent and Corporate Associate Agent.

7. Agent is required to have a two-party agreement with the Corporate Associate Agent, which enables Agent to protect and enforce his rights outlined in the Agent's Agreement. Agent must be willing to enforce these rights with assistance from Nationwide.

**EXHIBIT**

40

3-4-10

08/29/2005  16:00   4105446834              MORAN INSURANCE                    PAGE  03

# CORPORATE ASSOCIATE AGENT AGREEMENT

I have read the terms of this Agreement and these terms are contractual and not a mere recital. Authority to represent Nationwide for lines of insurance not checked in this Agreement may be secured by Agent's written request and subsequent written approval by the Sales Manager or other Nationwide Company Representative.

Aug 26 2005
_____
Date

*B Diane Tamariz-Wallace*
DIANE TAMARIZ & ASSOCIATES, PA

Aug 26 2005
_____
Date

*B Diane Tamariz-Wallace*
MORAN INSURANCE SERVICES, INC

On behalf of the Nationwide Companies identified herein, I agree to authorize the appointment of Corporate Associate Agent under the conditions and representations expressed.

NATIONWIDE MUTUAL INSURANCE COMPANY
NATIONWIDE MUTUAL FIRE INSURANCE COMPANY
NATIONWIDE LIFE INSURANCE COMPANY
NATIONWIDE GENERAL INSURANCE COMPANY
NATIONWIDE PROPERTY AND CASUALTY INSURANCE COMPANY
NATIONWIDE LIFE AND ANNUITY INSURANCE COMPANY
NATIONWIDE ASSURANCE COMPANY
NATIONWIDE INSURANCE COMPANY OF FLORIDA
COLONIAL COUNTY MUTUAL INSURANCE COMPANY
NATIONWIDE LLOYDS

8-29-05
_____
Date

_____
Sales Manager

- 2 -

Dear Insurance Licensee:

Enclosed is your new License.

Please use your new License number, your name as it appears on your License, and your Social Security number whenever calling or writing to the Maryland Insurance Administration.

Any update to the information given on your original application must be reported to Maryland Insurance Administration within thirty (30) days of the change.

You must remain current on, and comply with, all Continuing Education requirements for any License and lines of insurance that you hold. Please see the Maryland CE regulation for details.

Should you have any questions or concerns regarding your Maryland Insurance License, please call The Maryland Insurance Administration at 1-888-204-6198 between 8:00AM and 5:00PM EST Monday through Friday, or write to The Maryland Insurance Administration, 525 St.Paul Place Baltimore, MD 21202

Sincerely,

The Maryland Insurance Administration

---

**MARYLAND INSURANCE ADMINISTRATION**
**INSURANCE LICENSE**

LICENSE NUMBER
**RPF 99936696**

DATE OF ISSUANCE
Effective: 09/15/2005
Printed:   09/16/2005

**THIS IS TO CERTIFY THAT**
**MORAN INSURANCE SERVICES, INC.**
**696 RITCHIE HIGHWAY**
**SEVERNA PARK, MD 21146**

has met the requirements established by the Maryland Insurance Administration
to be qualified for a license as a(n)
**Resident Producer Firm**
This license qualifies the licensee for the following lines of insurance (issue date)

| Variable 09/15/2005 | Property 09/15/2005 | Life 09/15/2005 |
| Health 09/15/2005 | Casualty 09/15/2005 | |

Date of Expiration
09/14/2007

VOID IF ALTERED NON - TRANSFERABLE

Insurance Commissioner

# STATE OF MARYLAND
## Department of Assessments and Taxation

I, PAUL B. ANDERSON OF THE STATE DEPARTMENT OF ASSESSMENTS AND TAXATION OF THE STATE OF MARYLAND, DO HEREBY CERTIFY THAT THE DEPARTMENT, BY LAWS OF THE STATE, IS THE CUSTODIAN OF THE RECORDS OF THIS STATE RELATING TO THE FORFEITURE OR SUSPENSION OF CORPORATIONS , OR OF CORPORATIONS TO TRANSACT BUSINESS IN THIS STATE, AND THAT I AM THE PROPER OFFICER TO EXECUTE THIS CERTIFICATE.

I FURTHER CERTIFY THAT MORAN INSURANCE SERVICES INC. IS A CORPORATION DULY INCORPORATED AND EXISTING UNDER AND BY VIRTUE OF THE LAWS OF MARYLAND AND THE CORPORATION HAS FILED ALL ANNUAL REPORTS REQUIRED, HAS NO OUTSTANDING LATE FILING PENALTIES ON THOSE REPORTS, AND HAS A RESIDENT AGENT. THEREFORE, THE CORPORATION IS AT THE TIME OF THIS CERTIFICATE IN GOOD STANDING WITH THIS DEPARTMENT AND DULY AUTHORIZED TO EXERCISE ALL THE POWERS RECITED IN ITS CHARTER OR CERTIFICATE OF INCORPORATION, AND TO TRANSACT BUSINESS IN MARYLAND.

IN WITNESS WHEREOF, I HAVE HEREUNTO SUBSCRIBED MY SIGNATURE AND AFFIXED THE SEAL OF THE STATE DEPARTMENT OF ASSESSMENTS AND TAXATION OF MARYLAND AT BALTIMORE ON THIS AUGUST 29, 2005.

Paul B. Anderson
Charter Division



*301 West Preston Street, Baltimore, Maryland 21201*
*Telephone Balto. Metro (410) 767-1340 / Outside Balto. Metro (888) 246-5941*
*MRS (Maryland Relay Service) (800) 735-2258 TT, Voice*
*Fax (410) 333-7097*

R3572860

Moran Insurance ~~& Financial~~ Services Inc.

## ARTICLES OF INCORPORATION

**FIRST:** I, Brenda Diane Tamariz-Wallace, whose post office address is 696 Ritchie Highway, Severna Park, Maryland 21146, being at least Eighteen (18) Years of age, hereby form a corporation under and by virtue of the General Laws of the State of Maryland.

**SECOND:** The name of the Corporation (hereinafter called the "Corporation") is:

(and/or)

## Moran Insurance ~~& Financial~~ Services Inc.

**THIRD:** The Corporation shall be a CLOSE Corporation as authorized in Title four of the Annotated Code of Maryland as limited by Section 5-104 of the Corporations and Associations Article of the Annotated Code of Maryland, as amended.

**FOURTH:** The purposes for which the Corporation is formed are:

(1) To carry on and conduct a general insurance and surety brokerage business in all of its branches, acting as agents, solicitors, managers, brokers, or otherwise in connection with soliciting and receiving applications and premiums for all kinds, nature and description of insurance and bonds, and to do such other business as may be delegated to agents and/or brokers by insurance and or Surety companies.

(2) To carry on, operate and transact for itself, or for the account of others, the business of a general insurance agency, solicitor, brokerage firm, to sell all types, kinds, nature and description of insurance and surety bonds authorized by law.

(3) To do anything permitted by Section 2-103 of the Corporations and Associations Article of the Annotated Code of Maryland, as amended from time to time.

**FIFTH:** The post office address of the principal office of the Corporation in this State is 696 Ritchie Highway, Severna Park, Maryland 21146. The name and post office address of the Resident Agent of the Corporation in this State is Brenda Diane Tamariz-Wallace 696 Ritchie Highway, Severna Park, Maryland 21146.

**SIXTH:** The total number of shares of capital stock which the Corporation has authority to issue is five Thousand (5,000) shares, with no par value.

**SEVENTH:** After the completion of the organizational meeting of the directors, and the issuance of one or more shares of stock of the Corporation, the Corporation shall have no Board of Directors. Until such time, the Corporation shall have one Director whose name is: Brenda Diane Tamariz-Wallace.

IN WITNESS WHEREOF, I do hereby acknowledge these Articles of Incorporation to be my act as of this _26_ day of _Aug_, 2005.

WITNESS:

_Todd Simpson_

_Brenda Diane Tamariz-Wallace_
Brenda Diane Tamariz-Wallace, Incorporator

I hereby consent to act as resident agent

**EXHIBIT**

4/

3-4-10

July 13, 2005 agenda

1. Diane overview…first 60 days

2. George overview…first 60 days

3. Review of rollover volume to NW
   a. what has happened in last 60 days
   b. expiration list for July, August, Sept & Oct.
   c. the next four months on Diane's desk first of each month
   d. are we on track to move $5.2MM to NW—looks like after 90 days we need to move up to $400 to $500 or more a month for next 12 months.

4. Ex customer list (company name, contact, address, phone number, old expiration date and old DWP)…George who is valid to pursue?

5. Employee reassignments
   a. Shelley
   b. Jill
   c. Todd

6. Housekeeping issues…
   a. light bulbs out in several areas
   b. a/c not adequate and it simply needs to be cooler in the office
   c. tree needs to be trimmed so Moran sign can be seen going Northbound

7. Accounting recap for the year end close…..with George/Joan/Diane/Todd/Craig/Dave

7. Guidelines for business placed from DTA to Moran..and vise versa

8. Action plan regarding:
   a. Assistance for Diane and training
   b. Todd moving in space on first level—furniture etc.
   c. Diane's training on the brokered side
   d. Diane's introduction to major clients

9. Action plan regarding personal lines acquisition—commercial targets

10. Any unfinished business….

11. Diane recap…

EXHIBIT

42

3-4-10

| | |
|---|---|
| TO: | Dick Kelly |
| FROM: | Diane Tamariz-Wallace<br>Dave Wallace |
| RE: | Larry Cook's Independent Agency Acquisition Letter and<br>Conversion Payment Request Form of May 4, 2005 |
| DATE: | 11.18.05 |

Dick, thank you for bringing our concerns and observations to the State Team.

Following are our points:

- **This agreement was written from a personal lines perspective not a commercial perspective.**

- The third paragraph of Larry's letter refers to "a minimum of 90% of the original personal lines PIF within your agency at the time when you begin converting policies purchased from the IA to Nationwide. Nationwide will use the 5/2/05 sales results report as a starting point. If the 4/30/07 sales results show a reduction in personal lines PIF of the original agency below 90% of the personal lines PIF in force as of the 5/2/05 sales results report, you _will not qualify for the post-conversion bonus._ **First of all, this was never discussed with us prior to the acquisition. Second, the acquisition was 90% commercial. Third, while the letter says personal lines, the form presented for us to sign states P&C (para. #9-of the Conversion Payment Request Form) "at least 90% of the number of property/casualty policies that are in force in my agency at the start of the Effective Period remain in force for the first twenty four (24) months of the Effective Period." Our point is, the 90% rule was never discussed with us prior to acquisition. This is a commercial lines acquisition. Our question is what relationship does DTA's personal lines retention or PIF have to do with this new opportunity? Therefore, our request is that this point should be eliminated.**

- The Conversion Payment Request Form—(para #3). "As a point of clarification, the bonus applies to Term 1 and Term 2 for auto and Term 1 for all other lines of business." **During 24 months, commercial is two terms if originally converted. There appears to be a conflict here.**

- Paragraph #4—"A Converted Policy" is defined as only those policies of the acquired agency with existing renewals that have been placed with Nationwide, _as well as associated Adds and_

_Spins._" -----Redefine with more commercial book opportunity in mind. For example audits for WC and GL policies need to reconcile as part of the DWP count.

- Paragraph #5—" Adds are defined as any additional vehicles or coverages added to a policy converted from the acquired agency." **The definition of add should include policies added to complete the commercial account, or derived from the original converted policy.**

- Paragraph #6—"Spins are defined as any new Nationwide policy that is created from a policy converted from the acquired agency." **This is most applicable to personal auto but should also apply to commercial related business.**

- Paragraph #7—"I further understand and agree that a _separate tracking number will not be used for any other business._ Only policies in this separate tracking number are eligible for consideration for conversion payments." **The tracking process has been very poor and cumbersome. The reports do not reflect our true efforts. How does this tracking issue affect our contingency bonus calculation? Due to the licensing legalities necessary two tracking numbers had to be established on top of the original one.**

- Paragraph #8—"I understand and agree that certain conditions in the environment and marketplace can change and that Nationwide _makes no guarantee that nay policy will be converted to Nationwide._ These changes, including regulatory and legislative activities and rate adjustments may impact my ability to convert policies to Nationwide. _Other underwriting guidelines and/or processing_ activities that may affect the conversion should be discussed with the State Team members and Underwriting Officers. **The due diligence was conducted December of 2003 and January 2004—which is 17 months prior to settlement. The yardstick is rather stale and the underwriting appetite has changed, however we are being held accountable on a very old due diligence. Pulling out of certain large markets has penalized our opportunities upon which the purchase was based. Our request is to level the playing field and offset $1 for $1 with new premium in alternative acceptable lines. Not only will this affect us but it will be a basis for consideration in future commercial acquisitions for other agents. It is a win/win for both Nationwide and the agency.**

- Paragraph #9—"I understand that the Post-Conversion Payment will not be made unless _at least 90% of the number of property/casualty policies that are in force in my agency at the start of the Effective Period remain in force for the first twenty four (24) months of the Effective Period._ **Questions—(1) my agency—DTA and/or Moran Insurance Services?? (2) What is the magic**

PIF??  (3) Dependent relationship between two PIF for DTA. DWP for Moran.  As stated earlier, we recommend this be eliminated. (4) Here is another issue-- DTA and Moran Insurance Services have separate primary ID numbers—what does that do to the contingency bonus tracking and loss ratio tracking?  How is the system going to accurately report those numbers so that my contingency bonuses are correct?  There are further issues of reporting new business premium, retention etc. that will be impacted.  Will DTA and Moran reporting mechanism be corrected so as to accurate my true effort?

- Paragraph #10—" I further understand that no Post-Conversion payment will be made if the Post-Conversion payment is less than the Pre-Conversion payment (before deducting the Pre-Conversion payment from the Post-Conversion payment).  In this event, I agree to reimburse Nationwide for the difference between the Pre and Post-Conversion payment amounts.  Reimbursement will be made via *commission deductions over a twenty four (24) month period*, beginning within three (3) months after the Effective Period. **This should be negotiable due to the size of the repayment, further the deduction can not be taken from DTA since DTA does not own Moran Insurance Services, Inc. In the unlikely event the acquisition bonus should become a loan, and then a separate repayment arrangement will need to be made with the agent individually.**

All parties agreed that it is logical to extend the agency acquisition bonus and dual licensing from 15 months to 24 months due to the commercial term of 12 months and having two opportunities to convert.  I believe due to the amount of stumbling that has occurred, this period should be extended to 36 months for the conversion, dual licensing and the agency acquisition bonus.  Further, in the spirit of fairness, consideration goes both ways, in that should the period end in 24 months potential conversions dry up (due to the IA carriers possibly canceling contracts) therefore the extension is not a one way deal—in that this works for both parties regarding the extension.

In conclusion, we look forward to resolving these concerns as a team.  Further I would like my agency acquisition reimbursement money refunded to me ASAP without holding this agreement as hostage.  We will work through the term of the agreement but once again, in all fairness that money is unfair leverage in a contract that does not apply to this situation.



**EXHIBIT**

43

3-4-10

GTM
ACQ

## Conversion Payment Request Form

I confirm that I purchased the George T. Moran, Inc. located at 696 Ritchie Highway, Severna Park, MD 21146. I completed an evaluation and estimated that the first 24 months new business property and casualty direct written premium, when converted to Nationwide Mutual Insurance Company or one of its affiliates or subsidiary property and casualty insurance companies that are a party to my Agent's Agreement ("Nationwide"), would be $5,160,201.00 ("Converted Premium Estimate"). Based on this, Nationwide made the following payment to me, subject to the conditions outlined below:

1. <u>Pre-Conversion Payment</u> – A Pre-Conversion lump sum payment equal to 7% of the Converted Premium Estimate, which was $361,214.07.

   A "Converted Policy" is defined as only those policies of the acquired agency with existing renewals that have been placed with Nationwide, as well as associated Adds and Spins.

   "Adds" are defined as any additional vehicles or coverages added to a policy converted from the acquired agency.

   "Spins" are defined as any new Nationwide policy that is created from a policy converted from the acquired agency.

   "Direct Written Premium" or "DWP" is the total property and casualty direct written premium.

   "Effective Period" is May 1, 2005 to April 30, 2007.

In the event that I fail to meet the Converted Premium Estimate outlined above by the end of the Effective Period, I agree to reimburse Nationwide for the difference between the Pre-conversion payment and 7% of the amount of actual converted premium. Reimbursement will be made via commission deductions over a twenty four (24) month period, beginning within three (3) months after the Effective Period.

Due to not using a separate tracking number to track converted policies, I further understand and agree that the total amount of converted premium will be determined by the amount of my agency's new business DWP written during Effective Period, minus $1,213,506.26 of my agency's new business DWP which reflects an estimate of the amount of new business I would have written during this period without the merger.

I understand and agree that certain conditions in the environment and marketplace can change and that Nationwide makes no guarantee that any policy will be converted to Nationwide. These changes, including regulatory and legislative activities and rate adjustments may impact my ability to convert policies to Nationwide. Other underwriting guidelines and/or processing activities that may affect the conversion should be discussed with the State Team members and the Underwriting Officers

I understand that the I must reimburse Nationwide the Pre-Conversion Payment if less than 90% of the number of property/casualty policies that are in force in my agency at the start of the Effective Period remain in force at the end of the Effective Period.

I understand that all business presented from the acquired agency will be treated as new Nationwide applicants and underwritten accordingly and, except for the additional payments outlined above, will be treated as any other business placed with Nationwide for the purpose of compensation. All other terms and conditions of my Agent's Agreement remain unchanged.

**DTA007425**

## Conversion Payment Request Form

I agree and acknowledge that this Conversion Payment Request supersedes and hereby terminates any other Conversion Payments Requests entered into by me and relating to my acquisition of the agency stated above.

_Diane Tamariz Wallace_                    4/13/06
(Agent's Signature)                           (Date)

Based on satisfaction of the conditions outlined above, Nationwide authorizes the Conversion Payments.

_[signature]_                              4/28/06
(AVP-Agency Planning & Performance)          (Date)

Page 2 of 2

APR 13 2006 11:24

**DTA007426**

4105446934        PAGE.02

** TOTAL PAGE.02 **   DRDR  007422
HPK /Tamariz-Wallace/DocRecd12.10.09